# No. 25-1385

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

KELLY MILLIGAN, on behalf of himself
and all others similarly situated,

*Plaintiff-Appellant*,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; BANK OF
AMERICA CORPORATION; JOHN/JANE DOE 1, the Senior Vice
President-Human Resources Global Banking and Global Wealth and
Investment Management Administration at Bank of America Corp.,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Western District of North Carolina,
Case No. 3:24-cv-00440, Hon. Kenneth D. Bell

---

## BRIEF FOR PLAINTIFF-APPELLANT

---

John S. Edwards, Jr.
AJAMIE LLP
711 Louisiana, Suite 2150
Houston, TX 77002
(713) 860-1600
jedwards@ajamie.com

Robert A. Izard, Jr.
IZARD, KINDALL
& RAABE, LLP
29 South Main St., Suite 305
West Hartford, CT 06107
rizard@ikrlaw.com

Mathew P. Jasinski
Riley Breakell
MOTLEY RICE LLC
20 Church St., 17th Floor
Hartford, CT 06103
(860) 882-1681
mjasinski@motleyrice.com
rbreakell@motleyrice.com

May 27, 2025                               *Counsel for Plaintiff-Appellant*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 25-1385        Caption: Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kelly Milligan
(name of party/amicus)

who is _____ the appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
   If yes, identify all such owners:

i

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Mathew P. Jasinski        Date: _____ 05/27/2025 _____

Counsel for: Appellant Kelly Milligan

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ..........................................................3

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE ...............................................................4

     I.    Statement of Facts ..............................................................4

          A.    Merrill pays advisors cash and deferred commissions..5

          B.    Merrill pays FAs their deferred compensation after their employment ends but cancels the deferred compensation when an FA joins a competitor. ..............7

          C.    Merrill pays FAs awards that are different from the commission-based deferred compensation...................10

     II.    Procedural History ...............................................................11

SUMMARY OF THE ARGUMENT .......................................................14

STANDARD OF REVIEW...................................................................17

ARGUMENT ...................................................................................18

     I.    The Plan "results in" the deferral of income to periods extending to the termination of employment or beyond. .....18

          A.    ERISA's definition of an "employee pension benefit plan" in Subsection (ii) focuses on results, not purpose. ....................................................................18

               1.    The plain language of Subsection (ii) covers plans based on their effects. ..........................................19

2.    Legislative history and statutory structure confirm that § 1002(2)(A)(ii) establishes a results-based test. ..........................................................24

B.    The undisputed evidence shows that the Plan results in substantial post-employment payments. ................27

1.    The Plan involves "a deferral of income." ...........28

2.    The Plan "results in" a deferral of income for periods extending to the termination of covered employment or beyond........................................29

II.    The DOL's bonus-program regulation is inapplicable..........38

A.    Awards are deferred compensation, not bonuses. .......38

B.    The DOL cannot override ERISA's statutory definition through regulation. ......................................49

CONCLUSION ....................................................................55

REQUEST FOR ORAL ARGUMENT....................................................56

CERTIFICATE OF COMPLIANCE ......................................................57

CERTIFICATE OF SERVICE....................................................58

ADDENDUM: RELEVANT STATUTES & REGULATION .................A1

# TABLE OF AUTHORITIES

## Cases

*Bartenwerfer v. Buckley*,
    598 U.S. 69 (2023) ................................................................ 25

*Berry v. Wells Fargo & Co.*, No. 3:17-00304-JFA,
    2018 WL 9989754 (D.S.C. Oct. 9, 2018) ............................ 37

*Boyer-Liberto v. Fontainebleau Corp.*,
    786 F.3d 264 (4th Cir. 2015) .............................................. 17

*Burrage v. United States*,
    571 U.S. 204 (2014) ...................................................... 20, 50

*Callan v. Merrill Lynch & Co., Inc.*, No. 09 CV 0566 BEN (BGS),
    2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) ................ 48, 49

*Campbell v. Hewitt, Coleman & Assocs., Inc.*,
    21 F.3d 52 (4th Cir. 1994) .................................................. 17

*Emmenegger v. Bull Moose Tube Co.*,
    197 F.3d 929 (8th Cir. 1999) ............................ 46, 47, 48, 54

*Greene v. Feaster*,
    775 Fed. App'x 90 (4th Cir. 2019) ...................................... 17

*Groff v. DeJoy*,
    600 U.S. 447 (2023) ............................................................ 19

*Helvering v. Sabine Transp. Co.*,
    318 U.S. 306 (1943) ............................................................ 53

*Hilzendeger v. Wells Fargo Bank*,
    720 F. Supp. 3d 712 (S.D. Iowa 2024) .............................. 54

*In re Vickers*,
    116 B.R. 149 (Bankr. W.D. Mo. 1990) .......................... 26, 32

*Juric v. USALCO, LLC*,
    659 F. Supp. 3d 633 (D. Md. 2023) .................................... 23

*Keszenheimer v. Reliance Standard Life Ins. Co.*,
    402 F.3d 504 (5th Cir. 2005) ............................................................... 39

*Lamie v. U.S. Tr.*,
    540 U.S. 526 (2004) ............................................................................ 26

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ...................................................................... 51, 52

*Lorenzo v. Prime Commc'ns, L.P.*, No. 5:12-cv-69-H-KS,
    2018 WL 2296341 (E.D.N.C. March 29, 2018) .................................. 40

*Marx v. Gen. Revenue Corp.*,
    568 U.S. 371 (2013) ............................................................................ 19

*Mattei v. Mattei*,
    126 F.3d 794 (6th Cir. 1997) ............................................................... 24

*Mullett v. Merrill, Lynch, Pierce, Fenner & Smith*, No. 01-cv-2118,
    2002 WL 32298599 (E.D. Pa. Feb. 6, 2002) ....................................... 47

*Musmeci v. Schwegmann Giant Super Markets, Inc.*,
    332 F.3d 339 (5th Cir. 2003) ............................................................... 19

*New York Post Corp. v. C.I.R.*,
    40 T.C. 882 (T.C. 1963) ................................................................. 22, 28

*NISH v. Cohen*,
    247 F.3d 197 (4th Cir. 2001) ............................................................... 24

*Oatway v. Am. Int'l. Grp., Inc.*,
    325 F.3d 184 (3d. Cir. 2003) .......................................................... 46, 47

*Pasternack v. Shrader*,
    863 F.3d 162 (2d Cir. 2017) ................................................................ 19

*Paul v. RBC Capital Markets*, No. 16-cv-5616,
    2018 WL 784577 (W.D. Wash. Feb. 8, 2018) ............................... passim

*Pulsifer v. United States*,
    601 U.S. 124 (2024) ............................................................................ 26

vi

*Rich v. Shrader*,
   823 F.3d 1205 (9th Cir. 2016) ............................................... 54

*Shafer v. Morgan Stanley*, No. 20-cv-11047,
   2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023) .............................. passim

*Shafer v. Morgan Stanley*, No. 20-cv-11047,
   2024 WL 4697235 (S.D.N.Y. Nov. 5, 2024) ............................ 35, 37, 40

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ............................................................. 53

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) .............................................................. 21

*Tolbert v. RBC Capital Markets Corp.*,
   758 F.3d 619 (5th Cir. 2014) ............................................... passim

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
   513 U.S. 18 (1994) .............................................................. 31

*United States v. Ward*,
   972 F.3d 364 (4th Cir. 2020) ................................................ 19

*United States v. Wysinger*,
   64 F.4th 207 (4th Cir. 2023) ................................................ 20

*United Therapeutics Corp. v. Comm'r*,
   105 F. 4th 183 (4th Cir. 2024) .............................................. 26

*Wesley Heat Treating Co. v. C.I.R.*,
   30 T.C. 10 (T.C. 1958) ..................................................... 22, 28

*Wilson v. Safelite Grp., Inc.*,
   930 F.3d 429 (6th Cir. 2019) .............................................. 22, 50

**Statutes**

26 U.S.C. § 409A ................................................................... 29

28 U.S.C. § 1291 .................................................................... 3

28 U.S.C. § 1331.................................................................3

29 U.S.C. § 1001(a) ..........................................................32

29 U.S.C. § 1001(b) ..........................................................18

29 U.S.C. § 1001(c) ..........................................................18

29 U.S.C. § 1002(1) ..........................................................23

29 U.S.C. § 1002(2)(A) ............................................... passim

29 U.S.C. § 1002(2)(A)(i).................................................46

29 U.S.C. § 1002(2)(A)(ii) ........................................... passim

29 U.S.C. § 1002(2)(B) .....................................................52

29 U.S.C. § 1051(2) ..........................................................49

29 U.S.C. § 1053................................................................18

29 U.S.C. § 1081(a)(3).......................................................49

29 U.S.C. § 1101(a)(1).......................................................49

29 U.S.C. § 1132(a)(1)(B).............................................3, 11

29 U.S.C. § 1135................................................................51

29 U.S.C. § 207(e)(3).........................................................39

## Regulations

29 C.F.R. § 2510.3-2(c)................................................ passim

## Other Authorities

40 Fed. Reg. 24,642 (1974) ..............................................53

40 Fed. Reg. 34,526 (1975) ..............................................54

Black's Law Dictionary (10th ed. 2014)........................28, 40

DOL Advisory Op. 89-07A...........................................................45

H.R. 2, 93d Cong. (1973).......................................................25

H.R. 9824, 93d Cong. (1973)................................................25

Jay Conison, *Foundations of the Common Law of Plans*,
   41 DePaul L. Rev. 575, 624 (1992) ......................................26

S. Rep., No. 127, 93d Cong., 2d Sess. (April 18, 1973)...........26

Voting Rights Act Amendments of 1982,
   Pub. L. No. 97-205, 96 Stat. 131...........................................21

Welfare and Pension Plans Disclosure Act,
   Pub. L. No. 85-836, 72 Stat. 997...........................................25

# INTRODUCTION

Each year, Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill") requires its financial advisors to defer (for eight years) a portion of their main source of income: commissions on the revenue generated by their clients. When an advisor leaves to work for a competitor, Merrill cancels the advisor's accumulated, unpaid awards. Plaintiff-Appellant Kelly Milligan ("Milligan"), who worked at the firm for over twenty years, contends that this forfeiture scheme violates the Employee Retirement Income Security Act of 1974 ("ERISA").

ERISA protects any plan that "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). The test is straightforward: Does the plan result in income being deferred until employment ends (or later)? The answer here is yes. Overlapping eight-year deferral periods create a continuum of deferred compensation that extends throughout an advisor's employment, and the Plan expressly provides for post-termination payments in at least seven scenarios. In practice, Merrill paid over $▮▮▮▮▮ in deferred compensation to nearly ▮▮▮ former advisors between 2018 and 2024.

Rather than apply the statute's "results in" test, the district court improperly grafted a purpose requirement onto the text. Specifically, the district court held that ERISA does not apply unless the purpose of the plan is to provide retirement income or to defer income until termination or beyond. This interpretation finds no support in the statute's plain language and directly contradicts Congress's deliberate choice to omit the term "purpose." The district court's approach also departs from well-reasoned decisions of other federal courts that have correctly recognized similar deferred-compensation plans at other financial firms as ERISA plans.

The district court compounded its error by misconstruing the deferred commissions as discretionary "bonuses" exempt from ERISA under a Department of Labor regulation. But these awards are calculated according to a predetermined formula based on revenue generated; they are not discretionary payments "over and above normal compensation." Moreover, even if the awards were bonuses, a DOL regulation cannot override ERISA's clear statutory definition. The act applies to "any plan" that results in deferred income extending to termination—not "any plan except a bonus plan." The judgment below should be reversed.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under ERISA. Specifically, Milligan brought claims under ERISA §§ 502(a)(1)(B), 502(a)(2), and 502(a)(3), 29 U.S.C. §§ 1132(a)(1)(B), (a)(2), and (a)(3). JA28-32.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this appeal is from a final judgment that disposed of all claims. The district court entered final judgment on March 11, 2025. JA549. Milligan filed a timely notice of appeal on April 9, 2025. JA550.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in concluding that Merrill Lynch's WealthChoice Contingent Award Plan (the "Plan") is not an "employee pension benefit plan" under 29 U.S.C. § 1002(2)(A)(ii), despite evidence that the Plan results in a deferral of income by employees for periods extending to the termination of covered employment or beyond?

2.    Whether the district court erred in applying a purpose-based test rather than the "results in" test explicitly required by 29 U.S.C. § 1002(2)(A)(ii), which asks only whether the Plan "results in a deferral

of income by employees for periods extending to the termination of covered employment or beyond"?

3.    Whether the district court erred in concluding that awards issued under the Plan are discretionary bonuses, rather than deferred commissions?

4.    Whether the district court erred in applying the Department of Labor's "systematic deferral" test from 29 C.F.R. § 2510.3-2(c) in a manner that effectively nullified ERISA's statutory "results in" test in 29 U.S.C. § 1002(2)(A)(ii)?

## STATEMENT OF THE CASE

## I.    Statement of Facts[1]

Milligan worked as a financial advisor ("FA" or "advisor") at Merrill for over 20 years. As part of his compensation, Milligan received annual awards of deferred compensation in the WealthChoice Contingent Award Plan. When he left Merrill to take a different job, Merrill "canceled" his awards and withheld hundreds of thousands of dollars of his deferred compensation. On behalf of himself and other former Merrill advisors, Milligan contends that the Plan is subject to ERISA and that Merrill's

---

[1] The facts in this section are undisputed unless otherwise noted.

cancellation of their deferred-compensation awards violates the statute's vesting and anti-forfeiture requirements.

## A. Merrill pays advisors cash and deferred commissions.

Merrill pays advisors a monthly salary to comply with minimum wage requirements. 2020 Comp. Plan,[2] JA880. Most of an advisor's compensation is based on their "production credits"—i.e., the revenue generated from their clients' investment activities. 2020 Comp Plan, JA851, JA880. Advisors earn a combination of monthly "cash" and annual "long-term" commissions, JA851. Merrill calculates these commissions using a "Cash and Long Term Productivity Grid" ("Grid"). 2020 Comp Plan, JA851. As an example, the Grid for calendar year 2020 is shown below:

---

[2] 20XX Plan refers to the 20XX Merrill Lynch Financial Advisor Incentive Compensation Plan (the "Comp Plan"). As relevant here, the annual Comp Plans were substantively identical.



JA851.

Merrill pays "cash" commissions each month ████████. JA851.

Merrill then performs a final calculation of production credits at year-end

using the fees and revenues ██████████████████████████

████████████████████████████████████████████

████████████████████████ JA852, JA880. Merrill

applies the "long-term" commission rate to the same year-end calculation

of production credits to calculate "long-term" commissions, which Merrill

issues as WealthChoice awards. JA858, JA880.[3] As reflected in the Grid shown above, Merrill requires FAs whose clients generate at least $██████ in annual revenue to defer approximately ██████████ percent of their production commissions. *See* JA851. Merrill issues WealthChoice awards in dollars that advisors may invest in notional accounts until the awards "vest," which normally occurs after eight years. 2019 WC Award Agreement, JA559; 2020 Comp Plan, JA858. Awards vest on a rolling schedule, unrelated to an advisor's length of service, which virtually ensures that advisors will have some amount of unpaid deferred compensation remaining when their employment ends.

### B. Merrill pays FAs their deferred compensation after their employment ends but cancels the deferred compensation when an FA joins a competitor.

If an FA leaves Merrill before an award of deferred compensation vests, Merrill typically cancels the award. 2019 WC Award Agreement, JA559. This usually happens when an advisor leaves Merrill to join a

---

[3] Merrill also issues long-term deferred-commission awards in the form of Restricted Stock Units, which "████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████." 2020 Comp. Plan, JA858. RSU awards "██████████████████████████████████." JA858. Only WealthChoice awards are currently at issue. *See* Compl., JA14-16.

competitor, to change careers, or because they are terminated for "Cause." 2010 Award Agreement, JA83 ("All Other Terminations"). Merrill cancels awards, even for long-tenured advisors like Milligan, who worked at Merrill for more than 20 years. JA83-84 (the "Non-Competition" clause); JA85 (defining "Competition").

Nevertheless, Merrill regularly pays deferred compensation after the end of an advisor's employment. This occurs in several scenarios, each of which applies when the advisor will not be competing against Merrill.[4] The most common is "retirement." *See* JA891. Advisors with ten years of service who leave Merrill after turning age 55 receive their deferred compensation if they provide "written certification that [they] have not engaged in Competition" with Merrill. JA84.

Payments to retiring advisors follow a unique schedule. Rather than following the normal eight-year vesting schedule, Merrill pays the advisors half of their deferred compensation shortly after the end of the

---

[4] Merrill pays advisors their deferred compensation immediately (1) if the advisor dies while employed by Merrill, or (2) if the advisor's employment terminates for specified reasons after a change in control. 2010 WC Agreement, JA82-83. Merrill also pays awards to former advisors according to the normal eight-year vesting schedule (3) if the sum of the FA's age and years of service is over 65, or if their termination is due to a (4) disability, (5) layoff, or (6) divestiture. JA82.

year in which they leave Merrill and the other half a year later. JA82. Thus, Merrill pays some deferred compensation to advisors before the end of an award's eight-year "vesting" period, and some after.[5]

Merrill also awards deferred compensation to retiring advisors after their employment ends based on their production credits in their last year of employment. 2020 Comp. Plan, JA860 ("Retirement" section, stating that retired FAs "will still be eligible to receive an award for the performance year based on the Advisor's actual year-to-date [production credits]"). These post-employment awards of deferred compensation are paid to retiring advisors like their other awards: one-half after the end of the "calendar year in which . . . Retirement occurs," and the other half a year later. 2010 WC Agreement, JA82.

Merrill makes substantial payments of awards of deferred compensation to advisors after their employment ends. Between January 1, 2018, and June 30, 2024, Merrill made total payments under

---

[5] For example, an FA who retired in 2018, Optionee ID ▮▮▮▮▮▮, received a WealthChoice award in 2010. JA891. The eight-year vesting date of that award was in 2018, but Merrill paid it in 2019 and 2020, nine to ten years after it was issued. JA891. Merrill also issued an award to the FA in 2017, which was scheduled to vest eight years later in 2025, but Merrill paid this award in 2019 and 2020. JA891.

the Plan of over $███████ to ███ different FAs. JA890-891. These include post-termination payments of over $████████ (███% of all payments) to ███ different FAs (███% of these FAs) categorized as "████████" or "███████," or after the individual's listed termination date. JA890-891. The district court acknowledged that "18% of WCA recipients received some payment after their employment ended and 92.6% of the FAs who received WCAs between 2018 and 2024 were active employees." JA543.

## C. Merrill pays FAs awards that are different from the commission-based deferred compensation.

In addition to their commissions, advisors may receive awards for "achieving individualized, performance-based goals such as increasing their prior year's revenue by specified percentages or cross-selling products to clients." Compl., JA26. For example, Merrill pays advisors additional compensation if they ████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████. 2020 Comp. Plan, JA861-863. These awards are not part of Milligan's claim.

## II.    Procedural History

Milligan commenced this putative class action on April 30, 2024, alleging that the Plan qualifies as an "employee pension benefit plan" under ERISA and that Defendants[6] violated ERISA's vesting and anti-forfeiture requirements by forfeiting his unvested awards when he departed from Merrill. JA14-34. Milligan asserted three causes of action: (1) declaratory and equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3); (2) reformation of the Plan to comply with ERISA and benefits due under the reformed Plan under ERISA §§ 502(a)(1)(B) and (a)(3), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3); and (3) breach of fiduciary duty under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). JA28-32.

Defendants answered the Complaint on July 12, 2024, denying Milligan's claims and asserting various affirmative defenses, including that the Plan is not subject to ERISA. JA56. On September 30, 2024, Defendants moved for summary judgment, arguing that "ERISA does not apply to" the Plan. JA59. Specifically, Defendants contended that: (1) the Plan does not "result in a deferral of income" to the termination of

---

[6] Defendants include Merrill; its parent company, Bank of America Corp.; and the individual administrator of the Plan.

employment or beyond as required by 29 U.S.C. § 1002(2)(A)(ii) ("Subsection (ii)"); and (2) even if it did, the Plan qualifies as a "bonus program" exempt from ERISA under 29 C.F.R. § 2510.3-2(c). Dkt.[7] 42-2 at 12-25.

Milligan filed his opposition on December 6, 2024, arguing that the Plan is a pension plan because: (1) it results in the deferral of income to periods extending to the termination of employment or beyond; (2) it provides for deferred commissions, not bonuses; and (3) the DOL's "systematic deferral" test for bonus programs cannot override the statute's text. Dkt. 53, 54-2. Defendants filed their reply brief on December 30, 2024, reiterating their position that the Plan is a retention bonus program designed to reward active employees, not a pension plan deferring income until termination. Dkt. 58, 60.

On March 11, 2025, the court granted Defendants' motion, concluding that the Plan was not an "employee pension benefit plan" under ERISA but rather a "bonus plan exempt from ERISA." JA547-548.

The district court acknowledged that the Plan defers the payment of compensation based on advisors' production until after a vesting

---

[7] References to "Dkt. __" are to docket entries in the district court.

period, with potential payments occurring after an FA leaves Merrill. JA543-544. The court also recognized that in certain circumstances— including death, retirement, and involuntary termination—FAs receive payment of deferred compensation after their employment ends. JA543.

Despite these features, the district court held that the Plan did not "result[] in a deferral of income by employees for periods extending to the termination of covered employment or beyond" under Subsection (ii). JA544-545. The court rejected what it characterized as Milligan's "results-based" interpretation of Subsection (ii), stating that "adopting Milligan's view would mean that virtually any plan that allows for income to be paid after employment ends, even incidentally, could fall under ERISA's purview." JA544.

The court instead held that, to be an ERISA plan under Subsection (ii), "the purpose of the plan must be to provide retirement income or to defer income until termination or beyond." JA545 (internal quotation marks omitted). Applying this purpose-based test, the court concluded that "the express purpose of the [Plan] is to reward employees for performance and tenure," and therefore "the mere fact that some

payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage." JA545.

The court further determined that even if the Plan was an "employee pension benefit plan" under Subsection (ii), the Plan would not be covered by ERISA under the Department of Labor's regulatory exemption for "bonus programs" under 29 C.F.R. § 2510.3-2(c). JA546. The court characterized the Plan as "an unfunded, discretionary plan, devised for the express purpose of rewarding long-term FAs who also help the company meet financial goals," rather than being designed to provide retirement income. JA547. The court also concluded that the Plan does not "systematically defer income to the termination of covered employment or beyond," noting that "the vast majority of award payouts are to actively employed FAs." JA547. This appeal followed. JA550.

## SUMMARY OF THE ARGUMENT

This case presents a straightforward application of statutory text: ERISA defines "employee pension benefit plan" broadly as "any plan" that "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). The Plan does precisely that. By its express terms, the

Plan requires advisors to defer a significant portion of their compensation for up to eight years, and in multiple scenarios pays FAs their deferred compensation after employment with Merrill ends. The record shows that Merrill made paid more than $███████ to nearly ████ former Merrill advisors between 2018 and 2024. These are not incidental or exceptional payments; they reflect the Plan's design and regular operation.

First, the district court misread the statutory text by adopting a purpose-based test rather than the "results in" test that Congress explicitly enacted in Subsection (ii). The statutory phrase "results in" focuses on the actual outcome or effect of the Plan, not its stated purpose. Congress could have limited ERISA coverage to plans explicitly designed for the purpose of paying retirement or post-termination income. Indeed, Congress did not use purpose-based language, demonstrating its intent to extend ERISA's protections based on a plan's function, not its stated intent.

Second, courts have found similar deferred compensation plans for financial advisors to be covered by ERISA. In *Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619 (5th Cir. 2014), *Paul v. RBC Capital Markets*, No. 16-cv-5616, 2018 WL 784577 (W.D. Wash. Feb. 8, 2018), and

*Shafer v. Morgan Stanley*, No. 20-cv-11047, 2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023) ("*Shafer I*"), courts applying Subsection (ii) concluded that ERISA covered similar plans for advisors. The district court ignored this persuasive authority.

Third, the Department of Labor's "bonus program" regulation does not exempt the Plan from ERISA coverage. The WealthChoice awards are commissions, not bonuses. The awards are deferred compensation for work performed, based on a non-discretionary, predetermined grid formula tied to client-generated revenue. The awards are not discretionary payments "over and above normal compensation." But even if these awards were bonuses, an agency regulation cannot override the clear statutory definition enacted by Congress. Thus, the DOL lacks authority to categorically exempt otherwise-qualifying plans from ERISA's coverage.

The district court's misreading of ERISA subverts Congress's purpose in enacting the statute: to protect employees' deferred compensation from forfeiture. The Plan requires FAs to defer their compensation and then purports to cancel it if they leave to work for

16

competitors. This is precisely the type of forfeiture that ERISA was designed to prevent. The judgment below should be reversed.

## STANDARD OF REVIEW

This Court "review[s] de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the nonmoving party." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 276 (4th Cir. 2015) (en banc). Moreover, "it is well established that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Greene v. Feaster*, 775 Fed. App'x 90, 91 n.3 (4th Cir. 2019). Accordingly, a district court "should not grant summary judgment unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994).

## ARGUMENT

I. **The Plan "results in" the deferral of income to periods extending to the termination of employment or beyond.**

    A. **ERISA's definition of an "employee pension benefit plan" in Subsection (ii) focuses on results, not purpose.**

Congress designed ERISA's extensive programmatic, enforcement, and regulatory mechanisms "to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries." 29 U.S.C. § 1001(b); *see also* 29 U.S.C. § 1001(c). To further this broad goal, ERISA's vesting provision limits how long employees must work before they receive a non-forfeitable interest in certain plans' benefits. *See* 29 U.S.C. § 1053. ERISA defines "employee benefit pension plans" subject to this (and other protections, *see* JA28-29,) as "any plan" that, "by its express terms or as a result of surrounding circumstances":

      (i)    provides retirement income to employees ["Subsection (i)"], or

      (ii)   results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . . ["Subsection (ii)"]

29 U.S.C. § 1002(2)(A).

### 1. The plain language of Subsection (ii) covers plans based on their effects.

While ERISA does not define key phrases in § 1002(2)(A), courts "assume that the ordinary meaning of [the statutory] language controls." *United States v. Ward*, 972 F.3d 364, 369 (4th Cir. 2020) (quoting *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 376 (2013)); *see also Groff v. DeJoy*, 600 U.S. 447, 468 (2023) ("Statutory interpretation must begin with, and ultimately heed, what a statute actually says.") (cleaned up). Because § 1002(2)(A) uses the phrase "or," which is disjunctive, the statute creates two separate tests for ERISA coverage in Subsections (i) and (ii). *See Pasternack v. Shrader*, 863 F.3d 162, 168 (2d Cir. 2017) ("The two subparagraphs of [§ 1002(2)(A)] set out independent tests to determine whether a plan is protected by ERISA.").

Subsection (i) covers plans based on the nature of the benefit, i.e., retirement income. *Id.* at 169. It covers plans based on the income recipient's status (e.g., retired), not based on how the plans deliver that income. *See, e.g.*, *Musmeci v. Schwegmann Giant Super Markets, Inc.*, 332 F.3d 339, 348 (5th Cir. 2003) (finding plan designed to give grocery vouchers to retirees "provides retirement income"); *see also Tolbert*, 758

F.3d at 625 (construing Subsection (i) to refer to plans "designed for the purpose of paying retirement income").

Subsection (ii) takes a different approach, covering plans based on a plan's resulting outcome or effect—specifically, income deferral—rather than on the purpose of that income or status of the recipient. Subsection (ii)'s use of the phrase "results in" focuses on what "arises as an effect of" the plan. *Id.* at 624. As the Fifth Circuit explained, a thing "'results' when it arises as an effect, issue, or outcome from some action, process or design." *Id.* (quoting *Burrage v. United States*, 571 U.S. 204, 210 (2014)); *see also United States v. Wysinger*, 64 F.4th 207, 216 (4th Cir. 2023) (interpreting phrase "results from" to mean "caused by"). The only precipitating "action, process, or design" acknowledged in the statute is the plan itself (including its terms and effects). 29 U.S.C. § 1002(2)(A) ("[A]ny plan, fund, or program which . . . to the extent that by its express terms or as a result of surrounding circumstances . . . ."). Thus, irrespective of the plan's intent or the purpose of the plan's benefits, a plan is covered under Subsection (ii) if one of its *outcomes* is "a deferral of income by employees for periods extending to the termination of covered employment or beyond."

This reading finds further support in *Thornburg v. Gingles*, 478 U.S. 30 (1986). In *Thornburg*, the Supreme Court concluded that, by amending the Voting Rights Act to include "results in," Congress "[made] clear that a violation could be proved by showing discriminatory *effect alone*."[8] *Id.* at 35 (emphasis added). The Supreme Court explained that this "results test" asks "whether as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id.* at 44 (internal quotation marks omitted). The same effects-based analysis applies here: Subsection (ii) asks only whether the plan results in income deferral, not whether it was designed for that purpose.

Courts have interpreted the phrase "deferral of income" in Subsection (ii) to mean "deferred compensation." *Tolbert*, 758 F.3d at 625. The concept of "deferred compensation" has a well-established meaning that predates ERISA. A deferral of compensation occurs when payment

---

[8] The amended provision read, in relevant part: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which *results in* a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." *See* Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, § 3, 96 Stat. 131, 134 (emphasis added).

for services is delayed beyond the period when those services were performed, regardless of the label attached to such payments or their specific purpose. *New York Post Corp. v. C.I.R.*, 40 T.C. 882, 887-88 (T.C. 1963); *Wesley Heat Treating Co. v. C.I.R.*, 30 T.C. 10, 23-24 (T.C. 1958). Thus, a plan results in a "deferral of income by employees" if it defers an employee's compensation, i.e., postpones "payment for work performed" to some future date. *See Shafer I*, 2023 WL 8100717, at *20, *17–18 (S.D.N.Y. Nov. 21, 2023); *Tolbert*, 758 F.3d at 625–26.

Subsection (ii) further applies when compensation is deferred "for periods extending to the termination of covered employment or beyond,"[9] 29 U.S.C. § 1002(2)(A)(ii), thereby contemplating the possibility of multiple deferral periods that together reach the end of employment or later. Moreover, so long as the plan results in a deferral of income to the termination of employment or later, the plan may also result in earlier, pre-termination deferrals and still qualify as an ERISA plan. *See Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 435 (6th Cir. 2019) ("Subsection (ii)

---

[9] The phrase "covered employment" refers to when an employee leaves a company. *Tolbert*, 758 F.3d at 625.

covers a wide array of plans and does not exclude plans that give participants the option to receive in-service distributions.").

Subsection (ii)'s plain text does not support the district court's interpretation limiting its coverage to plans with the *purpose* of deferring income until the end of employment or later. *See* JA545 (quoting *Juric v. USALCO, LLC*, 659 F. Supp. 3d 619, 633 (D. Md. 2023)). As discussed above, the predicate—"results in"—creates an outcome-based test. None of the adjacent text supports a purpose-based requirement. Far from it, Congress separately defined the terms "employee welfare benefit plan" and "welfare plan" using the phrase "established or maintained *for the purpose* of providing." 29 U.S.C. § 1002(1) (emphasis added). Yet Congress defined the terms "employee pension benefit plan" and "pension plan" to include any plan that either "*provides* retirement income" (Subsection (i)) or "*results in* a deferral of income" (Subsection (ii)).[10] 29 U.S.C. § 1002(2)(A) (emphases added). "The omission by Congress of language in one section of a statute that is included in another section of

---

[10] That *Tolbert* also referenced "purpose" when describing Subsection (i)'s coverage merely underscores the textual distinction: Subsection (ii) reaches any arrangement that—regardless of purpose or design—objectively results in compensation deferred to termination or beyond. *Id*. at 624-25.

the same statute generally reflects Congress's intentional and purposeful exclusion in the former section." *NISH v. Cohen*, 247 F.3d 197, 203-204 (4th Cir. 2001).

In sum, ERISA's definition of an "employee benefit pension plan" establishes two distinct coverage tests: Subsection (i) covers plans designed to provide retirement income, while Subsection (ii) covers plans based on their outcome of deferring employee compensation until the end of employment or later, regardless of the plan's purpose, whether termination coincides with retirement, or other factors (such as whether income is deferred to earlier dates).

### 2. Legislative history and statutory structure confirm that § 1002(2)(A)(ii) establishes a results-based test.

ERISA's legislative history also underscores that Congress spoke only in terms of plan *results* in Subsection (ii)—not of the purpose of the plan rendering those results. In drafting ERISA, Congress drew from a predecessor statute, the Welfare and Pension Plans Disclosure Act ("WPPDA").[11] *See, e.g.*, *Mattei v. Mattei*, 126 F.3d 794, 801 (6th Cir. 1997)

---

[11] ERISA's extensive legislative history demonstrates that Congress directly engaged with the WPPDA definition of "employee pension benefit plan" to craft ERISA's definition. For example, proposed

("[A]mong other similarities, ERISA's definitions of 'person,' 'participant,' and 'beneficiary' are identical or virtually identical to those in the WPPDA."). The WPPDA defined "employee pension benefit plan[s]" as plans "established . . . *for the purpose* of providing for its participants or their beneficiaries . . . retirement benefits." WPPDA § 3(a)(2). Congress's decision to abandon the WPPDA's purpose-based test in Subsection (ii) reflects its intent to confer ERISA protections to plans based upon their *effect*.

Similarly, for at least two reasons, ERISA's policy goal to "protect[] the *retirement assets* of workers" should not narrow the Court's interpretation of § 1002(2)(A). *See* JA544-45. First, "[n]o statute pursues a single policy at all costs, and we are not free to rewrite this statute (or any other) as if it did." *Bartenwerfer v. Buckley*, 598 U.S. 69, 81 (2023). For example, ERISA's mandatory vesting rules reflect another of the many interests Congress entertained in drafting ERISA: job mobility.

---

versions of the definition initially included WPPDA language that a plan "be communicated or its benefits described in writing to employees." *Compare* WPPDA, Pub. L. No. 85-836, 72 Stat. 997, § 3(a)(2), *with* H.R. 9824, 93d Cong. (1973), *and* H.R. 2 (as reported in the House of Representatives, Jan. 3, 1973).

*See, e.g.*, S. Rep., No. 127, 93d Cong., 2d Sess. (April 18, 1973).[12] Subsection (ii) also promotes job mobility (and, therefore, economic efficiency and employee well-being). In any event, Congress's intent is best determined by the text it used. *See United Therapeutics Corp. v. Comm'r*, 105 F. 4th 183, 188 (4th Cir. 2024) (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004)). It is improper to bypass a natural reading of the provision to favor one of Congress's policy goals in drafting ERISA to the exclusion of another stated goal. Congress not only wanted to protect retirement benefits, *per se*, but also to limit the conditions employers place on deferred compensation.

Second, because Subsection (i) and Subsection (ii) are presented in the alternative, each must cover some unique ground. *See Pulsifer v. United States*, 601 U.S. 124, 143–44 (2024) ("When a statutory construction thus 'render[s] an entire subparagraph meaningless,' . . . the

---

[12] *See also* Jay Conison, *Foundations of the Common Law of Plans*, 41 DePaul L. Rev. 575, 624 (1992) (ERISA's vesting provisions give "preference to protecting job mobility over protecting employer use of plans to retain employees long term."); *In re Vickers,* 116 B.R. 149, 151 (Bankr. W.D. Mo. 1990) ("In response to a national concern about loss of private pension benefits resulting from financial difficulties of employers *and job mobility of employees*, Congress enacted ERISA.") (emphasis added).

canon against surplusage applies with special force."). Given that Subsection (i) already covers deferred compensation schemes designed to provide retirement income, Subsection (ii) must cover other deferred compensation schemes—otherwise Subsection (ii) would be superfluous. *Tolbert*, 758 F.3d at 624 (reading Subsection (ii) as requiring a plan "to be designed for the purpose of paying retirement or post-termination income. . . . would render the entirety of subsection (ii) superfluous, an unacceptable result"). Whether read in isolation, in the context of § 1002(2)(A) as a whole, or with reference to the legislative history, it is erroneous to infuse a purpose-based requirement into Subsection (ii)'s "results in" test.

## B. The undisputed evidence shows that the Plan results in substantial post-employment payments.

The Plan "results in" a deferral of income by employees for periods extending to the termination of covered employment or beyond under Subsection (ii). Under the Plan, Merrill pays deferred compensation to former advisors. And the record shows that Merrill paid ███████ ██████ in deferred compensation to former advisors, and over ██ of such payments are made to former advisors. JA890-891.

27

### 1.     The Plan involves "a deferral of income."

The Plan results in a "deferral of income" under Subsection (ii) because it is a deferred-compensation plan. *Tolbert*, 758 F.3d at 625; *accord Shafer I*, 2023 WL 8100717, at *17. "Deferred compensation" is (1) "[p]ayment for work performed, to be paid in the future or when some future event occurs," and (2) "an employee's earnings that are taxed when received or distributed rather than when earned . . . ." Black's Law Dictionary (10th ed. 2014). This meaning predates ERISA. *See New York Post*, 40 T.C. at 887-88 (holding that payments calculated on prior performance but distributed in future years constituted "deferred compensation" regardless of label or forfeitability); *Wesley Heat*, 30 T.C. at 23-24 (holding that profit-sharing awards distributed "in the next 1, 2, or 3 years" constituted deferred compensation). In *Tolbert*, the Fifth Circuit concluded that the plan's provisions for deferred compensation "plainly refer to income that is deferred" to be within Subsection (ii). *Tolbert*, 758 F.3d at 625.

Here, under its "express terms," the Plan provides deferred compensation. Advisors perform the work associated with an award of deferred compensation by generating revenue in one year but must wait

eight years to get paid. 2020 Comp. Plan, JA880 ("███████ ████████████████████████████████████████"); JA884 (████████████████████████████████████████████ ███████████████████████████████████████████████). In addition, award agreements refer to 26 U.S.C. § 409A, which governs the taxation of "deferred compensation." *See* JA81. In its accounting statements, Merrill reported that it "participates in Bank of America sponsored deferred compensation plans in which employees . . . may participate on either a voluntary or mandatory basis." JA409, JA432, JA454, JA472. Similarly, Merrill's ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████. JA897-888.

### 2. The Plan "results in" a deferral of income for periods extending to the termination of covered employment or beyond.

The Plan "results in" a deferral of income by employees for periods extending to the termination of covered employment or beyond under Subsection (ii). As discussed above, Subsection (ii) creates a "results test" in which intent or purpose is irrelevant. *Supra*, Arg. § I(A).

Here, the Plan "results in" a deferral of income for periods extending to the termination of covered employment or beyond. Under the Plan, advisors who end their employment with Merrill in several situations, including retirement, are still paid their deferred compensation—some immediately, some according to the normal eight-year vesting schedule, and some one to two years after they end their employment. *Supra*, Stmt. of Case § I(B). Even the district court acknowledged the Plan creates the possibility of post-employment payments. JA544 ("it is possible for a WCA to be paid out, in certain limited circumstances, after the end of covered employment"). *Tolbert*, *Paul*, and *Shafer*—three cases ignored by the district court—held that similar post-employment payments based on plan terms were enough to trigger ERISA coverage under Subsection (ii).

The surrounding circumstances of the Plan—i.e., how the Plan operates in practice—show that the Plan "results in" a deferral of income because it governs and facilitates substantial payments of deferred compensation to former employees, including many retirees. Between January 1, 2018, and June 30, 2024, Merrill made total post-termination payments of over $███████ (███% of all payments) to ████ different

FAs (███% of these advisors) categorized as ████████ ████████ or after the individual's listed termination date. JA890. This includes over $█████ to retirees. JA891. On average, the Plan paid over $█████ to over ██ former employees *each year*. JA891. The district court acknowledged these post-employment payments. JA543.

The district court erred, however, in concluding that these post-termination payments were "uncommon," "limited," "rare," and "happenstance." JA543-547. "Happenstance" is defined as "circumstances unattributable to any of the parties." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23 (1994). The evidence here shows that post-termination payments, especially following retirement, were common, regular, and substantial; based on the Plan terms; and attributable to the conduct of both parties (e.g., drafting Plan terms, retiring, signing non-compete agreements, etc.). JA890-891. These ███████████ of dollars in post-termination payments occurred *by design*, not chance.

Milligan does not argue that Subsection (ii) covers any plan that allows for "incidental[]" post-termination payments, as the district court suggests. *See* JA544. When the express terms of a plan defer income to

the end of covered employment, the timing is not incidental; it is dictated by the plan. That is the case here. Post-termination payments occur in substantial amounts to ███████ of advisors under the plan terms every year. JA890-891. Regardless, even if the payments were incidental, Subsection (ii) does not qualify coverage based on the frequency, amount, or systematic nature of post-termination payments. According to its text, Subsection (ii) covers any plan that "results in a deferral of income for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). This language creates a straightforward "results in" test: either a plan results in such a deferral or it does not.

Contrary to the district court's opinion, Milligan's interpretation of Subsection (ii) is consistent with ERISA's purpose of protecting the "*retirement assets* of workers." JA544-545 (italics in original). The Plan provides millions of dollars in income to hundreds of retired advisors every year. JA890-891. Without ERISA's protections, these retirement assets would be at risk of loss, in bankruptcy or otherwise. *See In re Vickers*, 116 B.R. at 151. This is exactly the scenario ERISA was designed to prevent. *See generally* 29 U.S.C. § 1001(a).

Merrill is not alone in offering commission-based deferred compensation to financial advisors. Royal Bank of Canada's ("RBC") plan for advisors was at issue in both *Tolbert*, 758 F.3d at 624, and *Paul*, 2018 WL 784577, at *4. RBC's plan involved voluntary and mandatory deferred compensation. *See Tolbert*, 758 F.3d at 622; *Paul*, 2018 WL 784577, at *1. Voluntary deferrals were always fully vested, while the compensation that RBC required advisors to defer vested and was paid at later dates. *See Tolbert*, 758 F.3d at 622. In addition, RBC paid such mandatory deferred compensation to *former employees* who retired, died, or became disabled while employed by RBC. *See id.* But in other situations, like when an advisor joined a competitor, RBC withheld any unvested awards. *See Paul*, 2018 WL 784577, at *1.

Two courts concluded that RBC's plan was an ERISA plan under Subsection (ii). Based solely on the express terms of RBC's plan, the Fifth Circuit in *Tolbert* concluded that income was deferred until former employees retired, died, or became disabled, and therefore resulted in a deferral of income for periods extending to the termination of covered employment or beyond. *Tolbert*, 58 F.3d at 626 & n.5. The district court in *Paul* also looked at the "express terms" of the plan, and agreed with

33

the Fifth Circuit that the plan was an ERISA plan under Subsection (ii). The *Paul* court went further and concluded that the "surrounding circumstances" also showed that the plan was an ERISA plan under Subsection (ii), because some participants actually received a retirement distribution of benefits. *Paul*, 2018 WL 784577, at *6 ("from 2007-2011, anywhere from one-third to approximately one-half of WAP participants elected to take retirement distribution").

Morgan Stanley also offers deferred compensation to its financial advisors. Morgan Stanley's plan is similar to RBC's and Merrill's plans. The amount of an award is based on a percentage of the revenue the advisor generated in the prior year. *Shafer I*, 2023 WL 8100717, at *2. Morgan Stanley's awards typically vest and are paid to current employees after four or six years. *Id.* But they also vest and are paid to former employees who retire, become disabled, are laid off, or depart for government service while employed by Morgan Stanley. *Id.* at *3. In other situations, like where an advisor joins a competitor, Morgan Stanley purports to cancel any unvested awards. *Id.*

The district court in *Shafer* concluded that Morgan Stanley's plan was an ERISA plan under Section (ii). *Shafer I*, 2023 WL 8100717, at *20.

34

The plan resulted in a deferral of income because awards were based on revenue generated in one year but were paid four or six years later. *Id.* The plan paid deferred compensation to former employees who retire, become disabled, are laid off, or depart for government service while employed by Morgan Stanley. Based on these plan terms, payments of deferred compensation sometimes occurred at the end of employment or beyond. *Shafer I*, 2023 WL 8100717, at *19-20.

Morgan Stanley moved for reconsideration, but the *Shafer* court reiterated that the plan was governed by ERISA under Subsection (ii), based on the express terms of the plan. *Shafer v. Morgan Stanley*, No. 20-cv-11047, 2024 WL 4697235, at *17-19 (S.D.N.Y. Nov. 5, 2024) ("*Shafer II*"). Morgan Stanley offered additional evidence—including that eight to fifteen percent of awards were paid to former employees—but this did not change the court's analysis. *Shafer II*, 2024 WL 4697235, at *14 & n.5.[13] To the contrary, the court concluded that this payment rate showed that post-termination payments were "commonplace," not "rare." *Id.* at *18. The court acknowledged that "the mere fact that some

---

[13] Morgan Stanley has appealed the *Shafer* decisions to the Second Circuit Court of Appeals. *See Shafer v. Morgan Stanley*, No. 24-3141 (L) (2d Cir.).

payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage." *Id.* (quoting *Tolbert*, 758 F.3d at 625) (cleaned up). But because these payments were made under its express terms, Morgan Stanley's plan "fit comfortably" within the meaning of Subsection (ii). *Id.* (quoting *Tolbert*, 758 F.3d at 626) (cleaned up).

Merrill's Plan is similar to both RBC's and Morgan Stanley's deferred compensation plans. All three plans issue awards of deferred compensation to financial advisors; the amount of each award is based on the revenue generated by the advisor in the previous year; and awards are paid years later. Further, each plan purports to cancel or forfeit unpaid awards if the advisor leaves for a competitor. But in other situations, like retirement, death, or disability, awards are paid to the advisor after their employment ends. In this way, all three plans result in a deferral of income by employees for periods extending to the termination of covered employment or beyond.

|  | RBC | Morgan Stanley | Merrill |
|---|---|---|---|
| **Awards of Deferred Compensation to FAs** | Yes | Yes | Yes |

36

|  | RBC | Morgan Stanley | Merrill |
|---|---|---|---|
| **Awards Based on Revenue Generated** | Yes | Yes | Yes |
| **Awards Paid Years Later** | Yes | Yes | Yes |
| **Forfeiture for Competition** | Yes | Yes | Yes |
| **Payments to Retirees** | Yes | Yes | Yes |
| **Payments to Deceased or Disabled FAs** | Yes | Yes | Yes |
| **Governed By ERISA Under Subsection (ii)** | Yes | Yes | Yes |

There is no material distinction between these three plans, such that RBC's and Morgan Stanley's plans were governed by ERISA under Subsection (ii), but Merrill's Plan is not. The district court ignored *Tolbert*, *Paul*, and *Shafer*, which each held that deferred compensation plans for financial advisors are governed by ERISA. *Tolbert*, 758 F.3d 619; *Paul*, 2018 WL 784577; *Shafer I*, 2023 WL 8100717; *Shafer II*, 2024 WL 4697235. *See also Berry v. Wells Fargo & Co.*, No. 3:17-00304-JFA, 2018 WL 9989754 (D.S.C. Oct. 9, 2018) (Wells Fargo's deferred compensation plan for financial advisors was governed by ERISA, but parties disputed whether it was a "top hat" plan).

37

## II.    The DOL's bonus-program regulation is inapplicable.

The district court held that, even if Merrill's WealthChoice Award "could be an employee pension benefit plan under ERISA, it is still subject to the Department of Labor's ('DOL') exemption for bonus plans." JA546. The district court's reliance on this regulation was doubly flawed. First, the court erroneously classified Merrill's WealthChoice Awards as "bonuses" under 29 C.F.R. § 2510.3-2(c) when they are, in fact, commissions. JA546-547. Second, even if the awards could be characterized as bonuses, the district court fundamentally erred in treating the DOL regulation as creating an "exception" or "exemption" from ERISA's statutory coverage. JA541, JA546.

### A.    Awards are deferred compensation, not bonuses.

The district court erroneously held that the awards are bonuses within the meaning of 29 C.F.R. § 2510.3-2(c). JA546-547. Contrary to the district court's finding, the awards are commissions, not bonuses.

As the district court held, "a bonus is 'a premium paid in addition to what is due or expected, especially a payment by way of division of a

38

business's profits, given over and above normal compensation.'"[14] JA546 (quoting *Shafer II*, 2024 WL 4697235, at \*7) (cleaned up). Although a plan's stated purpose is one factor to consider in determining whether the plan is a bonus program, a court must consider the totality of the plan. *Shafer II*, 2024 WL 4697235, at \*7; *Shafer I*, 2023 WL 8100717, at \*19. Other factors to consider include the type of compensation provided and the extent to which that compensation is paid to former employees. *Shafer I*, 2023 WL 8100717, at \*19.

By contrast, commissions are distinct from bonuses. *Shafer I*, 2023 WL 8100717, at \*19. "A 'commission' is 'a fee paid to an agent or employee for transacting a piece of business or performing a service,' usually 'a percentage of the money received in a sale or other transaction paid to the agent responsible for the business.'" *Keszenheimer v. Reliance Standard Life Ins. Co.*, 402 F.3d 504, 509 (5th Cir. 2005); *see also*

---

[14] This description aligns with the definition of bonuses that may be excluded from an employee's "regular rate" under the Fair Labor Standards Act: "Sums paid in recognition of services performed during a given period if . . . both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period *and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly*." 29 U.S.C. § 207(e)(3) (emphasis added).

*Macsherry v. Sparrows Point, LLC*, No. ELH-15-22, 2017 WL 3315262, at *23 (D. Md. Aug. 3, 2017) (defining a commission as a "fee paid to an agent or employee for a particular transaction, usu. as a percentage of the money received from the transaction…") (quoting Black's Law Dictionary (10th ed. 2014)); *Lorenzo v. Prime Commc'ns, L.P.*, No. 5:12-cv-69-H-KS, 2018 WL 2296341, at *2 (E.D.N.C. March 29, 2018) (distinguishing between "commissions" paid to salespeople based on their individual monthly sales and "bonuses" paid only to store managers based on store profits).

Here, the compensation deferred under Merrill's Plan constitutes commissions, not bonuses. Like in *Tolbert*, *Paul*, and *Shafer*, the awards defer a "percentage of an employee's compensation." *Tolbert*, 758 F.3d at 622; *see also Shafer II*, 2024 WL 4697235, at *2; *Paul*, 2018 WL 784577, at *1. In *Shafer*, the court determined that a similar plan offered by Morgan Stanley was not a bonus program because (1) advisors' deferred compensation is "premised on the revenue they generate, in the form of a percentage commission rather than a payment over and above normal compensation"; and (2) advisors are paid separate year-end bonuses that are distinct from their deferred compensation. *Shafer I*, 2023 WL

8100717, at *19. The same is true here. Merrill's Plan defers compensation in amounts based on the revenue advisors generate and pays separate year-end bonuses. *Supra*, Stmt. of Case §§ I(A) & (C). The awards are commissions and not bonuses because they are "a percentage of the money received in a sale or other transaction paid to the agent responsible for the business," not "a percentage of division of [Merrill's] profits, given over and above normal compensation.'" JA546 (quoting *Shafer II*, 2024 WL 4697235, at *7 (cleaned up)).

The district court relied on three facts in holding that awards are not commissions. JA547. However, none of those facts support the proposition that the Plan is a bonus plan.

First, the district court found that the annual "[a]wards are not guaranteed (the way salary and commission are)." JA547. This finding was clearly erroneous (or, at the very least, a disputed fact) because *neither* annual awards *nor* monthly commissions are "guaranteed" under the Plan; both are treated in precisely the same way. Specifically, the awards are part of the overall Merrill Lynch Incentive Compensation Plan, which, as the district court acknowledged, has three components: (1) a guaranteed salary; (2) "monthly incentive" cash compensation,

which the district court correctly noted are "commissions"; and (3) the annual awards at issue here. JA541. According to the Plan, an "███████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████" *See, e.g.*, 2020 Comp. Plan, JA851 (emphasis added).

In other words, contrary to the district court's finding, neither annual awards nor monthly commissions are guaranteed because neither are "███████████████████████." And although the 2020 Compensation Plan treats annual awards and monthly commissions the same, it expressly identifies awards and *bonuses* as separate categories of compensation, providing that "███████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████" JA887 (emphasis added). If an "award" were a "bonus," then the Plan would not explicitly put them in different categories.

Second, the district court found that annual awards are bonuses because the "employee must meet a minimum production threshold and stay with the company until the award vests, eight years later," which

42

the Court implies are unique to bonuses. JA547. But the production requirement also applies to monthly commissions. The Plan bases monthly commissions on production thresholds set forth on a grid. The more the FA produces, the higher the percentage of commission paid to the FA. *See*, *e.g.*, JA851. The same is true of the annual awards. JA851. Indeed, both annual awards and monthly commissions are based on the *same grid*. JA851. The only difference between annual awards and monthly commissions is the specific percentages applied, and the thresholds where annual awards and monthly commissions commence. Annual awards commence when the FA generates $██████ in annual revenue. JA851. Monthly commissions commence when the FA generates sufficient annual revenue—$██████ in Milligan's case—to exceed their guaranteed salary.[15] Different thresholds and percentages at different revenue levels do not convert commissions into bonuses.

Third, the district court erroneously concluded that awards are discretionary bonuses based on its finding that "the *award*, while based on a small percentage of the FA's revenue generated over a performance

---

[15] This is the point at which the lowest applicable commission rate (█%) produces compensation above Milligan's guaranteed salary. *See* JA851.

43

year, *is subject to adjustments* by the company based on company and business line performance." JA547 (referencing JA887) (emphasis added).[16] This language, however, is mere boilerplate contained in the "████████████████" section of the overall compensation plan document and simply provides "███████████████████████ ████████████████." JA884. The same section also states that ██████████████████████████████████████████████ ████████████████████████████████████████. JA884. Here, the WealthChoice Contingent Award Plan expressly states that "each award shall be evidenced by an Award Agreement that shall specify the terms and provisions applicable to such Award as determined by the Administrator." JA70. The Award Agreement in turn expressly provides the amount of and express terms of payment. *See, e.g.*, JA559 (awarding Milligan $█████) and JA565 (setting forth payment schedule). The Award Agreements under the Plan do not allow for any "adjustments" of

---

[16] The district court mistakenly cited Dkt. "41-10 at 39" when first discussing this finding of fact, JA542, which document is not related to the issue discussed by the court. Milligan believes this citation was a typo and that the district court meant to cite the 2020 Plan, which had been filed in the district court at Dkt. *42*-10, with the relevant discussion on page 3*8* thereof.

awards "by the company based on business and line performance." Because they are more specific, the Award Agreements control.

Even if the General Provisions did supersede the specific Award Agreements (and they do not), any conclusion that Merrill could adjust awards based on company or business line performance would apply equally to monthly commissions, because the General Provisions provide that Defendants have complete authority and discretion to determine the amount, if any, and payment of "█████████████████████████████

██████████████████████" JA887. As such, the General Provisions supply no basis for distinguishing between monthly and annual awards. If the monthly awards are commissions, then so, too, are the annual awards of deferred compensation.

The district court's reliance on DOL Advisory Op. 89-07A is misplaced. JA546. As quoted by the district court, that Advisory Opinion stated that a bonus plan must "not be 'a vehicle for the provision of retirement income.'" JA546. But as discussed above, Merrill's implementation of the Plan *did* give rise to substantial post-employment (including retirement) payments to advisors. *Supra*, Arg. § I(B). At any rate, by focusing on whether the Plan is "a vehicle for the provision of

retirement income," the court and DOL erroneously tethered the bonus-plan analysis exclusively to the retirement-focused inquiry in Subsection (i) of § 1002(2)(A), rendering Subsection (ii) superfluous. *Compare* 29 U.S.C. § 1002(2)(A)(i) (applying ERISA to plan that "provides *retirement income* to employees" (emphasis added)), *with* 29 U.S.C. § 1002(2)(A)(ii) (applying ERISA to plan that "results in a deferral of income by employees for *periods extending to the termination of covered employment*" (emphasis added)).

The district court's citations to *Oatway v. Am. Int'l. Grp., Inc.*, 325 F.3d 184, 188-89 (3d. Cir. 2003), and *Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929, 933 (8th Cir. 1999), are equally inapposite. In both of those cases, the court held that the relevant plans were bonus plans under Subsection (i) because the *purpose* of those plans was to provide for bonuses, not retirement income. But Milligan's claims do not concern whether the purpose or design of the Plan is to provide retirement income under Subsection (i). Rather, Milligan alleges that the *effect* of the Plan

46

is to defer income to the termination of covered employment or beyond under Subsection (ii).[17]

Moreover, *Oatway* concerned a stock option bonus plan, under which the "stock options were discretionary, given in recognition of special service, and awarded in addition to his regular compensation." 325 F.3d at 189. Here, by contrast, the annual awards of deferred compensation are part of an advisor's core regular compensation under the overall Merrill Lynch Financial Advisor Incentive Compensation Plan and calculated from the same grid used to calculate the monthly commissions. Likewise, the court in *Emmenegger*, described the payments at issue as a "reward . . . for superior performance' and thus as a 'classic bonus situation.'" 197 F.3d at 933. But here, advisors do not have to achieve "superior performance" to receive deferred compensation. An advisor's award of deferred compensation is based solely on the FA's previous year's production. JA852. Under the Plan, an advisor that

---

[17] Likewise, in *Mullett v. Merrill, Lynch, Pierce, Fenner & Smith,* No. 01-cv-2118, 2002 WL 32298599, at *2-4 (E.D. Pa. Feb. 6, 2002), JA547, the court *assumed* that the Financial Consultant Capital Accumulation Award Plan was a bonus plan, and then analyzed whether the bonus plan was also an ERISA plan under the bonus program regulation.

generated $███████ in revenue in 2019 still receives deferred compensation even if the advisor generates just $█████ in 2020, only ██% of the previous year's production. JA851. In other words, an advisor still receives deferred compensation even if the FA's production *decreases* by ███%. This is hardly "superior performance" and completely inconsistent with the ordinary concept of a "bonus."[18]

The district court's reliance on *Callan v. Merrill Lynch & Co., Inc.*, No. 09 CV 0566 BEN (BGS), 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010), is similarly misplaced. JA547. *Callan* involved three plans for advisors. *See* 2010 WL 3452371, at *1. Two were found to be bonus plans, albeit after the plaintiffs withdrew their ERISA claims as to those plans. The amounts of awards in those two plans were discretionary, providing nothing "that would allow a reasonable person to calculate or determine the benefits of the plan or the procedure for receiving benefits." *Id*. at *8-9. By contrast, Merrill's Plan in this case provides a detailed "Grid" formula for calculating annual commissions. The third plan in *Callan* was the WealthBuilder plan, which awarded deferred compensation to

---

[18] Notably, the "performance" discussed in *Emmenegger* refers to that of the company, not the individual. *See* 197 F.3d at 932-33.

advisors and appears to have provided for both in-service and retirement distribution of awards (awards vested when an advisor reached age 55 with at least 10 years of service, reached age 65, or completed at least 20 years of service). The court concluded this plan was an ERISA pension plan, albeit one that fell within the act's "top hat" provision.[19] *Id*. at *9-10. Thus, if relevant at all, *Callan* supports Milligan's position.

## B. The DOL cannot override ERISA's statutory definition through regulation.

Because the Plan is not a bonus program (as shown above), the district court's reliance on the DOL regulation requiring that payments be "systematically deferred to the termination of covered employment or beyond," 29 C.F.R. § 2510.3-2(c), was misplaced. JA547. But even if the Plan were a "bonus program," the Plan would nevertheless remain an "employee pension benefit plan" subject to ERISA's statutory requirements because it "results in a deferral of income by employees for

---

[19] ERISA's top-hat exception appears in three parallel provisions, which create an exemption from the act's core substantive requirements for a plan that is "unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2); 29 U.S.C. § 1081(a)(3); 29 U.S.C. § 1101(a)(1). Of course, this exception would be unnecessary if all unfunded deferred-compensation plans were already beyond ERISA's reach.

periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). To the extent DOL regulation 29 C.F.R. § 2510.3-2(c) suggests otherwise, it is inconsistent with the clear statutory language of ERISA and should be disregarded by this Court.

To reiterate, Subsection (ii) expressly provides that "*any plan*" that "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond" is an "employee benefit pension plan" subject to ERISA. 29 U.S.C. § 1002(2)(A)(ii) (emphasis added). Nothing in the statutory text suggests that the deferral must be "systematic." *See supra*, Arg. § I(A)(1); *Shafer I*, 2023 WL 8100717, at *20 (concluding § 1002(2)(A)(ii) applies if "future payments sometimes occur at 'the end of employment or beyond'"); *see also Wilson*, 930 F.3d at 435 ("[D]eferrals may occur for various 'periods,' and those 'periods' may last up to and/or beyond termination."). As the Fifth Circuit correctly observed in *Tolbert*, Subsection (ii) applies whenever "a 'deferral of income' arises as an 'effect, issue, or outcome' from that plan." *Tolbert*, 758 F.3d at 625 (quoting *Burrage*, 571 U.S. at 210-211).

No DOL regulation cannot supersede this clear statutory command. The Supreme Court's recent decision in *Loper Bright Enterprises v.*

*Raimondo*, 603 U.S. 369 (2024), confirms this limitation on agency authority. Under *Loper Bright*, it is incumbent upon the Court to "exercise independent judgment in determining the meaning of statutory provisions." *Id.* at 412. As is relevant here, Congress granted the DOL the authority to "define accounting, technical and trade terms used in" ERISA. *See* 29 U.S.C. § 1135. But Congress itself specifically defined the term "employee pension benefit plan" in § 1002(2)(A)(ii). The DOL exceeded its authority to "define accounting, technical and trade terms," 29 U.S.C. § 1135 by categorically excluding plans that otherwise fall within the statute.

Conceding, as they must, that "ERISA defined 'employee pension benefit plan' and 'pension plan,'" Defendants argued below that the phrase "results in a deferral of income" (which appears in the definition) is a technical or trade term that Congress left it up to the DOL to interpret. Dkt. 60 at 12 (quoting 29 U.S.C. § 1002(2)(A)(ii)). But even if that phrase were a "technical or trade term," the DOL does not define "results in a deferral of income;" it simply creates a different test for "bonus" plans. Had the DOL genuinely interpreted the statutory phrase, that interpretation would necessarily apply to all plans that "result[] in

a deferral of income," whatever that means. Instead, the DOL regulation subjects bonus plans to a heightened "systematically deferred" test found nowhere in the statute. 29 C.F.R. § 2510.3-2(c).

This is not a definition but rather an exemption, as the district court's own decision makes clear. The court reasoned that even if the Plan "could be an employee pension benefit plan under ERISA," it is still subject to the DOL's "*exemption* for bonus plans." JA546 (emphasis added) (quoting 29 C.F.R. § 2510.3-2(c)). Congress, of course, knew how to authorize the DOL to exempt specific types of plans from ERISA. Congress did exactly that by expressly empowering the DOL to promulgate regulations exempting "severance pay arrangements" and "supplemental retirement income payments" from the definition of "employee pension benefit plan." 29 U.S.C. § 1002(2)(B). This narrow grant of exemption authority would be superfluous if § 1135 already conferred broad authority on the DOL to exempt entire categories of plans from the statutory definition.

Even if the Department of Labor were empowered to craft such exemptions, the regulation is invalid because it is inconsistent with ERISA's text. *Loper Bright*, 603 U.S. at 392 (courts must "set aside any

52

[agency] action inconsistent with the law as they interpret it"); *see also, e.g.*, *Helvering v. Sabine Transp. Co.*, 318 U.S. 306, 311-12 (1943). As noted above, Subsection (ii) requires that post-employment compensation deferrals arise from the plan—not that they be "systematic." Subsection (ii)'s natural reading—that deferrals need only *arise* from the plan—conflicts with the imposition of a "systematic" deferral requirement for bonus plans.

The DOL's regulation further lacks the "power to persuade" because it is unclear and insufficiently supported. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). First, the DOL's explanation of its own regulation—issued contemporaneously with the announcement of the regulation's text—is inconsistent with the regulation itself. The DOL's brief justification of the regulation offered systematic deferral as an *example* of how a bonus program may be a pension plan, but the text of the regulation *requires* systematic deferral for a bonus plan to be covered under Subsection (ii). *Compare* 40 Fed. Reg. 24,642 at 24,642 (1974) ("Bonus programs . . . may be pension plans. For example, if payments are systematically deferred to the termination of covered employment or beyond."), *with id.* at 24,653 (proposing rule that bonus programs are not

pension plans *unless* they systematically defer payments to the termination of covered employment or beyond); *see also* 40 Fed. Reg. 34,526 at 34,532 (1975) (adopting same).

Second, because the DOL regulation does not define a "bonus" program, application of the regulation itself has unnecessarily puzzled courts and confused the interpretation of § 1002(2)(A)(ii). Possibly because "bonus programs" are not defined, courts conflate the exception with the rule. Rather than evaluating whether a bonus program is nevertheless ERISA protected because it "systematically defers" payments, courts sometimes assert that "when payments are not 'systematically deferred,'" the plan is a bonus plan not covered by ERISA. *See Hilzendeger v. Wells Fargo Bank*, 720 F. Supp. 3d 712, 720 (S.D. Iowa 2024) (citing *Emmenegger*, 197 F.3d at 932; *Rich v. Shrader*, 823 F.3d 1205, 1210 (9th Cir. 2016)). And while other, similar regulations are explained at length, *see, e.g.*, 40 Fed. Reg. 34,526, at 34,527 (1975) (discussing "severance payments"), the DOL provided no rationale for implementing the "bonus programs" regulation, *see id.*; *see also* 40 Fed. Reg. 24,642 at 24,642 (1974). Because the DOL's regulation offers no

reasoned interpretation of Subsection (ii), it is not persuasive and should not inform this Court's statutory interpretation.

Simply stated, the district court erred in concluding that the Plan is not subject to ERISA because payments are not "systematically deferred" under the regulation. JA547. By imposing this extra-statutory requirement, the district court effectively permitted the DOL to override Congress's clear definition of "employee pension benefit plan" in Subsection (ii). Under a proper reading of the statute, the test is whether the Plan, in operation, "results in" the deferral of income to the termination of employment or beyond. Because the undisputed evidence shows that Merrill's Plan does exactly that—deferring compensation for over 18% of advisors until after their employment ends, JA543—it satisfies the statutory definition of a "pension plan" and thus is governed by ERISA, regardless of whether such deferral is "systematic."

## CONCLUSION

For the foregoing reasons, this Court should hold that Merrill Lynch's WealthChoice Contingent Award Plan is governed by ERISA. Both the Plan's express terms and its practical operation demonstrate that it "results in a deferral of income by employees for periods extending

to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). The district court erred by imposing a purpose-based test found nowhere in the statute's text and by relying on a DOL regulation that does not apply and cannot override ERISA's clear statutory definition. The district court's judgment should be reversed.

## REQUEST FOR ORAL ARGUMENT

Because this appeal presents important questions regarding the definition of an "employee pension benefit plan" (or "pension plan") in ERISA § 3(2), 29 U.S.C. § 1002(2), Appellant respectfully requests oral argument.

May 27, 2025

John S. Edwards, Jr.
AJAMIE LLP
711 Louisiana, Suite 2150
Houston, TX 77002
(713) 860-1600

Robert A. Izard, Jr.
IZARD, KINDALL
& RAABE, LLP
29 South Main St., Suite 305
West Hartford, CT 06107
rizard@ikrlaw.com

Respectfully submitted,

*/s/ Mathew P. Jasinski*
Mathew P. Jasinski
Riley Breakell
MOTLEY RICE LLC
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1681

*Attorneys for Plaintiff-Appellant*

56

# CERTIFICATE OF COMPLIANCE

### UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 25-1385        Caption: Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2) & 40(d)(3).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6). Sans-serif type, such as Arial, may not be used except in captions and headings.

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains __10,696__ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
MS Word for MS 365 MSO v.2502 ___ [*identify word processing program*] in
Century Schoolbook, 14 pt. ___ [*identify font, size, and type style*];

**or**

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font, size, and type style*].

**NOTE: The Court's preferred typefaces are Times New Roman, Century Schoolbook, and Georgia. The Court discourages the use of Garamond.**

(s) Mathew P. Jasinski

Party Name Appellant Kelly Milligan          Date: May 27, 2025

12/09/2024 NA/MEO

## CERTIFICATE OF SERVICE

I hereby certify that, on May 27, 2025, I electronically filed the foregoing Brief for Appellant with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Mathew P. Jasinski*
Mathew P. Jasinski

.

# ADDENDUM:
# RELEVANT STATUTES & REGULATION

**29 U.S.C. §§ 1002(2)(A) & (B):**

For purposes of this subchapter:

(2)(A) Except as provided in subparagraph (B), the terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

    (i) provides retirement income to employees, or

    (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. A distribution from a plan, fund, or program shall not be treated as made in a form other than retirement income or as a distribution prior to termination of covered employment solely because such distribution is made to an employee who has attained age 62 and who is not separated from employment at the time of such distribution.

    (B) The Secretary may by regulation prescribe rules consistent with the standards and purposes of this chapter providing one or more exempt categories under which—

    (i) severance pay arrangements, and

    (ii) supplemental retirement income payments, under which the pension benefits of retirees or their beneficiaries are supplemented to take into account some portion or all of the increases in the cost of living (as determined by the Secretary of Labor) since retirement,

A1

shall, for purposes of this subchapter, be treated as welfare plans rather than pension plans. In the case of any arrangement or payment a principal effect of which is the evasion of the standards or purposes of this chapter applicable to pension plans, such arrangement or payment shall be treated as a pension plan. An applicable voluntary early retirement incentive plan (as defined in section 457(e)(11)(D)(ii) of title 26) making payments or supplements described in section 457(e)(11)(D)(i) of title 26, and an applicable employment retention plan (as defined in section 457(f)(4)(C) of title 26) making payments of benefits described in section 457(f)(4)(A) of title 26, shall, for purposes of this subchapter, be treated as a welfare plan (and not a pension plan) with respect to such payments and supplements.

**29 U.S.C. § 1135:**

Subject to subchapter II and section 1029 of this title, the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter. Among other things, such regulations may define accounting, technical and trade terms used in such provisions; may prescribe forms; and may provide for the keeping of books and records, and for the inspection of such books and records (subject to section 1134(a) and (b) of this title).

**29 C.F.R. § 2510.3-2(c):**

For purposes of title I of the Act and this chapter, the terms "employee pension benefit plan" and "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.