# No. 25-1385

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

KELLY MILLIGAN, on behalf of himself
and all others similarly situated,

*Plaintiff-Appellant*,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; BANK OF
AMERICA CORPORATION; JOHN/JANE DOE 1, the Senior Vice
President-Human Resources Global Banking and Global Wealth and
Investment Management Administration at Bank of America Corp.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Western District of North Carolina,
Case No. 3:24-cv-00440, Hon. Kenneth D. Bell

## JOINT APPENDIX VOL. 1 of 2
## (UNSEALED: JA1 – JA552)

John S. Edwards, Jr.
AJAMIE LLP
711 Louisiana, Suite 2150
Houston, TX 77002
(713) 860-1600

Robert A. Izard, Jr.
IZARD, KINDALL
& RAABE, LLP
29 South Main St., Suite 305
West Hartford, CT 06107
rizard@ikrlaw.com

Mathew P. Jasinski
Riley Breakell
MOTLEY RICE LLC
20 Church Street, 17th Floor
Hartford, CT 06103
(860) 882-1681

*Attorneys for Plaintiff-Appellant*

(*For continuation of appearances see inside cover.*)

Michael E. Kenneally
Andrew R. Hellman
MORGAN, LEWIS &
BOCKIUS LLP
1111 Pennsylvania Avenue,
NW
Washington, DC 20004
(202) 739-3000

Samuel S. Shaulson
MORGAN, LEWIS & BOCKIUS LLP
600 Brickell Avenue, Suite 1600
Miami, FL 33131
(305) 415-3000

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

| Volume I (unsealed) | |
|---|---|
| Docket Report............................................................................ | JA1 |
| Complaint (Apr. 30, 2024) (Doc. 1) ........................................ | JA14 |
| Answer (July 12, 2024) (Doc. 25)............................................ | JA35 |
| Defendants' Motion for Summary Judgment (Sept. 30, 2024) (Doc. 41) ........................................................ | JA59 |
| Exhibit 1 to Motion for Summary Judgment (Sept. 30, 2024) (Doc. 41-2): Declaration of Susanne Testani (redacted)......... | JA62 |
| Exhibit A to Testani Decl. (Doc. 41-3): WealthChoice Contingent Award Plan (Dec. 31, 2010)..... | JA65 |
| Exhibit H to Testani Decl. (Doc. 41-4): 2010 Performance Year WealthChoice Award Agreement | JA77 |
| Exhibit I to Testani Decl. (Doc. 41-5) 2010 Performance Year WealthChoice Award Agreement for Strategic Premium Award............................................. | JA88 |
| Exhibit J to Testani Decl. (Doc. 41-6): 2011 Performance Year WealthChoice Award Agreement | JA100 |
| Exhibit K to Testani Decl. (Doc. 41-7): 2011 Performance Year WealthChoice Award Agreement for Strategic Premium Award............................................. | JA121 |
| Exhibit L to Testani Decl. (Doc. 41-8): 2012 Performance Year WealthChoice Award Agreement | JA142 |
| Exhibit M to Testani Decl. (Doc. 41-9): 2012 Performance Year WealthChoice Award Agreement for Asset Gathering Award ................................................. | JA164 |

| | |
|---|---|
| Exhibit N to Testani Decl. (Doc. 41-10): 2013 Performance Year WealthChoice Award Agreement | JA186 |
| Exhibit O to Testani Decl. (Doc. 41-11): 2014 Performance Year WealthChoice Award Agreement | JA205 |
| Exhibit P to Testani Decl. (Doc. 41-12): 2015 Performance Year WealthChoice Award Agreement | JA225 |
| Exhibit Q to Testani Decl. (Doc. 41-13): 2016 Performance Year WealthChoice Award Agreement | JA246 |
| Exhibit R to Testani Decl. (Doc. 41-14): 2017 Performance Year WealthChoice Award Agreement | JA267 |
| Exhibit S to Testani Decl. (Doc. 41-15): 2018 Performance Year WealthChoice Award Agreement (redacted)................................................................ | JA287 |
| Exhibit T to Testani Decl. (Doc. 41-16): 2015 WealthChoice Award Fact Sheet .............................. | JA315 |
| Exhibit U to Testani Decl. (Doc. 41-17): 2016 WealthChoice Award Fact Sheet .............................. | JA320 |
| Exhibit V to Testani Decl. (Doc. 41-18): 2017 WealthChoice Award Fact Sheet .............................. | JA326 |
| Exhibit W to Testani Decl. (Doc. 41-19): 2018 WealthChoice Award Fact Sheet .............................. | JA332 |
| Exhibit X to Testani Decl. (Doc. 41-20): 2019 WealthChoice Award Fact Sheet .............................. | JA338 |
| Exhibit Y to Testani Decl. (Doc. 41-21): 2020 WealthChoice Award Fact Sheet .............................. | JA343 |
| Exhibit 2 to Motion for Summary Judgment (Sept. 30, 2024) (Doc. 41-22): Declaration of Edward Wastell ........................ | JA349 |

| | |
|---|---|
| Exhibit Z to Wastell Decl. (Doc. 41-23): Letter from M. Roman to K. Milligan (Apr. 30, 2021)....... | JA352 |
| Exhibit 3 to Motion for Summary Judgment (Sept. 30, 2024) (Doc. 41-24): Declaration of Tim Shook (redacted) ................ | JA359 |
| Exhibit B to Shook Decl. (Doc.41-25): 2015 Merrill Lynch Financial Advisor Incentive Compensation Plan (filed under seal)................................ | JA362 |
| Exhibit C to Shook Decl. (Doc. 41-26): 2016 Merrill Lynch Financial Advisor Incentive Compensation Plan (filed under seal)................................ | JA363 |
| Exhibit D to Shook Decl. (Doc. 41-27): 2017 Merrill Lynch Financial Advisor Incentive Compensation Plan (filed under seal)................................ | JA364 |
| Exhibit E to Shook Decl. (Doc. 41-28): 2018 Merrill Lynch Financial Advisor Incentive Compensation Plan (filed under seal)................................ | JA365 |
| Exhibit F to Shook Decl. (Doc. 41-29): 2019 Merrill Lynch Financial Advisor Incentive Compensation Plan (filed under seal)................................ | JA366 |
| Exhibit G to Shook Decl. (Doc. 41-30): 2020 Merrill Lynch Financial Advisor Incentive Compensation Plan (filed under seal)................................ | JA367 |
| Exhibit AA to Shook Decl. (Doc. 41-31): 2019 Financial Advisor Long Term Incentive Plan Change Q&A................................................... | JA368 |
| Exhibit 4 to Motion for Summary Judgment (Sept. 30, 2024) (Doc. 41-32): FINRA BrokerCheck Report for Kelly Dean Milligan ................................................................ | JA374 |

| | |
|---|---|
| Declaration of M. Zane Johnson in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (redacted) (Dec. 6, 2024) (Doc. 53-1)................................... | JA386 |
| Exhibit A to Johnson Decl. (Doc. 53-2): WealthChoice Award Payments (excerpt from data set) (filed under seal)................................... | JA390 |
| Exhibit B to Johnson Decl. (Doc. 53-3): Merrill Lynch, Pierce, Fenner & Smith Inc. and Subsidiaries Consolidated Balance Sheet (Dec. 31, 2020) ................................... | JA391 |
| Exhibit C to Johnson Decl. (Doc. 53-4): Merrill Lynch, Pierce, Fenner & Smith Inc. and Subsidiaries Consolidated Balance Sheet (Dec. 31, 2021) ................................... | JA412 |
| Exhibit D to Johnson Decl. (Doc. 53-5): Merrill Lynch, Pierce, Fenner & Smith Inc. and Subsidiaries Consolidated Balance Sheet (Dec. 31, 2022) ................................... | JA436 |
| Exhibit E to Johnson Decl. (Doc. 53-6): Merrill Lynch, Pierce, Fenner & Smith Inc. and Subsidiaries Consolidated Balance Sheet (Dec. 31, 2023) ................................... | JA458 |
| Exhibit F to Johnson Decl. (Doc. 53-7): US GAAP Month Ledger (filed under seal) ................................... | JA475 |
| Exhibit A to Defendants' Reply (Dec. 30, 2024) (Doc. 58-1): *Callan v. Merrill Lynch & Co., Inc.*, No. 3:09-cv-00566 (S.D. Cal.), Doc. 95-7, Merrill Lynch Financial Advisor Capital Accumulation Award Plan (as amended through Jan. 1, 2002)....................... | JA476 |

| | |
|---|---|
| Exhibit B to Defendants' Reply (Dec. 30, 2024) (Doc. 58-2): *Callan v. Merrill Lynch & Co., Inc.*, No. 3:09-cv-00566 (S.D. Cal.), Doc. 95-7, Merrill Lynch Growth Award Plan for Financial Advisors (effective Jan. 1, 2022) ........................... | JA496 |
| Exhibit C to Defendants' Reply (Dec. 30, 2024) (Doc. 58-3): *Callan v. Merrill Lynch & Co., Inc.*, No. 3:09-cv-00566 (S.D. Cal.), Doc. 95-9, Merrill Lynch WealthBuilder Account Plan (effective Jan. 1, 1994) ..................................................... | JA512 |
| Order (Mar. 10, 2025) (Doc. 82) (granting Motion for Summary Judgment) ........................... | JA537 |
| Judgment (Mar. 11, 2025) (Doc. 83) ...................................... | JA549 |
| Notice of Appeal (Apr. 9, 2025) (Doc. 84) .............................. | JA550 |
| **Volume II (sealed)** | |
| [Intentionally omitted.]........................................................... | JA553 |
| Exhibit 1 to Defendants' Motion for Summary Judgment (Sept. 30, 2024) (Doc. 42-3): Declaration of Susanne Testani (unredacted)....................... | JA555 |
| Exhibit S to Testani Decl. (Doc. 42-11): 2018 Performance Year WealthChoice Award Agreement (unredacted)....................................................................... | JA558 |
| Exhibit 3 to Motion for Summary Judgment (Sept. 30, 2024) (Doc. 42-4): Declaration of Tim Shook (unredacted) .............. | JA585 |
| Exhibit B to Shook Decl. (Doc.42-5): 2015 Merrill Lynch Financial Advisor Incentive Compensation Plan ........................................................... | JA588 |
| Exhibit C to Shook Decl. (Doc. 42-6): 2016 Merrill Lynch Financial Advisor Incentive Compensation Plan ........................................................... | JA650 |

| | |
|---|---|
| Exhibit D to Shook Decl. (Doc. 42-7): 2017 Merrill Lynch Financial Advisor Incentive Compensation Plan ............................................... | JA714 |
| Exhibit E to Shook Decl. (Doc. 42-8): 2018 Merrill Lynch Financial Advisor Incentive Compensation Plan ............................................... | JA777 |
| Exhibit F to Shook Decl. (Doc. 42-9): 2019 Merrill Lynch Financial Advisor Incentive Compensation Plan ............................................... | JA810 |
| Exhibit G to Shook Decl. (Doc. 42-10): 2020 Merrill Lynch Financial Advisor Incentive Compensation Plan ............................................... | JA849 |
| Declaration of M. Zane Johnson in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment (unredacted) (Dec. 6, 2024) (Doc. 54-3) .................................. | JA889 |
| Exhibit A to Johnson Decl. (Doc. 54-4): WealthChoice Award Payments (excerpt from data set) .. | JA893 |
| Exhibit F to Johnson Decl. (Doc. 54-5): US GAAP Month Ledger.................................................... | JA895 |

**3:24-cv-00440-KDB-DCK** Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc. et al
Kenneth D. Bell, presiding
David Keesler, referral
**Date filed:** 04/30/2024
**Date terminated:** 03/11/2025
**Date of last filing:** 04/14/2025

# History

| Doc. No. | Dates | Description |
|---|---|---|
| 1 | *Filed & Entered:*                    04/30/2024 | Complaint |
| | *Docket Text:* COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ANCWDC-6504120), filed by Kelly Milligan. (Attachments: # (1) Exhibit Civil Cover Sheet)(Hurst, John) | |
| | *Filed & Entered:*                    05/01/2024 | Case Assigned/Reassigned |
| | *Docket Text:* Case assigned to District Judge Kenneth D. Bell and US Magistrate Judge David Keesler. Notice: You must click this link to retrieve the **Case Assignment Packet**. *This is your only notice - you will not receive a separate document.*(mdp) | |
| | *Filed & Entered:*                    05/01/2024 | Judge Bell Civil Standing Order Requiring ISC |
| | *Docket Text:* Clerk's Entry and Service of **Standing Order Requiring an Initial Settlement Conference in Civil Cases** assigned to the Honorable Kenneth D. Bell (5:19-mc-5 (Doc. No. 1)). The parties are directed to click on the link above to retrieve the Order. The filing party is directed to serve a copy of the Order with service. (mdp) | |
| 2 | *Filed & Entered:*                    05/03/2024 | Summons Issued |
| | *Docket Text:* Summons Issued Electronically as to Bank of America Corporation, John/Jane Doe 1, Merrill Lynch, Pierce, Fenner & Smith, Inc. **NOTICE: Counsel shall print the summons and serve with other case opening documents in accordance with Fed.R.Civ.P.4** . (mdp) | |
| 3 | *Filed & Entered:*                    05/09/2024 | Summons Returned Executed |
| | *Docket Text:* SUMMONS Returned Executed by Kelly Milligan. Merrill Lynch, Pierce, Fenner & Smith, Inc. served on 5/8/2024, answer due 5/29/2024. (Hurst, John) | |
| 4 | *Filed & Entered:*                    05/09/2024 | Summons Returned Executed |
| | *Docket Text:* SUMMONS Returned Executed by Kelly Milligan. Bank of America Corporation served on 5/8/2024, answer due 5/29/2024. (Hurst, John) | |
| 5 | *Filed & Entered:*                    05/09/2024 | Summons Returned Executed |
| | *Docket Text:* SUMMONS Returned Executed by Kelly Milligan. John/Jane Doe 1 served on 5/8/2024, answer due 5/29/2024. (Hurst, John) | |
| | *Filed & Entered:*                    05/10/2024 | Notice - Out of State Counsel |
| | *Docket Text:* Notice to John S. Edwards, Jr: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via* | |

**JA1**

| | | | |
|---|---|---|---|
| | *NEF)* Deadline by 5/17/2024. (mga) | | |
| | *Filed & Entered:* | 05/10/2024 | Notice - Out of State Counsel |
| | *Docket Text:* Notice to Matthew P. Jasinski: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 5/17/2024. (mga) | | |
| | *Filed & Entered:* | 05/10/2024 | Notice - Out of State Counsel |
| | *Docket Text:* Notice to Douglas P. Needham: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 5/17/2024. (mga) | | |
| | *Filed & Entered:* | 05/10/2024 | Notice - Out of State Counsel |
| | *Docket Text:* Notice to Thomas R. Ajamie: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 5/17/2024. (mga) | | |
| 6 | *Filed & Entered:*<br>*Terminated:* | 05/10/2024<br>05/10/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Mathew P. Jasinski Filing fee $ 300, receipt number ANCWDC-6516120. by Kelly Milligan. (Hurst, John). Motions referred to David Keesler. | | |
| 7 | *Filed & Entered:*<br>*Terminated:* | 05/10/2024<br>05/10/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Douglas P. Needham Filing fee $ 300, receipt number ANCWDC-6516137. by Kelly Milligan. (Hurst, John). Motions referred to David Keesler. | | |
| 8 | *Filed & Entered:*<br>*Terminated:* | 05/10/2024<br>05/10/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Thomas R. Ajamie Filing fee $ 300, receipt number ANCWDC-6516146. by Kelly Milligan. (Hurst, John). Motions referred to David Keesler. | | |
| 9 | *Filed & Entered:*<br>*Terminated:* | 05/10/2024<br>05/10/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to John S. "Jack" Edwards, Jr. Filing fee $ 300, receipt number ANCWDC-6516168. by Kelly Milligan. (Hurst, John). Motions referred to David Keesler. | | |
| 10 | *Filed & Entered:*<br>*Terminated:* | 05/10/2024<br>05/14/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Courtney Scobie Filing fee $ 300, receipt number ANCWDC-6516185. by Kelly Milligan. (Hurst, John). Motions referred to David Keesler. | | |
| 11 | *Filed & Entered:* | 05/10/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [9] Motion for Leave to Appear Pro Hac Vice added John S. Edwards, Jr for Kelly Milligan** *(Pro Hac Vice Attorney served via NEF)*. **Signed by US Magistrate Judge David Keesler on 5/10/24. (mga)** | | |
| 12 | *Filed & Entered:* | 05/10/2024 | Order on Motion for Leave to Appear Pro Hac Vice |

| | | | |
|---|---|---|---|
| | *Docket Text:* **ORDER granting [6] Motion for Leave to Appear Pro Hac Vice added Mathew P. Jasinski for Kelly Milligan** *(Pro Hac Vice Attorney served via NEF)*. **Signed by US Magistrate Judge David Keesler on 5/10/24. (mga)** Modified text to correct pro hac attorney's name on 5/14/2024 (mga). | | |
| 13 | *Filed & Entered:* | 05/10/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [7] Motion for Leave to Appear Pro Hac Vice added Douglas P Needham for Kelly Milligan** *(Pro Hac Vice Attorney served via NEF)*. **Signed by US Magistrate Judge David Keesler on 5/10/24. (mga)** | | |
| 14 | *Filed & Entered:* | 05/10/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [8] Motion for Leave to Appear Pro Hac Vice added Thomas R. Ajamie for Kelly Milligan** *(Pro Hac Vice Attorney served via NEF)*. **Signed by US Magistrate Judge David Keesler on 5/10/24. (mga)** | | |
| | *Filed & Entered:* | 05/14/2024 | Notice - Out of State Counsel |
| | *Docket Text:* Notice to Courtney Scobie: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 5/21/2024. (cjs) | | |
| | *Filed & Entered:* | 05/14/2024 | Notice - Out of State Counsel |
| | *Docket Text:* Notice to Christopher M. Barrett: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 5/21/2024. (cjs) | | |
| 15 | *Filed & Entered:*<br>*Terminated:* | 05/14/2024<br>05/14/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Robert A. Izard Filing fee $ 300, receipt number ANCWDC-6519218. by Kelly Milligan. (Hurst, John). Motions referred to David Keesler. | | |
| 16 | *Filed & Entered:*<br>*Terminated:* | 05/14/2024<br>05/14/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Christopher M. Barrett Filing fee $ 300, receipt number ANCWDC-6519265. by Kelly Milligan. (Hurst, John). Motions referred to David Keesler. | | |
| 17 | *Filed & Entered:* | 05/14/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [10] Motion for Leave to Appear Pro Hac Vice added Courtney Scobie for Kelly Milligan** *(Pro Hac Vice Attorney served via NEF)*. **Signed by US Magistrate Judge David Keesler on 05/14/2024. (cjs)** | | |
| 18 | *Filed & Entered:* | 05/14/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [15] Motion for Leave to Appear Pro Hac Vice added Robert A. Izard for Kelly Milligan. Signed by US Magistrate Judge David Keesler on 05/14/2024. (cjs)** | | |
| 19 | *Filed & Entered:* | 05/14/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [16] Motion for Leave to Appear Pro Hac Vice added Christopher M. Barrett for Kelly Milligan** *(Pro Hac Vice Attorney served via NEF)*. **Signed by US Magistrate Judge David Keesler on 05/14/2024. (cjs)** | | |
| 20 | *Filed & Entered:*<br>*Terminated:* | 05/22/2024<br>05/22/2024 | Motion for Extension of Time |

| | *Docket Text:* Unopposed MOTION for Extension of Time to Answer re: [1] Complaint by Bank of America Corporation, John/Jane Doe 1, Merrill Lynch, Pierce, Fenner & Smith, Inc.. (Muckenfuss, Robert). Motions referred to David Keesler. |
|---|---|
| [21] | *Filed & Entered:*    05/22/2024 \| Corporate Disclosure Statement |
| | *Docket Text:* Corporate Disclosure Statement by Bank of America Corporation. (Muckenfuss, Robert) |
| [22] | *Filed & Entered:*    05/22/2024 \| Corporate Disclosure Statement |
| | *Docket Text:* Corporate Disclosure Statement by Merrill Lynch, Pierce, Fenner & Smith, Inc.. (Muckenfuss, Robert) |
| [23] | *Filed & Entered:*    05/22/2024 \| Notice of Appearance |
| | *Docket Text:* NOTICE of Appearance by Zachary L. McCamey on behalf of Bank of America Corporation, John/Jane Doe 1, Merrill Lynch, Pierce, Fenner & Smith, Inc. (McCamey, Zachary) |
| [24] | *Filed & Entered:*    05/22/2024 \| Order on Motion for Extension of Time |
| | ***Docket Text:* ORDER granting Defendant's [20] Unopposed Motion for Extension of Time to Answer re [1] Complaint. Bank of America Corporation answer due 7/12/2024; John/Jane Doe 1 answer due 7/12/2024; Merrill Lynch, Pierce, Fenner & Smith, Inc. answer due 7/12/2024. The parties shall file a "Certificate of Settlement Conference: on or before July 12, 2024. See 5:19-MC-005-KDB (Document No. 2) (W.D.N.C. July 16, 2019).. Signed by US Magistrate Judge David Keesler on 5/22/24. (mga)** |
| [25] | *Filed & Entered:*    07/12/2024 \| Answer to Complaint |
| | *Docket Text:* ANSWER to [1] Complaint by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc..(Muckenfuss, Robert) |
| [26] | *Filed & Entered:*    07/12/2024 \| Notice of Certificate of Initial Settlement Conference |
| | *Docket Text:* NOTICE of Certificate of Settlement Conference Pursuant to Standing Order 5:19-mc-5. Result: Unable to resolve. (Muckenfuss, Robert) |
| [27] | *Filed & Entered:*    07/12/2024 \| Motion to Appear Pro Hac Vice <br> *Terminated:*    07/15/2024 |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Matthew Zane Johnson Filing fee $ 300, receipt number ANCWDC-6589726. by Kelly Milligan. (Hurst, John). Motions referred to David Keesler. |
| | *Filed & Entered:*    07/15/2024 \| Notice - Out of State Counsel |
| | *Docket Text:* Notice to Matthew Zane Johnson: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 7/22/2024. (brl) |
| | *Filed & Entered:*    07/15/2024 \| Notice to Conduct Initial Attorneys Conference |
| | *Docket Text:* NOTICE pursuant to Local Rule 16.1 you are **required** to conduct an Initial Attorney's Conference within 14 days. At the conference, the parties are **required** to discuss the issue of consent to jurisdiction of a magistrate judge in accordance with Local Rules 16.1(A) and 73.1(C). The **Certificate of Initial Attorneys Conference**, and if applicable, the **Joint Stipulation of Consent to Exercise jurisdiction by a US Magistrate Judge**, should be filed within 7 days of the conference. If appropriate, a party |

| | | | |
|---|---|---|---|
| | may file a Motion to Stay the Initial Attorney's Conference. CIAC Report due by 8/5/2024. (mek) | | |
| 28 | *Filed & Entered:* | 07/15/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [27] Motion for Leave to Appear Pro Hac Vice added Matthew Zane Johnson for Kelly Milligan** *(Pro Hac Vice Attorney served via NEF).* **Signed by US Magistrate Judge David Keesler on 7/12/2024. (brl)** | | |
| 29 | *Filed & Entered:* *Terminated:* | 07/18/2024 07/19/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Sari M. Alamuddin Filing fee $ 300, receipt number ANCWDC-6596609. by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc.. (Attachments: # (1) Exhibit, # (2) Proposed Order) (McCamey, Zachary). Motions referred to David Keesler. | | |
| 30 | *Filed & Entered:* *Terminated:* | 07/18/2024 07/19/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Matthew A. Russell Filing fee $ 300, receipt number ANCWDC-6596628. by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc.. (Attachments: # (1) Exhibit, # (2) Proposed Order) (McCamey, Zachary). Motions referred to David Keesler. | | |
| 31 | *Filed & Entered:* | 07/19/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [29] Motion for Leave to Appear Pro Hac Vice added Sari M. Alamuddin for Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc. Signed by US Magistrate Judge David Keesler on 7/18/24. (mga)** | | |
| 32 | *Filed & Entered:* | 07/19/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [30] Motion for Leave to Appear Pro Hac Vice added Matthew A. Russell for Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc. Signed by US Magistrate Judge David Keesler on 7/19/24. (mga)** Modified signature date on 7/23/2024 (rth). | | |
| 33 | *Filed & Entered:* *Terminated:* | 08/02/2024 08/02/2024 | Motion for Extension of Time |
| | *Docket Text:* Joint MOTION for Extension of Time to Submit Certification and Report of Rule 26(f) Conference and Discovery Plan by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc. Responses due by 8/16/2024 (Muckenfuss, Robert). Motions referred to David Keesler. | | |
| 34 | *Filed & Entered:* | 08/02/2024 | Order on Motion for Extension of Time |
| | *Docket Text:* **ORDER granting parties' [33] Joint Motion for Extension of Time to Submit Certificate of Initial Attorney's Rule 26(f) Conference and Discovery Plan. CIAC Report due by 8/9/2024. Signed by US Magistrate Judge David Keesler on 8/2/24. (mga)** | | |
| 35 | *Filed & Entered:* | 08/09/2024 | Certification of Initial Attorneys Conference and Discovery Plan |
| | *Docket Text:* CERTIFICATION of initial attorney conference and discovery plan (Russell, Matthew) | | |
| 36 | *Filed & Entered:* | 08/13/2024 | Scheduling Order |
| | | | |

| | | | |
|---|---|---|---|
| | *Docket Text:* **Pretrial Order and Case Management Plan: Estimated Trial Time: five (5) days. Discovery due by 4/4/2025. Motions due by 5/5/2025. Mediator Designation deadline set for 10/11/2024. Mediation deadline set for 4/4/2025. Jury Trial set for 10/6/2025 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. Signed by US Magistrate Judge David Keesler on 8/12/24. (mga)** | | |
| [37](#) | *Filed & Entered:*<br>*Terminated:* | 09/17/2024<br>09/18/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Craig A. Raabe Filing fee $ 300, receipt number ANCWDC-6668901. by Kelly Milligan. (Hurst, John). Motions referred to David Keesler. | | |
| [38](#) | *Filed & Entered:*<br>*Terminated:* | 09/17/2024<br>09/18/2024 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Seth R. Klein Filing fee $ 300, receipt number ANCWDC-6668917. by Kelly Milligan. (Hurst, John). Motions referred to David Keesler. | | |
| | *Filed & Entered:* | 09/18/2024 | Notice - Out of State Counsel |
| | *Docket Text:* Notice to Craig A. Raabe: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **[Link](#)**. *(Attorney served via NEF)* Deadline by 9/25/2024. (cjs) | | |
| | *Filed & Entered:* | 09/18/2024 | Notice - Out of State Counsel |
| | *Docket Text:* Notice to Seth R. Klein: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **[Link](#)**. *(Attorney served via NEF)* Deadline by 9/25/2024. (cjs) | | |
| [39](#) | *Filed & Entered:* | 09/18/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [37] Motion for Leave to Appear Pro Hac Vice added Craig A. Raabe for Kelly Milligan** *(Pro Hac Vice Attorney served via NEF)***. Signed by US Magistrate Judge David Keesler on 09/18/2024. (cjs)** | | |
| [40](#) | *Filed & Entered:* | 09/18/2024 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [38] Motion for Leave to Appear Pro Hac Vice added Seth R. Klein for Kelly Milligan** *(Pro Hac Vice Attorney served via NEF)***. Signed by US Magistrate Judge David Keesler on 09/18/2024. (cjs)** | | |
| [41](#) | *Filed & Entered:*<br>*Terminated:* | 09/30/2024<br>03/11/2025 | Motion for Summary Judgment |
| | *Docket Text:* MOTION for Summary Judgment by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc.. Responses due by 10/15/2024 (Attachments: # (1) Memorandum In Support of Motion for Summary Judgment, # (2) Exhibit Ex 1 - Declaration of Susanne Testani, # (3) Exhibit Ex A to Declaration of Susanne Testani, # (4) Exhibit Ex H to Declaration of Susanne Testani, # (5) Exhibit Ex I to Declaration of Susanne Testani, # (6) Exhibit Ex J to Declaration of Susanne Testani, # (7) Exhibit Ex K to Declaration of Susanne Testani, # (8) Exhibit Ex L to Declaration of Susanne Testani, # (9) Exhibit Ex M to Declaration of Susanne Testani, # (10) Exhibit Ex N to Declaration of Susanne Testani, # (11) Exhibit Ex O to Declaration of Susanne Testani, # (12) Exhibit Ex P to Declaration of Susanne Testani, # (13) Exhibit Ex Q to Declaration of Susanne Testani, # (14) Exhibit Ex R to Declaration of Susanne Testani, # (15) Exhibit Ex S to | | |

Declaration of Susanne Testani, # (16) Exhibit Ex T to Declaration of Susanne Testani, # (17) Exhibit Ex U to Declaration of Susanne Testani, # (18) Exhibit Ex V to Declaration of Susanne Testani, # (19) Exhibit Ex W to Declaration of Susanne Testani, # (20) Exhibit Ex X to Declaration of Susanne Testani, # (21) Exhibit Ex Y to Declaration of Susanne Testani, # (22) Exhibit Ex 2 - Declaration of Edward Wastell, # (23) Exhibit Ex Z to Declaration of Edward Wastell, # (24) Exhibit Ex 3 - Declaration of Tim Shook, # (25) Exhibit Ex B to Declaration of Tim Shook, # (26) Exhibit Ex C to Declaration of Tim Shook, # (27) Exhibit Ex D to Declaration of Tim Shook, # (28) Exhibit Ex E to Declaration of Tim Shook, # (29) Exhibit Ex F to Declaration of Tim Shook, # (30) Exhibit Ex G to Declaration of Tim Shook, # (31) Exhibit Ex AA to Declaration of Tim Shook, # (32) Exhibit Ex 4 - Milligan's BrokerCheck Report) (Muckenfuss, Robert)

| 42 | *Filed & Entered:* 09/30/2024<br>*Terminated:* 10/01/2024 | Motion to Seal Document |
|----|----|----|
| | \multicolumn{2}{l}{*Docket Text:* Unopposed MOTION to Seal Document [41] MOTION for Summary Judgment by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc. Responses due by 10/15/2024 (Attachments: # (1) Memorandum In Support of Motion to Seal, # (2) Exhibit Memorandum In Support of Motion for Summary Judgment, # (3) Exhibit Declaration of Susanne Testani, # (4) Exhibit Declaration of Tim Shook, # (5) Exhibit B to Declaration of Tim Shook, # (6) Exhibit C to Declaration of Tim Shook, # (7) Exhibit D to Declaration of Tim Shook, # (8) Exhibit E to Declaration of Tim Shook, # (9) Exhibit F to Declaration of Tim Shook, # (10) Exhibit G to Declaration of Tim Shook, # (11) Exhibit S to Declaration of Susanne Testani, # (12) Proposed Order) (Muckenfuss, Robert). Motions referred to David Keesler. Modified access to attachments 2-12 on 9/30/2024 (mek).} | |

| 43 | *Filed & Entered:* 09/30/2024<br>*Terminated:* 10/01/2024 | Motion for Protective Order |
|----|----|----|
| | *Docket Text:* Joint MOTION for Protective Order by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc.. Responses due by 10/15/2024 (Attachments: # (1) Proposed Order) (Muckenfuss, Robert). Motions referred to David Keesler. | |

| 44 | *Filed & Entered:* 10/01/2024 | Protective Order |
|----|----|----|
| | *Docket Text:* **STIPULATED PROTECTIVE ORDER. Signed by US Magistrate Judge David Keesler on 10/1/24. (mga)** | |

| 45 | *Filed & Entered:* 10/01/2024 | Order on Motion to Seal Document |
|----|----|----|
| | *Docket Text:* **ORDER granting Defendants' [42] Unopposed Motion to Seal Exhibits to their Memorandum of Law in Support of their Motion for Summary Judgment Under Seal. Documents Nos. 42-2, 42-3, 42-4, 42-5, 42-6, 42-7, 42-8, 42-9, 42-10, and 42-11 shall remain under SEAL until otherwise ordered by this Court. Signed by US Magistrate Judge David Keesler on 10/1/24. (mga)** | |

| 46 | *Filed & Entered:* 10/07/2024<br>*Terminated:* 10/08/2024 | Motion for Extension of Time |
|----|----|----|
| | *Docket Text:* Joint MOTION for Extension of Time Regarding Briefing Schedule for Defendants Motion for Summary Judgment by Kelly Milligan. Responses due by 10/21/2024 (Hurst, John). Motions referred to David Keesler. | |

| 47 | *Filed & Entered:* 10/08/2024 | Order on Motion for Extension of Time |
|----|----|----|
| | *Docket Text:* **ORDER granting [46]Joint Motion for Extension of Time Regarding Briefing Schedule for Defendants Motion for Summary Judgment. The current** | |

| | | | |
|---|---|---|---|
| | **deadline for Plaintiff to file a response to "Defendants' Motion for Summary Judgment" (Document No. 41) is VACATED. The parties shall file a motion, jointly if possible, proposing revised deadlines for Plaintiff's Response and Defendants' Reply regarding "Defendants' Motion for Summary Judgment" (Document No. 41) on or before October 11, 2024. Signed by US Magistrate Judge David Keesler on 10/8/24. (mga)** | | |
| [48](#) | *Filed & Entered:* <br> *Terminated:* | 10/11/2024 <br> 10/15/2024 | Motion for Miscellaneous Relief |
| | *Docket Text:* Joint MOTION Regarding Briefing Schedule for Defendants' Motion for Summary Judgment by Bank of America Corporation, John/Jane Doe 1, Merrill Lynch, Pierce, Fenner & Smith, Inc.. Responses due by 10/25/2024 (McCamey, Zachary). Motions referred to David Keesler. | | |
| | *Filed & Entered:* | 10/15/2024 | Set/Reset Pretrial Order Deadlines |
| | *Docket Text:* Set/Reset Pretrial Order Deadlines: Mediator Designation deadline set for 10/28/2024. (mga) | | |
| [49](#) | *Filed & Entered:* | 10/15/2024 | Order on Motion for Miscellaneous Relief |
| | *Docket Text:* **ORDER granting parties'[48] second Motion Regarding Briefing Schedule for Defendants' Motion for Summary Judgment. IT IS FURTHER ORDERED that the parties shall meet and confer and then file a motion, jointly if possible, proposing revised deadlines for Plaintiff's Response and Defendants' Reply regarding "Defendants' Motion for Summary Judgment" (Document No. 41) on or before October 18, 2024. The parties shall file a Notice identifying their Mediator on or before October 28, 2024. Signed by US Magistrate Judge David Keesler on 10/14/24. (mga)** | | |
| [50](#) | *Filed & Entered:* <br> *Terminated:* | 10/18/2024 <br> 10/21/2024 | Motion for Miscellaneous Relief |
| | *Docket Text:* Joint MOTION Regarding Briefing Schedule for Defendants' Motion for Summary Judgment by Kelly Milligan. Responses due by 11/1/2024 (Hurst, John). Motions referred to David Keesler. | | |
| | *Filed & Entered:* | 10/21/2024 | Set Motion and M&R Deadlines/Hearings |
| | *Docket Text:* Set/Reset Deadlines as to [41] MOTION for Summary Judgment . Responses due by 12/6/2024. Replies due by 12/20/2024 (brl) | | |
| [51](#) | *Filed & Entered:* | 10/21/2024 | Order on Motion for Miscellaneous Relief |
| | *Docket Text:* **ORDER granting [50] Motion Regarding Briefing Schedule for Defendants' Motion for Summary Judgment. The case deadlines are revised as follows: Defendants shall produce additional discovery materials on or before November 11, 2024; Plaintiff shall file a response to Defendants Motion For Summary Judgment (Document No. 41) on or before December 6, 2024; and Defendants shall file a reply in support of the Motion For Summary Judgment (Document No. 41) on or before December 20, 2024. Signed by US Magistrate Judge David Keesler on 10/21/2024. (brl)** | | |
| [52](#) | *Filed & Entered:* | 10/28/2024 | Notice (Other) |
| | *Docket Text:* DESIGNATION of Robert A. Meyer as Mediator by all the parties. (Russell, Matthew) Modified on 10/30/2024 to correct event type (mek). | | |
| [53](#) | *Filed & Entered:* | 12/06/2024 | Response in Opposition to Motion |

|   | | | |
|---|---|---|---|
| | *Docket Text:* RESPONSE in Opposition re [41] MOTION for Summary Judgment by Kelly Milligan. Replies due by 12/13/2024 (Attachments: # (1) Affidavit Declaration of M. Zane Johnson, # (2) Exhibit A, # (3) Exhibit B, # (4) Exhibit C, # (5) Exhibit D, # (6) Exhibit E, # (7) Exhibit F)(Hurst, John) | | |
| 54 | *Filed & Entered:* <br> *Terminated:* | 12/06/2024 <br> 12/09/2024 | Motion to Seal Document |
| | *Docket Text:* Unopposed MOTION to Seal Document [53] Response in Opposition to Motion, by Kelly Milligan. Responses due by 12/20/2024 (Attachments: # (1) Memorandum of Law in Support of Motion to Seal, # (2) Exhibit Response to MSJ, # (3) Affidavit Declaration of M. Zane Johnson, # (4) Exhibit A to Declaration, # (5) Exhibit F to Declaration, # (6) Proposed Order) (Hurst, John). Motions referred to David Keesler. | | |
| 55 | *Filed & Entered:* | 12/09/2024 | Order on Motion to Seal Document |
| | *Docket Text:* **ORDER granting Plaintiff's [54] Unopposed Motion To File Under Seal Certain Exhibits To Their Response Brief In Opposition To Defendants' Motion For Summary Judgment. Document Nos. 54-2, 54-3, 54-4, and 54-5 shall remain under SEAL until otherwise ordered by this Court. Signed by US Magistrate Judge David Keesler on 12/9/2024. (mek)** | | |
| 56 | *Filed & Entered:* <br> *Terminated:* | 12/13/2024 <br> 12/16/2024 | Motion for Extension of Time |
| | *Docket Text:* Unopposed MOTION for Extension of Time to File Response/Reply re: [41] MOTION for Summary Judgment by Merrill Lynch, Pierce, Fenner & Smith, Inc., Bank of America Corporation. Responses due by 12/27/2024 (Muckenfuss, Robert). Motions referred to David Keesler. | | |
| 57 | *Filed & Entered:* | 12/16/2024 | Order on Motion for Extension of Time |
| | *Docket Text:* **ORDER granting Defendants Bank of America Corporation and Merrill Lynch, Pierce, Fenner & Smith, Inc's [56] Unopposed Motion for Extension of Time to File Response/Reply. Replies due by 12/30/2024. Signed by US Magistrate Judge David Keesler on 12/13/24. (mga)** Modified text on 12/17/2024 (mek). | | |
| 58 | *Filed & Entered:* | 12/30/2024 | Response in Support of Motion |
| | *Docket Text:* REPLY in Support re [41] MOTION for Summary Judgment by Merrill Lynch, Pierce, Fenner & Smith, Inc., Bank of America Corporation. (Attachments: # (1) Exhibit FACAAP Plan Doc, # (2) Exhibit Growth Award Plan Doc, # (3) Exhibit WealthBuilder Plan)(Muckenfuss, Robert) Modified text on 12/31/2024 (mek). | | |
| 59 | *Filed & Entered:* <br> *Terminated:* | 12/30/2024 <br> 12/31/2024 | Motion to Seal Document |
| | *Docket Text:* Unopposed MOTION to Seal Document [60] Unredacted Version of [58] Reply by Merrill Lynch, Pierce, Fenner & Smith, Inc., Bank of America Corporation. Responses due by 1/13/2025 (Attachments: # (1) Memorandum) (Muckenfuss, Robert). Motions referred to David Keesler. Modified text on 12/31/2024 (mek). | | |
| 60 | *Filed & Entered:* | 12/30/2024 | Sealed Response to Motion |
| | *Docket Text:* UNREDACTED DOCUMENT *(Sealed - Attorney)* re: [58] Reply by Bank of America Corporation and Merrill Lynch, Pierce, Fenner & Smith, Inc.; (available to Kelly Milligan, Merrill Lynch, Pierce, Fenner & Smith, Inc., Bank of America Corporation) (Muckenfuss, Robert) Modified text on 12/31/2024 (mek). | | |
| 61 | *Filed & Entered:* | 12/31/2024 | Order on Motion to Seal Document |

|  | | | |
|---|---|---|---|
| | *Docket Text:* **ORDER granting [59] Motion to Seal Document. Document No. 60 shall remain under SEAL until otherwise ordered by this Court. Signed by US Magistrate Judge David Keesler on 12/31/2024. (brl)** | | |
| 62 | *Filed & Entered:* *Terminated:* | 01/06/2025 03/11/2025 | Motion to Amend/Correct |
| | *Docket Text:* MOTION to Amend/Correct [1] Complaint by Kelly Milligan. Responses due by 1/21/2025 (Attachments: # (1) Exhibit A [Amended Complaint], # (2) Exhibit B [Redline of Amended Complaint], # (3) Memorandum, # (4) Proposed Order) (Hurst, John). Modified on 2/19/2025 to remove referral (mek). | | |
| 63 | *Filed & Entered:* *Terminated:* | 01/14/2025 01/16/2025 | Motion to Stay |
| | *Docket Text:* Joint MOTION to Stay by Kelly Milligan. Responses due by 1/28/2025 (Hurst, John). Motions referred to David Keesler. | | |
| 64 | *Filed & Entered:* | 01/16/2025 | Order on Motion to Stay |
| | *Docket Text:* **ORDER granting [63] Joint Motion to Stay. This matter is STAYED pending resolution of "Defendants' Motion for Summary Judgment " (Document No. [41]). Signed by US Magistrate Judge David Keesler on 1/16/24. (mga)** | | |
| 65 | *Filed & Entered:* | 01/22/2025 | Notice of Certificate of Initial Settlement Conference |
| | *Docket Text:* NOTICE of Certificate of Settlement Conference Pursuant to Standing Order 5:19-mc-5. Result: Unable to resolve. (McCamey, Zachary) | | |
| 66 | *Filed & Entered:* *Terminated:* | 02/14/2025 03/05/2025 | Motion to Intervene |
| | *Docket Text:* MOTION to Intervene by Jeffrey DeWees, Reinhold Wigand, Jay Tamkoc, William Schellenerg, Matthew Mendoza, Luke McKelvy, Alon Haim. Responses due by 2/28/2025 (Attachments: # (1) Proposed Order) (Wellman, Jacob).Modified on 2/19/2025 to remove referral (mek). | | |
| 67 | *Filed & Entered:* | 02/14/2025 | Declaration |
| | *Docket Text:* DECLARATION re [66] MOTION to Intervene filed by Jeffrey DeWees, Alon Haim, Luke McKelvy, Matthew Mendoza, William Schellenerg, Jay Tamkoc, Reinhold Wigand (Attachments: # (1) Exhibit FINR Statement of Claim, # (2) Exhibit Parties Uniform Submission Agmt, # (3) Exhibit ML Answer and Motion to Stay, # (4) Exhibit FINR Order re Proceeding Arbitration, # (5) Exhibit ML CRD Report, # (6) Exhibit Intervenor Pls CRD Report, # (7) Exhibit FINRA Bylaws Relevant Art, # (8) Exhibit FINRA Rules Cited, # (9) Exhibit Formu4, # (10) Exhibit FINRA RN 16-25, # (11) Exhibit Claimant's Dec 12 Notice, # (12) Exhibit ML Reply IFSO Answer and Motion to Stay, # (13) Exhibit ML Notice to Panel and Motion to Stay)(Wellman, Jacob) | | |
| 68 | *Filed & Entered:* | 02/14/2025 | Memorandum in Support of Motion |
| | *Docket Text:* MEMORANDUM in Support re [66] MOTION to Intervene by Jeffrey DeWees, Alon Haim, Luke McKelvy, Matthew Mendoza, William Schellenerg, Jay Tamkoc, Reinhold Wigand. (Wellman, Jacob) | | |
| 69 | *Filed & Entered:* *Terminated:* | 02/14/2025 03/05/2025 | Motion to Stay |
| | *Docket Text:* MOTION to Stay by Jeffrey DeWees, Alon Haim, Luke McKelvy, Matthew Mendoza, William Schellenerg, Jay Tamkoc, Reinhold Wigand. Responses due by | | |

| | | |
|---|---|---|
| | 2/28/2025 (Attachments: # (1) Proposed Order) (Wellman, Jacob). Modified on 2/19/2025 to remove referral (mek). | |
| [70](#) | *Filed & Entered:* 02/14/2025 | Memorandum in Support of Motion |
| | *Docket Text:* MEMORANDUM in Support re [69] MOTION to Stay by Jeffrey DeWees, Alon Haim, Luke McKelvy, Matthew Mendoza, William Schellenerg, Jay Tamkoc, Reinhold Wigand. (Wellman, Jacob) | |
| | *Filed & Entered:* 02/19/2025 | Notice of Hearing on Motion |
| | *Docket Text:* NOTICE of Hearing on Motions re: [41] MOTION for Summary Judgment, [62] MOTION to Amend/Correct [1] Complaint, [66] MOTION to Intervene, [69] MOTION to Stay: Motion Hearing set for 3/4/2025 10:00 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.*(mek) | |
| | *Filed & Entered:* 02/26/2025 | Notice of Hearing on Motion |
| | *Docket Text:* NOTICE of Hearing on Motions re: [41] MOTION for Summary Judgment, [62] MOTION to Amend/Correct [1] Complaint, [66] MOTION to Intervene, [69] MOTION to Stay: Motions Hearing **RESET as to time only** for 3/4/2025 09:30 AM in Courtroom #4B, 401 W Trade St, Charlotte, NC 28202 before District Judge Kenneth D. Bell. *This is your only notice - you will not receive a separate document.*(mek) | |
| [71](#) | *Filed & Entered:* 02/26/2025<br>*Terminated:* 03/04/2025 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Robert R. Miller Filing fee $ 300, receipt number ANCWDC-6866539. by Jeffrey DeWees, Alon Haim, Luke McKelvy, Matthew Mendoza, William Schellenerg, Jay Tamkoc, Reinhold Wigand. (Wellman, Jacob). Modified on 2/28/2025 to remove referral (mek). | |
| [72](#) | *Filed & Entered:* 02/26/2025<br>*Terminated:* 03/04/2025 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Barry R. Lax Filing fee $ 300, receipt number ANCWDC-6866563. by Jeffrey DeWees, Alon Haim, Luke McKelvy, Matthew Mendoza, William Schellenerg, Jay Tamkoc, Reinhold Wigand. (Wellman, Jacob). Modified on 2/28/2025 to remove referral (mek). | |
| [73](#) | *Filed & Entered:* 02/26/2025<br>*Terminated:* 03/04/2025 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Barry R. Lax Filing fee $ 300, receipt number ANCWDC-6866742. by Jeffrey DeWees, Alon Haim, Luke McKelvy, Matthew Mendoza, William Schellenerg, Jay Tamkoc, Reinhold Wigand. (Wellman, Jacob). Modified on 2/28/2025 to remove referral (mek). | |
| [74](#) | *Filed & Entered:* 02/26/2025<br>*Terminated:* 03/04/2025 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Robert R. Miller Filing fee $ 300, receipt number ANCWDC-6866750. by Jeffrey DeWees, Alon Haim, Luke McKelvy, Matthew Mendoza, William Schellenerg, Jay Tamkoc, Reinhold Wigand. (Wellman, Jacob). Modified on 2/28/2025 to remove referral (mek). | |
| | *Filed & Entered:* 02/27/2025 | Order Setting Response Deadline |
| | *Docket Text:* **TEXT ONLY ORDER: Defendants are directed to file a response, if any, indicating their objections to the pending motions for admission pro hac vice** | |

JA11

| | | | |
|---|---|---|---|
| | **(Document Nos. [71],[72],[73], and [74]) no later than 10:00 a.m. on Friday, February 28, 2025. So Ordered. Entered by US Magistrate Judge David Keesler on 2/27/25. (mga)** | | |
| 75 | *Filed & Entered:* | 02/27/2025 | Response to Motion |
| | *Docket Text:* RESPONSE to Motion re [72] MOTION for Leave to Appear Pro Hac Vice as to Barry R. Lax Filing fee $ 300, receipt number ANCWDC-6866563., [71] MOTION for Leave to Appear Pro Hac Vice as to Robert R. Miller Filing fee $ 300, receipt number ANCWDC-6866539. by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc.. Replies due by 3/6/2025 (McCamey, Zachary) | | |
| 76 | *Filed & Entered:* | 02/28/2025 | Response in Opposition to Motion |
| | *Docket Text:* RESPONSE in Opposition re [66] MOTION to Intervene by Kelly Milligan. Replies due by 3/7/2025 (Hurst, John) | | |
| 77 | *Filed & Entered:* | 02/28/2025 | Response in Opposition to Motion |
| | *Docket Text:* RESPONSE in Opposition re [69] MOTION to Stay by Kelly Milligan. Replies due by 3/7/2025 (Hurst, John) | | |
| 78 | *Filed & Entered:* | 02/28/2025 | Response in Opposition to Motion |
| | *Docket Text:* RESPONSE in Opposition re [69] MOTION to Stay , [66] MOTION to Intervene by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc.. Replies due by 3/7/2025 (Attachments: # (1) Exhibit 1 - Declaration of Matthew Russell, # (2) Exhibit 2 - Declaration of Robert Muckenfuss)(Muckenfuss, Robert) | | |
| 79 | *Filed & Entered:* <br> *Terminated:* | 03/03/2025 <br> 03/03/2025 | Motion to Appear Pro Hac Vice |
| | *Docket Text:* MOTION for Leave to Appear Pro Hac Vice as to Kevin F. Gaffney Filing fee $ 300, receipt number ANCWDC-6871311. by Bank of America Corporation, Merrill Lynch, Pierce, Fenner & Smith, Inc.. (Attachments: # (1) Proposed Order) (McCamey, Zachary). Motions referred to David Keesler. | | |
| 80 | *Filed & Entered:* | 03/03/2025 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORDER granting [79] Motion for Leave to Appear Pro Hac Vice; added Kevin F. Gaffney for Bank of America Corporation and Merrill Lynch, Pierce, Fenner & Smith, Inc. Signed by US Magistrate Judge David Keesler on 3/3/2025. (llp)** | | |
| | *Filed & Entered:* | 03/04/2025 | Motion Hearing |
| | *Docket Text:* Minute Entry: MOTION HEARING held before District Judge Kenneth D. Bell. Re [41] Motion for Summary Judgment, [62] Motion to Amend/Correct [1] Complaint, [66] Motion to Intervene, [69] Motion to Stay, and [71], [72], [73], and [74] Motions for Leave to Appear Pro Hac Vice. Written order to issue. Plaintiffs attorney: John S. Edwards, Jr, Douglas P Needham, Mathew Paul Jasinski, John David Hurst. Defendants attorney: Robert A. Muckenfuss, Matthew A. Russell, Kevin F. Gaffney.Intervenor Parties: Jacob H. Wellman, Barry R. Lax, Robert R. Miller Court reporter: Cheryl Nuccio. (mek) | | |
| | *Filed & Entered:* | 03/04/2025 | Order on Motion for Leave to Appear Pro Hac Vice |
| | *Docket Text:* **ORAL ORDER: The [73] and [74] Motions for Leave to Appear Pro Hac Vice by Barry R. Lax and Robert R. Miller on behalf of the proposed intervenor parties is GRANTED for the purposes of the motions hearing held on this date. The** | | |

| | | |
|---|---|---|
| | **[71] and [72] Motions for Leave to Appear Pro Hac Vice are terminated as moot. Entered by District Judge Kenneth D. Bell on 3/4/2025. (mek)** | |
| | *Filed & Entered:*     03/05/2025 | Order on Motion to Intervene |
| | *Docket Text:* **ORAL ORDER denying without prejudice Intervenor Parties' [66] Motion to Intervene for the reasons stated in court and denying as moot the Intervenor Parties' [69] Motion to Stay. Entered by District Judge Kenneth D. Bell on 3/4/2025. (mek)** Modified text on 3/5/2025 (mek). | |
| 81 | *Filed & Entered:*     03/05/2025 | Transcript |
| | *Docket Text:* TRANSCRIPT of Motion Hearing held on 3/4/25 before Judge Bell. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 6/2/2025. (Reporter: Cheryl Nuccio, cheryl_nuccio@ncwd.uscourts.gov) | |
| 82 | *Filed & Entered:*     03/11/2025 | Order on Motion for Summary Judgment |
| | *Docket Text:* **ORDER granting [41] Motion for Summary Judgment. Signed by District Judge Kenneth D. Bell on 3/10/2025. (tlj)** | |
| 83 | *Filed & Entered:*     03/11/2025 | Clerk's Judgment |
| | *Docket Text:* **CLERK'S JUDGMENT is hereby entered in accordance with the Court's Order dated 3/11/2025. Signed by Clerk, Katherine Hord Simon. (tlj)** | |
| 84 | *Filed & Entered:*     04/09/2025 | Notice of Appeal |
| | *Docket Text:* NOTICE OF APPEAL as to [83] Clerk's Judgment by Kelly Milligan. Filing fee $ 605, receipt number ANCWDC-6927822. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, and Transcript Order Form.* Note: Your Transcript Order Form must be served on the District Court as well as the Circuit Court. (Hurst, John) | |
| 85 | *Filed & Entered:*     04/10/2025 | Transmission of Notice of Appeal to USCA |
| | *Docket Text:* Transmission of Notice of Appeal to US Court of Appeals re [84] Notice of Appeal (mek) | |
| 86 | *Filed:*     04/14/2025 *Entered:*     04/15/2025 | Case Number - Court of Appeals |
| | *Docket Text:* USCA Case Number 25-1385 for [84] Notice of Appeal, USCA Case Manager: Karen Stump. (llp) | |

**JA13**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**

KELLY MILLIGAN,
ON BEHALF OF HIMSELF AND
ALL OTHERS SIMILARLY SITUATED,

           Plaintiff,

    vs.

MERRILL LYNCH, PIERCE, FENNER &
SMITH INC., BANK OF AMERICA CORP.,
and JOHN/JANE DOE 1, THE SENIOR VICE
PRESIDENT–HUMAN RESOURCES
GLOBAL BANKING AND GLOBAL
WEALTH AND INVESTMENT
MANAGEMENT ADMINISTRATION AT
BANK OF AMERICA CORP.,

           Defendants.

Civil Action No. _____

CLASS ACTION

## PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Kelly Milligan, on behalf of himself and all others similarly situated, files this Class Action Complaint against Defendants Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), Bank of America Corp. ("BOA"), and John/Jane Doe 1, the Senior Vice President–Human Resources Global Banking and Global Wealth and Investment Management Administration at BOA (together, "Defendants").

## INTRODUCTION

1.    This is a class action under the Employee Retirement Income Security Act of 1974 ("ERISA") to recover the deferred compensation that financial advisors ("FAs") forfeited in violation of ERISA § 203(a), 29 U.S.C. § 1053(a), when they left Merrill Lynch.

2.    FAs receive salary plus commissions. Commissions are based on the revenue generated by client investment activities. Defendants automatically allocate a portion of

1

commissions into the WealthChoice Contingent Award Plan (the "Plan"). The commissions are allocated to individual Plan accounts for each FA. Under the relevant Plan award agreements, commissions "vest" in eight years. Merrill Lynch causes FAs to forfeit the value in their Plan accounts if they leave Merrill Lynch before these vesting dates (the "Cancellation Rule").

3.      The Plan is an "employee benefit pension plan" under ERISA because it "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii).

4.      Specifically, the Plan "results in a deferral of income" because FAs are paid for work (i.e., the revenue they generate) years after they perform the work. The Plan also "results in" income being deferred "for periods extending to the termination of covered employment or beyond" because FAs receive the value of their Plan accounts after their employment ends if they retire, are laid off, or become disabled.

5.      Plaintiff worked as an FA at Merrill Lynch and, when he left Merrill Lynch, Defendants invoked the Cancellation Rule to deny him the deferred compensation that he earned under the FA Deferred Compensation Program.

6.      Plaintiff seeks an Order from the Court under ERISA § 502(a)(3) declaring that the Plan is subject to ERISA and that the Cancellation Rule violates ERISA's vesting and anti-forfeiture requirements. He seeks the payment of his and the other class members' deferred compensation that was wrongfully forfeited. He also asserts a claim against John/Jane Doe 1, the Senior Vice President–Human Resources Global Banking and Global Wealth and Investment Management Administration, who administers the deferred-compensation plan, for breach of fiduciary duty under ERISA § 502(a)(2) and (a)(3) for applying the Cancellation Rule in violation of ERISA. Alternatively, Plaintiff seeks an Order reforming the Plan so that it complies with

ERISA's vesting and anti-forfeiture requirements by, among other things, eliminating the Cancellation Rule. Plaintiff also asserts a claim under ERISA 502(a)(1)(B) to recover the benefits due to him and the other class members under the Plan, as reformed.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and under 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

8.    This Court has personal jurisdiction over Defendants because they are headquartered, transact business, reside in, or have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.    Venue is proper in this District under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District, and Defendants may be found in this District. Venue is also proper in this District under 28 U.S.C. § 1391 because Defendants do business in this District, and a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred within this District.

10.    Venue is also proper in this District because the relevant award agreements provide any dispute related to the Plan shall be resolved "solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina."

## PARTIES

### Plaintiff

11.    Plaintiff Kelly Milligan resides in the State of California. He is a Certified 401(k) Professional, Certified Plan Fiduciary Advisor, Certified Private Wealth Advisor, and Chartered

3

Retirement Planning Counselor, with more than 20 years of experience as a financial advisor. Milligan worked as an FA at Merrill Lynch from 2000–2021. When he left Merrill Lynch, he forfeited over $500,000 in deferred compensation as a result of the Cancellation Rule.

**Defendants**

12.     Defendant BOA is a Delaware corporation with its principal place of business in Charlotte, North Carolina. Bank of America is a global financial services firm that, through its subsidiaries and affiliates, including Merrill Lynch, provides financial advisory services to clients.

13.     Defendant Merrill Lynch is a registered broker-dealer, registered investment adviser, and wholly owned subsidiary of BOA. It is a Participating Employer under the Plan.

14.     Defendant John/Jane Doe 1 is the Senior Vice President–Human Resources Global Banking and Global Wealth and Investment Management Administration or the individual serving in the functionally equivalent position at BOA during the Class Period. This individual administers the deferred-compensation plan.

## SUBSTANTIVE ALLEGATIONS

A.     **Merrill Lynch's Compensation Program for FAs.**

1.     **The FA Compensation System.**

15.     FAs receive a combination of salary and commissions on the revenue generated through their clients' investment activities.

16.     To calculate commissions, Merrill Lynch applies a specified percentage to the amount of revenue an FA generates. For example, Milligan earned commissions ranging from approximately 38% to 46% of the revenue he generated in any given year. At least 5% of an FA's commission is then deferred into the Plan. A "grid" determines the exact deferral percentage. This deferral percentage is applied to the first dollar of commissions earned by an FA each month.

4

17.    In February of each year, the total of an FA's deferred compensation from the previous calendar year is granted to the FA as a Plan award. The terms and conditions of each award are contained in an Award Agreement. Plan, § 2 (definition of "Award Agreement"). The Administrator determines the terms and conditions of each award. *Id*. at § 4.1 ("Awards").

18.    FAs receive the remainder of their (non-deferred) commissions each month in their paychecks.

**2.     The WealthChoice Contingent Award Plan.**

19.    Bank of America sponsors the Plan.   This Plan is administered by BOA's Senior Vice President–Human Resources Global Banking and Global Wealth and Investment Management Administration or the individual serving in the functionally equivalent position ("Administrator"). The Administrator has "all of the powers necessary to enable it to properly carry out its duties" under the Plan, including the power to "construe and interpret the Plan and to determine all questions that shall arise thereunder."  *Id*. at § 3.

20.    The terms and conditions that apply to FAs are contained in the Plan document and the Award Agreements that Merrill Lynch issues to FAs when they receive Plan awards. *Id.* at § 4.1.

21.    FAs have individual, notional Plan accounts for each award they receive, i.e., they have an account for each year's deferred compensation. FAs can invest their accounts in notional investments, like in a 401(k) plan, with the value of their accounts tracking the performance of the selected investments. 2018 Award Agreement, § 1.

22.    FAs' Plan awards are subject to a "Vesting Date," which is the date the award's account balance "becomes earned and payable" under the Plan. Plan, § 2; 2018 Award Agreement, § 3 and Exhibit A, §(a). The Vesting Date for awards granted in February 2019 (based on deferred

5

compensation earned in 2018) was February 15, 2027, i.e., an 8-year vesting schedule. 2018 Award Agreement, Exhibit A, §(a).

23.     According to the Plan document, Merrill Lynch pays FAs their vested deferred compensation in the Plan. Plan, § 6.1; 2018 Award Agreement, ¶ 8 ("Your Account Balance represents an unsecured, unfounded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date."). Merrill Lynch makes the payment "as soon as practicable" after the Vesting Date. Plan, § 7.1; 2018 Award Agreement, Exhibit A, §(a).

24.     Subject to certain exceptions described below, an FA must be employed by Merrill Lynch on the Vesting Date to receive his or her deferred compensation. If an FA's employment ends before that date, Defendants invoke the Cancellation Rule and cancel the FA's Account Balance so that the FA never receives his or her deferred compensation. 2018 Award Agreement, Exhibit A, §(b).

25.     The Award Agreements contain several exceptions to the Cancellation Rule. *Id.* at §§(b), (c). The Cancellation Rule does not apply if an FA dies. *Id.* at §(b)(i) ("Death"). If this occurs, the FA's Account Balance "shall become immediately earned and payable." *Id.*

26.     The Cancellation Rule also does not apply if an FA's employment ends because of a "Workforce Reduction, Divestiture or Disability," as long as the FA agrees to certain "Covenants." *Id.* at §(b)(ii) ("Workforce Reduction, Divestiture or Disability"). The first Covenant is that the FA agrees to not (1) "solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries . . . [any] employee of Bank of America or its Subsidiaries; or (2) "solicit any client or customer of Bank of America or its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries." *Id.* at §(d)(i) ("Non-

6

Solicitation"). The second Covenant is that the FA agrees to "not engage in Detrimental Conduct" until the payment date. *Id.* at §(d)(ii) ("Detrimental Conduct"). If an FA complies with these Covenants, then the FA's Account Balance "shall continue to become earned and payable" on the payment date. *Id.* at §(b)(ii). But if the FA fails to comply with these Covenants, Defendants will invoke the Cancellation Rule and cancel the FA's Account Balance. *Id.* at §(e) ("Remedies").

27. The Cancellation Rule does not apply if an FA retires, as long as the FA does "not engage in Competition" before the payment date, provides Bank of America with an annual "certification that [they] have not engaged in competition," and agrees to the non-solicitation and detrimental-conduct Covenants described above. *Id.* at §§(c) ("Retirement"), (d). FAs are eligible for retirement when they reach age 65 or age 55 with 10 years of service. *Id.* at §(e) ("Retirement"). Once they meet these requirements, their Account Balance "will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which [their] Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year." *Id.* at §(e).

28. FAs, including retirement-eligible FAs, who end their employment to work for another brokerage firm or change careers do not receive the value of their Plan accounts because of the Cancellation Rule. *Id.* at §(v) ("All Other Terminations").

**B.    The Plan Is an "Employee Benefit Pension Plan" Governed by ERISA.**

29. ERISA covers any "employee benefit plan," ERISA § 4(a), 29 U.S.C. § 1003(a), a term that includes "employee pension benefit plans." ERISA § 3(3), 29 U.S.C. § 1002(3). An "employee benefit pension plan" is:

> any plan, fund, or program which . . . by its express terms or as a result of surrounding circumstances such plan, fund, or program—

7

(i)     provides retirement income to employees, *or*

(ii)    results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A) (emphasis added).

30.     As described below, the Plan is an "employee benefit pension plan" under ERISA.

**1.     The Plan Is a "Plan, Fund or Program."**

31.     The phrase "plan, fund or program" under ERISA "means nothing more than a 'scheme decided upon in advance.'" *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1209 (2d Cir. 2002) (citing *Pegram v. Hedrich*, 530 U.S. 211, 223 (2000)). A "plan, fund or program" is "established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Grimo v. Blue Cross/Blue Shield of Vt.*, 34 F.3d 148, 151 (2d Cir. 1994). A "plan, fund or program" does not be a formal written document and can be comprised of multiple documents. *Id.* at 151; *Feifer*, 306 F.3d at 1209 ("However slap-dash, the Program Summary and the accompanying memorandum" established a plan that was governed by ERISA).

32.     The Plan  is a "plan, fund or program" under ERISA because it identifies the intended benefits—deferred compensation—using an objective formula (i.e., a percentage) that determines how FAs earn benefits.

33.     The Plan also has an ascertainable class of beneficiaries. Only FAs are eligible to participate in the program, and the Award Agreements that are issued to them about their deferred compensation are specific to FAs.

8

34.     The Plan also has an identifiable source of financing. FAs' deferred compensation in the Plan is paid out of the general assets of Merrill Lynch on the payment date. Plan, § 6.1; 2018 Award Agreement, § 8.

### 2.     The Plan "Results in a Deferral of Income."

35.     Subparagraphs (i) and (ii) in Section 3(2)(A) of ERISA "set out independent tests" for whether a "plan, fund or program" is an "employee benefit pension plan." *Pasternack v. Schrader*, 863 F.3d 162, 168 (2d Cir. 2017); *see also Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619, 624 (5th Cir. 2014) ("The plain language of the statute makes clear that subsection (ii) is separate and distinct from subsection (i)."). The second of these two independent tests—whether a "plan, fund or program" "results in a deferral of income" under ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii)—is "an effects-based inquiry rather than one based on purpose." *Pasternack*, 863 F.3d at 170, n.5.

36.     The Plan results in a deferral of FAs' income. At least 5% of an FA's commissions are withheld from their paychecks each year, allocated to a Plan award of deferred compensation that the FA receives in February of the next year, and ultimately paid to the FA eight years later. FAs receive their remaining commissions at the end of the next month as cash compensation. In other words, Merrill Lynch forces FAs to defer the first portion of their compensation, instead of receiving it right away in cash.

37.     While ERISA does not define the phrase "deferral of income," it has the same meaning as "deferred compensation." *See*, *e.g.*, *Tolbert*, 758 F.3d at 625. Accordingly, "by its express terms," Merrill Lynch's  compensation program for FAs "results in a deferral of income." *See*, *e.g.*, *id.* at 625-26 (plan covered by ERISA because it "contain[ed] provisions for both Voluntary Deferred Compensation and Mandatory Deferred Compensation, terms that plainly

9

refer to income that is deferred."); *Wilson v. Safelite Group, Inc.*, 930 F.3d 429, 434 (6th Cir. 2019) (ERISA applied "when a deferral of income by employees . . . arises as an effect, issue, or outcome from' the provisions of that plan.").

38.     These cases are consistent with the dictionary definition of "deferred compensation" as (1) "[p]ayment for work performed, to be paid in the future or when some future event occurs," and (2) "an employee's earnings that are taxed when received or distributed rather than when earned . . . ." BLACK'S LAW DICTIONARY (11th ed. 2019). Here, FAs defer part of their compensation for work performed (by generating revenue) until a later date and do not pay taxes on this compensation until it is distributed. Plan, § 11; 2018 Award Agreement, § 10.

### 3.     The Plans Result in a Deferral of Income "For Periods Extending to the Termination of Covered Employment or Beyond."

39.     The Plan results in FAs deferring income "for periods extending to the end of covered employment or beyond."  ERISA § 3(2)(A)(ii), 29 U.S.C. § 1002(2)(A)(ii). The phrase "end of covered employment" refers to when an employee stops working for a company. *Wilson*, 930 F.3d at 435.

40.     A plan need ***not*** require employees to defer income until "the end of covered employment or beyond" in order to be governed by ERISA. *Wilson*, 930 F.3d at 434. ERISA "covers plans containing terms that have as an effect, issue, or outcome—even if not a requirement—deferral of income by employees extending to the termination of covered employment or beyond."  *Id*. at 435. As the court explained in *Wilson*,

> Subsection (ii) does not specify deferral of income "until termination" or "to termination;" rather it says "for periods extending to the termination." Thus, deferrals may occur for various periods, and those periods may last up to and/or beyond termination. Subsection (ii) covers a wide array of plans and does not exclude plans that give participants the option to receive in service distributions.

10

*Id.*

41.     The Plan contains several provisions that contemplate FAs receiving their deferred compensation at or after the end of their employment with Merrill Lynch. FAs whose employment ends because of Retirement receive their deferred compensation in two installments in the two years after they retire. And FAs whose employment ends because of a Workforce Reduction, Divestiture, Disability, or Retirement still receive their deferred compensation on the payment date, which occurs after their employments have ended. Thus, "by design," *Tolbert*, 758 F.3d at 625, and "as an effect, issue or outcome from the provisions of the plan," *Wilson*, 930 F.3d at 434, Merrill Lynch pays FAs their deferred compensation on or after the termination of employment.

**D.     The Cancellation Rule Violates ERISA's Vesting Requirements.**

42.     ERISA has strict vesting rules that apply to "individual account plans" like the Plan. Contributions to the Plan are employee contributions and, therefore, 100% vested when made under ERISA § 203.

43.     Even if contributions to the Plan were to be considered employer contributions under ERISA § 203(a)(2)(B), employees must be fully vested in their accounts plans after they have three years of service or, alternatively, gradually vested in their accounts under the following schedule:

| Years of Service | Nonforfeitable Percentage |
|:---:|:---:|
| 2 | 20 |
| 3 | 40 |
| 4 | 60 |
| 5 | 80 |
| 6 or more | 100 |

44.     The Plan violates ERISA's vesting requirements because FAs vest in their deferred compensation in eight years under the Plan, with the vesting schedule not impacted by the FA's years of service.

11

45.     Based upon his years of service, Plaintiff should have been fully vested in his deferred compensation under ERISA.

**E.    The Plan Is Not a "Bonus Program."**

46.     The Department of Labor has promulgated regulations that "clarify the limits" of the term "employee pension benefit plan" under ERISA. 29 C.F.R. § 2510.3-2(a). Employee pension benefit plans do not include "bonus programs," which are "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." *Id.* at § 2510.3-2(c).

47.     FAs' deferred compensation in the Plan is not a "bonus."

48.     A bonus is a "premium paid in addition to what is expected; esp., a payment by way of a division of a business's profits, given over and above normal compensation (year-end bonus.)." BLACK'S LAW DICTIONARY (11th ed. 2019).

49.     FAs do not have to do anything "in addition to what is expected" of them in order to earn the commissions allocated to the Plan. For example, they do not have to generate a specified amount of revenue or improve their previous year's production in order to earn deferred commissions. Indeed, FAs automatically receive deferred compensation with the ***very first dollar of commissions*** they earn as part of their compensation structure. Given that FAs are expected to generate revenue, their compensation for performing this core function—at the absolute minimum level—is not, and cannot, be a "bonus." Rather, FAs' compensation—including their deferred compensation—is a "commission."

50.     "A commission is a 'fee or percentage allowed to a sales representative or an agent for services rendered.'" *Wolfe v. Advance Ins. Co. of Kansas*, No. 07-1406-DWB, 2009 WL

12

2106138, at *8 (D. Kan. July 16, 2009) (quoting The American Heritage Dictionary (3d ed. 1992)). A "'commission' is commonly understood to refer to those in the business of selling goods, services or real estate set typically as a percentage of the sales price." *Israel v. Voya Institutional Plan Servs. LLC*, No. 15-cv-11914-ADB, 2017 WL 1026416, at *4 (D. Mass. Mar. 16, 2017).

51.     FAs automatically earn deferred compensation as a fixed percentage of the revenue they generate from the sale of Merrill Lynch investment services. Therefore, this deferred compensation constitutes "commissions."

52.     Indeed, FAs can receive separate discretionary "bonuses," which are in addition to their commissions. FAs earn deferred compensation under a non-discretionary, uniformly applied "grid" starting at the first dollar of revenue they generate. In contrast, FAs earn "year-end bonuses" by achieving individualized, performance-based goals such as increasing their prior year's revenue by specified percentages or cross-selling products to clients. "Achieving individualized, performance-based goals is "in addition to what is expected," and, therefore, a classic bonus. *Israel*, 2017 WL 1026416, at *6.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this case as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class (the "Class") defined as follows:

> All former Merrill Lynch financial advisors who forfeited deferred compensation in the WealthChoice Contingent Award Plan from April 30, 2018, until the date of judgement because of the Cancellation Rule. Excluded from the Class are Defendants and any individuals who are subsequently determined to be fiduciaries of the WealthChoice Contingent Award Plan.

54.     The members of the Class are so numerous that joinder of all members is impractical. Upon information and belief, the Class includes thousands of persons.

13

55.     Plaintiff's claims are typical of the claims of the members of the Class because his claims and the claims of all Class members arise out of the same policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendants' wrongful conduct.

56.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include:

(a)     Whether ERISA applies to the Plan;

(b)     Whether the Cancellation Rule is invalid under ERISA;

(c)     Whether Class Members are entitled to equitable relief under ERISA § 502(a)(3);

(d)     Whether John/Jane Doe 1 violated fiduciary duties under ERISA § 502(a)(2) in selecting and enforcing a vesting schedule that violated ERISA; and

(e)     Whether Class Members should receive additional benefits under the Plan.

57.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class actions. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in managing this litigation as a class action.

58.     This action may be properly certified under Rule 23(b)(1). Certification is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Certification is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of

the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

59.     Alternatively, certification is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive, declaratory, or other equitable relief appropriate to the Class as a whole.

60.     Alternatively, certification is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

<u>**CLAIMS FOR RELIEF**</u>

**FIRST CLAIM**
**Declaratory and Equitable Relief**
**(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))**

61.     Plaintiff re-alleges all prior allegations.

62.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

63.     Under this section of ERISA, 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57, Plaintiff seeks a declaration that the Plan is an "employee benefit pension plan" under ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

64.     Plaintiff also seeks orders from the Court providing a full range of equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including:

(a)    A declaration that the Plan and its Cancellation Rule violate ERISA's vesting and anti-forfeiture rules;

(b)    An injunction requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;

(c)    Surcharge;

(d)    An "accounting" of all deferred compensation wrongfully withheld from FAs because of the Cancellation Rule;

(e)    Disgorgement of all amounts wrongfully withheld;

(f)    Disgorgement of all profits Defendants earned on the amounts they wrongfully withheld;

(g)    A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiff and the Class;

(h)    An order granting Plaintiff and the Class an equitable lien on Defendants' assets equal to the amount that Defendants' wrongfully withheld; and

(i)    All other relief the Court determines is just and proper under its equitable powers.

### SECOND CLAIM
**Reformation of the FA Deferred Compensation Plan
and to Recover Benefits Under the Reformed Plan
(ERISA §§ 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))**

65.    Plaintiff re-alleges all prior allegations.

66.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: "(A) enjoin any act or practice which violates any provision of this title

16

or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

67.    Defendants improperly denied Plaintiff and the members of the Class their deferred compensation that should have been vested and not forfeited under ERISA. By denying Plaintiff and the members of the Class their deferred compensation, Defendants violated ERISA § 203(a), 29 U.S.C. § 1053(a).

68.    Plaintiff and the Class are entitled to reformation of the Plan to require Defendants to comply with the vesting and anti-forfeiture requirements in ERISA § 203(a), 29 U.S.C. § 1053(a).

69.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), authorizes a participant or beneficiary to bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

70.    Plaintiff and the Class are entitled to recover their vested benefits, enforce their rights to the payment of their past vested benefits, and clarify their rights to vested benefits under the Plan after reformation.

**THIRD CLAIM**
**Breach of Fiduciary Duty Against John/Jane Doe 1 Regarding the Plan**
**(ERISA §§ 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3))**

71.    Plaintiff re-alleges all prior allegations in the Amended Complaint.

72.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other person who in fact performs fiduciary functions. Thus, a person is a fiduciary if "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control

17

respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override a finding of fiduciary status when the statutory test is met.

73.     John/Jane Doe 1 is a fiduciary under the Plan because he/she is the administrator of the Plan and is responsible for, among other things, reviewing and establishing the rules and procedures of the Plan, including the ability to determine that it is governed by ERISA.

74.     ERISA requires that fiduciaries discharge their duties to a plan solely in the interest of the participants and their beneficiaries. ERISA § 1104, 29 U.S.C. § 1104(a). Further, fiduciaries must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," and must discharge their duties to a plan in accordance with the documents and instruments governing the plan insofar as the plan is consistent with ERISA. *Id.*

75.     ERISA's fiduciary provision mandates that fiduciaries discharge their duties "in accordance with the documents and instruments governing the plan," but *only if* the plan's terms "are consistent" with ERISA's substantive requirements. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

76.     John/Jane Doe 1 breached this fiduciary duty by implementing Vesting Dates for the Plan that violated ERISA's vesting requirements and then applying the Cancellation Rule to

deny the FAs who left Merrill Lynch their deferred compensation that should have been vested under ERISA.

77.     Section 409 of ERISA provides that any person who is a fiduciary of a plan and who breaches any responsibility, obligation, or duty imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from any breach, and to restore to the plan any profits the fiduciary made using the plan's assets. 29 U.S.C. § 1109. Section 409 of ERISA also provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. *Id.*

78.     Section 502(a)(2) of ERISA permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under Section 409 of ERISA. 29 U.S.C. § 1132(a)(2).

79.     Section 502(a)(3) of ERISA permits a plan participant, beneficiary, or fiduciary to (A) enjoin any act or practice that violates any provision of Title I of ERISA or the terms of a plan; or (B) obtain other appropriate equitable relief to (i) redress such violations, or (ii) enforce any provisions of Title I of ERISA or the terms of a plan. 29 U.S.C. § 1132(a)(3).

80.     Plaintiff and the class seek the restoration of all deferred compensation that was illegally deemed forfeited by Defendants.

<u>**PRAYER FOR RELIEF**</u>

For these reasons, Plaintiff prays that judgment be entered against Defendants and requests that the Court award the following relief:

A.     Certification of this action as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     A declaration that the Plan and the Cancellation Rule violate ERISA's vesting and anti-forfeiture rules;

C.    An injunction requiring Defendants to remedy their past violations of ERISA's vesting rules, including reversing all past forfeitures caused by the application of the Cancellation Rule;

D.    Surcharge;

E.    An "accounting" of all deferred compensation wrongfully withheld from Plaintiff and the Class;

F.    Disgorgement of the amounts that have been wrongfully withheld from Plaintiff and the Class;

G.    Disgorgement of the profits Defendants earned on the amounts wrongfully withheld from Plaintiff and the Class;

H.    A declaration that the amounts wrongfully withheld are in a constructive trust for the benefit of Plaintiff and the Class;

I.    An order granting Plaintiff and the Class an equitable lien on Defendants' assets equal to the amount that has been wrongfully withheld;

J.    Reformation of the FA Deferred Compensation Program;

K.    An Order directing Defendants to remedy their past violations of ERISA, including the re-instatement and payment of forfeited amounts and benefits of Plaintiff and the Class;

L.    An Order directing Defendants to pay all benefits improperly withheld under the Plan as reformed;

M.    Compensatory damages;

N.    Awarding, declaring, or otherwise providing Plaintiff and the Class all relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law that the Court deems proper;

20

O.      Attorneys' fees and expenses as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), or other applicable doctrine;

P.      Prejudgment and post-judgment interest; and

Q.      Any other relief the Court determines is just and proper.

Dated: April 30, 2024               Respectfully submitted,

                                            */s/ John D. Hurst*

| | |
|---|---|
| Thomas R. Ajamie* | John D. Hurst |
| John S. "Jack" Edwards, Jr.* | N.C. Bar No. 37680 |
| Courtney D. Scobie* | MOTLEY RICE LLC |
| AJAMIE LLP | 50 Clay Street, Suite 1 |
| Pennzoil Place - South Tower | Morgantown, WV 26501 |
| 711 Louisiana, Suite 2150 | Telephone: (304) 413-0456 |
| Houston, TX 77002 | Facsimile: (304) 413-0458 |
| Telephone: (713) 860-1600 | jhurst@motleyrice.com |
| Facsimile: (713) 860-1699 | |
| tajamie@ajamie.com | |
| jedwards@ajamie.com | Mathew P. Jasinski* |
| cscobie@ajamie.com | Douglas P. Needham* |
| | MOTLEY RICE LLC |
| | 27 Church Street, 17th Floor |
| | Hartford, CT 06103 |
| Robert A. Izard* | Telephone: (860) 882-1681 |
| Christopher M. Barrett* | Facsimile: (860) 882-1682 |
| IZARD, KINDALL & RAABE LLP | bnarwold@motleyrice.com |
| 29 South Main Street, Suite 305 | mjasinski@motleyrice.com |
| West Hartford, CT 06107 | dneedham@motleyrice.com |
| Tel: (860) 493-6292 | |
| Fax: (860) 493-6290 | |
| rizard@ikrlaw.com | *Pro hac vice* motions forthcoming. |
| cbarrett@ikrlaw.com | |

21

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

KELLY MILLIGAN,
on behalf of himself and all others similarly
situated,

        Plaintiff,

   v.

MERRILL LYNCH, PIERCE, FENNER &
SMITH INC., BANK OF AMERICA CORP.,
and JOHN/JANE DOE 1, THE SENIOR VICE
PRESIDENT–HUMAN RESOURCES
GLOBAL BANKING AND GLOBAL
WEALTH AND INVESTMENT
MANAGEMENT ADMINISTRATION AT
BANK OF AMERICA CORP.,

        Defendants.

Case No. 3:24-cv-00440-KDB-DCK

Judge Kenneth D. Bell

Magistrate Judge David Keesler

## DEFENDANTS' ANSWER AND
## DEFENSES TO PLAINTIFF'S CLASS ACTION COMPLAINT

Defendants Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") and Bank of

America Corp. ("Bank of America") (together, "Defendants"), by and through their attorneys and

pursuant to Rule 8 of the Federal Rules of Civil Procedure, provide the following answer and

defenses to Plaintiff's Complaint (Dkt. 1):

### GENERAL DENIAL

Defendants deny each allegation of the Complaint not specifically admitted herein.

### ANSWERS TO PLAINTIFF'S SPECIFIC ALLEGATIONS

Subject to their additional defenses, Defendants plead as follows to the specific allegations

contained in the numbered paragraphs of Plaintiff's Complaint.[1]

---

[1] The Complaint contains various headings and/or sub-headings. Defendants do not consider these to be substantive
allegations to which a response is required. However, to the extent that a responsive pleading is required, Defendants

## INTRODUCTION

1.      Defendants admit that Plaintiff purports to assert his claims on behalf of a putative class.  Defendants further admit that Plaintiff purports to assert claims under the Employee Retirement Income Security Act of 1974 ("ERISA").  Defendants deny that Plaintiff has asserted any viable claim arising under ERISA.  Defendants further deny that Plaintiff can satisfy the requirements for class certification under any theory, deny that class action treatment is appropriate, and further deny that Plaintiff is entitled to any relief in this action.  Defendants deny all remaining allegations in Paragraph 1.

2.      Denied. Answering further, Merrill Lynch financial advisors (or "FAs") are compensated, in relevant part, pursuant to a "Financial Advisor Incentive Compensation Plan" ("FA Incentive Comp. Plan"), which is issued annually and is subject to change by Merrill Lynch and/or Bank of America.  During the relevant period, FAs were paid a guaranteed monthly salary and also were eligible to receive additional incentive compensation, including in two separate and distinct forms: (1) monthly cash incentive compensation based on production credits at grid rates described in the FA Incentive Comp. Plan, and (2) "Long Term Contingent Awards," based on separate and distinct grid rates and subject to the other terms and conditions of the FA Incentive Comp. Plan, the relevant plan document(s) under which such awards are issued, and any applicable award agreement(s).  An FA's monthly cash incentive compensation is calculated and paid monthly.  Long Term Contingent Awards, by contrast, are issued annually, based on the full prior performance year and, during the relevant period, were awarded through two vehicles: the WealthChoice Contingent Award Plan ("WealthChoice Plan") and restricted stock units ("RSUs"), or some combination thereof.  Long Term Contingent Awards are only earned and payable if the

---

deny any and all allegations within any such heading or sub-heading.  For the Court's convenience, Defendants adopt the same numbering system used in the Complaint and italicize subheadings to distinguish them from the allegations.

FA remains employed through the award's designated vesting date, in addition to satisfying all other terms and conditions of each such award.[2]

3.    Denied.

4.    Denied.

5.    Defendants admit that Plaintiff was employed by Merrill Lynch as a Financial Advisor. Defendants further admit that, upon Plaintiff's voluntary resignation, he did not satisfy the conditions to earn or become entitled to payment of unvested WealthChoice awards pursuant to the terms of the Plan document and his individual WealthChoice Award Agreements ("Award Agreement"). Defendants deny all remaining allegations in Paragraph 5.

6.    Defendants admit that Plaintiff purports to seek the relief described in Paragraph 6. Defendants deny that Plaintiff has asserted any viable claims arising under ERISA. Defendants further deny that Plaintiff can satisfy the requirements for class certification under any theory, deny that class action treatment is appropriate, and further deny that Plaintiff is entitled to any relief in this action. Defendants deny all remaining allegations in Paragraph 6.

## JURISDICTION AND VENUE

7.    Denied. Specifically, Defendants deny that ERISA applies to this dispute, meaning Plaintiff asserts no claim arising under ERISA or any law of the United States.

8.    Defendants admit the Court has personal jurisdiction over Defendants. Defendants deny the remaining allegations in Paragraph 8.

9.    Defendants admit that venue is proper in this Court. Defendants deny the remaining allegations in Paragraph 9.

---

[2] For the Court's convenience, Defendants have utilized Plaintiff's defined term "the Plan" or "WealthChoice Plan." However, Defendants deny the accuracy of this defined term to the extent it implies that the WealthChoice Contingent Award Plan is an "employee benefit pension plan" under ERISA.

10.     Admitted.

**PARTIES**

***Plaintiff***

11.     Defendants admit, upon information and belief, that Plaintiff resides in California and is a certified 401(k) professional, certified plan fiduciary advisor, certified private wealth advisor, and chartered retirement planning counselor.  Defendants further admit that Plaintiff worked as an FA for Merrill Lynch from 2000 until 2021.  Defendants deny all remaining allegations in Paragraph 11, including but not limited to the allegation that Plaintiff "forfeited" any earned "deferred compensation."  Answering further, pursuant to the terms of the WealthChoice Plan and Plaintiff's WealthChoice Award Agreements, the contingent awards at issue did not become earned and payable unless and until Plaintiff remained employed through the designated vesting date for each such award. Award Agmt. Ex. A ¶ (a).  Under the express terms of Plaintiff's WealthChoice Award Agreements, therefore, if Plaintiff voluntarily terminated his employment before an award vested, such unearned awards "shall be canceled as of your Termination of Employment." *Id.* ¶ (b)(v).  Defendants deny all remaining allegations in Paragraph 11.

***Defendants***

12.     Admitted.

13.     Defendants admit that Merrill Lynch is a registered broker-dealer, registered investment adviser, and wholly owned subsidiary of Bank of America. Defendants further admit that Merrill Lynch is a "Participating Employer" as that term is specifically defined in Article II of the WealthChoice Plan document.  Defendants deny, however, that Merrill Lynch is a "Participating Employer under the Plan," to the extent the allegations in Paragraph 13 suggest or

imply that any Defendant is a "Participating Employer" as contemplated under or defined by ERISA, and deny that the WealthChoice Plan is an employee benefit pension plan under ERISA.

14.     Defendants admit that the WealthChoice Plan document defines the term "Administrator" as "the Senior Vice President-Human Resources Global Banking and Global Wealth and Investment Management Administrator or the individual serving in the functionally equivalent position if applicable from time to time (or any permitted delegate pursuant to Article III)." Defendants deny all remaining allegations in Paragraph 14, including but not limited to the extent they suggest that any Bank of America employee serves as a "plan administrator," as contemplated under or defined by ERISA. Defendants further deny that the WealthChoice Plan is a "deferred-compensation" plan or an employee benefit pension plan under ERISA. Defendants deny all remaining allegations in Paragraph 14.

## SUBSTANTIVE ALLEGATIONS

**A.     *Merrill Lynch's Compensation Program for FAs.***

       **1.     *The FA Compensation System.***

15.     Denied. Answering further, FAs were compensated, in relevant part, pursuant to the FA Incentive Comp. Plan in effect during a particular year, as noted above (*see* Response to ¶ 2). During the relevant period, FAs were paid a guaranteed monthly salary and also were eligible to receive additional incentive compensation, including in two separate and distinct forms: (1) monthly cash incentive compensation based on production credits at grid rates described in the FA Incentive Comp. Plan, and (2) "Long Term Contingent Awards," based on separate and distinct grid rates and subject to the other terms and conditions of the FA Incentive Comp. Plan, the relevant plan document(s) under which such awards are issued, and any applicable award agreement(s). An FA's monthly cash incentive compensation is calculated and paid monthly.

Long Term Contingent Awards, by contrast, are issued annually, based on the full prior performance year and, during the relevant period, were awarded through two vehicles: the WealthChoice Plan and as RSUs, or some combination thereof. Long Term Contingent Awards are only earned and payable if the FA remains employed through the award's designated vesting date, in addition to satisfying all other terms and conditions of each such award. Defendants specifically deny any characterization, description, or summary of Merrill Lynch's FA compensation program that contradicts the relevant FA Incentive Comp. Plan(s), the applicable plan document(s) for any plans under which such compensation or awards were issued, and any applicable award agreement(s) relating to or governing any such awards.

16.    Denied. Answering further, FAs are compensated, in relevant part, pursuant to the FA Incentive Comp. Plan in effect during a particular year, as noted above (*see* Responses to ¶¶ 2, 15). Defendants incorporate their responses to ¶¶ 2 and 15 as if fully stated herein, and specifically deny any characterization, description, or summary of Merrill Lynch's FA compensation program that contradicts the relevant FA Incentive Comp. Plan(s), the applicable plan document(s) for any plans under which such compensation or awards were issued, and any applicable award agreement(s) relating to or governing any such awards.

17.    Defendants admit that the WealthChoice Plan document defines "Award Agreement" as "an agreement between the Company and each Covered Associate setting forth the terms and provisions applicable to Awards under the Plan." Plan, Art. II. Defendants further admit that the Plan states that "[t]he amount of each Covered Associate's Award in any given year shall be determined by the Administrator and be subject to the review and approval by the Company." Plan, § 4.1. Defendants also admit that if an FA received a WealthChoice award, such award was issued no more than 120 days after the end of the previous calendar year, but Defendants expressly

deny that such awards constitute "deferred compensation" and any suggestion that FAs earned or became entitled to receive such awards before those awards became earned and payable upon their designated vesting date. Defendants deny all remaining allegations in Paragraph 17.

18.     Denied. Answering further, FAs are compensated, in relevant part, pursuant to the FA Incentive Comp. Plan in effect during a particular year, as noted above (*see* Responses to ¶¶ 2, 15). Defendants specifically deny that an FA's monthly cash incentive compensation constituted the "remainder" of any FA's "commissions each month." Defendants also incorporate their responses to ¶¶ 2 and 15 as if fully stated herein, and specifically deny any characterization, description, or summary of Merrill Lynch's FA compensation program that contradicts the relevant FA Incentive Comp. Plan(s), the applicable plan document(s) for any plans under which such compensation or awards were issued, and any applicable award agreement(s) relating to or governing any such awards.

## 2. *The WealthChoice Contingent Award Plan.*

19.     Defendants admit that Bank of America established the WealthChoice Plan, but deny that Bank of America "sponsors" the Plan to the extent the allegations in Paragraph 19 seek to imply that Bank of America is a "plan sponsor," as contemplated under and defined by ERISA § 203(a), 29 U.S.C. § 1002(16)(B). Defendants admit that the WealthChoice Plan defines "Administrator" as the "Senior Vice President–Human Resources Global Banking and Global Wealth and Investment Management Administration or the individual serving in the functionally equivalent position if applicable from time to time (or any permitted delegate pursuant to Article III)." Defendants further admit that the WealthChoice Plan states that the "Administrator shall have all of the powers necessary to enable it to properly carry out its duties under the Plan,"

including the power to "construe and interpret the Plan and to determine all questions that shall arise thereunder." Defendants deny all remaining allegations in Paragraph 19.

20.     Paragraph 20 purports to characterize the WealthChoice Plan document and undated and unspecified versions of WealthChoice Award Agreements, documents that speak for themselves; therefore no response is required.  To the extent a response is required, Defendants admit that the operative WealthChoice Plan and the applicable WealthChoice Award Agreement for a given year contained terms and conditions that apply to a long-term contingent award granted under the WealthChoice Plan to an FA in such year.  Answering further, the Plan states that "[t]he amount of each Covered Associate's Award in any given year shall be determined by the Administrator and by subject to the review and approval by the Company." Plan § 4.1.

21.     Defendants admit that a notional account was established for FAs who received a contingent award under the WealthChoice Plan, but deny that such accounts are "for each year's deferred compensation" or that they operate "like in a 401(k) plan."  Answering further, Plaintiff's 2018 Award Agreement cited in Paragraph 21 (granted on February 15, 2019) states, "Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth above. The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award. This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments."  2018 Award Agreement, § 1.  Plaintiff's Award Agreement further states that his WealthChoice account balance "represents an unsecured, unfunded, contingent promise by your employer to pay the value

of the Account Balance to you after the Vesting Date," and that "[y]ou will not own the mutual funds or other options chosen as benchmarks for your Account Balance."  Defendants deny all remaining allegations in Paragraph 21.

22.    Defendants admit that contingent WealthChoice awards do not "become[] earned and payable" until a specified vesting date (and assuming the FA satisfies all other terms and conditions for receiving payment of such awards).  Defendants further admit that the Plan defines "Vesting Date" as, "for any individual Award, the date on which the Account Balance with respect to an Award becomes earned and payable (as specified in the applicable Award Agreement)," Plan Art. II, and that Plaintiff's 2018 Award Agreement (granted on February 15, 2019) states, "the Account Balance representing your Award will become earned and payable on February 15, 2027 if you remain employed with Bank of America and its Subsidiaries through that date." 2018 Award Agmt., Ex. A, §(a).  Defendants deny all other allegations in Paragraph 22.

23.    Defendants admit that ¶ 8 of Plaintiff's 2018 Award Agreement contains the sentence quoted in this Paragraph 23, and also admit that the Award Agreement further states that "[o]nce the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made as soon as administratively practicable, generally within thirty (30) days after the payment date." 2018 Award Agmt., Ex. A § (a).  Defendants further admit that § 7.1 of the WealthChoice Plan document states, "Subject to the provisions of Article VIII below, a Covered Associate's Account Balance with respect to an Award for a Performance Period shall be paid as soon as practicable after the relevant Vesting Date in accordance with the terms of any applicable Award Agreement."  Defendants deny all remaining allegations in Paragraph 23.

24.    Defendants admit that an FA generally must be employed by Bank of America or its subsidiaries through the Vesting Date for his or her contingent WealthChoice award to become

earned and payable.  Defendants deny that they "invoke the Cancellation Rule" if "an FA's employment ends before that date," and further deny Plaintiff's characterization of such a so-called "Cancellation Rule"; rather, WealthChoice awards are paid in accordance with the terms and conditions of the Plan and applicable Award Agreement, and FAs—including Plaintiff—are not entitled to receive payment of an award under such terms unless and until that award becomes earned and payable (and subject to all other terms and conditions in the Plan document and applicable Award Agreement).  Defendants deny all remaining allegations in Paragraph 24.

25.      Defendants admit that Plaintiff's Award Agreements state, "The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your Termination of Employment is due to your death. Payment will be made as soon as administratively possible."  *See, e.g.*, 2018 Award Agmt. Ex. A, § (b)(i).  Defendants deny all remaining allegations in Paragraph 25, including but not limited to Plaintiff's definition of a so-called "Cancellation Rule" (which is not a defined term in the Plan document or Award Agreements), the characterization of his Award Agreements as containing "exceptions" to any such "Cancellation Rule," and any suggestion or implication that the Award Agreement supports Plaintiff's claim that the Plan is a "pension benefit plan" under ERISA.

26.      Paragraph 26 purports to characterize Plaintiff's 2018 WealthChoice Award Agreement, a written document that speaks for itself; therefore, no response is required. To the extent a response is required, Defendants admit that the language quoted in Paragraph 26 appears in Plaintiff's 2018 Award Agreement, but deny the allegations to the extent they inaccurately or incompletely describe or characterize the provisions, terms, or requirements of the cited Award Agreement.  Defendants deny all remaining allegations in Paragraph 26, including but not limited to Plaintiff's definition of a so-called "Cancellation Rule," the allegation that Defendants "invoke

the Cancellation Rule," and any suggestion or implication that the Award Agreement supports Plaintiff's claim that the Plan is a pension benefit plan, as defined under ERISA.

27.    Paragraph 27 purports to characterize Plaintiff's 2018 WealthChoice Award Agreement, a written document that speaks for itself; therefore, no response is required. To the extent a response is required, Defendants admit that the language quoted in Paragraph 27 appears in Plaintiff's 2018 Award Agreement, but deny the allegations to the extent they inaccurately or incompletely describe or characterize the provisions, terms, or requirements of the cited Award Agreement.  Defendants deny all remaining allegations in Paragraph 27, including but not limited to Plaintiff's definition of a so-called "Cancellation Rule," the allegation that such "Cancellation Rule does not apply if an FA retires," the incomplete characterization of the Award Agreement's definition of "Retirement," and any suggestion or implication that the Award Agreement supports Plaintiff's claim that the Plan is a pension benefit plan, as defined under ERISA.

28.    Paragraph 28 purports to characterize Plaintiff's 2018 WealthChoice Award Agreement, a written document that speaks for itself; therefore, no response is required. To the extent a response is required, Defendants admit that the cited Award Agreement states, "Unless you are eligible for Retirement as described below, in the case of All Other Terminations, the Account Balance shall be canceled as of your Termination of Employment." 2018 Award Agmt., Ex. A, §(b)(v).  Defendants deny all remaining allegations in Paragraph 28, including but not limited to the extent such allegations inaccurately or incompletely describe the provisions, terms, or requirements of the cited Award Agreement, Plaintiff's definition of a so-called "Cancellation Rule," and any suggestion or implication that the Award Agreement supports Plaintiff's claim that the Plan is a pension benefit plan, as defined under ERISA.

**B.**     *The Plan Is an "Employee Benefit Pension Plan" Governed by ERISA.*

29.     Paragraph 29 asserts legal conclusions and purports to characterize and/or quote a statute, which speaks for itself; therefore, no response is required.  To the extent a response is required, Defendants admit that the language quoted in Paragraph 29 appears in the cited statutory provisions.  Defendants deny that the allegations in Paragraph 29 suggest, imply, or otherwise establish that the Plan is a pension benefit plan, as defined under ERISA.

30.     Denied.

**1.**     *The Plan Is a "Plan, Fund or Program."*

31.     Paragraph 31 asserts legal conclusions and purports to characterize and/or quote case law, which speaks for itself; therefore, no response is required.  To the extent a response is required, Defendants admit that the language quoted in Paragraph 31 appears in the cited decisions. Defendants deny, however, that the descriptions of the cited case law are accurate or complete, and further deny that the allegations in Paragraph 31 in any way suggest, imply, or otherwise establish that the Plan is a pension benefit plan, as defined under ERISA.

32.     Denied.

33.     Denied.

34.     Denied.

**2.**     *The Plan "Results in a Deferral of Income."*

35.     Paragraph 35 asserts legal conclusions and purports to characterize and/or quote statutory provisions and case law, which speak for themselves; therefore, no response is required. To the extent a response is required, Defendants admit that the language quoted in Paragraph 35 appears in the cited legal decisions.  Defendants deny, however, that the descriptions of Section 3(2)(A) of ERISA and the cited case law are accurate or complete, and further deny that the

allegations in Paragraph 35 in any way suggest, imply, or otherwise establish that the Plan is a pension benefit plan, as defined under ERISA.

36.    Denied.

37.    Paragraph 37 asserts legal conclusions and purports to characterize and/or quote ERISA and case law, which speaks for itself; therefore, no response is required.  To the extent a response is required, Defendants admit that the language quoted in Paragraph 37 appears in the decisions cited therein.  Defendants deny all remaining allegations in Paragraph 37.

38.    Paragraph 38 asserts legal conclusions and purports to characterize and/or quote a legal dictionary, which speaks for itself; therefore, no response is required.  To the extent a response is required, Defendants admit that the language quoted in Paragraph 38 appears in the cited portion of Black's Law Dictionary (11th ed. 2019).  Defendants deny that the 2019 edition of Black's Law Dictionary has any potential relevance to this action.  Defendants further deny all remaining allegations in Paragraph 38.

   *3.*    ***The Plans Result in a Deferral of Income "For Periods Extending to the Termination of Covered Employment or Beyond."***

39.    Denied.

40.    Paragraph 40 asserts legal conclusions and purports to characterize and/or quote case law, which speaks for itself; therefore, no response is required.  To the extent a response is required, Defendants admit that the language quoted in Paragraph 40 appears in the decision cited therein.  Defendants deny the remaining allegations in Paragraph 40.

41.    Denied.

**D.**    ***The Cancellation Rule Violates ERISA's Vesting Requirements.***

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

**E.    *The Plan Is Not a "Bonus Program."***

46.    Admitted.

47.    Denied.

48.    Paragraph 48 asserts legal conclusions and purports to characterize and/or quote a legal dictionary, which speaks for itself; therefore, no response is required.  To the extent a response is required, Defendants admit that the language quoted in Paragraph 48 appears in the cited portion of Black's Law Dictionary (11th ed. 2019).  Defendants deny that the 2019 edition of Black's Law Dictionary has any potential relevance to this action, and further deny the allegations in Paragraph 48 to the extent they inaccurately or incompletely describe or characterize the cited provision.  Defendants deny the remaining allegations in Paragraph 38.

49.    Denied.

50.    Paragraph 50 asserts legal conclusions and purports to characterize and/or quote case law, which speaks for itself; therefore, no response is required.  To the extent a response is required, Defendants admit that the language quoted in Paragraph 50 appears in the cited decisions. Defendants deny, however, that the descriptions of the cited case law are accurate or complete, and further deny that these decisions have any potential relevance to this action and deny any suggestion or implication that these decisions support Plaintiff's claim that the Plan is a pension benefit plan, as defined under ERISA.

51.    Denied.

52.    Defendants admit that FAs may become eligible to receive a variety of awards and/or other types of compensation.  Defendants deny any allegation in Paragraph 52 that

incompletely or inaccurately describes or characterizes the terms of the applicable FA Incentive

Comp. Plan(s), and further deny all remaining allegations in Paragraph 52.

## CLASS ACTION ALLEGATIONS

53.    Defendants admit that Plaintiff purports to assert his claims on behalf of a putative

class and that Plaintiff's proposed class definition is set forth in Paragraph 53. Defendants deny

that Plaintiff can satisfy the requirements for class certification under any theory, deny that class

action treatment is appropriate, and further deny the remaining allegations in Paragraph 53.

54.    Denied.

55.    Denied.

56.    Denied.

57.    Denied.

58.    Denied.

59.    Denied.

60.    Denied.

## CLAIMS FOR RELIEF

### *FIRST CLAIM*
### *Declaratory and Equitable Relief*
### *(ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3))*

61.    Defendants restate and incorporate by reference the answers to all prior allegations,

as though fully set forth herein, and deny all remaining allegations in Paragraph 61.

62.    Paragraph 62 asserts legal conclusions and purports to characterize a statutory

provision, which speaks for itself; therefore, no response is required.  To the extent a response is

required, Defendants deny the allegations in Paragraph 62 to the extent they inaccurately or

incompletely describe the requirements of ERISA or any other applicable law or regulation.

Answering further, Defendants deny the cited statutory provisions are applicable to Plaintiff's claims, as he has not asserted any viable claims arising under ERISA.

63.    Defendants admit that Plaintiff purports to seek the relief identified in Paragraph 63. Defendants deny that Plaintiff has asserted any viable claims arising under ERISA, and as a result, deny that this Court has subject matter jurisdiction over Plaintiff's claims. Defendants further deny that Plaintiff is entitled to any relief whatsoever in this action.

64.    Defendants admit that Plaintiff purports to seek the relief identified in Paragraph 64. Defendants deny that Plaintiff has asserted any viable claims arising under ERISA, and as a result, deny that this Court has subject matter jurisdiction over Plaintiff's claims. Defendants further deny that Plaintiff is entitled to any relief whatsoever in this action.

**SECOND CLAIM**
***Reformation of the FA Deferred Compensation Plan***
***and to Recover Benefits Under the Reformed Plan***
***(ERISA §§ 502(a)(1) and (3), 29 U.S.C. § 1132(a)(1) and (3))***

65.    Defendants restate and incorporate by reference the answers to all prior allegations, as though fully set forth herein, and deny all remaining allegations in Paragraph 65.

66.    Paragraph 66 asserts legal conclusions and purports to characterize a statutory provision, which speaks for itself; therefore, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 66 to the extent they inaccurately or incompletely describe the requirements of ERISA or any other applicable law or regulation. Answering further, Defendants deny the cited statutory provisions are applicable to Plaintiff's claims, as he has not asserted any viable claims arising under ERISA.

67.    Denied.

68.    Denied.

69.    Paragraph 69 asserts legal conclusions and purports to characterize a statutory provision, which speaks for itself; therefore, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 69 to the extent they inaccurately or incompletely describe the requirements of ERISA or any other applicable law or regulation. Answering further, Defendants deny the cited statutory provisions are applicable to Plaintiff's claims, as he has not asserted any viable claims arising under ERISA.

70.    Denied.

### THIRD CLAIM
### Breach of Fiduciary Duty Against John/Jane Doe 1 Regarding the Plan
### (ERISA §§ 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3))

71.    Defendants restate and incorporate by reference the answers to all prior allegations, as though set forth fully herein, and deny all remaining allegations in Paragraph 71.

72.    Paragraph 72 asserts legal conclusions and purports to characterize and quote statutory provisions, which speak for themselves; therefore, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 72 to the extent they inaccurately or incompletely describe the requirements of ERISA or any other applicable law or regulation. Answering further, Defendants deny the cited statutory provisions are applicable to Plaintiff's claims, as he has not asserted any viable claims arising under ERISA.

73.    Denied.

74.    Paragraph 74 asserts legal conclusions and purports to characterize and quote statutory provisions, which speak for themselves; therefore, no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 74 to the extent they inaccurately or incompletely describe the requirements of ERISA or any other applicable law or

regulation.  Answering further, Defendants deny the cited statutory provisions are applicable to Plaintiff's claims, as he has not asserted any viable claims arising under ERISA.

75.     Paragraph 75 asserts legal conclusions and purports to characterize and quote statutory provisions, which speak for themselves; therefore, no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 75 to the extent they inaccurately or incompletely describe the requirements of ERISA or any other applicable law or regulation.  Answering further, Defendants deny the cited statutory provisions are applicable to Plaintiff's claims, as he has not asserted any viable claims arising under ERISA.

76.     Denied.

77.     Paragraph 77 asserts legal conclusions and purports to characterize and quote statutory provisions, which speak for themselves; therefore, no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 77 to the extent they inaccurately or incompletely describe the requirements of ERISA or any other applicable law or regulation.  Answering further, Defendants deny the cited statutory provisions are applicable to Plaintiff's claims, as he has not asserted any viable claims arising under ERISA.

78.     Paragraph 78 asserts legal conclusions and purports to characterize and quote statutory provisions, which speak for themselves; therefore, no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 78 to the extent they inaccurately or incompletely describe the requirements of ERISA or any other applicable law or regulation.  Answering further, Defendants deny the cited statutory provisions are applicable to Plaintiff's claims, as he has not asserted any viable claims arising under ERISA.

79.     Paragraph 79 asserts legal conclusions and purports to characterize and quote statutory provisions, which speak for themselves; therefore, no response is required.  To the extent

a response is required, Defendants deny the allegations in Paragraph 79 to the extent they inaccurately or incompletely describe the requirements of ERISA or any other applicable law or regulation. Answering further, Defendants deny the cited statutory provisions are applicable to Plaintiff's claims, as he has not asserted any viable claims arising under ERISA.

80.    Defendants admit that Plaintiff purports to seek the relief identified in Paragraph 63. Defendants deny that Plaintiff has asserted any viable claims arising under ERISA, and as a result, deny that this Court has subject matter jurisdiction over Plaintiff's claims. Defendants further deny the remaining allegations in Paragraph 80 and deny that Plaintiff is entitled to any relief whatsoever in this action.

## PLAINTIFF'S PRAYER FOR RELIEF

Defendants admit that Plaintiff purports to seek the relief identified in the foregoing "Prayer for Relief." Defendants deny all allegations within each and every paragraph within the foregoing "Prayer for Relief," deny that Plaintiff has asserted any viable claims (arising under ERISA or otherwise), and deny that Plaintiff is entitled to any relief whatsoever, including but not limited to the relief identified in the foregoing "Prayer for Relief."

## **AFFIRMATIVE AND OTHER DEFENSES**

Defendants, by and through their attorneys, hereby assert the following defenses to Plaintiff's Complaint.  By setting forth the defenses below, Defendants are not assuming the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiff or any other party or non-party.  Moreover, nothing stated herein is intended or shall be construed as an acknowledgement that any particular issue or subject necessarily is relevant to Plaintiff's allegations.  Defendants further reserve the right to amend their Answer and Defenses and assert additional defenses and other claims, as this matter proceeds and as additional information becomes available during discovery proceedings or otherwise.  Defendants therefore do not knowingly or intentionally waive any applicable defenses or affirmative defenses.

1.      Plaintiff fails to state a claim upon which relief may be granted.

2.      Some or all of the claims of Plaintiff and/or the claims of some or all of the putative class members are barred, in whole or in part, because Plaintiff lacks standing to seek some or all of the requested relief.

3.      Some or all of the claims of Plaintiff and/or the claims of some or all of the putative class members are barred, in whole or in part, by the applicable statute of limitations and/or statue of repose.

4.      The claims of some or all putative class members are barred, in whole or in part, to the extent such claims are required to be pursued in arbitration.

5.      Some or all of the claims of Plaintiff and/or some or all of the claims of some or all of the putative class members are barred, in whole or in part, to the extent that such claims have been released, discharged, abandoned, and/or barred in whole or in part by the doctrines of laches, waiver, and/or estoppel.

6.    Some or all of the claims of Plaintiff and/or some or all of the claims of some or all of the putative class are barred, in whole or in part, because they have not sustained any injury or damage by reason of any act or omission of Defendants.

7.    Any losses alleged by Plaintiff and/or some or all of the putative class members were not caused by any alleged act, fault, or omission by Defendants, but were caused by other circumstances, entities, persons, economic causes, and/or events not related to any alleged misconduct over which Defendants had control and/or for which Defendants are not responsible.

8.    The purported relief sought by the Complaint is not recoverable under the applicable provisions of ERISA, including but not limited to because such relief does not constitute "appropriate equitable relief" under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

9.    To the extent Plaintiff has stated a claim on which relief can be granted, Plaintiff has proximately caused, contributed to, or failed to mitigate any and all losses claimed by them.

10.    To the extent Plaintiff has stated a claim on which relief can be granted, Plaintiff is barred from recovery or subject to set-off to the extent he (or any other putative class member) has been made whole, all or in part, for alleged forfeitures, including but not limited to as a result of any compensation such individual received from a subsequent employer to account for forfeitures.

11.    Some or all of the claims of Plaintiff and/or some or all of the claims of some or all of the putative class members are barred, in whole or in part, by the doctrines of estoppel and/or set-off.

12.    If Defendants did violate applicable law as to the claims of Plaintiff and/or some or all of the putative class members (which Defendants fully deny), the act(s) or omission(s) giving rise to such violation(s) were in good faith and Defendants had good faith and reasonable grounds for believing that the act(s) or omission(s) were not a violation of applicable law.

13.     To the extent the WealthChoice Plan is deemed to be governed by ERISA, and any Defendant is deemed to be a "fiduciary" within the meaning of ERISA, then such Defendant at all times acted prudently, loyally, in good faith, and otherwise in compliance with all fiduciary duties.

14.     Some or all of the claims of Plaintiff cannot and should not be maintained on a class basis because they fail to meet the necessary requirements for certification, including, but not limited to, numerosity, commonality, typicality, adequacy, predominance, and/or superiority.

15.     Without waiving its ability to oppose class certification and expressly asserting its opposition to the propriety of class treatment, if the Court does certify a class in this case over Defendants' objections, Defendants assert all defenses set forth herein against each and every member of the certified class.

16.     The WealthChoice Contingent Award Plan is not a pension plan under ERISA.

17.     The WealthChoice Contingent Award Plan is a bonus program within the meaning of ERISA and Department of Labor regulations.

18.     The WealthChoice Contingent Award Plan does not result in a deferral of income within the meaning of ERISA.

19.     The WealthChoice Contingent Award Plan does not result in a deferral of income for periods extending to the termination of covered employment or beyond.

20.     The WealthChoice Contingent Award Plan does not systematically defer awards until termination or beyond.

21.     One or more of Defendants are not, or were not acting as, fiduciaries within the meaning of ERISA, with respect to the purported misconduct or actions alleged by Plaintiff.

22.     The Court lacks subject matter jurisdiction because Plaintiff does not assert a viable claim arising under ERISA or any other law of the United States.

\*       \*       \*

WHEREFORE, having fully answered Plaintiff's Complaint in its entirety, Defendants pray for judgment as set forth below.

a.        An order dismissing all claims with prejudice;

b.        An order awarding all costs and fees to Defendants; and

c.        Any such other order and further relief as the Court deems just and proper.

Dated: July 12, 2024                              Respectfully submitted,

                                                  By: _/s/  Robert A. Muckenfuss_

                                                  Robert A. Muckenfuss, NC State Bar #28218
                                                  Zachary L. McCamey, NC State Bar #53540
                                                  MCGUIRE WOODS LLP
                                                  201 North Tryon Street, Suite 3000
                                                  Charlotte, NC 28202
                                                  (704) 343-2000
                                                  (704) 343-2300
                                                  zmccamey@mcguirewoods.com
                                                  rmuckenfuss@mcguirewoods.com

                                                  Sari M. Alamuddin (*pro hac vice* forthcoming)
                                                  Matthew A. Russell (*pro hac vice* forthcoming)
                                                  Eric M. Makinen (*pro hac vice* forthcoming)
                                                  MORGAN, LEWIS & BOCKIUS LLP
                                                  110 North Wacker Drive, Suite 2800
                                                  Chicago, IL  60606
                                                  (312) 324-1000
                                                  (312) 324-1001 (fax)
                                                  sari.alamuddin@morganlewis.com
                                                  matthew.russell@morganlewis.com
                                                  eric.makinen@morganlewis.com

                                                  *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Robert A. Muckenfuss, an attorney, hereby certify that on July 12, 2024, I caused a copy of the foregoing **Defendants' Answer and Defenses to Plaintiff's Class Action Complaint** to be filed through the Court's CM/ECF Electronic Filing System, which will transmit notice of such filing to all counsel of record.

/s/   Robert A. Muckenfuss

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| KELLY MILLIGAN,<br>ON BEHALF OF HIMSELF AND<br>ALL OTHERS SIMILARLY SITUATED, | |
| Plaintiff, | |
| v. | Case No. 3:24-cv-00440-KDB-DCK |
| MERRILL LYNCH, PIERCE, FENNER &<br>SMITH INC., BANK OF AMERICA CORP.,<br>and JOHN/JANE DOE 1, THE SENIOR VICE<br>PRESIDENT–HUMAN RESOURCES<br>GLOBAL BANKING AND GLOBAL<br>WEALTH AND INVESTMENT<br>MANAGEMENT ADMINISTRATION AT<br>BANK OF AMERICA CORP., | Judge Kenneth D. Bell<br>Magistrate Judge David Keesler |
| Defendants. | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") and Bank of America Corp. ("Bank of America") (together, "Defendants") hereby move the Court for summary judgment on all claims asserted in Plaintiff Kelly Milligan's Class Action Complaint (Dkt. 1).

As more fully set forth in the accompanying Memorandum of Law and supporting exhibits, there is no genuine issue of material fact preventing the Court from holding that Plaintiff's claims—all of which arise under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461—fail as a matter of law, because ERISA does not apply to the WealthChoice Contingent Award Plan being challenged in this case. Defendants are therefore entitled to summary judgment, and Plaintiff's claims should be dismissed with prejudice.

1

WHEREFORE, Defendants respectfully request that the Court grant summary judgment in their favor as to each of Plaintiff's claims and dismiss this matter with prejudice.

This is the 30th day of September 2024.

Respectfully submitted,

By: /s/  Robert A. Muckenfuss

MORGAN, LEWIS & BOCKIUS LLP

MCGUIRE WOODS LLP

Samuel S. Shaulson (*pro hac vice forthcoming*)
600 Brickell Avenue
Miami, FL 33131
T: (305) 415-3000
F: (305) 415-3001
samuel.shaulson@morganlewis.com

Robert A. Muckenfuss, NC State Bar #28218
Zachary L. McCamey, NC State Bar #53540
201 North Tryon Street, Suite 3000
Charlotte, NC 28202
(704) 343-2000
(704) 343-2300
zmccamey@mcguirewoods.com
rmuckenfuss@mcguirewoods.com

Sari M. Alamuddin (*pro hac vice*)
Matthew A. Russell (*pro hac vice*)
Eric M. Makinen (*pro hac vice*)
110 North Wacker Drive, Suite 2800
Chicago, IL  60606
(312) 324-1000
(312) 324-1001 (fax)
sari.alamuddin@morganlewis.com
matthew.russell@morganlewis.com
eric.makinen@morganlewis.com

*Attorneys for Defendants*

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of September 2024, the foregoing was filed with the

Court using the CM/ECF system.

 /s/ *Robert A. Muckenfuss*
Robert A. Muckenfuss

3

# EXHIBIT 1

Docusign Envelope ID: D80D9727-69B2-4F3B-920F-1D01F9F7F4D1

## DECLARATION OF SUSANNE TESTANI

I, Susanne Testani, under penalty of perjury and based upon personal knowledge, make the following declaration:

1.      I am over 18 years old and have personal knowledge of, and am competent to testify to, all of the facts set forth herein.

2.      I have been employed by Bank of America for approximately 26 years, and currently serve as a Senior Vice President, Service Delivery Manager (Global Human Resources). In this role I am familiar with and have access to records relating to Merrill's operations, including those relating to the WealthChoice Contingent Award Plan ("WealthChoice" or "Plan").

3.      From 2018 through June 30, 2024, between 91.3% and 94.2% of all FAs who received payment for earned WealthChoice awards in each year received such payments while employed, pursuant to the normal eight-year vesting period.  Specifically, the percentages in each year were as follows:  2018 (92.8%); 2019 (93.2%); 2020 (91.3%); 2021 (91.7%); 2022 (92.6%); 2023 (92.7%); and from January 1 through June 30, 2024 (94.2%).

4.      During his tenure at Merrill, Mr. Milligan satisfied the conditions for earning, and was therefore paid for, several WealthChoice awards once they became earned and payable.

5.      In February 2021, Mr. Milligan received a cash payment of ███ (before taxes), for a WealthChoice award granted on February 15, 2013.

6.      In February 2020, Mr. Milligan was paid ███ (before taxes), the value of the WealthChoice award he was granted on February 15, 2012.

7.      When Mr. Milligan left Merrill in April 2021, he had not yet earned certain other WealthChoice awards, which were canceled pursuant to the terms of his Award Agreements.

1

Docusign Envelope ID: D80D9727-69B2-4F3B-920F-1D01F9F7F4D1

8.      Attached hereto as **Exhibit A** is a true and correct copy of the WealthChoice Plan document, as amended and restated effective December 31, 2010.

9.      Attached hereto as **Exhibits H-S** are true and correct copies of Mr. Milligan's WealthChoice Award Agreements from 2010 through 2019.

10.     Attached hereto as **Exhibits T-Y** are true and correct copies of WealthChoice Award Fact Sheets from 2015 through 2020.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of September 2024.

Signed by:

*Susanne Testani*

C3D8BC005621444...

Susanne Testani

2

# EXHIBIT A

**WEALTHCHOICE CONTINGENT AWARD PLAN**

**As amended and restated effective December 31, 2010**

MILLIGAN000001

# WEALTHCHOICE CONTINGENT AWARD PLAN

As amended and restated effective December 31, 2010

## ARTICLE I

## Name, Purpose, and Effective Date

The name of the Plan is the WealthChoice Contingent Award Plan.

The Plan, as in effect from time to time, is intended to be unfunded and maintained primarily for the purpose of providing long-term contingent incentive compensation, subject to certain conditions, to a select group of Financial Advisors.  By awarding a portion of a Financial Advisor's incentive compensation in the form of a cash award which becomes earned and payable over time, the Company intends to encourage the Financial Advisor to remain employed by the Company and its Subsidiaries and to further align the interests of the Financial Advisor with the Company's business objectives.

The Plan is effective for the Performance Period commencing January 1, 2009, and each Performance Period thereafter until terminated in accordance with Article X.

## ARTICLE II

## Definitions

Unless otherwise required by the context, each of the following terms shall have the meaning indicated for that term:

"Account" means a notional account established on the books and records of a Participating Employer in accordance with Article IV to which all credits and debits are made with respect to the Covered Associate's Awards credited hereunder.

"Account Balance" means, as of any date, the Awards credited to a Covered Associate's Account adjusted in accordance with Section 5.1 to reflect the performance of the Covered Associate's Selected Benchmark Return Options and any payments made from the Account prior to that date.

"Administrator" means the Senior Vice President-Human Resources Global Banking and Global Wealth and Investment Management Administration or the individual serving in the functionally equivalent position if applicable from time to time (or any permitted delegate pursuant to Article III).

"Associate" means a person who is identified as an employee in the personnel records of his or her Participating Employer.

"Award" means an award determined under the Plan for credit to a Covered Associate's Account.

MILLIGAN000002

"Award Agreement" means an agreement between the Company and each Covered Associate setting forth the terms and provisions applicable to Awards under the Plan.

"Award Date" means a date, established by the Administrator with respect to each Award, as of which such Award will be credited to the Account.

"Award Year" means the calendar year in which an Award Date falls.

"Benchmark Return Options" means such investment vehicles as the Administrator may from time to time designate for the purpose of indexing Accounts hereunder. In the event a Benchmark Return Option ceases to exist or is no longer to be a Benchmark Return Option, the Administrator may designate a substitute Benchmark Return Option for such discontinued option.

"Beneficiary" means any person(s) or entity(ies) designated as such in accordance with Article IX.

"Board" or "Board of Directors" means the Board of Directors of the Company.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time. References to the Code shall include the valid and binding governmental regulations, court decisions and other regulatory or judicial authority issued or rendered thereunder.

"Company" means Bank of America Corporation and its successors and assigns.

"Covered Associate" means, for any particular Performance Period, any Associate as the Administrator may determine from time to time who (i) is employed during the Performance Period as a Financial Advisor (regardless of whether such Associate continues to be a Financial Advisor on the Award Date), (ii) meets the applicable Award criteria or such other criteria determined by the Administrator and (iii) as of the Award Date, has not terminated employment with the Company or a Subsidiary for any reason other than death, Disability, Divestiture or "retirement" as determined by the Administrator consistent with the Company's retirement policies and programs.. The performance criteria for Awards will be established periodically by the Administrator and may vary from Performance Period to Performance Period and according to the type of performance, and may be announced prior to, during or following the applicable Performance Period. The Administrator shall make all determinations as to whether an Associate is a Covered Associate for a Performance Period. In that regard, the Administrator in its sole and exclusive discretion may determine to exclude an Associate (or group of Associates) from being considered a Covered Associate with respect to an Award at any time prior to the applicable Award Date.

"Director" means any individual who is a member of the Board of Directors of the Company.

"Disability" with respect to a Covered Associate, means "disability" as defined from time to time under any long-term disability plan of the Company or Subsidiary with which the Covered Associate is employed.

"Divestiture" means an Associate's Termination of Employment with the Company and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by the Associate's employer based on the personnel records of the Company and its Subsidiaries.

MILLIGAN000003

"Effective Date" shall mean January 1, 2009.

"Financial Advisor" means a financial advisor Associate of the Company or its Subsidiaries.

"Mutual Fund Return Options" means the mutual funds chosen as Benchmark Return Options by the Administrator from time to time.

"Participating Employer" means the Company and each Subsidiary participating in the Plan from time to time, and their successors and assigns.

"Performance Period" means the calendar year in which performance is measured in determining the amount of the Award, generally the calendar year immediately preceding the Award Year.

"Plan" means the WealthChoice Contingent Award Plan, as may be amended from time to time.

"Selected Benchmark Return Option" means a Benchmark Return Option selected by the Covered Associate in accordance with Section 5.1.

"Subsidiary" means any corporation, partnership, joint venture, affiliate or other entity in which the Company owns more than eighty percent (80%) of the voting stock or voting ownership interest, as applicable, or any business entity designated by the Administrator as a Subsidiary for purposes of the Plan.

"Termination of Employment" means a Covered Associate's termination of employment with the Company and its Subsidiaries as determined by the Administrator in accordance with the personnel records of the Covered Associate's Participating Employer; provided, however, that for a Covered Associate that is subject to the requirements of Section 409A of the Code as determined by the Administrator, "Termination of Employment" means a "separation from service" or "termination of employment" within the meaning of Code Section 409A and the Bank of America 409A Policy.

"Vesting Date" means, for any individual Award, the date on which the Account Balance with respect to an Award becomes earned and payable (as specified in the applicable Award Agreement).

"Years of Service" means the number of "years of service" reflected on the books and records of the Participating Employer as the Covered Associate's official Years of Service.

### ARTICLE III

### Administration

The Plan shall be administered by the Administrator. The Administrator shall have all of the powers necessary to enable it to properly carry out its duties under the Plan. The Administrator may delegate to the Head of Human Resources for the Global Wealth and Investment Management division (or the individual serving in the functionally equivalent position if applicable from time to time) the power to approve Awards under the Plan from time to time.

MILLIGAN000004

Not in limitation of the foregoing, the Administrator shall have the power to construe and interpret the Plan and to determine all questions that shall arise thereunder.  The Administrator shall have such other and further specified duties, powers, authority and discretion as are elsewhere in the Plan either expressly or by necessary implication conferred upon it.  The Administrator may appoint such agents as it may deem necessary for the effective performance of its duties, and may delegate to such agents such powers and duties as the Administrator may deem expedient or appropriate that are not inconsistent with the intent of the Plan.  The decision of the Administrator upon all matters within its scope of authority shall be final and conclusive on all persons, except to the extent otherwise provided by law.

**ARTICLE IV**

**Awards**

### 4.1      Awards

The amount of each Covered Associate's Award in any given year shall be determined by the Administrator and be subject to the review and approval by the Company.  Each Award shall be evidenced by an Award Agreement that shall specify the terms and provisions applicable to such Award as determined by the Administrator.

### 4.2      Crediting of Accounts

A Covered Associate's Award shall be credited to the Covered Associate's Account as soon as practicable (but in no event later than 120 days) after the last day of the prior calendar year.

**ARTICLE V**

**Operation of Plan**

### 5.1      Benchmark Return Elections

(a)      **Selection of Benchmark Return Options.**  A Covered Associate must choose one or more Benchmark Return Options and the percentage of the Covered Associate's Account to be adjusted to reflect the performance of each Selected Benchmark Return Option; provided, that if for any reason the Covered Associate does not effectively designate Benchmark Return Options with respect to such Covered Associate's entire Account, until such time as an effective election is provided, the Covered Associate's Selected Benchmark Return Option shall be the default Benchmark Return Option specified by the Administrator.  All elections of Selected Benchmark Return Options shall be in multiples of 1% and shall be in accordance with procedures specified by the Administrator, consistent with Company practice.

(b)      **Changes to Selected Benchmark Return Options.**  A Covered Associate may change the Selected Benchmark Return Options to be applicable with respect to such Covered Associate's Account by making a new election (expressed in whole percentages) in accordance with such procedures, and with such frequency, as shall be prescribed from time to time by the Administrator.  Notwithstanding anything herein to the contrary, the Administrator may establish any limitations on (i) the total number of Benchmark Return Options a Covered Associate may select in a particular election, and (ii) the frequency with which Covered Associates may make

MILLIGAN000005

elections under this Section as the Administrator may determine necessary or appropriate from time to time, including limitations relating to frequent trading or market timing activities.

(c)    **Adjustment of Mutual Fund Return Balances.**    While each Covered Associate's Account does not represent the Covered Associate's ownership of, or any ownership interest in, any particular assets, the Account shall be adjusted to reflect the investment experience of the Covered Associate's Selected Benchmark Return Options from time to time at such intervals as determined by the Administrator in accordance with procedures established by the Administrator.  The amount of the adjustment shall equal the amount that each Covered Associate's Account would have earned (or lost) for the period since the last adjustment had the Account actually been invested in the Selected Benchmark Return Option(s) designated by the Covered Associate for such period.

### 5.2    Statement of Account

For each calendar year quarter, each Covered Associate for whom an Account is maintained under the Plan will receive a statement that reports the value of the Account as of the end of the calendar year quarter.

### 5.3    Impact on Other Benefit Plans

The Administrator shall determine from time to time if, and to what extent, the Awards under the Plan shall be taken into account under the other benefit plans of the Company and its Subsidiaries.

### ARTICLE VI

### STATUS OF AWARDS AND ACCOUNTS

### 6.1    No Trust or Fund Created; General Creditor Status

Nothing contained herein and no action taken pursuant hereto will be construed to obligate the Administrator to invest any assets of the Participating Employer in any Selected Benchmark Return Option, nor to establish a trust or separate fund of any kind or a fiduciary relationship between the Participating Employer and a Covered Associate, Covered Associate's Beneficiary or estate, or any other person or entity.  The Administrator may, if it so chooses, earmark any assets of the Participating Employer to meet its obligations hereunder.  Title to and beneficial ownership of any funds represented by the Account will at all times remain in the Participating Employer; such funds will continue for all purposes to be a part of the general funds of the Participating Employer and may be used for any corporate purpose.  No person will, by virtue of the provisions of the Plan, have any interest whatsoever in any specific assets of the Participating Employer, including any such funds.  TO THE EXTENT THAT ANY PERSON ACQUIRES A RIGHT TO RECEIVE PAYMENTS FROM THE PARTICIPATING EMPLOYER UNDER THE PLAN, SUCH RIGHT WILL BE NO GREATER THAN THE RIGHT OF ANY UNSECURED GENERAL CREDITOR OF SUCH PARTICIPATING EMPLOYER.

### 6.2    Non-Assignability

The right of a Covered Associate, or of any other person with reference to the Covered Associate, to the Account Balance, or any other benefits hereunder, shall be: (a) subject to forfeiture as further described in the applicable Award Agreement, and (b) cannot be assigned, alienated, sold, garnished, transferred, pledged, or encumbered except by a designation of Beneficiary in accordance with Article IX below, by written will, or by the laws of descent and

MILLIGAN000006

distribution.  In that regard, no part of any Award shall, prior to actual payment, (a) be subject to seizure, attachment, garnishment or sequestration for the payment of debts, judgments, alimony, or separate maintenance owed by the Covered Associate or any other person, (b) be transferable by operation of law in the event of the Covered Associate's or any person's bankruptcy or insolvency or (c) be transferable to a spouse as a result of a property settlement or otherwise.  Notwithstanding the foregoing, a Participating Employer shall have the right to offset from a Covered Associate's unpaid benefits under the Plan any amounts due and owing from the Covered Associate to the extent permitted by law.

## ARTICLE VII

### Payment of Account Balances

#### 7. 1     Payment Schedule

Subject to the provisions of Article VIII below, a Covered Associate's Account Balance with respect to an Award for a Performance Period shall be paid as soon a practicable after the relevant Vesting Date in accordance with the terms of the applicable Award Agreement (but in no event later than 2½ months following such Vesting Date).

#### 7.2     Withholding of Taxes

The Participating Employer will deduct or withhold from any amounts to be credited to an Account, or from any payments to be made pursuant to an Award granted hereunder, any federal, state, local income or employment taxes as required under applicable laws to be withheld.  Alternatively or additionally, the Participating Employer may require the Covered Associate or the Beneficiary to pay any such amount, or the balance of any such amount to the Participating Employer and/or may withhold any such amount by any method set forth in the Award Agreement.

#### 7.3     Payment on Behalf of Incompetents

If the Administrator in its sole discretion finds that any person who is entitled to receive any payment hereunder is a minor or is unable to care for such person's affairs because of disability or incompetence, payment of the Account Balance may be made to anyone found by the Administrator to be the authorized representative of such person, or to be otherwise entitled to such payment, in the manner and under the conditions that the Administrator determines.  Such payment will be a complete discharge of the liabilities of the Participating Employer hereunder with respect to the amount so paid.

#### 7.4     Payment Delay for Specified Employees

Notwithstanding any provision in the Plan to the contrary, to the extent applicable, in no event shall any payment hereunder be made to a "specified employee" within the meaning of Code Section 409A earlier than six  months after the date of the Covered Associate's Termination of Employment, except in connection with the Covered Associate's death.

MILLIGAN000007

## ARTICLE VIII

### The Effect of Termination of Employment

Each Award Agreement shall set forth the extent to which a Covered Associate shall have the right to receive payment of the Account Balance with respect to an unvested Award following the Covered Associate's Termination of Employment prior to the Vesting Date. Such provisions shall be determined in the sole discretion of the Administrator, shall be included in the Award Agreement, need not be uniform among all Awards granted under the Plan, and may reflect distinctions based on the reasons for Termination of Employment.

## ARTICLE IX

### Beneficiary

#### 9.1     Designation of Beneficiary

To the extent permitted under the terms of the applicable Award Agreement, a Covered Associate may designate, in a form prescribed by the Company, a Beneficiary to receive payments in accordance with the Plan in the event of the Covered Associate's death and may also designate a contingent Beneficiary to receive such payments if the primary Beneficiary does not survive the Covered Associate. The Covered Associate may designate more than one person as the Beneficiary or contingent Beneficiary, in which case (a) no contingent Beneficiary would receive any payment unless all of the primary Beneficiaries predeceased the Covered Associate, and (b) the surviving Beneficiaries in any class shall share in any payments in proportion to the percentages of interest assigned to them by the Covered Associate.

If the Covered Associate dies without a surviving Beneficiary or a beneficiary designation is not permitted under the terms of the applicable Award Agreement or is not enforceable and/or valid under applicable law, the Covered Associate's estate will be considered the Beneficiary.

#### 9.2     Change of Beneficiary

A Covered Associate may change the Beneficiary or contingent Beneficiary (without the consent of any prior Beneficiary), in a form prescribed by the Company,  before the Covered Associate's death. Unless otherwise clearly provided in the form prescribed by the Company, any change in Beneficiary or contingent Beneficiary designation will automatically revoke prior such designations, as applicable, under the Plan.

#### 9.3     Beneficiary Death after Commencement of Payments

If, after a Covered Associate's death, a Beneficiary entitled to receive, or actually receiving, payments hereunder dies before receiving full payment, the Account Balance to which the Beneficiary was entitled will be paid as soon as practicable in one lump sum to such primary Beneficiary's estate.

MILLIGAN000008

## ARTICLE X

## Amendment and Termination

To the extent permitted under Code Section 409A, the Administrator shall have the right and power at any time and from time to time to amend the Plan in whole or in part and at any time to terminate the Plan; provided, however, that no such amendment or termination shall adversely affect any Award granted before the effective date of such amendment or termination without the consent of the affected Covered Associate.  Notwithstanding any provision of the Plan or any Award Agreement provision to the contrary, to the extent permitted under Code Section 409A, the Administrator, in its sole and exclusive discretion, shall have the power at any time to accelerate the vesting of any Award granted under the Plan, including, without limitation, acceleration to such a date that would result in such Awards becoming immediately vested.

## ARTICLE XI

## Miscellaneous Provisions

### 11.1    Books and Records Controlling

The books and records of the Participating Employers will be controlling in the event a question arises hereunder concerning the amount of Awards, Accounts, designations of Beneficiary(ies), or any similar matters.

### 11.2    Successors and Assigns

All obligations of the Participating Employers under the Plan with respect to Awards granted hereunder shall be binding on any successor to the Participating Employers, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation or otherwise, of all or substantially all of the business and/or assets of the Participating Employer.

### 11.3    Severability

In the event any provision of the Plan shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Plan, and the Plan shall be construed and enforced as if the illegal or invalid provision had not been included.

### 11.4    Litigation

A Participating Employer shall have the right to contest, at its expense, any ruling or decision, administrative or judicial, on an issue that is related to the Plan and that the Administrator believes to be important to the Covered Associates, and to conduct any such contest or any litigation arising therefrom to a final decision.

### 11.5    Headings Are Not Controlling

The headings contained in this Plan are for convenience only and will not control or affect the meaning or construction of any of the terms or provisions of this Plan.

### 11.6    Governing Law

This Plan will be construed, administered, regulated and governed in all respects under and by the laws of the United States to the extent applicable, and to the extent such laws are not applicable, by the laws of the state of Delaware.

### 11.7    Award Agreements

Unless otherwise provided for by an Award Agreement, in the event of any conflict between the terms of the Plan and the terms of an Award Agreement, the terms of the Plan shall control.

### 11.8    Code Section 409A

The Plan is intended to comply with Code Section 409A to the extent applicable. Notwithstanding any provision of the Plan to the contrary, the Plan shall be interpreted, operated and administered consistent with this intent.  In that regard, and notwithstanding any provision of the Plan to the contrary, the Company reserves the right to amend the Plan or any Award granted pursuant to the Plan, without the consent of any affected Covered Associate, to the extent deemed necessary or appropriate for purposes of maintaining compliance with Code Section 409A and the regulations promulgated thereunder.

MILLIGAN000010

IN WITNESS WHEREOF, this instrument has been executed by an authorized officer of the Company.


_____
Catherine J. Morgan
SVP-Human Resources, Global Banking and Global Wealth and Investment Management Adminstration


Date: _____

.

**JA76**                                              MILLIGAN000011

# EXHIBIT H

# WealthChoice Contingent Award Plan Award Agreement

This document contains your WealthChoice Award Agreement (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

**What you need to do**

1. Review the Award Agreement to ensure you understand its provisions. With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and the Plan and file them with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. Review the current competitor list, which can be found on Flagscape® under Benefits & Pay / Pay & Timekeeping / Stock and Long-Term Cash, to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

* If you do not accept your Award Agreement through the online acceptance process by September 30, 2011, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf.



## 2010 PERFORMANCE YEAR WEALTHCHOICE AWARD AGREEMENT

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an associate of Bank of America or one of its Subsidiaries.

A copy of the Plan is enclosed with this Agreement and its terms and provisions are incorporated herein by reference. When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Award covered by this Agreement (the "Award") is made to you in connection with your participation in the WealthChoice Contingent Award Plan, subject to the following terms and provisions.

1. Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement. The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award. This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2. You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement.

3. The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

4. To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account Balance paid to you pursuant to this Agreement. You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to the full value of the Account Balance paid to you pursuant to this Agreement. In addition, Awards are subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder, (ii) similar rules under laws of any other jurisdiction and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

5. You may designate a beneficiary to receive payment in connection with the Award awarded in the event of your death while in service with Bank of America or its Subsidiaries in

accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. If you do not designate a beneficiary or if your designated beneficiary does not survive you, then your beneficiary will be your estate.

6. Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an on-line or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

7. Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date. Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer. You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

8. Regardless of any action Bank of America or your employer takes with respect to any or all income tax, payroll tax or other tax-related withholding ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items owed by you is and remains your responsibility and may exceed the amount actually withheld by Bank of America or your employer. You further acknowledge that Bank of America and/or your employer (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award including the grant and vesting of the Award and the payment of the Account Balance; and (b) do not commit to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items. Further, if you have become subject to Tax-Related Items in connection with the Award in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items as a result of your participation in the Plan, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements, including, but not limited to, withholding

any applicable Tax-Related Items from any payment to be made pursuant to the Award. In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer. Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any withholding obligation.

9.  The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the state of Delaware and the laws of the United States, as provided in the Plan. For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this grant or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

10. In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding your Award. Any prior agreements, commitments or negotiations concerning the Award are superseded. Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

11. This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable. Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

12. If you move to any country outside of the United States during the term of your Award, additional terms and conditions may apply to your Award. Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Award and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer effective as of the date of grant listed in your Award Statement.

BANK OF AMERICA CORPORATION                ASSOCIATE

By:

Ben Gilman
Human Resources Executive for Wealth Management    _____

2010PY WealthChoice Award Agreement (Domestic)
Page 4 of 10

**Exhibit A**

WEALTHCHOICE CONTINGENT AWARD PLAN

PAYMENT OF AWARD

(a)    <u>PAYMENT SCHEDULE</u>.  Subject to the provisions of paragraphs (b) and (c) below, the Account Balance representing your Award shall become earned and payable on Feb. 15, 2019 if you remain employed with Bank of America and its Subsidiaries through that date.

Once the Account Balance representing your Award becomes earned and payable, the value of your Account Balance will be delivered, as soon as administratively practicable, to a Merrill Lynch account. This account cannot be a Trust Account, Individual Retirement Account or other tax-deferred account.  You may use a joint account if you are the primary owner of the account.

(b)    <u>IMPACT OF TERMINATION OF EMPLOYMENT ON YOUR AWARD</u>.  If your employment with Bank of America and its Subsidiaries terminates prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for termination as follows.

(i)    <u>Death</u>. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your termination is due to death. Payment will be made as soon as administratively practicable.

(ii)    <u>Rule of 65, Workforce Reduction, Divestiture or Disability</u>.  If your employment is terminated by Bank of America or its Subsidiaries, other than with Cause, when you are eligible for the Rule of 65 or due to a Disability, or if you are terminated in connection with a Workforce Reduction or Divestiture, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (c) below.

(iii)    <u>Retirement</u>.  If your employment terminates (other than with Cause), when you are eligible for Retirement, the Account Balance shall become earned and payable in two installments, with the first fifty percent (50%) of your Account Balance becoming earned and payable within 2 1/2 months following the end of the calendar year in which your Retirement occurs (or if your Retirement occurs before the Award Date, within 2 1/2 months following the calendar year in which the Award Date occurs), and the remaining Account Balance becoming earned and payable within 2 1/2 months following the end of the immediately subsequent calendar year, subject to your complying with the covenants set forth in paragraph (c) below.

(iv)  Termination with Cause.  If your employment is terminated by Bank of America or its Subsidiaries with Cause, the Account Balance representing your Award shall be canceled as of your employment termination date.

(v)  Change in Control.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) your employment is terminated by Bank of America or its Subsidiaries without Cause or (2) you terminate your employment with Bank of America or its Subsidiaries for Good Reason, then any unearned portion of the Award shall become immediately earned as of the date of such termination and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (c) below.

(vi)  All Other Terminations.  In the case of All Other Terminations, the Account Balance representing your Award shall be canceled as of your employment termination date.

(vii)  6-Month Payment Delay.  Notwithstanding the foregoing, the payment of an Account Balance  that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)  COVENANTS.

(i)  Non-Solicitation. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an associate of Bank of America and its Subsidiaries and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America and its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

(ii)  Non-Competition. To the extent permissible under applicable law, you agree that during any period in which your Account Balance remains

payable following termination of employment by Bank of America or its Subsidiaries due to Disability, Workforce Reduction or Divestiture, or following termination of employment by you after you have attained the Rule of 65 or are eligible for Retirement, you will not engage in Competition.

(iii)  <u>Detrimental Conduct</u>.  You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

(iv)  <u>Remedies</u>.  Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that (A) at all times prior to payment, to the extent permissible under applicable law, you do not engage in solicitation or Competition as described in paragraph (c)(i) and (ii) during such period, (B) at all times prior to payment, you do not engage in Detrimental Conduct, as described in paragraph (c)(iii), during such period and (C) in the case of termination by Bank of America or its Subsidiaries due to Disability, Workforce Reduction or Divestiture, or termination by you after you have attained the Rule of 65 or are eligible for Retirement, prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (A) above is applicable to you.  To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time.  If Bank of America or its Subsidiary determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.  In addition, from time to time following your termination of employment due to Disability, Workforce Reduction or Divestiture, or after having attained the Rule of 65 or Retirement, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the Competition restriction described in (A) above and the certification requirement described in (C) above will not apply to this Award.

(d)  <u>DEFINITIONS</u>.  For purposes hereof, the following terms shall have the following meanings:

<u>All Other Terminations</u> means any Termination of Employment with Bank of America and its Subsidiaries prior to your having attained Retirement or the Rule

of 65, whether initiated by you or your employer, other than (i) a termination due to your death or Disability, (ii) a termination in connection with a Divestiture, (iii) a termination with Cause and (iv) a termination in connection with a Change in Control as described in paragraph (b)(iv) above.

Cause shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a termination of your employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to financial advisors within the Global Wealth Management division or to your employment with Bank of America or any of its Subsidiaries generally including, but not limited to, compliance policies and the Bank of America Corporation Code of Ethics and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or customers or clients or have committed any other material violation of Bank of America's written policies or signed agreements regarding confidential and proprietary information.

Change in Control shall be defined as that term is defined in the Bank of America Corporation 2003 Key Associate Stock Plan.

Competition means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity that is designated as a "Competitive Business" as of the date of your Termination of Employment.  Bank of America shall communicate such list to you.

Detrimental Conduct means (i) any conduct that would constitute Cause or (ii) any one of the following: (A) any act or omission by you resulting or intended to result in personal gain at the expense of Bank of America or its Subsidiaries; (B) the improper disclosure by you of proprietary, privileged or confidential information of Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries or breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (C) improper conduct by you including, but not limited to, fraud, unethical conduct, falsification of the records of Bank of America or its Subsidiaries, unauthorized removal of property or information of Bank of

JA85

America or its Subsidiaries, intentional violation or negligent disregard for Bank of America's or its Subsidiaries' policies, rules and procedures, insubordination, theft, violent acts or threats of violence, unauthorized possession of controlled substances on the property of Bank of America or its Subsidiaries, conduct causing reputational harm to Bank of America or its Subsidiaries or a client of Bank of America or its Subsidiaries, or the use of the property, facilities or services of Bank of America or its Subsidiaries for unauthorized or illegal purposes; (D) the performance by you of your employment duties in a manner deemed by Bank of America or its Subsidiaries to be grossly negligent; (E) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment; or (F) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

<u>Disability</u> means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

<u>Divestiture</u> means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

<u>Good Reason</u> means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

<u>Good Reason Process</u> means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you terminate your employment for Good Reason within sixty (60) days after the end of the Cure Period. If Bank of

America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you terminate your employment with Bank of America and its Subsidiaries due to such condition (notwithstanding its cure), then you will not be deemed to have terminated your employment for Good Reason.

<u>Retirement</u> means that your employment terminates other than for Cause (i) on or after you have attained your sixty-fifth (65th) birthday or (ii) when you cease employment on or after your fifty-fifth (55th) birthday and you have completed at least ten (10) Years of Service, including approved leaves of absence of one year or less.

<u>Rule of 65</u> means that your employment terminates other than for Cause on or after (A) you have completed at least twenty (20) Years of Service with your employer, including approved leaves of absence of one year or less, and (B) your combined Years of Service with your employer and your age equals at least sixty-five (65).

<u>Workforce Reduction</u> means your termination of employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your termination of employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program), or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the termination is as a result of such action. Your termination of employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America. In the event you fail to execute all required documents in a timely fashion, your termination of employment will not be treated as a Workforce Reduction, and if any portion of your Award has been earned or paid to you after your termination of employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

# EXHIBIT I

# WealthChoice Contingent Award Plan
# Award Agreement for Strategic Premium Award

This document contains your WealthChoice Award Agreement for your Strategic Premium Award (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

---

**What you need to do**

1. Review the Award Agreement to ensure you understand its provisions.  With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and the Plan and file them with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. Review the current competitor list, which can be found on Flagscape® under Benefits & Pay / Pay & Timekeeping / Stock and Long-Term Cash, to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

---

\* If you do not accept your Award Agreement through the online acceptance process by September 30, 2011, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf.



## 2010 PERFORMANCE YEAR WEALTHCHOICE AWARD AGREEMENT
## FOR STRATEGIC PREMIUM AWARD

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an associate of Bank of America or one of its Subsidiaries.

A copy of the Plan is enclosed with this Agreement and its terms and provisions are incorporated herein by reference.  When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Strategic Premium Award covered by this Agreement (the "Award") is made to you in connection with your participation in the WealthChoice Contingent Award Plan, subject to the following terms and provisions.

1.  Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement.  The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award.  This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2.  You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement.

3.  The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

4.  To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account Balance paid to you pursuant to this Agreement.  You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to the full value of the Account Balance paid to you pursuant to this Agreement. In addition, Awards are subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder, (ii) similar rules under laws of any other jurisdiction and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

5. You may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. If you do not designate a beneficiary or if your designated beneficiary does not survive you, then your beneficiary will be your estate.

6. Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an on-line or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

   Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

7. Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date. Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer. You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

8. Regardless of any action Bank of America or your employer takes with respect to any or all income tax, payroll tax or other tax-related withholding ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items owed by you is and remains your responsibility and may exceed the amount actually withheld by Bank of America or your employer. You further acknowledge that Bank of America and/or your employer (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award including the grant and vesting of the Award and the payment of the Account Balance; and (b) do not commit to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items. Further, if you have become subject to Tax-Related Items in connection with the Award in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items as a result of your participation in the Plan, you agree as a condition of the

Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award. In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer. Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any withholding obligation.

9. The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the state of Delaware and the laws of the United States, as provided in the Plan. For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this grant or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

10. In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding your Award. Any prior agreements, commitments or negotiations concerning the Award are superseded. Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

11. This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable. Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

12. If you move to any country outside of the United States during the term of your Award, additional terms and conditions may apply to your Award. Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Award and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer effective as of the date of grant listed in your Award Statement.

BANK OF AMERICA CORPORATION            ASSOCIATE

By:

2010PY WealthChoice Award Agreement for Strategic Premium Award (Domestic)
Page 4 of 11

Ben Gilman
Human Resources Executive for Wealth Management    _____

**Exhibit A**

WEALTHCHOICE CONTINGENT AWARD PLAN

PAYMENT OF AWARD

(a)     <u>PAYMENT SCHEDULE</u>.  Subject to the provisions of paragraphs (b) and (c) below, the Account Balance representing your Award shall become earned and payable on March 25, 2019 if you remain employed with Bank of America and its Subsidiaries through that date.

Once the Account Balance representing your Award becomes earned and payable, the value of your Account Balance will be delivered, as soon as administratively practicable, to a Merrill Lynch account. This account cannot be a Trust Account, Individual Retirement Account or other tax-deferred account.  You may use a joint account if you are the primary owner of the account.

(b)     <u>IMPACT OF TERMINATION OF EMPLOYMENT ON YOUR AWARD</u>.  If your employment with Bank of America and its Subsidiaries terminates prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for termination as follows.

(i)     <u>Death</u>. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your termination is due to death. Payment will be made as soon as administratively practicable.

(ii)     <u>Rule of 65, Workforce Reduction, Divestiture or Disability</u>.  If your employment is terminated by Bank of America or its Subsidiaries, other than with Cause, when you are eligible for the Rule of 65 or due to a Disability, or if you are terminated in connection with a Workforce Reduction or Divestiture, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (c) below.

(iii)     <u>Retirement</u>.  If your employment terminates (other than with Cause), when you are eligible for Retirement, the Account Balance shall become earned and payable in two installments, with the first fifty percent (50%) of your Account Balance becoming earned and payable within 2 1/2 months following the end of the calendar year in which your Retirement occurs (or if your Retirement occurs before the Award Date, within 2 1/2 months following the calendar year in which the Award Date occurs), and the remaining Account Balance becoming earned and payable within 2 1/2 months following the end of the immediately subsequent calendar year, subject to your complying with the covenants set forth in paragraph (c) below.

    (iv)   <u>Termination with Cause</u>.  If your employment is terminated by Bank of America or its Subsidiaries with Cause, the Account Balance representing your Award shall be canceled as of your employment termination date.

    (v)   <u>Change in Control</u>.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) your employment is terminated by Bank of America or its Subsidiaries without Cause or (2) you terminate your employment with Bank of America or its Subsidiaries for Good Reason, then any unearned portion of the Award shall become immediately earned as of the date of such termination and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (c) below.

    (vi)   <u>All Other Terminations</u>.  In the case of All Other Terminations, the Account Balance representing your Award shall be canceled as of your employment termination date.

    (vii)   <u>6-Month Payment Delay</u>.  Notwithstanding the foregoing, the payment of an Account Balance  that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)    <u>COVENANTS</u>.

    (i)   <u>Non-Solicitation</u>. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an associate of Bank of America and its Subsidiaries and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America and its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

    (ii)   <u>Non-Competition</u>. To the extent permissible under applicable law, you agree that during any period in which your Account Balance remains

payable following Termination of Employment by Bank of America or its Subsidiaries due to Disability, Workforce Reduction or Divestiture, or following Termination of Employment by you after you have attained the Rule of 65 or are eligible for Retirement, you will not engage in Competition.

(iii)   <u>Detrimental Conduct</u>.  You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

(iv)   <u>Remedies</u>.  Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that (A) at all times prior to payment, to the extent permissible under applicable law, you do not engage in solicitation or Competition as described in paragraphs (c)(i) and (ii) during such period, (B) at all times prior to payment, you do not engage in Detrimental Conduct, as described in paragraph (c)(iii), during such period and (C) in the case of termination by Bank of America or its Subsidiaries due to Disability, Workforce Reduction or Divestiture, or termination by you after you have attained the Rule of 65 or are eligible for Retirement, prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (A) above is applicable to you.  To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time.  If Bank of America or one of its Subsidiaries determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.  In addition, from time to time following your Termination of Employment due to Disability, Workforce Reduction or Divestiture, or after having attained the Rule of 65 or Retirement, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition.  Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the Competition restriction described in (A) above and the certification requirement described in (C) above will not apply to this Award.

(d)   <u>DEFINITIONS</u>.  For purposes hereof, the following terms shall have the following meanings:

<u>All Other Terminations</u> means any Termination of Employment with Bank of America and its Subsidiaries prior to your having attained Retirement or the Rule

of 65, whether initiated by you or your employer, other than (i) a termination due to your death or Disability, (ii) a termination in connection with a Workforce Reduction or Divestiture, (iii) a termination with Cause and (iv) a termination in connection with a Change in Control as described in paragraph (b)(v) above.

Cause shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a termination of your employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to financial advisors within the Global Wealth Management division or to your employment with Bank of America or any of its Subsidiaries generally including, but not limited to, compliance policies and the Bank of America Corporation Code of Ethics and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or customers or clients or have committed any other material violation of Bank of America's written policies or signed agreements regarding confidential and proprietary information.

Change in Control shall be defined as that term is defined in the Bank of America Corporation 2003 Key Associate Stock Plan.

Competition means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity that is designated as a "Competitive Business" as of the date of your Termination of Employment. Bank of America shall communicate such list to you.

Detrimental Conduct means (i) any conduct that would constitute Cause or (ii) any one of the following: (A) any act or omission by you resulting or intended to result in personal gain at the expense of Bank of America or its Subsidiaries; (B) the improper disclosure by you of proprietary, privileged or confidential information of Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries or breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (C) improper conduct by you including, but not limited to, fraud, unethical conduct, falsification of the records of Bank of America or its Subsidiaries, unauthorized removal of property or information of Bank of

America or its Subsidiaries, intentional violation or negligent disregard for Bank of America's or its Subsidiaries' policies, rules and procedures, insubordination, theft, violent acts or threats of violence, unauthorized possession of controlled substances on the property of Bank of America or its Subsidiaries, conduct causing reputational harm to Bank of America or its Subsidiaries or a client of Bank of America or its Subsidiaries, or the use of the property, facilities or services of Bank of America or its Subsidiaries for unauthorized or illegal purposes; (D) the performance by you of your employment duties in a manner deemed by Bank of America or its Subsidiaries to be grossly negligent; (E) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment; or (F) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

<u>Disability</u> means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

<u>Divestiture</u> means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

<u>Good Reason</u> means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

<u>Good Reason Process</u> means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you terminate your employment for Good Reason within sixty (60) days after the end of the Cure Period. If Bank of

America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you terminate your employment with Bank of America and its Subsidiaries due to such condition (notwithstanding its cure), then you will not be deemed to have terminated your employment for Good Reason.

<u>Retirement</u> means that your employment terminates other than with Cause (i) on or after you have attained your sixty-fifth (65th) birthday or (ii) when you cease employment on or after your fifty-fifth (55th) birthday and you have completed at least ten (10) Years of Service, including approved leaves of absence of one (1) year or less.

<u>Rule of 65</u> means that your employment terminates other than with Cause on or after (i) you have completed at least twenty (20) Years of Service with your employer, including approved leaves of absence of one (1) year or less, and (ii) your combined Years of Service with your employer and your age equals at least sixty-five (65).

<u>Workforce Reduction</u> means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program), or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the termination is as a result of such action.  Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America.  In the event you fail to execute all required documents in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

# EXHIBIT J

# WealthChoice Contingent Award Plan
# Award Agreement

This document contains your WealthChoice Award Agreement (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

---

**What you need to do**

1. Review the Award Agreement to ensure you understand its provisions.  With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and the Plan and file them with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. More detailed information about competitive businesses can be found on Flagscape® under Benefits & Pay / Pay & Timekeeping / Stock and Long-Term Cash to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

---

\* If you do not accept your Award Agreement through the online acceptance process by November 15, 2012, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf.  If you decline your Award Agreement, your award will be canceled and you will not be entitled to any benefits from the award nor any compensation or benefits in lieu of the canceled award.

2011 PY WealthChoice Award Agreement US
Page 1 of 20



## 2011 PERFORMANCE YEAR WEALTHCHOICE AWARD AGREEMENT

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an employee of Bank of America or one of its Subsidiaries.

A copy of the Plan is enclosed with this Agreement and its terms and provisions are incorporated herein by reference. When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Award covered by this Agreement (the "Award") is made to you in connection with your participation in the Plan, subject to the following terms and provisions.

1.  Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement. The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award. This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2.  Notwithstanding any provisions in this Agreement, the Award shall be subject to any special terms and conditions applicable to employees based outside the U.S., as set forth in Exhibit B to this Agreement. If you relocate to one of the countries included in Exhibit B, the special terms and conditions for such country will apply to you to the extent that Bank of America determines that the application of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Award. Exhibit B constitutes part of this Agreement.

3.  You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement, including any special terms and provisions applicable to employees based outside the U.S., as set forth in Exhibit B. IN THE EVENT OF ANY CONFLICT BETWEEN THIS WEALTHCHOICE AWARD AGREEMENT, EXHIBIT A AND EXHIBIT B, THE PROVISIONS OF EXHIBIT B SHALL PREVAIL AND CONTROL THE AWARD.

4.  The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

5.  To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account Balance paid to you pursuant to this Agreement. You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to

the full value of the Account Balance paid to you pursuant to this Agreement.  In addition, this Award is subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder, (ii) similar rules under the laws of any other jurisdiction and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

6. Subject to applicable laws in your country, you may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time.  If you do not designate a beneficiary, if your designated beneficiary does not survive you or if the designation is not enforceable and/or valid under the inheritance and other laws in your country (as determined by Bank of America in its sole discretion), then your beneficiary will be your estate.

7. Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means.  You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an on-line or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

   Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

8. Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date.  Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer.  You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

9. Regardless of any action Bank of America or your employer takes with respect to any or all income tax, payroll tax or other tax-related withholding ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items owed by you is and remains your responsibility and may exceed the amount actually withheld by Bank of America or your employer.  You further acknowledge that Bank of America and/or your employer (a) make no representations or undertakings regarding the treatment of any Tax-Related

Items in connection with any aspect of the Award including the grant and vesting of the Award and the payment of the Account Balance; and (b) do not commit to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items. Further, if you have become subject to Tax-Related Items in connection with the Award in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items as a result of your participation in the Plan, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award. In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer. Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any withholding obligation.

10. The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the State of Delaware and the laws of the United States, as provided in the Plan. For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this grant or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

11. In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding the Award. Any prior agreements, commitments or negotiations concerning the Award are superseded. Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

12. This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable. Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

13. Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Award and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer effective as of the date of grant listed in your Award Statement.

BANK OF AMERICA CORPORATION

By:

Ben Gilman
Human Resources Executive for Wealth Management

2011 PY WealthChoice Award Agreement US
Page 5 of 20

**Exhibit A**

W<small>EALTH</small>C<small>HOICE</small> C<small>ONTINGENT</small> A<small>WARD</small> P<small>LAN</small>

PAYMENT OF AWARD

(a)     <u>PAYMENT SCHEDULE</u>.  Subject to the provisions of paragraphs (b) and (c) below, the Account Balance representing your Award shall become earned and payable on Feb. 15, 2020 if you remain employed with Bank of America and its Subsidiaries through that date.

Once the Account Balance representing your Award becomes earned and payable, the value of your Account Balance will be delivered, as soon as administratively practicable, to a Merrill Lynch account. This account cannot be a Trust Account, Individual Retirement Account or other tax-deferred account.  You may use a joint account if you are the primary owner of the account.

(b)     <u>IMPACT OF TERMINATION OF EMPLOYMENT ON YOUR AWARD</u>.  If your employment with Bank of America and its Subsidiaries terminates prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for termination as follows.

   (i)  <u>Death</u>. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your termination is due to death. Payment will be made as soon as administratively practicable.

   (ii)  <u>Rule of 65, Workforce Reduction, Divestiture or Disability</u>.  If your employment is terminated by Bank of America or its Subsidiaries, other than with Cause, when you are eligible for the Rule of 65 or due to a Disability, or if you are terminated in connection with a Workforce Reduction or Divestiture, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (c) below.

   (iii)  <u>Retirement</u>.  If your employment terminates (other than with Cause) when you are eligible for Retirement, the Account Balance shall become earned and payable in two installments, with the first fifty percent (50%) of your Account Balance becoming earned and payable within 2 1/2 months following the end of the calendar year in which your Retirement occurs (or if your Retirement occurs before the Award Date, within 2 1/2 months following the calendar year in which the Award Date occurs), and the remaining Account Balance becoming earned and payable within 2 1/2 months following the end of the immediately subsequent calendar year, subject to your complying with the covenants set forth in paragraph (c) below.

      (iv)   <u>Termination with Cause</u>.  If your employment is terminated by Bank of America or its Subsidiaries with Cause, the Account Balance representing your Award shall be canceled as of your employment termination date.

      (v)   <u>Change in Control</u>.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) your employment is terminated by Bank of America or its Subsidiaries without Cause or (2) you terminate your employment with Bank of America or its Subsidiaries for Good Reason, then any unearned portion of the Award shall become immediately earned as of the date of such termination and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (c) below.

      (vi)   <u>All Other Terminations</u>.  In the case of All Other Terminations, the Account Balance representing your Award shall be canceled as of your employment termination date.

      (vii)   <u>6-Month Payment Delay</u>.  Notwithstanding the foregoing, the payment of an Account Balance that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)    <u>COVENANTS</u>.

      (i)   <u>Non-Solicitation</u>. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an employee of Bank of America and its Subsidiaries and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America and its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

      (ii)   <u>Non-Competition</u>. To the extent permissible under applicable law, you agree that during any period in which your Account Balance remains

payable following Termination of Employment by Bank of America or its Subsidiaries due to Disability, Workforce Reduction or Divestiture, or following Termination of Employment by you after you have attained the Rule of 65 or are eligible for Retirement, you will not engage in Competition.

(iii)   <u>Detrimental Conduct</u>.  You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

(iv)   <u>Remedies</u>.  Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that (A) at all times prior to payment, to the extent permissible under applicable law, you do not engage in solicitation or Competition, as described in paragraphs (c)(i) and (ii) during such period, (B) at all times prior to the payment date, you do not engage in Detrimental Conduct, as described in paragraph (c)(iii), during such period and (C) in the case of termination by Bank of America or its Subsidiaries due to Disability, Workforce Reduction or Divestiture, or termination by you after you have attained the Rule of 65 or are eligible for Retirement, prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (A) above is applicable to you.  To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time.  If Bank of America determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination. In addition, from time to time following your Termination of Employment due to Disability, Workforce Reduction or Divestiture, or after having attained the Rule of 65 or Retirement, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the Competition restriction described in (A) above and the certification requirement described in (C) above will not apply to this Award.

(d)   <u>DEFINITIONS</u>.  For purposes hereof, the following terms shall have the following meanings:

<u>All Other Terminations</u> means any Termination of Employment with Bank of America and its Subsidiaries prior to your having attained Retirement or the Rule

of 65, whether initiated by you or your employer, other than (i) a termination due to your death or Disability, (ii) a termination in connection with a Workforce Reduction or Divestiture, (iii) a termination with Cause and (iv) a termination in connection with a Change in Control as described in paragraph (b)(v) above.

Cause shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a termination of your employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to financial advisors within the Global Wealth Management division or to your employment with Bank of America or any of its Subsidiaries generally including, but not limited to, compliance policies and the Bank of America Corporation Code of Ethics and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or customers or clients or have committed any other material violation of Bank of America's written policies or signed agreements regarding confidential and proprietary information.

Change in Control shall be defined as that term is defined in the Bank of America Corporation 2003 Key Associate Stock Plan.

Competition means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity that is designated as a "Competitive Business" as of the date of your Termination of Employment.

Detrimental Conduct means (i) any conduct that would constitute Cause or (ii) any one of the following: (A) any act or omission by you resulting or intended to result in personal gain at the expense of Bank of America or its Subsidiaries; (B) the improper disclosure by you of proprietary, privileged or confidential information of Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries or breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (C) improper conduct by you including, but not limited to, fraud, unethical conduct, falsification of the records of Bank of America or its Subsidiaries, unauthorized removal of property or information of Bank of

America or its Subsidiaries, intentional violation or negligent disregard for Bank of America's or its Subsidiaries' policies, rules and procedures, insubordination, theft, violent acts or threats of violence, unauthorized possession of controlled substances on the property of Bank of America or its Subsidiaries, conduct causing reputational harm to Bank of America or its Subsidiaries or a client of Bank of America or its Subsidiaries, or the use of the property, facilities or services of Bank of America or its Subsidiaries for unauthorized or illegal purposes; (D) the performance by you of your employment duties in a manner deemed by Bank of America or its Subsidiaries to be grossly negligent; (E) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment; or (F) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

<u>Disability</u> means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

<u>Divestiture</u> means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

<u>Good Reason</u> means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

<u>Good Reason Process</u> means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you terminate your employment for Good Reason within sixty (60) days after the end of the Cure Period. If Bank of

America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you terminate your employment with Bank of America and its Subsidiaries due to such condition (notwithstanding its cure), then you will not be deemed to have terminated your employment for Good Reason.

Retirement means that your employment terminates other than with Cause (i) on or after you have attained your sixty-fifth (65th) birthday or (ii) when you cease employment on or after your fifty-fifth (55th) birthday and you have completed at least ten (10) Years of Service, including approved leaves of absence of one (1) year or less.

Rule of 65 means that your employment terminates other than with Cause on or after (i) you have completed at least twenty (20) Years of Service with your employer, including approved leaves of absence of one (1) year or less, and (ii) your combined Years of Service with your employer and your age equals at least sixty-five (65).

Workforce Reduction means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program), or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the termination is as a result of such action.  Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America.  In the event you fail to execute all required documents in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of the Account Balance representing your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

2011 PY WealthChoice Award Agreement US
Page 11 of 20

Exhibit B

# BANK OF AMERICA CORPORATION
## WEALTHCHOICE AWARDS

### Special Provisions for WealthChoice Awards in Countries Outside the U.S.

This Exhibit B contains the terms that govern your WealthChoice Award and/or WealthChoice Strategic Premium Award if you are an employee of Bank of America or one of its Subsidiaries outside of the U.S. Capitalized terms used but not defined herein shall have the same meanings assigned to them in the Agreement.

This Exhibit B also includes certain country-specific disclosures that may be applicable to you if you work or reside in one of the countries listed herein. These disclosures are based on the securities exchange control and other laws in effect in the respective countries as of January 2012. Such laws are often complex and change frequently. As a result, Bank of America strongly recommends that you not rely on the information in this Exhibit B as the only source of information relating to the consequences of receiving an Award because the information may be out of date at the time the Award becomes earned and payable or at any later date indicated herein.

If you are a citizen or resident of a country other than the one in which you are currently working, are considered a citizen or resident of another country for local law purposes or transfer employment to another country after the Award is granted to you, Bank of America shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you.

### General terms applicable to WealthChoice Awards granted to employees in any country outside of the U.S.

**Data Privacy**

*By accepting the Award, you hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer and Bank of America and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Award.*

*You understand that Bank of America and your employer hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor, for the purpose of implementing, administering and managing the Award ("Data"). You understand that Data may be transferred to any third parties assisting in the implementation, administration and management of the Award, that these recipients may be located in your country or elsewhere, and that the recipient's country may have different data privacy laws and protections from your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage the Award. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing your local human resources representative. You understand, however, that refusing or withdrawing your consent may affect your ability to benefit from the Award. For more information on the consequences of your refusal*

**JA112**

*to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

**Nature of Grant**

By entering into this Agreement and accepting the grant of the Award evidenced hereby, you acknowledge, understand and agree that:

(a)    the Award is granted voluntarily by Bank of America, is discretionary in nature and may be modified, suspended or terminated by Bank of America at any time;

(b)    the grant of the Award is voluntary and occasional and does not create any contractual or other right to receive future awards or benefits in lieu of awards even if such awards have been awarded repeatedly in the past;

(c)    all decisions with respect to future awards, if any, will be at the sole discretion of Bank of America;

(d)    the grant of the Award shall not create a right to further employment with your employer and shall not interfere with the ability of your employer to terminate your employment relationship at any time, with or without Cause;

(e)    you are voluntarily accepting the grant of the Award;

(f)    the future value of the benchmark return options and your Account Balance is unknown and cannot be predicted with certainty.

(g)    the Award and any cash payment made pursuant to the Award are an extraordinary item that do not constitute compensation of any kind for services of any kind rendered to Bank of America or your employer, and which are outside the scope of your employment contract, if any;

(h)    the Award and any cash payment made pursuant to the Award are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement benefits or welfare benefits or similar payments, and in no event should be considered as compensation for, or in any way relating to, past services for Bank of America or any of its Subsidiaries;

(i)    in the event that you are not an employee of Bank of America, the Award will not be interpreted to form an employment contract or relationship with Bank of America; furthermore, the Award will not be interpreted to form an employment contract with any Subsidiary;

(j)    no claim or entitlement to compensation or damages shall arise from forfeiture of the Award resulting from violation of a covenant set forth in Exhibit A, termination of your employment by Bank of America or your employer (for any reason whatsoever and regardless of whether in breach of local labor laws) or recoupment of all or any portion of any payment made pursuant to the Award, and in consideration of the grant of the Award, to which you are not otherwise entitled, you irrevocably agree never to institute any claim against Bank of America or your employer, waive your ability, if any, to bring any such claim and release Bank of America and your employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the

Award, you shall be deemed irrevocably to have agreed not to pursue such claim, and you agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(k)     for purposes of the Award, your employment will be considered terminated as of the date you are no longer actively employed and providing services to Bank of America or one of its Subsidiaries, and your right, if any, to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (regardless of whether the termination is in breach of local labor laws and/or later found to be invalid) will be measured by the date you cease to be actively employed and will not be extended by any notice period mandated under local law (e.g., active employment would not include a period of "garden leave" or similar period pursuant to local law); Bank of America, in its sole discretion, shall determine when you are no longer actively employed for purposes of the Award (including whether you may still be considered actively employed while on an approved leave of absence);

(l)     unless otherwise provided in this Exhibit B, you are solely responsible for investigating and complying with any exchange control laws applicable to you in connection with the Award and any payment made pursuant to the Award;

(m)     the Award will not automatically transfer to another company in the case of a merger, take-over or transfer of liability; and

(n)     Bank of America and your employer are not providing any tax, legal, financial or investment advice, nor making any recommendations regarding participation in the Plan.  You acknowledge that you have the necessary knowledge and experience to understand how the Award and the Plan work, as well as any risks that may be related to the Plan and the Award and any notional or benchmark investment decisions that you may make in connection with the Plan or the Award.  You are advised to consult with your personal tax, legal and financial advisors regarding participation in the Plan.

Language

If you have received this Agreement or any other document related to the Award translated into a language other than English and if the meaning of the translated version differs from the English version, the English version shall control.

**Country-specific terms and disclosures applicable to WealthChoice Awards granted to employees outside of the U.S.**

**Argentina**

You agree to comply with any and all Argentine currency exchange restrictions, approvals and reporting requirements in connection with the Award.  Please note that, according to current exchange control regulations issued by the Argentine Central Bank, 30% of any funds in excess of a maximum monthly amount of US$2,000,000 that are transferred back into Argentina will be subject to a non-interest bearing 365-day dollar denominated mandatory deposit.  Such deposit will be released in your favor only upon expiration of the required 365-day term.

You should consult with your legal advisor regarding any exchange control obligations that you may have prior to transferring any funds back to Argentina.

**Australia**

There are no special provisions.

**Bahrain**

There are no special provisions.

**Belgium**

If you are a Belgian resident, you are required to report any bank or brokerage accounts held outside of Belgium on your annual tax return.

**Brazil**

By accepting the Award, you agree to comply with all applicable Brazilian laws and report and pay any and all applicable taxes associated with the receipt of the Award and any cash payment made pursuant to the Award.

If you are resident or domiciled in Brazil, you will be required to submit an annual declaration of assets and rights held outside of Brazil to the Central Bank of Brazil if the aggregate value of such assets and rights is equal to or greater than US$100,000. Assets and rights that must be reported include bank deposits.

**Chile**

You are not required to repatriate any cash payments you receive pursuant to the Award to Chile. However, if you decide to repatriate such funds, you acknowledge that you will be required to effect such repatriation through the Formal Exchange Market (*i.e.*, a commercial bank or registered foreign exchange office) if the amount of the funds repatriated exceeds US$10,000. Further, if the value of your aggregate investments held outside of Chile exceeds US$5,000,000 at any time in a calendar year, you must report the status of such investments to the Central Bank of Chile. Exchange control regulations in Chile are subject to change; you should consult with your personal legal advisor regarding any exchange control obligations that you may have prior to the payment date of the Award.

**France**

You may hold cash payments you receive pursuant to the Award outside France provided you declare all foreign accounts, whether open, current, or closed, in your income tax return. Furthermore, you must declare to the customs and excise authorities any cash you import or export without the use of a financial institution when the value of the cash or securities is equal to or exceeds €10,000.

*En cliquant sur le bouton «J'accepte» ou en signant et renvoyant le présent document décrivant les termes et conditions de votre attribution, vous confirmez ainsi avoir lu et compris les documents relatifs à cette attribution (ce Contrat d'Attribution) qui vous ont été communiqués en langue anglaise. Vous en acceptez les termes en connaissance de cause.*

By clicking on the "I accept" button or by signing and returning this document providing for the terms and conditions of your grant, you confirm having read and understood the documents relating to this grant (the Agreement) which were provided to you in the English language. You accept the terms of those documents accordingly.

**Hong Kong**

*WARNING: The Award does not constitute a public offering of securities under Hong Kong law and is available only to employees of Bank of America or its Subsidiaries. The Agreement, including this Exhibit B, and any other incidental*

*communication materials distributed in connection with the Award (i) have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, (ii) have not been reviewed by any regulatory authority in Hong Kong, and (iii) are intended only for the personal use of each eligible employee of your employer, Bank of America or its Subsidiaries and may not be distributed to any other person. If you have any questions regarding the contents of the Agreement, including this Exhibit B, or any other incidental communication materials distributed in connection with the Award, you should obtain independent professional advice.*

Bank of America specifically intends that the program under which the Award was granted will not be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance.

### India

Due to exchange control restrictions in India, you are required to repatriate any cash payments you receive pursuant to the Award to India within 90 days of receipt. You should obtain a foreign inward remittance certificate from the bank for your records to document compliance with this requirement and submit a copy of the foreign inward remittance certificate to your employer.

### Ireland

There are no special provisions.

### Israel

There are no special provisions.

### Italy

By your acceptance of the Agreement, you acknowledge that you have read and specifically and expressly approve the following clauses of the Agreement (including Exhibit A and this Exhibit B): (a) the provision regarding your acknowledgement that you read and understand the provisions of the Agreement; (b) the provision regarding Tax-Related Items; (c) the provision regarding Delaware law governing the Agreement; (d) the provision regarding the enforceability of provisions in the Agreement; (e) the provision regarding the voluntary and discretionary nature of the program under which the Award was granted, which also contains information regarding the nature of the Award and how the benefits provided under the Agreement are not part of local salary/compensation for any reason; (f) the provision regarding your consent to collect/transfer your personal data in conjunction with administration of the Agreement; (g) the provision regarding the English version of the Agreement governing; (h) the provisions regarding the possible imposition of additional terms/conditions for the Award and specifically, the country-specific provisions for Italy in this Exhibit B; (i) the provision regarding the payment schedule for the Award; and (j) the provisions regarding the impact of termination of employment on the Award.

This section replaces in its entirety the data privacy provision contained in this Exhibit B:

**You understand that your employer and/or Bank of America may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social security number (or any other social or national identification number), salary, nationality, job title, number of shares of Bank of America common stock held and the details of all entitlements to Bank of America shares and other awards, including this Award, awarded, cancelled, exercised, vested, unvested or outstanding (the "Data") for the purposes of implementing, administering and managing the Award. You are aware that providing Bank of America with your Data is necessary for the performance of the Agreement and that your refusal to provide such Data would make it impossible for**

*Bank of America to perform its contractual obligations and may affect your ability to receive and retain the Award.*

*The Controller of personal data processing is Bank of America Corporation, 100 North Tryon Street, Charlotte, NC, 28255, U.S.A.; its representative in Italy is Bank of America, N.A. Milan Branch, with registered offices at 5th Floor, Corso Matteotti 10, 20121 Milan Italy.  You understand that the Data may be transferred to Bank of America or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Award, including any transfer required to a broker or other third party with whom cash paid pursuant to the Award may be deposited. Furthermore, the recipients that may receive, possess, use, retain and transfer such Data for the above mentioned purposes may be located in Italy or elsewhere, including outside of the European Union and that the recipient's country (e.g., the United States) may have different data privacy laws and protections from your country.  The processing activity, including the transfer of your personal data abroad, outside of the European Union, as herein specified and pursuant to applicable laws and regulations, does not require your consent thereto as the processing is necessary for the performance of contractual obligations related to the implementation, administration and management of the Award.  You understand that Data processing relating to the purposes above specified shall take place under automated or non-automated conditions, anonymously when possible, that comply with the purposes for which Data are collected and with confidentiality and security provisions as set forth by applicable laws and regulations, with specific reference to D.lgs. 196/2003.*

*You understand that Data will be held only as long as is required by law or as necessary to implement, administer and manage the Award.  You understand that pursuant to art.7 of D.lgs 196/2003, you have the right, including but not limited to, access, delete, update, request the rectification of your Data and cease, for legitimate reasons, the Data processing.  Furthermore, you are aware that your Data will not be used for direct marketing purposes.  In addition, the Data provided can be reviewed and questions or complaints can be addressed by contacting a local representative available at the following address: Bank of America, N.A. Milan Branch, 5th Floor, Corso Matteotti 10, 20121 Milan Italy.*

Italian resident employees are required to report in their annual tax returns:  (a) any transfers of cash or shares of stock to or from Italy exceeding €10,000; (b) any foreign investments or investments (including proceeds from the Award or the sale of shares of stock) held outside of Italy at the end of the calendar year if the value of such investment exceeds €10,000 and may give rise to income taxable in Italy; and (c) the amount of any transfers to and from accounts held abroad which may have had an impact during the calendar year on your foreign investments or investments held outside of Italy.  You may be exempt from the formalities in (a) above, if the transfers or investments are made through an authorized broker resident in Italy, as the broker will comply with the reporting obligation on your behalf.

## Lebanon

There are no special provisions.

## Luxembourg

You are required to report any inward remittances of funds to the *Banque Central de Luxembourg* and/or the *Service Central de La Statistique et des Études Économiques* within 15 working days following the month during which the transaction occurred.  If a Luxembourg financial institution is involved in the transaction, it generally will fulfill the reporting obligation on your behalf.

**Monaco**

There are no special provisions.

**Netherlands**

There are no special provisions.

**Republic of Korea**

Exchange control laws require Korean residents who realize US$500,000 or more from any cash payment made pursuant to the Award to repatriate the proceeds to Korea within eighteen (18) months of the receipt.

**Russia**

Under current exchange control regulations in Russia, you are required to repatriate any cash payments you receive pursuant to the Award to Russia within a reasonably short time after receipt. Such funds must initially be credited to you through a foreign currency account at an authorized bank in Russia. After the funds are initially received in Russia, they may be further remitted to foreign banks in accordance with Russian exchange control laws.

You are encouraged to contact your personal advisor before remitting any funds to Russia, as exchange control requirements may change.

Further, you are required to report the existence of any foreign bank account to Russian tax authorities within 30 days of opening such account.

**Saudi Arabia**

There are no special provisions.

**Singapore**

There are no special provisions.

**Spain**

When receiving foreign currency payments derived pursuant to the Award, you must inform the financial institution receiving the payment of the basis upon which such payment is made if the payment exceeds €50,000. You will need to provide the institution with the following information: your name, address, and fiscal identification number; the name and corporate domicile of Bank of America; the amount of the payment; the currency used; the country of origin; the reasons for the payment; and required information.

This section supplements the Nature of Grant provision contained in this Exhibit B:

In accepting the Award, you consent to the terms of the Agreement and the special terms included in this Exhibit B.

You understand that Bank of America has unilaterally, gratuitously and discretionally decided to grant Awards to individuals who may be employees of Bank of America or its Subsidiaries throughout the world. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not bind Bank of America or any Subsidiary. Consequently, you understand that the

2011 PY WealthChoice Award Agreement US
Page 18 of 20

Award is granted on the assumption and condition that the Award and any cash payments made pursuant to the Award are not a part of any employment contract (either with Bank of America or any Subsidiary) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever.

Further, you understand and agree that, unless otherwise expressly provided for by Bank of America, the Award will be cancelled without entitlement to any cash payment or to any amount as indemnification if you terminate employment other than by reason of death, Disability, Workforce Reduction, Divestiture, Retirement or in the context of a Change in Control, including, but not limited to: resignation, disciplinary dismissal adjudged to be with cause, disciplinary dismissal adjudged or recognized to be without cause, material modification of the terms of employment under Article 41 of the Workers' Statute, relocation under Article 40 of the Workers' Statute, Article 50 of the Workers' Statute, or under Article 10.3 of Royal Decree 1382/1985. Bank of America, in its sole discretion, shall determine the date when your employment has terminated for purposes of the Award.

In addition, you understand that this grant would not be made to you but for the assumptions and conditions referred to above; thus, you acknowledge and freely accept that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, then any grant of or right to the Award shall be null and void.

### Switzerland

By accepting the Award, you agree to be bound by any tax ruling obtained by Bank of America or any Subsidiary for the canton in which you reside with respect to the Award. You further agree to sign any agreements, forms and/or consents that may be requested by your employer or Bank of America in connection with such ruling. You may obtain a copy of any tax ruling that may be applicable to you by contacting your employer. If you reside in a canton other than the one in which you are currently working, you are advised to contact your personal tax advisor to determine the tax treatment that will be applicable to the Award.

### Taiwan

You may acquire and remit foreign currency up to US$5,000,000 per year without justification.

If the transaction amount is TWD500,000 or more in a single transaction, you must submit a Foreign Exchange Transaction Form. If the transaction amount is US$500,000 or more in a single transaction, you must also provide any supporting documentation to the satisfaction of the remitting bank.

### Thailand

Any cash payment received pursuant to the Award must be repatriated immediately to Thailand upon receipt. In addition, any foreign currency funds repatriated to Thailand must be converted to Thai Baht or deposited into a foreign currency deposit account opened with any commercial bank in Thailand within 360 days from the date when the funds are repatriated to Thailand. If the amount of funds is US$50,000 or more, you must specifically report the inward remittance to the Bank of Thailand on a foreign exchange transaction form.

### Turkey

There are no special provisions.

**United Arab Emirates**

There are no special provisions.

**United Kingdom**

The following sections supplement the provision regarding Tax-Related Items contained in the Agreement:

Any sum withheld on an estimated basis shall be repaid to you to the extent that such sum was not applied in satisfaction of the actual tax liabilities arising.

If payment or withholding of the income tax due is not made within 90 days of the event giving rise to the income tax liability or such other period specified in Section 222(1)(c) of the United Kingdom Income Tax (Earnings and Pensions) Act 2003 (the "Due Date"), the amount of any uncollected income tax will constitute a loan owed by you to your employer, effective on the Due Date. You agree that the loan will bear interest at the then-current Official Rate of Her Majesty's Revenue and Customs ("HMRC"), it will be immediately due and repayable, and Bank of America or your employer may recover it at any time thereafter by any of the means referred to in the Agreement. Notwithstanding the foregoing, if you are a director or executive officer of Bank of America (within the meaning of Section 13(k) of the U.S. Securities and Exchange Act of 1934, as amended), you will not be eligible for such a loan to cover the income tax due. In the event that you are a director or executive officer and the income tax is not collected from or paid by you by the Due Date, the amount of any uncollected income tax will constitute a benefit to you on which additional income tax and National Insurance Contributions will be payable. You will be responsible for reporting and paying any income tax and national insurance contributions due on this additional benefit directly to HMRC under the self-assessment regime.

**Uruguay**

There are no special provisions.

2011 PY WealthChoice Award Agreement US
Page 20 of 20

# EXHIBIT K

# WealthChoice Contingent Award Plan
# Award Agreement for Strategic Premium Award

This document contains your WealthChoice Award Agreement for your Strategic Premium Award (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

**What you need to do**

1. Review the Award Agreement to ensure you understand its provisions.  With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and the Plan and file them with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. More detailed information about competitive businesses can be found on Flagscape® under Benefits & Pay / Pay & Timekeeping / Stock and Long-Term Cash to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

* If you do not accept your Award Agreement through the online acceptance process by November 15, 2012, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf.  If you decline your Award Agreement, your award will be canceled and you will not be entitled to any benefits from the award nor any compensation or benefits in lieu of the canceled award.

2011PY WealthChoice Award Agreement for Strategic Premium Award US
Page 1 of 20



## 2011 PERFORMANCE YEAR WEALTHCHOICE AWARD AGREEMENT
## FOR STRATEGIC PREMIUM AWARD

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an employee of Bank of America or one of its Subsidiaries.

A copy of the Plan is enclosed with this Agreement and its terms and provisions are incorporated herein by reference. When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Strategic Premium Award covered by this Agreement (the "Award") is made to you in connection with your participation in the Plan, subject to the following terms and provisions.

1. Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement. The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award. This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2. Notwithstanding any provisions in this Agreement, the Award shall be subject to any special terms and conditions applicable to employees based outside the U.S., as set forth in Exhibit B to this Agreement. If you relocate to one of the countries included in Exhibit B, the special terms and conditions for such country will apply to you to the extent that Bank of America determines that the application of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Award. Exhibit B constitutes part of this Agreement.

3. You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement, including any special terms and provisions applicable to employees based outside the U.S., as set forth in Exhibit B. IN THE EVENT OF ANY CONFLICT BETWEEN THIS WEALTHCHOICE AWARD AGREEMENT, EXHIBIT A AND EXHIBIT B, THE PROVISIONS OF EXHIBIT B SHALL PREVAIL AND CONTROL THE AWARD.

4. The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

5. To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account Balance paid to you pursuant to this Agreement. You recognize that if you engage in

Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to the full value of the Account Balance paid to you pursuant to this Agreement. In addition, this Award is subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder, (ii) similar rules under the laws of any other jurisdiction and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

6. Subject to applicable laws in your country, you may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. If you do not designate a beneficiary, if your designated beneficiary does not survive you or if the designation is not enforceable and/or valid under the inheritance and other laws in your country (as determined by Bank of America in its sole discretion), then your beneficiary will be your estate.

7. Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an on-line or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

8. Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date. Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer. You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

9. Regardless of any action Bank of America or your employer takes with respect to any or all income tax, payroll tax or other tax-related withholding ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items owed by you is and remains your responsibility and may exceed the amount actually withheld by Bank of America or your employer. You further acknowledge that Bank of America and/or your employer (a) make no representations or undertakings regarding the treatment of any Tax-Related

2011PY WealthChoice Award Agreement for Strategic Premium Award US
Page 3 of 20
Case 3:24-cv-00440-KDB-DCK     Document 41-7     Filed 09/30/24     Page 4 of 21     MERRILL_WC_000653

JA124

Items in connection with any aspect of the Award including the grant and vesting of the Award and the payment of the Account Balance; and (b) do not commit to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items.  Further, if you have become subject to Tax-Related Items in connection with the Award in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items as a result of your participation in the Plan, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award.  In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer.  Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any withholding obligation.

10. The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the State of Delaware and the laws of the United States, as provided in the Plan.  For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this grant or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

11. In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding the Award.  Any prior agreements, commitments or negotiations concerning the Award are superseded.  Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

12. This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable.  Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

13. Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Award and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

2011PY WealthChoice Award Agreement for Strategic Premium Award US
Page 4 of 20
Case 3:24-cv-00440-KDB-DCK   Document 41-7   Filed 09/30/24   Page 5 of 21 MERRILL_WDNC_000654

JA125

**Exhibit A**

WEALTHCHOICE CONTINGENT AWARD PLAN

PAYMENT OF AWARD

(a)     <u>PAYMENT SCHEDULE</u>.  Subject to the provisions of paragraphs (b) and (c) below, the Account Balance representing your Award shall become earned and payable on March 15, 2020 if you remain employed with Bank of America and its Subsidiaries through that date.

Once the Account Balance representing your Award becomes earned and payable, the value of your Account Balance will be delivered, as soon as administratively practicable, to a Merrill Lynch account. This account cannot be a Trust Account, Individual Retirement Account or other tax-deferred account.  You may use a joint account if you are the primary owner of the account.

(b)     <u>IMPACT OF TERMINATION OF EMPLOYMENT ON YOUR AWARD</u>.  If your employment with Bank of America and its Subsidiaries terminates prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for termination as follows.

(i)     <u>Death</u>. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your termination is due to death. Payment will be made as soon as administratively practicable.

(ii)     <u>Rule of 65, Workforce Reduction, Divestiture or Disability</u>.  If your employment is terminated by Bank of America or its Subsidiaries, other than with Cause, when you are eligible for the Rule of 65 or due to a Disability, or if you are terminated in connection with a Workforce Reduction or Divestiture, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (c) below.

(iii)     <u>Retirement</u>.  If your employment terminates (other than with Cause) when you are eligible for Retirement, the Account Balance shall become earned and payable in two installments, with the first fifty percent (50%) of your Account Balance becoming earned and payable within 2 1/2 months following the end of the calendar year in which your Retirement occurs (or if your Retirement occurs before the Award Date, within 2 1/2 months following the calendar year in which the Award Date occurs), and the remaining Account Balance becoming earned and payable within 2 1/2 months following the end of the immediately subsequent calendar year, subject to your complying with the covenants set forth in paragraph (c) below.

(iv)    Termination with Cause.  If your employment is terminated by Bank of America or its Subsidiaries with Cause, the Account Balance representing your Award shall be canceled as of your employment termination date.

(v)    Change in Control.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) your employment is terminated by Bank of America or its Subsidiaries without Cause or (2) you terminate your employment with Bank of America or its Subsidiaries for Good Reason, then any unearned portion of the Award shall become immediately earned as of the date of such termination and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (c) below.

(vi)    All Other Terminations.  In the case of All Other Terminations, the Account Balance representing your Award shall be canceled as of your employment termination date.

(vii)    6-Month Payment Delay.  Notwithstanding the foregoing, the payment of an Account Balance  that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)    COVENANTS.

(i)    Non-Solicitation. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an employee of Bank of America and its Subsidiaries and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America and its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

(ii)    Non-Competition. To the extent permissible under applicable law, you agree that during any period in which your Account Balance remains

payable following Termination of Employment by Bank of America or its Subsidiaries due to Disability, Workforce Reduction or Divestiture, or following Termination of Employment by you after you have attained the Rule of 65 or are eligible for Retirement, you will not engage in Competition.

(iii)   <u>Detrimental Conduct</u>.  You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

(iv)   <u>Remedies</u>.  Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that (A) at all times prior to payment, to the extent permissible under applicable law, you do not engage in solicitation or Competition, as described in paragraphs (c)(i) and (ii) during such period, (B) at all times prior to the payment date, you do not engage in Detrimental Conduct, as described in paragraph (c)(iii), during such period and (C) in the case of termination by Bank of America or its Subsidiaries due to Disability, Workforce Reduction or Divestiture, or termination by you after you have attained the Rule of 65 or are eligible for Retirement, prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (A) above is applicable to you.  To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time.  If Bank of America determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.  In addition, from time to time following your Termination of Employment due to Disability, Workforce Reduction or Divestiture, or after having attained the Rule of 65 or Retirement, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the Competition restriction described in (A) above and the certification requirement described in (C) above will not apply to this Award.

(d)   <u>DEFINITIONS</u>.  For purposes hereof, the following terms shall have the following meanings:

<u>All Other Terminations</u> means any Termination of Employment with Bank of America and its Subsidiaries prior to your having attained Retirement or the Rule

of 65, whether initiated by you or your employer, other than (i) a termination due to your death or Disability, (ii) a termination in connection with a Workforce Reduction or Divestiture, (iii) a termination with Cause and (iv) a termination in connection with a Change in Control as described in paragraph (b)(v) above.

Cause shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a termination of your employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to financial advisors within the Global Wealth Management division or to your employment with Bank of America or any of its Subsidiaries generally including, but not limited to, compliance policies and the Bank of America Corporation Code of Ethics and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or customers or clients or have committed any other material violation of Bank of America's written policies or signed agreements regarding confidential and proprietary information.

Change in Control shall be defined as that term is defined in the Bank of America Corporation 2003 Key Associate Stock Plan.

Competition means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity that is designated as a "Competitive Business" as of the date of your Termination of Employment.

Detrimental Conduct means (i) any conduct that would constitute Cause or (ii) any one of the following: (A) any act or omission by you resulting or intended to result in personal gain at the expense of Bank of America or its Subsidiaries; (B) the improper disclosure by you of proprietary, privileged or confidential information of Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries or breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (C) improper conduct by you including, but not limited to, fraud, unethical conduct, falsification of the records of Bank of America or its Subsidiaries, unauthorized removal of property or information of Bank of

America or its Subsidiaries, intentional violation or negligent disregard for Bank of America's or its Subsidiaries' policies, rules and procedures, insubordination, theft, violent acts or threats of violence, unauthorized possession of controlled substances on the property of Bank of America or its Subsidiaries, conduct causing reputational harm to Bank of America or its Subsidiaries or a client of Bank of America or its Subsidiaries, or the use of the property, facilities or services of Bank of America or its Subsidiaries for unauthorized or illegal purposes; (D) the performance by you of your employment duties in a manner deemed by Bank of America or its Subsidiaries to be grossly negligent; (E) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment; or (F) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

<u>Disability</u> means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

<u>Divestiture</u> means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

<u>Good Reason</u> means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

<u>Good Reason Process</u> means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you terminate your employment for Good Reason within sixty (60) days after the end of the Cure Period.  If Bank of

America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you terminate your employment with Bank of America and its Subsidiaries due to such condition (notwithstanding its cure), then you will not be deemed to have terminated your employment for Good Reason.

<u>Retirement</u> means that your employment terminates other than with Cause (i) on or after you have attained your sixty-fifth (65th) birthday or (ii) when you cease employment on or after your fifty-fifth (55th) birthday and you have completed at least ten (10) Years of Service, including approved leaves of absence of one (1) year or less.

<u>Rule of 65</u> means that your employment terminates other than with Cause on or after (i) you have completed at least twenty (20) Years of Service with your employer, including approved leaves of absence of one (1) year or less, and (ii) your combined Years of Service with your employer and your age equals at least sixty-five (65).

<u>Workforce Reduction</u> means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program), or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the termination is as a result of such action. Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America. In the event you fail to execute all required documents in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of the Account Balance representing your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

2011PY WealthChoice Award Agreement for Strategic Premium Award US
Page 10 of 20
Case 3:24-cv-00440-KDB-DCK   Document 41-7   Filed 09/30/24   Page 11 of 21   BANA_NC00660

JA131

**Exhibit B**

## BANK OF AMERICA CORPORATION
## WEALTHCHOICE AWARDS

### Special Provisions for WealthChoice Awards in Countries Outside the U.S.

This Exhibit B contains the terms that govern your WealthChoice Award and/or WealthChoice Strategic Premium Award if you are an employee of Bank of America or one of its Subsidiaries outside of the U.S. Capitalized terms used but not defined herein shall have the same meanings assigned to them in the Agreement.

This Exhibit B also includes certain country-specific disclosures that may be applicable to you if you work or reside in one of the countries listed herein. These disclosures are based on the securities exchange control and other laws in effect in the respective countries as of January 2012. Such laws are often complex and change frequently. As a result, Bank of America strongly recommends that you not rely on the information in this Exhibit B as the only source of information relating to the consequences of receiving an Award because the information may be out of date at the time the Award becomes earned and payable or at any later date indicated herein.

If you are a citizen or resident of a country other than the one in which you are currently working, are considered a citizen or resident of another country for local law purposes or transfer employment to another country after the Award is granted to you, Bank of America shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you.

### General terms applicable to WealthChoice Awards granted to employees in any country outside of the U.S.

**Data Privacy**

*By accepting the Award, you hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer and Bank of America and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Award.*

*You understand that Bank of America and your employer hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor, for the purpose of implementing, administering and managing the Award ("Data"). You understand that Data may be transferred to any third parties assisting in the implementation, administration and management of the Award, that these recipients may be located in your country or elsewhere, and that the recipient's country may have different data privacy laws and*

*protections from your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage the Award. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing your local human resources representative. You understand, however, that refusing or withdrawing your consent may affect your ability to benefit from the Award. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

**Nature of Grant**

By entering into this Agreement and accepting the grant of the Award evidenced hereby, you acknowledge, understand and agree that:

(a)    the Award is granted voluntarily by Bank of America, is discretionary in nature and may be modified, suspended or terminated by Bank of America at any time;

(b)    the grant of the Award is voluntary and occasional and does not create any contractual or other right to receive future awards or benefits in lieu of awards even if such awards have been awarded repeatedly in the past;

(c)    all decisions with respect to future awards, if any, will be at the sole discretion of Bank of America;

(d)    the grant of the Award shall not create a right to further employment with your employer and shall not interfere with the ability of your employer to terminate your employment relationship at any time, with or without Cause;

(e)    you are voluntarily accepting the grant of the Award;

(f)    the future value of the benchmark return options and your Account Balance is unknown and cannot be predicted with certainty.

(g)    the Award and any cash payment made pursuant to the Award are an extraordinary item that do not constitute compensation of any kind for services of any kind rendered to Bank of America or your employer, and which are outside the scope of your employment contract, if any;

(h)    the Award and any cash payment made pursuant to the Award are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement benefits or welfare benefits or similar payments, and in no event should be considered as compensation for, or in any way relating to, past services for Bank of America or any of its Subsidiaries;

(i)     in the event that you are not an employee of Bank of America, the Award will not be interpreted to form an employment contract or relationship with Bank of America; furthermore, the Award will not be interpreted to form an employment contract with any Subsidiary;

(j)     no claim or entitlement to compensation or damages shall arise from forfeiture of the Award resulting from violation of a covenant set forth in Exhibit A, termination of your employment by Bank of America or your employer (for any reason whatsoever and regardless of whether in breach of local labor laws) or recoupment of all or any portion of any payment made pursuant to the Award, and in consideration of the grant of the Award, to which you are not otherwise entitled, you irrevocably agree never to institute any claim against Bank of America or your employer, waive your ability, if any, to bring any such claim and release Bank of America and your employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed not to pursue such claim, and you agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(k)     for purposes of the Award, your employment will be considered terminated as of the date you are no longer actively employed and providing services to Bank of America or one of its Subsidiaries, and your right, if any, to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (regardless of whether the termination is in breach of local labor laws and/or later found to be invalid) will be measured by the date you cease to be actively employed and will not be extended by any notice period mandated under local law (e.g., active employment would not include a period of "garden leave" or similar period pursuant to local law); Bank of America, in its sole discretion, shall determine when you are no longer actively employed for purposes of the Award (including whether you may still be considered actively employed while on an approved leave of absence);

(l)     unless otherwise provided in this Exhibit B, you are solely responsible for investigating and complying with any exchange control laws applicable to you in connection with the Award and any payment made pursuant to the Award;

(m)   the Award will not automatically transfer to another company in the case of a merger, take-over or transfer of liability; and

(n)   Bank of America and your employer are not providing any tax, legal, financial or investment   advice, nor making any recommendations regarding participation in the Plan.  You acknowledge that you have the necessary knowledge and experience to understand how the Award and the Plan work, as well as any risks that may be related to the Plan and the Award and any notional or benchmark investment decisions that you may make in connection with the Plan or the Award.  You are advised to consult with your personal tax, legal and financial advisors regarding participation in the Plan.

**Language**

If you have received this Agreement or any other document related to the Award translated into a language other than English and if the meaning of the translated version differs from the English version, the English version shall control.

**Country-specific terms and disclosures applicable to WealthChoice Awards granted to employees outside of the U.S.**

**Argentina**

You agree to comply with any and all Argentine currency exchange restrictions, approvals and reporting requirements in connection with the Award. Please note that, according to current exchange control regulations issued by the Argentine Central Bank, 30% of any funds in excess of a maximum monthly amount of US$2,000,000 that are transferred back into Argentina will be subject to a non-interest bearing 365-day dollar denominated mandatory deposit. Such deposit will be released in your favor only upon expiration of the required 365-day term.

You should consult with your legal advisor regarding any exchange control obligations that you may have prior to transferring any funds back to Argentina.

**Australia**

There are no special provisions.

**Bahrain**

There are no special provisions.

**Belgium**

If you are a Belgian resident, you are required to report any bank or brokerage accounts held outside of Belgium on your annual tax return.

**Brazil**

By accepting the Award, you agree to comply with all applicable Brazilian laws and report and pay any and all applicable taxes associated with the receipt of the Award and any cash payment made pursuant to the Award.

If you are resident or domiciled in Brazil, you will be required to submit an annual declaration of assets and rights held outside of Brazil to the Central Bank of Brazil if the aggregate value of such assets and rights is equal to or greater than US$100,000. Assets and rights that must be reported include bank deposits.

**Chile**

You are not required to repatriate any cash payments you receive pursuant to the Award to Chile. However, if you decide to repatriate such funds, you acknowledge that you will be required to effect such repatriation through the Formal Exchange Market (*i.e.*, a commercial bank or registered foreign exchange office) if the amount of the funds repatriated exceeds US$10,000. Further, if the value of your aggregate investments held outside of Chile exceeds US$5,000,000 at any time in a calendar year, you must report the status of such investments to the Central Bank of Chile. Exchange control regulations in Chile are subject to change; you should consult with

your personal legal advisor regarding any exchange control obligations that you may have prior to the payment date of the Award.

## France

You may hold cash payments you receive pursuant to the Award outside France provided you declare all foreign accounts, whether open, current, or closed, in your income tax return. Furthermore, you must declare to the customs and excise authorities any cash you import or export without the use of a financial institution when the value of the cash or securities is equal to or exceeds €10,000.

*En cliquant sur le bouton «J'accepte» ou en signant et renvoyant le présent document décrivant les termes et conditions de votre attribution, vous confirmez ainsi avoir lu et compris les documents relatifs à cette attribution (ce Contrat d'Attribution) qui vous ont été communiqués en langue anglaise. Vous en acceptez les termes en connaissance de cause.*

By clicking on the "I accept" button or by signing and returning this document providing for the terms and conditions of your grant, you confirm having read and understood the documents relating to this grant (the Agreement) which were provided to you in the English language. You accept the terms of those documents accordingly.

## Hong Kong

*WARNING: The Award does not constitute a public offering of securities under Hong Kong law and is available only to employees of Bank of America or its Subsidiaries. The Agreement, including this Exhibit B, and any other incidental communication materials distributed in connection with the Award (i) have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, (ii) have not been reviewed by any regulatory authority in Hong Kong, and (iii) are intended only for the personal use of each eligible employee of your employer, Bank of America or its Subsidiaries and may not be distributed to any other person. If you have any questions regarding the contents of the Agreement, including this Exhibit B, or any other incidental communication materials distributed in connection with the Award, you should obtain independent professional advice.*

Bank of America specifically intends that the program under which the Award was granted will not be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance.

## India

Due to exchange control restrictions in India, you are required to repatriate any cash payments you receive pursuant to the Award to India within 90 days of receipt. You should obtain a foreign inward remittance certificate from the bank for your records to document compliance with this requirement and submit a copy of the foreign inward remittance certificate to your employer.

## Ireland

There are no special provisions.

## Israel

There are no special provisions.

## Italy

By your acceptance of the Agreement, you acknowledge that you have read and specifically and expressly approve the following clauses of the Agreement (including Exhibit A and this Exhibit B): (a) the provision regarding your acknowledgement that you read and understand the provisions of the Agreement; (b) the provision regarding Tax-Related Items; (c) the provision regarding Delaware law governing the Agreement; (d) the provision regarding the enforceability of provisions in the Agreement; (e) the provision regarding the voluntary and discretionary nature of the program under which the Award was granted, which also contains information regarding the nature of the Award and how the benefits provided under the Agreement are not part of local salary/compensation for any reason; (f) the provision regarding your consent to collect/transfer your personal data in conjunction with administration of the Award; (g) the provision regarding the English version of the Agreement governing; (h) the provisions regarding the possible imposition of additional terms/conditions for the Award and specifically, the country-specific provisions for Italy in this Exhibit B; (i) the provision regarding the payment schedule for the Award; and (j) the provisions regarding the impact of termination of employment on the Award.

This section replaces in its entirety the data privacy provision contained in this Exhibit B:

*You understand that your employer and/or Bank of America may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social security number (or any other social or national identification number), salary, nationality, job title, number of shares of Bank of America common stock held and the details of all entitlements to Bank of America shares and other awards, including this Award, awarded, cancelled, exercised, vested, unvested or outstanding (the "Data") for the purposes of implementing, administering and managing the Award. You are aware that providing Bank of America with your Data is necessary for the performance of the Agreement and that your refusal to provide such Data would make it impossible for Bank of America to perform its contractual obligations and may affect your ability to receive and retain the Award.*

*The Controller of personal data processing is Bank of America Corporation, 100 North Tryon Street, Charlotte, NC, 28255, U.S.A.; its representative in Italy is Bank of America, N.A. Milan Branch, with registered offices at 5th Floor, Corso Matteotti 10, 20121 Milan Italy. You understand that the Data may be transferred to Bank of America or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Award, including any transfer required to a broker or other third party with whom cash paid pursuant to the Award may be deposited. Furthermore, the recipients that may receive, possess, use, retain and transfer such Data for the above mentioned purposes*

*may be located in Italy or elsewhere, including outside of the European Union and that the recipient's country (e.g., the United States) may have different data privacy laws and protections from your country.  The processing activity, including the transfer of your personal data abroad, outside of the European Union, as herein specified and pursuant to applicable laws and regulations, does not require your consent thereto as the processing is necessary for the performance of contractual obligations related to the implementation, administration and management of the Award.  You understand that Data processing relating to the purposes above specified shall take place under automated or non-automated conditions, anonymously when possible, that comply with the purposes for which Data are collected and with confidentiality and security provisions as set forth by applicable laws and regulations, with specific reference to D.lgs. 196/2003.*

*You understand that Data will be held only as long as is required by law or as necessary to implement, administer and manage the Award.  You understand that pursuant to art.7 of D.lgs 196/2003, you have the right, including but not limited to, access, delete, update, request the rectification of your Data and cease, for legitimate reasons, the Data processing. Furthermore, you are aware that your Data will not be used for direct marketing purposes.  In addition, the Data provided can be reviewed and questions or complaints can be addressed by contacting a local representative available at the following address: Bank of America, N.A. Milan Branch, 5th Floor, Corso Matteotti 10, 20121 Milan Italy.*

Italian resident employees are required to report in their annual tax returns:  (a) any transfers of cash or shares of stock to or from Italy exceeding €10,000; (b) any foreign investments or investments (including proceeds from the Award or the sale of shares of stock) held outside of Italy at the end of the calendar year if the value of such investment exceeds €10,000 and may give rise to income taxable in Italy; and (c) the amount of any transfers to and from accounts held abroad which may have had an impact during the calendar year on your foreign investments or investments held outside of Italy.  You may be exempt from the formalities in (a) above, if the transfers or investments are made through an authorized broker resident in Italy, as the broker will comply with the reporting obligation on your behalf.

## Lebanon

There are no special provisions.

## Luxembourg

You are required to report any inward remittances of funds to the *Banque Central de Luxembourg* and/or the *Service Central de La Statistique et des Études Économiques* within 15 working days following the month during which the transaction occurred.  If a Luxembourg financial institution is involved in the transaction, it generally will fulfill the reporting obligation on your behalf.

## Monaco

There are no special provisions.

## Netherlands

There are no special provisions.

## Republic of Korea

Exchange control laws require Korean residents who realize US$500,000 or more from any cash payment made pursuant to the Award to repatriate the proceeds to Korea within eighteen (18) months of the receipt.

## Russia

Under current exchange control regulations in Russia, you are required to repatriate any cash payments you receive pursuant to the Award to Russia within a reasonably short time after receipt. Such funds must initially be credited to you through a foreign currency account at an authorized bank in Russia.  After the funds are initially received in Russia, they may be further remitted to foreign banks in accordance with Russian exchange control laws.

You are encouraged to contact your personal advisor before remitting any funds to Russia, as exchange control requirements may change.

Further, you are required to report the existence of any foreign bank account to Russian tax authorities within 30 days of opening such account.

## Saudi Arabia

There are no special provisions.

## Singapore

There are no special provisions.

## Spain

When receiving foreign currency payments derived pursuant to the Award, you must inform the financial institution receiving the payment of the basis upon which such payment is made if the payment exceeds €50,000.   You will need to provide the institution with the following information: your name, address, and fiscal identification number; the name and corporate domicile of Bank of America; the amount of the payment; the currency used; the country of origin; the reasons for the payment; and required information.

This section supplements the Nature of Grant provision contained in this Exhibit B:

In accepting the Award, you consent to the terms of the Agreement and the special terms included in this Exhibit B.

You understand that Bank of America has unilaterally, gratuitously and discretionally decided to grant Awards to individuals who may be employees of Bank of America or its Subsidiaries throughout the world.  The decision is a limited decision that is entered into upon the express

assumption and condition that any grant will not bind Bank of America or any Subsidiary. Consequently, you understand that the Award is granted on the assumption and condition that the Award and any cash payments made pursuant to the Award are not a part of any employment contract (either with Bank of America or any Subsidiary) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever.

Further, you understand and agree that, unless otherwise expressly provided for by Bank of America, the Award will be cancelled without entitlement to any cash payment or to any amount as indemnification if you terminate employment other than by reason of death, Disability, Workforce Reduction, Divestiture, Retirement or in the context of a Change in Control, including, but not limited to: resignation, disciplinary dismissal adjudged to be with cause, disciplinary dismissal adjudged or recognized to be without cause, material modification of the terms of employment under Article 41 of the Workers' Statute, relocation under Article 40 of the Workers' Statute, Article 50 of the Workers' Statute, or under Article 10.3 of Royal Decree 1382/1985. Bank of America, in its sole discretion, shall determine the date when your employment has terminated for purposes of the Award.

In addition, you understand that this grant would not be made to you but for the assumptions and conditions referred to above; thus, you acknowledge and freely accept that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, then any grant of or right to the Award shall be null and void.

## Switzerland

By accepting the Award, you agree to be bound by any tax ruling obtained by Bank of America or any Subsidiary for the canton in which you reside with respect to the Award. You further agree to sign any agreements, forms and/or consents that may be requested by your employer or Bank of America in connection with such ruling. You may obtain a copy of any tax ruling that may be applicable to you by contacting your employer. If you reside in a canton other than the one in which you are currently working, you are advised to contact your personal tax advisor to determine the tax treatment that will be applicable to the Award.

## Taiwan

You may acquire and remit foreign currency up to US$5,000,000 per year without justification.

If the transaction amount is TWD500,000 or more in a single transaction, you must submit a Foreign Exchange Transaction Form. If the transaction amount is US$500,000 or more in a single transaction, you must also provide any supporting documentation to the satisfaction of the remitting bank.

## Thailand

Any cash payment received pursuant to the Award must be repatriated immediately to Thailand upon receipt. In addition, any foreign currency funds repatriated to Thailand must be converted to Thai Baht or deposited into a foreign currency deposit account opened with any commercial bank in Thailand within 360 days from the date when the funds are repatriated to Thailand. If

the amount of funds is US$50,000 or more, you must specifically report the inward remittance to the Bank of Thailand on a foreign exchange transaction form.

## Turkey

There are no special provisions.

## United Arab Emirates

There are no special provisions.

## United Kingdom

The following sections supplement the provision regarding Tax-Related Items contained in the Agreement:

Any sum withheld on an estimated basis shall be repaid to you to the extent that such sum was not applied in satisfaction of the actual tax liabilities arising.

If payment or withholding of the income tax due is not made within 90 days of the event giving rise to the income tax liability or such other period specified in Section 222(1)(c) of the United Kingdom Income Tax (Earnings and Pensions) Act 2003 (the "Due Date"), the amount of any uncollected income tax will constitute a loan owed by you to your employer, effective on the Due Date. You agree that the loan will bear interest at the then-current Official Rate of Her Majesty's Revenue and Customs ("HMRC"), it will be immediately due and repayable, and Bank of America or your employer may recover it at any time thereafter by any of the means referred to in the Agreement. Notwithstanding the foregoing, if you are a director or executive officer of Bank of America (within the meaning of Section 13(k) of the U.S. Securities and Exchange Act of 1934, as amended), you will not be eligible for such a loan to cover the income tax due. In the event that you are a director or executive officer and the income tax is not collected from or paid by you by the Due Date, the amount of any uncollected income tax will constitute a benefit to you on which additional income tax and National Insurance Contributions will be payable. You will be responsible for reporting and paying any income tax and national insurance contributions due on this additional benefit directly to HMRC under the self-assessment regime.

## Uruguay

There are no special provisions.

# EXHIBIT L

# WealthChoice Contingent Award Plan
# Award Agreement

This document contains your WealthChoice Award Agreement (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

---

**What you need to do**

1. Review the Award Agreement to ensure you understand its provisions. With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and the Plan and file them with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. More detailed information about competitive businesses can be found on Flagscape® under Benefits & Pay / Pay & Timekeeping / Stock and Long-Term Cash to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

---

\* If you do not accept your Award Agreement through the online acceptance process by November 15, 2013, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf. If you decline your Award Agreement, your award will be canceled and you will not be entitled to any benefits from the award nor any compensation or benefits in lieu of the canceled award.



## 2012 PERFORMANCE YEAR WEALTHCHOICE AWARD AGREEMENT

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an employee of Bank of America or one of its Subsidiaries.

A copy of the Plan is enclosed with this Agreement and its terms and provisions are incorporated herein by reference.  When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Award covered by this Agreement (the "Award") is made to you in connection with your participation in the Plan, subject to the following terms and provisions.

1.  Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement.  The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award.  This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2.  Notwithstanding any provisions in this Agreement, the Award shall be subject to any special terms and conditions applicable to employees based outside the U.S., as set forth in Exhibit B to this Agreement.  If you relocate to one of the countries included in Exhibit B, the special terms and conditions for such country will apply to you to the extent that Bank of America determines that the application of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Award.  Exhibit B constitutes part of this Agreement.

3.  You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement, including any special terms and provisions applicable to employees based outside the U.S., as set forth in Exhibit B.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS WEALTHCHOICE AWARD AGREEMENT, EXHIBIT A AND EXHIBIT B, THE PROVISIONS OF EXHIBIT B SHALL PREVAIL AND CONTROL THE AWARD.

4.  The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

5.  To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account Balance paid to you pursuant to this Agreement.  You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to

the full value of the Account Balance paid to you pursuant to this Agreement. In addition, this Award is subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder, (ii) similar rules under the laws of any other jurisdiction and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

6.    Subject to applicable laws in your country, you may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. Any beneficiary designation in effect at the time of your termination of employment with Bank of America and its Subsidiaries (other than a termination of employment due to your death) will remain in effect following your termination of employment unless you change your beneficiary designation or it otherwise ceases to be enforceable and/or valid in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. If you do not designate a beneficiary, if your designated beneficiary does not survive you or if the designation is not enforceable and/or valid under the inheritance and other laws in your country (as determined by Bank of America in its sole discretion), then your beneficiary will be your estate.

7.    Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an on-line or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

8.    Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date. Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer. You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

9.    Regardless of any action Bank of America or your employer takes with respect to any or all income tax, payroll tax or other tax-related withholding ("Tax-Related Items"), you

acknowledge that the ultimate liability for all Tax-Related Items owed by you is and remains your responsibility and may exceed the amount actually withheld by Bank of America or your employer.  You further acknowledge that Bank of America and/or your employer (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award including the grant and vesting of the Award and the payment of the Account Balance; and (b) do not commit to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items.  Further, if you have become subject to Tax-Related Items in connection with the Award in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items as a result of your participation in the Plan, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award.  In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer.  Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any withholding obligation.

10.  The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the State of Delaware and the laws of the United States, as provided in the Plan.  For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this grant or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

11.  In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding the Award.  Any prior agreements, commitments or negotiations concerning the Award are superseded.  Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

12.  This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable.  Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

13.  Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable in order to comply with local law or

2012PY WealthChoice Award Agreement
Case 3:24-cv-00440-KDB-DCK   Document 41-8   Filed 09/30/24   Page 5 of 22   MERRILL_BON2000674

JA146

facilitate the administration of the Award and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer effective as of the date of grant listed in your Award Statement.

BANK OF AMERICA CORPORATION
By:

Kemberly Danner
Human Resources Executive for Global Wealth and Investment Management

**Exhibit A**

WEALTHCHOICE CONTINGENT AWARD PLAN

PAYMENT OF AWARD

(a)     PAYMENT SCHEDULE.  Subject to the provisions of paragraphs (b), (c) and (d) below, the Account Balance representing your Award will become earned and payable on Feb. 15, 2021 if you remain employed with Bank of America and its Subsidiaries through that date. Once the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made through payroll as soon as administratively practicable. Bank of America, in its sole discretion, will select an appropriate exchange rate for converting the payment into local currency.

(b)     IMPACT OF TERMINATION OF EMPLOYMENT ON AWARD.  If your employment with Bank of America and its Subsidiaries terminates prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for termination as follows.

(i)     Death. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your termination is due to death. Payment will be made as soon as administratively practicable.

(ii)     Workforce Reduction, Divestiture or Disability.  If your employment is terminated by your employer due to Disability, Workforce Reduction or Divestiture, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (d) below.

(iii)     Termination by your Employer with Cause.  If your employment is terminated by your employer with Cause, the Account Balance representing your Award shall be canceled as of your employment termination date.

(iv)     Change in Control.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) your employment is terminated without Cause or (2) you terminate your employment with Bank of America or its Subsidiaries for Good Reason, then the Account Balance shall become immediately earned as of the date of such termination and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (d) below.

2012PY WealthChoice Award Agreement
Case 3:24-cv-00440-KDB-DCK   Document 41-8   Filed 09/30/24   Page 7 of 22   BOFA_WONG_000676

JA148

(v)    <u>All Other Terminations</u>.  Unless you are eligible for Retirement or have attained the Rule of 65 as described below, in the case of All Other Terminations, the Account Balance representing your Award shall be canceled as of your employment termination date.

(vi)    <u>Possible Variations to Payment Date</u>.  Notwithstanding the provisions set forth above, in the event of Termination of Employment, Bank of America may, in its sole discretion, accelerate payment of all or a portion of the unearned Account Balance to the date of Termination of Employment (if the unearned Account Balance is not canceled as of such date) to facilitate compliance with local law and/or administrative considerations; provided, however, that if you are subject to U.S. Internal Revenue Code Section 409A, payment of the Account Balance representing your Award may be accelerated, and payment may be made, only to the extent necessary to pay federal, state, local or foreign tax obligations arising from the Award that apply to an amount before the amount is paid or made available to you.  Also, the payment of an Account Balance that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)    <u>IMPACT OF RETIREMENT AND RULE OF 65 ON AWARD</u>.

(i)    <u>Retirement</u>.  If your employment terminates for any reason other than death, Disability, Workforce Reduction, Divestiture, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you are eligible for Retirement, then the Account Balance will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which your Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year, subject to the requirements of paragraph (c)(iii).

(ii)    <u>Rule of 65</u>.  If your employment terminates for any reason other than death, Disability, Workforce Reduction, Divestiture, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you have attained the Rule of 65, then the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to the requirements of paragraph (c)(iii).

(iii)    <u>Competition and Covenants</u>.  The Account Balance will continue to become earned and payable following your termination of employment due to Retirement as provided in paragraph (c)(i) or attainment of the Rule of 65 as provided in paragraph (c)(ii) only if (A) to the extent permissible under applicable law, you do not engage in Competition during such

period, (B) you comply with the covenants described in paragraph (d) below and (C) prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (A) above is applicable. To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time. If Bank of America determines in its reasonable business judgment that you have failed to satisfy any of the requirements of this paragraph (c)(iii), then the Account Balance representing your Award shall be immediately canceled as of the date of such determination. In addition, from time to time following your termination of employment after you are eligible for Retirement or have attained the Rule of 65, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the Competition restriction described in (A) above and the certification requirement described in (C) above will not apply to this Award.

(d)  <u>COVENANTS</u>.

(i)  <u>Non-Solicitation</u>. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an employee of Bank of America or its Subsidiaries and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America or its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

(ii)  <u>Detrimental Conduct</u>. You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

(iii)  <u>Remedies</u>.  Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that at all times prior to payment, you do not engage in solicitation or Detrimental Conduct, as described in paragraphs (d)(i) and (ii), during such period.  If Bank of America determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.

(e)  <u>DEFINITIONS</u>.  For purposes hereof, the following terms shall have the following meanings:

<u>All Other Terminations</u> means any Termination of Employment with Bank of America and its Subsidiaries prior to your having attained Retirement or the Rule of 65, whether initiated by you or your employer, other than (i) a termination due to your death or Disability, (ii) a termination in connection with a Workforce Reduction or Divestiture, (iii) a termination by your employer with Cause and (iv) a termination in connection with a Change in Control as described in paragraph (b)(iv) above.

<u>Cause</u> shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a termination of your employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to your employment with Bank of America or any of its Subsidiaries including, but not limited to, the Bank of America Corporation Code of Ethics and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or have committed any other material violation of Bank of America's written policy regarding Confidential and Proprietary Information.

<u>Change in Control</u> shall be defined as that term is defined in the Bank of America Corporation 2003 Key Associate Stock Plan.

<u>Competition</u> means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity

that is designated as a "Competitive Business" as of the date of your Termination of Employment.

Detrimental Conduct means your serious misconduct or unethical behavior, including any one of the following: (i) any conduct that would constitute Cause; (ii) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment, or other improper or intentional conduct causing reputational harm to Bank of America, its Subsidiaries, or a client of Bank of America or its Subsidiaries; (iii) the breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (iv) intentional violation, or grossly negligent disregard, of Bank of America's or its Subsidiaries' policies, rules and procedures, specifically including, but not limited to any of your obligations under the Bank of America Corporation Code of Ethics and workplace policies; or (v) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

Disability means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

Divestiture means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

Good Reason means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

Good Reason Process means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days

following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you terminate your employment for Good Reason within sixty (60) days after the end of the Cure Period. If Bank of America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you terminate your employment with Bank of America and its Subsidiaries due to such condition (notwithstanding its cure), then you will not be deemed to have terminated your employment for Good Reason.

Retirement means that your employment terminates other than with Cause (i) on or after you have attained your sixty-fifth (65th) birthday or (ii) when you cease employment on or after your fifty-fifth (55th) birthday and you have completed at least ten (10) Years of Service, including approved leaves of absence of one (1) year or less.

Rule of 65 means that your employment terminates other than with Cause on or after (i) you have completed at least twenty (20) Years of Service with your employer, including approved leaves of absence of one (1) year or less, (ii) your combined Years of Service with your employer and your age equals at least sixty-five (65) and (iii) you are not Retirement eligible.

Workforce Reduction means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program), or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the termination is as a result of such action. Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America. In the event you fail to execute all required documents in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of the Account Balance representing your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

Exhibit B

## BANK OF AMERICA CORPORATION
## WEALTHCHOICE AWARDS

### Special Provisions for WealthChoice Awards in Countries Outside the U.S.

This Exhibit B contains the terms that govern your WealthChoice Award and/or WealthChoice Strategic Premium Award if you are an employee of Bank of America or one of its Subsidiaries outside of the U.S. Capitalized terms used but not defined herein shall have the same meanings assigned to them in the Agreement.

This Exhibit B also includes certain country-specific disclosures that may be applicable to you if you work or reside in one of the countries listed herein. These disclosures are based on the securities exchange control and other laws in effect in the respective countries as of January 2013. Such laws are often complex and change frequently. As a result, Bank of America strongly recommends that you not rely on the information in this Exhibit B as the only source of information relating to the consequences of receiving an Award because the information may be out of date at the time the Award becomes earned and payable or at any later date indicated herein.

If you are a citizen or resident of a country other than the one in which you are currently working, are considered a citizen or resident of another country for local law purposes or transfer employment or residency to another country after the Award is granted to you, Bank of America shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you.

### General terms applicable to WealthChoice Awards granted to employees in any country outside of the U.S.

### Data Privacy

*By accepting the Award, you hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer and Bank of America and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Award.*

*You understand that Bank of America and your employer hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor ("Data"), for the purpose of implementing, administering and managing the Award. You understand that Data may be transferred to any third parties assisting in the implementation, administration and management of the Award, that these recipients may be located in your country or elsewhere, and that the recipient's country may have different data privacy laws and protections from your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing*

*the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage the Award. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing your local human resources representative. Further, you understand that you are providing the consents herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service and career with your employer will not be adversely affected; the only adverse consequence of refusing or withdrawing your consent is that Bank of America would not be able to grant you future awards or administer or maintain such awards. Therefore, you understand that refusing or withdrawing your consent may affect your ability to benefit from the Award. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

**Nature of Grant**

By entering into this Agreement and accepting the grant of the Award evidenced hereby, you acknowledge, understand and agree that:

(a)    the Award is granted voluntarily by Bank of America, is discretionary in nature and may be modified, suspended or terminated by Bank of America at any time;

(b)    the grant of the Award is voluntary and occasional and does not create any contractual or other right to receive future awards or benefits in lieu of awards even if such awards have been awarded repeatedly in the past;

(c)    all decisions with respect to future awards, if any, will be at the sole discretion of Bank of America;

(d)    the grant of the Award shall not create a right to further employment with your employer and shall not interfere with the ability of your employer to terminate your employment relationship at any time, with or without Cause;

(e)    you are voluntarily accepting the grant of the Award;

(f)    the future value of the benchmark return options and your Account Balance is unknown and cannot be predicted with certainty.

(g)    the Award and any cash payment made pursuant to the Award are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement benefits or welfare benefits or similar payments, and in no event should be considered as compensation for, or in any way relating to, past services for Bank of America or any of its Subsidiaries;

(h)    in the event that you are not an employee of Bank of America, the Award will not be interpreted to form an employment contract or relationship with Bank of America; furthermore, the Award will not be interpreted to form an employment contract with any Subsidiary;

(i)     no claim or entitlement to compensation or damages shall arise from forfeiture of the Award resulting from violation of a covenant set forth in Exhibit A, termination of your employment by Bank of America or your employer (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) or recoupment of all or any portion of any payment made pursuant to the Award, and in consideration of the grant of the Award, to which you are not otherwise entitled, you irrevocably agree never to institute any claim against Bank of America or your employer, waive your ability, if any, to bring any such claim and release Bank of America and your employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed not to pursue such claim, and you agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(j)     for purposes of the Award, your employment will be considered terminated as of the date you are no longer actively employed and providing services to Bank of America or one of its Subsidiaries, and your right, if any, to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by the date you cease to be actively employed and will not be extended by any notice period mandated under local law (e.g., active employment would not include a period of "garden leave" or similar period pursuant to local law); Bank of America, in its sole discretion, shall determine when you are no longer actively employed for purposes of the Award (including whether you may still be considered actively employed while on an approved leave of absence);

(k)     unless otherwise provided in this Exhibit B, you are solely responsible for investigating and complying with any exchange control laws applicable to you in connection with the Award and any payment made pursuant to the Award;

(l)     unless otherwise provided by Bank of America in its discretion, the Award and the benefits evidenced by this Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting Bank of America;

(m)     neither your employer, Bank of America or any of its Subsidiaries shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the Award or any payment made pursuant to the Award; and

(n)     Bank of America and your employer are not providing any tax, legal, financial or investment   advice, nor making any recommendations regarding participation in the Plan.  You acknowledge that you have the necessary knowledge and experience to understand how the Award and the Plan work, as well as any risks that may be related to the Plan and the Award and any notional or benchmark investment decisions that you may make in connection with the Plan or the Award.  You are advised to consult with your personal tax, legal and financial advisors regarding participation in the Plan.

**Language**

If you have received this Agreement or any other document related to the Award translated into a language other than English and if the meaning of the translated version differs from the English version, the English version shall control.

**Country-specific terms and disclosures applicable to WealthChoice Awards granted to employees outside of the U.S.**

**Bahrain**

There are no special provisions.

**Chile**

You are not required to repatriate any cash payments you receive pursuant to the Award to Chile. However, if you decide to repatriate such funds, you acknowledge that you will be required to effect such repatriation through the Formal Exchange Market (*i.e.*, a commercial bank or registered foreign exchange office) if the amount of the funds repatriated exceeds US$10,000. Further, if the value of your aggregate investments held outside of Chile exceeds US$5,000,000 at any time in a calendar year, you must report the status of such investments to the Central Bank of Chile.  Exchange control regulations in Chile are subject to change; you should consult with your personal legal advisor regarding any exchange control obligations that you may have prior to the payment date of the Award.

**France**

You may hold cash payments you receive pursuant to the Award outside France provided you declare all foreign accounts, whether open, current, or closed, in your income tax return. Furthermore, you must declare to the customs and excise authorities any cash you import or export without the use of a financial institution when the value of the cash or securities is equal to or exceeds €10,000.

*En cliquant sur le bouton «J'accepte» ou en signant et renvoyant le présent document décrivant les termes et conditions de votre attribution, vous confirmez ainsi avoir lu et compris les documents relatifs à cette attribution (ce Contrat d'Attribution) qui vous ont été communiqués en langue anglaise.  Vous en acceptez les termes en connaissance de cause.*

By clicking on the "I accept" button or by signing and returning this document providing for the terms and conditions of your grant, you confirm having read and understood the documents relating to this grant (the Agreement) which were provided to you in the English language.  You accept the terms of those documents accordingly.

**Hong Kong**

*WARNING: The Award does not constitute a public offering of securities under Hong Kong law and is available only to employees of Bank of America or its Subsidiaries.  The Agreement, including this Exhibit B, and any other incidental communication materials distributed in*

*connection with the Award (i) have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, (ii) have not been reviewed by any regulatory authority in Hong Kong, and (iii) are intended only for the personal use of each eligible employee of your employer, Bank of America or its Subsidiaries and may not be distributed to any other person. If you have any questions regarding the contents of the Agreement, including this Exhibit B, or any other incidental communication materials distributed in connection with the Award, you should obtain independent professional advice.*

Bank of America specifically intends that the program under which the Award was granted will not be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance.

## India

Any cash payments made to you pursuant to the Award will be made to you through the payroll of your employer in India.

## Ireland

There are no special provisions.

## Israel

There are no special provisions.

## Italy

By your acceptance of the Agreement, you acknowledge that you have read and specifically and expressly approve the following clauses of the Agreement (including Exhibit A and this Exhibit B): (a) the provision regarding your acknowledgement that you read and understand the provisions of the Agreement; (b) the provision regarding Tax-Related Items; (c) the provision regarding Delaware law governing the Agreement; (d) the provision regarding the enforceability of provisions in the Agreement; (e) the provision regarding the voluntary and discretionary nature of the program under which the Award was granted, which also contains information regarding the nature of the Award and how the benefits provided under the Agreement are not part of local salary/compensation for any reason; (f) the provision regarding your personal data in conjunction with administration of the Award; (g) the provision regarding the English version of the Agreement governing; (h) the provisions regarding the possible imposition of additional terms/conditions for the Award and specifically, the country-specific provisions for Italy in this Exhibit B; (i) the provision regarding the payment schedule for the Award; and (j) the provisions regarding the impact of termination of employment on the Award.

The following three paragraphs replace in its entirety the data privacy provision contained in this Exhibit B:

*You understand that your employer and/or Bank of America may hold certain personal information about you, including, but not limited to, your name, home address and telephone*

*number, date of birth, social security number (or any other social or national identification number), salary, nationality, job title, number of shares of Bank of America common stock held and the details of all entitlements to Bank of America shares and other awards, including this Award, awarded, cancelled, exercised, vested, unvested or outstanding (the "Data") for the purposes of implementing, administering and managing the Award.  You are aware that providing Bank of America with your Data is necessary for the performance of the Agreement and that your refusal to provide such Data would make it impossible for Bank of America to perform its contractual obligations and may affect your ability to receive and retain the Award.*

*The Controller of personal data processing is Bank of America Corporation, 100 North Tryon Street, Charlotte, NC, 28255, U.S.A.; its representative in Italy is Bank of America, N.A. Milan Branch, with registered offices at 5th Floor, Corso Matteotti 10, 20121 Milan Italy.  You understand that the Data may be transferred to Bank of America or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Award, including any transfer required to a broker or other third party with whom cash paid pursuant to the Award may be deposited.  Furthermore, the recipients that may receive, possess, use, retain and transfer such Data for the above mentioned purposes may be located in Italy or elsewhere, including outside of the European Union and that the recipient's country (e.g., the United States) may have different data privacy laws and protections from your country.  The processing activity, including the transfer of your personal data abroad, outside of the European Union, as herein specified and pursuant to applicable laws and regulations, does not require your consent thereto as the processing is necessary for the performance of contractual obligations related to the implementation, administration and management of the Award.  You understand that Data processing relating to the purposes above specified shall take place under automated or non-automated conditions, anonymously when possible, that comply with the purposes for which Data are collected and with confidentiality and security provisions as set forth by applicable laws and regulations, with specific reference to D.lgs. 196/2003.*

*You understand that Data will be held only as long as is required by law or as necessary to implement, administer and manage the Award.  You understand that pursuant to art.7 of D.lgs 196/2003, you have the right, including but not limited to, access, delete, update, request the rectification of your Data and cease, for legitimate reasons, the Data processing.  Furthermore, you are aware that your Data will not be used for direct marketing purposes.  In addition, the Data provided can be reviewed and questions or complaints can be addressed by contacting a local representative available at the following address: Bank of America, N.A. Milan Branch, 5th Floor, Corso Matteotti 10, 20121 Milan Italy.*

Italian resident employees are required to report in their annual tax returns:  (a) any transfers of cash or shares of stock to or from Italy exceeding €10,000; (b) any foreign investments or investments (including proceeds from the Award or the sale of shares of stock) held outside of Italy at the end of the calendar year if the value of such investment exceeds €10,000 and may give rise to income taxable in Italy; and (c) the amount of any transfers to and from accounts held abroad which may have had an impact during the calendar year on your foreign investments or investments held outside of Italy.  You may be exempt from the formalities in (a) above, if the

transfers or investments are made through an authorized broker resident in Italy, as the broker will comply with the reporting obligation on your behalf.

## Lebanon

There are no special provisions.

## Luxembourg

You are required to report any inward remittances of funds to the *Banque Central de Luxembourg* and/or the *Service Central de La Statistique et des Études Économiques* within 15 working days following the month during which the transaction occurred. If a Luxembourg financial institution is involved in the transaction, it generally will fulfill the reporting obligation on your behalf.

## Monaco

There are no special provisions.

## Netherlands

There are no special provisions.

## Panama

There are no special provisions.

## Russia

Under current exchange control regulations in Russia, you are required to repatriate any cash payments you receive pursuant to the Award to Russia within a reasonably short time after receipt. Such funds must initially be credited to you through a foreign currency account at an authorized bank in Russia. After the funds are initially received in Russia, they may be further remitted to foreign banks in accordance with Russian exchange control laws. You are required to report the existence of any foreign bank account to Russian tax authorities within 30 days of opening such account. You are encouraged to contact your personal advisor before remitting any funds to Russia, as exchange control requirements may change.

## Singapore

There are no special provisions.

## Spain

When receiving foreign currency payments derived pursuant to the Award, you must inform the financial institution receiving the payment of the basis upon which such payment is made if the payment exceeds €50,000. You will need to provide the institution with the following information: your name, address, and fiscal identification number; the name and corporate

domicile of Bank of America; the amount of the payment; the currency used; the country of origin; the reasons for the payment; and required information.

Effective January 1, 2013, to the extent that you hold assets (*e.g.*, cash held in a bank account) or rights (*e.g.*, the Award) outside of Spain with a value in excess of €20,000 (on a per-asset basis) as of December 31 each year, you will be required to report information on such rights and assets on your tax return for such year.

The following paragraphs supplement the Nature of Grant provision contained in this Exhibit B:

In accepting the Award, you consent to the terms of the Agreement and the special terms included in this Exhibit B.

You understand that Bank of America has unilaterally, gratuitously and discretionally decided to grant Awards to individuals who may be employees of Bank of America or its Subsidiaries throughout the world. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not bind Bank of America or any Subsidiary. Consequently, you understand that the Award is granted on the assumption and condition that the Award and any cash payments made pursuant to the Award are not a part of any employment contract (either with Bank of America or any Subsidiary) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever.

Further, you understand and agree that, unless otherwise expressly provided for by Bank of America or set forth in Exhibit A to the Agreement, the Award will be cancelled without entitlement to any cash payment or to any amount as indemnification if you terminate employment for any reason, including, but not limited to: resignation, disciplinary dismissal adjudged to be with cause, disciplinary dismissal adjudged or recognized to be without cause, material modification of the terms of employment under Article 41 of the Workers' Statute, relocation under Article 40 of the Workers' Statute, Article 50 of the Workers' Statute, or under Article 10.3 of Royal Decree 1382/1985. Bank of America, in its sole discretion, shall determine the date when your employment has terminated for purposes of the Award.

In addition, you understand that this grant would not be made to you but for the assumptions and conditions referred to above; thus, you acknowledge and freely accept that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, then any grant of or right to the Award shall be null and void.

## Switzerland

By accepting the Award, you agree to be bound by any tax ruling obtained by Bank of America or any Subsidiary for the canton in which you reside with respect to the Award. You further agree to sign any agreements, forms and/or consents that may be requested by your employer or Bank of America in connection with such ruling. You may obtain a copy of any tax ruling that may be applicable to you by contacting your employer. If you reside in a canton other than the one in which you are currently working, you are advised to contact your personal tax advisor to determine the tax treatment that will be applicable to the Award.

**Taiwan**

You may acquire and remit foreign currency up to US$5,000,000 per year without justification.

If the transaction amount is TWD500,000 or more in a single transaction, you must submit a Foreign Exchange Transaction Form.  If the transaction amount is US$500,000 or more in a single transaction, you must also provide any supporting documentation to the satisfaction of the remitting bank.

**Thailand**

If you receive a cash payment pursuant to the Award in excess of US$50,000, you will be required to immediately repatriate the funds to Thailand and report the inward remittance to the Bank of Thailand on a Foreign Exchange Transaction Form through the bank in Thailand through which the repatriation was made.  Further, within 360 days of the repatriation, you must deposit the funds into a foreign currency deposit account in Thailand or convert the funds into Thai Baht.

**United Arab Emirates**

There are no special provisions.

**United Kingdom**

The following paragraphs supplement the provision regarding Tax-Related Items contained in the Agreement:

Any sum withheld on an estimated basis shall be repaid to you to the extent that such sum was not applied in satisfaction of the actual tax liabilities arising.

If payment or withholding of the income tax due is not made within 90 days of the event giving rise to the income tax liability or such other period specified in Section 222(1)(c) of the United Kingdom Income Tax (Earnings and Pensions) Act 2003 (the "Due Date"), the amount of any uncollected income tax will constitute a loan owed by you to your employer, effective on the Due Date.  You agree that the loan will bear interest at the then-current Official Rate of Her Majesty's Revenue and Customs ("HMRC"), it will be immediately due and repayable, and Bank of America or your employer may recover it at any time thereafter by any of the means referred to in the Agreement.  Notwithstanding the foregoing, if you are a director or executive officer of Bank of America (within the meaning of Section 13(k) of the U.S. Securities and Exchange Act of 1934, as amended), you will not be eligible for such a loan to cover the income tax due.  In the event that you are a director or executive officer and the income tax is not collected from or paid by you by the Due Date, the amount of any uncollected income tax will constitute a benefit to you on which additional income tax and National Insurance Contributions will be payable.  You will be responsible for reporting and paying any income tax and national insurance contributions due on this additional benefit directly to HMRC under the self-assessment regime and for reimbursing Bank of America or your employer, as applicable, for the value of any employee National Insurance Contributions due on this additional benefit.

**<u>Uruguay</u>**

There are no special provisions.

# EXHIBIT M

# WealthChoice Contingent Award Plan
# Award Agreement for Asset Gathering Award

This document contains your WealthChoice Award Agreement for your Asset Gathering Award (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

**What you need to do**

1. Review the Award Agreement to ensure you understand its provisions. With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and the Plan and file them with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. More detailed information about competitive businesses can be found on Flagscape® under Benefits & Pay / Pay & Timekeeping / Stock and Long-Term Cash to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

* If you do not accept your Award Agreement through the online acceptance process by November 15, 2013, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf. If you decline your Award Agreement, your award will be canceled and you will not be entitled to any benefits from the award nor any compensation or benefits in lieu of the canceled award.



## 2012 PERFORMANCE YEAR WEALTHCHOICE AWARD AGREEMENT
## FOR ASSET GATHERING AWARD

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an employee of Bank of America or one of its Subsidiaries.

A copy of the Plan is enclosed with this Agreement and its terms and provisions are incorporated herein by reference. When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Asset Gathering Award covered by this Agreement (the "Award") is made to you in connection with your participation in the Plan, subject to the following terms and provisions.

1. Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement. The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award. This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2. Notwithstanding any provisions in this Agreement, the Award shall be subject to any special terms and conditions applicable to employees based outside the U.S., as set forth in Exhibit B to this Agreement. If you relocate to one of the countries included in Exhibit B, the special terms and conditions for such country will apply to you to the extent that Bank of America determines that the application of such terms and conditions is necessary or advisable in order to comply with local law or facilitate the administration of the Award. Exhibit B constitutes part of this Agreement.

3. You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement, including any special terms and provisions applicable to employees based outside the U.S., as set forth in Exhibit B. IN THE EVENT OF ANY CONFLICT BETWEEN THIS WEALTHCHOICE AWARD AGREEMENT, EXHIBIT A AND EXHIBIT B, THE PROVISIONS OF EXHIBIT B SHALL PREVAIL AND CONTROL THE AWARD.

4. The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

5. To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account

Balance paid to you pursuant to this Agreement. You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to the full value of the Account Balance paid to you pursuant to this Agreement. In addition, this Award is subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder, (ii) similar rules under the laws of any other jurisdiction and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

6.  Subject to applicable laws in your country, you may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. Any beneficiary designation in effect at the time of your termination of employment with Bank of America and its Subsidiaries (other than a termination of employment due to your death) will remain in effect following your termination of employment unless you change your beneficiary designation or it otherwise ceases to be enforceable and/or valid in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. If you do not designate a beneficiary, if your designated beneficiary does not survive you or if the designation is not enforceable and/or valid under the inheritance and other laws in your country (as determined by Bank of America in its sole discretion), then your beneficiary will be your estate.

7.  Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an on-line or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

8.  Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date. Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer. You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

2012PY WealthChoice AGA Award Agreement
MERRILL 00200694

**JA167**

9. Regardless of any action Bank of America or your employer takes with respect to any or all income tax, payroll tax or other tax-related withholding ("Tax-Related Items"), you acknowledge that the ultimate liability for all Tax-Related Items owed by you is and remains your responsibility and may exceed the amount actually withheld by Bank of America or your employer.  You further acknowledge that Bank of America and/or your employer (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award including the grant and vesting of the Award and the payment of the Account Balance; and (b) do not commit to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items.  Further, if you have become subject to Tax-Related Items in connection with the Award in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items as a result of your participation in the Plan, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award.  In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer.  Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any withholding obligation.

10.  The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the State of Delaware and the laws of the United States, as provided in the Plan.  For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this grant or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

11. In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding the Award.  Any prior agreements, commitments or negotiations concerning the Award are superseded.  Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

12. This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable.  Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

13. Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable in order to comply with local law or facilitate the administration of the Award and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer effective as of the date of grant listed in your Award Statement.

BANK OF AMERICA CORPORATION
By:

Kemberly Danner
Human Resources Executive for Global Wealth and Investment Management

2012PY WealthChoice AGA Award Agreement
MERRILL WON 200696

**Exhibit A**

WEALTHCHOICE CONTINGENT AWARD PLAN

PAYMENT OF AWARD

(a)      <u>PAYMENT SCHEDULE</u>.  Subject to the provisions of paragraphs (b), (c) and (d) below, the Account Balance representing your Award will become earned and payable on Mar. 15, 2021 if you remain employed with Bank of America and its Subsidiaries through that date. Once the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made through payroll as soon as administratively practicable. Bank of America, in its sole discretion, will select an appropriate exchange rate for converting the payment into local currency.

(b)      <u>IMPACT OF TERMINATION OF EMPLOYMENT ON AWARD</u>.  If your employment with Bank of America and its Subsidiaries terminates prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for termination as follows.

(i)      <u>Death</u>. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your termination is due to death. Payment will be made as soon as administratively practicable.

(ii)      <u>Workforce Reduction, Divestiture or Disability</u>.  If your employment is terminated by your employer due to Disability, Workforce Reduction or Divestiture, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (d) below.

(iii)      <u>Termination by your Employer with Cause</u>.  If your employment is terminated by your employer with Cause, the Account Balance representing your Award shall be canceled as of your employment termination date.

(iv)      <u>Change in Control</u>.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) your employment is terminated without Cause or (2) you terminate your employment with Bank of America or its Subsidiaries for Good Reason, then the Account Balance shall become immediately earned as of the date of such termination and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (d) below.

(v)　　All Other Terminations.  Unless you are eligible for Retirement or have attained the Rule of 65 as described below, in the case of All Other Terminations, the Account Balance representing your Award shall be canceled as of your employment termination date.

(vi)　　Possible Variations to Payment Date.  Notwithstanding the provisions set forth above, in the event of Termination of Employment, Bank of America may, in its sole discretion, accelerate payment of all or a portion of the unearned Account Balance to the date of Termination of Employment (if the unearned Account Balance is not canceled as of such date) to facilitate compliance with local law and/or administrative considerations; provided, however, that if you are subject to U.S. Internal Revenue Code Section 409A, payment of the Account Balance representing your Award may be accelerated, and payment may be made, only to the extent necessary to pay federal, state, local or foreign tax obligations arising from the Award that apply to an amount before the amount is paid or made available to you.  Also, the payment of an Account Balance that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)　　IMPACT OF RETIREMENT AND RULE OF 65 ON AWARD.

(i)　　Retirement.  If your employment terminates for any reason other than death, Disability, Workforce Reduction, Divestiture, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you are eligible for Retirement, then the Account Balance will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which your Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year, subject to the requirements of paragraph (c)(iii).

(ii)　　Rule of 65.  If your employment terminates for any reason other than death, Disability, Workforce Reduction, Divestiture, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you have attained the Rule of 65, then the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to the requirements of paragraph (c)(iii).

(iii)　　Competition and Covenants.  The Account Balance will continue to become earned and payable following your termination of employment due to Retirement as provided in paragraph (c)(i) or attainment of the Rule of 65 as provided in paragraph (c)(ii) only if (A) to the extent permissible under applicable law, you do not engage in Competition during such

period, (B) you comply with the covenants described in paragraph (d) below and (C) prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (A) above is applicable. To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time. If Bank of America determines in its reasonable business judgment that you have failed to satisfy any of the requirements of this paragraph (c)(iii), then the Account Balance representing your Award shall be immediately canceled as of the date of such determination. In addition, from time to time following your termination of employment after you are eligible for Retirement or have attained the Rule of 65, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the Competition restriction described in (A) above and the certification requirement described in (C) above will not apply to this Award.

(d)     <u>COVENANTS</u>.

    (i)     <u>Non-Solicitation</u>. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an employee of Bank of America or its Subsidiaries and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America or its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

    (ii)     <u>Detrimental Conduct</u>. You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

(iii)    Remedies.  Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that at all times prior to payment, you do not engage in solicitation or Detrimental Conduct, as described in paragraphs (d)(i) and (ii), during such period.  If Bank of America determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.

(e)    DEFINITIONS.  For purposes hereof, the following terms shall have the following meanings:

All Other Terminations means any Termination of Employment with Bank of America and its Subsidiaries prior to your having attained Retirement or the Rule of 65, whether initiated by you or your employer, other than (i) a termination due to your death or Disability, (ii) a termination in connection with a Workforce Reduction or Divestiture, (iii) a termination by your employer with Cause and (iv) a termination in connection with a Change in Control as described in paragraph (b)(iv) above.

Cause shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a termination of your employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to your employment with Bank of America or any of its Subsidiaries including, but not limited to, the Bank of America Corporation Code of Ethics and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or have committed any other material violation of Bank of America's written policy regarding Confidential and Proprietary Information.

Change in Control shall be defined as that term is defined in the Bank of America Corporation 2003 Key Associate Stock Plan.

Competition means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity

that is designated as a "Competitive Business" as of the date of your Termination of Employment.

Detrimental Conduct means your serious misconduct or unethical behavior, including any one of the following: (i) any conduct that would constitute Cause; (ii) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment, or other improper or intentional conduct causing reputational harm to Bank of America, its Subsidiaries, or a client of Bank of America or its Subsidiaries; (iii) the breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (iv) intentional violation, or grossly negligent disregard, of Bank of America's or its Subsidiaries' policies, rules and procedures, specifically including, but not limited to any of your obligations under the Bank of America Corporation Code of Ethics and workplace policies; or (v) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

Disability means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

Divestiture means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

Good Reason means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

Good Reason Process means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days

2012PY WealthChoice AGA Award Agreement
Case 3:24-cv-00440-KDB-DCK   Document 41-9   Filed 09/30/24   Page 11 of 26   BOA00000701

JA174

following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you terminate your employment for Good Reason within sixty (60) days after the end of the Cure Period. If Bank of America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you terminate your employment with Bank of America and its Subsidiaries due to such condition (notwithstanding its cure), then you will not be deemed to have terminated your employment for Good Reason.

Retirement means that your employment terminates other than with Cause (i) on or after you have attained your sixty-fifth (65th) birthday or (ii) when you cease employment on or after your fifty-fifth (55th) birthday and you have completed at least ten (10) Years of Service, including approved leaves of absence of one (1) year or less.

Rule of 65 means that your employment terminates other than with Cause on or after (i) you have completed at least twenty (20) Years of Service with your employer, including approved leaves of absence of one (1) year or less, (ii) your combined Years of Service with your employer and your age equals at least sixty-five (65) and (iii) you are not Retirement eligible.

Workforce Reduction means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program), or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the termination is as a result of such action. Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America. In the event you fail to execute all required documents in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of the Account Balance representing your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

Exhibit B

## BANK OF AMERICA CORPORATION
## WEALTHCHOICE AWARDS

### Special Provisions for WealthChoice Awards in Countries Outside the U.S.

This Exhibit B contains the terms that govern your WealthChoice Award and/or WealthChoice Strategic Premium Award if you are an employee of Bank of America or one of its Subsidiaries outside of the U.S.  Capitalized terms used but not defined herein shall have the same meanings assigned to them in the Agreement.

This Exhibit B also includes certain country-specific disclosures that may be applicable to you if you work or reside in one of the countries listed herein.  These disclosures are based on the securities exchange control and other laws in effect in the respective countries as of January 2013.  Such laws are often complex and change frequently.  As a result, Bank of America strongly recommends that you not rely on the information in this Exhibit B as the only source of information relating to the consequences of receiving an Award because the information may be out of date at the time the Award becomes earned and payable or at any later date indicated herein.

If you are a citizen or resident of a country other than the one in which you are currently working, are considered a citizen or resident of another country for local law purposes or transfer employment or residency to another country after the Award is granted to you, Bank of America shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you.

### General terms applicable to WealthChoice Awards granted to employees in any country outside of the U.S.

### Data Privacy

*By accepting the Award, you hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer and Bank of America and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Award.*

*You understand that Bank of America and your employer hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor ("Data"), for the purpose of implementing, administering and managing the Award.  You understand that Data may be transferred to any third parties assisting in the implementation, administration and management of the Award, that these recipients may be located in your country or elsewhere, and that the recipient's country may have different data privacy laws and protections from your country.  You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative.  You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing*

*the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage the Award. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing your local human resources representative. Further, you understand that you are providing the consents herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service and career with your employer will not be adversely affected; the only adverse consequence of refusing or withdrawing your consent is that Bank of America would not be able to grant you future awards or administer or maintain such awards. Therefore, you understand that refusing or withdrawing your consent may affect your ability to benefit from the Award. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

**Nature of Grant**

By entering into this Agreement and accepting the grant of the Award evidenced hereby, you acknowledge, understand and agree that:

(a)    the Award is granted voluntarily by Bank of America, is discretionary in nature and may be modified, suspended or terminated by Bank of America at any time;

(b)    the grant of the Award is voluntary and occasional and does not create any contractual or other right to receive future awards or benefits in lieu of awards even if such awards have been awarded repeatedly in the past;

(c)    all decisions with respect to future awards, if any, will be at the sole discretion of Bank of America;

(d)    the grant of the Award shall not create a right to further employment with your employer and shall not interfere with the ability of your employer to terminate your employment relationship at any time, with or without Cause;

(e)    you are voluntarily accepting the grant of the Award;

(f)    the future value of the benchmark return options and your Account Balance is unknown and cannot be predicted with certainty.

(g)    the Award and any cash payment made pursuant to the Award are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement benefits or welfare benefits or similar payments, and in no event should be considered as compensation for, or in any way relating to, past services for Bank of America or any of its Subsidiaries;

(h)    in the event that you are not an employee of Bank of America, the Award will not be interpreted to form an employment contract or relationship with Bank of America; furthermore, the Award will not be interpreted to form an employment contract with any Subsidiary;

(i)    no claim or entitlement to compensation or damages shall arise from forfeiture of the Award resulting from violation of a covenant set forth in Exhibit A, termination of your employment by Bank of America or your employer (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) or recoupment of all or any portion of any payment made pursuant to the Award, and in consideration of the grant of the Award, to which you are not otherwise entitled, you irrevocably agree never to institute any claim against Bank of America or your employer, waive your ability, if any, to bring any such claim and release Bank of America and your employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed not to pursue such claim, and you agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(j)    for purposes of the Award, your employment will be considered terminated as of the date you are no longer actively employed and providing services to Bank of America or one of its Subsidiaries, and your right, if any, to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by the date you cease to be actively employed and will not be extended by any notice period mandated under local law (e.g., active employment would not include a period of "garden leave" or similar period pursuant to local law); Bank of America, in its sole discretion, shall determine when you are no longer actively employed for purposes of the Award (including whether you may still be considered actively employed while on an approved leave of absence);

(k)    unless otherwise provided in this Exhibit B, you are solely responsible for investigating and complying with any exchange control laws applicable to you in connection with the Award and any payment made pursuant to the Award;

(l)    unless otherwise provided by Bank of America in its discretion, the Award and the benefits evidenced by this Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting Bank of America;

(m)    neither your employer, Bank of America or any of its Subsidiaries shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the Award or any payment made pursuant to the Award; and

(n)    Bank of America and your employer are not providing any tax, legal, financial or investment  advice, nor making any recommendations regarding participation in the Plan.  You acknowledge that you have the necessary knowledge and experience to understand how the Award and the Plan work, as well as any risks that may be related to the Plan and the Award and any notional or benchmark investment decisions that you may make in connection with the Plan or the Award.  You are advised to consult with your personal tax, legal and financial advisors regarding participation in the Plan.

2012PY WealthChoice AGA Award Agreement
Page 15 of 26
BANA-CONNICK00705
Case 3:24-cv-00440-KDB-DCK   Document 41-9   Filed 09/30/24   Page 15 of 26

JA178

**Language**

If you have received this Agreement or any other document related to the Award translated into a language other than English and if the meaning of the translated version differs from the English version, the English version shall control.

**Country-specific terms and disclosures applicable to WealthChoice Awards granted to employees outside of the U.S.**

**Bahrain**

There are no special provisions.

**Chile**

You are not required to repatriate any cash payments you receive pursuant to the Award to Chile. However, if you decide to repatriate such funds, you acknowledge that you will be required to effect such repatriation through the Formal Exchange Market (*i.e.*, a commercial bank or registered foreign exchange office) if the amount of the funds repatriated exceeds US$10,000. Further, if the value of your aggregate investments held outside of Chile exceeds US$5,000,000 at any time in a calendar year, you must report the status of such investments to the Central Bank of Chile.  Exchange control regulations in Chile are subject to change; you should consult with your personal legal advisor regarding any exchange control obligations that you may have prior to the payment date of the Award.

**France**

You may hold cash payments you receive pursuant to the Award outside France provided you declare all foreign accounts, whether open, current, or closed, in your income tax return. Furthermore, you must declare to the customs and excise authorities any cash you import or export without the use of a financial institution when the value of the cash or securities is equal to or exceeds €10,000.

*En cliquant sur le bouton «J'accepte» ou en signant et renvoyant le présent document décrivant les termes et conditions de votre attribution, vous confirmez ainsi avoir lu et compris les documents relatifs à cette attribution (ce Contrat d'Attribution) qui vous ont été communiqués en langue anglaise.  Vous en acceptez les termes en connaissance de cause.*

By clicking on the "I accept" button or by signing and returning this document providing for the terms and conditions of your grant, you confirm having read and understood the documents relating to this grant (the Agreement) which were provided to you in the English language.  You accept the terms of those documents accordingly.

**Hong Kong**

*WARNING: The Award does not constitute a public offering of securities under Hong Kong law and is available only to employees of Bank of America or its Subsidiaries.  The Agreement, including this Exhibit B, and any other incidental communication materials distributed in*

*connection with the Award (i) have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, (ii) have not been reviewed by any regulatory authority in Hong Kong, and (iii) are intended only for the personal use of each eligible employee of your employer, Bank of America or its Subsidiaries and may not be distributed to any other person. If you have any questions regarding the contents of the Agreement, including this Exhibit B, or any other incidental communication materials distributed in connection with the Award, you should obtain independent professional advice.*

Bank of America specifically intends that the program under which the Award was granted will not be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance.

### India

Any cash payments made to you pursuant to the Award will be made to you through the payroll of your employer in India.

### Ireland

There are no special provisions.

### Israel

There are no special provisions.

### Italy

By your acceptance of the Agreement, you acknowledge that you have read and specifically and expressly approve the following clauses of the Agreement (including Exhibit A and this Exhibit B): (a) the provision regarding your acknowledgement that you read and understand the provisions of the Agreement; (b) the provision regarding Tax-Related Items; (c) the provision regarding Delaware law governing the Agreement; (d) the provision regarding the enforceability of provisions in the Agreement; (e) the provision regarding the voluntary and discretionary nature of the program under which the Award was granted, which also contains information regarding the nature of the Award and how the benefits provided under the Agreement are not part of local salary/compensation for any reason; (f) the provision regarding your personal data in conjunction with administration of the Award; (g) the provision regarding the English version of the Agreement governing; (h) the provisions regarding the possible imposition of additional terms/conditions for the Award and specifically, the country-specific provisions for Italy in this Exhibit B; (i) the provision regarding the payment schedule for the Award; and (j) the provisions regarding the impact of termination of employment on the Award.

The following three paragraphs replace in its entirety the data privacy provision contained in this Exhibit B:

***You understand that your employer and/or Bank of America may hold certain personal information about you, including, but not limited to, your name, home address and telephone***

*number, date of birth, social security number (or any other social or national identification number), salary, nationality, job title, number of shares of Bank of America common stock held and the details of all entitlements to Bank of America shares and other awards, including this Award, awarded, cancelled, exercised, vested, unvested or outstanding (the "Data") for the purposes of implementing, administering and managing the Award. You are aware that providing Bank of America with your Data is necessary for the performance of the Agreement and that your refusal to provide such Data would make it impossible for Bank of America to perform its contractual obligations and may affect your ability to receive and retain the Award.*

*The Controller of personal data processing is Bank of America Corporation, 100 North Tryon Street, Charlotte, NC, 28255, U.S.A.; its representative in Italy is Bank of America, N.A. Milan Branch, with registered offices at 5th Floor, Corso Matteotti 10, 20121 Milan Italy. You understand that the Data may be transferred to Bank of America or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Award, including any transfer required to a broker or other third party with whom cash paid pursuant to the Award may be deposited. Furthermore, the recipients that may receive, possess, use, retain and transfer such Data for the above mentioned purposes may be located in Italy or elsewhere, including outside of the European Union and that the recipient's country (e.g., the United States) may have different data privacy laws and protections from your country. The processing activity, including the transfer of your personal data abroad, outside of the European Union, as herein specified and pursuant to applicable laws and regulations, does not require your consent thereto as the processing is necessary for the performance of contractual obligations related to the implementation, administration and management of the Award. You understand that Data processing relating to the purposes above specified shall take place under automated or non-automated conditions, anonymously when possible, that comply with the purposes for which Data are collected and with confidentiality and security provisions as set forth by applicable laws and regulations, with specific reference to D.lgs. 196/2003.*

*You understand that Data will be held only as long as is required by law or as necessary to implement, administer and manage the Award. You understand that pursuant to art.7 of D.lgs 196/2003, you have the right, including but not limited to, access, delete, update, request the rectification of your Data and cease, for legitimate reasons, the Data processing. Furthermore, you are aware that your Data will not be used for direct marketing purposes. In addition, the Data provided can be reviewed and questions or complaints can be addressed by contacting a local representative available at the following address: Bank of America, N.A. Milan Branch, 5th Floor, Corso Matteotti 10, 20121 Milan Italy.*

Italian resident employees are required to report in their annual tax returns: (a) any transfers of cash or shares of stock to or from Italy exceeding €10,000; (b) any foreign investments or investments (including proceeds from the Award or the sale of shares of stock) held outside of Italy at the end of the calendar year if the value of such investment exceeds €10,000 and may give rise to income taxable in Italy; and (c) the amount of any transfers to and from accounts held abroad which may have had an impact during the calendar year on your foreign investments or investments held outside of Italy. You may be exempt from the formalities in (a) above, if the

2012PY WealthChoice AGA Award Agreement
Case 3:24-cv-00440-KDB-DCK   Document 41-9   Filed 09/30/24   Page 189 of 560   BOA-LEWIS-000708

JA181

transfers or investments are made through an authorized broker resident in Italy, as the broker will comply with the reporting obligation on your behalf.

## Lebanon

There are no special provisions.

## Luxembourg

You are required to report any inward remittances of funds to the *Banque Central de Luxembourg* and/or the *Service Central de La Statistique et des Études Économiques* within 15 working days following the month during which the transaction occurred. If a Luxembourg financial institution is involved in the transaction, it generally will fulfill the reporting obligation on your behalf.

## Monaco

There are no special provisions.

## Netherlands

There are no special provisions.

## Panama

There are no special provisions.

## Russia

Under current exchange control regulations in Russia, you are required to repatriate any cash payments you receive pursuant to the Award to Russia within a reasonably short time after receipt. Such funds must initially be credited to you through a foreign currency account at an authorized bank in Russia. After the funds are initially received in Russia, they may be further remitted to foreign banks in accordance with Russian exchange control laws. You are required to report the existence of any foreign bank account to Russian tax authorities within 30 days of opening such account. You are encouraged to contact your personal advisor before remitting any funds to Russia, as exchange control requirements may change.

## Singapore

There are no special provisions.

## Spain

When receiving foreign currency payments derived pursuant to the Award, you must inform the financial institution receiving the payment of the basis upon which such payment is made if the payment exceeds €50,000. You will need to provide the institution with the following information: your name, address, and fiscal identification number; the name and corporate

domicile of Bank of America; the amount of the payment; the currency used; the country of origin; the reasons for the payment; and required information.

Effective January 1, 2013, to the extent that you hold assets (*e.g.*, cash held in a bank account) or rights (*e.g.*, the Award) outside of Spain with a value in excess of €20,000 (on a per-asset basis) as of December 31 each year, you will be required to report information on such rights and assets on your tax return for such year.

The following paragraphs supplement the Nature of Grant provision contained in this Exhibit B:

In accepting the Award, you consent to the terms of the Agreement and the special terms included in this Exhibit B.

You understand that Bank of America has unilaterally, gratuitously and discretionally decided to grant Awards to individuals who may be employees of Bank of America or its Subsidiaries throughout the world. The decision is a limited decision that is entered into upon the express assumption and condition that any grant will not bind Bank of America or any Subsidiary. Consequently, you understand that the Award is granted on the assumption and condition that the Award and any cash payments made pursuant to the Award are not a part of any employment contract (either with Bank of America or any Subsidiary) and shall not be considered a mandatory benefit, salary for any purposes (including severance compensation) or any other right whatsoever.

Further, you understand and agree that, unless otherwise expressly provided for by Bank of America or set forth in Exhibit A to the Agreement, the Award will be cancelled without entitlement to any cash payment or to any amount as indemnification if you terminate employment for any reason, including, but not limited to: resignation, disciplinary dismissal adjudged to be with cause, disciplinary dismissal adjudged or recognized to be without cause, material modification of the terms of employment under Article 41 of the Workers' Statute, relocation under Article 40 of the Workers' Statute, Article 50 of the Workers' Statute, or under Article 10.3 of Royal Decree 1382/1985. Bank of America, in its sole discretion, shall determine the date when your employment has terminated for purposes of the Award.

In addition, you understand that this grant would not be made to you but for the assumptions and conditions referred to above; thus, you acknowledge and freely accept that should any or all of the assumptions be mistaken or should any of the conditions not be met for any reason, then any grant of or right to the Award shall be null and void.

### Switzerland

By accepting the Award, you agree to be bound by any tax ruling obtained by Bank of America or any Subsidiary for the canton in which you reside with respect to the Award. You further agree to sign any agreements, forms and/or consents that may be requested by your employer or Bank of America in connection with such ruling. You may obtain a copy of any tax ruling that may be applicable to you by contacting your employer. If you reside in a canton other than the one in which you are currently working, you are advised to contact your personal tax advisor to determine the tax treatment that will be applicable to the Award.

**Taiwan**

You may acquire and remit foreign currency up to US$5,000,000 per year without justification.

If the transaction amount is TWD500,000 or more in a single transaction, you must submit a Foreign Exchange Transaction Form. If the transaction amount is US$500,000 or more in a single transaction, you must also provide any supporting documentation to the satisfaction of the remitting bank.

**Thailand**

If you receive a cash payment pursuant to the Award in excess of US$50,000, you will be required to immediately repatriate the funds to Thailand and report the inward remittance to the Bank of Thailand on a Foreign Exchange Transaction Form through the bank in Thailand through which the repatriation was made. Further, within 360 days of the repatriation, you must deposit the funds into a foreign currency deposit account in Thailand or convert the funds into Thai Baht.

**United Arab Emirates**

There are no special provisions.

**United Kingdom**

The following paragraphs supplement the provision regarding Tax-Related Items contained in the Agreement:

Any sum withheld on an estimated basis shall be repaid to you to the extent that such sum was not applied in satisfaction of the actual tax liabilities arising.

If payment or withholding of the income tax due is not made within 90 days of the event giving rise to the income tax liability or such other period specified in Section 222(1)(c) of the United Kingdom Income Tax (Earnings and Pensions) Act 2003 (the "Due Date"), the amount of any uncollected income tax will constitute a loan owed by you to your employer, effective on the Due Date. You agree that the loan will bear interest at the then-current Official Rate of Her Majesty's Revenue and Customs ("HMRC"), it will be immediately due and repayable, and Bank of America or your employer may recover it at any time thereafter by any of the means referred to in the Agreement. Notwithstanding the foregoing, if you are a director or executive officer of Bank of America (within the meaning of Section 13(k) of the U.S. Securities and Exchange Act of 1934, as amended), you will not be eligible for such a loan to cover the income tax due. In the event that you are a director or executive officer and the income tax is not collected from or paid by you by the Due Date, the amount of any uncollected income tax will constitute a benefit to you on which additional income tax and National Insurance Contributions will be payable. You will be responsible for reporting and paying any income tax and national insurance contributions due on this additional benefit directly to HMRC under the self-assessment regime and for reimbursing Bank of America or your employer, as applicable, for the value of any employee National Insurance Contributions due on this additional benefit.

**Uruguay**

There are no special provisions.

# EXHIBIT N

# WealthChoice Contingent Award Plan
# Award Agreement

This document contains your WealthChoice Award Agreement (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

**What you need to do**

1. Review the Award Agreement to ensure you understand its provisions.  With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and the Plan and file them with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. More detailed information about competitive businesses can be found on Flagscape® under Benefits & Pay / Pay & Timekeeping / Stock and Long-Term Cash to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

* If you do not accept your Award Agreement through the online acceptance process by November 15, 2014, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf.  If you decline your Award Agreement, your award will be canceled and you will not be entitled to any benefits from the award nor any compensation or benefits in lieu of the canceled award.

## 2013 PERFORMANCE YEAR WEALTHCHOICE AWARD AGREEMENT

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an employee of Bank of America or one of its Subsidiaries.

A copy of the Plan is enclosed with this Agreement and its terms and provisions are incorporated herein by reference.  When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Award covered by this Agreement (the "Award") is made to you in connection with your participation in the Plan as part of your long-term contingent award, subject to the following terms and provisions.

1.  Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement.  The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award.  This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2.  Notwithstanding any provisions in this Agreement, the Award shall be subject to any special terms and conditions applicable to employees based outside the U.S., as set forth in Exhibit B to this Agreement.  If you relocate to one of the countries included in Exhibit B, the special terms and conditions for such country will apply to you to the extent that Bank of America determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons.  Exhibit B constitutes part of this Agreement.

3.  You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement, including any special terms and provisions applicable to employees based outside the U.S., as set forth in Exhibit B.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS WEALTHCHOICE AWARD AGREEMENT, EXHIBIT A AND EXHIBIT B, THE PROVISIONS OF EXHIBIT B SHALL PREVAIL AND CONTROL THE AWARD.

4.  The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

5.  To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account Balance paid to you pursuant to this Agreement.  You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to the full value of the Account Balance paid to you pursuant to this Agreement.  In addition, this Award is subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street

Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder, (ii) similar rules under the laws of any other jurisdiction and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

6. Subject to applicable laws in your country, you may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. Any beneficiary designation in effect at the time of your Termination of Employment with Bank of America and its Subsidiaries (other than a Termination of Employment due to your death) will remain in effect following your Termination of Employment unless you change your beneficiary designation or it otherwise ceases to be enforceable and/or valid in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. If you do not designate a beneficiary, if your designated beneficiary does not survive you or if the designation is not enforceable and/or valid under the inheritance and other laws in your country (as determined by Bank of America in its sole discretion), then your beneficiary will be your estate.

7. Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an on-line or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

8. Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date. Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer. You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

9. You acknowledge that, regardless of any action taken by Bank of America or your employer, the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Award and legally applicable to you ("Tax-Related Items") is and remains your responsibility and may exceed the amount (if

any) withheld by Bank of America or your employer.  You further acknowledge that Bank of America and/or your employer (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award including the grant and vesting of the Award and the payment of the Account Balance; and (b) do not commit to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items.  Further, if you have become subject to Tax-Related Items in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items as a result of your participation in the Plan, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award.  In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer.  Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any obligations in connection with the Tax-Related Items.

10.  The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the State of Delaware and the laws of the United States, as provided in the Plan.  For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this grant or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

11. In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding the Award.  Any prior agreements, commitments or negotiations concerning the Award are superseded.  Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

12. This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable.  Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

13. Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable for legal or administrative reasons and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

14. Nothing in this Agreement shall interfere with or limit in any way the right of Bank of America or your employer to terminate your employment at any time, nor confer upon you any right to continue in the employment of Bank of America or its Subsidiaries.  For purposes of this Agreement, a transfer of your employment between Bank of America and a Subsidiary, or between Subsidiaries, shall not be deemed to be a Termination of Employment.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer effective as of the date of grant listed in your Award Statement.

BANK OF AMERICA CORPORATION
By:

Cheri Lytle
Human Resources Executive
Merrill Lynch Wealth Management
Bank of America Corporation

**Exhibit A**

WEALTHCHOICE CONTINGENT AWARD PLAN

PAYMENT OF AWARD

(a)    PAYMENT SCHEDULE.  Subject to the provisions of paragraphs (b), (c) and (d) below, the Account Balance representing your Award will become earned and payable on February 14, 2022 if you remain employed with Bank of America and its Subsidiaries through that date.  Once the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made through payroll as soon as administratively practicable.  Bank of America, in its sole discretion, will select an appropriate exchange rate for converting the payment into local currency.

(b)    IMPACT OF TERMINATION OF EMPLOYMENT ON AWARD.  If your employment with Bank of America and its Subsidiaries terminates prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for termination as follows.

    (i)    Death. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your termination is due to death. Payment will be made as soon as administratively practicable.

    (ii)    Workforce Reduction, Divestiture or Disability.  If your employment is terminated by your employer due to Disability, Workforce Reduction or Divestiture, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (d) below; provided, however, that if you are eligible for Retirement at the time of your Termination of Employment due to Disability, Workforce Reduction or Divestiture, the Account Balance will become earned and payable in accordance with paragraph (c)(i).

    (iii)    Termination by your Employer with Cause.  If your employment is terminated by your employer with Cause, the Account Balance shall be canceled as of your employment termination date.

    (iv)    Change in Control.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) your employment is terminated without Cause or (2) you terminate your employment with Bank of America or its Subsidiaries for Good Reason, then the Account Balance shall become immediately earned as of the date of such termination and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (d) below.

(v)    <u>All Other Terminations</u>.  Unless you are eligible for Retirement or have attained the Rule of 65 as described below, in the case of All Other Terminations, the Account Balance shall be canceled as of your employment termination date.

(vi)    <u>Possible Variations to Payment Date</u>.  Notwithstanding the provisions set forth above, in the event of Termination of Employment, Bank of America may, in its sole discretion, accelerate payment of all or a portion of the unearned Account Balance to the date of Termination of Employment (if the unearned Account Balance is not canceled as of such date) to facilitate compliance with local law and/or administrative considerations; provided, however, that if you are subject to U.S. Internal Revenue Code Section 409A, payment of the Account Balance may be accelerated, and payment may be made, only to the extent necessary to pay federal, state, local or foreign tax obligations arising from the Award that apply to an amount before the amount is paid or made available to you.  Also, the payment of an Account Balance that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)    <u>IMPACT OF RETIREMENT AND RULE OF 65 ON AWARD</u>.

(i)    <u>Retirement</u>.  If your employment terminates for any reason other than death, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you are eligible for Retirement, then the Account Balance will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which your Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year, subject to the requirements of paragraph (c)(iii).

(ii)    <u>Rule of 65</u>.  If your employment terminates for any reason other than death, Disability, Workforce Reduction, Divestiture, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you have attained the Rule of 65, then the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to the requirements of paragraph (c)(iii).

(iii)    <u>Competition and Covenants</u>.  The Account Balance will continue to become earned and payable following your Termination of Employment due to Retirement as provided in paragraph (c)(i) or attainment of the Rule of 65 as provided in paragraph (c)(ii) only if (A) to the extent permissible under applicable law, you do not engage in Competition during such period, (B) you comply with the covenants described in paragraph (d)

below and (C) prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (A) above is applicable. To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time. If Bank of America determines in its reasonable business judgment that you have failed to satisfy any of the requirements of this paragraph (c)(iii), then the Account Balance representing your Award shall be immediately canceled as of the date of such determination. In addition, from time to time following your Termination of Employment after you are eligible for Retirement or have attained the Rule of 65, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California, (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, or (3) your employment is terminated by your employer due to Disability, Workforce Reduction or Divestiture when you are eligible for Retirement, the Competition restriction described in (A) above and the certification requirement described in (C) above will not apply to this Award.

(d)    COVENANTS.

(i)    Non-Solicitation. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an employee of Bank of America or its Subsidiaries and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America or its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

(ii)    Detrimental Conduct. You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

(iii)  <u>Remedies</u>.  Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that at all times prior to payment, you do not engage in solicitation or Detrimental Conduct, as described in paragraphs (d)(i) and (ii), during such period.  If Bank of America determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.

(e)  <u>DEFINITIONS</u>.  For purposes hereof, the following terms shall have the following meanings:

<u>All Other Terminations</u> means any Termination of Employment with Bank of America and its Subsidiaries prior to your having attained Retirement or the Rule of 65, whether initiated by you or your employer, other than (i) a termination due to your death or Disability, (ii) a termination in connection with a Workforce Reduction or Divestiture, (iii) a termination by your employer with Cause and (iv) a termination in connection with a Change in Control as described in paragraph (b)(iv) above.

<u>Cause</u> shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a termination of your employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to your employment with Bank of America or any of its Subsidiaries including, but not limited to, the Bank of America Corporation Code of Conduct and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or have committed any other material violation of Bank of America's written policy regarding Confidential and Proprietary Information.

<u>Change in Control</u> shall be defined as that term is defined in the Bank of America Corporation 2003 Key Associate Stock Plan.

<u>Competition</u> means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity

that is designated as a "Competitive Business" as of the date of your Termination of Employment.

Detrimental Conduct means your serious misconduct or unethical behavior, including any one of the following: (i) any conduct that would constitute Cause; (ii) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment, or other improper or intentional conduct causing reputational harm to Bank of America, its Subsidiaries, or a client of Bank of America or its Subsidiaries; (iii) the breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (iv) intentional violation, or grossly negligent disregard, of Bank of America's or its Subsidiaries' policies, rules and procedures, specifically including, but not limited to any of your obligations under the Bank of America Corporation Code of Conduct and workplace policies; or (v) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

Disability means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

Divestiture means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

Good Reason means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

Good Reason Process means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days

following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you terminate your employment for Good Reason within sixty (60) days after the end of the Cure Period.  If Bank of America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you terminate your employment with Bank of America and its Subsidiaries due to such condition (notwithstanding its cure), then you will not be deemed to have terminated your employment for Good Reason.

<u>Retirement</u> means that your employment terminates other than with Cause (i) on or after you have attained your sixty-fifth (65th) birthday or (ii) when you cease employment on or after your fifty-fifth (55th) birthday and you have completed at least ten (10) Years of Service, including approved leaves of absence of one (1) year or less.

<u>Rule of 65</u> means that your employment terminates other than with Cause on or after (i) you have completed at least twenty (20) Years of Service with your employer, including approved leaves of absence of one (1) year or less, (ii) your combined Years of Service with your employer and your age equals at least sixty-five (65) and (iii) you are not Retirement eligible.

<u>Workforce Reduction</u> means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program), or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the termination is as a result of such action.  Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America.  In the event you fail to execute all required documents in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of the Account Balance representing your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

2013PY WealthChoice Award Agreement (LTCA 8YR Cliff)
Case 3:24-cv-00440-KDB-DCK   Document 41-10   Filed 09/30/24   Page 12 of 16 MERRILL_00723

JA197

<strong>Exhibit B</strong>

## BANK OF AMERICA CORPORATION
## WEALTHCHOICE AWARDS

### Special Provisions for WealthChoice Awards in Countries Outside the U.S.

This Exhibit B contains the terms that govern your WealthChoice Award, including any WealthChoice Award granted as part of the long-term contingent award, WealthChoice Strategic Growth Award and/or WealthChoice Strategic Premium Award, if you are an employee of Bank of America or one of its Subsidiaries outside of the U.S. Capitalized terms used but not defined herein shall have the same meanings assigned to them in the Agreement.

This Exhibit B also includes certain country-specific disclosures that may be applicable to you if you work or reside in one of the countries listed herein. These disclosures are based on the securities exchange control and other laws in effect in the respective countries as of December 2013. Such laws are often complex and change frequently. As a result, Bank of America strongly recommends that you not rely on the information in this Exhibit B as the only source of information relating to the consequences of receiving an Award because the information may be out of date at the time the Award becomes earned and payable or at any later date indicated herein.

If you are a citizen or resident of a country other than the one in which you are currently working, are considered a citizen or resident of another country for local law purposes or transfer employment or residency to another country after the Award is granted to you, Bank of America shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you.

### General terms applicable to WealthChoice Awards granted to employees in any country outside of the U.S.

### Data Privacy

*By accepting the Award, you hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer and Bank of America and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Award.*

*You understand that Bank of America and your employer hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor ("Data"), for the purpose of implementing, administering and managing the Award. You understand that Data may be transferred to any third parties assisting in the implementation, administration and management of the Award, that these recipients may be located in your country or elsewhere, and that the recipient's country may have different data privacy laws and*

*protections from your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage the Award. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing your local human resources representative. Further, you understand that you are providing the consents herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service and career with your employer will not be adversely affected; the only adverse consequence of refusing or withdrawing your consent is that Bank of America would not be able to grant you future awards or administer or maintain such awards. Therefore, you understand that refusing or withdrawing your consent may affect your ability to benefit from the Award. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

**Nature of Grant**

By entering into this Agreement and accepting the grant of the Award evidenced hereby, you acknowledge, understand and agree that:

(a)   the Award is granted voluntarily by Bank of America, is discretionary in nature and may be modified, suspended or terminated by Bank of America at any time;

(b)   the grant of the Award is voluntary and occasional and does not create any contractual or other right to receive future awards or benefits in lieu of awards even if such awards have been awarded repeatedly in the past;

(c)   all decisions with respect to future awards, if any, will be at the sole discretion of Bank of America;

(d)   the grant of the Award shall not create a right to further employment with your employer and shall not interfere with the ability of your employer to terminate your employment relationship at any time, with or without Cause;

(e)   you are voluntarily accepting the grant of the Award;

(f)   the future value of the benchmark return options and your Account Balance is unknown and cannot be predicted with certainty.

(g)   the Award and any cash payment made pursuant to the Award are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement benefits or welfare benefits or similar payments, and in no event should be considered as compensation for, or in any way relating to, past services for Bank of America or any of its Subsidiaries;

(h)    in the event that you are not an employee of Bank of America, the Award will not be interpreted to form an employment contract or relationship with Bank of America; furthermore, the Award will not be interpreted to form an employment contract with any Subsidiary;

(i)    no claim or entitlement to compensation or damages shall arise from forfeiture of the Award resulting from violation of a covenant set forth in Exhibit A, termination of your employment by Bank of America or your employer (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) or recoupment of all or any portion of any payment made pursuant to the Award, and in consideration of the grant of the Award, to which you are not otherwise entitled, you irrevocably agree never to institute any claim against Bank of America or your employer, waive your ability, if any, to bring any such claim and release Bank of America and your employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed not to pursue such claim, and you agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(j)    for purposes of the Award, your employment will be considered terminated as of the date you are no longer actively employed and providing services to Bank of America or one of its Subsidiaries, and your right, if any, to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by the date you cease to be actively employed and will not be extended by any notice period mandated under local law (e.g., active employment would not include a period of "garden leave" or similar period pursuant to local law); Bank of America, in its sole discretion, shall determine when you are no longer actively employed for purposes of the Award (including whether you may still be considered actively employed while on an approved leave of absence);

(k)    unless otherwise provided in this Exhibit B, you are solely responsible for investigating and complying with any exchange control laws applicable to you in connection with the Award and any payment made pursuant to the Award;

(l)    unless otherwise provided by Bank of America in its discretion, the Award and the benefits evidenced by this Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting Bank of America;

(m)    neither your employer, Bank of America or any of its Subsidiaries shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the Award or any payment made pursuant to the Award; and

(n)    Bank of America and your employer are not providing any tax, legal, financial or investment   advice, nor making any recommendations regarding participation in the Plan.  You acknowledge that you have the necessary knowledge and experience to understand how the

Award and the Plan work, as well as any risks that may be related to the Plan and the Award and any notional or benchmark investment decisions that you may make in connection with the Plan or the Award. You are advised to consult with your personal tax, legal and financial advisors regarding participation in the Plan.

**Language**

If you have received this Agreement or any other document related to the Award translated into a language other than English and if the meaning of the translated version differs from the English version, the English version shall control.

**Country-specific terms and disclosures applicable to WealthChoice Awards granted to employees outside of the U.S.**

**France**

*En cliquant sur le bouton «J'accepte» ou en signant et renvoyant le présent document décrivant les termes et conditions de votre attribution, vous confirmez ainsi avoir lu et compris les documents relatifs à cette attribution (ce Contrat d'Attribution) qui vous ont été communiqués en langue anglaise. Vous en acceptez les termes en connaissance de cause.*

By clicking on the "I accept" button or by signing and returning this document providing for the terms and conditions of your grant, you confirm having read and understood the documents relating to this grant (the Agreement) which were provided to you in the English language. You accept the terms of those documents accordingly.

**Hong Kong**

*WARNING: The Award does not constitute a public offering of securities under Hong Kong law and is available only to employees of Bank of America or its Subsidiaries. The Agreement, including this Exhibit B, and any other incidental communication materials distributed in connection with the Award (i) have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, (ii) have not been reviewed by any regulatory authority in Hong Kong, and (iii) are intended only for the personal use of each eligible employee of your employer, Bank of America or its Subsidiaries and may not be distributed to any other person. If you have any questions regarding the contents of the Agreement, including this Exhibit B, or any other incidental communication materials distributed in connection with the Award, you should obtain independent professional advice.*

Bank of America specifically intends that the program under which the Award was granted will not be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance.

**India**

There are no special provisions.

**Ireland**

There are no special provisions.

**Italy**

By your acceptance of the Agreement, you acknowledge that you have read and specifically and expressly approve the following clauses of the Agreement (including Exhibit A and this Exhibit B):  (a) the provision regarding your acknowledgement that you have read and understand the provisions of the Agreement; (b) the provision regarding Tax-Related Items; (c) the provision regarding Delaware law governing the Agreement; (d) the provision regarding the enforceability of provisions in the Agreement; (e) the provision regarding the voluntary and discretionary nature of the program under which the Award was granted, which also contains information regarding the nature of the Award and how the benefits provided under the Agreement are not part of local salary/compensation for any reason; (f) the provision regarding your personal data in conjunction with administration of the Award; (g) the provision regarding the English version of the Agreement governing; (h) the provisions regarding the possible imposition of additional terms/conditions for the Award and specifically, the country-specific provisions for Italy in this Exhibit B; (i) the provision regarding the payment schedule for the Award; and (j) the provisions regarding the impact of termination of employment on the Award.

The following three paragraphs replace in its entirety the data privacy provision contained in this Exhibit B:

*You understand that your employer and/or Bank of America may hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social security number (or any other social or national identification number), salary, nationality, job title, number of shares of Bank of America common stock held and the details of all entitlements to Bank of America shares and other awards, including this Award, awarded, cancelled, exercised, vested, unvested or outstanding (the "Data") for the purposes of implementing, administering and managing the Award.  You are aware that providing Bank of America with your Data is necessary for the performance of the Agreement and that your refusal to provide such Data would make it impossible for Bank of America to perform its contractual obligations and may affect your ability to receive and retain the Award.*

*The Controller of personal data processing is Bank of America Corporation, 100 North Tryon Street, Charlotte, NC, 28255, U.S.A.; its representative in Italy is Bank of America, N.A. Milan Branch, with registered offices at 5th Floor, Corso Matteotti 10, 20121 Milan Italy. You understand that the Data may be transferred to Bank of America or any of its Subsidiaries, or to any third parties assisting in the implementation, administration and management of the Award, including any transfer required to a broker or other third party with whom cash paid pursuant to the Award may be deposited.  Furthermore, the recipients that may receive, possess, use, retain and transfer such Data for the above mentioned purposes may be located in Italy or elsewhere, including outside of the European Union and that the recipient's country (e.g., the United States) may have different data privacy laws and protections from your country.  The processing activity, including the transfer of your*

*personal data abroad, outside of the European Union, as herein specified and pursuant to applicable laws and regulations, does not require your consent thereto as the processing is necessary for the performance of contractual obligations related to the implementation, administration and management of the Award.  You understand that Data processing relating to the purposes above specified shall take place under automated or non-automated conditions, anonymously when possible, that comply with the purposes for which Data are collected and with confidentiality and security provisions as set forth by applicable laws and regulations, with specific reference to D.lgs. 196/2003.*

*You understand that Data will be held only as long as is required by law or as necessary to implement, administer and manage the Award.  You understand that pursuant to art.7 of D.lgs 196/2003, you have the right, including but not limited to, access, delete, update, request the rectification of your Data and cease, for legitimate reasons, the Data processing. Furthermore, you are aware that your Data will not be used for direct marketing purposes.  In addition, the Data provided can be reviewed and questions or complaints can be addressed by contacting a local representative available at the following address: Bank of America, N.A. Milan Branch, 5th Floor, Corso Matteotti 10, 20121 Milan Italy.*

## Jersey

There are no special provisions.

## Netherlands

There are no special provisions.

## Singapore

There are no special provisions.

## United Kingdom

The following paragraphs supplement the provision regarding Tax-Related Items contained in the Agreement:

Any sum withheld on an estimated basis shall be repaid to you to the extent that such sum was not applied in satisfaction of the actual tax liabilities arising.

If payment or withholding of the income tax due is not made within 90 days of the event giving rise to the income tax liability or such other period specified in Section 222(1)(c) of the United Kingdom Income Tax (Earnings and Pensions) Act 2003 (the "Due Date"), the amount of any uncollected income tax will constitute a loan owed by you to your employer, effective on the Due Date.  You agree that the loan will bear interest at the then-current Official Rate of Her Majesty's Revenue and Customs ("HMRC"), it will be immediately due and repayable, and Bank of America or your employer may recover it at any time thereafter by any of the means referred to in the Agreement.  Notwithstanding the foregoing, if you are a director or executive officer of Bank of America (within the meaning of Section 13(k) of the U.S. Securities and Exchange Act of 1934, as amended), you will not be eligible for such a loan to cover the income

tax due.  In the event that you are a director or executive officer and the income tax is not collected from or paid by you by the Due Date, the amount of any uncollected income tax may constitute a benefit to you on which additional income tax and National Insurance Contributions may be payable.  You will be responsible for reporting and paying any income tax due on this additional benefit directly to HMRC under the self-assessment regime and for paying Bank of America or your employer, as applicable, for the value of any employee National Insurance Contributions due on this additional benefit.

# EXHIBIT O

# WealthChoice Contingent Award Plan
# Award Agreement

This document contains your WealthChoice Award Agreement (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

---

**What you need to do**

1. Review the Award Agreement to ensure you understand its provisions.  With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and the Plan and file them with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. More detailed information about competitive businesses can be found on Flagscape® under HR, Benefits & Career / Compensation & Benefits / Pay / Cash & Stock Awards to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

---

\* If you do not accept your Award Agreement through the online acceptance process by November 15, 2015, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf.  If you decline your Award Agreement, your award will be canceled and you will not be entitled to any benefits from the award nor any compensation or benefits in lieu of the canceled award.



## 2014 PERFORMANCE YEAR WEALTHCHOICE AWARD AGREEMENT

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an employee of Bank of America or one of its Subsidiaries.

A copy of the Plan is viewable on the Advisory Division Election System and also is available upon request, and its terms and provisions are incorporated herein by reference. When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Award covered by this Agreement (the "Award") is made to you in connection with your participation in the Plan as part of your long-term contingent award, subject to the following terms and provisions.

1. Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement. The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award. This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2. Notwithstanding any provisions in this Agreement to the contrary, the Award shall be subject to any special terms and conditions applicable to employees based outside the U.S., as set forth in Exhibit B to this Agreement. If you relocate to one of the countries included in Exhibit B, the special terms and conditions for such country will apply to you to the extent that Bank of America determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. Exhibit B constitutes part of this Agreement.

3. You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement, including any special terms and provisions applicable to employees based outside the U.S., as set forth in Exhibit B. IN THE EVENT OF ANY CONFLICT BETWEEN THIS WEALTHCHOICE AWARD AGREEMENT, EXHIBIT A AND EXHIBIT B, THE PROVISIONS OF EXHIBIT B SHALL PREVAIL AND CONTROL THE AWARD.

4. The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

5. To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account

Balance paid to you pursuant to this Agreement. You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to the full value of the Account Balance paid to you pursuant to this Agreement. In addition, this Award is subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder; (ii) similar rules under the laws of any other jurisdiction; and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

6. Subject to applicable laws in your country, you may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. Any beneficiary designation in effect at the time of your Termination of Employment with Bank of America and its Subsidiaries (other than a Termination of Employment due to your death) will remain in effect following your Termination of Employment unless you change your beneficiary designation or it otherwise ceases to be enforceable and/or valid in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. If you do not designate a beneficiary, if your designated beneficiary does not survive you or if the designation is not enforceable and/or valid under the inheritance and other laws in your country (as determined by Bank of America in its sole discretion), then your beneficiary will be your estate.

7. Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an on-line or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time or as otherwise determined appropriate by Bank of America, in its sole discretion, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

8. Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date. Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer. You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

9.  You acknowledge that, regardless of any action taken by Bank of America or your employer, the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Award and legally applicable to you ("Tax-Related Items") is and remains your responsibility and may exceed the amount (if any) withheld by Bank of America or your employer.  You further acknowledge that Bank of America and/or your employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award including the grant and vesting of the Award and the payment of the Account Balance; and (ii) do not commit to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items.  Further, if you have become subject to Tax-Related Items in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items as a result of your participation in the Plan, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements by all legal means, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award.  In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer.  Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any obligations in connection with the Tax-Related Items.

10. The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the State of Delaware and the laws of the United States, as provided in the Plan.  For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this Award or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

11. In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding the Award.  Any prior agreements, commitments or negotiations concerning the Award are superseded.  Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

12. This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable.  Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

13. Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable for legal or administrative reasons and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

14. Nothing in this Agreement shall interfere with or limit in any way the right of Bank of America or your employer to terminate your employment at any time, nor confer upon you any right to continue in the employment of Bank of America or its Subsidiaries.  For purposes of this Agreement, a transfer of your employment between Bank of America and a Subsidiary, or between Subsidiaries, shall not be deemed to be a Termination of Employment.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer effective as of the date of grant listed in your Award Statement.

BANK OF AMERICA CORPORATION
By:

Cheri Lytle
Human Resources Executive
Merrill Lynch Wealth Management
Bank of America Corporation

**Exhibit A**

WEALTHCHOICE CONTINGENT AWARD PLAN

PAYMENT OF AWARD

(a)     PAYMENT SCHEDULE.  Subject to the provisions of paragraphs (b), (c) and (d) below, the Account Balance representing your Award will become earned and payable on February 13, 2023 if you remain employed with Bank of America and its Subsidiaries through that date.  Once the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made through payroll as soon as administratively practicable.  Bank of America, in its sole discretion, will select an appropriate exchange rate for converting the payment into local currency.

(b)     IMPACT OF TERMINATION OF EMPLOYMENT ON AWARD.  In the case of your Termination of Employment prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for your Termination of Employment as follows.

    (i)     Death. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your Termination of Employment is due to your death. Payment will be made as soon as administratively practicable.

    (ii)     Workforce Reduction, Divestiture or Disability.  In the case of your Termination of Employment due to your Disability, Workforce Reduction or Divestiture, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (d) below; provided, however, that if you are eligible for Retirement at the time of your Termination of Employment due to your Disability, Workforce Reduction or Divestiture, the Account Balance will become earned and payable in accordance with paragraph (c)(i).

    (iii)     Termination by your Employer with Cause.  In the case of your Termination of Employment with Cause, the Account Balance shall be canceled as of your Termination of Employment.

    (iv)     Change in Control.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs; and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) you have a Termination of Employment without Cause; or (2) you have a Termination of Employment for Good Reason, then the Account Balance shall become immediately earned as of the date of such Termination of Employment and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (d) below.

(v)     All Other Terminations.  Unless you are eligible for Retirement or have attained the Rule of 65 as described below, in the case of All Other Terminations, the Account Balance shall be canceled as of your Termination of Employment.

(vi)    Possible Variations to Payment Date.  Notwithstanding anything in the provisions set forth above to the contrary, in the event of Termination of Employment, Bank of America may, in its sole discretion, accelerate payment of all or a portion of the unearned Account Balance to the date of Termination of Employment (if the unearned Account Balance is not canceled as of such date) to facilitate compliance with local law and/or administrative considerations; provided, however, that if you are subject to U.S. Internal Revenue Code Section 409A, payment of the Account Balance may be accelerated, and payment may be made, only to the extent necessary to pay federal, state, local or foreign tax obligations arising from the Award that apply to an amount before the amount is paid or made available to you.  Also, the payment of an Account Balance that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)     IMPACT OF RETIREMENT AND RULE OF 65 ON AWARD.

(i)     Retirement.  In the case of your Termination of Employment for any reason other than your death, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you are eligible for Retirement, then the Account Balance will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which your Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year, subject to the requirements of paragraph (c)(iii).

(ii)    Rule of 65.  In the case of your Termination of Employment for any reason other than your death, your Disability, Workforce Reduction, Divestiture, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you have attained the Rule of 65, then the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to the requirements of paragraph (c)(iii).

(iii)   Competition and Covenants.  The Account Balance will continue to become earned and payable following your Termination of Employment due to Retirement as provided in paragraph (c)(i) or attainment of the Rule of 65 as provided in paragraph (c)(ii) only if (A) to the extent permissible under applicable law, you do not engage in Competition during such period; (B) you comply with the covenants described in paragraph (d)

below; and (C) prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (A) above is applicable. To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time. If Bank of America determines in its reasonable business judgment that you have failed to satisfy any of the requirements of this paragraph (c)(iii), then the Account Balance representing your Award shall be immediately canceled as of the date of such determination. In addition, from time to time following your Termination of Employment after you are eligible for Retirement or have attained the Rule of 65, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California; (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California; or (3) you have a Termination of Employment due to your Disability, Workforce Reduction or Divestiture when you are eligible for Retirement, the Competition restriction described in (A) above and the certification requirement described in (C) above will not apply to this Award.

(d)     <u>COVENANTS</u>.

(i)     <u>Non-Solicitation</u>. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an employee of Bank of America or its Subsidiaries; and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America or its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California; or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

(ii)     <u>Detrimental Conduct</u>. You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

(iii)   <u>Remedies</u>.  Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that at all times prior to payment, you do not engage in solicitation or Detrimental Conduct, as described in paragraphs (d)(i) and (ii), during such period.  If Bank of America determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.

(e)   <u>DEFINITIONS</u>.  For purposes hereof, the following terms shall have the following meanings:

<u>All Other Terminations</u> means any Termination of Employment with Bank of America and its Subsidiaries prior to your having attained Retirement or the Rule of 65, whether initiated by you or your employer, other than (i) a Termination of Employment due to your death or your Disability; (ii) a Termination of Employment in connection with a Workforce Reduction or Divestiture; (iii) a Termination of Employment with Cause; and (iv) a Termination of Employment in connection with a Change in Control as described in paragraph (b)(iv) above.

<u>Cause</u> shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a Termination of Employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to your employment with Bank of America or any of its Subsidiaries including, but not limited to, the Bank of America Corporation Code of Conduct and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or have committed any other material violation of Bank of America's written policy regarding Confidential and Proprietary Information.

<u>Change in Control</u> shall be defined as that term is defined in the Bank of America Corporation 2003 Key Associate Stock Plan.

<u>Competition</u> means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity

that is designated as a "Competitive Business" as of the date of your Termination of Employment.

Detrimental Conduct means your serious misconduct or unethical behavior, including any one of the following: (i) any conduct that would constitute Cause; (ii) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment, or other improper or intentional conduct causing reputational harm to Bank of America, its Subsidiaries, or a client of Bank of America or its Subsidiaries; (iii) the breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (iv) intentional violation, or grossly negligent disregard, of Bank of America's or its Subsidiaries' policies, rules and procedures, specifically including, but not limited to any of your obligations under the Bank of America Corporation Code of Conduct and workplace policies; or (v) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

Disability means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

Divestiture means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

Good Reason means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

Good Reason Process means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days

following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you have a Termination of Employment for Good Reason within sixty (60) days after the end of the Cure Period. If Bank of America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you have a Termination of Employment due to such condition (notwithstanding its cure), then you will not be deemed to have a Termination of Employment for Good Reason.

Retirement means that you have a Termination of Employment other than with Cause (i) on or after you have attained your sixty-fifth (65th) birthday; or (ii) when you cease employment on or after your fifty-fifth (55th) birthday and you have completed at least ten (10) Years of Service, including approved leaves of absence of one (1) year or less.

Rule of 65 means that you have a Termination of Employment other than with Cause on or after (i) you have completed at least twenty (20) Years of Service with your employer, including approved leaves of absence of one (1) year or less; (ii) your combined Years of Service with your employer and your age equals at least sixty-five (65); and (iii) you are not Retirement eligible.

Workforce Reduction means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program); or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the Termination of Employment is as a result of such action. Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America. In the event you fail to execute all required documents in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of the Account Balance representing your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

**Exhibit B**

## BANK OF AMERICA CORPORATION
## WEALTHCHOICE AWARDS

### Special Provisions for WealthChoice Awards in Countries Outside the U.S.

This Exhibit B contains additional (or, if so indicated, different) terms and conditions that govern your WealthChoice Award, including any WealthChoice Award granted as part of the long-term contingent award, WealthChoice Strategic Growth Award and/or WealthChoice Strategic Premium Award, if you are an employee of Bank of America or one of its Subsidiaries outside of the U.S. Capitalized terms used but not defined herein shall have the same meanings assigned to them in the Agreement.

This Exhibit B also includes certain country-specific disclosures that may be applicable to you if you work or reside in one of the countries listed herein. These disclosures are based on the securities exchange control and other laws in effect in the respective countries as of December 2014. Such laws are often complex and change frequently. As a result, Bank of America strongly recommends that you not rely on the information in this Exhibit B as the only source of information relating to the consequences of receiving an Award because the information may be out of date at the time the Award becomes earned and payable or at any later date indicated herein.

If you are a citizen or resident of a country other than the one in which you are currently working, are considered a citizen or resident of another country for local law purposes or transfer employment or residency to another country after the Award is granted to you, Bank of America shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you.

### General terms applicable to WealthChoice Awards granted to employees in any country outside of the U.S.

**Data Privacy**

*By accepting the Award, you hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer and Bank of America and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Award.*

*You understand that Bank of America and your employer hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor ("Data"), for the purpose of implementing, administering and managing the Award. You understand that Data may be transferred to any third parties assisting in the implementation,*

*administration and management of the Award, that these recipients may be located in your country or elsewhere, and that the recipient's country may have different data privacy laws and protections from your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage the Award. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing your local human resources representative. Further, you understand that you are providing the consents herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service and career with your employer will not be adversely affected; the only consequence of refusing or withdrawing your consent is that Bank of America would not be able to grant you future awards or administer or maintain such awards. Therefore, you understand that refusing or withdrawing your consent may affect your ability to benefit from the Award. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

**Nature of Grant**

By entering into this Agreement and accepting the grant of the Award evidenced hereby, you acknowledge, understand and agree that:

(a)    the Award is granted voluntarily by Bank of America, is discretionary in nature and may be modified, suspended or terminated by Bank of America at any time;

(b)    the grant of the Award is voluntary and occasional and does not create any contractual or other right to receive future awards or benefits in lieu of awards even if such awards have been awarded repeatedly in the past;

(c)    all decisions with respect to future awards, if any, will be at the sole discretion of Bank of America;

(d)    the grant of the Award shall not create a right to further employment with your employer and shall not interfere with the ability of your employer to terminate your employment relationship at any time, with or without Cause;

(e)    you are voluntarily accepting the grant of the Award;

(f)    the future value of the benchmark return options and your Account Balance is unknown and cannot be predicted with certainty.

(g)    the Award and any cash payment made pursuant to the Award are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement benefits or welfare benefits or similar payments, and

2014PY WealthChoice Award Agreement (LTCA 8YR Cliff)
Case 3:24-cv-00440-KDB-DCK    Document 41-11    Filed 09/30/24    Page 14 of 20    ME_1_DOC_200743

JA218

in no event should be considered as compensation for, or in any way relating to, past services for Bank of America or any of its Subsidiaries;

(h)    in the event that you are not an employee of Bank of America, the Award will not be interpreted to form an employment contract or relationship with Bank of America; furthermore, the Award will not be interpreted to form an employment contract with any Subsidiary;

(i)    no claim or entitlement to compensation or damages shall arise from (A) forfeiture of the Award resulting from violation of a covenant set forth in Exhibit A or the application of the malus provisions contained in this Exhibit B, or termination of your employment by Bank of America or your employer (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) or (B) recoupment of all or any portion of any payment made pursuant to the Award under any provision of the Agreement (including any provision in Exhibits A or B) and, in consideration of the grant of the Award to which you are not otherwise entitled, you irrevocably agree never to institute any claim against Bank of America or your employer, waive your ability, if any, to bring any such claim and release Bank of America and your employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed not to pursue such claim, and you agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(j)    for purposes of the Award, your employment will be considered terminated as of the date you are no longer actively employed and providing services to Bank of America or one of its Subsidiaries, and your right, if any, to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by the date you cease to be actively employed and will not be extended by any notice period mandated under local law (*e.g.*, active employment would not include a period of "garden leave" or similar period pursuant to local law); Bank of America, in its sole discretion, shall determine when you are no longer actively employed for purposes of the Award (including whether you may still be considered actively employed while on an approved leave of absence);

(k)    unless otherwise provided in this Exhibit B, you are solely responsible for investigating and complying with any exchange control laws applicable to you in connection with the Award and any payment made pursuant to the Award;

(l)    unless otherwise provided by Bank of America in its discretion, the Award and the benefits evidenced by this Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting Bank of America;

(m)    neither your employer, Bank of America or any of its Subsidiaries shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the Award or any payment made pursuant to the Award; and

2014PY WealthChoice Award Agreement (LTCA 8YR Cliff)
Case 3:24-cv-00440-KDB-DCK    Document 41-11    Filed 09/30/24    Page 15 of 20    M BOFA 00744

JA219

(n)   Bank of America and your employer are not providing any tax, legal, financial or investment advice, nor making any recommendations regarding participation in the Plan. You acknowledge that you have the necessary knowledge and experience to understand how the Award and the Plan work, as well as any risks that may be related to the Plan and the Award and any notional or benchmark investment decisions that you may make in connection with the Plan or the Award. You should consult with your personal tax, legal and financial advisors regarding participation in the Plan.

## Language

If you have received this Agreement or any other document related to the Award translated into a language other than English and if the meaning of the translated version differs from the English version, the English version shall control.

## <u>Terms applicable to the WealthChoice Awards granted to employees in any European Economic Area ("EEA") country</u>

### *General*

In addition to and without limitation to any recoupment provisions or covenants included in the Agreement and any country-specific terms set forth below, the Award is subject to the requirements of the European Union Capital Requirements Directive IV ("CRD IV"), as implemented into local law, local regulations or remuneration codes in your country (together "Local Regulations") or, if not yet implemented into Local Regulations, as adopted by the European Commission.

Further, payment of the Award is subject to the conditions that (a) you do not breach the standards expected of you pursuant to Local Regulations, including, in particular, that you do not participate in and are not responsible for conduct which results in significant losses for Bank of America or its Subsidiaries and that you meet appropriate standards of fitness and propriety, (b) circumstances do not arise which require that your Award must be forfeited or repaid, in whole or in part, pursuant to the requirements of CRD IV and Local Regulations, as from time to time applicable, (c) payment of the Award is sustainable according to the financial situation of Bank of America and justified on the basis of the performance of Bank of America and your business unit and (d) payment of the Award is justified on the basis of your performance.

### *Malus*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, reduce in whole or in part the amount of cash subject to the Award at or before the payment of the Award if (a) Bank of America determines, in its sole discretion, that you are or were within the categories of staff described in Article 92(2) of CRD IV or that Local Regulations, as from time to time applicable, require these provisions to apply to you and (b) there is a breach of the requirements or conditions set out above or, without limitation to the above, (i) you have participated in or were responsible for conduct which resulted in significant losses for Bank of America or its Subsidiaries, or (ii) you have failed to meet appropriate standards of fitness and propriety, as determined by Bank of America in its sole discretion.

*Clawback*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, require you to repay some or all of the cash paid to you pursuant to this Agreement if (a) Bank of America determines, in its sole discretion, that you are or were within the categories of staff described in Article 92(2) of CRD IV or that Local Regulations, as from time to time applicable, require these provisions to apply to you and (b) there is a breach of the requirements or conditions set out above or, without limitation to the above, (i) you have participated in or were responsible for conduct which resulted in significant losses for Bank of America or its Subsidiaries, or (ii) you have failed to meet appropriate standards of fitness and propriety, as determined by Bank of America in its sole discretion.

Bank of America will determine, in its sole discretion, the appropriate amount required to be reduced or repaid, as applicable, as well as the terms on which and the process by which you must repay any amount pursuant to this provision.  Without limitation to the foregoing, Bank of America may determine, in its sole discretion, that any cash amount to be repaid will be deducted from your salary or from any other payment to be made to you by Bank of America or one of its Subsidiaries.

## Country-specific terms and disclosures applicable to WealthChoice Awards granted to employees outside of the U.S.

### Australia

There are no special provisions.

### Brazil

By accepting the Award, you agree to comply with all applicable Brazilian laws and report and pay any and all applicable taxes associated with the receipt of the Award and any cash payment made pursuant to the Award.

If you are resident or domiciled in Brazil, you will be required to submit an annual declaration of assets and rights held outside of Brazil to the Central Bank of Brazil if the aggregate value of such assets and rights is equal to or greater than US$100,000.  Assets and rights that must be reported include bank deposits.

### Canada

The following paragraph replaces the termination of employment paragraph of the Nature of Grant provision contained in this Exhibit B:

For purposes of the Award, your employment will be considered terminated as of, and your right (if any) to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (regardless of the reason for such termination and whether or not later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by, the date that is the earliest of:  (a) the date your employment with Bank of America and its Subsidiaries is

2014PY WealthChoice Award Agreement (LTCA 8YR Cliff)
Case 3:24-cv-00440-KDB-DCK   Document 41-11   Filed 09/30/24   Page 17 of 20   ML_TDOC_200746

JA221

terminated, (b) the date you receive written notice of termination from Bank of America or your employer, regardless of any notice period or period of pay in lieu of such notice mandated under the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any; and (c) the date you are no longer actively employed by or actively providing services to Bank of America or any of its Subsidiaries; Bank of America, in its sole discretion, shall determine when you are no longer actively employed or providing services for purposes of the Award (including whether you may still be considered actively employed or actively providing services while on an approved leave of absence).

In the event payment of the Award is made into a U.S. brokerage account, you should be aware that if the cost of your foreign property exceeds C\$100,000 at any time during the year, you must report all of your foreign property on Form T1135 by April 30th of the following year.  You should consult with a personal tax advisor to ensure that you are properly complying with applicable reporting requirements.

*The following provisions are applicable to employees in Quebec:*

The following paragraph supplements the data privacy provision contained in this Exhibit B:

You hereby authorize Bank of America and Bank of America's representatives to discuss with and obtain all relevant information from all personnel, professional or not, involved in the administration and operation of the Award.  You further authorize Bank of America, its Subsidiaries and the administrator of the Award to disclose and discuss the Award with their advisors.  You further authorize Bank of America and its Subsidiaries to record such information and to keep such information in your employee file.

Consent to Receive Information in English for Employees in Quebec

The parties acknowledge that it is their express wish that the Agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

*Les parties reconnaissent avoir exigé la rédaction en anglais de la convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, directement ou indirectement, relativement à ou suite à la présente convention.*

**Hong Kong**

*WARNING: The Award does not constitute a public offering of securities under Hong Kong law and is available only to employees of Bank of America or its Subsidiaries.  The Agreement, including this Exhibit B, and any other incidental communication materials distributed in connection with the Award (i) have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, (ii)  have not been reviewed by any regulatory authority in Hong Kong, and (iii) are intended only for the personal use of each eligible employee of your employer, Bank of America or its Subsidiaries and may not be distributed to any other person.  If you have any questions regarding the contents of the Agreement, including this Exhibit B, or any other incidental communication materials distributed in connection with the Award, you should*

*obtain independent professional advice.*

Bank of America specifically intends that the program under which the Award was granted will not be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance.

## India

There are no special provisions.

## Japan

There are no special provisions.

## Singapore

There are no special provisions.

## United Kingdom

The following paragraphs supplement the provision regarding Tax-Related Items contained in the Agreement:

Any sum withheld on an estimated basis shall be repaid to you to the extent that such sum was not applied in satisfaction of the actual tax liabilities arising.

If payment or withholding of the income tax due is not made within 90 days after the end of the tax year in which the income tax liability arises, or such other period specified in Section 222(1)(c) of the United Kingdom Income Tax (Earnings and Pensions) Act 2003 (the "Due Date"), the amount of any uncollected income tax will constitute a loan owed by you to your employer, effective on the Due Date. You agree that the loan will bear interest at the then-current Official Rate of Her Majesty's Revenue and Customs ("HMRC"), it will be immediately due and repayable, and Bank of America or your employer may recover it at any time thereafter by any of the means referred to in the Agreement. Notwithstanding the foregoing, if you are a director or executive officer of Bank of America (within the meaning of Section 13(k) of the U.S. Securities Exchange Act of 1934, as amended), you will not be eligible for such a loan to cover the income tax due. In the event that you are a director or executive officer and the income tax is not collected from or paid by you by the Due Date, the amount of any uncollected income tax may constitute a benefit to you on which additional income tax and National Insurance Contributions may be payable. You will be responsible for reporting and paying any income tax due on this additional benefit directly to HMRC under the self-assessment regime and for paying Bank of America or your employer, as applicable, for the value of any employee National Insurance Contributions due on this additional benefit.

The following paragraphs are in addition to and without limitation to any recoupment provisions or covenants included in the Agreement and the provision regarding CRD IV in the European Economic Area section of this Exhibit B.

The Award is also subject to the requirements of the Remuneration Codes of the Prudential Regulation Authority and the Financial Conduct Authority (the "Remuneration Codes").

*Malus*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, reduce in whole or in part the amount of cash subject to the Award at or before the payment of the Award if (a) Bank of America determines, in its sole discretion, that the requirements of the Remuneration Codes are applicable to you, and (b)

(i) There is reasonable evidence of misbehavior or material error by you;

(ii) Bank of America and/or its Subsidiaries and/or a business unit suffer a material failure of risk management, taking into account your proximity to the failure of risk management and your level of responsibility; or

(iii) Bank of America and/or its Subsidiaries and/or a business unit suffer a material downturn in their financial performance.

*Clawback*

Bank of America will, unless Bank of America determines that it is inappropriate, require you to repay some or all of the cash paid to you pursuant to this Agreement if during the Clawback Period (a) Bank of America determines, in its sole discretion, that the requirements of the Remuneration Codes are applicable to you, and (b)

(i) There is reasonable evidence of misbehavior or material error by you; or

(ii) Bank of America and/or its Subsidiaries and/or a business unit suffer a material failure of risk management, taking into account your proximity to the failure of risk management and your level of responsibility.

For purposes of this "Clawback" provision, Clawback Period means such period commencing on the date of payment of the Award and ending on the seventh anniversary of the date of grant of the Award.

# EXHIBIT P

# WealthChoice Contingent Award Plan
# Award Agreement

This document contains your WealthChoice Award Agreement (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

---

**What you need to do**

1. Review the Award Agreement to ensure you understand its provisions. With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and the Plan and file them with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. More detailed information about competitive businesses can be found on HR Connect under Money / Pay / Incentive plans & awards / How Performance Plan awards are paid, to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

---

* If you do not accept your Award Agreement through the online acceptance process by November 15, 2016, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf. If you decline your Award Agreement, your award will be canceled and you will not be entitled to any benefits from the award nor any compensation or benefits in lieu of the canceled award.



## 2015 PERFORMANCE YEAR WEALTHCHOICE AWARD AGREEMENT

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an employee of Bank of America or one of its Subsidiaries.

A copy of the Plan is viewable on the Advisory Division Election System and also is available upon request, and its terms and provisions are incorporated herein by reference. When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Award covered by this Agreement (the "Award") is made to you in connection with your participation in the Plan as part of your long-term contingent award, subject to the following terms and provisions.

1. Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement. The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award. This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2. Notwithstanding any provisions in this Agreement to the contrary, the Award shall be subject to any special terms and conditions applicable to employees based outside the U.S., as set forth in Exhibit B to this Agreement. If you relocate to one of the countries included in Exhibit B, the special terms and conditions for such country will apply to you to the extent that Bank of America determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. Exhibit B constitutes part of this Agreement.

3. You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement, including any special terms and provisions applicable to employees based outside the U.S., as set forth in Exhibit B. IN THE EVENT OF ANY CONFLICT BETWEEN THIS WEALTHCHOICE AWARD AGREEMENT, EXHIBIT A AND EXHIBIT B, THE PROVISIONS OF EXHIBIT B SHALL PREVAIL AND CONTROL THE AWARD.

4. The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

5. To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account Balance paid to you pursuant to this Agreement. You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to

the full value of the Account Balance paid to you pursuant to this Agreement.  In addition, this Award is subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder; (ii) similar rules under the laws of any other jurisdiction; and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

6.  Subject to applicable laws in your country, you may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time.  Any beneficiary designation in effect at the time of your Termination of Employment with Bank of America and its Subsidiaries (other than a Termination of Employment due to your death) will remain in effect following your Termination of Employment unless you change your beneficiary designation or it otherwise ceases to be enforceable and/or valid in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time.  If you do not designate a beneficiary, if your designated beneficiary does not survive you or if the designation is not enforceable and/or valid under the inheritance and other laws in your country (as determined by Bank of America in its sole discretion), then your beneficiary will be your estate.

7.  Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means.  You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an on-line or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time or as otherwise determined appropriate by Bank of America, in its sole discretion, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

8.  Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date.  Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer.  You will not own the mutual funds or other options chosen as benchmarks for your Account Balance.  In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

9.  You acknowledge that, regardless of any action taken by Bank of America or your employer, the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Award and legally applicable to you ("Tax-Related Items") is and remains your responsibility and may exceed the amount (if any) withheld by Bank of America or your employer. You further acknowledge that Bank of America and/or your employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award including the grant and vesting of the Award and the payment of the Account Balance; and (ii) do not commit to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items. Further, if you have become subject to Tax-Related Items in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

    In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items as a result of your participation in the Plan, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements by all legal means, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award. In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer. Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any obligations in connection with the Tax-Related Items.

10. The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the State of Delaware and the laws of the United States, as provided in the Plan. For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this Award or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

11. In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding the Award. Any prior agreements, commitments or negotiations concerning the Award are superseded. Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

12. This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable. Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

13. Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable for legal or administrative reasons and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

14. Nothing in this Agreement shall interfere with or limit in any way the right of Bank of America or your employer to terminate your employment at any time, nor confer upon you any right to continue in the employment of Bank of America or its Subsidiaries.  For purposes of this Agreement, a transfer of your employment between Bank of America and a Subsidiary, or between Subsidiaries, shall not be deemed to be a Termination of Employment.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer effective as of the date of grant listed in your Award Statement.

BANK OF AMERICA CORPORATION
By:

Cheri Lytle
Human Resources Executive
Merrill Lynch Wealth Management
Bank of America Corporation

**Exhibit A**

WEALTHCHOICE CONTINGENT AWARD PLAN

PAYMENT OF AWARD

(a)    <u>PAYMENT SCHEDULE</u>.  Subject to the provisions of paragraphs (b), (c) and (d) below, the Account Balance representing your Award will become earned and payable on February 15, 2024 if you remain employed with Bank of America and its Subsidiaries through that date.  Once the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made through payroll as soon as administratively practicable.  Bank of America, in its sole discretion, will select an appropriate exchange rate for converting the payment into local currency.

(b)    <u>IMPACT OF TERMINATION OF EMPLOYMENT ON AWARD</u>.  In the case of your Termination of Employment prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for your Termination of Employment as follows.

    (i)    <u>Death</u>. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your Termination of Employment is due to your death. Payment will be made as soon as administratively practicable.

    (ii)    <u>Workforce Reduction, Divestiture or Disability</u>.  In the case of your Termination of Employment due to your Disability, Workforce Reduction or Divestiture, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (d) below; provided, however, that if you are eligible for Retirement at the time of your Termination of Employment due to your Disability, Workforce Reduction or Divestiture, the Account Balance will become earned and payable in accordance with paragraph (c).

    (iii)    <u>Termination by your Employer with Cause</u>.  In the case of your Termination of Employment with Cause, the Account Balance shall be canceled as of your Termination of Employment.

    (iv)    <u>Change in Control</u>.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs; and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) you have a Termination of Employment without Cause; or (2) you have a Termination of Employment for Good Reason, then the Account Balance shall become immediately earned as of the date of such Termination of Employment and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (d) below.

6          2015PY WealthChoice Award Agreement (LTCA 8YR Cliff)
Case 3:24-cv-00440-KDB-DCK   Document 41-12   Filed 09/30/24   Page 7 of 21
JA231          MILLIGAN000017

      (v)    <u>All Other Terminations</u>.  Unless you are eligible for Retirement as described below, in the case of All Other Terminations, the Account Balance shall be canceled as of your Termination of Employment.

      (vi)    <u>Possible Variations to Payment Date</u>.  Notwithstanding anything in the provisions set forth above to the contrary, in the event of Termination of Employment, Bank of America may, in its sole discretion, accelerate payment of all or a portion of the unearned Account Balance to the date of Termination of Employment (if the unearned Account Balance is not canceled as of such date) to facilitate compliance with local law and/or administrative considerations; provided, however, that if you are subject to U.S. Internal Revenue Code Section 409A, payment of the Account Balance may be accelerated, and payment may be made, only to the extent necessary to pay federal, state, local or foreign tax obligations arising from the Award that apply to an amount before the amount is paid or made available to you.  Also, the payment of an Account Balance that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

    (c)    <u>RETIREMENT</u>.  In the case of your Termination of Employment for any reason other than your death, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you are eligible for Retirement, then the Account Balance will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which your Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year; provided, however, that (i) to the extent permissible under applicable law, you do not engage in Competition during such period; (ii) you comply with the covenants described in paragraph (d) below; and (iii) prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (i) above is applicable.  To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time. If Bank of America determines in its reasonable business judgment that you have failed to satisfy any of the foregoing requirements, then the Account Balance representing your Award shall be immediately canceled as of the date of such determination.  In addition, from time to time following your Termination of Employment after you are eligible for Retirement, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition.  Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California; (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California; or (3) you have a Termination of Employment due to your Disability, Workforce Reduction or Divestiture when you are eligible for Retirement, the Competition restriction described in (i) above and the certification requirement described in (iii) above will not apply to this Award.

(d)    <u>COVENANTS</u>.

    (i)    <u>Non-Solicitation</u>. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an employee of Bank of America or its Subsidiaries; and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America or its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California; or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

    (ii)    <u>Detrimental Conduct</u>.  You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

    (iii)    <u>Remedies</u>.  Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that at all times prior to payment, you do not engage in solicitation or Detrimental Conduct, as described in paragraphs (d)(i) and (ii), during such period.  If Bank of America determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.

(e)    <u>DEFINITIONS</u>.  For purposes hereof, the following terms shall have the following meanings:

    <u>All Other Terminations</u> means any Termination of Employment with Bank of America and its Subsidiaries prior to your Retirement, whether initiated by you or your employer, other than (i) a Termination of Employment due to your death or your Disability; (ii) a Termination of Employment in connection with a Workforce Reduction or Divestiture; (iii) a Termination of Employment with Cause; and (iv) a Termination of Employment in connection with a Change in Control as described in paragraph (b)(iv) above.

    <u>Cause</u> shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a Termination of Employment with Bank of America and its Subsidiaries if

it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to your employment with Bank of America or any of its Subsidiaries including, but not limited to, the Bank of America Corporation Code of Conduct and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or have committed any other material violation of Bank of America's written policy regarding Confidential and Proprietary Information.

Change in Control shall be defined as that term is defined in the Bank of America Corporation Key Employee Equity Plan.

Competition means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity that is designated as a "Competitive Business" as of the date of your Termination of Employment.

Detrimental Conduct means your serious misconduct or unethical behavior, including any one of the following: (i) any conduct that would constitute Cause; (ii) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment, or other improper or intentional conduct causing reputational harm to Bank of America, its Subsidiaries, or a client of Bank of America or its Subsidiaries; (iii) the breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (iv) intentional violation, or grossly negligent disregard, of Bank of America's or its Subsidiaries' policies, rules and procedures, specifically including, but not limited to any of your obligations under the Bank of America Corporation Code of Conduct and workplace policies; or (v) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

Disability means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

<u>Divestiture</u> means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

<u>Good Reason</u> means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

<u>Good Reason Process</u> means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you have a Termination of Employment for Good Reason within sixty (60) days after the end of the Cure Period.  If Bank of America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you have a Termination of Employment due to such condition (notwithstanding its cure), then you will not be deemed to have a Termination of Employment for Good Reason.

<u>Retirement</u> means, as of the date of your Termination of Employment (i) you have attained at least age sixty-five (65); or (ii) you have a length of service of at least ten (10) years and you have attained at least age fifty-five (55).  Your length of service will be determined by Bank of America, in its sole discretion, and, in that regard, if you are a U.S. based employee and you participate in a tax-qualified 401(k) plan sponsored by Bank of America or its Subsidiaries, your length of service shall be your "Vesting Service" under the tax-qualified 401(k) plan in which you participate.

<u>Workforce Reduction</u> means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program); or (ii) if

not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the Termination of Employment is as a result of such action. Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America. In the event you fail to execute all required documents in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of the Account Balance representing your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

**Exhibit B**

## BANK OF AMERICA CORPORATION
## WEALTHCHOICE AWARDS

### Special Provisions for WealthChoice Awards in Countries Outside the U.S.

This Exhibit B contains additional (or, if so indicated, different) terms and conditions that govern your WealthChoice Award, including any WealthChoice Award granted as part of the long-term contingent award, WealthChoice Strategic Growth Award and/or WealthChoice Strategic Premium Award, if you are an employee of Bank of America or one of its Subsidiaries outside of the U.S. Capitalized terms used but not defined herein shall have the same meanings assigned to them in the Agreement.

This Exhibit B also includes certain country-specific disclosures that may be applicable to you if you work or reside in one of the countries listed herein. These disclosures are based on the securities exchange control and other laws in effect in the respective countries as of February 2016. Such laws are often complex and change frequently. As a result, Bank of America strongly recommends that you not rely on the information in this Exhibit B as the only source of information relating to the consequences of receiving an Award because the information may be out of date at the time the Award becomes earned and payable or at any later date indicated herein.

If you are a citizen or resident of a country other than the one in which you are currently working, are considered a citizen or resident of another country for local law purposes, transfer employment or residency to another country after the Award is granted to you, or are subject to regulation by a regulatory authority in any country other than the country in which you work or are a citizen or resident, Bank of America shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you.

### General terms applicable to WealthChoice Awards granted to employees in any country outside of the U.S.

**Data Privacy**

*By accepting the Award, you hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer and Bank of America and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Award.*

*You understand that Bank of America and your employer hold certain personal information about you, including, but not limited to, your name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor ("Data"), for the purpose of implementing, administering and managing the Award. You*

*understand that Data may be transferred to any third parties assisting in the implementation, administration and management of the Award, that these recipients may be located in your country or elsewhere, and that the recipient's country may have different data privacy laws and protections from your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage the Award. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing your local human resources representative. Further, you understand that you are providing the consents herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service and career with your employer will not be adversely affected; the only consequence of refusing or withdrawing your consent is that Bank of America would not be able to grant you future awards or administer or maintain such awards. Therefore, you understand that refusing or withdrawing your consent may affect your ability to benefit from the Award. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

**Nature of Grant**

By entering into this Agreement and accepting the grant of the Award evidenced hereby, you acknowledge, understand and agree that:

(a)     the Award is granted voluntarily by Bank of America, is discretionary in nature and may be modified, suspended or terminated by Bank of America at any time;

(b)     the grant of the Award is voluntary and occasional and does not create any contractual or other right to receive future awards or benefits in lieu of awards even if such awards have been awarded repeatedly in the past;

(c)     all decisions with respect to future awards, if any, will be at the sole discretion of Bank of America;

(d)     the grant of the Award shall not create a right to further employment with your employer and shall not interfere with the ability of your employer to terminate your employment relationship at any time, with or without Cause;

(e)     you are voluntarily accepting the grant of the Award;

(f)     the future value of the benchmark return options and your Account Balance is unknown and cannot be predicted with certainty.

(g)     the Award and any cash payment made pursuant to the Award are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses,

long-service awards, pension or retirement benefits or welfare benefits or similar payments, and in no event should be considered as compensation for, or in any way relating to, past services for Bank of America or any of its Subsidiaries;

(h)  in the event that you are not an employee of Bank of America, the Award will not be interpreted to form an employment contract or relationship with Bank of America; furthermore, the Award will not be interpreted to form an employment contract with any Subsidiary;

(i)  no claim or entitlement to compensation or damages shall arise from (A) forfeiture of the Award resulting from violation of a covenant set forth in Exhibit A or the application of the malus provisions contained in this Exhibit B, or termination of your employment by Bank of America or your employer (regardless of the reason for such termination and whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) or (B) recoupment of all or any portion of any payment made pursuant to the Award under any provision of the Agreement (including any provision in Exhibits A or B) and, in consideration of the grant of the Award to which you are not otherwise entitled, you irrevocably agree never to institute any claim against Bank of America or your employer, waive your ability, if any, to bring any such claim and release Bank of America and your employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed not to pursue such claim, and you agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(j)  for purposes of the Award, your employment will be considered terminated as of the date you are no longer actively employed and providing services to Bank of America or one of its Subsidiaries, and your right, if any, to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by the date you cease to be actively employed and will not be extended by any notice period mandated under local law (*e.g.*, active employment would not include a period of "garden leave" or similar period pursuant to local law); Bank of America, in its sole discretion, shall determine when you are no longer actively employed for purposes of the Award (including whether you may still be considered actively employed while on an approved leave of absence);

(k)  unless otherwise provided in this Exhibit B, you are solely responsible for investigating and complying with any exchange control laws and foreign account or asset reporting requirements applicable to you in connection with the Award and any payment made pursuant to the Award;

(l)  unless otherwise provided by Bank of America in its discretion, the Award and the benefits evidenced by this Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting Bank of America;

(m)   neither your employer, Bank of America or any of its Subsidiaries shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the Award or any payment made pursuant to the Award; and

(n)   Bank of America and your employer are not providing any tax, legal, financial or investment advice, nor making any recommendations regarding participation in the Plan.  You acknowledge that you have the necessary knowledge and experience to understand how the Award and the Plan work, as well as any risks that may be related to the Plan and the Award and any notional or benchmark investment decisions that you may make in connection with the Plan or the Award.  You should consult with your personal tax, legal and financial advisors regarding participation in the Plan.

**Language**

If you have received this Agreement or any other document related to the Award translated into a language other than English and if the meaning of the translated version differs from the English version, the English version shall control.

**<u>Terms applicable to the WealthChoice Awards granted to employees in (or who are regulated by) any European Economic Area ("EEA") country</u>**

*General*

In addition to and without limitation to any recoupment provisions or covenants included in the Agreement and any country-specific terms set forth below, the Award is subject to the requirements of the European Union Directive 2013/36/EU (the Capital Requirements Directive or "CRD"), as implemented into local law, local regulations or remuneration codes in your country (together "Local Regulations") or, if not yet implemented into Local Regulations, as adopted by the European Commission.

Further, payment of the Award is subject to the conditions that (a) you do not breach the standards expected of you pursuant to your employment contract, Bank of America Corporation Code of Conduct and Local Regulations, including, in particular, that you do not participate in and are not responsible for conduct which results in significant losses for Bank of America or its Subsidiaries and that you meet appropriate standards of fitness and propriety, (b) circumstances do not arise which require that your Award must be forfeited or repaid, in whole or in part, pursuant to the requirements of CRD and/or Local Regulations, as from time to time applicable, (c) payment of the Award is sustainable according to the financial situation of Bank of America and justified on the basis of the performance of Bank of America and your business unit and (d) payment of the Award is justified on the basis of your performance.

*Malus*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, reduce in whole or in part the amount of cash subject to the Award at or before the payment of the Award if (a) Bank of America determines, in its sole discretion, that you are or were within the categories of staff described in Article 92(2) of CRD (or the equivalent provisions under any Local Regulations) and/or you are or were deemed to have a material impact on the risk profile

of Bank of America or any of its Subsidiaries in accordance with the criteria set out in articles 3 to 5 of Commission Delegated Regulation (EU) No 604/2014 and (b) there is a breach of the requirements or conditions set out above or, without limitation to the above, (i) you have participated in or were responsible for conduct which resulted in significant losses for Bank of America or its Subsidiaries, or (ii) you have failed to meet appropriate standards of fitness and propriety, as determined by Bank of America in its sole discretion.

### *Clawback*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, require you to repay some or all of the cash paid to you pursuant to this Agreement if (a) Bank of America determines, in its sole discretion, that you are or were within the categories of staff described in Article 92(2) of CRD (or the equivalent provisions under any Local Regulations) and/or you are or were deemed to have a material impact on the risk profile of Bank of America or any of its Subsidiaries in accordance with the criteria set out in articles 3 to 5 of Commission Delegated Regulation (EU) No 604/2014 and (b) there is a breach of the requirements or conditions set out above or, without limitation to the above, (i) you have participated in or were responsible for conduct which resulted in significant losses for Bank of America or its Subsidiaries, or (ii) you have failed to meet appropriate standards of fitness and propriety, as determined by Bank of America in its sole discretion.

Bank of America will determine, in its sole discretion, the appropriate amount required to be reduced or repaid, as applicable, as well as the terms on which and the process by which you must repay any amount pursuant to this provision. Without limitation to the foregoing, Bank of America may determine, in its sole discretion, that any cash amount to be repaid will be deducted from your salary or from any other payment to be made to you by Bank of America or one of its Subsidiaries.

### **Country-specific terms and disclosures applicable to WealthChoice Awards granted to employees in countries (or regulated by countries) outside of the U.S.**

### **Australia**

There are no special provisions.

### **Brazil**

By accepting the Award, you agree to comply with all applicable Brazilian laws and report and pay any and all applicable taxes associated with the receipt of the Award and any cash payment made pursuant to the Award.

If you are resident or domiciled in Brazil, you will be required to submit an annual declaration of assets and rights held outside of Brazil to the Central Bank of Brazil if the aggregate value of such assets and rights is equal to or greater than US$100,000. If such amount exceeds US$100,000,000, the declaration must be submitted quarterly. Assets and rights that must be reported include cash deposited into a foreign bank or brokerage account.

**Canada**

The following paragraph replaces the termination of employment paragraph of the Nature of Grant provision contained in this Exhibit B:

For purposes of the Award, your employment will be considered terminated as of, and your right (if any) to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (regardless of the reason for such termination and whether or not later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by, the date that is the earliest of:  (a) the date your employment with Bank of America and its Subsidiaries is terminated, (b) the date you receive written notice of termination from Bank of America or your employer, regardless of any notice period or period of pay in lieu of such notice mandated under the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any; and (c) the date you are no longer actively employed by or actively providing services to Bank of America or any of its Subsidiaries; Bank of America, in its sole discretion, shall determine when you are no longer actively employed or providing services for purposes of the Award (including whether you may still be considered actively employed or actively providing services while on an approved leave of absence).

In the event payment of the Award is made into a U.S. brokerage account, you should be aware that if the cost of your foreign property exceeds C$100,000 at any time during the year, you must report all of your foreign property on Form T1135 by April 30th of the following year.  You should consult with a personal tax advisor to ensure that you are properly complying with applicable reporting requirements.

*The following provisions are applicable to employees in Quebec:*

The following paragraph supplements the data privacy provision contained in this Exhibit B:

You hereby authorize Bank of America and Bank of America's representatives to discuss with and obtain all relevant information from all personnel, professional or not, involved in the administration and operation of the Award.  You further authorize Bank of America, its Subsidiaries and the administrator of the Award to disclose and discuss the Award with their advisors.  You further authorize Bank of America and its Subsidiaries to record such information and to keep such information in your employee file.

Consent to Receive Information in English for Employees in Quebec

The parties acknowledge that it is their express wish that the Agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

*Les parties reconnaissent avoir exigé la rédaction en anglais de la convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaries intentées, directement ou indirectement, relativement à ou suite à la présente convention.*

**Hong Kong**

*WARNING: The Award does not constitute a public offering of securities under Hong Kong law and is available only to employees of Bank of America or its Subsidiaries. The Agreement, including this Exhibit B, and any other incidental communication materials distributed in connection with the Award (i) have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, (ii) have not been reviewed by any regulatory authority in Hong Kong, and (iii) are intended only for the personal use of each eligible employee of your employer, Bank of America or its Subsidiaries and may not be distributed to any other person. If you have any questions regarding the contents of the Agreement, including this Exhibit B, or any other incidental communication materials distributed in connection with the Award, you should obtain independent professional advice.*

Bank of America specifically intends that the program under which the Award was granted will not be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance.

**India**

There are no special provisions.

**Japan**

There are no special provisions.

**Singapore**

There are no special provisions.

**United Kingdom**

The following paragraphs supplement the provision regarding Tax-Related Items contained in the Agreement:

Any sum withheld on an estimated basis shall be repaid to you to the extent that such sum was not applied in satisfaction of the actual tax liabilities arising.

If payment or withholding of the income tax due is not made within 90 days after the end of the tax year in which the income tax liability arises, or such other period specified in Section 222(1)(c) of the United Kingdom Income Tax (Earnings and Pensions) Act 2003 (the "Due Date"), the amount of any uncollected income tax will constitute a loan owed by you to your employer, effective on the Due Date. You agree that the loan will bear interest at the then-current Official Rate of Her Majesty's Revenue and Customs ("HMRC"), it will be immediately due and repayable, and Bank of America or your employer may recover it at any time thereafter by any of the means referred to in the Agreement. Notwithstanding the foregoing, if you are a director or executive officer of Bank of America (within the meaning of Section 13(k) of the U.S. Securities Exchange Act of 1934, as amended), you will not be eligible for such a loan to cover the income

tax due.  In the event that you are a director or executive officer and the income tax is not collected from or paid by you by the Due Date, the amount of any uncollected income tax may constitute a benefit to you on which additional income tax and National Insurance Contributions may be payable.  You will be responsible for reporting and paying any income tax due on this additional benefit directly to HMRC under the self-assessment regime and for paying Bank of America or your employer, as applicable, for the value of any employee National Insurance Contributions due on this additional benefit.

The following paragraphs are in addition to and without limitation to any recoupment provisions or covenants included in the Agreement and the provision regarding CRD in the European Economic Area section of this Exhibit B.

The Award is also subject to the requirements of the Remuneration Codes of the Prudential Regulation Authority and the Financial Conduct Authority (the "Remuneration Codes").

*Malus*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, reduce in whole or in part the amount of cash subject to the Award at or before the payment of the Award if (a) Bank of America determines, in its sole discretion, that the requirements of the Remuneration Codes are or were applicable to you, and (b)

    (i)   There is reasonable evidence of misbehavior or material error;

    (ii)  Bank of America and/or its Subsidiaries and/or a business unit suffer a material failure of risk management; or

    (iii)  Bank of America and/or its Subsidiaries and/or a business unit suffer a material downturn in its or their financial performance.

In respect of paragraphs (i) and (ii) above, Bank of America may take into account the extent to which (x) you could have been reasonably expected to be aware of a failure or misconduct at the time it occurred but failed to take adequate steps to promptly identify, assess, report, escalate or address it; and (y) by virtue of your role or seniority, you could be deemed indirectly responsible or accountable for the failure or misconduct.

*Clawback*

Bank of America will, unless Bank of America determines that it is inappropriate, require you to repay some or all of the cash paid to you pursuant to this Agreement if during the Clawback Period (a) Bank of America determines, in its sole discretion, that the requirements of the Remuneration Codes are or were applicable to you, and (b)

    (i)  There is reasonable evidence of misbehavior or material error; or

    (ii)  Bank of America and/or its Subsidiaries and/or a business unit suffer a material failure of risk management.

In respect of paragraphs (i) and (ii) above, Bank of America will take into account the extent to which (x) you could have been reasonably expected to be aware of a failure or misconduct at the time it occurred but failed to take adequate steps to promptly identify, assess, report, escalate or address it; and (y) by virtue of your role or seniority, you could be deemed indirectly responsible or accountable for the failure or misconduct.

For purposes of this "Clawback" provision, Clawback Period means such period commencing on the date of payment of the Award and ending on the seventh anniversary of the date of grant of the Award or such longer period as is required under the Remuneration Codes.

# EXHIBIT Q

**Bank of America**

# Award Agreement

This document contains your WealthChoice Award Agreement (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

---

### What you need to do

1. Review the Award Agreement to ensure you understand its provisions. With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and file it with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. More detailed information about competitive businesses can be found on HR Connect under Money / Pay / Incentive plans & awards / How Performance Plan awards are paid, to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

*If you do not accept your Award Agreement through the online acceptance process by November 15, 2017, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf. If you decline your Award Agreement, your award will be canceled and you will not be entitled to any benefits from the award nor any compensation or benefits in lieu of the canceled award.

---

Page 1 of 20

**Bank of America**

### 2016 Performance Year WealthChoice Award Agreement

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an employee of Bank of America or one of its Subsidiaries.

A copy of the Plan is viewable on the Advisory Division Election System and also is available upon request, and its terms and provisions are incorporated herein by reference. When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Award covered by this Agreement (the "Award") is made to you in connection with your participation in the Plan as part of your long-term contingent award, subject to the following terms and provisions.

1. Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement. The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award. This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2. Notwithstanding any provisions in this Agreement to the contrary, the Award shall be subject to any special terms and conditions applicable to employees based outside the U.S., as set forth in Exhibit B to this Agreement. If you relocate to one of the countries included in Exhibit B, the special terms and conditions for such country will apply to you to the extent that Bank of America determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. Exhibit B constitutes part of this Agreement.

3. You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement, including any special terms and provisions applicable to employees based outside the U.S., as set forth in Exhibit B. IN THE EVENT OF ANY CONFLICT BETWEEN THIS WEALTHCHOICE AWARD AGREEMENT, EXHIBIT A AND EXHIBIT B, THE PROVISIONS OF EXHIBIT B SHALL PREVAIL AND CONTROL THE AWARD.

4. The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

5. To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account Balance paid to you pursuant to this Agreement. You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to

Page 2 of 20

the full value of the Account Balance paid to you pursuant to this Agreement. In addition, this Award is subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder; (ii) similar rules under the laws of any other jurisdiction; and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

6.  Subject to applicable laws in your country, you may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. Any beneficiary designation in effect at the time of your Termination of Employment with Bank of America and its Subsidiaries (other than a Termination of Employment due to your death) will remain in effect following your Termination of Employment unless you change your beneficiary designation or it otherwise ceases to be enforceable and/or valid in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. If you do not designate a beneficiary, if your designated beneficiary does not survive you or if the designation is not enforceable and/or valid under the inheritance and other laws in your country (as determined by Bank of America in its sole discretion), then your beneficiary will be your estate.

7.  Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an on-line or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time or as otherwise determined appropriate by Bank of America, in its sole discretion, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

8.  Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date. Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer. You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan

will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

9.  You acknowledge that, regardless of any action taken by Bank of America or your employer, the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items related to the Award and legally applicable to you ("Tax-Related Items") is and remains your responsibility and may exceed the amount (if any) withheld by Bank of America or your employer.  You further acknowledge that Bank of America and/or your employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award including the grant and vesting of the Award and the payment of the Account Balance; and (ii) do not commit to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items.  Further, if you have become subject to Tax-Related Items in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items as a result of your participation in the Plan, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements by all legal means, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award.  In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer.  Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any obligations in connection with the Tax-Related Items.

10.  The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the State of Delaware and the laws of the United States, as provided in the Plan.  For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this Award or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

11.  In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding the Award.  Any prior agreements, commitments or negotiations

**Bank of America** ≫

concerning the Award are superseded.  Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

12.  This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable.  Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

13.  Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable for legal or administrative reasons and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

14.  Nothing in this Agreement shall interfere with or limit in any way the right of Bank of America or your employer to terminate your employment at any time, nor confer upon you any right to continue in the employment of Bank of America or its Subsidiaries.  For purposes of this Agreement, a transfer of your employment between Bank of America and a Subsidiary, or between Subsidiaries, shall not be deemed to be a Termination of Employment.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer effective as of the date of grant listed in your Award Statement.

BANK OF AMERICA CORPORATION
By:

Karen A. Reardon
Human Resources Executive
Global Wealth and Investment Management
Bank of America Corporation

**Bank of America**

Bank of America    Merrill U.S.    Bank of America
America    vnch Trust    Merrill vnch

Exhibit A

## WealthChoice Contingent Award Plan

PAYMENT OF AWARD

(a)    <u>PAYMENT SCHEDULE</u>.  Subject to the provisions of paragraphs (b), (c) and (d) below, the Account Balance representing your Award will become earned and payable on February 15, 2025 if you remain employed with Bank of America and its Subsidiaries through that date.  Once the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made through payroll as soon as administratively practicable.  Bank of America, in its sole discretion, will select an appropriate exchange rate for converting the payment into local currency.

(b)    <u>IMPACT OF TERMINATION OF EMPLOYMENT ON AWARD</u>.  In the case of your Termination of Employment prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for your Termination of Employment as follows.

(i)    <u>Death</u>. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your Termination of Employment is due to your death. Payment will be made as soon as administratively practicable.

(ii)    <u>Workforce Reduction, Divestiture or Disability</u>.  In the case of your Termination of Employment due to your Workforce Reduction,  Divestiture or Disability, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (d) below; provided, however, that if you are eligible for Retirement at the time of your Termination of Employment due to your Workforce Reduction, Divestiture or Disability, the Account Balance will become earned and payable in accordance with paragraph (c).  Notwithstanding anything in this paragraph (b)(ii) to the contrary, upon your death following a Termination of Employment due to Workforce Reduction, Divestiture or Disability, any unearned portion of the Account Balance representing your Award that is continuing to become earned and payable in accordance with the provisions of this paragraph (b)(ii), but has not yet become earned and payable,  shall become immediately earned and payable as of the date of your death, and payment will be made as soon as administratively practicable following your death.

(iii)    <u>Termination by your Employer with Cause</u>.  In the case of your Termination of Employment with Cause, the Account Balance shall be canceled as of your Termination of Employment.

(iv)    <u>Change in Control</u>.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs; and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) you have a Termination of

Page 6 of 20

Employment without Cause; or (2) you have a Termination of Employment for Good Reason, then the Account Balance shall become immediately earned as of the date of such Termination of Employment and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (d) below. Notwithstanding anything in this paragraph (b)(iv) to the contrary, upon your death following (A) a Termination of Employment without Cause on or before the second anniversary of a Change in Control or (B) a Termination of Employment for Good Reason on or before the second anniversary of a Change in Control, any portion of the Account Balance representing your Award that is continuing to become payable in accordance with the provisions of this paragraph (b)(iv), but has not yet become payable, shall become immediately payable as of the date of your death, and payment will be made as soon as administratively practicable following your death.

(v)     <u>All Other Terminations</u>.  Unless you are eligible for Retirement as described below, in the case of All Other Terminations, the Account Balance shall be canceled as of your Termination of Employment.

(vi)     <u>Possible Variations to Payment Date</u>.  Notwithstanding anything in the provisions set forth above to the contrary, in the event of Termination of Employment, Bank of America may, in its sole discretion, accelerate payment of all or a portion of the unearned Account Balance to the date of Termination of Employment (if the unearned Account Balance is not canceled as of such date) to facilitate compliance with local law and/or administrative considerations; provided, however, that if you are subject to U.S. Internal Revenue Code Section 409A, payment of the Account Balance may be accelerated, and payment may be made, only to the extent necessary to pay federal, state, local or foreign tax obligations arising from the Award that apply to an amount before the amount is paid or made available to you. Also, the payment of an Account Balance that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)     <u>RETIREMENT</u>.  In the case of your Termination of Employment for any reason other than your death, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you are eligible for Retirement, then the Account Balance will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which your Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year; provided, however, that (i) to the extent permissible under applicable law, you do not engage in Competition during such period; (ii) you comply with the covenants described in paragraph (d) below; and (iii) prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (i) above is applicable.  To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time.  If Bank of America determines in its reasonable business judgment that you

MILLIGAN000038

**Bank of America**

have failed to satisfy any of the foregoing requirements, then the Account Balance representing your Award shall be immediately canceled as of the date of such determination. In addition, from time to time following your Termination of Employment after you are eligible for Retirement, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California; (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California; or (3) you have a Termination of Employment due to your Workforce Reduction, Divestiture or Disability when you are eligible for Retirement, the Competition restriction described in (i) above and the certification requirement described in (iii) above will not apply to this Award. Notwithstanding anything in this paragraph (c) to the contrary, upon your death following Retirement, any unearned portion of the Account Balance representing your Award that is continuing to become earned and payable in accordance with the provisions of this paragraph (c), but has not yet become earned and payable, shall become immediately earned and payable as of the date of your death, and payment will be made as soon as administratively practicable following your death.

    (d)   <u>COVENANTS</u>.

    (i)   <u>Non-Solicitation</u>. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an employee of Bank of America or its Subsidiaries; and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America or its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California; or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

    (ii)   <u>Detrimental Conduct</u>. You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

    (iii)   <u>Remedies</u>. Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that at all times prior to payment, you do not engage in solicitation or Detrimental Conduct, as described in paragraphs (d)(i) and (ii), during such period. If Bank of America determines in its reasonable business judgment that you have failed to satisfy such

**Bank of America**

requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.

(e)    DEFINITIONS.  For purposes hereof, the following terms shall have the following meanings:

All Other Terminations means any Termination of Employment with Bank of America and its Subsidiaries prior to your Retirement, whether initiated by you or your employer, other than (i) a Termination of Employment due to your death or your Disability; (ii) a Termination of Employment in connection with a Workforce Reduction or Divestiture; (iii) a Termination of Employment with Cause; and (iv) a Termination of Employment in connection with a Change in Control as described in paragraph (b)(iv) above.

Cause shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a Termination of Employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to your employment with Bank of America or any of its Subsidiaries including, but not limited to, the Bank of America Corporation Code of Conduct and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or have committed any other material violation of Bank of America's written policy regarding Confidential and Proprietary Information.

Change in Control shall be defined as that term is defined in the Bank of America Corporation Key Employee Equity Plan.

Competition means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity that is designated as a "Competitive Business" as of the date of your Termination of Employment.

Detrimental Conduct means your serious misconduct or unethical behavior, including any one of the following: (i) any conduct that would constitute Cause; (ii) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment, or other improper or intentional conduct causing reputational harm to Bank of America, its Subsidiaries, or a client of Bank of America or its Subsidiaries; (iii) the breach of a

fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (iv) intentional violation, or grossly negligent disregard, of Bank of America's or its Subsidiaries' policies, rules and procedures, specifically including, but not limited to any of your obligations under the Bank of America Corporation Code of Conduct and workplace policies; or (v) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

       Disability means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

       Divestiture means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

       Good Reason means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

       Good Reason Process means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you have a Termination of Employment for Good Reason within sixty (60) days after the end of the Cure Period.  If Bank of America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you have a Termination of Employment due to such condition (notwithstanding its cure), then you will not be deemed to have a Termination of Employment for Good Reason.

       Retirement means, as of the date of your Termination of Employment (i) you have attained at least age sixty-five (65); or (ii) you have a length of service of at least ten (10) years and you have attained at least age fifty-five (55).  Your length of service will be determined by Bank of America, in its sole discretion, and, in that regard, if you are a U.S. based employee and you participate in a tax-qualified 401(k) plan sponsored by Bank of America or its



Subsidiaries, your length of service shall be your "Vesting Service" under the tax-qualified 401(k) plan in which you participate.

        <u>Workforce Reduction</u> means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program); or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the Termination of Employment is as a result of such action.  Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America.  In the event you fail to execute all required documents in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of the Account Balance representing your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

**Bank of America** 

## Bank of America Corporation WealthChoice Awards

**Special Provisions for WealthChoice Awards in Countries Outside the U.S.**

This Exhibit B contains additional (or, if so indicated, different) terms and conditions that govern your WealthChoice Award, including any WealthChoice Award granted as part of the long-term contingent award, WealthChoice Strategic Growth Award and/or WealthChoice Strategic Premium Award, if you are an employee of Bank of America or one of its Subsidiaries outside of the U.S. Capitalized terms used but not defined herein shall have the same meanings assigned to them in the Agreement.

This Exhibit B also includes certain country-specific disclosures that may be applicable to you if you work or reside in one of the countries listed herein.  These disclosures are based on the securities exchange control and other laws in effect in the respective countries as of January 2017. Such laws are often complex and change frequently.  As a result, Bank of America strongly recommends that you not rely on the information in this Exhibit B as the only source of information relating to the consequences of receiving an Award because the information may be out of date at the time the Award becomes earned and payable or at any later date indicated herein.

If you are a citizen or resident of a country other than the one in which you are currently working or residing, are considered a citizen or resident of another country for local law purposes, transfer employment or residency to another country after the Award is granted to you, or are subject to regulation by a regulatory authority in any country other than the country in which you work or are a citizen or resident, Bank of America shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you.

**General terms applicable to WealthChoice Awards granted to employees in any country outside of the U.S.**

### Data Privacy

*By accepting the Award, you hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer and Bank of America and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Award.*

*You understand that Bank of America and your employer hold certain personal information about you and persons closely associated with you, including, but not limited to, your name, home address and telephone number, email address, date of birth, social insurance, passport or other identification number (e.g., resident registration number), salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of*

MILLIGAN000043

**Bank of America**

*stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor ("Data"), for the purpose of implementing, administering and managing the Award.*

*You understand that Data may also be transferred to any third parties assisting in the implementation, administration and management of the Award. Where required under applicable law, Data also may be disclosed to certain securities or other regulatory authorities where Bank of America's securities are listed or traded or regulatory filings are made. You understand that the recipients of Data may be located in your country or elsewhere, and that the recipient's country may have different data privacy laws and protections from your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage the Award. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing your local human resources representative. Further, you understand that you are providing the consents herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service with your employer will not be affected; the only consequence of refusing or withdrawing your consent is that Bank of America would not be able to grant you future awards or administer or maintain such awards. Therefore, you understand that refusing or withdrawing your consent may affect your ability to benefit from the Award. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

**Nature of Grant**

By entering into this Agreement and accepting the grant of the Award evidenced hereby, you acknowledge, understand and agree that:

    (a)    the Award is granted voluntarily by Bank of America, is discretionary in nature and may be modified, suspended or terminated by Bank of America at any time;

    (b)    the grant of the Award is voluntary and occasional and does not create any contractual or other right to receive future awards or benefits in lieu of awards even if such awards have been awarded repeatedly in the past;

    (c)    all decisions with respect to future awards, if any, will be at the sole discretion of Bank of America;

    (d)    the grant of the Award shall not create a right to further employment with your employer and shall not interfere with the ability of your employer to terminate your employment relationship at any time, with or without Cause;

**Bank of America**

(e)    you are voluntarily accepting the grant of the Award;

(f)    the future value of the benchmark return options and your Account Balance is unknown and cannot be predicted with certainty.

(g)    the Award and any cash payment made pursuant to the Award are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, holiday pay, bonuses, long-service awards, pension or retirement benefits or welfare benefits or similar mandatory payments, and in no event should be considered as compensation for, or in any way relating to, past services for Bank of America or any of its Subsidiaries;

(h)    in the event that you are not an employee of Bank of America, the Award will not be interpreted to form an employment contract or relationship with Bank of America; furthermore, the Award will not be interpreted to form an employment contract with any Subsidiary;

(i)    no claim or entitlement to compensation or damages shall arise from (A) forfeiture of the Award resulting from violation of a covenant set forth in Exhibit A or the application of the malus provisions contained in this Exhibit B, or termination of your employment by Bank of America or your employer (regardless of the reason for such termination and whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) or (B) recoupment of all or any portion of any payment made pursuant to the Award under any provision of the Agreement (including any provision in Exhibits A or B) and, in consideration of the grant of the Award to which you are not otherwise entitled, you irrevocably agree never to institute any claim against Bank of America or your employer, waive your ability, if any, to bring any such claim and release Bank of America and your employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed not to pursue such claim, and you agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(j)    for purposes of the Award, your employment will be considered terminated as of the date you are no longer actively employed and providing services to Bank of America or one of its Subsidiaries, and your right, if any, to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by the date you cease to be actively employed and will not be extended by any notice period mandated under local law (*e.g.*, active employment would not include a period of "garden leave" or similar period pursuant to local law); Bank of America, in its sole discretion, shall determine when you are no longer actively employed for purposes of the Award (including whether you may still be considered actively employed while on an approved leave of absence);

**Bank of America**

(k)    unless otherwise provided in this Exhibit B, you are solely responsible for investigating and complying with any exchange control laws and foreign account or asset reporting requirements applicable to you in connection with the Award and any payment made pursuant to the Award;

(l)    unless otherwise provided by Bank of America in its discretion, the Award and the benefits evidenced by this Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting Bank of America;

(m)    neither your employer, Bank of America or any of its Subsidiaries shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the Award or any payment made pursuant to the Award; and

(n)    Bank of America and your employer are not providing any tax, legal, financial or investment advice, nor making any recommendations regarding participation in the Plan.  You acknowledge that you have the necessary knowledge and experience to understand how the Award and the Plan work, as well as any risks that may be related to the Plan and the Award and any notional or benchmark investment decisions that you may make in connection with the Plan or the Award.  You should consult with your personal tax, legal and financial advisors regarding participation in the Plan.

### Language

If you have received this Agreement or any other document related to the Award translated into a language other than English and if the meaning of the translated version differs from the English version, the English version shall control.

**Terms applicable to the WealthChoice Awards granted to employees in (or who are regulated by) any European Economic Area ("EEA") country**

### *General*

In addition to and without limitation to any recoupment provisions or covenants included in the Agreement and any country-specific terms set forth below, the Award is subject to the requirements of the European Union Directive 2013/36/EU (the Capital Requirements Directive or "CRD"), as implemented into local law, local regulations or remuneration codes in your country (together "Local Regulations") or, if not yet implemented into Local Regulations, as adopted by the European Commission.

Further, payment of the Award is subject to the conditions that (a) you do not breach the standards expected of you pursuant to your employment contract, Bank of America Corporation Code of Conduct and Local Regulations, including, in particular, that you do not participate in and are not responsible for conduct which results in significant losses for Bank of America or its Subsidiaries and that you meet appropriate standards of fitness and propriety,

Page 15 of 20

MILLIGAN000046

(b) circumstances do not arise which require that your Award must be forfeited or repaid, in whole or in part, pursuant to the requirements of CRD and/or Local Regulations, as from time to time applicable, (c) payment of the Award is sustainable according to the financial situation of Bank of America and justified on the basis of the performance of Bank of America and your business unit and (d) payment of the Award is justified on the basis of your performance.

### *Malus*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, reduce in whole or in part the amount of cash subject to the Award at or before the payment of the Award if (a) Bank of America determines, in its sole discretion, that you are or were within the categories of staff described in Article 92(2) of CRD (or the equivalent provisions under any Local Regulations as from time to time applicable) and/or you are or were deemed to have a material impact on the risk profile of Bank of America or any of its Subsidiaries in accordance with the criteria set out in articles 3 to 5 of Commission Delegated Regulation (EU) No 604/2014 and (b) there is a breach of the requirements or conditions set out above or, without limitation to the above, (i) you have participated in or were responsible for conduct which resulted in significant losses for Bank of America or its Subsidiaries, or (ii) you have failed to meet appropriate standards of fitness and propriety, as determined by Bank of America in its sole discretion.

### *Clawback*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, require you to repay some or all of the cash paid to you pursuant to this Agreement if (a) Bank of America determines, in its sole discretion, that you are or were within the categories of staff described in Article 92(2) of CRD (or the equivalent provisions under any Local Regulations as from time to time applicable) and/or you are or were deemed to have a material impact on the risk profile of Bank of America or any of its Subsidiaries in accordance with the criteria set out in articles 3 to 5 of Commission Delegated Regulation (EU) No 604/2014 and (b) there is a breach of the requirements or conditions set out above or, without limitation to the above, (i) you have participated in or were responsible for conduct which resulted in significant losses for Bank of America or its Subsidiaries, or (ii) you have failed to meet appropriate standards of fitness and propriety, as determined by Bank of America in its sole discretion.

Bank of America will determine, in its sole discretion, the appropriate amount required to be repaid, as applicable, as well as the terms on which and the process by which you must repay any amount pursuant to this provision.  Without limitation to the foregoing, Bank of America may determine, in its sole discretion, that any cash amount to be repaid will be deducted from your salary or from any other payment to be made to you by Bank of America or one of its Subsidiaries.

**Bank of America** ≫

**Country-specific terms and disclosures applicable to WealthChoice Awards granted to employees in countries (or regulated by countries) outside of the U.S.**

**Australia**

There are no country-specific provisions.

**Brazil**

By accepting the Award, you agree to comply with all applicable Brazilian laws and report and pay any and all applicable taxes associated with the receipt of the Award and any cash payment made pursuant to the Award.

If you are resident or domiciled in Brazil, you will be required to submit an annual declaration of assets and rights held outside of Brazil to the Central Bank of Brazil if the aggregate value of such assets and rights is equal to or greater than US$100,000.  If such amount exceeds US$100,000,000, the declaration must be submitted quarterly.  Assets and rights that must be reported include cash deposited into a foreign bank or brokerage account.

**Canada**

The following paragraph replaces the termination of employment paragraph of the Nature of Grant provision contained in this Exhibit B:

For purposes of the Award, your employment will be considered terminated as of, and your right (if any) to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (regardless of the reason for such termination and whether or not later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by, the date that is the earliest of:  (a) the date your employment with Bank of America and its Subsidiaries is terminated, (b) the date you receive written notice of termination from Bank of America or your employer, regardless of any notice period or period of pay in lieu of such notice mandated under the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any; and (c) the date you are no longer actively employed by or actively providing services to Bank of America or any of its Subsidiaries; Bank of America, in its sole discretion, shall determine when you are no longer actively employed or providing services for purposes of the Award (including whether you may still be considered actively employed or actively providing services while on an approved leave of absence).

In the event payment of the Award is made into a U.S. brokerage account, you should be aware that if the cost of your foreign specified property exceeds C$100,000 at any time during the year, you must report all of your foreign specified property on Form T1135 by April 30th of the following year.  You should consult with a personal tax advisor to ensure that you are properly complying with applicable reporting requirements.

*The following provisions are applicable to employees in Quebec:*

The following paragraph supplements the data privacy provision contained in this Exhibit B:

You hereby authorize Bank of America and Bank of America's representatives to discuss with and obtain all relevant information from all personnel, professional or non-professional, involved in the administration of the Award.  You further authorize Bank of America, its Subsidiaries and the administrator of the Award to disclose and discuss the Award with their advisors.  You further authorize Bank of America and its Subsidiaries to record such information and to keep such information in your employee file.

<u>Consent to Receive Information in English for Employees in Quebec</u>

The parties acknowledge that it is their express wish that the Agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

*Les parties reconnaissent avoir exigé la rédaction en anglais de la convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, directement ou indirectement, relativement à ou suite à la présente convention.*

**Hong Kong**

*WARNING: The Award does not constitute a public offering of securities under Hong Kong law and is available only to employees of Bank of America and its Subsidiaries.  The Agreement, including this Exhibit B, and any other incidental communication materials distributed in connection with the Award (i) have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, (ii) have not been reviewed by any regulatory authority in Hong Kong, and (iii) are intended only for the personal use of each eligible employee of your employer, Bank of America or its Subsidiaries and may not be distributed to any other person.  If you have any questions regarding the contents of the Agreement, including this Exhibit B, or any other incidental communication materials distributed in connection with the Award, you should obtain independent professional advice.*

Bank of America specifically intends that the program under which the Award was granted will not be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance.

**India**

There are no country-specific provisions.

**Japan**

There are no country-specific provisions.

**Bank of America**

### Singapore

There are no country-specific provisions.

### United Kingdom

Without limitation to the Agreement provisions regarding Tax-Related Items contained in the Agreement, you hereby agree that you are liable for all Tax-Related Items and hereby covenant to pay all such Tax-Related Items, as and when requested by Bank of America or (if different) your employer or by Her Majesty's Revenue and Customs ("HMRC") (or any other tax authority or any other relevant authority).  You also hereby agree to indemnify and keep indemnified Bank of America and (if different) your employer against any Tax-Related Items that they are required to pay or withhold on your behalf or have paid or will pay to HMRC (or any other tax authority or any other relevant authority).

The following paragraphs are in addition to and without limitation to any recoupment provisions or covenants included in the Agreement and the provision regarding CRD in the European Economic Area section of this Exhibit B.

The Award is also subject to the requirements of the Remuneration Codes of the Prudential Regulation Authority and the Financial Conduct Authority (the "Remuneration Codes").

### *Malus*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, reduce in whole or in part the amount of cash subject to the Award at or before the payment of the Award if (a) Bank of America determines, in its sole discretion, that the requirements of the Remuneration Codes are or were applicable to you, and (b)

    (i)   There is reasonable evidence of misbehavior or material error by you;

    (ii)  Bank of America and/or its Subsidiaries and/or a business unit suffer a material failure of risk management; or

    (iii)  Bank of America and/or its Subsidiaries and/or a business unit suffer a material downturn in its or their financial performance.

In respect of paragraphs (i) and (ii) above, Bank of America may take into account the extent to which (x) you could have been reasonably expected to be aware of a failure or misconduct at the time it occurred but failed to take adequate steps to promptly identify, assess, report, escalate or address it; and (y) by virtue of your role or seniority, you could be deemed directly or indirectly responsible or accountable for the failure or misconduct.

*Clawback*

Bank of America will, unless Bank of America determines that it is inappropriate, require you to repay some or all of the cash paid to you pursuant to this Agreement if during the Clawback Period (a) Bank of America determines, in its sole discretion, that the requirements of the Remuneration Codes are or were applicable to you, and (b)

    (i)    There is reasonable evidence of misbehavior or material error by you; or

    (ii)    Bank of America and/or its Subsidiaries and/or a business unit suffer a material failure of risk management.

In respect of paragraphs (i) and (ii) above, Bank of America will take into account the extent to which (x) you could have been reasonably expected to be aware of a failure or misconduct at the time it occurred but failed to take adequate steps to promptly identify, assess, report, escalate or address it; and (y) by virtue of your role or seniority, you could be deemed directly or indirectly responsible or accountable for the failure or misconduct.

For purposes of this "Clawback" provision, Clawback Period means such period commencing on the date of payment of the Award and ending on the seventh anniversary of the date of grant of the Award or, by way of notice to you given before the seventh anniversary of the date of grant of the Award, such longer period as is required under the Remuneration Codes.

2016PY WealthChoice Award Agreement (LTCA 8YR Cliff)

**JA266**    MILLIGAN000051

# EXHIBIT R

**Bank of America**

# Award Agreement

This document contains your WealthChoice Award Agreement (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

## What you need to do

1. Review the Award Agreement to ensure you understand its provisions. With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and the Plan and file them with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. More detailed information about competitive businesses can be found on HR Connect under Money / Pay / Incentive plans & awards / How Performance Plan awards are paid, to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

*If you do not accept your Award Agreement through the online acceptance process by November 15, 2018, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf. If you decline your Award Agreement, your award will be canceled and you will not be entitled to any benefits from the award nor any compensation or benefits in lieu of the canceled award.

Page 1 of 20



**2017 Performance Year WealthChoice Award Agreement**

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an employee of Bank of America or one of its Subsidiaries.

A copy of the Plan is viewable on the Advisory Division Election System and also is available upon request, and its terms and provisions are incorporated herein by reference.  When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Award covered by this Agreement (the "Award") is made to you in connection with your participation in the Plan as part of your long-term contingent award, subject to the following terms and provisions.

1.  Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth in the Award Statement.  The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award.  This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2.  Notwithstanding any provisions in this Agreement to the contrary, the Award shall be subject to any special terms and conditions applicable to employees based outside the U.S., as set forth in Exhibit B to this Agreement.  If you relocate to one of the countries included in Exhibit B, the special terms and conditions for such country will apply to you to the extent that Bank of America determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons.  Exhibit B constitutes part of this Agreement.

3.  You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement, including any special terms and provisions applicable to employees based outside the U.S., as set forth in Exhibit B.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS WEALTHCHOICE AWARD AGREEMENT, EXHIBIT A AND EXHIBIT B, THE PROVISIONS OF EXHIBIT B SHALL PREVAIL AND CONTROL THE AWARD.

4.  The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

5.  To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account Balance paid to you pursuant to this Agreement.  You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to the full value of the Account Balance paid to you pursuant to this Agreement.  In addition, this Award is subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of



erroneously awarded compensation) and any implementing rules and regulations thereunder; (ii) similar rules under the laws of any other jurisdiction; and (iii) any policies adopted by Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

6. Subject to applicable laws in your country, you may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. Any beneficiary designation in effect at the time of your Termination of Employment with Bank of America and its Subsidiaries (other than a Termination of Employment due to your death) will remain in effect following your Termination of Employment unless you change your beneficiary designation or it otherwise ceases to be enforceable and/or valid in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. If you do not designate a beneficiary, if your designated beneficiary does not survive you or if the designation is not enforceable and/or valid under the inheritance and other laws in your country (as determined by Bank of America in its sole discretion), then your beneficiary will be your estate.

7. Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an online or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time or as otherwise determined appropriate by Bank of America, in its sole discretion, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

8. Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date. Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer. You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

9. You acknowledge that, regardless of any action taken by Bank of America or your employer, the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items (or, if applicable, your portion thereof) related to the Award



("Tax-Related Items") is and remains your responsibility and may exceed the amount (if any) withheld by Bank of America or your employer. You further acknowledge that Bank of America and/or your employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award including but not limited to the grant and vesting of the Award, your satisfaction of any age and/or length of service criteria and the payment of the Account Balance, (ii) do not commit to and are under no obligation to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items or achieve any specific tax result and (iii) do not commit to and are under no obligation to use a withholding method for Tax-Related Items which results in the most favorable or any particular tax treatment for you. Further, if you have become subject to Tax-Related Items in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements by all legal means, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award. In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer. Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any obligations in connection with the Tax-Related Items.

10. The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the State of Delaware and the laws of the United States, as provided in the Plan. For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this Award or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts.

11. In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding the Award. Any prior agreements, commitments or negotiations concerning the Award are superseded. Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

12. This Agreement is intended to comply with Section 409A of the Internal Revenue Code to the extent applicable. Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

**Bank of America**

13. Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable for legal or administrative reasons and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

14. Nothing in this Agreement shall interfere with or limit in any way the right of Bank of America or your employer to terminate your employment at any time, nor confer upon you any right to continue in the employment of Bank of America or its Subsidiaries. For purposes of this Agreement, a transfer of your employment between Bank of America and a Subsidiary, or between Subsidiaries, shall not be deemed to be a Termination of Employment.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer effective as of the date of grant listed in your Award Statement.

BANK OF AMERICA CORPORATION
By:

*Stephanie Kiefer*

Stephanie Kiefer
Senior Vice President - Human Resources Executive
Merrill Lynch Wealth Management
Bank of America Corporation

Page 5 of 20

**Bank of America**

## WealthChoice Contingent Award Plan

PAYMENT OF AWARD

    (a)   <u>PAYMENT SCHEDULE</u>.  Subject to the provisions of paragraphs (b), (c) and (d) below, the Account Balance representing your Award will become earned and payable on February 15, 2026 if you remain employed with Bank of America and its Subsidiaries through that date.  Once the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made through payroll as soon as administratively practicable.  Bank of America, in its sole discretion, will select an appropriate exchange rate for converting the payment into local currency.

    (b)   <u>IMPACT OF TERMINATION OF EMPLOYMENT ON AWARD</u>.  In the case of your Termination of Employment prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for your Termination of Employment as follows.

        (i)   <u>Death</u>. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your Termination of Employment is due to your death. Payment will be made as soon as administratively practicable.

        (ii)   <u>Workforce Reduction, Divestiture or Disability</u>.  In the case of your Termination of Employment due to your Workforce Reduction,  Divestiture or Disability, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (d) below; provided, however, that if you are eligible for Retirement at the time of your Termination of Employment due to your Workforce Reduction, Divestiture or Disability, the Account Balance will become earned and payable in accordance with paragraph (c).  Notwithstanding anything in this paragraph (b)(ii) to the contrary, upon your death following a Termination of Employment due to Workforce Reduction, Divestiture or Disability, any unearned portion of the Account Balance representing your Award that is continuing to become earned and payable in accordance with the provisions of this paragraph (b)(ii), but has not yet become earned and payable,  shall become immediately earned and payable as of the date of your death, and payment will be made as soon as administratively practicable following your death.

        (iii)   <u>Termination by your Employer with Cause</u>.  In the case of your Termination of Employment with Cause, the Account Balance shall be canceled as of your Termination of Employment.

        (iv)   <u>Change in Control</u>.  Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) you have a Termination of Employment without Cause or (2) you have a Termination of Employment for Good Reason, then the Account

Balance shall become immediately earned as of the date of such Termination of Employment and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (d) below. Notwithstanding anything in this paragraph (b)(iv) to the contrary, upon your death following (A) a Termination of Employment without Cause on or before the second anniversary of a Change in Control or (B) a Termination of Employment for Good Reason on or before the second anniversary of a Change in Control, any portion of the Account Balance representing your Award that is continuing to become payable in accordance with the provisions of this paragraph (b)(iv), but has not yet become payable, shall become immediately payable as of the date of your death, and payment will be made as soon as administratively practicable following your death.

(v)    <u>All Other Terminations</u>. Unless you are eligible for Retirement as described below, in the case of All Other Terminations, the Account Balance shall be canceled as of your Termination of Employment.

(vi)    <u>Possible Variations to Payment Date</u>. Notwithstanding anything in the provisions set forth above to the contrary, in the event of Termination of Employment, Bank of America may, in its sole discretion, accelerate payment of all or a portion of the unearned Account Balance to the date of Termination of Employment (if the unearned Account Balance is not canceled as of such date) to facilitate compliance with local law and/or administrative considerations; provided, however, that if you are subject to U.S. Internal Revenue Code Section 409A, payment of the Account Balance may be accelerated, and payment may be made, only to the extent necessary to pay federal, state, local or foreign tax obligations arising from the Award that apply to an amount before the amount is paid or made available to you. Also, the payment of an Account Balance that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)    <u>RETIREMENT</u>. In the case of your Termination of Employment for any reason other than your death, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you are eligible for Retirement, then the Account Balance will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which your Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year; provided, however, that (i) to the extent permissible under applicable law, you do not engage in Competition during such period; (ii) you comply with the covenants described in paragraph (d) below and (iii) prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (i) above is applicable. To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time. If Bank of America determines in its reasonable business judgment that you have failed to satisfy any of the foregoing requirements, then the Account Balance representing your Award shall be immediately canceled as of the date of such determination. In addition, from time to time following your Termination of Employment after you are eligible for Retirement, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to

**Bank of America**

fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition.  Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California; (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California or (3) you have a Termination of Employment due to your Workforce Reduction,  Divestiture or Disability when you are eligible for Retirement, the Competition restriction described in (i) above and the certification requirement described in (iii) above will not apply to this Award.  Notwithstanding anything in this paragraph (c) to the contrary, upon your death following Retirement, any unearned portion of the Account Balance representing your Award that is continuing to become earned and payable in accordance with the provisions of this paragraph (c), but has not yet become earned and payable, shall become immediately earned and payable as of the date of your death, and payment will be made as soon as administratively practicable following your death.

(d)    <u>COVENANTS</u>.

(i)    <u>Non-Solicitation</u>. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an employee of Bank of America or its Subsidiaries and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America or its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries.  Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

(ii)    <u>Detrimental Conduct</u>.  You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

(iii)    <u>Remedies</u>.  Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that at all times prior to payment, you do not engage in solicitation or Detrimental Conduct, as described in paragraphs (d)(i) and (ii), during such period.  If Bank of America determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.

(e)    <u>DEFINITIONS</u>.  For purposes hereof, the following terms shall have the following meanings:

<u>All Other Terminations</u> means any Termination of Employment with Bank of America and its Subsidiaries prior to your Retirement, whether initiated by you or your employer, other than (i) a Termination of Employment due to your death or your Disability; (ii) a Termination of

**Bank of America**

Employment in connection with a Workforce Reduction or Divestiture; (iii) a Termination of Employment with Cause; and (iv) a Termination of Employment in connection with a Change in Control as described in paragraph (b)(iv) above.

<u>Cause</u> shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a Termination of Employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to your employment with Bank of America or any of its Subsidiaries including, but not limited to, the Bank of America Corporation Code of Conduct and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or have committed any other material violation of Bank of America's written policy regarding Confidential and Proprietary Information.

<u>Change in Control</u> shall be defined as that term is defined in the Bank of America Corporation Key Employee Equity Plan.

<u>Competition</u> means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity that is designated as a "Competitive Business" as of the date of your Termination of Employment.

<u>Detrimental Conduct</u> means your serious misconduct or unethical behavior, including any one of the following: (i) any conduct that would constitute Cause; (ii) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment, or other improper or intentional conduct causing reputational harm to Bank of America, its Subsidiaries, or a client of Bank of America or its Subsidiaries; (iii) the breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (iv) intentional violation, or grossly negligent disregard, of Bank of America's or its Subsidiaries' policies, rules and procedures, specifically including, but not limited to any of your obligations under the Bank of America Corporation Code of Conduct and workplace policies; or (v) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

<u>Disability</u> means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.



Divestiture means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

Good Reason means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an extent substantially consistent with your business travel obligations at the time of the Change in Control.

Good Reason Process means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you have a Termination of Employment for Good Reason within sixty (60) days after the end of the Cure Period.  If Bank of America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you have a Termination of Employment due to such condition (notwithstanding its cure), then you will not be deemed to have a Termination of Employment for Good Reason.

Retirement means, as of the date of your Termination of Employment (i) you have attained at least age sixty-five (65); or (ii) you have a length of service of at least ten (10) years and you have attained at least age fifty-five (55).  Your length of service will be determined by Bank of America, in its sole discretion, and, in that regard, if you are a U.S. based employee and you participate in a tax-qualified 401(k) plan sponsored by Bank of America or its Subsidiaries, your length of service shall be your "Vesting Service" under the tax-qualified 401(k) plan in which you participate.

Workforce Reduction means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program); or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the Termination of Employment is as a result of such action.  Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America.  In the event you fail to execute all required documents



in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of the Account Balance representing your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

**Bank of America** Bank of America Merrill U.S. Bank of America
America Lynch Trust Merrill Lynch

**Exhibit B**

## BANK OF AMERICA CORPORATION WEALTHCHOICE AWARDS
**Special Provisions for WealthChoice Awards in Countries Outside the U.S.**

This Exhibit B contains additional (or, if so indicated, different) terms and conditions that govern your WealthChoice Award, including any WealthChoice Award granted as part of the long-term contingent award, WealthChoice Strategic Growth Award and/or WealthChoice Strategic Premium Award, if you are an employee of Bank of America or one of its Subsidiaries outside of the U.S. Capitalized terms used but not defined herein shall have the same meanings assigned to them in the Agreement.

This Exhibit B also includes certain country-specific disclosures that may be applicable to you if you work or reside in one of the countries listed herein. These disclosures are based on the securities exchange control and other laws in effect in the respective countries as of January 2018. Such laws are often complex and change frequently. As a result, Bank of America strongly recommends that you not rely on the information in this Exhibit B as the only source of information relating to the consequences of receiving an Award because the information may be out of date at the time the Award becomes earned and payable or at any later date indicated herein.

If you are a citizen or resident of a country other than the one in which you are currently working or residing, are considered a citizen or resident of another country for local law purposes, transfer employment or residency to another country after the Award is granted to you, or are subject to regulation by a regulatory authority in any country other than the country in which you work or are a citizen or resident, Bank of America shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you.

**<u>General terms applicable to WealthChoice Awards granted to employees in any country outside of the U.S.</u>**

### Data Privacy

*By accepting the Award, you hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of your personal data as described in this document by and among, as applicable, your employer and Bank of America and its Subsidiaries for the exclusive purpose of implementing, administering and managing the Award.*

*You understand that Bank of America and your employer hold certain personal information about you and persons closely associated with you, including, but not limited to, your name, home address and telephone number, email address, date of birth, social insurance, passport or other identification number (e.g., resident registration number), salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor ("Data"), for the purpose of implementing, administering and managing the Award.*

*You understand that Data may also be transferred to any third parties assisting in the implementation, administration and management of the Award. Where required under applicable*

Page 12 of 20

**Bank of America**

*law, Data also may be disclosed to certain securities or other regulatory authorities where Bank of America's securities are listed or traded or regulatory filings are made. You understand that the recipients of Data may be located in your country or elsewhere, and that the recipient's country may have different data privacy laws and protections from your country. You understand that you may request a list with the names and addresses of any potential recipients of the Data by contacting your local human resources representative. You authorize the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the purposes of implementing, administering and managing the Award. You understand that Data will be held only as long as is necessary to implement, administer and manage the Award. You understand that you may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing your local human resources representative. Further, you understand that you are providing the consents herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service with your employer will not be affected; the only consequence of refusing or withdrawing your consent is that Bank of America would not be able to grant you future awards or administer or maintain such awards. Therefore, you understand that refusing or withdrawing your consent may affect your ability to benefit from the Award. For more information on the consequences of your refusal to consent or withdrawal of consent, you understand that you may contact your local human resources representative.*

### Nature of Grant

By entering into this Agreement and accepting the grant of the Award evidenced hereby, you acknowledge, understand and agree that:

(a) the Plan is established voluntarily by Bank of America, it is discretionary in nature and it may be altered, amended suspended or terminated by Bank of America at any time, to the extent permitted by the Plan;

(b) the grant of the Award is voluntary and occasional and does not create any contractual or other right to receive future awards or benefits in lieu of awards even if such awards have been awarded repeatedly in the past;

(c) all decisions with respect to future awards, if any, will be at the sole discretion of Bank of America;

(d) the grant of the Award shall not create a right to further employment with your employer and shall not interfere with the ability of your employer to terminate your employment relationship at any time, with or without Cause;

(e) you are voluntarily accepting the grant of the Award;

(f) the future value of the benchmark return options and your Account Balance is unknown and cannot be predicted with certainty.

**Bank of America**

(g)  the Award and any cash payment made pursuant to the Award are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, holiday pay, bonuses, long-service awards, pension or retirement benefits or welfare benefits or similar mandatory payments, and in no event should be considered as compensation for, or in any way relating to, past services for Bank of America or any of its Subsidiaries;

(h)  in the event that you are not an employee of Bank of America, the Award will not be interpreted to form an employment contract or relationship with Bank of America; furthermore, the Award will not be interpreted to form an employment contract with any Subsidiary;

(i)  no claim or entitlement to compensation or damages shall arise from (A) forfeiture of the Award resulting from violation of a covenant set forth in Exhibit A or the application of the malus provisions contained in this Exhibit B, or termination of your employment by Bank of America or your employer (regardless of the reason for such termination and whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) or (B) recoupment of all or any portion of any payment made pursuant to the Award under any provision of the Agreement (including any provision in Exhibits A or B) and, in consideration of the grant of the Award to which you are not otherwise entitled, you irrevocably agree never to institute any claim against Bank of America or your employer, waive your ability, if any, to bring any such claim and release Bank of America and your employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed not to pursue such claim, and you agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(j)  for purposes of the Award, your employment will be considered terminated as of the date you are no longer actively employed and providing services to Bank of America or one of its Subsidiaries, and your right, if any, to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by the date you cease to be actively employed and will not be extended by any notice period mandated under local law (*e.g.*, active employment would not include a period of "garden leave" or similar period pursuant to local law); Bank of America, in its sole discretion, shall determine when you are no longer actively employed for purposes of the Award (including whether you may still be considered actively employed while on an approved leave of absence);

(k)  unless otherwise provided in this Exhibit B, you are solely responsible for investigating and complying with any exchange control laws and foreign account or asset reporting requirements applicable to you in connection with the Award and any payment made pursuant to the Award;

(l)  unless otherwise provided by Bank of America in its discretion, the Award and the benefits evidenced by this Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with any corporate transaction affecting Bank of America;

(m)  neither your employer, Bank of America or any of its Subsidiaries shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the Award or any payment made pursuant to the Award; and

(n)  Bank of America and your employer are not providing any tax, legal, financial or investment advice, nor making any recommendations regarding participation in the Plan.  You acknowledge that you have the necessary knowledge and experience to understand how the Award and the Plan work, as well as any risks that may be related to the Plan and the Award and any notional or benchmark investment decisions that you may make in connection with the Plan or the Award.  You should consult with your personal tax, legal and financial advisors regarding participation in the Plan.

## Language

If you have received this Agreement or any other document related to the Award translated into a language other than English and if the meaning of the translated version differs from the English version, the English version shall control.

### Terms applicable to the WealthChoice Awards granted to employees in (or who are regulated by) any European Economic Area ("EEA") country

#### *General*

In addition to and without limitation to any recoupment provisions or covenants included in the Agreement and any country-specific terms set forth below, the Award is subject to the requirements of the European Union Directive 2013/36/EU (the Capital Requirements Directive or "CRD"), as implemented into local law, local regulations or remuneration codes in your country (together "Local Regulations") or, if not yet implemented into Local Regulations, as adopted by the European Commission.

Further, payment of the Award is subject to the conditions that (a) you do not breach the standards expected of you pursuant to your employment contract, Bank of America Corporation Code of Conduct and Local Regulations, including, in particular, that you do not participate in and are not responsible for conduct which results in significant losses for Bank of America or its Subsidiaries and that you meet appropriate standards of fitness and propriety, (b) circumstances do not arise which require that your Award must be forfeited or repaid, in whole or in part, pursuant to the requirements of CRD and/or Local Regulations, as from time to time applicable, (c) payment of the Award is sustainable according to the financial situation of Bank of America and justified on the basis of the performance of Bank of America and your business unit and (d) payment of the Award is justified on the basis of your performance.



*Malus*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, reduce in whole or in part the amount of cash subject to the Award at or before the payment of the Award if (a) Bank of America determines, in its sole discretion, that you are or were within the categories of staff described in Article 92(2) of CRD (or the equivalent provisions under any Local Regulations as from time to time applicable) and/or you are or were deemed to have a material impact on the risk profile of Bank of America or any of its Subsidiaries in accordance with the criteria set out in articles 3 to 5 of Commission Delegated Regulation (EU) No 604/2014 and (b) there is a breach of the requirements or conditions set out above or, without limitation to the above, (i) you have participated in or were responsible for conduct which resulted in significant losses for Bank of America or its Subsidiaries, or (ii) you have failed to meet appropriate standards of fitness and propriety, as determined by Bank of America in its sole discretion.

*Clawback*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, require you to repay some or all of the cash paid to you pursuant to this Agreement if (a) Bank of America determines, in its sole discretion, that you are or were within the categories of staff described in Article 92(2) of CRD (or the equivalent provisions under any Local Regulations as from time to time applicable) and/or you are or were deemed to have a material impact on the risk profile of Bank of America or any of its Subsidiaries in accordance with the criteria set out in articles 3 to 5 of Commission Delegated Regulation (EU) No 604/2014 and (b) there is a breach of the requirements or conditions set out above or, without limitation to the above, (i) you have participated in or were responsible for conduct which resulted in significant losses for Bank of America or its Subsidiaries, or (ii) you have failed to meet appropriate standards of fitness and propriety, as determined by Bank of America in its sole discretion.

Bank of America will determine, in its sole discretion, the appropriate amount required to be repaid, as applicable, as well as the terms on which and the process by which you must repay any amount pursuant to this provision.  Without limitation to the foregoing, Bank of America may determine, in its sole discretion, that any cash amount to be repaid will be deducted from your salary or from any other payment to be made to you by Bank of America or one of its Subsidiaries.

**Country-specific terms and disclosures applicable to WealthChoice Awards granted to employees in countries (or regulated by countries) outside of the U.S.**

**Australia**

There are no country-specific provisions.

**Brazil**

By accepting the Award, you agree to comply with all applicable Brazilian laws and report and pay any and all applicable taxes associated with the receipt of the Award and any cash payment made pursuant to the Award.

MILLIGAN000067

If you are resident or domiciled in Brazil, you will be required to submit an annual declaration of assets and rights held outside of Brazil to the Central Bank of Brazil if the aggregate value of such assets and rights is equal to or greater than US$100,000.  If such amount exceeds US$100,000,000, the declaration must be submitted quarterly.  Assets and rights that must be reported include cash deposited into a foreign bank or brokerage account.

## Canada

The following paragraph replaces the termination of employment paragraph of the Nature of Grant provision contained in this Exhibit B:

For purposes of the Award, your employment will be considered terminated as of, and your right (if any) to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (regardless of the reason for such termination and whether or not later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by, the date that is the earliest of:  (a) the date your employment with Bank of America and its Subsidiaries is terminated, (b) the date you receive written notice of termination from Bank of America or your employer, regardless of any notice period or period of pay in lieu of such notice mandated under the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any; and (c) the date you are no longer actively employed by or actively providing services to Bank of America or any of its Subsidiaries; Bank of America, in its sole discretion, shall determine when you are no longer actively employed or providing services for purposes of the Award (including whether you may still be considered actively employed or actively providing services while on an approved leave of absence).

In the event payment of the Award is made into a U.S. brokerage account, you should be aware that if the cost of your foreign specified property exceeds C$100,000 at any time during the year, you must report all of your foreign specified property on Form T1135 by April 30th of the following year.  You should consult with a personal tax advisor to ensure that you are properly complying with applicable reporting requirements.

*The following provisions are applicable to employees in Quebec:*

The following paragraph supplements the data privacy provision contained in this Exhibit B:

You hereby authorize Bank of America and Bank of America's representatives to discuss with and obtain all relevant information from all personnel, professional or non-professional, involved in the administration of the Award.  You further authorize Bank of America, its Subsidiaries and the administrator of the Award to disclose and discuss the Award with their advisors.  You further authorize Bank of America and its Subsidiaries to record such information and to keep such information in your employee file.

Consent to Receive Information in English for Employees in Quebec

The parties acknowledge that it is their express wish that the Agreement, as well as all documents,

MILLIGAN000068

**Bank of America**

notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

*Les parties reconnaissent avoir exigé la rédaction en anglais de la convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, directement ou indirectement, relativement à ou suite à la présente convention.*

**Hong Kong**

*WARNING: The Award does not constitute a public offering of securities under Hong Kong law and is available only to employees of Bank of America or its Subsidiaries.  The Agreement, including this Exhibit B, and any other incidental communication materials distributed in connection with the Award (i) have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, (ii)  have not been reviewed by any regulatory authority in Hong Kong, and (iii) are intended only for the personal use of each eligible employee of your employer, Bank of America or its Subsidiaries and may not be distributed to any other person. You are advised to exercise caution in relation to the offer contained in the Agreement. If you have any doubt or questions regarding the contents of the Agreement, including this Exhibit B, or any other incidental communication materials distributed in connection with the Award, you should obtain independent professional advice.*
Bank of America specifically intends that the program under which the Award was granted will not be an occupational retirement scheme for purposes of the Occupational Retirement Schemes Ordinance.

The following sentence supplements the data privacy provision contained in this Exhibit B:

Any requests for access to and correction of your personal data should be made to the Human Resources Service Center by phone at +65.6591.1166 or via email at hrsc.apac@baml.com.

**India**

There are no country-specific provisions.

**Japan**

There are no country-specific provisions.

**Singapore**

There are no country-specific provisions.

**United Kingdom**

Without limitation to the Agreement provisions regarding Tax-Related Items contained in the Agreement, you hereby agree that you are liable for all Tax-Related Items and hereby covenant to pay all such Tax-Related Items, as and when requested by Bank of America or (if different) your employer or by Her Majesty's Revenue and Customs ("HMRC") (or any other tax authority or any

Page 18 of 20

**Bank of America**

other relevant authority).  You also hereby agree to indemnify and keep indemnified Bank of America and (if different) your employer against any Tax-Related Items that they are required to pay or withhold on your behalf or have paid or will pay to HMRC (or any other tax authority or any other relevant authority).

The following paragraphs are in addition to and without limitation to any recoupment provisions or covenants included in the Agreement and the provision regarding CRD in the European Economic Area section of this Exhibit B.

The Award is also subject to the requirements of the Remuneration Codes of the Prudential Regulation Authority and the Financial Conduct Authority (the "Remuneration Codes").

*Malus*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, reduce in whole or in part the amount of cash subject to the Award at or before the payment of the Award if (a) Bank of America determines, in its sole discretion, that the requirements of the Remuneration Codes are or were applicable to you, and (b)

(i)    There is reasonable evidence of misbehavior or material error by you;

(ii)    Bank of America and/or its Subsidiaries and/or a business unit suffer a material failure of risk management; or

(iii)    Bank of America and/or its Subsidiaries and/or a business unit suffer a material downturn in its or their financial performance.

In respect of paragraphs (i) and (ii) above, Bank of America may take into account the extent to which (x) you could have been reasonably expected to be aware of a failure or misconduct at the time it occurred but failed to take adequate steps to promptly identify, assess, report, escalate or address it; and (y) by virtue of your role or seniority, you could be deemed directly or indirectly responsible or accountable for the failure or misconduct.

*Clawback*

Bank of America will, unless Bank of America determines that it is inappropriate, require you to repay some or all of the cash paid to you pursuant to this Agreement if during the Clawback Period (a) Bank of America determines, in its sole discretion, that the requirements of the Remuneration Codes are or were applicable to you, and (b)

(i)    There is reasonable evidence of misbehavior or material error by you; or

(ii)    Bank of America and/or its Subsidiaries and/or a business unit suffer a material failure of risk management.



In respect of paragraphs (i) and (ii) above, Bank of America will take into account the extent to which (x) you could have been reasonably expected to be aware of a failure or misconduct at the time it occurred but failed to take adequate steps to promptly identify, assess, report, escalate or address it; and (y) by virtue of your role or seniority, you could be deemed directly or indirectly responsible or accountable for the failure or misconduct.

For purposes of this "Clawback" provision, Clawback Period means such period commencing on the date of payment of the Award and ending on the seventh anniversary of the date of grant of the Award or, by way of notice to you given before the seventh anniversary of the date of grant of the Award, such longer period as is required under the Remuneration Codes.

2017PY WealthChoice Award Agreement (LTCA 8YR Cliff)

# EXHIBIT S



March 05, 2019

## Award Agreement

This document contains your WealthChoice Award Agreement (the "Award Agreement") under the WealthChoice Contingent Award Plan (the "Plan").

---

### What you need to do

1. Review the Award Agreement to ensure you understand its provisions. With each award you receive, provisions of your Award Agreement may change so it is important to review your Award Agreement.
2. Print the Award Agreement and file it with your important papers.
3. Accept your Award Agreement through the online acceptance process.*
4. Designate your beneficiary on the Benefits OnLine® Beneficiary tab.
5. More detailed information about competitive businesses can be found on HR Connect under Money / Pay / Incentive plans & awards / How Performance Plan awards are paid, to the extent that the competition restriction is applicable to you, as described in this Award Agreement.

*If you do not accept your Award Agreement through the online acceptance process by November 15, 2019, or such other date that may be communicated, Bank of America will automatically accept the Award Agreement on your behalf. If you decline your Award Agreement, your award will be canceled and you will not be entitled to any benefits from the award nor any compensation or benefits in lieu of the canceled award.

---

## WealthChoice Award Agreement

**Granted To: Kelly D Milligan**
**Grant Date: February 15, 2019**
**Grant Type: LTI Cash Plan**
**Grant Code: 18WC8CCA**
**Amount Granted:** ███████

This Award Agreement and all Exhibits hereto (the "Agreement") is made between Bank of America Corporation, a Delaware corporation ("Bank of America"), and you, an employee of Bank of America or one of its Subsidiaries.

A copy of the Plan is viewable on Benefits OnLine and also is available upon request, and its terms and provisions are incorporated herein by reference. When used herein, the terms which are defined in the Plan shall have the meanings given to them in the Plan, as modified herein (if applicable).

The WealthChoice Award covered by this Agreement (the "Award") is made to you in connection with your participation in the Plan as part of your long-term contingent award, subject to the following terms and provisions.

1. Subject to the terms and conditions of the Plan and this Agreement, Bank of America or its Subsidiary will establish a notional Account under the Plan in your name with the value set forth above. The Account represents your contingent right to receive the value of the Account Balance on the Vesting Date for your Award. This Account shall be indexed to mutual funds or other benchmark investments that you select from choices established by the Administrator ("benchmark selections"), and the value of your Account Balance will increase or decrease based on the performance of the selected mutual funds or other benchmark investments.

2. Notwithstanding any provisions in this Agreement to the contrary, the Award shall be subject to any special terms and conditions applicable to employees based outside the U.S., as set forth in Exhibit B to this Agreement. If you relocate to one of the countries included in Exhibit B, the special terms and conditions for such country will apply to you to the extent that Bank of America determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. Exhibit B constitutes part of this Agreement.

3. You acknowledge having read the Plan and this Agreement and agree to be bound by all the terms and conditions of the Plan and this Agreement, including any special terms and provisions applicable to employees based outside the U.S., as set forth in Exhibit B. IN THE EVENT OF ANY CONFLICT BETWEEN THIS WEALTHCHOICE AWARD AGREEMENT, EXHIBIT A AND EXHIBIT B, THE PROVISIONS OF EXHIBIT B SHALL PREVAIL AND CONTROL THE AWARD.

4. The Account Balance covered by this Award shall become earned by, and payable to, you in the amounts and on the dates shown on the enclosed Exhibit A.

5. To the extent allowed by and consistent with applicable law and any applicable limitations period, if it is determined at any time that you have engaged in Detrimental Conduct, Bank of America will be entitled to recover from you in its sole discretion some or all of the Account Balance paid to you pursuant to this Agreement. You recognize that if you engage in Detrimental Conduct, the losses to Bank of America and/or its Subsidiaries may amount to the full value of the Account Balance paid to you pursuant to this Agreement. In addition, this Award is subject to the requirements of (i) Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (regarding recovery of erroneously awarded compensation) and any implementing rules and regulations thereunder; (ii) similar rules under the laws of any other jurisdiction; and (iii) any policies adopted by

MILLIGAN000073

Bank of America to implement such requirements, all to the extent determined by Bank of America in its discretion to be applicable to you.

6.   Subject to applicable laws in your country, you may designate a beneficiary to receive payment in connection with the Award in the event of your death while in service with Bank of America or its Subsidiaries in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. Any beneficiary designation in effect at the time of your Termination of Employment with Bank of America and its Subsidiaries (other than a Termination of Employment due to your death) will remain in effect following your Termination of Employment unless you change your beneficiary designation or it otherwise ceases to be enforceable and/or valid in accordance with Bank of America's beneficiary designation procedures, as in effect from time to time. If you do not designate a beneficiary, if your designated beneficiary does not survive you or if the designation is not enforceable and/or valid under the inheritance and other laws in your country (as determined by Bank of America in its sole discretion), then your beneficiary will be your estate.

7.   Bank of America may, in its sole discretion, decide to deliver any documents related to the Plan and this Award or future awards that may be granted under the Plan by electronic means or request your consent to participate in the Plan by electronic means. You hereby consent to receive such documents by electronic delivery and, if requested, agree to participate in the Plan through an online or electronic system established and maintained by Bank of America or a third party designated by Bank of America.

Any notice which either party hereto may be required or permitted to give to the other shall be in writing and may be delivered personally, by intraoffice mail, by fax, by electronic mail or other electronic means, or via a postal service, postage prepaid, to such electronic mail or postal address and directed to such person as Bank of America may notify you from time to time; and to you at your electronic mail or postal address as shown on the records of Bank of America from time to time or as otherwise determined appropriate by Bank of America, in its sole discretion, or at such other electronic mail or postal address as you, by notice to Bank of America, may designate in writing from time to time.

8.   Your Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date. Until paid, such amounts will be subject to the prior claims of creditors of your employer in the event of a bankruptcy or insolvency of your employer. You will not own the mutual funds or other options chosen as benchmarks for your Account Balance. In the event of a bankruptcy or insolvency of your employer, your right to payment of your Account

MILLIGAN000074

Balance under the Plan will be no greater than the right of any unsecured general creditor of your employer or its affiliates.

9.   You acknowledge that Bank of America has not provided you with any legal advice and that you have the right to consult with your personal legal advisor prior to accepting this Agreement.

10.  You acknowledge that, regardless of any action taken by Bank of America or your employer, the ultimate liability for all income tax, social insurance, payroll tax, fringe benefits tax, payment on account or other tax-related items (or, if applicable, your portion thereof) related to the Award ("Tax-Related Items") is and remains your responsibility and may exceed the amount (if any) withheld by Bank of America or your employer. You further acknowledge that Bank of America and/or your employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award including but not limited to the grant and vesting of the Award, your satisfaction of any age and/or length of service criteria and the payment of the Account Balance, (ii) do not commit to and are under no obligation to structure the terms of the Award or any aspect of the Award to reduce or eliminate your liability for Tax-Related Items or achieve any specific tax result and (iii) do not commit to and are under no obligation to use a withholding method for Tax-Related Items which results in the most favorable or any particular tax treatment for you. Further, if you have become subject to Tax-Related Items in more than one jurisdiction, you acknowledge that Bank of America or your employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

In the event Bank of America determines that it and/or your employer must withhold any Tax-Related Items, you agree as a condition of the Award to make arrangements satisfactory to Bank of America and/or your employer to enable it to satisfy all withholding requirements by all legal means, including, but not limited to, withholding any applicable Tax-Related Items from any payment to be made pursuant to the Award. In addition, you authorize Bank of America and/or your employer to fulfill its withholding obligations by all legal means, including, but not limited to, withholding Tax-Related Items from your wages, salary or other cash compensation paid to you by Bank of America and/or your employer. Bank of America may refuse to deliver the value of your Account Balance if you fail to comply with any obligations in connection with the Tax-Related Items.

11.  The validity, construction and effect of this Agreement are governed by, and subject to, the laws of the State of Delaware and the laws of the United States, as provided in the Plan, unless otherwise required by applicable law. For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this

Award or this Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of North Carolina and agree that such litigation shall be conducted solely in the courts of Mecklenburg County, North Carolina or the federal courts for the United States for the Western District of North Carolina, where this grant is made and/or to be performed, and no other courts, unless otherwise required by applicable law.

12.  In the event any provision of this Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Agreement, and the Agreement shall be construed and enforced as if the illegal or invalid provision had not been included. This Agreement constitutes the final understanding between you and Bank of America regarding the Award. Any prior agreements, commitments or negotiations concerning the Award are superseded. Subject to the terms of the Plan, this Agreement may only be amended by a written instrument signed by both parties.

13.  This Agreement is intended to comply with Section 409A of the Internal Revenue Code, to the extent applicable. Notwithstanding any provision of the Agreement to the contrary, the Agreement shall be interpreted, operated and administered consistent with this intent.

14.  Bank of America reserves the right to impose other requirements on the Award to the extent Bank of America determines it is necessary or advisable for legal or administrative reasons and to require you to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

15.  Nothing in this Agreement shall interfere with or limit in any way the right of Bank of America or your employer to terminate your employment at any time, nor confer upon you any right to continue in the employment of Bank of America or its Subsidiaries. For purposes of this Agreement, a transfer of your employment between Bank of America and a Subsidiary, or between Subsidiaries, shall not be deemed to be a Termination of Employment.

IN WITNESS WHEREOF, Bank of America has caused this Agreement to be executed by its duly authorized officer, and you have hereunto set your hand, all effective as of the Grant Date listed above.

BANK OF AMERICA CORPORATION
By:

Stephanie Kiefer
Senior Vice President - Human Resources Executive
Merrill Lynch Wealth Management
Bank of America Corporation

**WealthChoice Contingent Award Plan**

PAYMENT OF AWARD

(a)    <u>PAYMENT SCHEDULE</u>. Subject to the provisions of paragraphs (b), (c) and (d) below, the Account Balance representing your Award will become earned and payable on February 15, 2027 if you remain employed with Bank of America and its Subsidiaries through that date.Once the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made as soon as administratively practicable, generally within thirty (30) days after the payment date. Payment of your Account Balance shall be made into an account at Bank of America's designated brokerage firm.

(b)    <u>IMPACT OF TERMINATION OF EMPLOYMENT ON AWARD</u>. In the case of your Termination of Employment prior to the above payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for your Termination of Employment as follows.

(i)    <u>Death</u>. The Account Balance shall become immediately earned and payable as of the date of your Termination of Employment if your Termination of Employment is due to your death. Payment will be made as soon as administratively practicable.

(ii)    <u>Workforce Reduction, Divestiture or Disability</u>. In the case of your Termination of Employment due to your Workforce Reduction, Divestiture or Disability, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (d) below; provided, however, that if you are eligible for Retirement at the time of your Termination of Employment due to your Workforce Reduction, Divestiture or Disability, the Account Balance will become earned and payable in accordance with paragraph (c). Notwithstanding anything in this paragraph (b)(ii) to the contrary, upon your death following a Termination of Employment due to Workforce Reduction, Divestiture or Disability, any unearned portion of the Account Balance representing your Award that is continuing to become earned and payable in accordance with the provisions of this paragraph (b)(ii), but has not yet become earned and payable, shall become immediately earned and payable as of the date of your death, and payment will be made as soon as administratively practicable following your death.

(iii)    <u>Termination by your Employer with Cause</u>. In the case of your Termination of Employment with Cause, the Account Balance shall be canceled as of the date of your Termination of Employment.

(iv)  <u>Change in Control</u>. Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) you have a Termination of Employment without Cause or (2) you have a Termination of Employment for Good Reason, then the Account Balance shall become immediately earned as of the date of such Termination of Employment and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (d) below. Notwithstanding anything in this paragraph (b)(iv) to the contrary, upon your death following (A) a Termination of Employment without Cause on or before the second anniversary of a Change in Control or (B) a Termination of Employment for Good Reason on or before the second anniversary of a Change in Control, any portion of the Account Balance representing your Award that is continuing to become payable in accordance with the provisions of this paragraph (b)(iv), but has not yet become payable, shall become immediately payable as of the date of your death, and payment will be made as soon as administratively practicable following your death.

(v)  <u>All Other Terminations</u>. Unless you are eligible for Retirement as described below, in the case of All Other Terminations, the Account Balance shall be canceled as of your Termination of Employment.

(vi)  <u>Possible Variations to Payment Date</u>. Notwithstanding anything in the provisions set forth above to the contrary, in the event of Termination of Employment, Bank of America may, in its sole discretion, accelerate payment of all or a portion of the unearned Account Balance to the date of Termination of Employment (if the unearned Account Balance is not canceled as of such date) to facilitate compliance with local law and/or administrative considerations; provided, however, that if you are subject to U.S. Internal Revenue Code Section 409A, payment of the Account Balance may be accelerated, and payment may be made, only to the extent necessary to pay federal, state, local or foreign tax obligations arising from the Award that apply to an amount before the amount is paid or made available to you. Also, the payment of an Account Balance that has become earned and payable upon your Termination of Employment shall be delayed until six (6) months following the date of your Termination of Employment if and to the extent required by Section 409A of the Code.

(c)  <u>RETIREMENT</u>. In the case of your Termination of Employment for any reason other than your death, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you are eligible for Retirement, then the Account Balance will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which your Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year; provided, however, that (i) to the extent permissible under applicable law, you do not engage in Competition during such period; (ii) you comply with the covenants described in paragraph (d) below and (iii) prior to each anniversary of the grant date of your Award, you provide Bank of America with

a certification that you have not engaged in Competition to the extent the Competition restriction in (i) above is applicable.

To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time. If Bank of America determines in its reasonable business judgment that you have failed to satisfy any of the foregoing requirements, then the Account Balance representing your Award shall be immediately canceled as of the date of such determination. In addition, from time to time following your Termination of Employment after you are eligible for Retirement, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition. Notwithstanding anything in this paragraph (c) to the contrary, upon your death following Retirement, any unearned portion of the Account Balance representing your Award that is continuing to become earned and payable in accordance with the provisions of this paragraph (c), but has not yet become earned and payable, shall become immediately earned and payable as of the date of your death, and payment will be made as soon as administratively practicable following your death. Notwithstanding anything in this Agreement to the contrary:

(i)    if you are a permanent resident of California or you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the Competition restriction and the certification requirement described in this paragraph (c) will not apply to this Award;

(ii)    if you have a Termination of Employment due to your Workforce Reduction, Divestiture or Disability when you are eligible for Retirement, the Competition restriction and the certification requirement described in this paragraph (c) will not apply to this Award; and

(iii)    if you live or work in Massachusetts, the Competition restriction and the certification requirement described in this paragraph (c) will only apply for one year following the date of your Termination of Employment.

(d)    <u>COVENANTS</u>.

(i)    <u>Non-Solicitation</u>. You agree that during any period in which your Account Balance remains payable, (A) you will not directly or indirectly solicit or recruit for employment or encourage to leave employment with Bank of America or its Subsidiaries, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, any person who is an employee of Bank of America or its Subsidiaries and (B) to the extent permissible under applicable law, you will not, directly or indirectly, on your own behalf or on behalf of any other person or entity other than Bank of America or its Subsidiaries, solicit any client or customer of Bank of America or its Subsidiaries which you actively solicited or with whom you worked or otherwise had material contact in the course of your employment with Bank of America and its Subsidiaries. Notwithstanding

anything in this Agreement to the contrary, if (1) you are a permanent resident of California or (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California, the solicitation restriction described in (B) above will not apply to this Award.

        (ii)    <u>Detrimental Conduct</u>. You agree that during any period in which your Account Balance remains payable, you will not engage in Detrimental Conduct.

        (iii)    <u>Remedies</u>. Payment of your Account Balance in accordance with the Payment Schedule set forth in paragraph (a) above is specifically conditioned on the requirement that at all times prior to payment, you do not engage in solicitation or Detrimental Conduct, as described in paragraphs (d)(i) and (ii), during such period. If Bank of America determines in its reasonable business judgment that you have failed to satisfy such requirements, then the Account Balance representing your Award shall be canceled as of such date of determination.

    (e)    <u>DEFINITIONS</u>. For purposes hereof, the following terms shall have the following meanings:

        <u>All Other Terminations</u> means any Termination of Employment with Bank of America and its Subsidiaries prior to your Retirement, whether initiated by you or your employer, other than (i) a Termination of Employment due to your death or your Disability; (ii) a Termination of Employment in connection with a Workforce Reduction or Divestiture; (iii) a Termination of Employment with Cause; and (iv) a Termination of Employment in connection with a Change in Control as described in paragraph (b)(iv) above

        <u>Cause</u> shall be defined as that term is defined in your offer letter or other applicable employment agreement; or, if there is no such definition, "Cause" means a Termination of Employment with Bank of America and its Subsidiaries if it occurs in conjunction with a determination by your employer that you have (i) committed an act of fraud or dishonesty in the course of your employment; (ii) been convicted of (or plead no contest with respect to) a crime constituting a felony or a crime of comparable magnitude under applicable law (as determined by Bank of America in its sole discretion); (iii) committed an act or omission which causes you or Bank of America or its Subsidiaries to be in violation of federal or state securities laws, rules or regulations, and/or the rules of any exchange or association of which Bank of America or its Subsidiaries is a member, including statutory disqualification; (iv) failed to perform your job duties where such failure is injurious to Bank of America or any Subsidiary, or to Bank of America's or such Subsidiary's business interests or reputation; (v) materially breached any written policy applicable to your employment with Bank of America or any of its Subsidiaries including, but not limited to, the Bank of America Corporation Code of Conduct and General Policy on Insider Trading; or (vi) made an unauthorized disclosure of any confidential or proprietary information of Bank of America or its Subsidiaries or have committed any other material violation of Bank of America's written policy regarding Confidential and Proprietary Information.

Change in Control shall be defined as that term is defined in the Bank of America Corporation Key Employee Equity Plan.

Competition means your being engaged, directly or indirectly, whether as a director, officer, employee, consultant, agent or otherwise, with a business entity that is or later becomes designated as a "Competitive Business" based on the criteria effective as of the date of your Termination of Employment. If you live or work in Massachusetts, the scope of Competition will be as broad as necessary to protect the legitimate business interests of Bank of America and its Subsidiaries.

Detrimental Conduct means your serious misconduct or unethical behavior, including any one of the following: (i) any conduct that would constitute Cause; (ii) the commission of a criminal act by you, whether or not performed in the workplace, that subjects, or if generally known, would subject Bank of America or its Subsidiaries to public ridicule or embarrassment, or other improper or intentional conduct causing reputational harm to Bank of America, its Subsidiaries, or a client of Bank of America or its Subsidiaries; (iii) the breach of a fiduciary duty owed to Bank of America or its Subsidiaries or a client or former client of Bank of America or its Subsidiaries; (iv) intentional violation, or grossly negligent disregard, of Bank of America's or its Subsidiaries' policies, rules and procedures, specifically including, but not limited to any of your obligations under the Bank of America Corporation Code of Conduct and workplace policies; or (v) you taking or maintaining trading positions that result in a need to restate financial results in a subsequent reporting period or that result in a significant financial loss to Bank of America or its Subsidiaries during or after the performance year.

Disability means "Disability" as defined from time to time under any long-term disability plan of Bank of America or your employer.

Divestiture means a Termination of Employment with Bank of America and its Subsidiaries as the result of a divestiture or sale of a business unit as determined by your employer based on the personnel records of Bank of America and its Subsidiaries.

Good Reason means, provided that you have complied with the Good Reason Process, the occurrence of any of the following events without your consent: (i) a material diminution in your responsibility, authority or duty; (ii) a material diminution in your base salary except for across-the-board salary reductions based on Bank of America and its Subsidiaries' financial performance similarly affecting all or substantially all management employees of Bank of America and its Subsidiaries; or (iii) the relocation of the office at which you were principally employed immediately prior to a Change in Control to a location more than fifty (50) miles from the location of such office, or your being required to be based anywhere other than such office, except to the extent you were not previously assigned to a principal location and except for required travel on your employer's business to an

extent substantially consistent with your business travel obligations at the time of the Change in Control.

Good Reason Process means that (i) you reasonably determine in good faith that a Good Reason condition has occurred; (ii) you notify Bank of America and its Subsidiaries in writing of the occurrence of the Good Reason condition within sixty (60) days of such occurrence; (iii) you cooperate in good faith with Bank of America and its Subsidiaries' efforts, for a period of not less than thirty (30) days following such notice (the "Cure Period"), to remedy the condition; (iv) notwithstanding such efforts, the Good Reason condition continues to exist following the Cure Period; and (v) you have a Termination of Employment for Good Reason within sixty (60) days after the end of the Cure Period. If Bank of America or its Subsidiaries cures the Good Reason condition during the Cure Period, and you have a Termination of Employment due to such condition (notwithstanding its cure), then you will not be deemed to have a Termination of Employment for Good Reason.

Retirement means, as of the date of your Termination of Employment (i) you have attained at least age sixty-five (65); or (ii) you have a length of service of at least ten (10) years and you have attained at least age fifty-five (55). Your length of service will be determined by Bank of America, in its sole discretion, and, in that regard, if you are a U.S. based employee and you participate in a tax-qualified 401(k) plan sponsored by Bank of America or its Subsidiaries, your length of service shall be your "Vesting Service" under the tax-qualified 401(k) plan in which you participate.

Workforce Reduction means your Termination of Employment with Bank of America and its Subsidiaries as a result of a labor force reduction, realignment or similar measure as determined by your employer and (i) you are officially notified in writing of your Termination of Employment due to a workforce reduction and eligibility for the Corporate Severance Program (or any successor program); or (ii) if not eligible for the Corporate Severance Program, you are notified in writing by an authorized officer of Bank of America or any Subsidiary that the Termination of Employment is as a result of such action. Your Termination of Employment shall not be considered due to Workforce Reduction unless you execute all documents required under the Corporate Severance Program or otherwise, including without limitation any required release of claims, within the applicable time frames set forth in such documents or as prescribed by Bank of America. In the event you fail to execute all required documents in a timely fashion, your Termination of Employment will not be treated as a Workforce Reduction, and if any portion of the Account Balance representing your Award has been earned or paid to you after your Termination of Employment but before your failure to execute all required documents, you covenant and agree that you will have no right, title or interest in such amount earned or paid and that you will cause such amount to be returned immediately to Bank of America upon notice.

**BANK OF AMERICA CORPORATION WEALTHCHOICE AWARDS**
**Special Provisions for WealthChoice Awards in Countries Outside the U.S.**

This Exhibit B contains additional (or, if so indicated, different) terms and conditions that govern your WealthChoice Award, including any WealthChoice Award granted as part of the long-term contingent award, if you are an employee of Bank of America or one of its Subsidiaries outside of the U.S. Capitalized terms used but not defined herein shall have the same meanings assigned to them in the Agreement.

This Exhibit B also includes certain country-specific disclosures that may be applicable to you if you work or reside in one of the countries listed herein. These disclosures are based on the securities exchange control and other laws in effect in the respective countries as of January 2019. Such laws are often complex and change frequently. As a result, Bank of America strongly recommends that you not rely on the information in this Exhibit B as the only source of information relating to the consequences of receiving an Award because the information may be out of date at the time the Award becomes earned and payable or at any later date indicated herein.

If you are a citizen or resident of a country other than the one in which you are currently working or residing, are considered a citizen or resident of another country for local law purposes, transfer employment or residency to another country after the Award is granted to you, or are subject to regulation by a regulatory authority in any country other than the country in which you work or are a citizen or resident, Bank of America shall, in its discretion, determine to what extent the terms and conditions contained herein shall be applicable to you.

**General terms applicable to WealthChoice Awards granted to employees in any country outside of the U.S.**

**Data Privacy**

The following provision applies to you if you are a citizen or resident of Australia, Brazil, Canada, Hong Kong, India, Japan or Singapore.

    (a)    *Declaration of Consent. By accepting the Award, you hereby consent to the collection, processing and use, in electronic or other form, of your personal data as described in this document and the transfer of such personal data to the recipients mentioned below, including recipients located in countries which may not have a similar level of protection from the perspective of your country's data protection laws.*

    (b)    *Data Collection and Usage. Bank of America and your employer will collect, process and use certain personal information about you and persons closely associated with you, specifically, your name, home address and telephone number, email address, date of birth,*

*social insurance, passport or other identification number (e.g., resident registration number), salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor ("Data"), for the purposes of implementing, administering and managing the Award. The legal basis, where required, for the processing of Data is your consent. In addition to the above-identified recipients and where required under applicable law, Data also may be disclosed to certain securities or other regulatory authorities where Bank of America's securities are listed or traded or regulatory filings are made. The legal basis, where required, for such disclosure is compliance with applicable law.*

(c)    *Further Information. Further information about data protection issues are contained in the Employee Data Protection Notice for your jurisdiction.*

(d)    *Voluntariness and Consequences of Consent, Denial or Withdrawal. Participation in the Plan is voluntary and you are providing the consent herein on a purely voluntary basis. If you do not consent, or if you later seek to revoke your consent, your employment status or service with your employer will not be affected. The only consequence of refusing or withdrawing your consent is that Bank of America would not be able to grant you future awards or administer or maintain such awards.*

**Data Privacy**

The following provision applies to you if you are a citizen or resident of France or the United Kingdom.

*(a)    Data Collection and Usage. Pursuant to applicable data protection laws, you are hereby notified that Bank of America and your employer will collect, process and use certain personal information about you and persons closely associated with you, specifically, your name, home address and telephone number, email address, date of birth, social insurance, passport or other identification number (e.g., resident registration number), salary, nationality, job title, any shares of stock or directorships held in Bank of America, details of any entitlement to shares of stock or equivalent benefits awarded, canceled, vested, unvested or outstanding in your favor ("Data"), for the legitimate purposes of implementing, administering and managing the Award.*

*(b)    Legal Basis for Processing of Data. The legal basis for the processing of Data is Bank of America's legitimate business interest of managing the Plan and generally administering employee incentive compensation and related benefits. In addition to the below-identified recipients and where required under applicable law, Data also may be disclosed to certain securities or other regulatory authorities where Bank of America's securities are listed or traded or regulatory filings are made. The legal basis, where*

*required, for such disclosure is compliance with applicable law. Your refusal to provide Data would make it impossible for Bank of America to perform its contractual obligations and may affect your ability to be granted Awards.*

**(c)** *__Further Information__. Further information about data protection issues are contained in the Employee Data Protection Notice for your jurisdiction.*

**Nature of Grant**

By entering into this Agreement and accepting the grant of the Award evidenced hereby, you acknowledge, understand and agree that:

(a)    the Plan is established voluntarily by Bank of America, it is discretionary in nature and it may be altered, amended, suspended or terminated by Bank of America at any time, to the extent permitted by the Plan;

(b)    the grant of the Award is voluntary and occasional and does not create any contractual or other right to receive future awards or benefits in lieu of awards even if such awards have been awarded repeatedly in the past;

(c)    all decisions with respect to future awards, if any, will be at the sole discretion of Bank of America;

(d)    the grant of the Award shall not create a right to further employment with your employer and shall not interfere with the ability of your employer to terminate your employment relationship at any time, with or without Cause;

(e)    you are voluntarily accepting the grant of the Award;

(f)    the future value of the benchmark return options and your Account Balance is unknown and cannot be predicted with certainty;

(g)    the Award and any cash payment made pursuant to the Award are not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, holiday pay, bonuses, long-service awards, pension or retirement benefits or welfare benefits or similar mandatory payments, and in no event should be considered as compensation for, or in any way relating to, past services for Bank of America or any of its Subsidiaries;

(h)    in the event that you are not an employee of Bank of America, the Award will not be interpreted to form an employment contract or relationship with Bank of America;

furthermore, the Award will not be interpreted to form an employment contract with any Subsidiary;

(i)    no claim or entitlement to compensation or damages shall arise from (A) forfeiture of the Award resulting from violation of a covenant set forth in Exhibit A or the application of the malus provisions contained in this Exhibit B, or termination of your employment by Bank of America or your employer (regardless of the reason for such termination and whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) or (B) recoupment of all or any portion of any payment made pursuant to the Award under any provision of the Agreement (including any provision in Exhibits A or B) and, in consideration of the grant of the Award to which you are not otherwise entitled, you irrevocably agree never to institute any claim against Bank of America or your employer, waive your ability, if any, to bring any such claim and release Bank of America and your employer from any such claim; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, then, by accepting the Award, you shall be deemed irrevocably to have agreed not to pursue such claim, and you agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(j)    for purposes of the Award, your employment will be considered terminated as of the date you are no longer actively employed and providing services to Bank of America or one of its Subsidiaries, and your right, if any, to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (for any reason whatsoever and regardless of whether or not such termination is later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by the date you cease to be actively employed and will not be extended by any notice period mandated under local law (*e.g.*, active employment would not include a period of "garden leave" or similar period pursuant to local law); Bank of America, in its sole discretion, shall determine when you are no longer actively employed for purposes of the Award (including whether you may still be considered actively employed while on an approved leave of absence);

(k)    unless otherwise provided in this Exhibit B, you are solely responsible for investigating and complying with any exchange control laws and foreign account or asset reporting requirements applicable to you in connection with the Award and any payment made pursuant to the Award;

(l)    unless otherwise provided by Bank of America in its discretion, the Award and the benefits evidenced by this Agreement do not create any entitlement to have the Award or any such benefits transferred to, or assumed by, another company nor to be exchanged,

MILLIGAN000087

cashed out or substituted for, in connection with any corporate transaction affecting Bank of America;

(m)  neither your employer, Bank of America or any of its Subsidiaries shall be liable for any foreign exchange rate fluctuation between your local currency and the United States Dollar that may affect the value of the Award or any payment made pursuant to the Award; and

(n)  Bank of America and your employer are not providing any tax, legal, financial or investment advice, nor making any recommendations regarding participation in the Plan. You acknowledge that you have the necessary knowledge and experience to understand how the Award and the Plan work, as well as any risks that may be related to the Plan and the Award and any notional or benchmark investment decisions that you may make in connection with the Plan or the Award. You should consult with your personal tax, legal and financial advisors regarding participation in the Plan.

**Language**

You acknowledge that you are sufficiently proficient in English to understand the terms and conditions of this Agreement. If you have received this Agreement or any other document related to the Award translated into a language other than English and if the meaning of the translated version differs from the English version, the English version shall control.

**Terms applicable to the WealthChoice Awards granted to employees in (or who are regulated by) any European Economic Area ("EEA") country**

*General*

In addition to and without limitation to any recoupment provisions or covenants included in the Agreement and any country-specific terms set forth below, the Award is subject to the requirements of the European Union Directive 2013/36/EU (the Capital Requirements Directive or "CRD"), as implemented into local law, local regulations or remuneration codes in your country (together "Local Regulations") or, if not yet implemented into Local Regulations, as adopted by the European Commission.

Further, payment of the Award is subject to the conditions that (a) you do not breach the standards expected of you pursuant to your employment contract, Bank of America Corporation Code of Conduct and Local Regulations, including, in particular, that you do not participate in and are not responsible for conduct which results in significant losses for Bank of America or its Subsidiaries and that you meet appropriate standards of fitness and propriety, (b) circumstances do not arise which require that your Award must be forfeited or repaid, in whole or in part, pursuant to the requirements of CRD and/or Local Regulations, as from time to time applicable, (c) payment of the

Award is sustainable according to the financial situation of Bank of America and justified on the basis of the performance of Bank of America and your business unit and (d) payment of the Award is justified on the basis of your performance.

### *Malus*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, reduce in whole or in part the amount of cash subject to the Award at or before the payment of the Award if (a) Bank of America determines, in its sole discretion, that you are or were within the categories of staff described in Article 92(2) of CRD (or the equivalent provisions under any Local Regulations as from time to time applicable) and/or you are or were deemed to have a material impact on the risk profile of Bank of America or any of its Subsidiaries in accordance with the criteria set out in articles 3 to 5 of Commission Delegated Regulation (EU) No 604/2014 and (b) there is a breach of the requirements or conditions set out above or, without limitation to the above, (i) you have participated in or were responsible for conduct which resulted in significant losses for Bank of America or its Subsidiaries, or (ii) you have failed to meet appropriate standards of fitness and propriety, as determined by Bank of America in its sole discretion.

### *Clawback*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, require you to repay some or all of the cash paid to you pursuant to this Agreement if (a) Bank of America determines, in its sole discretion, that you are or were within the categories of staff described in Article 92(2) of CRD (or the equivalent provisions under any Local Regulations as from time to time applicable) and/or you are or were deemed to have a material impact on the risk profile of Bank of America or any of its Subsidiaries in accordance with the criteria set out in articles 3 to 5 of Commission Delegated Regulation (EU) No 604/2014 and (b) there is a breach of the requirements or conditions set out above or, without limitation to the above, (i) you have participated in or were responsible for conduct which resulted in significant losses for Bank of America or its Subsidiaries, or (ii) you have failed to meet appropriate standards of fitness and propriety, as determined by Bank of America in its sole discretion.

Bank of America will determine, in its sole discretion, the appropriate amount required to be repaid, as applicable, as well as the terms on which and the process by which you must repay any amount pursuant to this provision. Without limitation to the foregoing, Bank of America may determine, in its sole discretion, that any cash amount to be repaid will be deducted from your salary or from any other payment to be made to you by Bank of America or one of its Subsidiaries.

**Country-specific terms and disclosures applicable to WealthChoice Awards granted to employees in countries (or regulated by countries) outside of the U.S.**

**Australia**

There are no country-specific provisions.

**Brazil**

By accepting the Award, you agree to comply with all applicable Brazilian laws and report and pay any and all applicable taxes associated with the receipt of the Award and any cash payment made pursuant to the Award.

If you are resident or domiciled in Brazil, you will be required to submit an annual declaration of assets and rights held outside of Brazil to the Central Bank of Brazil if the aggregate value of such assets and rights is equal to or greater than US$100,000. If such amount exceeds US$100,000,000, the declaration must be submitted quarterly. Assets and rights that must be reported include cash deposited into a foreign bank or brokerage account.

**Canada**

The following paragraph replaces the termination of employment paragraph of the Nature of Grant provision contained in this Exhibit B:

For purposes of the Award, your employment will be considered terminated as of, and your right (if any) to earn and be paid any portion of the Award pursuant to this Agreement after such termination of employment (regardless of the reason for such termination and whether or not later found to be invalid or in breach of the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any) will be measured by, the date that is the earliest of: (a) the date your employment with Bank of America and its Subsidiaries is terminated, (b) the date you receive written notice of termination from Bank of America or your employer, regardless of any notice period or period of pay in lieu of such notice mandated under the employment laws in the jurisdiction where you are employed or the terms of your employment agreement, if any; and (c) the date you are no longer actively employed by or actively providing services to Bank of America or any of its Subsidiaries; Bank of America, in its sole discretion, shall determine when you are no longer actively employed or providing services for purposes of the Award (including whether you may still be considered actively employed or actively providing services while on an approved leave of absence).

In the event payment of the Award is made into a U.S. brokerage account, you should be aware that if the cost of your foreign specified property exceeds C$100,000 at any time during the year, you must report all of your foreign specified property on Form T1135 by April 30th of the following year.

You should consult with a personal tax advisor to ensure that you are properly complying with applicable reporting requirements.

*The following provisions are applicable to employees in Quebec:*

The following paragraph supplements the data privacy provision contained in this Exhibit B:

You hereby authorize Bank of America and Bank of America's representatives to discuss with and obtain all relevant information from all personnel, professional or non-professional, involved in the administration of the Award. You further authorize Bank of America, its Subsidiaries and the administrator of the Award to disclose and discuss the Award with their advisors. You further authorize Bank of America and its Subsidiaries to record such information and to keep such information in your employee file.

<u>Consent to Receive Information in English for Employees in Quebec</u>

The parties acknowledge that it is their express wish that the Agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

*Les parties reconnaissent avoir exigé la rédaction en anglais de la convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, directement ou indirectement, relativement à ou suite à la présente convention.*

**<u>France</u>**

The following paragraphs translate the provision regarding CRD in the European Economic Area section of this Exhibit B:

***<u>Conditions applicables à l'attribution de WealthChoice (« la Prime ») aux salariés travaillant dans (ou soumis à la législation d') un pays de l'Espace économique européen (« EEE »)</u>***

***Généralités***

*Sans préjudice (i) des dispositions relatives à la récupération ou (ii) de tout engagement fondées sur la performance prévus au Contrat ou disposition spécifique prévue ci-dessous, la Prime est soumise (a) aux exigences de la Directive Européenne 2013/36/EU (« CRD») telle que transposée dans la législation locale, et (b) aux réglementations ou politiques de rémunération locales (collectivement les « Réglementations locales ») ou, si la Directive n'a pas encore été transposée en droit local, la Directive telle qu'adoptée par la Commission européenne.*

*De plus, le paiement de la Prime est soumis aux paramètres suivants: a) respect dispositions de votre contrat de travail, du Code de Conduite de Bank of America et/ou des Réglementations locales, et*

*notamment, de l'interdiction d'adopter un comportement qui entrainerait des pertes financières sérieuses pour Bank of America ou ses Filiales et le respect des exigences d'honorabilité et de compétence, b) absence de circonstance entraînant la perte du droit à votre Prime ou son remboursement, en tout ou en partie, conformément aux exigences de la CRD et des Réglementations locales en vigueur, c) situation financière de Bank of America suffisamment solide, performance de Bank of America et de votre service (Business Unit) et d) performance personnelle.*

### *Malus*

*Sauf si Bank of America juge cela inadapté, Bank of America réduira, en tout ou en partie, le montant dédié à la Prime au moment ou avant le paiement de la Prime si a) vous appartenez ou avez appartenu aux catégories de personnel décrites à l'Article 92(2) de la CRD, tel que déterminé de manière discrétionnaire par Bank of America ou en application des Réglementations locales en vigueur et/ou que vous avez eu ou auriez pu avoir une incidence significative sur le profil de risque de Bank of America ou ses filiales en application des critères déterminés aux articles 3 à 5 du Règlement délégué (EU) N 604/2014 de la Commission et b) en cas de violation des exigences ou conditions stipulées ci-dessus ou, sans préjudice de ce qui précède, i) si vous avez adopté un comportement qui entrainerait des pertes sérieuses pour Bank of America ou ses Filiales ou ii) vous n'avez pas respecté les exigences d'honorabilité et de compétence, déterminées discrétionnairement par Bank of America.*

### *Clawback*

*Sauf si Bank of America juge cela inadapté, Bank of America exigera de votre part le remboursement de tout ou partie du montant qui vous a été versé en application du présent Contrat si a) vous appartenez ou avez appartenu aux catégories de personnel décrites à l'Article 92(2) de la CRD, tel que déterminé de manière discrétionnaire par Bank of America ou en application des Réglementations locales en vigueur et/ou que vous avez eu ou auriez pu avoir une incidence significative sur le profil de risque de Bank of America ou ses filiales en application des critères déterminés aux articles 3 à 5 du Règlement délégué (EU) N 604/2014 de la Commission et b) en cas de violation des exigences ou conditions stipulées ci-dessus ou, sans préjudice de ce qui précède, i) si vous avez adopté un comportement qui entrainerait des pertes sérieuses pour Bank of America ou ses Filiales ou ii) vous n'avez pas respecté les exigences d'honorabilité et de compétence, déterminées discrétionnairement par Bank of America.*

*Bank of America déterminera, de manière discrétionnaire, le montant à rembourser, selon le cas, ainsi que les modalités et la procédure selon laquelle devra s'opérer le remboursement en application de la présente disposition. Sans préjudice de ce qui précède, Bank of America pourra décider, de manière discrétionnaire, que tout montant devant être remboursé sera déduit de votre salaire ou de tout autre paiement devant vous être versé par Bank of America ou une de ses Filiales.*

*En cliquant sur le bouton «J'accepte» ou en signant et renvoyant le présent document décrivant les termes et conditions de votre attribution, vous confirmez ainsi avoir lu et compris les documents*

MILLIGAN000092

*relatifs à cette attribution (ce Contrat d'Attribution) qui vous ont été communiqués en langue anglaise. Vous en acceptez les termes en connaissance de cause.*

By clicking on the "I accept" button or by signing and returning this document providing for the terms and conditions of your grant, you confirm having read and understood the documents relating to this grant (the Agreement) which were provided to you in the English language. You accept the terms of those documents accordingly.

### **Hong Kong**

*WARNING: The Award does not constitute a public offering of securities under Hong Kong law and is available only to employees of Bank of America or its Subsidiaries. The Agreement, including this Exhibit B, and any other incidental communication materials distributed in connection with the Award (i) have not been prepared in accordance with and are not intended to constitute a "prospectus" for a public offering of securities under the applicable securities legislation in Hong Kong, (ii) have not been reviewed by any regulatory authority in Hong Kong, and (iii) are intended only for the personal use of each eligible employee of your employer, Bank of America or its Subsidiaries and may not be distributed to any other person. You are advised to exercise caution in relation to the offer contained in the Agreement. If you have any doubt or questions regarding the contents of the Agreement, including this Exhibit B, or any other incidental communication materials distributed in connection with the Award, you should obtain independent professional advice.*

The following paragraphs replace paragraphs (b)(i), (b)(ii), (b)(iv) and (c), respectively, of Exhibit A to the Agreement:

(b)(i)  Death. The Account Balance shall become earned and payable the earlier of (i) the date that is three months after your Termination of Employment if your Termination of Employment is due to your death and (ii) the scheduled payment date in paragraph (a). Payment will be made as soon as administratively practicable thereafter.

(ii)  Workforce Reduction, Divestiture or Disability. In the case of your Termination of Employment due to your Workforce Reduction, Divestiture or Disability, the Account Balance shall continue to become earned and payable in accordance with the Payment Schedule set forth in paragraph (a) above, subject to your complying with the covenants set forth in paragraph (d) below; provided, however, that if you are eligible for Retirement at the time of your Termination of Employment due to your Workforce Reduction, Divestiture or Disability, the Account Balance will become earned and payable in accordance with paragraph (c). Notwithstanding anything in this paragraph (b)(ii) to the contrary, upon your death following a Termination of Employment due to Workforce Reduction, Divestiture or Disability, any unearned portion of the Account Balance representing your Award that is continuing to become earned and payable in accordance with the provisions of this paragraph (b)(ii), but has not yet become earned and payable, shall become earned and payable the earlier of (i) the date that is three months after the date of your death and (ii) the

scheduled payment date in paragraph (a), and payment will be made as soon as administratively practicable thereafter.

(iv)    <u>Change in Control</u>. Notwithstanding anything in this Agreement to the contrary, if (A) a Change in Control occurs and (B) on or after the Change in Control and on or before the second anniversary of the Change in Control either (1) you have a Termination of Employment without Cause or (2) you have a Termination of Employment for Good Reason, then the Account Balance shall become immediately earned as of the date of such Termination of Employment and shall be payable at such time as provided in the Payment Schedule described in paragraph (a) above, without regard to the covenants set forth in paragraph (d) below. Notwithstanding anything in this paragraph (b)(iv) to the contrary, upon your death following (A) a Termination of Employment without Cause on or before the second anniversary of a Change in Control or (B) a Termination of Employment for Good Reason on or before the second anniversary of a Change in Control, any portion of the Account Balance representing your Award that is continuing to become payable in accordance with the provisions of this paragraph (b)(iv), but has not yet become payable, shall become payable the earlier of (i) the date that is three months after the date of your death and (ii) the scheduled payment date in paragraph (a), and payment will be made as soon as administratively practicable thereafter.

(c)    <u>RETIREMENT</u>. In the case of your Termination of Employment for any reason other than your death, Cause or in connection with a Change in Control as described in paragraph (b)(iv) above after you are eligible for Retirement, then the Account Balance will become earned and payable in two installments, with the first 50% becoming earned and payable within 2½ months following the end of the calendar year in which your Retirement occurs and the remaining 50% becoming earned and payable within 2½ months following the end of the immediately subsequent calendar year; provided, however, that (i) to the extent permissible under applicable law, you do not engage in Competition during such period; (ii) you comply with the covenants described in paragraph (d) below and (iii) prior to each anniversary of the grant date specified in your Award Statement, you provide Bank of America with a written certification that you have not engaged in Competition to the extent the Competition restriction in (i) above is applicable. To be effective, such certification must be provided on such form, at such time and pursuant to such procedures as Bank of America shall establish from time to time. If Bank of America determines in its reasonable business judgment that you have failed to satisfy any of the foregoing requirements, then the Account Balance representing your Award shall be immediately canceled as of the date of such determination. In addition, from time to time following your Termination of Employment after you are eligible for Retirement, Bank of America may require you to further certify that you are not engaging in Competition, and if you fail to fully cooperate with any such requirement Bank of America may determine that you are engaging in Competition. Notwithstanding anything in this Agreement to the contrary, if (1) you are a permanent resident of California; (2) you are a tax resident of California who is assigned to perform services for Bank of America or any Subsidiary from an office located in California or (3) you have a Termination of Employment due to your Workforce Reduction, Divestiture or Disability when you are eligible for

Retirement, the Competition restriction described in (i) above and the certification requirement described in (iii) above will not apply to this Award. Notwithstanding anything in this paragraph (c) to the contrary, upon your death following Retirement, any unearned portion of the Account Balance representing your Award that is continuing to become earned and payable in accordance with the provisions of this paragraph (c), but has not yet become earned and payable, shall become earned and payable the earlier of (i) the date that is three months after the date of your death and (ii) the scheduled payment date in paragraph (a), and payment will be made as soon as administratively practicable thereafter.

### India

There are no country-specific provisions.

### Japan

There are no country-specific provisions.

### Singapore

There are no country-specific provisions.

### United Kingdom

Without limitation to the Agreement provisions regarding Tax-Related Items contained in the Agreement, you hereby agree that you are liable for all Tax-Related Items and hereby covenant to pay all such Tax-Related Items, as and when requested by Bank of America or (if different) your employer or by Her Majesty's Revenue and Customs ("HMRC") (or any other tax authority or any other relevant authority). You also hereby agree to indemnify and keep indemnified Bank of America and (if different) your employer against any Tax-Related Items that they are required to pay or withhold or have paid or will pay to HMRC (or any other tax authority or any other relevant authority) on your behalf.

The following paragraphs are in addition to and without limitation to any recoupment provisions or covenants included in the Agreement and the provision regarding CRD in the European Economic Area section of this Exhibit B.

The Award is also subject to the requirements of the Remuneration Codes of the Prudential Regulation Authority and the Financial Conduct Authority (the "Remuneration Codes").

*Malus*

Bank of America will, unless Bank of America otherwise determines that it is inappropriate, reduce in whole or in part the amount of cash subject to the Award at or before the payment of the Award if

(a) Bank of America determines, in its sole discretion, that the requirements of the Remuneration Codes are or were applicable to you, and (b)

    (i)     There is reasonable evidence of misbehavior or material error by you;

    (ii)    Bank of America and/or its Subsidiaries and/or a business unit suffer a material failure of risk management; or

    (iii)   Bank of America and/or its Subsidiaries and/or a business unit suffer a material downturn in its or their financial performance.

In respect of paragraphs (i) and (ii) above, Bank of America may take into account the extent to which (x) you could have been reasonably expected to be aware of a failure or misconduct at the time it occurred but failed to take adequate steps to promptly identify, assess, report, escalate or address it; and (y) by virtue of your role or seniority, you could be deemed directly or indirectly responsible or accountable for the failure or misconduct.

### *Clawback*

Bank of America will, unless Bank of America determines that it is inappropriate, require you to repay some or all of the cash paid to you pursuant to this Agreement if during the Clawback Period (a) Bank of America determines, in its sole discretion, that the requirements of the Remuneration Codes are or were applicable to you, and (b)

    (i)     There is reasonable evidence of misbehavior or material error by you; or

    (ii)    Bank of America and/or its Subsidiaries and/or a business unit suffer a material failure of risk management.

In respect of paragraphs (i) and (ii) above, Bank of America will take into account the extent to which (x) you could have been reasonably expected to be aware of a failure or misconduct at the time it occurred but failed to take adequate steps to promptly identify, assess, report, escalate or address it; and (y) by virtue of your role or seniority, you could be deemed directly or indirectly responsible or accountable for the failure or misconduct.

For purposes of this "Clawback" provision, Clawback Period means such period commencing on the date of payment of the Award and ending on the seventh anniversary of the date of grant of the Award or, by way of notice to you given before the seventh anniversary of the date of grant of the Award, such longer period as is required under the Remuneration Codes.

MILLIGAN000096

Accepted on: March 05, 2019

PY2018 FA WealthChoice (LTCA 8YR CLIFF)
18WC8C-18WC8CCA-18WC8CMA

# EXHIBIT T

# 2015 WealthChoice Award

Long-term contingent award fact sheet for Financial Advisors

January 2015







## Table of contents

When will my award be granted and paid? 2

How are taxes applied to my award? 2

How does my award affect my benefits? 2

What happens if I leave Bank of America? 2-3

What additional award conditions apply? 4

Where can I learn more? 4



**Bank of America**

## 2015 WealthChoice Award

Your Bank of America long-term incentive WealthChoice Award is an important part of our pay for performance approach.

## When will my award be granted and paid?

The grant date of your 2015 award is Feb. 13, 2015. The U.S. dollar amount of your award is determined based on your level of achievement of objectives established in the 2014 Financial Advisor Incentive Compensation Plan. Your 2015 WealthChoice Award generally will become earned and payable on Feb. 13, 2023.

You'll receive payment of your WealthChoice Award generally within 30 days after the payment date.

## How are taxes applied to my award?

| If you're subject to U.S. taxes |
| --- |
| WealthChoice Awards subject to U.S. taxes are not taxable when granted and generally become taxable when paid. You're responsible for FICA, federal, state and local income taxes, as applicable. |

| If you're subject to taxes outside the U.S. |
| --- |
| The taxation of WealthChoice Awards outside the U.S. depends on the country (or countries) in which you're subject to taxes. Most countries do not tax WealthChoice Awards when granted, but you may be subject to tax on the value delivered when the payment is made. Income tax and social insurance contribution withholding and reporting will be made to the extent required under applicable law. |

Please consult with your personal tax advisor to discuss taxation of your WealthChoice Award.

## How does my award affect my benefits?

| If you're based in the U.S. |
| --- |
| WealthChoice Awards are not considered plan-eligible compensation for any of Bank of America's employee benefit plans, including the 401(k), employee life insurance, accidental death and dismemberment insurance and long-term disability insurance plans. |

| If you're based outside the U.S. |
| --- |
| WealthChoice Awards are not considered part of local salary or compensation for any purpose, including calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments. WealthChoice Awards also are not considered to be compensation for — or related to — past services provided to Bank of America. |

## What happens if I leave Bank of America?

Whether your WealthChoice Award becomes earned and payable when you leave the bank depends on several factors, including the reason you're leaving the company and the fulfillment of certain other award conditions. The treatment may vary in certain countries, depending on applicable law. Please review your award agreement for more details that apply to you.

| Termination Reason | Treatment of your WealthChoice Award |
| --- | --- |
| If your employment ends for cause | The unearned portion of your award will be canceled. |
| If your employment ends because you have a disability or are affected by a divestiture or workforce reduction | The unearned portion of your award will continue to become earned and payable according to the original payment schedule unless you're eligible for retirement, in which case the retirement payment schedule applies. You must comply with the conditions described in your award agreement, with the exception of the agreement not to work for a competitive business or your award will be cancelled. |

| Termination Reason | Treatment of your WealthChoice Award |
|---|---|
| **If your employment ends without cause or for good reason within two years following a change in control (such as a merger or acquisition)** | The unearned portion of your award generally will become earned immediately and will be payable according to the original payment schedule. |
| **In the event of your death** | The unearned portion of your award will be paid to your beneficiary generally within 30 days after notification of your death from the payroll system. In the event of your death after you have left the company, your outstanding award will continue to be paid to your beneficiary according to the payment schedule in effect at the time of your death. |
| **If your employment ends for any other reason (including if you leave voluntarily)** | The unearned portion of your award will be canceled (unless you meet certain age and service requirements listed below). If your employment ends because you have taken an eligible government position and you meet other conditions of our Government Leaver Policy found on Flagscape, your award may also qualify for special treatment. |

## Meeting certain age and service requirements

Each of the plans and/or programs in which you participate may have different age and service requirements for the continuation of your benefit once you leave the bank.

The following conditions apply to your WealthChoice Award, subject to the definitions below.

| | |
|---|---|
| **If you're eligible for retirement** | Your award will become earned and payable in two installments.<br>• The first half will become earned and payable within 2½ months following the end of the calendar year in which your retirement occurs.<br>• The remaining half will become earned and payable within 2½ months after the end of the following calendar year. |
| **If you're not eligible for retirement but meet the rule of 65** | Your award will continue to become earned and payable on the original payment date. |

**Important:** In order for your award to become earned and payable as described above, you must comply with all conditions described in your award agreement – including your agreement to not work for a competitive business. Each year until your award is fully earned and payable, you'll receive a certification to sign and return to confirm that you aren't working for a competitive business.*

*The competition restriction and certification requirement do not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.*

### Important definitions

**Retirement:** You have either 10 or more years of service and are at least age 55 or are at least age 65 regardless of your years of service.

**Rule of 65:** You have at least 20 years of service and your age plus service equals at least 65.

**Length of service:** Length of service is determined by Bank of America. If you're a U.S.-based employee and participate in a Bank of America tax-qualified 401(k) plan, your length of service is your "vesting service" in your 401(k) plan. If you're based outside the U.S., you may be subject to different country-specific rules.

**Working for a competitive business:** Generally means being engaged, directly or indirectly, with a business entity designated as a competitive business at the time you leave Bank of America.

**JA318**

## What additional award conditions apply?

Payment of your WealthChoice Award assumes that you don't engage in detrimental conduct or solicitation* as described in your award agreement. The company also may recover some or all of the cash paid to you pursuant to your award if you engage in detrimental conduct as described above. For more details, please read your award agreement.

*The customer/client solicitation covenant does not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.*

## Where can I learn more?

In addition to this fact sheet, your award agreement will provide full details about your award. A few weeks after the grant date, you'll receive notification that your award agreement is available on the Advisory Division website. Please note that WealthChoice Awards granted in prior years may be subject to different rules, so it's important to review the award agreement for each award you receive.

### Benefits OnLine (www.benefits.ml.com)

About five to seven business days after you accept your award, its value will be allocated to your account and benchmarked to the Stable Value Fund. You can change the investment allocation for your award up to 12 times a year on Benefits OnLine.®

*To receive a WealthChoice Award, you must be actively employed with Bank of America or on an approved leave of absence on the grant date, unless otherwise required by law. To receive payment of your WealthChoice Award, you must be actively employed with Bank of America or on an approved leave of absence on the payment date, and continue to meet other conditions of your award agreement*

*Many of the terms used in this fact sheet are defined in your award agreement. Please review your award agreement for more details.*

*This fact sheet summarizes some of the key features of the 2015 Bank of America Corporation WealthChoice Awards. In case of any conflict between this fact sheet and the WealthChoice Contingent Award Plan document or your 2015 Bank of America Corporation WealthChoice Award agreement, the plan document and award agreement will control. The design of awards is reviewed periodically and is subject to revision at the discretion of Bank of America. Although Bank of America does not plan to make further changes to the 2015 Bank of America Corporation WealthChoice Awards, market conditions or government regulations may make such changes necessary. Awards are made at the sole discretion of Bank of America and all awards will be governed by the laws of the State of Delaware, U.S.A. and the laws of the United States.*

© 2015 Bank of America Corporation      ARXDYTXN

**JA319**

# EXHIBIT U

Fact sheet

# 2016 WealthChoice Award

Long-term contingent award for
Financial Advisors

## Inside

What's changing from last year?

When will my award be granted and paid?

How are taxes applied to my award?

How does my award affect my benefits?    2

What happens if I leave Bank of America?    3

What additional award conditions apply?    4

Where can I learn more?    5









Bank of America



## 2016 WealthChoice Award

Your Bank of America long-term incentive WealthChoice Award is an important part of our pay for performance approach.



## Keep in mind

How your award is taxed will vary depending on the countries and/or states in which you're subject to taxes.

If you have questions about the taxation of your WealthChoice award, consult with your personal tax advisor.

## What's changing from last year?

There are some important changes to awards this year. For more information see the related section of this fact sheet and review your award agreement once it is available.

- WealthChoice awards will become earned and payable on Feb. 15, 2024.
- The retirement definition has been updated to reflect the new definition previously communicated in the PY2015 Financial Advisor Compensation Guide.

## When will my award be granted and paid?

**The grant date of your 2016 award is Feb. 12, 2016.**

The U.S. dollar amount of your award is determined based on your level of achievement of objectives established in the 2015 Financial Advisor Incentive Compensation Plan. Your 2016 WealthChoice Award generally will become earned and payable on Feb. 15, 2024.

You'll receive payment of your WealthChoice Award generally within 30 days after the payment date.

## How are taxes applied to my award?

**If you're subject to U.S. taxes**

WealthChoice Awards subject to U.S. taxes are not taxable when granted and generally become taxable when paid. You're responsible for FICA, federal, state and local income taxes, as applicable.

**If you're subject to taxes outside the U.S.**

Most countries do not tax WealthChoice Awards when granted, but you may be subject to tax on the value delivered when the payment is made. Income tax and social insurance contribution withholding and reporting will be made to the extent required under applicable law.

## How does my award affect my benefits?

**If you're based in the U.S.**

WealthChoice Awards are not considered plan-eligible compensation for any of Bank of America's employee benefit plans, including the 401(k), employee life insurance, accidental death and dismemberment insurance and long-term disability insurance plans.

**If you're based outside the U.S.**

WealthChoice Awards are not considered part of local salary or compensation for any purpose, including calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments. WealthChoice Awards are not considered to be compensation for — or related to — past services provided to Bank of America.



**JA322**

2016 WealthChoice Award **Fact Sheet**         3



## Review your award agreement

The treatment of your WealthChoice Award may vary in certain countries, depending on applicable law. Please review your award agreement for more details that apply to you.

## What happens if I leave Bank of America?

Whether your WealthChoice Award becomes earned and payable when you leave the bank depends on several factors, including the reason you're leaving the company and the fulfillment of certain other award conditions.

| Termination Reason | Treatment of your WealthChoice Award |
|---|---|
| If your employment ends for cause | The unearned portion of your award will be canceled. |
| If your employment ends because you have a disability or are affected by a divestiture or workforce reduction | The unearned portion of your award will continue to become earned and payable according to the original payment schedule unless you're eligible for retirement, in which case the retirement payment schedule applies. You must comply with the conditions described in your award agreement, with the exception of the agreement not to work for a competitive business, or your award will be cancelled. |
| If your employment ends without cause or for good reason within two years following a change in control (such as a merger or acquisition) | The unearned portion of your award generally will become earned immediately and will be payable according to the original payment schedule. |
| In the event of your death | The unearned portion of your award will be paid to your beneficiary generally within 30 days after notification of your death from the payroll system. In the event of your death after you have left the company, your outstanding award will continue to be paid to your beneficiary according to the payment schedule in effect at the time of your death. |
| If your employment ends for any other reason (including if you leave voluntarily) | The unearned portion of your award will be canceled, unless you are eligible for retirement as described on page 4. |

**Bank of America**

**JA323**



## Definitions

**Length of service**

Length of service is determined by Bank of America. If you're a U.S.-based employee and participate in a Bank of America tax-qualified 401(k) plan, your length of service is your "vesting service" in your 401(k) plan.

**Working for a competitive business**

Generally means being engaged, directly or indirectly, with a business entity designated as a competitive business at the time you leave Bank of America.

**If you're eligible for retirement**

Each of the plans and/or programs in which you participate may define retirement differently. Here's how eligibility is determined for your WealthChoice Award:

- You're at least age 65; or
- You have at least 10 years of service and you're at least age 55.

**If you meet these age and service requirements when you leave the company,** your award will become earned and payable in two installments.

- The first half will become earned and payable within 2½ months following the end of the calendar year in which your retirement occurs.
- The remaining half will become earned and payable within 2½ months after the end of the following calendar year.

**Important:** In order for your award to become earned and payable as described above, you must comply with all conditions described in your award agreement – including your agreement to not work for a competitive business. Each year until your award is fully earned and payable, you'll receive a certification to sign and return to confirm that you aren't working for a competitive business.*

*The competition restriction and certification requirement do not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.

## What additional award conditions apply?

Payment of your WealthChoice Award assumes that you don't engage in detrimental conduct or customer, client or employee solicitation* as described in your award agreement. The company also may recover some or all of the cash paid to you pursuant to your award if you engage in detrimental conduct as described above. For more details, please read your award agreement.

*The customer/client solicitation covenant does not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.

Bank of America    Bank of America  Merrill U.S. Bank of America  Lynch Trust Merrill Lynch  ML_BOA_00797

**JA324**

## Where can I learn more?

In addition to this fact sheet, your award agreement will provide full details about your award. A few weeks after the grant date, you'll receive notification that your award agreement is available on the Advisory Division website. Please note that WealthChoice Awards granted in prior years may be subject to different rules, so it's important to review the award agreement for each award you receive.

| Additional resources |
| --- |
| **Benefits OnLine** |
| About five to seven business days after you accept your award, its value will be allocated to your account and benchmarked to the Stable Value Fund. You can change the investment allocation for your award up to 12 times a year on Benefits OnLine. |
| Visit: **www.benefits.ml.com** |

To receive a WealthChoice Award, you must be actively employed with Bank of America or on an approved leave of absence on the grant date, unless otherwise required by law. To receive payment of your WealthChoice Award, you must be actively employed with Bank of America or on an approved leave of absence on the payment date, and continue to meet other conditions of your award agreement

Many of the terms used in this fact sheet are defined in your award agreement. Please review your award agreement for more details.

This fact sheet summarizes some of the key features of the 2016 Bank of America Corporation WealthChoice Awards. In case of any conflict between this fact sheet and the WealthChoice Contingent Award Plan document or your 2016 Bank of America Corporation WealthChoice Award agreement, the plan document and award agreement will control. The design of awards is reviewed periodically and is subject to revision at the discretion of Bank of America. Although Bank of America does not plan to make further changes to the 2016 Bank of America Corporation WealthChoice Awards, market conditions or government regulations may make such changes necessary. Awards are made at the sole discretion of Bank of America and all awards will be governed by the laws of the State of Delaware, U.S.A. and the laws of the United States.

**Bank of America**

Case 3:24-cv-00440-KDB-DCK     Document 41-17     Filed 09/30/24     Page 2 of 6     ML00798

**JA325**

# EXHIBIT V

Fact sheet

# 2017 WealthChoice Award

Long-term contingent award for Financial Advisors

## Inside

| | |
|---|---|
| When will my award be granted and paid? | |
| How are taxes applied to my award? | |
| How does my award affect my benefits? | 2 |
| What happens if I leave Bank of America? | 3 |
| What additional award conditions apply? | 4 |
| Additional resources | 5 |











## 2017 WealthChoice Award

Your Bank of America long-term incentive WealthChoice Award is an important part of our pay for performance approach.



## Keep in mind

How your award is taxed will vary depending on the countries and/or states in which you're subject to taxes.

If you have questions about the taxation of your WealthChoice award, consult with your personal tax advisor.

## When will my award be granted and paid?

**The grant date of your 2017 award is Feb. 15, 2017.**

The U.S. dollar amount of your award is determined based on your level of achievement of objectives established in the 2016 Financial Advisor Incentive Compensation Plan. Your 2017 WealthChoice Award generally will become earned and payable on Feb. 15, 2025.

You'll receive payment of your WealthChoice Award generally within 30 days after the payment date.

## How are taxes applied to my award?

**If you're subject to U.S. taxes**

WealthChoice Awards subject to U.S. taxes are not taxable when granted and generally become taxable when paid. You're responsible for FICA, federal, state and local income taxes, as applicable.

**If you're subject to taxes outside the U.S.**

Most countries do not tax WealthChoice Awards when granted, but you may be subject to tax when the WealthChoice Awards become earned and payable. Income tax and social insurance contribution withholding and reporting will be made to the extent required under applicable law.

## How does my award affect my benefits?

**If you're based in the U.S.**

WealthChoice Awards are not considered plan-eligible compensation for any of Bank of America's employee benefit plans, including the 401(k), employee life insurance, accidental death and dismemberment insurance and long-term disability insurance plans.

**If you're based outside the U.S.**

WealthChoice Awards are not considered part of local salary or compensation for any purpose, including calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, holiday pay, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments. WealthChoice Awards are not considered to be compensation for — or related to — past services provided to Bank of America.





## Review your award agreement

The treatment of your WealthChoice Award may vary in certain countries, depending on applicable law. Please review your award agreement for more details that apply to you.

## What happens if I leave Bank of America?

Whether your WealthChoice Award becomes earned and payable when you leave the bank depends on several factors, including the reason you're leaving the company and the fulfillment of certain other award conditions.

| Termination Reason | Treatment of your WealthChoice Award |
|---|---|
| **If your employment ends for cause** | The unearned portion of your award will be canceled. |
| **If your employment ends because you have a disability or are affected by a divestiture or workforce reduction** | The unearned portion of your award will continue to become earned and payable according to the original payment schedule unless you're eligible for retirement, in which case the retirement payment schedule applies. You must comply with the conditions described in your award agreement, with the exception of the agreement not to work for a competitive business, or your award will be canceled. |
| **If your employment ends without cause or for good reason within two years following a change in control (such as a merger or acquisition)** | The unearned portion of your award generally will become earned immediately and will be payable according to the original payment schedule. |
| **In the event of your death** | The unearned portion of your award will be paid to your beneficiary generally within 30 days after notification of your death from the payroll system. In the event of your death after you have left the company, your outstanding award will vest immediately and be paid to your beneficiary as soon as administratively possible. |
| **If your employment ends for any other reason (including if you leave voluntarily)** | The unearned portion of your award will be canceled, unless you are eligible for retirement as described on page 4. |

Bank of America

**JA329**



## Definitions

**Length of service**

Length of service is determined by Bank of America. If you're a U.S.-based employee and participate in a Bank of America tax-qualified 401(k) plan, your length of service is your "vesting service" in your 401(k) plan.

**Working for a competitive business**

Generally means being engaged, directly or indirectly, with a business entity designated as a competitive business at the time you leave Bank of America.

**If you're eligible for retirement**

Each of the plans and/or programs in which you participate may define retirement differently. Here's how eligibility is determined for your WealthChoice Award:

- You're at least age 65; or
- You have at least 10 years of service and you're at least age 55.

If you meet these age and service requirements when you leave the company, your award will become earned and payable in two installments.

- The first half will become earned and payable within 2½ months following the end of the calendar year in which your retirement occurs.
- The remaining half will become earned and payable within 2½ months after the end of the following calendar year.

**Important:** In order for your award to become earned and payable as described above, you must comply with all conditions described in your award agreement – including your agreement to not work for a competitive business. Each year until your award is fully earned and payable, you'll receive a certification to sign and return to confirm that you aren't working for a competitive business.*

*The competition restriction and certification requirement does not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.

## What additional award conditions apply?

Payment of your WealthChoice Award assumes that you don't engage in detrimental conduct or customer, client or employee solicitation* as described in your award agreement. The company also may recover some or all of the cash paid to you pursuant to your award if you engage in detrimental conduct as described above. For more details, please read your award agreement.

*The customer/client solicitation covenant does not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.



ML-BAC_WC_000822

**JA330**



## Where can I learn more?

In addition to this fact sheet, your award agreement will provide full details about your award. A few weeks after the grant date, you'll receive notification that your award agreement is available on the PMAC website.

Please note that WealthChoice Awards granted in prior years may be subject to different rules, so it's important to review the award agreement for each award you receive.

## Additional resources

**Benefits OnLine**

About five to seven business days after you accept your award, its value will be allocated to your account and benchmarked to the Stable Value Fund. You can change the investment allocation for your award and review or update the beneficiary designation for your RSU awards on Benefits OnLine.

Visit: www.benefits.ml.com

**HR Connect**

Offers resources to help you understand and take action on your incentive plans and awards. You'll find:

· Current and historical fact sheets for your awards

· The enterprise competitor list

· Access to the updated RSU Learning Center and Benefits OnLine User Guide

· Direct access to your awards through Benefits OnLine

Visit: https://hrconnect.bankofamerica.com > Money > Pay > Incentive plans & awards

To receive a WealthChoice Award, you must be actively employed with Bank of America or on an approved leave of absence on the grant date, unless otherwise required by law. To receive payment of your WealthChoice Award, you must be actively employed with Bank of America or on an approved leave of absence on the payment date, and continue to meet other conditions of your award agreement.

Many of the terms used in this fact sheet are defined in your award agreement. Please review your award agreement for more details.

This fact sheet summarizes some of the key features of the 2017 Bank of America Corporation WealthChoice Awards. In case of any conflict between this fact sheet and the WealthChoice Contingent Award Plan document or your 2017 Bank of America Corporation WealthChoice Award agreement, the plan document and award agreement will control. The design of awards is reviewed periodically and is subject to revision at the discretion of Bank of America. Although Bank of America does not plan to make further changes to the 2017 Bank of America Corporation WealthChoice Awards, market conditions or government regulations may make such changes necessary. Awards are made at the sole discretion of Bank of America and all awards will be governed by the laws of the State of Delaware, U.S.A. and the laws of the United States.

**Bank of America**

**JA331**

# EXHIBIT W

Fact sheet

# 2018 WealthChoice Award

Long-term contingent award for Financial Advisors

## Inside

When will my award be granted and paid?

How are taxes applied to my award?

How does my award affect my benefits? | 2

What happens if I leave Bank of America? | 3

What additional award conditions apply? | 4

Additional resources | 5









Bank of America

ML-WDC-000824

JA333



# 2018 WealthChoice Award

Your Bank of America long-term incentive WealthChoice Award is an important part of our pay for performance approach.



## Keep in mind

How your award is taxed will vary depending on the countries and/or states in which you're subject to taxes.

If you have questions about the taxation of your WealthChoice Award, consult with your personal tax advisor.

## When will my award be granted and paid?

**The grant date of your 2018 award is Feb. 15, 2018.**

The U.S. dollar amount of your award is determined based on your level of achievement of objectives established in the 2017 Financial Advisor Incentive Compensation Plan. Your 2018 WealthChoice Award generally will become earned and payable on Feb. 15, 2026.

You'll receive payment of your WealthChoice Award generally within 30 days after the payment date.

## How are taxes applied to my award?

**If you're subject to U.S. taxes**

WealthChoice Awards subject to U.S. taxes are not taxable when granted and generally become taxable when paid. You're responsible for FICA, federal, state and local income taxes, as applicable.

**If you're subject to taxes outside the U.S.**

Most countries do not tax WealthChoice Awards when granted, but you may be subject to tax when your WealthChoice Award becomes earned and payable. Income tax and social insurance contribution withholding and reporting will be made to the extent required under applicable law.

## How does my award affect my benefits?

**If you're based in the U.S.**

WealthChoice Awards are not considered plan-eligible compensation for any of Bank of America's employee benefit plans, including the 401(k), employee life insurance, accidental death and dismemberment insurance and long-term disability insurance plans.

**If you're based outside the U.S.**

WealthChoice Awards are not considered part of local salary or compensation for any purpose, including calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, holiday pay, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments. WealthChoice Awards are not considered to be compensation for — or related to — past services provided to Bank of America.





## Review your award agreement

The treatment of your WealthChoice Award may vary in certain countries, depending on applicable law. Please review your award agreement for more details that apply to you.

## What happens if I leave Bank of America?

Whether your WealthChoice Award becomes earned and payable when you leave the bank depends on several factors, including the reason you're leaving the company and the fulfillment of certain other award conditions.

| Termination Reason | Treatment of your WealthChoice Award |
|---|---|
| **If your employment ends for cause** | The unearned portion of your award will be canceled. |
| **If your employment ends because you have a disability or are affected by a divestiture or workforce reduction** | The unearned portion of your award will continue to become earned and payable according to the original payment schedule unless you are eligible for retirement, in which case the retirement payment schedule applies. You must comply with the conditions described in your award agreement, with the exception of the agreement to not work for a competitive business, or your award will be canceled. |
| **If your employment ends without cause or for good reason within two years following a change in control (such as a merger or acquisition)** | The unearned portion of your award generally will become earned immediately and will be payable according to the original payment schedule. |
| **In the event of your death** | The unearned portion of your award will be paid to your beneficiary generally within 30 days after notification of your death from the payroll system. In the event of your death after you have left the company, your outstanding award will become earned immediately and be paid to your beneficiary as soon as administratively possible. |
| **If your employment ends for any other reason (including if you leave voluntarily)** | The unearned portion of your award will be canceled, unless you are eligible for retirement as described on page 4. |

Bank of America

**JA335**



## Definitions

**Length of service**

Length of service is determined by Bank of America. If you're a U.S.-based employee and participate in a Bank of America tax-qualified 401(k) plan, your length of service is your "vesting service" in your 401(k) plan.

**Working for a competitive business**

Generally means being engaged, directly or indirectly, with a business entity designated as a competitive business at the time you leave Bank of America.

**If you're eligible for retirement**

Each of the plans and/or programs in which you participate may define retirement differently. Here's how eligibility is determined for your WealthChoice Award:

- You're at least age 65; or
- You have at least 10 years of service and you're at least age 55.

If you meet these age and service requirements when you leave the company, your award will become earned and payable in two installments.

- The first half will become earned and payable within 2½ months following the end of the calendar year in which your retirement occurs.
- The remaining half will become earned and payable within 2½ months after the end of the following calendar year.

**Important:** In order for your award to become earned and payable as described above, you must comply with all conditions described in your award agreement – including your agreement to not work for a competitive business. Each year until your award is fully earned and payable, you'll be required to complete a certification confirming that you aren't working for a competitive business.*

*The competition restriction and certification requirement do not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.

## What additional award conditions apply?

Payment of your WealthChoice Award assumes that you don't engage at any time in detrimental conduct or customer, client or employee solicitation* as described in your award agreement. The company also may recover some or all of the cash paid to you pursuant to your award if you engage in detrimental conduct as described above. For more details, please read your award agreement.

*The customer/client solicitation covenant does not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.

**Bank of America**



## Where can I learn more?

In addition to this fact sheet, your award agreement will provide full details about your award. A few weeks after the grant date, you'll receive notification that your award agreement is available on the PMAC website.

Please note that WealthChoice Awards granted in prior years may be subject to different rules, so it's important to review the award agreement for each award you receive.

## Additional resources

**Benefits OnLine®**

About five to seven business days after you accept your award, its value will be allocated to your account and benchmarked to the Stable Value Fund. You can change the investment allocation for your award and review or update the beneficiary designation for your WealthChoice awards on Benefits OnLine.

Visit: www.benefits.ml.com

**HR Connect**

Offers resources to help you understand and take action on your incentive plans and awards. You'll find:

· Current and historical fact sheets for your awards

· The enterprise competitor list

· Access to the RSU Learning Center and Benefits OnLine User Guide

· Direct access to your awards through Benefits OnLine

Visit: https://hrconnect.bankofamerica.com > Money > Pay > Incentive plans & awards

To receive a WealthChoice Award, you must be actively employed with Bank of America or on an approved leave of absence on the grant date, unless otherwise required by law. To receive payment of your WealthChoice Award, you must be actively employed with Bank of America or on an approved leave of absence on the payment date, and continue to meet other conditions of your award agreement.

Many of the terms used in this fact sheet are defined in your award agreement. Please review your award agreement for more details.

This fact sheet summarizes some of the key features of the 2018 Bank of America Corporation WealthChoice Awards. In case of any conflict between this fact sheet and the WealthChoice Contingent Award Plan document or your 2018 Bank of America Corporation WealthChoice Award agreement, the plan document and award agreement will control. The design of awards is reviewed periodically and is subject to revision at the discretion of Bank of America. Although Bank of America does not plan to make further changes to the 2018 Bank of America Corporation WealthChoice Awards, market conditions, legislation and/or government regulations may make such changes necessary. Awards are made at the sole discretion of Bank of America and all awards will be governed by the laws of the State of Delaware, U.S.A. and the laws of the United States.

**Bank of America**

**JA337**

# EXHIBIT X

Fact Sheet

# 2019 WealthChoice Award







Long-term contingent award for Financial Advisors

## Inside

When will my award be granted and paid?
How are taxes applied to my award?
How does my award affect my benefits?          2

What happens if I leave Bank of America?          3

What additional award conditions apply?
Additional resources          4

**BANK OF AMERICA**



## 2019 WealthChoice Award

Your Bank of America long-term incentive WealthChoice Award is an important part of our pay for performance approach.



### Keep in mind

How your award is taxed will vary depending on the countries and/or states in which you're subject to taxes.

If you have questions about the taxation of your WealthChoice Award, consult with your personal tax advisor.

## When will my award be granted and paid?

### The grant date of your 2019 award is Feb. 15, 2019.

The U.S. dollar amount of your award is determined based on your level of achievement of objectives established in the 2018 Financial Advisor Incentive Compensation Plan. Your 2019 WealthChoice Award generally will become earned and payable on Feb. 15, 2027.

You'll receive payment of your WealthChoice Award generally within two to three weeks after the payment date. To receive payment of your award, you need to designate a Merrill Lynch brokerage account. If you need help, visit the RSU Learning Center, go to the "How-to's" section in the RSU Library and review "How to open your brokerage account."

## How are taxes applied to my award?

### If you're subject to U.S. taxes

WealthChoice Awards subject to U.S. taxes are not taxable when granted and generally become taxable when paid. You're responsible for FICA, federal, state and local income taxes as applicable.

### If you're subject to taxes outside the U.S.

Most countries do not tax WealthChoice Awards when granted, but you may be subject to tax when your WealthChoice Award becomes earned and payable or when the payment is made. Income tax and social insurance contribution withholding and reporting will be made to the extent required under applicable law.

## How does my award affect my benefits?

### If you're based in the U.S.

WealthChoice Awards are not considered plan-eligible compensation for any of Bank of America's employee benefit plans, including the 401(k), employee life insurance, accidental death and dismemberment insurance and long-term disability insurance plans.

### If you're based outside the U.S.

WealthChoice Awards are not considered part of local salary or compensation for any purpose, including calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, holiday pay, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments. WealthChoice Awards are not considered to be compensation for — or related to — past services provided to Bank of America.

## What happens if I leave Bank of America?

Whether your WealthChoice Award becomes earned and payable when you leave the bank depends on several factors, including the reason you're leaving the company and the fulfillment of other award conditions.

### Review your award agreement

The treatment of your WealthChoice Award may vary in certain countries, depending on applicable law. Please review your award agreement for more details that apply to you.

### Definitions

**Length of service**

Length of service is determined by Bank of America. If you're a U.S.-based employee and participate in a Bank of America tax-qualified 401(k) plan, your length of service is your "vesting service" in your 401(k) plan.

**Working for a competitive business**

Generally means being engaged, directly or indirectly, with a business entity designated as a competitive business at the time you leave Bank of America. Additional details are available on HR Connect.

| Termination Reason | Treatment of your WealthChoice Award |
|---|---|
| **If your employment ends for cause** | The unearned portion of your award will be canceled. |
| **If your employment ends because you have a disability or are affected by a divestiture or workforce reduction** | The unearned portion of your award will continue to become earned and payable according to the original payment schedule unless you are eligible for retirement, in which case the retirement payment schedule applies. You must comply with the conditions described in your award agreement, with the exception of the agreement not to work for a competitive business, or your award will be canceled. |
| **If your employment ends without cause or for good reason within two years following a change in control (such as a merger or acquisition)** | The unearned portion of your award generally will become earned immediately and will be payable according to the original payment schedule. |
| **In the event of your death** | The unearned portion of your award will be paid to your beneficiary generally within 30 days after notification of your death from the payroll system. In the event of your death after you have left the company, your outstanding award will become earned immediately and be paid to your beneficiary as soon as administratively possible. |
| **If your employment ends for any other reason (including if you leave voluntarily)** | The unearned portion of your award will be canceled, unless you are eligible for retirement as described below. |

### If you're eligible for retirement

Each of the plans and/or programs in which you participate may define retirement differently. Here's how eligibility for retirement is determined for your WealthChoice Award:

- You're at least age 65; or
- You have at least 10 years of service and you're at least age 55.

If you meet these age and service requirements when you leave the company, your award will become earned and payable in two installments.

- The first half will become earned and payable within 2½ months following the end of the calendar year in which your retirement occurs.
- The remaining half will become earned and payable within 2½ months after the end of the following calendar year.

**Important:** In order for your award to become earned and payable following retirement as described above, you must comply with all conditions described in your award agreement – including your agreement not to work for a competitive business. Each year until your award is fully earned and payable, you'll be required to complete a certification confirming that you aren't working for a competitive business.*

*The competition restriction and certification requirement do not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.

# What additional award conditions apply?

Payment of your WealthChoice Award assumes that you don't engage at any time in detrimental conduct or customer, client or employee solicitation* as described in your award agreement. The company also may recover some or all of the cash paid to you pursuant to your award if you engage in detrimental conduct as described above. For more details, please read your award agreement.

*The customer/client solicitation covenant does not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.

# Additional resources



## Where can I learn more?

In addition to this fact sheet, your award agreement will provide full details about your award.

A few weeks after the grant date, you'll receive notification that your award agreement is available on Benefits OnLine®.

Please note that WealthChoice Awards granted in prior years may be subject to different rules, so it's important to review the award agreement for each award you receive.

**Benefits OnLine**
Provides access to details about your awards (including your award agreements), the Merrill Lynch brokerage account you designated to receive payment of your awards and your retirement plan accounts. In addition, you can change the investment allocation and review or update the beneficiary designation for your WealthChoice awards on Benefits OnLine.

Visit: www.benefits.ml.com

**HR Connect**
Offers resources to help you understand and take action on your incentive plans and awards. You'll find:

• Current and historical fact sheets for your awards

• The competitive businesses list

• Access to the RSU Learning Center and Benefits OnLine User Guide

• Direct access to your awards through Benefits OnLine

Visit: https://hrconnect.bankofamerica.com > Money > Pay > Incentive plans & awards

To receive a WealthChoice Award, you must be actively employed with Bank of America or on an approved leave of absence on the grant date, unless otherwise required by law. To receive payment of your WealthChoice Award, you must generally be actively employed with Bank of America or on an approved leave of absence on the payment date, and continue to meet other conditions of your award agreement.

Many of the terms used in this fact sheet are defined in your award agreement. Please review your award agreement for more details.

This fact sheet summarizes some of the key features of the 2019 Bank of America Corporation WealthChoice Awards. In case of any conflict between this fact sheet and the WealthChoice Contingent Award Plan document or your 2019 Bank of America Corporation WealthChoice Award agreement, the plan document and award agreement will control. The design of awards is reviewed periodically and is subject to revision at the discretion of Bank of America. Although Bank of America does not plan to make further changes to the 2019 Bank of America Corporation WealthChoice Awards, market conditions, legislation and/or government regulations may make such changes necessary. Awards are made at the sole discretion of Bank of America and all awards will be governed by the laws of the State of Delaware, U.S.A. and the laws of the United States.

# EXHIBIT Y

FACT SHEET

# 2020 WealthChoice Award





## Long-term contingent award for Financial Advisors

### Inside

| | |
|---|---|
| When will my award be granted and paid? | 2 |
| How are taxes applied to my award? | 2 |
| How does my award affect my benefits? | 2 |
| What happens if I leave Bank of America? | 3 |
| What additional award conditions apply? | 4 |
| Additional resources | 4 |



## 2020 WealthChoice Award

The long-term incentive WealthChoice Award is an important part of our pay-for-performance approach.

## When will my award be granted and paid?

The grant date of your 2020 award is Feb. 14, 2020.

The U.S. dollar amount of your award is determined based on your level of achievement of objectives established in the 2019 Financial Advisor Incentive Compensation Plan. Your 2020 WealthChoice Award generally will become earned and payable on Feb. 15, 2028.

You'll receive payment of your WealthChoice Award generally within two to three weeks after the payment date.

To receive payment of your award, you need to designate a Merrill brokerage account. If you need help, visit the RSU Learning Center, go to the "How-to" section in the RSU Library, and review "How to open your brokerage account."

## How are taxes applied to my award?

If you're subject to U.S. taxes

WealthChoice Awards subject to U.S. taxes are not taxable when granted and generally become taxable when paid. You're responsible for FICA, federal, state and local income taxes, as applicable.

If you're subject to taxes outside the U.S.

Most countries do not tax WealthChoice Awards when granted, but you may be subject to tax when your award becomes earned and payable or when the payment is made. Income tax and social insurance contribution withholding and reporting will be made to the extent required under applicable law.



## Keep in mind

How your award is taxed will vary depending on the countries and/or states in which you're subject to taxes.

If you have questions about the taxation of your WealthChoice Award, consult with your personal tax advisor.

## How does my award affect my benefits?

If you're based in the U.S.

WealthChoice Awards are not considered plan-eligible compensation for any of Bank of America's employee benefit plans, including the 401(k), employee life insurance, accidental death and dismemberment insurance and long-term disability insurance plans.

If you're based outside the U.S.

WealthChoice Awards are not considered part of local salary or compensation for any purpose, including calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, holiday pay, bonuses, long-service awards, pension or retirement or welfare benefits or similar payments. WealthChoice Awards are not considered to be compensation for, or related to, past services provided to Bank of America.



### Review your award agreement

The treatment of your WealthChoice Award may vary in certain countries, depending on applicable law. Review your award agreement for more details that apply to you.



### Definitions

**Length of service**

Length of service is determined by Bank of America. If you're a U.S.-based employee and participate in the Bank of America tax-qualified 401(k) plan, your length of service is your vesting service in your 401(k) plan.

**Working for a competitive business**

Generally means being engaged, directly or indirectly, with a business entity designated as a competitive business.* Additional details are available on HR Connect.

# What happens if I leave Bank of America?

Whether your WealthChoice Award becomes earned and payable when you leave the company depends on several factors, including the reason you're leaving the company and the fulfillment of other award conditions.

| Termination reason | Treatment of your WealthChoice Award |
|---|---|
| If your employment ends for cause | The unearned portion of your award will be canceled. |
| If your employment ends because you have a disability or are affected by a divestiture or workforce reduction | The unearned portion of your award will continue to become earned and payable according to the original payment schedule unless you are eligible for retirement, in which case the retirement payment schedule applies. You must comply with the conditions described in your award agreement, with the exception of the agreement not to work for a competitive business, or your award will be canceled. |
| If your employment ends without cause or for good reason within two years following a change in control such as a merger or acquisition | The unearned portion of your award generally will become earned immediately and payable according to the original payment schedule. |
| In the event of your death | The unearned portion of your award will be paid to your beneficiary generally within 30 days after notification of your death from the payroll system. In the event of your death after you have left the company, your outstanding award will become earned immediately and paid to your beneficiary as soon as administratively possible. |
| If your employment ends for any other reason including if you leave voluntarily | The unearned portion of your award will be canceled, unless you are eligible for retirement as described below. |

### If you're eligible for retirement

If, at the time you leave the company, you're age 65, or if you have at least 10 years of service and are at least age 55, your WealthChoice Award will become earned and payable in two installments:

• First half of award — within 2½ months after the end of the calendar year in which you retire
• Second half of award — within 2½ months after the end of the following calendar year

**Important:** For your award to become earned and payable following retirement, you must comply with all conditions described in your award agreement, including your agreement not to work for a competitive business. Each year, until your award is fully earned and payable, you'll be required to complete a certification confirming that you aren't working for a competitive business.*

* The competition restriction and certification requirement do not apply if you're a permanent resident of California or are assigned by Bank of America to work in California, and therefore pay taxes to that state. In addition, the competition restriction and certification requirement may be limited if required by applicable state law, such as for employees who live or work in Washington State.



### Where can I learn more?

In addition to this fact sheet, your award agreement will provide full details about your award.

A few weeks after the grant date, you'll receive notification that your award agreement is available on Benefits OnLine®.

Please note that WealthChoice Awards granted in prior years may be subject to different rules, so it's important to review the award agreement for each award you receive.

## What additional award conditions apply?

Payment of your WealthChoice Award assumes that you don't engage at any time in detrimental conduct or customer, client or employee solicitation* as described in your award agreement. The company also may recover some or all of the cash paid to you pursuant to your award if you engage in detrimental conduct.

For more details, please read your award agreement.

* The customer/client solicitation covenant does not apply if you're a permanent resident of California or are assigned by Bank of America to work in California and therefore pay taxes to that state.

## Additional resources

| Benefits OnLine |
| --- |
| To help you manage your awards, this site provides access to details about your awards, including your award agreements, the Merrill brokerage account you designated to receive payment of your awards and your retirement plan accounts.<br><br>Visit:<br>http://www.benefits.ml.com |

| HR Connect |
| --- |
| Find resources to help you understand and take action on your incentive plans and awards, including:<br>• How to view and accept your awards, open a brokerage account or update your beneficiary information<br>• Current and historical fact sheets for your awards<br>• The competitive businesses list<br>• Access to the RSU Learning Center<br>• Direct access to your awards through Benefits OnLine<br><br>Visit:<br>https://hrconnect.bankofamerica.com > Money > Pay > Incentive plans & awards |

To receive a WealthChoice Award, you must be actively employed with Bank of America or on an approved leave of absence on the grant date, unless otherwise required by law. To receive payment of your WealthChoice Award, you must generally be actively employed with Bank of America or on an approved leave of absence on the payment date, and continue to meet other conditions of your award agreement.

Many of the terms used in this fact sheet are defined in your award agreement. Review your award agreement for details.

This fact sheet summarizes some of the key features of the 2020 Bank of America Corporation WealthChoice Awards. In case of any conflict between this fact sheet and the WealthChoice Contingent Award plan document or your 2020 Bank of America Corporation WealthChoice Award agreement, the plan document and award agreement will control. The design of awards is reviewed periodically and is subject to revision at the discretion of Bank of America. This fact sheet is not an offer of participation or compensation, and receipt of this document does not entitle you to participate in or benefit from programs or plans offered by Bank of America. Bank of America reserves the right to amend or terminate any plan, program or policy in its sole discretion at any time for any reason. Any benefit you may receive under a Bank of America plan, program or policy is occasional and not part of normal or expected compensation. Receipt of any such benefit does not imply or guarantee any right to receive future benefits under any Bank of America plan, program or policy. Although Bank of America does not plan to make further changes to the 2020 Bank of America Corporation WealthChoice Awards, market conditions, legislation and/or government regulations may make such changes necessary. Awards are made at the sole discretion of Bank of America, and all awards will be governed by the laws of the State of Delaware, U.S.A., and the laws of the United States.

# EXHIBIT 2

Docusign Envelope ID: 522D6B37-2621-4685-B17A-62D1C177D417

## DECLARATION OF EDWARD WASTELL

I, Edward Wastell III, under penalty of perjury and based upon personal knowledge, make the following declaration:

1.    I am over 18 years old and have personal knowledge of, and am competent to testify to, all of the facts set forth herein.

2.    I have been employed by Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill") since 2021, and currently serve as a Senior Vice President, Compensation Executive. In this role I am familiar with and have access to records relating to Merrill's operations.

3.    Merrill operates in a highly competitive market for well-performing Financial Advisors ("FAs") and strives to offer a competitive total compensation package to FAs.

4.    Merrill's ability to recruit and retain FAs is an integral part of the success of its business. FAs are commonly recruited by other firms, and many choose to change employers over their careers—often taking clients with them. Merrill and its competitor firms offer various incentives to recruit FAs, including sign-on bonuses.

5.    It is a common industry practice for financial services firms, including Merrill, to offer FAs an initial bonus or other award designed specifically to compensate them for unvested incentive compensation they will leave behind upon departing their prior employer.

6.    Bank of America sponsored several retirement plans during Mr. Milligan's employment, including the Bank of America 401(k) Plan, and a voluntary deferred compensation plan for eligible employees.

7.    As part of my role and responsibilities, I have access to certain personnel records for Merrill employees.  Attached hereto as **Exhibit Z** is a true and correct copy of an April 30,

1

Docusign Envelope ID: 522D6B37-2621-4685-B17A-62D1C177D417

2021 letter from Mr. Milligan to Michael Ronan, a former Merrill Lynch Market Executive, as

Merrill maintains in its files in the normal course of its business.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is

true and correct.

Executed on this 27th day of September 2024.

Signed by:

*Ed Wastell*

9BA199083FD84E6

Ed Wastell

2

# EXHIBIT Z

**Kelly Milligan**
**2177 Stewart Avenue**
**Walnut Creek, CA 94596**

April 30, 2021

Michael Ronan, Market Executive
Merrill Lynch
1331 N. California Blvd, Suite 400
Walnut Creek, CA 94596

Dear Michael,

This letter is to advise that effective on April 30, 2021, I hereby resign my position at Merrill Lynch. Pursuant to the Protocol for Broker Recruiting, within the email you received today, you will find the Protocol spreadsheet *without account numbers* and I will also be overnighting a list as a result of COVID-19 and the current closure of the Merrill offices with the following information: the name of my clients, the clients' addresses, the clients' phone numbers, the clients' email addresses, the title of the clients' accounts and the account numbers for the clients' accounts. I am retaining a copy of this list, *without account numbers*, as permitted by the Protocol, and am also enclosing a copy of the list I am retaining.

Pursuant to FINRA Regulatory Notice 19-10, if anyone wishes to contact me, please advise them I have joined Sanctuary Wealth, another Protocol firm, located at:

Quorum Private Wealth
1676 N. California Blvd, Suite 350
Walnut Creek, CA 94596
Kelly@quorumpw.com
(925) 488-0000

If you or Merrill Lynch need anything else, or if any issues arise, please contact, Kevin Chase, Chief of Compliance, Sanctuary Wealth. 317-633-1723 kchase@sanctuarywealth.com.

Sincerely,

Kelly Milligan



# FINANCIAL CONSULTANT
# EMPLOYMENT AGREEMENT

Merrill Lynch

USCA4 Appeal: 25-1385      Doc: 16      Filed: 05/27/2025      Pg: 362 of 560

PLEASE READ

ADDITIONAL DOCUMENTATION

CAREFULLY

# FINANCIAL CONSULTANT

# EMPLOYMENT AGREEMENT AND RESTRICTIVE COVENANTS

In consideration of Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") employing me; compensating me; providing to me employment related benefits; training me; sponsoring me for the General Securities Examination; registering me with various exchanges; licensing me in various states; providing me with office facilities and sales support; executing, processing and clearing transactions; providing research and investment recommendations; supervising the development of my career; and other good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged, and intending to be legally bound, I hereby agree that:

1.  <u>All records</u>, whether original, duplicated, computerized, memorized, handwritten, or in any other form, <u>and all information</u> contained therein, including names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch. This information, whether provided to me by Merrill Lynch or by any Account, is entrusted to me as an employee and sales representative of Merrill Lynch. I will not use this information or remove any such records from the Merrill Lynch office except for the sole purpose of conducting business on behalf of Merrill Lynch. I agree not to divulge or disclose this information to any third party and under no circumstances will I reveal or permit this information to become known by any competitor of Merrill Lynch either during my employment or at any time thereafter.

This information is extremely valuable to Merrill Lynch and Merrill Lynch takes all reasonable measures to maintain its confidentiality and to guard its secrecy. This information is not generally known outside Merrill Lynch and within Merrill Lynch this information is confidential and used only on a "need to know" basis. This information is developed and acquired by great expenditures of time, effort, and money. This information is unique and cannot be lawfully duplicated or easily acquired. Consequently, I agree that these records and the information contained therein are the property of Merrill Lynch and are deserving of trade secret status and protection.

2.  If, at any time, I resign from Merrill Lynch, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any Account whom I served or whose name became known to me during my employment at Merrill Lynch in any office and in any capacity. My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account:

    (a)    to transfer from Merrill Lynch to me or to my new employer, or

    (b)    to open a new account with me or with my new employer, or

    (c)    to otherwise discontinue its patronage and business relationship with Merrill Lynch.

3.    I agree that at all times during my employment I owe Merrill Lynch a duty of loyalty and a duty to act in good faith. I agree that during my employment I will not individually, or in combination with any other employee or competitor of Merrill Lynch, violate or breach the terms of this agreement.

4.    In the event I breach any of the covenants of paragraphs 1, 2 or 3, I agree that Merrill Lynch will be entitled to injunctive relief. I recognize that Merrill Lynch will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Merrill Lynch or to protect and preserve the status quo. Therefore, I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION ordering:

(a)    that I immediately return to Merrill Lynch all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and

(b)    that, for a period of one year, I be enjoined and restrained from soliciting any Account whom I served or whose name became known to me while employed by Merrill Lynch, in any office and in any capacity; and

(c)    that I be further enjoined and restrained, for a period of one year, from accepting business from any Account who was solicited in violation of paragraph 2 or whose records and information was used in violation of paragraph 1.

The above restraints shall apply to each and every Account whom I served or whose name became known to me while employed at Merrill Lynch, in any office and in any capacity, including without limitation, reassignments, walk-ins, call-ins, write-ins, transfers, referrals, prospects, cold-calls, seminars, mailers, lead lists, and etc. During my employment, some of the accounts I expect to develop and acquire are likely to be those of individuals I knew or was familiar with prior to joining Merrill Lynch ("Prior Acquaintances"). Nevertheless, because I will be acting as a representative of Merrill Lynch and I will be utilizing and benefiting from Merrill Lynch's goodwill, reputation, name recognition, and other assets and resources, I further agree that the Accounts of such Prior Acquaintances will be subject to the same restraints as all the other Accounts. The only exception will be my family and relatives.

5.    For the purposes of paragraph 4, I agree to submit to, and confer exclusive jurisdiction on, the United States District Court or the State Court which has original jurisdiction for judicial district or county in which I last worked for Merrill Lynch. This Agreement shall be construed, governed by, and enforced in accordance with the laws of said jurisdiction. Further, in the event I voluntarily resign my employment, I will take no action (either by court proceedings or otherwise), to inhibit in any way Merrill Lynch's rights under paragraph 4 herein.

*Continued*

USCA4 Appeal: 25-1385    Doc: 16    Filed: 05/27/2025    Pg: 365 of 560

6.    If after issuance of a TEMPORARY RESTRAINING ORDER or a PRELIMINARY or PERMANENT INJUNCTION, the parties voluntarily agree, or are ordered, to arbitrate a dispute arising out of this Agreement, each party agrees and demands that any such arbitration be conducted in strict compliance with the applicable written Rules of Arbitration, as published, amended, effective, and in force at the time of my termination. The parties further agree that any Order of the Court shall stay in full force and effect until a Panel of Arbitrators can be properly constituted in accordance with the above referenced written Rules of Arbitration and until said Panel renders a full and final decision.

7.    NOTHING HEREIN IS A PROMISE OF EMPLOYMENT FOR A FIXED TERM. MERRILL LYNCH MAY TERMINATE MY EMPLOYMENT FOR ANY REASON OR FOR NO REASON, JUST AS I MAY RESIGN AT ANY TIME.

8.    I HAVE READ AND REVIEWED THIS EMPLOYMENT AGREEMENT AND RESTRICTIVE COVENANTS IN ITS ENTIRETY. I HAVE BEEN GIVEN AN OPPORTUNITY TO ASK MERRILL LYNCH QUESTIONS ABOUT IT. I HAVE ALSO BEEN GIVEN AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF MY CHOICE. I FULLY UNDERSTAND THE TERMS OF THIS DOCUMENT AND KNOWINGLY AND FREELY AGREE TO ABIDE BY THEM.

IN ADDITION TO THE FOREGOING, I UNDERSTAND THAT I HAVE AN ADDITIONAL THIRTY DAYS FROM THE DAY I SIGN THIS AGREEMENT TO CONTINUE TO REVIEW IT AND SEEK LEGAL COUNSEL. AT ANY TIME WITHIN THIS THIRTY DAYS, I MAY RESCIND THIS AGREEMENT BY DISCONTINUING MY EMPLOYMENT WITH MERRILL LYNCH WITHOUT ANY OF THE PROVISIONS HEREIN BEING ENFORCED AGAINST ME. TO THE CONTRARY, HOWEVER, IF I CONTINUE MY EMPLOYMENT WITH MERRILL LYNCH BEYOND SAID THIRTY DAYS, MY CONTINUATION OF EMPLOYMENT WILL CONSTITUTE MY RATIFICATION AND COMPLETE ACCEPTANCE OF THE TERMS OF THIS AGREEMENT.

Date: _12/27/99_ _____

_____
Financial Consultant

Date: _1/10/2000_ _____

_____
For Merrill Lynch, Pierce, Fenner & Smith Inc.

Kelly D. Milligan
Emp. # 5492F

# EXHIBIT 3

Docusign Envelope ID: B197DD8E-AD9C-437E-A354-3EF8D7819CD2

## DECLARATION OF TIM SHOOK

I, Tim Shook, under penalty of perjury and based upon personal knowledge, make the following declaration:

1.    I am over 18 years old and have personal knowledge of, and am competent to testify to, all of the facts set forth herein.

2.    I have been employed by Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill") for 31 years, and currently serve as a Managing Director, FA Strategic Performance. In this role I am familiar with and have access to records relating to Merrill's operations.

3.    From 2015 through 2020, Mr. Milligan's total annual cash compensation, based on the "cash grid" in the annual Merrill Lynch Financial Advisor Incentive Plan, ranged from around ███████████ per year, averaging ██████ annually.

4.    From 2015 until leaving in April 2021, Mr. Milligan earned and was paid a total of approximately ███████ in annual cash compensation based on the aforementioned "cash grid" (i.e., not including his distinct long-term contingent awards).

5.    From 2015 until 2021, Mr. Milligan was issued long-term contingent awards that collectively ranged from around ████████████ annually, or ██████ per year on average.

6.    From 2015 through 2018, Mr. Milligan was granted 50% of his long-term contingent incentive awards as awards under the WealthChoice Contingent Award Plan ("Plan" or "WealthChoice"), with the other 50% as restricted stock units (or "RSUs").

7.    In 2019 and 2020, Mr. Milligan elected to receive his long-term contingent incentive awards as 100% RSUs, meaning he was not granted any WealthChoice awards for those years.

1

Docusign Envelope ID: B197DD8E-AD9C-437E-A354-3EF8D7819CD2

8.      Attached hereto as **Exhibits B-G** are true and correct copies of all Financial Advisor Incentive Compensation Plans from 2015 through 2020, as maintained in Merrill's business records.

9.      Attached hereto as **Exhibit AA** is a true and correct copy of the 2019 Financial Advisor Long Term Incentive Plan Change Q&A.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27th day of September 2024.



Tim Shook

2

# EXHIBIT B
# FILED UNDER SEAL

# EXHIBIT C
# FILED UNDER SEAL

# EXHIBIT D
# FILED UNDER SEAL

# EXHIBIT E
# FILED UNDER SEAL

# EXHIBIT F
# FILED UNDER SEAL

# EXHIBIT G
# FILED UNDER SEAL

# EXHIBIT AA



# Questions and Answers (Q&As)

## Financial advisor long-term incentive plan changes

As announced, we are making some changes to our financial advisor long-term incentive (FA LTI) plans. These changes require your attention and, in some cases, specific actions to ensure these plans continue to reflect your investment goals. Please read the following **Q&As** for more information about these changes and important deadlines.

------------------------------------------------------------------------

## WealthChoice allocation changes

Many advisors have asked for greater flexibility around the allocation of long-term productivity grid awards under the 2019 Financial Advisor Incentive Compensation Plan. Based on that feedback, we're providing participants the opportunity to make a one-time adjustment to long-term productivity grid award allocation for 2019.

The previous default split for the 2019 awards was 75 percent Wealth Choice/Cash and 25 percent restricted stock units (RSUs), with the option to increase the allocation of RSUs to as much as 50 percent. Advisors will now have the flexibility to adjust this allocation to up to 100 percent RSUs, or 100 percent WealthChoice/Cash, for 2019 plan year awards – **but this election must take place no later than June 28 at 4 p.m. Eastern on PMAC. If you do not make a new election by this deadline, any election (or default split) from January 2019 will remain in effect.**

**Q:  Does the re-election only apply to the 2019 plan?**
**A:**  Yes. The re-election is a one-time opportunity that **only** applies to long-term productivity grid awards under the 2019 Financial Advisor Incentive Compensation Plan due to be granted in February 2020.

**Q:  Why doesn't the re-election apply to other plan years?**
**A:**  Awards for prior plan years already have been awarded and cannot be altered.

**Q:  What's the difference in the way RSUs awards become earned and payable vs. how WealthChoice/Cash awards become earned and payable?**
**A:**  RSU awards generally become earned and payable in three equal annual installments beginning on the first anniversary of the grant date. WealthChoice awards generally become earned and payable in one installment on the eighth anniversary of the grant date. All RSU and WealthChoice awards are subject to the terms and conditions provided in the award agreement for each award.

**Q:  If I don't make a re-election by June 28, will my current election stay in effect?**
**A:**  If you do not make any changes to your WealthChoice elections by **June 28**, your current election will remain in effect. You can view your current allocation elections on PMAC.

**Q: How does our FA LTI plan now compare with competitors' plans as a result of these changes?**

**A:** Our plan is broadly competitive with peer companies and we will continue to assess it in the context of the market competitiveness of our overall financial advisor compensation program.

**Q: Will you be making other changes to the FA LTI plan or my compensation in the near future?**

**A:** The financial advisor compensation program for 2020 will be announced in late 2019 as part of the annual compensation process.

**Q: Who can I contact if I have questions about my WealthChoice re-election?**

**A:** Please send an email to advdivisionpcc@ml.com.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## Investment changes

As the size of our financial advisor long-term incentive plans has increased over time, so have the risks associated with managing the company's exposures. We're making the following changes in order to continue to deliver a variety of investment options while reducing volatility and portfolio risk to the company:

- We are adding five new investment options under the plans beginning **June 1**, and discontinuing 16 current investment options effective **June 28**.
- In addition, beginning **July 1**, any fund transfers you make for your accounts will be processed on a **monthly** basis instead of on a daily basis.

**What award plans are affected by these investment changes?**

- WealthChoice
- Short-Term Deferred Contingent
- WealthBuilder
- FACAAP Deferral
- Growth Award Deferral

**Please note: Investment changes described here do not apply to any accounts you may have in the company's 401(k), deferred compensation and/or retirement pension plans.**

**Q: What investment options are being added?**

**A:** These five investment options are being added under the plans beginning **June 1**:

- FIDELITY INTERMEDIATE GOVERNMENT INCOME OPTION
- FIDELITY MID CAP ENHANCED INDEX OPTION
- USAA NASDAQ-100 INDEX OPTION
- VANGUARD RUSSELL 2000 INDEX OPTION
- T. ROWE PRICE INTERNATIONAL EQUITY INDEX OPTION

**Q:  What investment options are being discontinued?**
**A:**  These 16 investment options are being discontinued under the plans effective **June 28**:

- PIMCO TOTAL RETURN OPTION
- WESTERN ASSET CORE BOND OPTION
- VANGUARD INFLATION-PROTECTED SECURITIES OPTION
- BLACKROCK EQUITY DIVIDEND OPTION
- DODGE & COX STOCK OPTION
- BLACKROCK U.S. FUNDAMENTAL LARGE CAP GROWTH OPTION
- T. ROWE PRICE INSTITUTIONAL LARGE-CAP GROWTH OPTION
- VANGUARD EXTENDED MARKET INDEX OPTION

- FIAM U.S. SMALL/MID CAP CORE II OPTION
- QS U.S. SMALL CAP EQUITY OPTION
- TEMPLETON INSTITUTIONAL INTERNATIONAL EQUITY SERIES OPTION
- MFS INTERNATIONAL GROWTH EQUITY OPTION
- NORTHERN GLOBAL SUSTAINABILITY  INDEX OPTION
- STATE STREET REAL ASSET OPTION
- BLACKROCK GLOBAL ALLOCATION OPTION
- PIMCO ALL ASSET OPTION

**Q:  What investment options are staying the same?**
**A:**  These 14 investment options are not changing and will continue to be available under the plans:

LIFEPATH INDEX 2060 OPTION, LIFEPATH INDEX 2055 OPTION, LIFEPATH INDEX 2050 OPTION, LIFEPATH INDEX 2045 OPTION, LIFEPATH INDEX 2040 OPTION, LIFEPATH INDEX 2035 OPTION, LIFEPATH INDEX 2030 OPTION, LIFEPATH INDEX 2025 OPTION, LIFEPATH INDEX 2020 OPTION, LIFEPATH RETIREMENT INDEX OPTION, STABLE VALUE OPTION, VANGUARD INSTITUTIONAL 500 INDEX OPTION, VANGUARD TOTAL INTERNATIONAL STOCK INDEX OPTION, VANGUARD TOTAL BOND MARKET INDEX OPTION

**Q:  Do I need to take any action?**
**A:**  If you have a balance in any of the 16 investment options that are being discontinued, **you must take action on** Benefits OnLine® (**benefits.ml.com**) **by 4 p.m. Eastern on June 28,** or your balance will automatically move to the plan's Stable Value investment option on **July 1**.

If you do not have a balance in any of the investment options being discontinued, no action is required.

**Q:  What happens if I don't take action by June 28?**
**A:**  If you don't make new investment elections by **June 28**, your balance in any of the 16 discontinued investment options will automatically move to the plan's Stable Value investment option on **July 1**. (You can then elect to make investment changes to other available options at any time, on a monthly basis.)

**Q:  Why don't these investment changes also apply to my company retirement plans?**
**A:**  The company retirement plans are fully funded and therefore do not create the same volatility or portfolio risk for the company. While our voluntary deferred compensation plans do carry portfolio risk for the company, it is not on the same scale as our long-term incentive award plans. As such, we are not making any changes to investment options in those plans at this time.

**Q:  What happens if other investment changes occur for my company retirement plans (like 401k) or voluntary deferred compensation? Will those also apply to my WealthChoice investment options?**
**A:**  Unless otherwise communicated, any future changes to the company's retirement plans and voluntary deferred compensation plans will not impact your WealthChoice investment options or elections.

3

**Q:  Why were the five new investment options chosen?**

**A:**  We chose the five new investment options because they offer participants either passively managed options or lower active risk options in similar asset classes to what is available today, while allowing the company to more effectively manage risk related to the plans' portfolio.

**Q:  Where can I find more information about the new investment options?**

**A:**  Please read our summary for highlights of the five new investment options, including the goals of each option, what the option invests in and who may want to invest in the option. You also can access details – including past fund performance information (which does not guarantee future results) – on Benefits OnLine (**benefits.ml.com**) beginning June 1.

**Q:  My investment returns for my Wealth Choice/Cash have increased this year, but the investment options that contributed to this will no longer be available. Can I preserve my earnings to date as part of the re-election?**

**A:**  Yes. All investment activity up until the point the fund changes occur will be counted towards any balance being reallocated to the Stable Value Fund or any of the other available investment options that you elect.

**Q:  Are there changes to the way fund transfers are processed?**

**A:**  Any fund transfers made from June 1 through 28 will be processed on a daily basis; any fund transfers beginning July 1 will be processed on a monthly basis.

**Q:  Don't most plan participants make daily changes to their plan accounts?**

**A:**  No. Transaction trends and usage from the past several years showed that participants in these plans changed their investment options on a limited basis with the majority making investment changes as little as once or twice a year – even during times of market volatility.

**Q:  What are the deadlines associated with making fund transfers on a monthly basis?**

**A:**  Beginning July 1, any fund transfers that you elect by 4 p.m. Eastern on the last business day of the month will be processed for that month.

**Important note:** Beginning July 1, you can make fund transfers on a monthly basis by visiting Benefits OnLine (**benefits.ml.com**). To make changes to an initial election, you must call the Bank of America Employee Retirement Savings Center at **800.637.4015** for assistance by a representative. (We expect that you will be able to use Benefits OnLine beginning November 2019 for all fund transfers.)

**Q:  Will I experience lower fees as a result of these investment changes?**

**A:**  The performance of your account will depend on how you allocate your balance among the investment options. The returns on these investment options are net of the option's operating expenses, which are represented as the option's expense ratio. Since each investment option has its own expense ratio, expense impacts will vary based on account allocations.

**Q:  Who can I speak to if I have questions about these investment changes?**

**A:**  Call the Bank of America Employee Retirement Savings Center at **800.637.4015**. Representatives are available Monday through Friday, 7 a.m. to 8 p.m. Eastern (excluding certain holidays).

This communication provides certain information about the financial advisor long-term incentive plans. Receipt of this document does not automatically entitle you to benefits offered under the plans. Every effort has been made to ensure the accuracy of this communication. However, if there are discrepancies between this communication and the official plan documents and/or award agreements, the plan documents and/or award agreements will always govern. Bank of America retains the discretion to interpret the terms or language used in any of its communications according to the provisions contained in the plan documents and/or award agreements. Bank of America also reserves the right to amend or terminate any benefit plan in its sole discretion at any time for any reason.

For more complete information on any plan's notional investment options, including their management fees and other charges and expenses, please consult the fund prospectuses and other comparable documents. You should carefully consider the investment objectives, risks, charges and expenses before choosing the benchmark return option for your plan account balance. This, and additional information about the benchmark return options, can be found in the fund prospectuses, which can be obtained by calling the Bank of America Employee Retirement Savings Center at 800.637.4015 or by logging on to Benefits OnLine (benefits.ml.com). Please read these documents carefully before selecting an investment option. The design and structure of incentive and equity-based awards, including vesting requirements, is reviewed periodically and is subject to change at the discretion of Bank of America.

The financial advisor long-term incentive plans are nonqualified plans under the rules and regulations of the Internal Revenue Code and are exempt from most of the rules and regulations under the Employee Retirement Income Security Act (ERISA). The plans are unfunded and unsecured. The balance in your account represents a promise by Bank of America to pay nonqualified benefits at a future date. That means the plan is backed by the general assets of Bank of America, which are subject to claims by Bank of America's creditors. Generally, participants have no rights to the assets of the company other than as a general unsecured creditor.

# EXHIBIT 4



**BrokerCheck Report**

## Kelly DEAN Milligan

CRD# 4122399

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 – 5 |
| Registration and Employment History | 7 – 8 |

 Please be aware that fraudsters may link to BrokerCheck from phishing and similar scam websites, trying to steal your personal information or your money. Make sure you know who you're dealing with when investing, and contact FINRA with any concerns.
For more information read our investor alert on imposters.

**1**

MERRILL_WDNC_000596

**About BrokerCheck®**



BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
- BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
- Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- **Where did this information come from?**
- The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - ○ information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - ○ information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- **How current is this information?**
- Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
- To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- **Are there other resources I can use to check the background of investment professionals?**
- FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.
- 

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at
brokercheck.finra.org

For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.

2

MERRILL_WDNC_000597

www.finra.org/brokercheck

User Guidance



### Kelly D. Milligan
CRD# 4122399

**Currently employed by and registered with the following Firm(s):**

**IA** SANCTUARY ADVISORS, LLC
345 Hartz Ave.
Danville, CA 94523
CRD# 226606
Registered with this firm since: 04/30/2021

**B** SANCTUARY SECURITIES, INC.
345 Hartz Ave.
Danville, CA 94526
CRD# 205
Registered with this firm since: 04/30/2021

## Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

### Broker Qualifications

This broker is registered with:
- 1 Self-Regulatory Organization
- 28 U.S. states and territories

This broker has passed:
- 0 Principal/Supervisory Exams
- 4 General Industry/Product Exams
- 1 State Securities Law Exam

### Registration History

This broker was previously registered with the following securities firm(s):

**IA** MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
CRD# 7691
NEW YORK, NY
04/2000 – 05/2021

**B** MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED
CRD# 7691
WALNUT CREEK, CA
03/2000 – 05/2021

### Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker? **No**

©2024 FINRA. All rights reserved. Report about Kelly D. Milligan.

MERRILL_WDNC_000598

1

www.finra.org/brokercheck

## Broker Qualifications



### Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 1 SRO and is licensed in 28 U.S. states and territories through his or her employer.**

### Employment 1 of 2

| | |
|---|---|
| Firm Name: | **SANCTUARY ADVISORS, LLC** |
| Main Office Address: | **3815 RIVER CROSSING PKWY** |
| | **SUITE 200** |
| | **INDIANAPOLIS, IN  46240** |
| Firm CRD#: | **226606** |

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| IA | California | Investment Adviser Representative | Approved | 04/30/2021 |
| IA | Texas | Investment Adviser Representative | Approved | 11/11/2022 |

### Branch Office Locations

3815 RIVER CROSSING PKWY
SUITE 200
INDIANAPOLIS, IN  46240

345 Hartz Ave.
Danville, CA  94523

### Employment 2 of 2

| | |
|---|---|
| Firm Name: | **SANCTUARY SECURITIES, INC.** |
| Main Office Address: | **3815 RIVER CROSSING PKWY, SUITE 200** |
| | **INDIANAPOLIS, IN  46240** |
| Firm CRD#: | **205** |

| | SRO | Category | Status | Date |
|---|---|---|---|---|
| B | FINRA | General Securities Representative | Approved | 04/30/2021 |

**4**

◆2024 FINRA. All rights reserved. Report about Kelly D. Milligan.

MERRILL_WDNC_000599

2

www.finra.org/brokercheck

User Guidance

**Broker Qualifications**



### Employment 2 of 2, continued

| SRO | Category | Status | Date |
|-----|----------|--------|------|

| U.S. State/ Territory | Category | Status | Date |
|-----------------------|----------|--------|------|
| Arizona | Agent | Approved | 11/11/2022 |
| California | Agent | Approved | 04/30/2021 |
| Colorado | Agent | Approved | 04/30/2021 |
| Connecticut | Agent | Approved | 04/30/2021 |
| District of Columbia | Agent | Approved | 04/30/2021 |
| Florida | Agent | Approved | 04/30/2021 |
| Georgia | Agent | Approved | 09/16/2022 |
| Hawaii | Agent | Approved | 04/30/2021 |
| Idaho | Agent | Approved | 03/31/2022 |
| Illinois | Agent | Approved | 11/29/2022 |
| Indiana | Agent | Approved | 11/17/2021 |
| Kentucky | Agent | Approved | 12/08/2023 |
| Maryland | Agent | Approved | 04/30/2021 |
| Massachusetts | Agent | Approved | 04/30/2021 |
| Minnesota | Agent | Approved | 04/30/2021 |
| Montana | Agent | Approved | 12/08/2023 |
| Nevada | Agent | Approved | 04/30/2021 |
| New Mexico | Agent | Approved | 04/30/2021 |
| New York | Agent | Approved | 04/30/2021 |
| North Carolina | Agent | Approved | 04/30/2021 |

5

◆2024 FINRA. All rights reserved. Report about Kelly D. Milligan.

MERRILL_WDNC_000600

3

www.finra.org/brokercheck

User Guidance

## Broker Qualifications



### Employment 2 of 2, continued

| | U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|---|
| B | Ohio | Agent | Approved | 04/30/2021 |
| B | Oregon | Agent | Approved | 04/30/2021 |
| B | Pennsylvania | Agent | Approved | 04/30/2021 |
| B | Rhode Island | Agent | Approved | 04/30/2021 |
| B | Tennessee | Agent | Approved | 04/30/2021 |
| B | Texas | Agent | Approved | 04/30/2021 |
| B | Utah | Agent | Approved | 06/02/2022 |
| B | Washington | Agent | Approved | 04/30/2021 |

### Branch Office Locations

**SANCTUARY SECURITIES, INC.**
345 Hartz Ave.
Danville, CA  94526

♦2024 FINRA. All rights reserved. Report about Kelly D. Milligan.

MERRILL_WDNC_000601

4

www.finra.org/brokercheck

User Guidance

## Broker Qualifications



### Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

**This individual has passed 0 principal/supervisory exams, 4 general industry/product exams, and 1 state securities law exam.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| No information reported. | | |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| B  Securities Industry Essentials Examination | SIE | 10/01/2018 |
| B  National Commodity Futures Examination | Series 3 | 09/01/2009 |
| B  Futures Managed Funds Examination | Series 31 | 01/02/2003 |
| B  General Securities Representative Examination | Series 7 | 03/09/2000 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| B  IA  Uniform Combined State Law Examination | Series 66 | 04/05/2000 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

www.finra.org/brokercheck User Guidance

## Broker Qualifications



### Professional Designations

This section details that the representative has reported **0** professional designation(s).

No information reported.

�2024 FINRA. All rights reserved. Report about Kelly D. Milligan.

MERRILL_WDNC_000603

6

www.finra.org/brokercheck User Guidance

## Registration and Employment History



### Registration History

The broker previously was registered with the following firms:

| | Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|---|
| IA | 04/2000 – 05/2021 | MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED | 7691 | WALNUT CREEK, CA |
| B | 03/2000 – 05/2021 | MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED | 7691 | WALNUT CREEK, CA |

### Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 04/2021 – Present | Sanctuary Wealth | Registered representative | Y | Danville, CA, United States |
| 06/2011 – 04/2021 | Bank of America, N.A. | Wealth Management Advisor | Y | WALNUT CREEK, CA, United States |
| 01/2000 – 04/2021 | MERRILL LYNCH | PDP FINANCIAL CONSULTANT | Y | WALNUT CREEK, CA, United States |

### Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

(1)

FOR PROFIT OR NOT FOR PROFIT: NON-PROFIT ORGANIZATION
NAME OF OUTSIDE BUSINESS ORGANIZATION: LAZAREX CANCER FOUNDATION
DISCLOSURE ID: 69599
INVESTMENT RELATED: N
ADDRESS OF BUSINESS: DANVILLE, CALIFORNIA 94526
NATURE OF BUSINESS: CHARITABLE ORGANIZATION,
POSITION, TITLE, ASSOCIATION: COMMITTEE MEMBER,

**9**
©2024 FINRA. All rights reserved. Report about Kelly D. Milligan.

MERRILL_WDNC_000604

7

**Registration and Employment History**



**Other Business Activities, continued**
START DATE OF RELATIONSHIP: 3/5/2014
NUMBER OF HOURS DEVOTED: 6 HOUR(S) QUARTERLY
NUMBER OF HOURS DEVOTED DURING TRADING HOURS: 0
DUTIES: LAZAREX SUPPORTS END STAGE CANCER PATIENTS BY PROVIDING ASSISTANCE WITH COSTS FOR CLINICAL TRIAL
PARTICIPATION, NAVIGATION THROUGH CLINICAL TRIALS, COMMUNITY OUTREACH AND EDUCATION.  I WILL SERVE ON THE
FINANCE COMMITTEE, REVIEWING BUDGETS, ETC.

www.finra.org/brokercheck

User Guidance

**End of Report**

**This page is intentionally left blank.**

**11**
◆2024 FINRA. All rights reserved. Report about Kelly D. Milligan.

MERRILL_WDNC_000606

9

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

KELLY MILLIGAN,
ON BEHALF OF HIMSELF AND
ALL OTHERS SIMILARLY SITUATED,

        Plaintiff,

    vs.

MERRILL LYNCH, PIERCE, FENNER &
SMITH INC., BANK OF AMERICA CORP.,
and JOHN/JANE DOE 1, THE SENIOR VICE
PRESIDENT–HUMAN RESOURCES
GLOBAL BANKING AND GLOBAL
WEALTH AND INVESTMENT
MANAGEMENT ADMINISTRATION AT
BANK OF AMERICA CORP.,

        Defendants.

Civil Action No. 3:24-cv-00440-KDB-DCK

Judge Kenneth D. Bell
Magistrate Judge David Keesler

### DECLARATION OF M. ZANE JOHNSON IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, M. Zane Johnson, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am an associate with the law firm Motley Rice LLC, co-counsel for the Plaintiff Kelly Milligan.

2.      I have been actively involved in all material aspects of the Action since I joined Motley Rice in March 2024. I make this Declaration in support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment.

3.      Defendants produced a limited set of documents in support of their Motion to for Summary Judgment (the "Motion"), ECF 41, and in response to Plaintiff's requests for production.

**The Data Set**

4.      During discovery, Merrill produced an Excel spreadsheet containing information about each WealthChoice award payment made to Merrill financial advisors ("FAs") between January 1, 2018, and June 30, 2024, identified by a Bates number MERRILL_WDNC_00000001 (the "Data Set").[1]

5.      The Data Set appears to contain the data used to prepare the Declaration of Suzanne Testani, which is Exhibit 1 to the Motion. ECF 41-2. The Data Set contains, among other information, the ID of the FA that Merrill paid, the date Merrill granted the award, the date the award vested, the date Merrill paid the award, and the amount of the payment.

6.      The Data Set contains a "Category" field, which Merrill said it generated, and which describes each payment as Normal Cliff Vesting, Retirement, Deceased, or Special Agreement. The Data Set also shows the termination date for many individuals, representing the day the individual's employment with Merrill ended.

7.      Each row in the Data Set represents a single payment to a single FA.  Between January 1, 2018, and June 30, 2024, the Data Set shows that ███████ payments were made to ████ different FAs.

8.      Between January 1, 2018, and June 30, 2024, Merrill made payments to ████ FAs (18.6%) categorized as "Retirement" or "Deceased," or after the individual's listed termination date.

9.      Between January 1, 2018, and June 30, 2024, Merrill paid FAs a total of ████████████ including ████████████ (15.3%) to FAs after the termination of their

---

[1]      Merrill also produced an Excel spreadsheet Bates-numbered MERRILL_WDNC_003120 that contains additional fields.

employment. Of this amount, Merrill classified ███████ (13.5%) as "Retirement," ██████ (1.1%) as payments to deceased FAs, and ███████ (0.7%) as "normal" vesting payments to FAs after the individual's termination date.

10.    The Data Set contains a column showing the vesting date for each payment. For payments made to active Merrill FAs, the vesting date is eight years after the date the award was granted. For example, the vesting date for an award granted February 15, 2010, will be around February 15, 2018.[2] But if an FA leaves Merrill under the Plan's "Retirement" provision, the FA is paid one-half of their unvested awards shortly after the end of the calendar year in which they leave Merrill and the other one-half shortly after the end of the next calendar year.

11.    This is shown in the records in the Data Set. Merrill granted WealthChoice awards in the February of each year between 2010 to 2017 to the FA with ██████████ terminated employment with Merrill on January 25, 2018, and Merrill categorized each payment to ██████ as "Retirement." The Data Set reflects that the vesting dates for ██████ WealthChoice awards are January 1, 2019, and January 1, 2020. This includes awards granted on February 12, 2010, that would have vested on February 12, 2018, under the eight-year cliff vest. It also includes awards granted on February 12, 2016, and February 15, 2017, that would have vested on February 12, 2024, and February 15, 2025, respectively, under the eight-year cliff vest.

12.    Attached as **Exhibit A** is an excerpt from the Data Set showing these payments and the normal eight-year cliff vesting date of each payment.

---

[2] For example, Merrill granted an award to ██████ on February 12, 2010, and this award vested on February 28, 2018.

3

**Merrill's Treatment of WealthChoice Awards as Deferred Compensation**

13.     During discovery, Merrill produced its Consolidated Balance Sheets for the years ending December 31, 2020, to December 31, 2023, and a monthly ledger for 2022 and 2023.

14.     Attached as **Exhibit B** is a true and correct copy of Merrill's Consolidated Balance Sheet for the year ending December 31, 2020.

15.     Attached as **Exhibit C** is a true and correct copy of Merrill's Consolidated Balance Sheet from the year ending December 31, 2021.

16.     Attached as **Exhibit D** is a true and correct copy of Merrill's Consolidated Balance Sheet from the year ending December 31, 2022.

17.     Attached as **Exhibit E** is a true and correct copy of Merrill's Consolidated Balance Sheet from the year ending December 31, 2023.

18.     Attached as **Exhibit F** is a true and correct copy of a document titled "US GAAP Month Ledger," which shows Merrill's calculated values for various components of FA compensation for 2022 and 2023.

Executed this 6th day of December 2024 in Hartford, Connecticut.

/s/ *M. Zane Johnson*
M. Zane Johnson

4

# EXHIBIT A
# FILED UNDER SEAL

Exhibit B

# Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries

**(SEC ID No. 8-7221)**

**Consolidated Balance Sheet**

**December 31, 2020**

Filed pursuant to Rule 17a-5(e)(3) under the Securities Exchange Act of 1934 as a Public Document

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Table of Contents**
**December 31, 2020**

**Report of Independent Registered Public Accounting Firm**      **Page(s)**

Consolidated Balance Sheet ............................................................................. **1**

Notes to the Consolidated Balance Sheet ........................................................ **2 -17**



### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholder of Merrill Lynch, Pierce, Fenner & Smith Incorporated:

***Opinion on the Financial Statement – Balance Sheet***

We have audited the accompanying consolidated balance sheet of Merrill Lynch, Pierce, Fenner & Smith Incorporated and its subsidiaries (the "Company") as of December 31, 2020, including the related notes (collectively referred to as the "consolidated financial statement"). In our opinion, the consolidated financial statement presents fairly, in all material respects, the financial position of the Company as of December 31, 2020 in conformity with accounting principles generally accepted in the United States of America.

***Basis for Opinion***

The consolidated financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statement based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of this consolidated financial statement in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statement is free of material misstatement, whether due to error or fraud.

Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statement, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statement. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statement. We believe that our audit provides a reasonable basis for our opinion.

*Pricewaterhouse Coopers LLP*

Charlotte, NC
February 26, 2021

We have served as the Company's auditor since 2009.

*PricewaterhouseCoopers LLP, 214 N. Tryon Street, Suite 4200, Charlotte, NC 28202*
*T: (704) 344 7500, F: (704) 344 4100, www.pwc.com/us*

MERRILL_WDNC_002951

## Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries
### Consolidated Balance Sheet
### December 31, 2020

*(dollars in millions, except share and per share amounts)*

**ASSETS**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 3,040 |
| Cash and securities segregated for regulatory purposes or deposited with clearing organizations | | 1,258 |
| Securities financing transactions | | |
| Receivables under resale agreements | | 17,934 |
| Receivables under securities borrowed transactions | | 1,503 |
| | | 19,437 |
| Other receivables | | |
| Customers | | 6,596 |
| Brokers and dealers | | 138 |
| Interest and other, including loans due from affiliates | | 1,892 |
| | | 8,626 |
| Right-of-use lease assets | | 989 |
| Equipment and facilities, net | | 253 |
| Goodwill and intangible assets | | 1,813 |
| Other assets | | 184 |
| **Total Assets** | $ | 35,600 |

**LIABILITIES**

| | | |
|---|---|---:|
| Securities financing transactions | | |
| Payables under securities loaned transactions | $ | 2,037 |
| Other payables | | |
| Customers | | 20,286 |
| Brokers and dealers | | 144 |
| Compensation and benefits | | 787 |
| Interest and other | | 1,889 |
| Loans due to affiliates | | 1,471 |
| Lease liabilities | | 1,044 |
| | | 25,621 |
| Commitments, contingencies and guarantees (See Note 10) | | |
| Subordinated borrowings | | 620 |
| **Total Liabilities** | | 28,278 |

**STOCKHOLDER'S EQUITY**

| | | |
|---|---|---:|
| Common stock, par value $1 per share; 1,200 shares authorized; 1,000 shares issued and outstanding | | — |
| Paid-in capital | | 6,764 |
| Accumulated other comprehensive loss (net of tax) | | (5) |
| Retained earnings | | 563 |
| **Total Stockholder's Equity** | | 7,322 |
| **Total Liabilities and Stockholder's Equity** | $ | 35,600 |

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

1.  **Organization**

**Description of Business**
Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"), together with its subsidiaries (the "Company"), is registered as a broker-dealer and investment adviser with the U.S. Securities and Exchange Commission ("SEC"), and is a member firm of the Financial Industry Regulatory Authority ("FINRA"), the New York Stock Exchange ("NYSE"), and other securities exchanges. MLPF&S is also registered as an introducing broker with the U.S. Commodity Futures Trading Commission ("CFTC") and is a member of the National Futures Association ("NFA") and the Securities Investor Protection Corporation ("SIPC"). Additionally, it is registered as a swap firm with the NFA.

The Company provides its clients with investment-related products and services, including brokerage services and discretionary and non-discretionary investment advisory services through its investment advisory programs. Through its retirement group, the Company provides a wide variety of investment and custodial services to Individual Retirement Accounts ("IRAs") and other retirement plans for small businesses. The Company also provides investment, administration, communications, and consulting services to corporations and their employees for their retirement programs, including 401(k), pension, profit-sharing and nonqualified deferred compensation plans.  In addition, the Company provides financing to clients, including margin lending and other extensions of credit.  Certain products and services may be provided through affiliates.

The Company is a wholly-owned indirect subsidiary of Bank of America Corporation ("Bank of America" or the "Parent").  The Company's direct parent is BAC North America Holding Company ("BACNA"), which is a wholly-owned subsidiary of NB Holdings Corporation ("NB Holdings"). NB Holdings is a wholly-owned subsidiary of Bank of America.

2.  **Summary of Significant Accounting Policies**

**Basis of Presentation**
The Consolidated Balance Sheet is presented in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP"). Intercompany transactions and balances have been eliminated. The Consolidated Balance Sheet are presented in U.S. dollars.

**Consolidation Accounting**
The Consolidated Balance Sheet includes the accounts of the Company and its subsidiaries in which the Company has a controlling financial interest.

The Company determines whether it is required to consolidate an entity by first evaluating whether the entity qualifies as a voting rights entity ("VRE") or as a variable interest entity ("VIE").  VREs are defined to include entities that have both equity at risk that is sufficient to fund future operations and have equity investors that have a controlling financial interest in the entity through their equity investments. The Company generally consolidates those VREs where it has the majority of the voting rights. VIEs are those entities that do not meet the VRE criteria. A VIE is an entity that lacks equity investors or whose equity investors do not have a controlling financial interest in the entity through their equity investments. At December 31, 2020, there were no consolidated nor unconsolidated VIEs.

**Use of Estimates**

In presenting the Consolidated Balance Sheet, management makes estimates including the following:

- Valuations of assets and liabilities requiring fair value estimates;
- The ability to realize deferred tax assets and the recognition and measurement of uncertain tax positions;
- The carrying amount of goodwill and intangible assets;
- The outcome of pending litigation;
- Incentive-based compensation accruals and valuation of share-based payment compensation arrangements; and
- Other matters that affect the reported amounts and disclosure of contingencies in the Consolidated Balance Sheet.

Estimates, by their nature, are based on judgment and available information. Therefore, actual results could differ from those estimates and could have a material impact on the Consolidated Balance Sheet, and it is possible that such

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

changes could occur in the near term. A discussion of certain areas in which estimates are a significant component of the amounts reported in the Consolidated Balance Sheet follows:

*Fair Value Measurement*
The Company had no material assets and liabilities measured at fair value on a recurring basis as of December 31, 2020.

Accounting Standards Codification ("ASC") 825-10-50 - *Financial Instruments*, requires disclosure of the fair value of certain financial instruments that are not carried at fair value in the financial statements. The Company classifies its fair value measurements of financial instruments based on the three-level fair value hierarchy in ASC 820, *Fair Value Measurements and Disclosures*: Level 1 consist of unadjusted quoted prices in active markets for identical assets or liabilities, Level 2 consist of observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities, and Level 3 consist of unobservable inputs that are supported by little or no market activity and that are significant to the overall fair value of the assets or liabilities. The level in the fair value hierarchy in which the Company's financial instruments are categorized is disclosed in the Consolidated Balance Sheet Captions section included in this note.

*Legal Reserves*
The Company is occasionally a party in various actions, some of which involve claims for substantial amounts. Amounts are accrued for the financial resolution of claims that have either been asserted or are deemed probable of assertion if, in the opinion of management, it is both probable that a liability has been incurred and the amount of the loss can be reasonably estimated. In many cases, it is not possible to determine whether a liability has been incurred or to estimate the ultimate or minimum amount of that liability until the case is close to resolution, in which case no accrual is made until that time. Accruals are subject to significant estimation by management, with input from any outside counsel handling the matter. Refer to Note 10 for further information.

*Income Taxes*
The Company provides for income taxes on all transactions that have been recognized in the Consolidated Balance Sheet in accordance with ASC 740 *Income Taxes* ("Income Tax Accounting"). Accordingly, deferred taxes are adjusted to reflect the tax rates at which future taxable amounts will likely be settled or realized. The effects of tax rate changes on deferred tax liabilities and deferred tax assets, as well as other changes in income tax laws, are recognized in net earnings in the period during which such changes are enacted.

Valuation allowances are established when necessary to reduce deferred tax assets to the amounts that are more-likely-than-not to be realized. Pursuant to Income Tax Accounting, the Company may consider various sources of evidence in assessing the necessity of valuation allowances to reduce deferred tax assets to amounts more-likely-than-not to be realized, including the following: 1) past and projected earnings, including losses, of the Company and Bank of America, as certain tax attributes such as U.S. net operating losses ("NOLs"), U.S. capital loss carryforwards and foreign tax credit carryforwards can be utilized by Bank of America in certain income tax returns, 2) tax carryforward periods, and 3) tax planning strategies and other factors of the legal entities, such as the intercompany tax allocation agreement. Included within the Company's net deferred tax assets are carryforward amounts generated in the U.S. that are deductible in the future as NOLs. The Company has concluded that these net deferred tax assets are more-likely-than-not to be fully utilized prior to expiration, based on the projected level of future taxable income of the Company and Bank of America, which is relevant due to the intercompany tax allocation agreement. For this purpose, future taxable income was projected based on forecasts, historical earnings after adjusting for past market disruptions and the anticipated impact of the differences between pre-tax earnings and taxable income.

The Company recognizes and measures its unrecognized tax benefits ("UTB") in accordance with Income Tax Accounting. The Company estimates the likelihood, based on their technical merits, that tax positions will be sustained upon examination considering the facts and circumstances and information available at the end of each period. The Company adjusts the level of unrecognized tax benefits when there is more information available, or when an event occurs requiring a change. In accordance with Bank of America's intercompany tax allocation agreement, any new or subsequent change in an unrecognized tax benefit related to Bank of America's state consolidated, combined or unitary return in which the Company is a member will generally not be reflected in the Company's Consolidated Balance

MERRILL_WDNC_002954

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

Sheet. However, upon resolution of the item, any significant impact determined to be attributable to the Company will be reflected in the Company's Consolidated Balance Sheet

Under the intercompany tax allocation agreements, tax benefits associated with NOLs (or other tax attributes) of the Company are payable to the Company generally upon utilization in Bank of America's tax returns.

In addition, under these agreements, substantially all current income taxes (federal, combined and unitary state) are recorded as income tax receivable and payable due to affiliate, which are included on the Consolidated Balance Sheet within *Interest and other, including loans due from affiliates, Interest and other payables* and *Loans due to affiliates* and settled on at least an annual basis. See Note 13 for further discussion of income taxes.

***Goodwill and Intangible Assets***
Goodwill is the purchase premium after adjusting for the fair value of net assets acquired. Goodwill is not amortized but is reviewed for potential impairment on an annual basis, or when events or circumstances indicate a potential impairment.

The Company assesses its fair value against its carrying value, including goodwill, as measured by equity. In performing its goodwill impairment testing, the Company first assesses qualitative factors to determine whether it is more likely than not that the Company's fair value is less than its carrying value. Qualitative factors include, among other things, macroeconomic conditions, industry and market considerations, financial performance and other relevant entity specific considerations. If the Company concludes it is more likely than not that its fair value is less than its carrying value, a quantitative assessment is performed. The Company has an unconditional option to bypass the qualitative assessment in any period and proceed directly to performing the quantitative goodwill impairment test. The Company may resume performing the qualitative assessment in any subsequent period.

When performing the quantitative assessment, if the Company's fair value exceeds its carrying value, goodwill would not be considered impaired. If the carrying value of the Company exceeds its fair value, a goodwill impairment loss would be recognized for the amount by which equity exceeds its fair value. An impairment loss recognized cannot exceed the amount of the Company's goodwill. An impairment loss establishes a new basis in the goodwill, and subsequent reversals of goodwill impairment losses are not permitted under applicable accounting guidance. For further information, refer to Note 6.

The Company had no unamortized intangible assets with definite lives as of December 31, 2020.

Intangible assets with indefinite lives consist of the Company's proportion of the value assigned to the Merrill Lynch brand name and are tested for impairment in accordance with Goodwill and Intangible Assets Accounting. Intangible assets with indefinite lives are not amortized.

The Company makes certain judgments with respect to its goodwill and intangible assets, including assumptions and estimates used to determine fair value and evaluate impairment. Refer to Note 6 for further information.

**Consolidated Balance Sheet Captions**
The following are descriptions related to specific consolidated balance sheet captions, and the company estimates the carrying value of these items approximates their fair value. Assets and liabilities including segregated securities, securities financing transactions, other receivables and payables from and to customers, brokers and dealers, and affiliates, interest and other receivables and payables, and subordinated borrowings are considered level 2. Cash and cash equivalents are considered level 1.

**Cash and Cash Equivalents**
The Company defines cash equivalents as short-term, highly liquid securities, and interest-earning deposits with maturities, when purchased, of 90 days or less, that are not used for trading purposes.

**Cash and Securities Segregated for Regulatory Purposes or Deposited with Clearing Organizations**
The Company maintains relationships with clients and therefore is obligated by rules mandated by its primary regulator, the SEC, to segregate or set aside cash and/or qualified securities in order to protect customer assets. In addition, the Company is a member of various clearing organizations and exchanges at which it maintains cash and/or

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

securities required for the conduct of its day-to-day clearance activities. At December 31, 2020, the Company had $1.2 billion of cash at clearing organizations.

Included in *Cash and securities segregated for regulatory purposes or deposited with clearing organizations* at December 31, 2020 was $86 million of cash that is considered restricted cash by the Company.

**Securities Financing Transactions**
Resale agreements are treated as collateralized financing transactions. These transactions are recorded at their contractual amounts plus accrued interest, approximate fair value, as the fair value of these items is not materially sensitive to shifts in market interest rates because of the short-term nature of these instruments and/or variable interest rates or to credit risk because the resale agreements are substantially collateralized.

The Company may use securities received as collateral for resale agreements to satisfy regulatory requirements such as Rule 15c3-3. At December 31, 2020, approximately $13.5 billion of such securities had been segregated in special reserve accounts as required by Rule 15c3-3 under the Securities Exchange Act of 1934 ("Rule 15c3-3").

Securities borrowed and loaned transactions are recorded at the amount of cash collateral advanced or received plus accrued interest. Securities borrowed transactions require the Company to provide the counterparty with collateral in the form of cash, letters of credit, or other securities. The Company receives collateral in the form of cash or other securities for securities loaned transactions.

The carrying value of securities borrowed and loaned transactions approximates fair value as these items are not materially sensitive to shifts in market interest rates because of their short-term nature and/or variable interest rates or to credit risk because securities borrowed and loaned transactions are substantially collateralized.

For securities financing transactions, the Company's policy is to monitor the market value of the principal amount loaned and obtain collateral from or return collateral pledged to counterparties, where appropriate. Securities financing agreements do not create material credit risk due to these collateral provisions; therefore, an allowance for loan losses is unnecessary. The collateral maintenance provisions consisting of daily margining of collateral is expected to be maintained into the foreseeable future and any expected losses are assumed to not have a material impact to the Consolidated Balance Sheet.

A significant majority of securities financing activities are transacted under legally enforceable master agreements that give the Company, in the event of default by the counterparty, the right to liquidate securities held and to offset receivables and payables with the same counterparty. The Company offsets certain repurchase and resale transactions with the same counterparty on the Consolidated Balance Sheet where it has such a legally enforceable master netting agreement, and the transactions have the same maturity date.

**Other Receivables and Payables**
*Customers*
Customer securities transactions are recorded on a settlement date basis. Receivables from and payables to customers include amounts due on cash and margin transactions. Securities owned by customers, including those that collateralize margin or other similar transactions, are not reflected on the Consolidated Balance Sheet.

Customer receivables include margin loan transactions where the Company will typically make a loan to a customer to finance the customer's purchase of securities. These transactions are conducted through margin accounts. In these transactions, the customer is required to post collateral in excess of the value of the loan and the collateral must meet marketability criteria. Collateral is valued daily and must be maintained over the life of the loan. Given that these loans are fully collateralized by marketable securities, credit risk is negligible and reserves for loan losses are rarely required. The collateral maintenance provisions consisting of daily margining of collateral is expected to be maintained into the foreseeable future and the expected losses are assumed to not have a material impact to the Consolidated Balance Sheet.

*Brokers and Dealers*
Receivables from brokers and dealers primarily include amounts receivable for securities not delivered by the Company to a purchaser by the settlement date ("fails to deliver"), margin deposits, and commissions. Payables to

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

brokers and dealers primarily include amounts payable for securities not received by the Company from a seller by the settlement date ("fails to receive"). Brokers and dealers receivables and payables additionally include the variation margin related to futures contracts cleared on domestic and international derivatives exchanges as well as net receivables or net payables arising from unsettled trades. These accounts generally settle daily and due to the short nature of broker and dealers receivables the credit exposures arising from these accounts are of limited amounts owed to the Company for a short period of time. The expected credit losses are assumed to not have a material impact to the Consolidated Balance Sheet.

***Compensation and Benefits***
Compensation and benefits payables consists of salaries payable, financial advisor compensation, incentive and deferred compensation, payroll taxes, pension and other employee benefits.

***Interest and Other***
Interest and other receivables include interest receivable on customer or other receivables, and securities financing transactions, income taxes, commissions and fees, and other receivables. The Company performs qualitative analyses, including consideration of historical losses and current economic conditions, to estimate any expected credit losses which are then included in a valuation account that is recorded as a contra-asset against the amortized cost basis of the financial asset.The changes in allowance for credit losses are included in other revenues. Interest and other payables include interest payable for securities financing transactions, amounts payable for income taxes, and other payables.

**Equipment and Facilities**
Equipment and facilities primarily consist of technology hardware and software, leasehold improvements, and owned facilities. Equipment and facilities are reported at historical cost, net of accumulated depreciation and amortization, except for land, which is reported at historical cost. The cost of certain facilities shared with affiliates is allocated to the Company by Bank of America based on the relative amount of space occupied.

Depreciation and amortization are computed using the straight-line method. Equipment is depreciated over its estimated useful life, while leasehold improvements are amortized over the lesser of the improvement's estimated economic useful life or the term of the lease.

**Leases**
The Company's lessee arrangements are comprised of operating leases. Under these arrangements, the Company records right-of-use assets and lease liabilities at lease commencement. All leases are recorded on the Consolidated Balance Sheet, except for leases with an initial term of less than 12 months for which the Company made the short-term lease election. The Company made an accounting policy election not to separate lease and non-lease components of a contract that is or contains a lease for its real estate and equipment leases. As such, lease payments represent payments on both lease and nonlease components. At lease commencement, lease liabilities are discounted using the Company's incremental borrowing rate. Right-of-use assets initially equal the lease liability, adjusted for any lease payments made prior to lease commencement and for any lease incentives, Refer to Note 8 for further information.

**Other Assets**
Other assets consist primarily of prepaid expenses, deferred charges and trading assets.

**Loans Due to Affiliates**
Loans due to affiliates consist of unsecured borrowings with Bank of America and NB Holdings. Refer to Note 3 for further information.

**Subordinated Borrowings**
The Company enters into subordinated borrowings with NB Holdings. Refer to Note 7 for further information.

**Translation of Foreign Currencies**
Assets and liabilities denominated in foreign currencies are translated at period-end rates of exchange.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

**New Accounting Pronouncements**

***Accounting for Financial Instruments - Credit Losses***

On January 1, 2020, the Company adopted the new accounting standard that requires the measurement of the allowance for credit losses to be based on management's best estimate of lifetime expected credit losses ("ECL") inherent in the Company's relevant financial assets. The Company's lifetime expected credit losses are determined using macroeconomic forecast assumptions and management judgments applicable to and through the expected life of the financial assets and is net of expected recoveries. The beginning of the year balance of retained earnings has been adjusted by $23M to establish the allowance for credit losses.

***Reference Rate Reform***

In March 2020, the FASB issued a new accounting standard related to contracts or hedging relationships that reference LIBOR or other reference rates that are expected to be discontinued due to reference rate reform. The new standard provides for optional expedients and other guidance regarding the accounting related to modifications of contracts, hedging relationships and other transactions affected by reference rate reform. The Company has elected to retrospectively adopt the new standard as of January 1, 2020 which resulted in no immediate impact. While reference rate reform is not expected to have a material accounting impact on the Company's Consolidated Balance Sheet, the standard will ease the administrative burden in accounting for the future effects of reference rate reform.

3.  **Related Party Transactions**

The Company enters into securities financing transactions with affiliates. The Company also provides certain securities services to affiliated companies, and contracts a variety of services from Bank of America and certain affiliated companies including accounting, legal, regulatory compliance, transaction processing, purchasing, building management and other services.

The following two tables summarize related party balances included in the respective balance sheet captions as of December 31, 2020.

**Assets**
*(dollars in millions)*

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 2,778 |
| Receivables under resale agreements | | 17,934 |
| Receivables under securities borrowed transactions | | 1,503 |
| Interest and other, including loans due from affiliates | | 530 |
| Total | $ | 22,745 |

**Liabilities**
*(dollars in millions)*

| | | |
|---|---|---:|
| Payables under securities loaned transactions | $ | 2,037 |
| Interest and other payables | | 407 |
| Loans due to affiliates | | 1,471 |
| Subordinated borrowings | | 620 |
| Total | $ | 4,535 |

The Company has established unsecured borrowing agreements with Bank of America and NB Holdings in the normal course of business. Amounts outstanding under these arrangements are included within *Loans due to affiliates*. The arrangements are summarized below:

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

Agreements with Bank of America

- A $2.5 billion uncommitted six month revolving senior unsecured line of credit. Interest on the line of credit is based on prevailing short-term market rates. The credit line will mature on August 01, 2021 and may automatically be extended semi-annually to the succeeding August 1st unless specific actions are taken 180 days prior to the maturity date. At December 31, 2020, approximately $2 million was outstanding on the line of credit.

Agreements with NB Holdings

- A $1 billion committed six month revolving senior unsecured line of credit. Interest on the line of credit is based on prevailing short-term market rates. The credit line will mature on August 01, 2021 and may automatically be extended semi-annually to the succeeding August 1st unless specific actions are taken 180 days prior to the maturity date. At December 31, 2020, there were no amounts outstanding on the line of credit.

- A $7 billion uncommitted six month revolving senior unsecured line of credit. Interest on the line of credit is based on prevailing short-term market rates. The credit line will mature on August 01, 2021 and may automatically be extended semi-annually to the succeeding August 1st unless specific actions are taken 180 days prior to the maturity date. At December 31, 2020 approximately $1,469 million was outstanding on the line of credit.

Other subsidiaries of MLPF&S engage in lending transactions with NB Holdings in the normal course of business. At December 31, 2020, the subsidiaries of MLPF&S had $64 million due from NB Holdings included in Loans due from affiliates.

Agreements with Bank of America, National Association ("BANA")

- The Company has a $3.5 billion uncommitted intra-day unsecured line of credit with BANA. The intraday liquidity is provided through daylight overdraft of the demand deposit accounts held by the Company at BANA. At December 31, 2020, there were no amounts outstanding on this line of credit.

Other subsidiaries of MLPF&S engage in lending transactions with Bank of America Europe Designated Activity Company ("BOAEDAC") in the normal course of business. At December 31, 2020, the subsidiaries of MLPF&S had $17 million due from BOAEDAC included in Loans due from affiliates.

Refer to Note 7 for information on subordinated borrowings between the Company and NB Holdings.

Certain of the Company's financial advisors are offered cash upfront in the form of an interest-bearing loan ("FA Loans"). Financial advisors who receive this loan also receive a monthly service incentive payment that equates to the principal and interest due on the loan for as long as they remain with the Company during the loan term. The outstanding loan balance becomes due if employment is terminated before the vesting period. As of December 31, 2020, the Company had loans outstanding from financial advisors of $588 million, which are not included in the table above but are included in *Interest and other receivables* on the Consolidated Balance Sheet. See Note 10 for guarantees related to FA Loans.

4.    **Risks and Uncertainties**

**Market Risk**
Market risk is the risk that changes in market conditions may adversely impact the value of assets, liabilities, and AUM, and may negatively impact earnings.

*Market Liquidity Risk*
Market liquidity risk represents the risk that the level of expected market activity changes dramatically and, in certain cases, may even cease. This exposes the Company to the risk that the Company will not be able to transact business and execute trades in an orderly manner, which may impact results. The impact could be further exacerbated if

MERRILL_WDNC_002959

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

expected hedging or pricing correlations are compromised by disproportionate demand or lack of demand for certain instruments.

### Liquidity Risk

Liquidity Risk represents the risk of inability to meet expected or unexpected cash flow and collateral needs while continuing to support the Company's business and customer needs, under a range of economic conditions. The Company's primary liquidity risk management objective is to meet all contractual and contingent financial obligations at all times, including during periods of stress. To achieve that objective, the Company analyzes and monitors its liquidity risk under expected and stressed conditions, maintains excess liquidity and access to diverse funding sources and seeks to align liquidity-related incentives and risks. Excess liquidity is defined as readily available assets, limited to cash and high-quality, liquid, unencumbered securities that the Company can use to meet contractual and contingent financial obligations as those obligations arise. In addition, the Company is supported through committed and uncommitted borrowing arrangements with Bank of America and NB Holdings.

### Counterparty Credit Risk

The Company is exposed to risk of loss if an individual, counterparty or issuer fails to perform its obligations under contractual terms ("default risk"). Cash instruments expose the Company to default risk.

In the normal course of business, the Company executes, settles, and finances various customer securities transactions. Execution of these transactions includes the purchase and sale of securities by the Company. These activities may expose the Company to default risk arising from the potential that customers or counterparties may fail to satisfy their obligations. In these situations, the Company may be required to purchase or sell financial instruments at unfavorable market prices to satisfy obligations to other customers or counterparties. In addition, the Company seeks to control the risks associated with its customer margin activities by requiring customers to maintain collateral in compliance with regulatory and internal guidelines.

Liabilities to other brokers and dealers related to unsettled transactions (i.e., securities fails to receive) are recorded at the amount for which the securities were purchased, and are paid upon receipt of the securities from other brokers or dealers. In the case of aged securities fails to receive, the Company may purchase the underlying security in the market and seek reimbursement for losses from the counterparty.

### Concentrations of Credit Risk

The Company's exposure to credit risk associated with its activities is measured on an individual counterparty basis, as well as by groups of counterparties that share similar attributes. Concentrations of credit risk can be affected by changes in political, industry, or economic factors. To reduce the potential for risk concentration, credit limits are established and monitored in light of changing counterparty and market conditions.

### Concentration of Risk to the U.S. Government and its Agencies

At December 31, 2020, the Company had indirect exposure to the U.S. Government and its agencies from maintaining U.S. Government and agencies securities as collateral for resale agreements and securities borrowed transactions. The Company's direct credit exposure on these transactions is with the counterparty; thus the Company has credit exposure to the U.S. Government and its agencies only in the event of the counterparty's default. Securities issued by the U.S. Government or its agencies held as collateral for resale agreements and securities borrowed transactions at December 31, 2020 totaled $15.5 billion, which was from affiliated companies.

### Industry Concentration Risk

The Company's primary industry credit concentration is with financial institutions, including affiliates, which arises in the normal course of the Company's brokerage and financing activities. Financial institutions include other brokers and dealers, commercial banks, financing companies, insurance companies, and investment companies.

**5.    Securities Financing Transactions**

The Company enters into securities financing transactions with affiliates to obtain securities for settlement, to meet its regulatory reserve requirements under Rule 15c3-3, and to maintain liquidity.

MERRILL_WDNC_002960

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

Under these transactions, the Company either receives or provides collateral, including U.S. Treasury and government agency securities and equity securities. The Company receives collateral in connection with resale agreements, securities borrowed transactions, customer margin loans, and other loans. Under most agreements the Company is permitted to sell or repledge the securities received (e.g., use the securities to secure repurchase agreements, enter into securities lending transactions or deliver to counterparties to cover short positions). At December 31, 2020, the fair value of securities received as collateral where the Company is permitted to sell or repledge the securities was $2.0 billion, all of which was received from affiliated companies. The fair value of securities received as collateral that had been sold or repledged was $1.5 billion, all of which had been sold or repledged to affiliated companies.

*Offsetting of Securities Financing Agreements*
A significant majority of securities financing transactions are transacted under legally enforceable master repurchase agreements that give the Company, in the event of default by the counterparty, the right to liquidate securities held and to offset receivables and payables with the same counterparty. The Company offsets financing transactions with the same counterparty on the Company's Consolidated Balance Sheet where it has such a legally enforceable master netting agreement and the transactions have the same maturity date. At December 31, 2020, the Company did not offset any of its financing transactions.

The tables below present securities financing agreements included on the Company's Consolidated Balance Sheet at December 31, 2020. Gross assets and liabilities are adjusted on an aggregate basis to take into consideration the effects of legally enforceable master netting agreements.

The column entitled "Financial Instruments" in the tables below includes securities collateral received or pledged under repurchase or securities lending agreements where there is a legally enforceable master netting agreement. These amounts are not offset in the Consolidated Balance Sheet but are shown as a reduction to the net balance sheet amount in the table to derive a net asset or liability.

*(dollars in millions)*

| | Assets | | | | |
|---|---|---|---|---|---|
| | December 31, 2020 | | | | |
| | Gross Assets | Amounts Offset | Balance Sheet Amount | Financial Instruments[1] | Net Asset |
| Receivables under resale agreements | $ 17,934 $ | — $ | 17,934 $ | (17,934) $ | — |
| Receivables under securities borrowed transactions | 1,503 | — | 1,503 | (1,476) | 27 |
| **Total** | $ 19,437 $ | — $ | 19,437 $ | (19,410) $ | 27 |

| | Liabilities | | | | |
|---|---|---|---|---|---|
| | December 31, 2020 | | | | |
| | Gross Liabilities | Amounts Offset | Balance Sheet Amount | Financial Instruments[1] | Net Liability |
| Payables under securities loaned transactions | $ 2,037 $ | — $ | 2,037 $ | (1,901) $ | 136 |
| **Total** | $ 2,037 $ | — $ | 2,037 $ | (1,901) $ | 136 |

[1]These amounts are limited to the securities financing asset/liability balance and accordingly, do not include excess collateral received/pledged.

*Payables under Securities Loaned Transactions Accounted for as Secured Borrowings*
At December 31, 2020, the maturity of all of the Company's securities loaned transactions were either overnight or continuous (i.e., no stated term). At December 31, 2020, the Company pledged equity securities of $2 billion as collateral for its securities loaned transactions.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

For securities loaned transactions, the Company receives collateral in the form of cash. The collateral is generally valued daily based on the market value of the securities loaned and the Company may receive or return collateral pledged, when appropriate.

## 6.  Goodwill and Intangible Assets

Refer to Note 2 for the Company's accounting policies for goodwill and intangible assets.

**Goodwill**
The carrying amount of the Company's goodwill at December 31, 2020 was $878 million.

The Company completed its annual goodwill impairment test as of June 30, 2020 using a quantitative assessment. Based on the results of the annual goodwill impairment test, the Company determined there was no impairment.

**Intangible Assets**
The carrying amount of the Company's indefinite lived intangible asset as of December 31, 2020 was $935 million.

The Company determined that there was no impairment of the Merrill Lynch brand name as of the June 30, 2020 test date.

## 7.  Subordinated Borrowings and Other Financing

At December 31, 2020, subordinated borrowings and credit committed under agreements with NB Holdings consisted of the following:

*(dollars in millions)*

|  | Maturity | Amount Outstanding | | Total Credit Facility | |
|---|---|---|---|---|---|
| **MLPF&S with NB Holdings** | | | | | |
| Revolving Subordinated Line of Credit | August 19, 2022 | $ | 620 | $ | 6,000 |
| **Total Subordinated Liabilities** | | $ | 620 | $ | 6,000 |

In August 2020, with Board of Directors and FINRA approvals, the Company entered into a new agreement with NB Holdings for a $6 billion revolving subordinated line of credit, and cancelled it's pre-existing $12.0 billion revolving subordinated line of credit facility with NB Holdings.

The borrowing, which has been approved for regulatory capital purposes, is a U.S. dollar-denominated obligation at variable interest rates based on Fed Funds plus a market-based spread. MLPF&S' revolving subordinated line of credit agreement contains a provision that automatically extends the loan's maturity by one year unless specified actions are taken 390 days prior to the maturity date.

The Company obtains letters of credit from issuing banks to satisfy various counterparty collateral requirements in lieu of depositing cash or securities collateral.  There were no letters of credit outstanding at December 31, 2020.

## 8.  Leases

The Company enters into lessee arrangements. For more information on lease accounting, see Note 2.

The Company's lessee arrangements predominantly consist of operating leases for premises and equipment.  Right-of-use assets and the related lease liabilities for such arrangements were approximately $1 billion respectively, at December 31, 2020. The weighted-average discount rate used to calculate the present value of future minimum lease payments was 3.4% .

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

Lease terms may contain renewal and extension options and early termination features. Generally, these options do not impact the lease term because the Company is not reasonably certain that it will exercise the options. The weighted-average lease term was 6.1 years at December 31, 2020.

**Maturity Analysis**

The maturities of lessee arrangements outstanding at December 31, 2020 are presented in the table below based on undiscounted cash flows.

| *(dollars in millions)* | Lessee Operating Leases |
|---|---|
| 2021 | $ 250 |
| 2022 | 222 |
| 2023 | 190 |
| 2024 | 157 |
| Thereafter | 344 |
| Total undiscounted cash flows | 1,163 |
| Less: Net present value adjustment | (119) |
| **Total Lease Liability** | **$ 1,044** |

**9.    Stockholder's Equity**

MLPF&S is authorized to issue 1,200 shares of $1.00 par value common stock. At December 31, 2020, there were 1,000 shares issued and outstanding.

MLPF&S is authorized to issue 1,000 shares of $1.00 par value preferred stock. At December 31, 2020, there were no preferred shares issued and outstanding.

**10.    Commitments, Contingencies, and Guarantees**

**Litigation and Regulatory Matters**
In the ordinary course of business, the Company is occasionally a defendant in or a party to pending and threatened legal actions and proceedings. In view of the inherent difficulty of predicting the outcome of such litigation and regulatory matters, particularly where the claimants seek unspecified or very large or indeterminate damages or where the matters present novel legal theories or involve a large number of parties, the Company cannot predict what the eventual outcome of the pending matters will be, what the timing of the ultimate resolution of these matters will be, or what the eventual loss, fines or penalties related to each pending matter may be.

In accordance with applicable accounting guidance, the Company establishes an accrued liability for litigation and regulatory matters when those matters present loss contingencies that are both probable and estimable. In such cases, there may be an exposure to loss in excess of any amounts accrued. As a matter develops, the Company, in conjunction with any outside counsel handling the matter, evaluates on an ongoing basis whether such matter presents a loss contingency that is probable and estimable. Once the loss contingency related to a litigation or regulatory matter is deemed to be both probable and estimable, the Company will establish an accrued liability and record a corresponding amount of litigation-related expense.

The Company continues to monitor the matter for further developments that could affect the amount of the accrued liability that has been previously established.

MERRILL_WDNC_002963

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

**Commitments**

At December 31, 2020, the Company's commitments had the following expirations:

*(dollars in millions)*

| | Total | | Commitment expiration | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Less than 1 year | 1 - 3 years | 3 - 5 years | Over 5 years |
| Purchasing commitments | $ | 13 | $   7 | $   4 | $   2 | $   — |
| Operating leases | | 1,163 | 250 | 412 | 253 | 248 |
| Total | $ | 1,176 | $   257 | $   416 | $   255 | $   248 |

***Purchasing Commitments***

The Company has entered into commitments to purchase service contracts with providers of market data, communications, and systems consulting services.

***Operating Leases***

The Company has entered into various non-cancelable long-term lease agreements for premises that expire through 2036. See Note 8 for further information.

**Guarantees**

The Company is a member of various securities and derivative exchanges and clearinghouses, both in the U.S. and in other countries. As a member, the Company may be required to pay a pro-rata share of the losses incurred by some of these organizations as a result of another member's default and under other loss scenarios. The Company's potential obligations may be limited to its membership interests in such exchanges and clearinghouses, to the amount (or multiple) of the Company's contribution to the guarantee fund or, in limited instances, to the full pro-rata share of the residual losses after applying the guarantee fund. The Company's maximum potential exposure under these membership agreements is difficult to estimate; however, the potential for the Company to be required to make these payments is remote.

The Company performs securities clearance and settlement services with other brokerage firms and clearinghouses on behalf of its clients. Under these arrangements, the Company stands ready to meet the obligations of its clients with respect to securities transactions. The Company's obligations in this respect are secured by the assets in the clients' accounts and the accounts of their customers as well as by any proceeds received from the transactions cleared and settled by the Company on behalf of clients or their customers. The Company's maximum potential exposure under these arrangements is difficult to estimate; however, the potential for the Company to incur material losses pursuant to these arrangements is remote.

In connection with the FA Loans discussed in Note 3, the Company services FA loans through an affiliate in addition to those serviced directly by the Company. The Company fully guarantees the amount outstanding of the affiliate serviced FA Loans in the event of default during the FA loan's vesting period. At December 31, 2020, the Company had FA Loan guarantees of $27 million which is the maximum potential amount of future payments. The affiliate performs qualitative analyses, including consideration of historical losses and current economic conditions, to estimate any expected credit losses. At December 31, 2020, expected credit losses assessed by the affiliate do not have a material impact to the Consolidated Balance Sheet.

**11. Employee Benefit Plans**

Bank of America provides pension and other postretirement benefits to its employees worldwide through sponsorship of defined contribution pension, defined benefit pension and other post retirement plans.

The Bank of America Corporation Corporate Benefits Committee has overall responsibility for the administration of these benefit plans.

MERRILL_WDNC_002964

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

Bank of America maintains certain qualified retirement and defined contribution plans covering the Company's full-time, salaried employees and certain part-time employees.

The defined benefit pension plans and postretirement benefit plans are accounted for in accordance with ASC 715-20-50, *Compensation - Retirement Benefits, Defined Benefit Plans-General* ("Defined Benefit Plan Accounting"). Post employment benefits are accounted for in accordance with ASC 712, *Compensation-Non retirement Post employment Benefits*. Required disclosures are included in the December 31, 2020 Form 10-K of Bank of America.

**Defined Contribution Pension Plans**
The active U.S. defined contribution plan sponsored by Bank of America is the Bank of America 401 (k) Plan. Effective January 1, 2020, the Merrill Lynch 401 (k) Savings & Investment Plan ("SIP") was merged into the Bank of America 401 (k) Plan.

**Defined Benefit Pension Plans**
Certain of the Company's employees are covered by Bank of America's qualified pension plan.

Bank of America has an annuity contract that guarantees the payment of benefits vested under a terminated U.S. pension plan. Bank of America, under a supplemental agreement, may be responsible for, or benefit from, actual experience and investment performance of the annuity assets. Bank of America made no contribution under this agreement for the year ended December 31, 2020. Contributions may be required in the future under this agreement.

Bank of America also maintains non-contributory, non qualified pension plans (i.e., plans not subject to Title IV of ERISA) that are unfunded and provide supplemental defined benefit pension benefits for certain eligible U.S. employees.

**Postretirement Benefits Other Than Pensions**
Health insurance benefits are provided to eligible retired employees and dependents through Bank of America sponsored plans. The health care coverage is contributory, with certain retiree contributions adjusted periodically. The accounting for costs of health care benefits for most eligible employees anticipates future changes in cost-sharing provisions.

**Postemployment Benefits**
Bank of America provides certain post employment benefits for employees on extended leave due to injury, illness, or death and for terminated employees. Eligible employees who are disabled due to non-work related illness or injury are entitled to disability income, medical coverage and life insurance. Severance benefits may be provided to eligible terminated employees under the terms of a severance pay plan. All full-time employees are eligible for severance benefits subject to the terms of the severance pay plan.

12. **Employee Incentive Plans**

Incentive plans are sponsored by Bank of America. Disclosures required by ASC 718, *Stock Compensation* ("Stock Compensation Accounting") are included in the December 31, 2020 Form 10-K of Bank of America.

The Company participates in a number of equity compensation plans sponsored by Bank of America, with awards being granted predominantly from the Bank of America Corporation Key Employee Equity Plan ("KEEP"). Under the KEEP, Bank of America grants stock based awards, including restricted stock units ("RSUs"), to eligible employees. Grants in 2020 from the KEEP include RSUs that were authorized to settle predominantly in shares of common stock of Bank of America. Certain RSUs will be settled in cash or contain settlement provisions that subject these awards to variable accounting whereby compensation expense is adjusted to fair value based on changes in the share price of Bank of America's common stock up to the settlement date.

These RSUs will generally vest in one-third increments on each of the first three anniversaries of the grant date, provided that the employee remains continuously employed with the Company during that time. For non-retirement eligible employees, awards will be expensed ratably over the vesting period, net of estimated forfeitures, based on the grant date fair value of the shares.

MERRILL_WDNC_002965

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

For stock-based compensation awards granted to retirement-eligible employees, awards are deemed authorized at the beginning of the year preceding the grant date when the incentive award plans are generally approved. As a result, the estimated value of the award is expensed ratably over the year preceding the grant date.

**Other Compensation Arrangements**
The Company participates in Bank of America sponsored deferred compensation plans in which employees who meet certain minimum compensation thresholds may participate on either a voluntary or mandatory basis. Contributions to the plans are made on a tax-deferred basis by participants. Participants' returns on these contributions may be indexed to various mutual funds and other funds. The Company also participates in several Bank of America sponsored, cash-based employee award programs, under which certain employees are eligible to receive future cash compensation, generally upon fulfillment of the service and vesting criteria for the particular program.  When appropriate, Bank of America maintains various investments as an economic hedge of its liabilities to participants under these deferred compensation plans and award programs, including derivative transactions.

13. **Income Taxes**

The reconciliation of the beginning UTB balance to the ending balance is presented in the table below:

| *(dollars in millions)* | | |
|---|---|---|
| **Balance at December 31, 2019** | $ | 53 |
| Increases related to positions taken during current year | | — |
| Increases related to positions taken during prior years | | — |
| Decreases in positions taken during prior years | | (2) |
| Settlements | | (3) |
| Expiration of statute | | — |
| **Balance at December 31, 2020** | $ | 48 |

As of December 31, 2020, the balance of the Company's UTBs which would, if recognized, affect the Company's effective tax rate, was $38 million. Included in the UTB balance are some items, the recognition of which would not affect the effective tax rate, such as the portion of gross state UTBs that would be offset by the tax benefit of the associated federal deduction, and the portion of gross non-U.S. UTBs that would be offset by tax reductions in other jurisdictions.

It is reasonably possible that the UTB balance may decrease by as much as $3 million during the next 12 months, since resolved items will be removed from the balance whether their resolution results in payment or recognition.

The Company files income tax returns in numerous state, local and non-U.S. jurisdictions each year. The Internal Revenue Service ("IRS") and other tax authorities in states, cities, and countries in which the Company has significant business operations, examine tax returns periodically (continuously in some jurisdictions). The table below summarizes the status of significant tax examinations, by jurisdiction, for the Company as of December 31, 2020.

| Jurisdiction | Years under Examination [1] | Status at December 31, 2020 |
|---|---|---|
| U.S. federal | 2017-2020 | Field examination |
| California | 2012-2017 | Field examination |
| New York | 2016-2018 | Field examination |

[1] All tax years subsequent to the above years remain open to examination.

At December 31, 2020, the Company's accrual for interest and penalties that related to income taxes, net of taxes and remittances, was $11 million.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

Current and deferred income taxes are recorded as income tax receivable and payable due to affiliate, which are included on the Consolidated Balance Sheet within *Interest and other, including loans due from affiliates, Interest and other payables*. Significant components of the Company's deferred tax assets and liabilities as of December 31, 2020 are presented below.

| (dollars in millions) | | |
|---|---|---:|
| **Deferred tax assets** | | |
| Lease liability | $ | 257 |
| Loss carryforward | | 155 |
| Accrued expenses | | 41 |
| Other | | 46 |
| Gross deferred tax assets | | 499 |
| Less: valuation allowance | | (53) |
| Total deferred tax assets, net of valuation allowance | | 446 |
| | | |
| **Deferred tax liabilities** | | |
| Right-to-use asset | | 243 |
| Goodwill and intangibles | | 240 |
| Other | | — |
| Gross deferred tax liabilities | | 483 |
| | | |
| **Net deferred tax liability** | $ | (37) |

The table below summarizes the deferred tax assets and the related valuation allowance recognized for the net operating loss and tax credit carryforwards at December 31, 2020.

| (dollars in millions) | Deferred Tax Asset | | Valuation Allowance | | Net Deferred Tax Asset | | First Year Expiring |
|---|---:|---|---:|---|---:|---|---|
| Net operating losses - U.S. | $ 20 | $ | — | $ | 20 | | After 2028 |
| Net operating losses - U.S. states [1] | 135 | | (45) | | 90 | | Various |
| Total Loss Carryforwards | $ 155 | $ | (45) | $ | 110 | | |
| | | | | | | | |
| State tax credits | 4 | | — | | 4 | | After 2033 |
| Foreign tax credits | 8 | | (8) | | — | | |
| Total Tax Credit Carryforwards | $ 12 | $ | (8) | $ | 4 | | |

[1] Amounts above include capital losses. The losses and related valuation allowances for U.S. states before considering the benefit of federal deductions were $171 million and $(57) million, respectively.

Realization of the deferred tax assets above is dependent on the Company's or Bank of America's ability to generate sufficient taxable income prior to their expiration. Management concluded that no valuation allowance was necessary to reduce the U.S. federal NOL and general business credit carryforwards since estimated future taxable income will more-likely-than-not be sufficient to utilize these assets prior to expiration.

At December 31, 2020, the Company had a current income tax payable due to its affiliates of approximately $262 million as a result of its inclusion in consolidated, combined, and unitary tax return filings with Bank of America as determined under the intercompany tax allocation agreements with Bank of America.

MERRILL_WDNC_002967

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2020**

**14. Subsequent Events**

ASC 855, *Subsequent Events*, requires the Company to evaluate whether events, occurring after the Consolidated Balance Sheet date but before the date the Consolidated Balance Sheet are available to be issued, require accounting as of the balance sheet date, or disclosure in the Consolidated Balance Sheet. The Company has evaluated such subsequent events through date of issuance.

In February 2020, the maturities of the Company's existing revolving senior unsecured lines of credit with NB Holdings and Bank of America were extended to February 1, 2022.

There were no other material subsequent events which affected the amounts or disclosures in the Consolidated Balance Sheet through February 26, 2021, which is the issuance date of the Consolidated Balance Sheet.

**15. Regulatory Requirements**

*SEC Uniform Net Capital Rule*

As an SEC registered broker-dealer and CFTC registered introducing broker, MLPF&S is subject to the net capital requirements of the Securities Exchange Act of 1934 Rule 15c3-1 ("SEA Rule 15c3-1") and CFTC Regulation 1.17. MLPF&S has elected to compute the minimum capital requirement in accordance with the "Alternative Standard" as permitted by SEA Rule 15c3-1.

The company prepares SEC Form X-17A-5, FOCUS Report, Part II, on an unconsolidated basis. The following is a summary of certain consolidating financial information of the Company:

*(dollars in millions)*

|  | Standalone (FOCUS Report) | Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|
| Total Assets | $ 35,370 | $ 1,011 | $ (781) | $ 35,600 |
| Total Liabilities | $ 28,048 | $ 389 | $ (159) | $ 28,278 |
| Total Stockholder's Equity | 7,322 | 622 | (622) | 7,322 |
| Total Liabilities and Stockholder's Equity | $ 35,370 | $ 1,011 | $ (781) | $ 35,600 |

At December 31, 2020, MLPF&S' regulatory net capital as defined by SEA Rule 15c3-1 was $3.6 billion and exceeded the minimum requirement of $180 million by $3.5 billion.

In accordance with the Alternative Standard, MLPF&S is required to maintain net capital in excess of $180 million or two percent of aggregate debit items computed in accordance with the Formula for Determination of Customer Account Reserve Requirements of Brokers and Dealers. As of December 31, 2020, MLPF&S had net capital in excess of the minimum requirement.

*SEC Customer Protection Rule*

MLPF&S is also subject to SEA Rule 15c3-3, which requires, under certain circumstances, that cash or securities be deposited into a special reserve bank account for the exclusive benefit of customers. As of December 31, 2020, the Company had $13.5 billion of U.S. Government securities segregated in the special reserve bank account.

As a clearing broker and in accordance with Rule 15c3-3, MLPF&S computed a reserve requirement for the proprietary accounts of broker dealers ("PAB"). As of December 31, 2020, the Company had $5 million of cash segregated in a special reserve bank account for such requirement.

MERRILL_WDNC_002968

# Exhibit C

# Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries

**(SEC ID No. 8-07221)**

**Consolidated Balance Sheet**

**December 31, 2021**

Filed pursuant to Rule 17a-5(e)(3) under the Securities Exchange Act of 1934 as a Public Document

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Table of Contents**
**December 31, 2021**

|  | Page(s) |
|---|---|
| **Report of Independent Registered Public Accounting Firm** | |
| Consolidated Balance Sheet | **1 - 2** |
| Notes to Consolidated Balance Sheet | **3 - 20** |

MERRILL_WDNC_002970

**JA414**



### Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholder of Merrill Lynch, Pierce, Fenner & Smith Incorporated:

#### Opinion on the Financial Statements – Balance Sheet

We have audited the accompanying consolidated balance sheet of Merrill Lynch, Pierce, Fenner & Smith Incorporated and its subsidiaries (the "Company") as of December 31, 2021, including the related notes (collectively referred to as the "consolidated financial statement"). In our opinion, the consolidated financial statement presents fairly, in all material respects, the financial position of the Company as of December 31, 2021 in conformity with accounting principles generally accepted in the United States of America.

#### Basis for Opinion

The consolidated financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statement based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of the consolidated financial statement in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statement is free of material misstatement, whether due to error or fraud.

Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statement, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statement. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as, evaluating the overall presentation of the consolidated financial statement. We believe that our audit provides a reasonable basis for our opinion.

*PricewaterhouseCoopers LLP*

Charlotte, NC
February 25, 2022

We have served as the Company's auditor since 2009.

PricewaterhouseCoopers LLP, 214 North Tryon Street, Suite 4200, Charlotte, North Carolina 28202
T: (704) 344 7500, www.pwc.com/us

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Consolidated Balance Sheet**
**December 31, 2021**

*(dollars in millions)*

| | | |
|---|---|---:|
| **ASSETS** | | |
| Cash and cash equivalents | $ | 2,532 |
| Cash segregated for regulatory purposes or deposited with clearing organizations | | 1,106 |
| | | |
| Securities financing transactions | | |
| Receivables under resale agreements | | 18,132 |
| Receivables under securities borrowed transactions | | 443 |
| | | 18,575 |
| | | |
| Trading assets, at fair value | | |
| Equities | | 213 |
| Other | | 3 |
| | | 216 |
| | | |
| Other receivables | | |
| Customers | | 8,867 |
| Brokers and dealers | | 261 |
| Interest and other, including loans due from affiliates | | 2,085 |
| | | 11,213 |
| | | |
| Right-of-use lease assets | | 1,133 |
| | | |
| Equipment and facilities, net | | 239 |
| Goodwill and intangible assets | | 1,813 |
| Other assets | | 162 |
| | | |
| **Total Assets** | $ | 36,989 |

MERRILL_WDNC_002972

**JA416**

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Consolidated Balance Sheet**
**December 31, 2021**

*(dollars in millions, except share and per share amounts)*

**LIABILITIES**

| | | |
|---|---|---|
| Securities financing transactions | | |
|   Payables under securities loaned transactions | $ | 1,642 |
| | | |
| Trading liabilities, at fair value (includes $210 measured at fair value in accordance with the fair value option election) | | |
|   Equities | | 207 |
|   Other | | 13 |
| | | 220 |
| | | |
| Other payables | | |
|   Customers | | 18,720 |
|   Brokers and dealers | | 274 |
|   Compensation and benefits | | 943 |
|   Interest and other | | 3,460 |
|   Loans due to affiliates | | 822 |
|   Lease liabilities | | 1,190 |
| | | 25,409 |
| | | |
| Contingencies and guarantees (See Note 11) | | |
| | | |
| Subordinated borrowings | | 620 |
| **Total Liabilities** | | 27,891 |

**STOCKHOLDER'S EQUITY**

| | | |
|---|---|---|
|   Common stock, par value $1 per share; 1,200 shares authorized; 1,000 shares issued and outstanding | | — |
|   Paid-in capital | | 6,764 |
|   Accumulated other comprehensive loss (net of tax) | | (5) |
|   Retained earnings | | 2,339 |
| **Total Stockholder's Equity** | | 9,098 |
| | | |
| **Total Liabilities and Stockholder's Equity** | $ | 36,989 |

MERRILL_WDNC_002973

**JA417**

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

1.  **Organization**

    **Description of Business**
    Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"), together with its subsidiaries (the "Company"), is registered as a broker-dealer and investment adviser with the U.S. Securities and Exchange Commission ("SEC"), and is a member firm of the Financial Industry Regulatory Authority ("FINRA"), the New York Stock Exchange ("NYSE"), and other securities exchanges. MLPF&S is also registered as an introducing broker with the U.S. Commodity Futures Trading Commission ("CFTC") and is a member of the National Futures Association ("NFA") and the Securities Investor Protection Corporation ("SIPC"). Additionally, it is registered as a swap firm with the NFA.

    The Company provides its clients with investment-related products and services, including brokerage services and discretionary and non-discretionary investment advisory services through its investment advisory programs. Through its retirement group, the Company provides a wide variety of investment and custodial services to Individual Retirement Accounts ("IRAs") and other retirement plans for small businesses. The Company also provides investment, administration, communications, and consulting services to corporations and their employees for their retirement programs, including 401(k), pension, profit-sharing and nonqualified deferred compensation plans. In addition, the Company provides financing to clients including margin lending, and other extensions of credit. Certain products and services may be provided through affiliates.

    The Company is a wholly-owned indirect subsidiary of Bank of America Corporation ("Bank of America" or the "Parent"). The Company's direct parent is BAC North America Holding Company ("BACNA"), which is a wholly-owned subsidiary of NB Holdings Corporation ("NB Holdings"). NB Holdings is a wholly-owned subsidiary of Bank of America.

2.  **Summary of Significant Accounting Policies**

    **Basis of Presentation**
    The Consolidated Balance Sheet is presented in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP"). Intercompany transactions and balances have been eliminated. The Consolidated Balance Sheet is presented in U.S. dollars.

    **Consolidation Accounting**
    The Consolidated Balance Sheet includes the accounts of the Company and its subsidiaries in which the Company has a controlling financial interest.

    The Company determines whether it is required to consolidate an entity by first evaluating whether the entity qualifies as a voting rights entity ("VRE") or as a variable interest entity ("VIE"). VREs are defined to include entities that have both equity at risk that is sufficient to fund future operations and have equity investors that have a controlling financial interest in the entity through their equity investments. The Company generally consolidates those VREs where it has the majority of the voting rights. VIEs are those entities that do not meet the VRE criteria. A VIE is an entity that lacks equity investors or whose equity investors do not have a controlling financial interest in the entity through their equity investments. At December 31, 2021, there were no consolidated nor unconsolidated VIEs.

    **Use of Estimates**

    In presenting the Consolidated Balance Sheet, management makes estimates including the following:

    •   Valuations of assets and liabilities requiring fair value estimates;
    •   The ability to realize deferred tax assets and the recognition and measurement of uncertain tax positions;
    •   The carrying amount of goodwill and intangible assets;
    •   The outcome of pending litigation;
    •   Incentive-based compensation accruals and valuation of share-based payment compensation arrangements; and
    •   Other matters that affect the reported amounts and disclosure of contingencies in the Consolidated Balance Sheet.

    Estimates, by their nature, are based on judgment and available information. Therefore, actual results could differ from those estimates and could have a material impact on the Consolidated Balance Sheet, and it is possible that such

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

changes could occur in the near term. A discussion of certain areas in which estimates are a significant component of the amounts reported in the Consolidated Balance Sheet follows:

*Fair Value Measurement*
The Company accounts for certain assets at fair value under applicable industry guidance, namely Accounting Standards Codification ("ASC") 940 *Financial Services - Brokers and Dealers*. The Company also accounts for certain financial liabilities at fair value under the fair value option election in accordance with ASC 825-10-25, *Financial Instruments - Recognition,* ("fair value option election"). ASC 820, *Fair Value Measurements and Disclosures*, ("Fair Value Accounting") defines fair value, establishes a framework for measuring fair value, establishes a fair value hierarchy based on the quality of inputs used to measure fair value and enhances disclosure requirements for fair value measurements. ASC 825-10-50 - *Financial Instruments*, requires disclosure of the fair value of certain financial instruments that are not carried at fair value in the Balance Sheet.

*Legal Reserves*
The Company is occasionally a party in various actions, some of which involve claims for substantial amounts. Amounts are accrued for the financial resolution of claims that have either been asserted or are deemed probable of assertion if, in the opinion of management, it is both probable that a liability has been incurred and the amount of the loss can be reasonably estimated. In many cases, it is not possible to determine whether a liability has been incurred or to estimate the ultimate or minimum amount of that liability until the case is close to resolution, in which case no accrual is made until that time. Accruals are subject to significant estimation by management, with input from any outside counsel handling the matter. Refer to Note 11 for further information.

*Income Taxes*
The Company provides for income taxes on all transactions that have been recognized in the Consolidated Balance Sheet in accordance with ASC 740 *Income Taxes* ("Income Tax Accounting").  Accordingly, deferred taxes are adjusted to reflect the tax rates at which future taxable amounts will likely be settled or realized. The effects of tax rate changes on deferred tax liabilities and deferred tax assets, as well as other changes in income tax laws, are recognized in net earnings in the period during which such changes are enacted.

Valuation allowances are established when necessary to reduce deferred tax assets to the amounts that are more-likely-than-not to be realized. Pursuant to Income Tax Accounting, the Company may consider various sources of evidence in assessing the necessity of valuation allowances to reduce deferred tax assets to amounts more-likely-than-not to be realized, including the following: 1) past and projected earnings, including losses, of the Company and Bank of America, as certain tax attributes such as U.S. net operating losses ("NOLs"), U.S. capital loss carryforwards and foreign tax credit carryforwards can be utilized by Bank of America in certain income tax returns, 2) tax carryforward periods, and 3) tax planning strategies and other factors of the legal entities, such as the intercompany tax allocation agreement. Included within the Company's net deferred tax assets are carryforward amounts generated in the U.S. that are deductible in the future as NOLs. The Company has concluded that these net deferred tax assets are more-likely-than-not to be fully utilized prior to expiration, based on the projected level of future taxable income of the Company and Bank of America, which is relevant due to the intercompany tax allocation agreement. For this purpose, future taxable income was projected based on forecasts, historical earnings after adjusting for past market disruptions and the anticipated impact of the differences between pre-tax earnings and taxable income.

The Company recognizes and measures its unrecognized tax benefits ("UTB") in accordance with Income Tax Accounting. The Company estimates the likelihood, based on their technical merits, that tax positions will be sustained upon examination considering the facts and circumstances and information available at the end of each period. The Company adjusts the level of unrecognized tax benefits when there is more information available, or when an event occurs requiring a change. In accordance with Bank of America's intercompany tax allocation agreement, any new or subsequent change in an unrecognized tax benefit related to Bank of America's state consolidated, combined or unitary return in which the Company is a member will generally not be reflected in the Company's Consolidated Balance Sheet.  However, upon resolution of the item, any significant impact determined to be attributable to the Company will be reflected in the Company's Consolidated Balance Sheet.

Under the intercompany tax allocation agreements, tax benefits associated with NOLs (or other attributes) of the Company are payable to the Company generally upon utilization in Bank of America's tax returns.

MERRILL_WDNC_002975

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

In addition, under these agreements, substantially all current income taxes (federal, combined and unitary state) are recorded as income tax receivable and payable due to affiliate, which are included on the Consolidated Balance Sheet within *Interest and other, including loans due from affiliates, Interest and other payables* and *Loans due to affiliates* and settled on at least an annual basis. See Note 14 for further discussion of income taxes.

*Goodwill and Intangible Assets*
Goodwill is the purchase premium after adjusting for the fair value of net assets acquired. Goodwill is not amortized but is reviewed for potential impairment on an annual basis, or when events or circumstances indicate a potential impairment.

The Company assesses its fair value against its carrying value, including goodwill, as measured by equity. In performing its goodwill impairment testing, the Company first assesses qualitative factors to determine whether it is more likely than not that the Company's fair value is less than its carrying value. Qualitative factors include, among other things, macroeconomic conditions, industry and market considerations, financial performance and other relevant entity specific considerations. If the Company concludes it is more likely than not that its fair value is less than its carrying value, a quantitative assessment is performed. The Company has an unconditional option to bypass the qualitative assessment in any period and proceed directly to performing the quantitative goodwill impairment test. The Company may resume performing the qualitative assessment in any subsequent period.

When performing the quantitative assessment, if the Company's fair value exceeds its carrying value, goodwill would not be considered impaired. If the carrying value of the Company exceeds its fair value, a goodwill impairment loss would be recognized for the amount by which equity exceeds its fair value. An impairment loss recognized cannot exceed the amount of the Company's goodwill. An impairment loss establishes a new basis in the goodwill, and subsequent reversals of goodwill impairment losses are not permitted under applicable accounting guidance. For further information, refer to Note 7.

The Company had no unamortized intangible assets with definite lives as of December 31, 2021.

Intangible assets with indefinite lives consist of the Company's proportion of the value assigned to the Merrill Lynch brand name and are tested for impairment in accordance with Goodwill and Intangible Assets Accounting. Intangible assets with indefinite lives are not amortized.

The Company makes certain judgments with respect to its goodwill and intangible assets, including assumptions and estimates used to determine fair value and evaluate impairment. Refer to Note 7 for further information.

**Consolidated Balance Sheet Captions**
The following are descriptions related to specific consolidated balance sheet captions.

**Cash and Cash Equivalents**
The Company defines cash equivalents as short-term, highly liquid securities, and interest-earning deposits with maturities, when purchased, of 90 days or less, that are not used for trading purposes.

**Cash Segregated for Regulatory Purposes or Deposited with Clearing Organizations**
The Company maintains relationships with clients and therefore is obligated by rules mandated by its primary regulator, the SEC, to segregate or set aside cash and/or qualified securities in order to protect customer assets. In addition, the Company is a member of various clearing organizations and exchanges at which it maintains cash and/or securities required for the conduct of its day-to-day clearance activities. At December 31, 2021, the Company had approximately $1.1 billion of cash at clearing organizations.

Included in cash segregated for regulatory purposes or deposited with clearing organizations at December 31, 2021 was $5.0 million of cash that had been segregated in special reserve account as required by Rule 15c3-3 under the Securities Exchange Act of 1934 ("Rule 15c3-3") and considered restricted cash by the Company. Additional segregated assets as required by Rule 15c3-3 are included within *Receivables under resale agreements.*

Included in cash segregated for regulatory purposes or deposited with clearing organizations was an additional $6 million of cash that is considered restricted cash by the Company at December 31, 2021.

MERRILL_WDNC_002976

**JA420**

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

**Securities Financing Transactions**
Resale agreements are treated as collateralized financing transactions. These transactions are recorded at their contractual amounts plus accrued interest, and approximate fair value, as the fair value of these items is not materially sensitive to shifts in market interest rates because of the short-term nature of these instruments and/or variable interest rates or to credit risk because the resale agreements are substantially collateralized.

The Company may use securities received as collateral for resale agreements to satisfy regulatory requirements such as Rule 15c3-3. At December 31, 2021, approximately $12 billion of such securities had been segregated in special reserve accounts as required by Rule 15c3-3. Refer to Note 16 for further information

Securities borrowed and loaned transactions are recorded at the amount of cash collateral advanced or received plus accrued interest. Securities borrowed transactions require the Company to provide the counterparty with collateral in the form of cash, letters of credit, or other securities. The Company receives collateral in the form of cash or other securities for securities loaned transactions.

The carrying value of securities borrowed and loaned transactions approximates fair value as these items are not materially sensitive to shifts in market interest rates because of their short-term nature and/or variable interest rates or to credit risk because securities borrowed and loaned transactions are substantially collateralized.

For securities financing transactions, the Company's policy is to monitor the market value of the principal amount loaned and obtain collateral from or return collateral pledged to counterparties, where appropriate. Securities financing agreements do not create material credit risk due to these collateral provisions; therefore, an allowance for loan losses is unnecessary. The collateral maintenance provisions consisting of daily margining of collateral is expected to be maintained into the foreseeable future and any expected losses are assumed to not have a material impact to the Consolidated Balance Sheet.

A significant majority of securities financing activities are transacted under legally enforceable master agreements that give the Company, in the event of default by the counterparty, the right to liquidate securities held and to offset receivables and payables with the same counterparty. The Company offsets certain repurchase and resale transactions with the same counterparty on the Consolidated Balance Sheet where it has such a legally enforceable master netting agreement, and the transactions have the same maturity date.

**Trading Assets and Liabilities**
Trading assets and liabilities are recorded at fair value, and primarily consist of equity securities held by the Company in connection with dividend reinvestment plans ("DRIP") participated in by our clients.

**Other Receivables and Payables**
*Customers*
Customer securities transactions are recorded on a settlement date basis. Receivables from and payables to customers include amounts due on cash and margin transactions. Securities owned by customers, including those that collateralize margin or other similar transactions, are not reflected on the Consolidated Balance Sheet.

Customer receivables include margin loan transactions where the Company will typically make a loan to a customer to finance the customer's purchase of securities. These transactions are conducted through margin accounts. In these transactions, the customer is required to post collateral in excess of the value of the loan and the collateral must meet marketability criteria. Collateral is valued daily and must be maintained over the life of the loan. Given that these loans are fully collateralized by marketable securities, credit risk is negligible and reserves for loan losses are rarely required. The collateral maintenance provisions consisting of daily margining of collateral is expected to be maintained into the foreseeable future and the expected losses are assumed to not have a material impact to the Consolidated Balance Sheet.

*Brokers and Dealers*
Receivables from brokers and dealers primarily include amounts receivable for securities not delivered by the Company to a purchaser by the settlement date ("fails to deliver"), margin deposits, and commissions. Payables to brokers and dealers primarily include amounts payable for securities not received by the Company from a seller by the settlement date ("fails to receive"). These accounts generally settle daily and due to the short nature of broker and

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
December 31, 2021

dealers receivables the credit exposures arising from these accounts are of limited amounts owed to the Company for a short period of time. The expected credit losses are assumed to not have a material impact to the Consolidated Balance Sheet.

*__Compensation and Benefits__*
Compensation and benefits payables consists of salaries payable, financial advisor compensation, incentive and deferred compensation, payroll taxes, pension and other employee benefits.

*__Interest and Other__*
Interest and other receivables include interest receivable on customer or other receivables, and securities financing transactions, income taxes, commissions and fees, financial advisors are offered cash upfront in the form of an interest-bearing loan ("FA Loans"), and other receivables. The Company performs qualitative analyses, including consideration of historical losses and current economic conditions, to estimate any expected credit losses which are then included in a valuation account that is recorded as a contra-asset against the amortized cost basis of the financial asset. Interest and other payables include interest payable for securities financing transactions, amounts payable for income taxes, and other payables.

**Equipment and Facilities**
Equipment and facilities primarily consist of technology hardware and software, leasehold improvements, and owned facilities. Equipment and facilities are reported at historical cost, net of accumulated depreciation and amortization, except for land, which is reported at historical cost. The cost of certain facilities shared with affiliates is allocated to the Company by Bank of America based on the relative amount of space occupied.

Depreciation and amortization are computed using the straight-line method. Equipment is depreciated over its estimated useful life, while leasehold improvements are amortized over the lesser of the improvement's estimated economic useful life or the term of the lease.

**Leases**
The Company's lessee arrangements are comprised of operating leases. Under these arrangements, the Company records right-of-use assets and lease liabilities at lease commencement. All leases are recorded on the Consolidated Balance Sheet, except for leases with an initial term of less than 12 months for which the Company made the short-term lease election. The Company made an accounting policy election not to separate lease and non-lease components of a contract that is or contains a lease for its real estate and equipment leases. As such, lease payments represent payments on both lease and non-lease components. At lease commencement, lease liabilities are discounted using the Company's incremental borrowing rate. Right-of-use assets initially equal the lease liability, adjusted for any lease payments made prior to lease commencement and for any lease incentives. Refer to Note 9 for further information.

**Other Assets**
Other assets consist primarily of prepaid expenses, deferred charges and trading assets.

**Loans Due to Affiliates**
Loans due to affiliates consist of unsecured borrowings with Bank of America, NB Holdings and Merrill Lynch Bank and Trust Company (Cayman) Ltd. ("MLBTC"). Refer to Note 3 for further information.

**Subordinated Borrowings**
The Company enters into subordinated borrowings with NB Holdings. Refer to Note 8 for further information.

**Translation of Foreign Currencies**
Assets and liabilities denominated in foreign currencies are translated at period-end rates of exchange.

3.  **Related Party Transactions**

The Company enters into securities financing transactions with affiliates. The Company also provides certain securities services to affiliated companies, and contracts a variety of services from Bank of America and certain affiliated companies including accounting, legal, regulatory compliance, transaction processing, purchasing, building management and other services.

MERRILL_WDNC_002978

JA422

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

In June 2021, the Company entered into a new agreement with NB Holdings for a $9.0 billion revolving unsecured senior line of credit, and cancelled it's $7.0 billion revolving unsecured senior line of credit.

In October, 2021, the Company entered into a new agreement with MLBTC for a $5.0 billion revolving unsecured senior line of credit.

In October 2021, the Company entered into a new agreement with Bank of America, National Association ("BANA") for a $3.5 billion committed inter-day unsecured line of credit, and cancelled it's $3.5 billion uncommitted inter-day unsecured line of credit.

The following two tables summarize related party balances included in the respective balance sheet captions as of December 31, 2021.

**Assets**
*(dollars in millions)*

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 2,176 |
| Receivables under resale agreements | | 18,132 |
| Receivables under securities borrowed transactions | | 443 |
| Interest and other, including loans due from affiliates | | 446 |
| Total | $ | 21,197 |

**Liabilities**
*(dollars in millions)*

| | | |
|---|---|---:|
| Payables under securities loaned transactions | $ | 1,642 |
| Interest and other payables | | 1,397 |
| Loans due to affiliates | | 822 |
| Subordinated borrowings | | 620 |
| Total | $ | 4,481 |

The Company has established unsecured borrowing agreements with Bank of America, NB Holdings and MLBTC in the normal course of business. Amounts outstanding under these arrangements are included within *Loans due to affiliates*. The arrangements are summarized below:

Agreements with Bank of America
- A $2.5 billion uncommitted six month revolving senior unsecured line of credit. Interest on the line of credit is based on prevailing short-term market rates. The credit line will mature on August 01, 2022 and may automatically be extended semi-annually to the succeeding August 1st unless specific actions are taken 180 days prior to the maturity date. At December 31, 2021, approximately $2.1 million was outstanding on the line of credit.

Agreements with NB Holdings
- A $1.0 billion committed six month revolving senior unsecured line of credit. Interest on the line of credit is based on prevailing short-term market rates. The credit line will mature on August 01, 2022 and may automatically be extended semi-annually to the succeeding August 1st unless specific actions are taken 180 days prior to the maturity date. At December 31, 2021, there was no significant amount outstanding on the line of credit.

- A $9.0 billion uncommitted six month revolving senior unsecured line of credit. Interest on the line of credit is based on prevailing short-term market rates. The credit line will mature on August 01, 2022 and may

MERRILL_WDNC_002979

**JA423**

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

automatically be extended semi-annually to the succeeding August 1st unless specific actions are taken 180 days prior to the maturity date. At December 31, 2021, approximately $820.0 million was outstanding on the line of credit.

Other subsidiaries of MLPF&S engage in lending transactions with NB Holdings in the normal course of business. At December 31, 2021, the subsidiaries of MLPF&S had $70.4 million due from NB Holdings included in Loans due from affiliates.

Other subsidiaries of MLPF&S engage in borrowing transactions with NB Holdings in the normal course of business. At December 31, 2021, the subsidiaries of MLPF&S had no amounts outstanding on this line of credit.

Agreements with MLBTC

- A $5.0 billion uncommitted six month revolving senior unsecured line of credit. Interest on the line of credit is based on prevailing short-term market rates. The credit line will mature on August 01, 2022 and may automatically be extended semi-annually to the succeeding August 1st unless specific actions are taken 180 days days prior to the maturity date. At December 31, 2021, there was no significant amount outstanding on the line of credit.

Agreements with BANA

- The Company has a $3.5 billion committed intra-day unsecured line of credit with BANA. The intraday liquidity is provided through daylight overdraft of the demand deposit accounts held by the Company at BANA. At December 31, 2021, there were no amounts outstanding on this line of credit.

Other subsidiaries of MLPF&S engage in borrowing transactions with Bank of America Europe Designated Activity Company ("BOAEDAC") in the normal course of business. During April 2021, the outstanding facilities with BOAEDAC were repaid and closed.

Refer to Note 8 for information on subordinated borrowings between the Company and NB Holdings.

Financial advisors who receive FA loans also receive a monthly service incentive payment that equates to the principal and interest due on the loan for as long as they remain with the Company during the loan term. The outstanding loan balance becomes due if employment is terminated before the vesting period. As of December 31, 2021, the Company had loans outstanding from financial advisors of $402.0 million, net of allowance for credit losses of $20.0 million, which are not included in the table above but are included in *Interest and other receivables* on the Consolidated Balance Sheet. See Note 11 for guarantees related to FA Loans.

4.    **Risks and Uncertainties**

   *Market Risk*
   Market risk is the risk that changes in market conditions may adversely impact the value of assets, liabilities, and assets under management, and may negatively impact earnings.

   *Market Liquidity Risk*
   Market liquidity risk represents the risk that the level of expected market activity changes dramatically and, in certain cases, may even cease.  This exposes the Company to the risk that the Company will not be able to transact business and execute trades in an orderly manner, which may impact results.  The impact could be further exacerbated if expected hedging or pricing correlations are compromised by disproportionate demand or lack of demand for certain instruments.

   *Liquidity Risk*
   Liquidity Risk represents the risk of inability to meet expected or unexpected cash flow and collateral needs while continuing to support the Company's business and customer needs, under a range of economic conditions. The Company's primary liquidity risk management objective is to meet all contractual and contingent financial obligations at all times, including during periods of stress. To achieve that objective, the Company analyzes and monitors its liquidity risk under expected and stressed conditions, maintains excess liquidity and access to diverse funding sources

MERRILL_WDNC_002980

**JA424**

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

and seeks to align liquidity-related incentives and risks.  Excess liquidity is defined as readily available assets, limited to cash and high-quality, liquid, unencumbered securities that the Company can use to meet contractual and contingent financial obligations as those obligations arise. In addition, the Company is supported through committed and uncommitted borrowing arrangements with Bank of America and NB Holdings.

*Counterparty Credit Risk*
The Company is exposed to risk of loss if an individual, counterparty or issuer fails to perform its obligations under contractual terms ("default risk"). Cash instruments expose the Company to default risk.

In the normal course of business, the Company executes, settles, and finances various customer securities transactions. Execution of these transactions includes the purchase and sale of securities by the Company. These activities may expose the Company to default risk arising from the potential that customers or counterparties may fail to satisfy their obligations. In these situations, the Company may be required to purchase or sell financial instruments at unfavorable market prices to satisfy obligations to other customers or counterparties. In addition, the Company seeks to control the risks associated with its customer margin activities by requiring customers to maintain collateral in compliance with regulatory and internal guidelines.

Liabilities to other brokers and dealers related to unsettled transactions (i.e., securities fails to receive) are recorded at the amount for which the securities were purchased, and are paid upon receipt of the securities from other brokers or dealers. In the case of aged securities fails to receive, the Company may purchase the underlying security in the market and seek reimbursement for losses from the counterparty.

*Concentrations of Credit Risk*
The Company's exposure to credit risk associated with its activities is measured on an individual counterparty basis, as well as by groups of counterparties that share similar attributes. Concentrations of credit risk can be affected by changes in political, industry, or economic factors. To reduce the potential for risk concentration, credit limits are established and monitored in light of changing counterparty and market conditions.

*Concentration of Risk to the U.S. Government and its Agencies*
At December 31, 2021, the Company had indirect exposure to the U.S. Government and its agencies from maintaining U.S. Government and agencies securities as collateral for resale agreements and securities borrowed transactions. The Company's direct credit exposure on these transactions is with the counterparty; thus the Company has credit exposure to the U.S. Government and its agencies only in the event of the counterparty's default. Securities issued by the U.S. Government or its agencies held as collateral for resale agreements and securities borrowed transactions at December 31, 2021 totaled $18.6 billion, which was from affiliated companies.

*Industry Concentration Risk*
The Company's primary industry credit concentration is with financial institutions, including affiliates, which arises in the normal course of the Company's brokerage and financing activities. Financial institutions include other brokers and dealers, commercial banks, financing companies, insurance companies, and investment companies.

5.    **Fair Value Accounting**

**Fair Value Hierarchy**
In accordance with Fair Value Accounting, the Company has categorized its financial instruments, based on the priority of the inputs to the valuation technique, into a three-level fair value hierarchy.

The fair value hierarchy gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3).

Financial assets and liabilities recorded on the Consolidated Balance Sheet are categorized based on the inputs to the valuation techniques as follows:

Level 1. Financial assets and liabilities whose values are based on unadjusted quoted prices for identical assets or liabilities in an active market that the Company has the ability to access.

MERRILL_WDNC_002981

**JA425**

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

Level 2.  Financial assets and liabilities whose values are based on quoted prices in markets that are not active or model inputs that are observable either directly or indirectly for substantially the full term of the asset or liability. Level 2 inputs include the following:

a.   Quoted prices for similar assets or liabilities in active markets;
b.   Quoted prices for identical or similar assets or liabilities in non-active markets;
c.   Pricing models whose inputs are observable for substantially the full term of the asset or liability; and
d.   Pricing models whose inputs are derived principally from or corroborated by observable market data through correlation or other means for substantially the full term of the asset or liability.

Level 3.  Financial assets and liabilities whose values are based on prices or valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement. These inputs reflect management's view about the assumptions a market participant would use in pricing the asset or liability.

As required by Fair Value Accounting, when the inputs used to measure fair value fall within different levels of the hierarchy, the level within which the fair value measurement is categorized is based on the lowest level input that is significant to the fair value measurement in its entirety. For example, a Level 3 fair value measurement may include inputs that are observable (Level 1 and 2) and unobservable (Level 3). Therefore, gains and losses for such assets and liabilities categorized within the Level 3 reconciliation below may include changes in fair value that are attributable to both observable inputs (Level 1 and 2) and unobservable inputs (Level 3). Further, the following reconciliations do not take into consideration the offsetting effect of Level 1 and 2 financial instruments entered into by the Company that economically hedge certain exposures to the Level 3 positions.

A review of fair value hierarchy classifications is conducted on a quarterly basis. Changes in the observability or significance of valuation inputs may result in a reclassification for certain financial assets or liabilities. Transfers into or out of fair value hierarchy classifications are made if the significant inputs used in the financial models measuring the fair values of the assets and liabilities became unobservable or observable in the current market place.

**Valuation Techniques**
The following sections outline the valuation methodologies for the Company's material categories of assets and liabilities. While the Company believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different estimate of fair value at the reporting date.

During 2021, there were no changes to valuation approaches or techniques that had, or are expected to have, a material impact on the Company's Consolidated Balance Sheet.

*Equities*
Exchange-traded equity securities:  Exchange-traded equity securities are generally valued based on quoted prices from the exchange. These securities are classified as either Level 1 or Level 2 in the fair value hierarchy, primarily based on volume and bid-offer spread information.

MERRILL_WDNC_002982

**JA426**

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

The following table presents the Company's fair value hierarchy for those assets and liabilities measured at fair value on a recurring basis as of December 31, 2021:

*(dollars in millions)*

| | Fair Value Measurement on a Recurring Basis | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| **Assets:** | | | | |
| Trading assets | | | | |
| Equities | $ 212 | $ 1 | $ — | $ 213 |
| Other | — | — | 3 | 3 |
| Total trading assets | $ 212 | $ 1 | $ 3 | $ 216 |
| **Liabilities:** | | | | |
| Trading liabilities | | | | |
| Equities | $ 206 | $ 1 | $ — | $ 207 |
| Other | — | 13 | — | 13 |
| Total trading liabilities | $ 206 | $ 14 | $ — | $ 220 |

During 2021, there were no material changes in the fair value of the Company's Level 3 financial assets.

**Additional Disclosures About the Fair Value of Financial Instruments**
Certain financial instruments that are not carried at fair value on the Consolidated Balance Sheet are carried at amounts that approximate fair value due their short term nature and generally negligible credit risk. Assets and liabilities that the Company estimates their carrying value to approximate their fair value include securities financing transactions, other receivables and payables from and to customers, brokers and dealers, and affiliates, interest and other receivables and payables, and subordinated borrowings which are considered level 2 in the fair value hierarchy. Cash and cash equivalents and cash segregated for regulatory purposes or deposited with clearing organizations are considered level 1 in the fair value hierarchy.

**Fair Value Option Election**
The fair value option election allows companies to irrevocably elect fair value as the initial and subsequent measurement attribute for certain financial assets and liabilities. The fair value option election is permitted on an instrument by instrument basis at initial recognition of an asset or liability or upon an event that gives rise to a new basis of accounting for that instrument. As discussed above, certain of the Company's financial instruments are required to be accounted for at fair value under industry level guidance. For certain financial instruments that are not accounted for at fair value under other applicable accounting guidance, the fair value option election has been made.

The Company elected the fair value option for trading liabilities related to the Company's DRIP program.

6. **Securities Financing Transactions**

The Company enters into securities financing transactions with affiliates to obtain securities for settlement, to meet its regulatory reserve requirements under Rule 15c3-3, and to maintain liquidity.

Under these transactions, the Company either receives or provides collateral, including U.S. Treasury and government agency securities and equity securities. The Company receives collateral in connection with resale agreements, securities borrowed transactions, customer margin loans, and other loans. Under most agreements the Company is permitted to sell or repledge the securities received (e.g., use the securities to secure repurchase agreements, enter into securities lending transactions or deliver to counterparties to cover short positions). At December 31, 2021, the fair value of securities received as collateral where the Company is permitted to sell or repledge the securities was $2.0 billion, all of which was received from affiliated companies. The fair value of securities received as collateral that had been sold or repledged was $0.4 billion, all of which had been sold or repledged to affiliated companies.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

*Offsetting of Securities Financing Agreements*
A significant majority of securities financing transactions are transacted under legally enforceable master repurchase agreements that give the Company, in the event of default by the counterparty, the right to liquidate securities held and to offset receivables and payables with the same counterparty. The Company offsets financing transactions with the same counterparty on the Company's Consolidated Balance Sheet where it has such a legally enforceable master netting agreement and the transactions have the same maturity date. At December 31, 2021, the Company did not offset any of its financing transactions.

The tables below present securities financing agreements included on the Company's Consolidated Balance Sheet at December 31, 2021. Gross assets and liabilities are adjusted on an aggregate basis to take into consideration the effects of legally enforceable master netting agreements.

The column entitled "Financial Instruments" in the tables below includes securities collateral received or pledged under repurchase or securities lending agreements where there is a legally enforceable master netting agreement. These amounts are not offset in the Consolidated Balance Sheet but are shown as a reduction to the net balance sheet amount in the table to derive a net asset or liability.

*(dollars in millions)*

| | Assets | | | | |
|---|---|---|---|---|---|
| | December 31, 2021 | | | | |
| | Gross Assets | Amounts Offset | Net Balance Sheet Amount | Financial Instruments[1] | Net Asset |
| Receivables under resale agreements | $ 18,132 | $ — | $ 18,132 | $ (18,132) | $ — |
| Receivables under securities borrowed transactions | 443 | — | 443 | (422) | 21 |
| **Total** | $ 18,575 | $ — | $ 18,575 | $ (18,554) | $ 21 |

| | Liabilities | | | | |
|---|---|---|---|---|---|
| | December 31, 2021 | | | | |
| | Gross Liabilities | Amounts Offset | Net Balance Sheet Amount | Financial Instruments[1] | Net Liability |
| Payables under securities loaned transactions | $ 1,642 | $ — | $ 1,642 | $ (1,589) | $ 53 |
| **Total** | $ 1,642 | $ — | $ 1,642 | $ (1,589) | $ 53 |

[1]These amounts are limited to the securities financing asset/liability balance and accordingly, do not include excess collateral received/pledged.

*Payables under Securities Loaned Transactions Accounted for as Secured Borrowings*
At December 31, 2021, the maturity of all of the Company's securities loaned transactions were either overnight or continuous (i.e., no stated term). At December 31, 2021, the Company pledged equity securities of $1.6 billion as collateral for its securities loaned transactions.

For securities loaned transactions, the Company receives collateral in the form of cash. The collateral is generally valued daily based on the market value of the securities loaned and the Company may receive or return collateral pledged, when appropriate.

7.    **Goodwill and Intangible Assets**

Refer to Note 2 for the Company's accounting policies for goodwill and intangible assets.

**Goodwill**
The carrying amount of the Company's goodwill at December 31, 2021 was $878.0 million.

MERRILL_WDNC_002984

**JA428**

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

The Company completed its annual goodwill impairment test as of June 30, 2021 using a qualitative assessment. Based on the results of the annual goodwill impairment test, the Company determined there was no impairment.

**Intangible Assets**
The carrying amount of the Company's indefinite lived intangible asset representing the Merrill Lynch brand name, as of December 31, 2021, was $935.0 million.

The Company determined that there was no impairment of the intangible asset as of the June 30, 2021 test date.

8.  **Subordinated Borrowings and Other Financing**

At December 31, 2021, subordinated borrowings and credit committed under agreements with NB Holdings consisted of the following:

*(dollars in millions)*

|  | Maturity | Amount Outstanding | Total Credit Facility |
|---|---|---|---|
| **MLPF&S with NB Holdings** | | | |
| Revolving Subordinated Line of Credit | August 19, 2023 | $ 620 | $ 6,000 |
| **Total Subordinated Liabilities** | | $ 620 | $ 6,000 |

The borrowing, which has been approved for regulatory capital purposes, is a U.S. dollar-denominated obligation at variable interest rates based on Fed Funds plus a market-based spread. MLPF&S' revolving subordinated line of credit agreement contains a provision that automatically extends the loan's maturity by one year unless specified actions are taken 390 days prior to the maturity date.

The Company obtains letters of credit from issuing banks to satisfy various counterparty collateral requirements in lieu of depositing cash or securities collateral. There were no letters of credit outstanding at December 31, 2021.

9.  **Leases**

The Company enters into lessee arrangements. For more information on lease accounting, see Note 2.

The Company's lessee arrangements predominantly consist of operating leases for premises and equipment. Right-of-use assets and the related lease liabilities for such arrangements were approximately $1.0 billion respectively, at December 31, 2021. The weighted-average discount rate used to calculate the present value of future minimum lease payments was 2.9% .

Lease terms may contain renewal and extension options and early termination features. Generally, these options do not impact the lease term because the Company is not reasonably certain that it will exercise the options. The weighted-average lease term was 7.7 years at December 31, 2021.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

**Maturity Analysis**

The maturities of lessee arrangements outstanding at December 31, 2021 are presented in the table below based on undiscounted cash flows.

| *(dollars in millions)* | Lessee Operating Leases |
| --- | --- |
| 2022 | 238 |
| 2023 | 221 |
| 2024 | 190 |
| 2025 | 139 |
| Thereafter | 539 |
| | |
| Total undiscounted cash flows | 1,327 |
| Less: Net present value adjustment | (137) |
| **Total Lease Liability** | $          **1,190** |

**10.   Stockholder's Equity**

MLPF&S is authorized to issue 1,200 shares of $1.00 par value common stock. At December 31, 2021, there were 1,000 shares issued and outstanding.

MLPF&S is authorized to issue 1,000 shares of $1.00 par value preferred stock. At December 31, 2021, there were no preferred shares issued and outstanding.

**11.   Contingencies and Guarantees**

**Litigation and Regulatory Matters**

In the ordinary course of business, the Company is occasionally a defendant in or a party to pending and threatened legal actions and proceedings. In view of the inherent difficulty of predicting the outcome of such litigation and regulatory matters, particularly where the claimants seek unspecified or very large or indeterminate damages or where the matters present novel legal theories or involve a large number of parties, the Company cannot predict what the eventual outcome of the pending matters will be, what the timing of the ultimate resolution of these matters will be, or what the eventual loss, fines or penalties related to each pending matter may be.

In accordance with applicable accounting guidance, the Company establishes an accrued liability for litigation and regulatory matters when those matters present loss contingencies that are both probable and estimable. In such cases, there may be an exposure to loss in excess of any amounts accrued. As a matter develops, the Company, in conjunction with any outside counsel handling the matter, evaluates on an ongoing basis whether such matter presents a loss contingency that is probable and estimable. Once the loss contingency related to a litigation or regulatory matter is deemed to be both probable and estimable, the Company will establish an accrued liability.

At December 31, 2021, the Company did not have an accrued liability for litigation nor regulatory matters.

**Guarantees**

The Company is a member of various securities and derivative exchanges and clearinghouses, both in the U.S. and in other countries.  As a member, the Company may be required to pay a pro-rata share of the losses incurred by some of these organizations as a result of another member's default and under other loss scenarios.  The Company's potential obligations may be limited to its membership interests in such exchanges and clearinghouses, to the amount (or multiple) of the Company's contribution to the guarantee fund or, in limited instances, to the full pro-rata share of the

MERRILL_WDNC_002986

**JA430**

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

residual losses after applying the guarantee fund. The Company's maximum potential exposure under these membership agreements is difficult to estimate; however, the potential for the Company to be required to make these payments is remote.

The Company performs securities clearance and settlement services with other brokerage firms and clearinghouses on behalf of its clients. Under these arrangements, the Company stands ready to meet the obligations of its clients with respect to securities transactions. The Company's obligations in this respect are secured by the assets in the clients' accounts and the accounts of their customers as well as by any proceeds received from the transactions cleared and settled by the Company on behalf of clients or their customers. The Company's maximum potential exposure under these arrangements is difficult to estimate; however, the potential for the Company to incur material losses pursuant to these arrangements is remote.

In connection with the FA Loans discussed in Note 3, the Company services FA loans through an affiliate in addition to those serviced directly by the Company. The Company fully guarantees the amount outstanding of the affiliate serviced FA Loans in the event of default during the FA loan's vesting period. At December 31, 2021, the Company had FA Loan guarantees of $39.0 million which is the maximum potential amount of future payments. The affiliate performs qualitative analyses, including consideration of historical losses and current economic conditions, to estimate any expected credit losses. At December 31, 2021, expected credit losses assessed by the affiliate do not have a material impact to the Consolidated Balance Sheet.

12. **Employee Benefit Plans**

Bank of America provides pension and other postretirement benefits to its employees worldwide through sponsorship of defined contribution pension, defined benefit pension and other post retirement plans.

The Bank of America Corporation Corporate Benefits Committee has overall responsibility for the administration of these benefit plans.

The defined benefit pension plans and postretirement benefit plans are accounted for in accordance with ASC 715-20-50, *Compensation - Retirement Benefits, Defined Benefit Plans-General* ("Defined Benefit Plan Accounting"). Post employment benefits are accounted for in accordance with ASC 712, *Compensation-Non retirement Post employment Benefits*. Required disclosures are included in the December 31, 2021 Form 10-K of Bank of America.

**Defined Contribution Pension Plans**
The U.S. defined contribution plan sponsored by Bank of America is the Bank of America 401(k) Plan.

**Defined Benefit Pension Plans**
Certain of the Company's employees are covered by Bank of America's qualified pension plan.

Bank of America has an annuity contract that guarantees the payment of benefits vested under a terminated U.S. pension plan. Bank of America, under a supplemental agreement, may be responsible for, or benefit from, actual experience and investment performance of the annuity assets. Bank of America made no contribution under this agreement for the period ended December 31, 2021. Contributions may be required in the future under this agreement.

Bank of America also maintains non-contributory, non qualified pension plans (i.e., plans not subject to Title IV of ERISA) that are unfunded and provide supplemental defined benefit pension benefits for certain eligible U.S. employees.

**Postretirement Benefits Other Than Pensions**
Health insurance benefits are provided to eligible retired employees and dependents through Bank of America sponsored plans. The health care coverage is contributory, with certain retiree contributions adjusted periodically. The accounting for costs of health care benefits for most eligible employees anticipates future changes in cost-sharing provisions.

**Postemployment Benefits**
Bank of America provides certain post employment benefits for employees on extended leave due to injury, illness, or death and for terminated employees. Eligible employees who are disabled due to non-work related illness or injury are

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

entitled to disability income, medical coverage and life insurance. Severance benefits may be provided to eligible terminated employees under the terms of a severance pay plan. All full-time employees are eligible for severance benefits subject to the terms of the severance pay plan.

**13.  Employee Incentive Plans**

Incentive plans are sponsored by Bank of America. Disclosures required by ASC 718, *Stock Compensation* ("Stock Compensation Accounting") are included in the December 31, 2021 Form 10-K of Bank of America.

The Company participates in a number of equity compensation plans sponsored by Bank of America, with awards being granted predominantly from the Bank of America Key Employee Equity Plan (KEEP). Under the KEEP, Bank of America grants stock based awards, including restricted stock units ("RSUs"), to eligible employees. On April 20, 2021, Bank of America's shareholders approved the amendment and restatement of the KEEP, changing its name to the Bank of America Corporation Equity Plan. Grants in 2021 from the KEEP include RSUs that were authorized to settle predominantly in shares of common stock of Bank of America. Certain RSUs will be settled in cash or contain settlement provisions that subject these awards to variable accounting whereby compensation expense is adjusted to fair value based on changes in the share price of Bank of America's common stock up to the settlement date.

The RSUs will generally vest over four years and three years. The four year awards vest primarily in one-fourth increments on each of the first four anniversaries of the grant date while the three year awards vest primarily in one-third increments on each of the first three anniversaries of the grant date, provided that the employee remains continuously employed with the Corporation during that time, and will be expensed ratably over the vesting period, net of estimated forfeitures, for non-retirement eligible employees based on the grant-date fair value of the shares. The majority of the RSUs granted to employees who are retirement eligible are deemed authorized as of the beginning of the year preceding the grant date when the incentive award plans are generally approved. As a result, the estimated value is expensed ratably over the year preceding the grant date.

**Other Compensation Arrangements**
The Company participates in Bank of America sponsored deferred compensation plans in which employees who meet certain minimum compensation thresholds may participate on either a voluntary or mandatory basis. Contributions to the plans are made on a tax-deferred basis by participants. Participants' returns on these contributions may be indexed to various mutual funds and other funds. The Company also participates in several Bank of America sponsored, cash-based employee award programs, under which certain employees are eligible to receive future cash compensation, generally upon fulfillment of the service and vesting criteria for the particular program. When appropriate, Bank of America maintains various investments as an economic hedge of its liabilities to participants under these deferred compensation plans and award programs, including derivative transactions.

**14.  Income Taxes**

The reconciliation of the beginning UTB balance to the ending balance is presented in the table below:

| *(dollars in millions)* | | |
|---|---|---|
| **Balance at December 31, 2020** | $ | 48 |
| Increases related to positions taken during current year | | — |
| Increases related to positions taken during prior years | | — |
| Decreases in positions taken during prior years | | — |
| Settlements | | — |
| Expiration of statute | | (2) |
| **Balance at December 31, 2021** | $ | 46 |

As of December 31, 2021, the balance of the Company's UTBs which would, if recognized, affect the Company's effective tax rate, was $37.0 million. Included in the UTB balance are some items, the recognition of which would not affect the effective tax rate, such as the portion of gross state UTBs that would be offset by the tax benefit of the

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

associated federal deduction, and the portion of gross non-U.S. UTBs that would be offset by tax reductions in other jurisdictions.

It is reasonably possible that the UTB balance may decrease by as much as $7.6 million during the next 12 months, since resolved items will be removed from the balance whether their resolution results in payment or recognition.

The Company files income tax returns in numerous state, local and non-U.S. jurisdictions each year. The Internal Revenue Service ("IRS") and other tax authorities in states, cities, and countries in which the Company has significant business operations, examine tax returns periodically (continuously in some jurisdictions). The table below summarizes the status of significant tax examinations, by jurisdiction, for the Company as of December 31, 2021.

| Jurisdiction | Years under Examination [1] | Status at December 31, 2021 |
|---|---|---|
| U.S. federal | 2017-2021 | Field examination |
| California | 2012-2014 | Appeals |
| California | 2015-2017 | Field examination |
| New York | 2016-2018 | Field examination |

(1) All tax years subsequent to the above years remain open to examination.

At December 31, 2021, the Company's accrual for interest and penalties that related to income taxes, net of taxes and remittances, was $13.0 million.

Current income taxes are recorded as income tax payable due to affiliate, which are included on the Consolidated Balance Sheet within *Interest and other payables*. Significant components of the Company's deferred tax assets and liabilities as of December 31, 2021 are presented below.

| *(dollars in millions)* | | |
|---|---|---|
| **Deferred tax assets** | | |
| Lease liability | $ | 296 |
| Loss carryforward | | 117 |
| Accrued expenses | | 35 |
| Other | | 40 |
| Gross deferred tax assets | | 488 |
| Less: valuation allowance | | (62) |
| Total deferred tax assets, net of valuation allowance | | 426 |
| | | |
| **Deferred tax liabilities** | | |
| Right-to-use asset | | 282 |
| Goodwill and intangibles | | 240 |
| Gross deferred tax liabilities | | 522 |
| | | |
| **Net deferred tax liability** | $ | 96 |

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

The table below summarizes the deferred tax assets and the related valuation allowance recognized for the net operating loss and tax credit carryforwards at December 31, 2021.

*(dollars in millions)*

|  | Deferred Tax Asset | | Valuation Allowance | | Net Deferred Tax Asset | | First Year Expiring |
|---|---|---|---|---|---|---|---|
| Net operating losses - U.S. | $ | — | $ | — | $ | — | After 2028 |
| Net operating losses - U.S. States [1] | | 117 | | (44) | | 73 | Various |
| Total Loss Carryforwards | $ | 117 | $ | (44) | $ | 73 | |
| | | | | | | | |
| State tax credits | $ | 4 | $ | — | $ | 4 | After 2033 |
| Foreign tax credits | | 18 | | (18) | | — | |
| Total Tax Credit Carryforwards | $ | 22 | $ | (18) | $ | 4 | |

[1] Amounts above include capital losses. The losses and related valuation allowances for U.S. states before considering the benefit of federal deductions were $147.9 million and $(55.4) million, respectively.

Realization of the deferred tax assets above is dependent on the Company's, or Bank of America's ability to generate sufficient taxable income prior to their expiration. Management concluded that no valuation allowance was necessary to reduce the U.S. federal NOL and state tax credit carryforwards since estimated future taxable income will more-likely-than-not be sufficient to utilize these assets prior to expiration.

At December 31, 2021, the Company had a current income tax payable due to its affiliates of approximately $547.0 million as a result of its inclusion in consolidated, combined, and unitary tax return filings with Bank of America under the intercompany tax allocation agreements with Bank of America.

### 15. Subsequent Events

ASC 855, *Subsequent Events*, requires the Company to evaluate whether events, occurring after the Consolidated Balance Sheet date but before the date the Consolidated Balance Sheet is available to be issued, require accounting as of the balance sheet date, or disclosure in the Consolidated Balance Sheet. The Company has evaluated such subsequent events through date of issuance.

In February 2022, the maturities of the Company's existing revolving senior unsecured lines of credit with NB Holdings, Bank of America and MLBTC were extended to February 1, 2023.

There were no other material subsequent events which affected the amounts or disclosures in the Consolidated Balance Sheet through February 25, 2022, which is the issuance date of the Consolidated Balance Sheet.

### 16. Regulatory Requirements

*SEC Uniform Net Capital Rule*

As an SEC registered broker-dealer and CFTC registered introducing broker, MLPF&S is subject to the net capital requirements of the Securities Exchange Act of 1934 Rule 15c3-1 ("SEA Rule 15c3-1") and CFTC Regulation 1.17.

MLPF&S has elected to compute the minimum capital requirement in accordance with the "Alternative Standard" as permitted by SEA Rule 15c3-1.

MERRILL_WDNC_002990

**JA434**

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2021**

The company prepares SEC Form X-17A-5, FOCUS Report, Part II, on an unconsolidated basis. The following is a summary of certain consolidating financial information of the Company:

*(dollars in millions)*

| | Standalone (FOCUS Report) | Adjustments | Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|---|
| Total Assets | $      36,607 | $      111 | $      1,051 | $      (780) | $      36,989 |
| Total Liabilities | $      27,509 | $      111 | $      458 | $      (187) | $      27,891 |
| Total Stockholder's Equity | 9,098 | — | 593 | (593) | 9,098 |
| Total Liabilities and Stockholder's Equity | $      36,607 | $      111 | $      1,051 | $      (780) | $      36,989 |

At December 31, 2021, MLPF&S' regulatory net capital as defined by SEA Rule 15c3-1 was $5.6 billion and exceeded the minimum requirement of $198.9 million by $5.4 billion.

In accordance with the Alternative Standard, MLPF&S is required to maintain net capital in excess of $198.9 million or two percent of aggregate debit items computed in accordance with the Formula for Determination of Customer Account Reserve Requirements of Brokers and Dealers. As of December 31, 2021, MLPF&S had net capital in excess of the minimum requirement.

*SEC Customer Protection Rule*

MLPF&S is also subject to SEA Rule 15c3-3, which requires, under certain circumstances, that cash or securities be deposited into a special reserve bank account for the exclusive benefit of customers. As of December 31, 2021, the Company had $12.0 billion of U.S. Government securities segregated in the special reserve bank account.

As a clearing broker and in accordance with Rule 15c3-3, MLPF&S computed a reserve requirement for the proprietary accounts of broker dealers ("PAB"). As of December 31, 2021, the Company had $5.0 million of cash segregated in a special reserve bank account for such requirement.

MERRILL_WDNC_002991

**JA435**

Exhibit D

# Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries

**(SEC ID No. 8-07221)**

**Consolidated Balance Sheet**

**December 31, 2022**

Filed pursuant to Rule 17a-5(e)(3) under the Securities Exchange Act of 1934 as a Public Document

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Table of Contents**
**December 31, 2022**

**Page(s)**

**Report of Independent Registered Public Accounting Firm**

Consolidated Balance Sheet ........................................................................................................................ 1-2

Notes to Consolidated Balance Sheet .......................................................................................................... 3–18

MERRILL_WDNC_002993



**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholder of Merrill Lynch, Pierce, Fenner & Smith Incorporated:

***Opinion on the Financial Statement – Balance Sheet***

We have audited the accompanying consolidated balance sheet of Merrill Lynch, Pierce, Fenner & Smith Incorporated and its subsidiaries (the "Company") as of December 31, 2022, including the related notes (collectively referred to as the "consolidated financial statement"). In our opinion, the consolidated financial statement presents fairly, in all material respects, the financial position of the Company as of December 31, 2022 in conformity with accounting principles generally accepted in the United States of America.

***Basis for Opinion***

The consolidated financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statement based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of this consolidated financial statement in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statement is free of material misstatement, whether due to error or fraud.

Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statement, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statement. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statement. We believe that our audit provides a reasonable basis for our opinion.

*PricewaterhouseCoopers LLP*

Charlotte, NC
February 24, 2023

We have served as the Company's auditor since 2009.

*PricewaterhouseCoopers LLP, 214 N. Tryon Street, Suite 4200, Charlotte, NC 28202*
*T: (704) 344 7500, F: (704) 344 4100, www.pwc.com/us*

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Consolidated Balance Sheet**
**December 31, 2022**

| *(dollars in millions)* | | |
|---|---|---:|
| **ASSETS** | | |
| Cash and cash equivalents | $ | 2,878 |
| Cash segregated for regulatory purposes or deposited with clearing organizations | | 722 |
| | | |
| Securities financing transactions | | |
| Receivables under resale agreements | | 18,082 |
| Receivables under securities borrowed transactions | | 170 |
| Total securities financing transactions | | 18,252 |
| | | |
| Trading assets, at fair value | | |
| Equities | | 201 |
| Other | | 16 |
| Total trading assets, at fair value | | 217 |
| | | |
| Other receivables | | |
| Customers | | 6,604 |
| Brokers and dealers | | 294 |
| Interest and other, including loans due from affiliates | | 1,714 |
| Total other receivables | | 8,612 |
| | | |
| Right-of-use lease assets | | 1,096 |
| Equipment and facilities, net | | 217 |
| Goodwill and intangible assets | | 1,813 |
| Other assets | | 107 |
| | | |
| **Total Assets** | **$** | **33,914** |

MERRILL_WDNC_002995

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Consolidated Balance Sheet**
December 31, 2022

| *(dollars in millions, except share and per share amounts)* | | |
|---|---|---|
| **LIABILITIES** | | |
| Securities financing transactions | | |
|    Payables under securities loaned transactions | $ | 2,073 |
| | | |
| Trading liabilities, at fair value (includes $200 measured at fair value in accordance with the fair value option election) | | |
|   Equities | | 197 |
|   Other | | 3 |
|    Total trading liabilities, at fair value | | 200 |
| | | |
| Other payables | | |
|   Customers | | 14,942 |
|   Brokers and dealers | | 390 |
|   Compensation and benefits | | 829 |
|   Interest and other | | 2,642 |
|   Loans due to affiliates | | 2,083 |
|   Lease liabilities | | 1,155 |
|    Total other payables | | 22,041 |
| | | |
| Contingencies and guarantees (See *Note 10*) | | |
| | | |
| **Total Liabilities** | **$** | **24,314** |
| | | |
| **STOCKHOLDER'S EQUITY** | | |
|   Common stock, par value $1 per share; 1,200 shares authorized; 1,000 shares issued and outstanding | | — |
|   Preferred stock, par value $1 per share; 1,000 shares authorized; 0 shares issued and outstanding | | — |
|   Paid-in capital | | 6,764 |
|   Retained earnings | | 2,836 |
| **Total Stockholder's Equity** | **$** | **9,600** |
| | | |
| **Total Liabilities and Stockholder's Equity** | **$** | **33,914** |

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
December 31, 2022

1. **Organization**

   **Description of Business**
   Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S), together with its subsidiaries (the "Company"), is registered as a broker-dealer and investment adviser with the U.S. Securities and Exchange Commission (SEC), and is a member firm of the Financial Industry Regulatory Authority (FINRA), the New York Stock Exchange (NYSE), and other securities exchanges. MLPF&S is also registered as an introducing broker with the U.S. Commodity Futures Trading Commission (CFTC) and is a member of the National Futures Association (NFA) and the Securities Investor Protection Corporation (SIPC). Additionally, it is registered as a swap firm with the NFA.

   The Company provides its clients with investment-related products and services, including brokerage services and discretionary and non-discretionary investment advisory services through its investment advisory programs. Through its retirement group, the Company provides a wide variety of investment and custodial services to Individual Retirement Accounts (IRAs) and other retirement plans for small businesses. The Company also provides investment, administration, communications, and consulting services to corporations and their employees for their retirement programs, including 401(k), pension, profit-sharing, and nonqualified deferred compensation plans. In addition, the Company provides financing to clients through margin lending and other extensions of credit. Certain products and services may be provided through affiliates.

   The Company is a wholly-owned indirect subsidiary of Bank of America Corporation ("Bank of America" or the "Parent"). The Company's direct parent is BAC North America Holding Company (BACNA), which is a wholly-owned subsidiary of NB Holdings Corporation ("NB Holdings"). NB Holdings is a wholly-owned subsidiary of Bank of America.

2. **Summary of Significant Accounting Policies**

   **Principles of Consolidation and Basis of Presentation**
   The Consolidated Balance Sheet is presented in conformity with accounting principles generally accepted in the United States of America. The Consolidated Balance Sheet is presented in U.S. dollars.

   The Consolidated Balance Sheet includes the accounts of the Company and its majority-owned subsidiaries. Intercompany transactions and balances have been eliminated. Assets held in an agency or fiduciary capacity are not included in the Consolidated Balance Sheet.

   The Company generally consolidates those variable interest entities (VIEs) where the Company is the primary beneficiary. At December 31, 2022, there were no interests in consolidated nor unconsolidated VIEs.

   The preparation of the Consolidated Balance Sheet in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect reported amounts and disclosures. Actual results could materially differ from those estimates and assumptions.

   **Cash and Cash Equivalents**
   The Company defines cash equivalents as short-term, highly liquid securities, and interest-earning deposits with maturities, when purchased, of 90 days or less, that are not used for trading purposes.

   **Cash Segregated for Regulatory Purposes or Deposited with Clearing Organizations**
   The Company maintains relationships with clients and is therefore obligated by rules mandated by its primary regulator, the SEC, to segregate or set aside cash and/or qualified securities to satisfy these regulations in order to protect customer assets. In addition, the Company is a member of various clearing organizations and exchanges at which it maintains cash and/or securities required for the conduct of its day-to-day clearance activities. At December 31, 2022, the Company had approximately $695.0 million of cash deposited with clearing organizations.

   Included in Cash segregated for regulatory purposes or deposited with clearing organizations at December 31, 2022 was $5.0 million of cash that had been segregated in a special reserve account as required by Rule 15c3-3 under the Securities Exchange Act of 1934 ("SEA Rule 15c3-3") and considered restricted cash by the Company. Additional segregated assets as required by SEA Rule 15c3-3 are included within Receivables under resale agreements.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2022**

Included in cash segregated for regulatory purposes or deposited with clearing organizations was an additional $22.0 million of cash that is considered restricted cash by the Company at December 31, 2022.

**Securities Financing Transactions**

Securities borrowed or purchased under agreements to resell and securities loaned or sold under agreements to repurchase ("securities financing transactions") are treated as collateralized financing transactions.

The Company's policy is to monitor the market value of the principal amount loaned and obtain collateral from or return collateral pledged to counterparties when appropriate. Securities financing transactions do not create material credit risk due to these collateral provisions; therefore, an allowance for loan losses is unnecessary. The collateral maintenance provisions consisting of daily margining of collateral is expected to be maintained into the foreseeable future and any expected losses are assumed not to have a material impact to the Consolidated Balance Sheet.

The Company may use securities received as collateral for resale agreements to satisfy regulatory requirements such as SEA Rule 15c3-3. At December 31, 2022, approximately $11.2 billion of such securities had been segregated in special reserve accounts as required by SEA Rule 15c3-3. Refer to *Note 15 - Regulatory Requirements* for further information.

Resale and repurchase agreements are recorded at their contractual amounts plus accrued interest.

Securities borrowed and loaned transactions are recorded at the amount of cash collateral advanced or received plus accrued interest. Securities borrowed transactions require the Company to provide the counterparty with collateral in the form of cash, letters of credit, or other securities. The Company receives collateral in the form of cash or other securities for securities loaned transactions.

The carrying values of securities financing transactions approximate fair value as these items are not materially sensitive to shifts in market interest rates because of their short-term nature and/or variable interest rates or to credit risk because securities financing transactions are substantially collateralized.

Substantially all of the Company's securities financing activities are transacted under legally enforceable master agreements that give the Company, in the event of default by the counterparty, the right to liquidate securities held and to offset receivables and payables with the same counterparty. The Company may offset repurchase and resale transactions with the same counterparty on the Consolidated Balance Sheet where it has such a legally enforceable master netting agreement and the transactions have the same maturity date. Refer to *Note 6 – Securities Financing Transactions*.

**Trading Assets and Liabilities**

Trading assets and liabilities are recorded at fair value, and primarily consist of equity securities held by the Company in connection with dividend reinvestment plans (DRIP) participated in by the Company's customers. Fair value is generally based on quoted market prices for the same or similar assets and liabilities. If these market prices are not available, fair values are estimated based on dealer quotes, pricing models, discounted cash flow methodologies, or similar techniques where the determination of fair value may require significant management judgment or estimation.

**Other Receivables and Payables**

*Customers*

Customer securities transactions are recorded on a settlement date basis. Securities owned by customers, including those that collateralize margin or other similar transactions, are not reflected on the Consolidated Balance Sheet.

Customer receivables include margin loan transactions which represent credit extended to customers to finance their purchases of securities by borrowing against securities they own, and are fully collateralized by these securities in customer accounts. Collateral is maintained at required levels at all times. The borrowers of a margin loan are contractually required to continually adjust the amount of the collateral as its fair value changes. The Company applies the practical expedient based on collateral maintenance provisions in estimating an allowance for credit losses for margin loans. Expected losses are assumed not to have a material impact to the Consolidated Balance Sheet.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
December 31, 2022

Payables to customers primarily include cash.

### Brokers and Dealers

Receivables from brokers and dealers primarily include amounts receivable for securities not delivered by the Company to a purchaser by the settlement date ("fails to deliver"), margin deposits, and commissions. Payables to brokers and dealers primarily include amounts payable for securities not received by the Company from a seller by the settlement date ("fails to receive"). These accounts generally settle daily and due to the short-term nature of brokers and dealers receivable, the credit exposure is limited. Expected credit losses are assumed not to have a material impact to the Consolidated Balance Sheet.

### Interest and Other

Interest and other receivables include interest receivable on customer receivables and securities financing transactions, dividends receivable, income taxes, commissions and fees, interest-bearing loans due from financial advisors for upfront cash ("FA Loans"), and other receivables. The Company performs qualitative analyses, including consideration of historical losses and current economic conditions, to estimate any expected credit losses which are recorded as a contra-asset against the amortized cost basis of the financial asset.

Interest and other payables include interest payable for securities financing transactions, amounts payable for income taxes, and other payables.

### Leases

The Company's lessee arrangements are comprised of operating leases. Under these arrangements, the Company records right-of-use assets and lease liabilities at lease commencement. All leases are recorded on the Consolidated Balance Sheet, except for leases with an initial term of less than 12 months for which the Company has made the short-term lease election. The Company made an accounting policy election not to separate lease and non-lease components of a contract that is or contains a lease for its real estate and equipment leases. As such, lease payments represent payments on both lease and non-lease components. At lease commencement, lease liabilities are discounted using the Company's incremental borrowing rate. Right-of-use assets initially equal the lease liability, adjusted for any lease payments made prior to lease commencement and for any lease incentives. Refer to *Note 9 - Leases* for further information.

### Equipment and Facilities

Equipment and facilities primarily consist of technology hardware and software, leasehold improvements, and owned facilities. Equipment and facilities are carried at cost, less accumulated depreciation and amortization, except for land, which is reported at cost. The cost of certain facilities shared with affiliates is allocated to the Company by Bank of America based on the relative amount of space occupied.

Depreciation and amortization are recognized using the straight-line method over the estimated useful lives of the assets. Estimated lives range up to 40 years for buildings, up to 12 years for furniture and equipment, and the shorter of lease term or estimated useful life for leasehold improvements.

### Goodwill and Intangible Assets

Goodwill is the purchase premium after adjusting for the fair value of net assets acquired. Goodwill is not amortized but is reviewed for potential impairment on an annual basis, or when events or circumstances indicate a potential impairment.

The Company assesses its fair value against its carrying value, including goodwill, as measured by Stockholder's Equity. In performing its goodwill impairment testing, the Company first assesses qualitative factors to determine whether it is more likely than not that the Company's fair value is less than its carrying value. Qualitative factors include, among other things, macroeconomic conditions, industry and market considerations, financial performance, and other relevant Company-specific considerations. If the Company concludes it is more likely than not that its fair value is less than its carrying value, a quantitative assessment is performed. The Company has an unconditional option to bypass the qualitative assessment in any period and proceed directly to performing the quantitative goodwill impairment test. The Company may resume performing the qualitative assessment in any subsequent period.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2022**

When performing the quantitative assessment, if the Company's fair value exceeds its carrying value, goodwill would not be considered impaired. If the carrying value of the Company exceeds its fair value, goodwill would be considered impaired for the amount by which equity exceeds its fair value. The amount of impairment recognized cannot exceed the amount of the Company's goodwill. Impairment establishes a new basis in the goodwill, and subsequent reversals of impairment are not permitted under applicable accounting guidance.

The Company had no unamortized intangible assets with finite lives as of December 31, 2022.

Intangible assets deemed to have indefinite useful lives are not subject to amortization. This consists of the Company's proportion of the value assigned to the Merrill Lynch brand name. Impairment is recognized if the carrying value of the intangible asset with an indefinite life exceeds its fair value.

Refer to *Note 7 - Goodwill and Intangible Assets* for further information.

**Other Assets**
Other assets consist primarily of prepaid expenses and deferred charges.

**Compensation and Benefits Payables**
Compensation and benefits payables consist of salaries payable, financial advisor compensation, incentive and deferred compensation, payroll taxes, pension, and other employee benefits.

**Loans Due to Affiliates**
Loans due to affiliates consist of unsecured borrowings with Bank of America, NB Holdings, Merrill Lynch Bank and Trust Company (Cayman) Ltd. (MLBTC), and Bank of America National Association (BANA). Refer to *Note 3 - Related Party Transactions* for further information.

**Fair Value**
The Company measures the fair values of its assets and liabilities, where applicable, in accordance with accounting guidance that requires an entity to base fair value on exit price. Under this guidance, an entity is required to maximize the use of observable inputs and minimize the use of unobservable inputs in measuring fair value. Under applicable accounting standards, fair value measurements are categorized into one of three levels based on the inputs to the valuation technique with the highest priority given to unadjusted quoted prices in active markets and the lowest priority given to unobservable inputs. The Company categorizes its fair value measurements of financial instruments based on this three-level hierarchy.

**Level 1** Unadjusted quoted prices in active markets for identical assets or liabilities. Level 1 assets and liabilities include equity securities that are traded in an active exchange market.

**Level 2** Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities. Level 2 assets and liabilities include equity securities with quoted prices that are traded less frequently than exchange-traded instruments.

**Level 3** Unobservable inputs that are supported by little or no market activity and that are significant to the overall fair value of the assets or liabilities. Level 3 assets and liabilities include financial instruments for which the determination of fair value requires significant management judgment or estimation. The fair value for such assets and liabilities is generally determined using pricing models, discounted cash flow methodologies or similar techniques that incorporate the assumptions a market participant would use in pricing the asset or liability.

See *Note 5 – Fair Value Measurements*.

**Income Taxes**
Gross deferred tax assets and liabilities represent decreases or increases in taxes expected to be paid in the future because of future reversals of temporary differences in the bases of assets and liabilities as measured by tax laws and their bases as reported in the balance sheet. Deferred tax assets are also recognized for tax attributes such as net

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
December 31, 2022

operating loss carryforwards and tax credit carryforwards. Valuation allowances are recorded to reduce deferred tax assets to the amounts management concludes are more likely than not to be realized.

Unrecognized income tax benefits (UTBs) are recognized and measured based upon a two-step model: first, a tax position must be more likely than not to be sustained based solely on its technical merits in order to be recognized, and second, the benefit is measured as the largest dollar amount of that position that is more likely than not to be sustained upon settlement. The difference between the benefit recognized and the tax benefit claimed on a tax return is referred to as an unrecognized tax benefit.

Under the intercompany tax allocation agreements, tax benefits associated with net operating losses (NOLs) (or other tax attributes) of the Company are payable to the Company generally upon utilization in Bank of America's tax returns.

In addition, under these agreements, substantially all current income taxes (federal, combined and unitary state) are recorded as income tax receivable and payable due to affiliate, which are included on the Consolidated Balance Sheet within Interest and other receivables, including loans due from affiliates, Interest and other payables, and Loans due to affiliates, and is settled on at least an annual basis.

In accordance with Bank of America's intercompany tax allocation agreements, any new or subsequent change in a UTB related to Bank of America's state consolidated, combined, or unitary return in which the Company is a member will generally not be reflected in the Company's Consolidated Balance Sheet. However, upon resolution of the item, any significant impact determined to be attributable to the Company will be reflected in the Company's Consolidated Balance Sheet.

See *Note 13 - Income Taxes* for further discussion of income taxes.

**Foreign Currency Translation**
Assets, liabilities, and operations of foreign branches and subsidiaries are recorded based on the functional currency of each entity.

3. **Related Party Transactions**

The Company enters into securities financing transactions with affiliates. The Company also provides certain investment management, brokerage, trust, and other securities services to affiliated companies, and contracts a variety of services from Bank of America and certain affiliated companies, including accounting, legal, regulatory compliance, transaction processing, purchasing, building management, and other services.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2022**

The following table summarizes related party assets and liabilities as of December 31, 2022.

| *(dollars in millions)* | | |
|---|---|---:|
| **Assets** | | |
| Cash and cash equivalents | $ | 2,530 |
| Receivables under resale agreements | | 18,082 |
| Receivables under securities borrowed transactions | | 170 |
| Interest and other, including loans due from affiliates | | 239 |
| **Total** | $ | **21,021** |
| | | |
| **Liabilities** | | |
| Payables under securities loaned transactions | $ | 2,073 |
| Customers | | 40 |
| Brokers and dealers | | 11 |
| Interest and other payables | | 898 |
| Loans due to affiliates | | 2,083 |
| **Total** | $ | **5,105** |

The Company has established unsecured borrowing agreements with Bank of America, NB Holdings, and MLBTC in the normal course of business. The agreements are revolving senior lines of credit, which have a term of six months. Interest is based on prevailing short-term market rates. The credit lines will be automatically extended for another six month term unless specific actions are taken 180 days prior to the maturity date. Amounts outstanding under these arrangements are included within Loans due to affiliates on the Consolidated Balance Sheet. The arrangements are summarized below:

| Borrower | Lender | Committed/ Uncommitted | Limit ($ millions) | Maturity | Outstanding Balance ($ millions) |
|---|---|---|---:|---|---:|
| MLPF&S | NB Holdings | Uncommitted | $ 9,000 | 8/1/2023 | $ 2,081 |
| MLPF&S | Bank of America | Uncommitted | 2,500 | 8/1/2023 | 2 |
| MLPF&S | NB Holdings | Committed | 1,000 | 8/1/2023 | — |
| MLPF&S | MLBTC | Uncommitted | 5,000 | 8/1/2023 | — |
| Managed Account Advisors LLC [1] | NB Holdings | Uncommitted | 100 | 8/1/2023 | — |
| | | | | | $ 2,083 |

[1] Managed Account Advisors LLC is a wholly-owned, consolidated subsidiary of MLPF&S

On August 1, 2022, the Company entered into a new agreement with MLBTC for a $5.0 billion revolving unsecured senior line of credit, and cancelled its $5.0 billion revolving unsecured senior line of credit.

The Company also has a $3.5 billion committed intraday unsecured line of credit with BANA. The intraday liquidity is provided through daylight overdraft of the demand deposit accounts held by the Company at BANA. At December 31, 2022, there were no amounts outstanding on this line of credit.

Other subsidiaries of MLPF&S engage in lending transactions with NB Holdings in the normal course of business. At December 31, 2022, the subsidiaries of MLPF&S had $41.2 million due from NB Holdings included in Interest and other, including loans due from affiliates on the Consolidated Balance Sheet.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2022**

Refer to *Note 8 - Subordinated Borrowings and Other Financing* for information on subordinated borrowings between the Company and NB Holdings.

Financial advisors who receive FA loans also receive a monthly service incentive payment that equates to the principal and interest due on the loan for as long as they remain with the Company during the loan term. The outstanding loan balance becomes due if employment is terminated before the vesting period. As of December 31, 2022, the Company had loans outstanding from financial advisors of $271.0 million, net of allowance for credit losses of $12.0 million, which are not included in the table above but are included in Interest and other receivables, including loans due from affiliates on the Consolidated Balance Sheet. See *Note 10 - Contingencies and Guarantees* for guarantees related to these FA Loans.

4.    **Risks and Uncertainties**

**Market Risk**
Market risk is the risk that changes in market conditions may adversely impact the value of assets, liabilities, and assets under management, and may negatively impact earnings.

**Market Liquidity Risk**
Market liquidity risk represents the risk that the level of expected market activity changes dramatically and, in certain cases, may even cease. This exposes the Company to the risk that the Company will not be able to transact business and execute trades in an orderly manner, which may impact results. The impact could be further exacerbated if expected hedging or pricing correlations are compromised by disproportionate demand or lack of demand for certain instruments.

**Liquidity Risk**
Liquidity risk represents the risk of inability to meet expected or unexpected cash flow and collateral needs while continuing to support the Company's business and customers under a range of economic conditions. The Company's primary liquidity risk management objective is to meet all contractual and contingent financial obligations as they arise, including during periods of stress. To achieve that objective, the Company analyzes and monitors its liquidity risk under expected and stressed conditions, maintains excess liquidity and access to diverse funding sources and seeks to align liquidity-related incentives and risks. Excess liquidity is defined as readily available assets, limited to cash and high-quality, liquid, unencumbered securities that the Company can use to meet contractual and contingent financial obligations as those obligations arise. In addition, the Company is supported through committed and uncommitted borrowing arrangements with Bank of America, NB Holdings, and other affiliates. See *Note 3 - Related Party Transactions*.

**Counterparty Credit Risk**
The Company is exposed to risk of loss if an individual, counterparty, or issuer fails to perform its obligations under contractual terms ("default risk"). Cash instruments expose the Company to default risk. Financial services institutions and other counterparties are inter-related because of trading, funding, clearing, or other relationships. As a result, defaults by one or more counterparties, or market uncertainty about the financial stability of one or more financial services institutions, or the financial services industry generally, could lead to market-wide liquidity disruptions, losses and defaults.

The Company has established policies and procedures for mitigating counterparty credit risk, including reviewing and establishing limits for credit exposure, maintaining qualifying collateral, and continually assessing the creditworthiness of counterparties.

In the normal course of business, the Company executes, settles, and finances various customer securities transactions. Execution of these transactions includes the purchase and sale of securities by the Company. These activities may expose the Company to default risk arising from the potential that customers or counterparties may fail to satisfy their obligations. In these situations, the Company may be required to purchase or sell financial instruments at unfavorable market prices to satisfy obligations to other customers or counterparties. In addition, the Company seeks to control the risks associated with its customer margin activities by requiring customers to maintain collateral in compliance with regulatory and internal guidelines.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
December 31, 2022

Liabilities to other brokers and dealers related to unsettled transactions (i.e., fails to receive) are recorded at the amount for which the securities were purchased, and are paid upon receipt of the securities from other brokers or dealers. In the case of aged fails to receive, the Company may purchase the underlying security in the market and seek reimbursement for losses from the counterparty.

**Concentrations of Credit Risk**
The Company's exposure to credit risk associated with its activities is measured on an individual counterparty basis, as well as by groups of counterparties that share similar attributes. Concentrations of credit risk can be affected by changes in political, industry, or economic factors. To reduce the potential for risk concentration, credit limits are established and monitored in light of changing counterparty and market conditions.

**Concentration of Risk to the U.S. Government and its Agencies**
At December 31, 2022, the Company had indirect exposure to the U.S. Government and its agencies from maintaining U.S. Government and agencies securities as collateral for resale agreements. The Company's direct credit exposure on these transactions is with the counterparty; thus the Company has credit exposure to the U.S. Government and its agencies only in the event of the counterparty's default. Securities issued by the U.S. Government or its agencies held as collateral for resale agreements at December 31, 2022 totaled $18.1 billion, which was from affiliated companies.

**Industry Concentration Risk**
The Company's primary industry credit concentration is with counterparties in the financial services industry, including affiliates, which arises in the normal course of the Company's brokerage and financing activities. Financial institutions include other brokers and dealers, commercial banks, financing companies, insurance companies, and investment companies.

5.   **Fair Value Measurements**

The Company categorizes its financial instruments into three levels based on the established fair value hierarchy and conducts a review of fair value hierarchy classifications on a quarterly basis. Transfers into or out of fair value hierarchy classifications are made if the significant inputs used in the financial models measuring the fair values of the assets and liabilities become unobservable or observable in the current marketplace. For more information regarding the fair value hierarchy and how the Company measures fair value, see *Note 2 – Summary of Significant Accounting Policies*. The Company accounts for certain financial instruments under the fair value option.

**Valuation Techniques**
The following sections outline the valuation methodologies for the Company's material categories of assets and liabilities. While the Company believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different estimate of fair value at the reporting date.

During 2022, there were no significant changes to valuation approaches or techniques that had, or are expected to have, a material impact on the Company's Consolidated Balance Sheet.

*Equity Securities*
The fair values of equity securities are primarily based on actively traded markets where prices are based on either direct market quotes or observed transactions. These securities are classified as either Level 1 or Level 2 in the fair value hierarchy, primarily based on volume and bid-offer spread information.

Assets and liabilities carried at fair value on a recurring basis at December 31, 2022, including financial instruments that the Company accounts for under the fair value option, are summarized in the following table.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
December 31, 2022

| (dollars in millions) | Fair Value Measurement on a Recurring Basis | | | |
| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets:** | | | | |
| Trading assets | | | | |
| Equities | $ 199 | $ 2 | $ — | $ 201 |
| Other | — | 16 | — | 16 |
| **Total trading assets** | **$ 199** | **$ 18** | **$ —** | **$ 217** |
| | | | | |
| **Liabilities:** | | | | |
| Trading liabilities | | | | |
| Equities | $ 195 | $ 2 | $ — | $ 197 |
| Other | — | 3 | — | 3 |
| **Total trading liabilities** | **$ 195** | **$ 5** | **$ —** | **$ 200** |

**Short-Term Financial Instruments**

Certain financial instruments are not carried at fair value or only a portion of the ending balance is carried at fair value on the Consolidated Balance Sheet. The carrying value of short-term financial instruments, including cash and cash equivalents, cash segregated for regulatory purposes or deposited with clearing organizations, securities financing transactions, receivables from customers, receivables from brokers and dealers, interest and other, payables to customers, and payables to brokers and dealers approximates the fair value of these instruments. These financial instruments generally expose the Company to limited credit risk and have no stated maturities or have short-term maturities and carry interest rates that approximate market levels.

Under the fair value hierarchy, cash and cash equivalents and cash segregated for regulatory purposes or deposited with clearing organizations are classified as Level 1. Securities financing transactions, receivables from customers, receivables from brokers and dealers, interest and other, payables to customers, and payables to brokers and dealers are classified as Level 2.

**Fair Value Option Election**

The Company elected the fair value option for trading liabilities related to the Company's DRIP program. This represents the Company's obligation to settle the fractional shares in cash equal to the fair value at the date of settlement. The fair value option has been elected for the Company's DRIP program obligations to offset the changes in the corresponding trading account assets, which are recognized at fair value.

6. **Securities Financing Transactions**

The Company enters into securities financing transactions with affiliates to obtain securities for settlement, meet its regulatory reserve requirements under SEA Rule 15c3-3, and maintain liquidity.

Under these transactions, the Company either receives or provides collateral, including U.S. Treasury and government agency securities and equity securities. The Company receives collateral in connection with resale agreements, securities borrowed transactions, customer margin loans, and other loans. Under most agreements the Company is permitted to sell or repledge the securities received (e.g., use the securities to secure repurchase agreements, enter into securities lending transactions or deliver to counterparties to cover short positions). At December 31, 2022, the fair value of securities received as collateral where the Company is permitted to sell or repledge the securities was $2.0 billion, all of which was received from affiliated companies. The fair value of securities received as collateral that had been sold or repledged was $0.2 billion, all of which had been sold or repledged to affiliated companies.

**Offsetting of Securities Financing Agreements**

The tables below present securities financing transactions included on the Company's Consolidated Balance Sheet at December 31, 2022. Balances are presented on a gross basis. Gross assets and liabilities may be adjusted on an aggregate basis to take into consideration the effects of legally enforceable master netting agreements, where applicable. At December 31, 2022, the Company did not offset any of its financing transactions.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
December 31, 2022

The column entitled "Financial Instruments" in the table below includes securities collateral received or pledged under repurchase or securities lending agreements where there is a legally enforceable master netting agreement. These amounts are not offset in the Consolidated Balance Sheet but are shown as a reduction to the net balance sheet amount in the table to derive a net asset or liability.

| (dollars in millions) | Gross Assets | | Amounts Offset | | Net Balance Sheet Amount | | Financial Instruments[1] | | Net Asset | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Assets** | | | | | |
| Receivables under resale agreements | $ | 18,082 | $ | — | $ | 18,082 | $ | (18,082) | $ | — |
| Receivables under securities borrowed transactions | | 170 | | — | | 170 | | (152) | | 18 |
| **Total** | **$** | **18,252** | **$** | **—** | **$** | **18,252** | **$** | **(18,234)** | **$** | **18** |

| | Gross Liabilities | | Amounts Offset | | Net Balance Sheet Amount | | Financial Instruments[1] | | Net Liability | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Liabilities** | | | | | |
| Payables under securities loaned transactions | $ | 2,073 | $ | — | $ | 2,073 | $ | (1,991) | $ | 82 |
| **Total** | **$** | **2,073** | **$** | **—** | **$** | **2,073** | **$** | **(1,991)** | **$** | **82** |

[1] These amounts are limited to the securities financing asset/liability balance and accordingly, do not include excess collateral received/pledged.

**Payables under Securities Loaned Transactions Accounted for as Secured Borrowings**
At December 31, 2022, the maturity of all of the Company's securities loaned transactions were either overnight or continuous (i.e., no stated term). At December 31, 2022, the Company pledged equity securities of $2.0 billion as collateral for its securities loaned transactions.

For securities loaned transactions, the Company receives collateral in the form of cash. The collateral is generally valued daily based on the market value of the securities loaned and the Company may receive or return collateral pledged, when appropriate.

7.   **Goodwill and Intangible Assets**

**Goodwill**
The Company completed its annual goodwill impairment test as of June 30, 2022 using a qualitative assessment. Based on the results of the annual goodwill impairment test, the Company determined there was no impairment. For more information on the use of qualitative assessments, see *Note 2 – Summary of Significant Accounting Principles*.

The carrying amount of the Company's goodwill at December 31, 2022 was $878.0 million.

**Intangible Asset**
The carrying amount of the Company's indefinite-lived intangible asset representing the Merrill Lynch brand name as of December 31, 2022 was $935.0 million.

The Company determined that there was no impairment of the intangible asset as of the June 30, 2022 test date.

Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries
**Notes to the Consolidated Balance Sheet**
December 31, 2022

**8.    Subordinated Borrowings and Other Financing**

The Company has a $6.0 billion revolving subordinated line of credit agreement with NB Holdings. In June 2022, with Board of Directors and FINRA approvals, the Company repaid $620 million on its revolving subordinated line of credit with NB Holdings.

The credit line will mature on August 18, 2024 and may be automatically extended by one year unless specific actions are taken 390 days prior to the maturity date. At December 31, 2022, there was no outstanding balance on the line of credit.

The borrowing, which has been approved for regulatory capital purposes, is a U.S. dollar-denominated obligation at a variable interest rate based on Fed Funds plus a market-based spread. The weighted average interest rate for the year ended December 31, 2022 was 1.5%.

The Company may obtain letters of credit from issuing banks to satisfy various counterparty collateral requirements in lieu of depositing cash or securities collateral. There were no letters of credit outstanding at December 31, 2022.

**9.    Leases**

The Company enters into lessee arrangements, which predominantly consist of operating leases for premises and equipment; the Company's financing leases are not significant. For more information on lease accounting, see *Note 2 – Summary of Significant Accounting Policies*. Lease terms may contain renewal and extension options and early termination features. Generally, these options do not impact the lease term because the Company is not reasonably certain that it will exercise the options. Right-of-use assets were approximately $1.1 billion and the related lease liabilities for such arrangements were approximately $1.2 billion, at December 31, 2022. The weighted-average discount rate used to calculate the present value of future minimum lease payments was 3.0% and the weighted-average lease term was 7.5 years.

**Maturity Analysis**
The maturities of lessee arrangements outstanding at December 31, 2022 are presented in the table below based on undiscounted cash flows.

| (dollars in millions) | Lessee Operating Leases |
|---|---|
| 2023 | $           233 |
| 2024 | 215 |
| 2025 | 162 |
| 2026 | 157 |
| 2027 | 123 |
| Thereafter | 402 |
| Total undiscounted cash flows | 1,292 |
| Less: Net present value adjustment | (137) |
| **Total Lease Liabilities** | **$        1,155** |

**10.    Contingencies and Guarantees**

**Litigation and Regulatory Matters**
In the ordinary course of business, the Company is routinely a defendant in or a party to pending and threatened legal, regulatory, or governmental actions and proceedings. In view of the inherent difficulty of predicting the outcome of such matters, particularly where the claimants seek very large or indeterminate damages or where the matters present

MERRILL_WDNC_003007

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2022**

novel legal theories or involve a large number of parties, the Company generally cannot predict the eventual outcome of the pending matters, timing of the ultimate resolution of these matters, or eventual loss, fines or penalties related to each pending matter.

As a matter develops, the Company, in conjunction with any outside counsel handling the matter, evaluates whether such matter presents a loss contingency that is probable and estimable and whether a loss in excess of any accrued liability is reasonably possible in future periods. Once the loss contingency related to a litigation or regulatory matter is deemed to be both probable and estimable, the Company will establish an accrued liability. The Company continues to monitor any matters for further developments that could affect the amount of the accrued liability that has been previously established.

At December 31, 2022, the Company did not have a material accrued liability for litigation or regulatory matters.

**Guarantees**
The Company is a member of various securities and derivative exchanges and clearinghouses, both in the U.S. and in other countries. As a member, the Company may be required to pay a pro-rata share of the losses incurred by some of these organizations as a result of another member's default and under other loss scenarios. The Company's potential obligations may be limited to its membership interests in such exchanges and clearinghouses, to the amount (or multiple) of the Company's contribution to the guarantee fund or, in limited instances, to the full pro-rata share of the residual losses after applying the guarantee fund. The Company's maximum potential exposure under these membership agreements is difficult to estimate; however, the Company has assessed the probability of making any such payments as remote.

The Company performs securities clearance and settlement services with other brokerage firms and clearinghouses on behalf of its clients. Under these arrangements, the Company stands ready to meet the obligations of its clients with respect to securities transactions. The Company's obligations in this respect are secured by the assets in the clients' accounts and the accounts of their customers as well as by any proceeds received from the transactions cleared and settled by the Company on behalf of clients or their customers. The Company's maximum potential exposure under these arrangements is difficult to estimate; however, the potential for the Company to incur material losses pursuant to these arrangements is remote.

In connection with the FA Loans discussed in *Note 3 - Related Party Transactions*, the Company services FA loans through an affiliate in addition to those serviced directly by the Company. The Company fully guarantees the amount outstanding of the affiliate-serviced FA Loans in the event of default during the FA loan's vesting period. At December 31, 2022, the Company had FA Loan guarantees of $72.8 million which is the maximum potential amount of future payments. The affiliate performs qualitative analyses, including consideration of historical losses and current economic conditions, to estimate any expected credit losses. At December 31, 2022, expected credit losses assessed by the affiliate do not have a material impact to the Consolidated Balance Sheet.

11.  **Employee Benefit Plans**

Bank of America sponsors a qualified noncontributory trusteed pension plan (Qualified Pension Plan), a number of noncontributory nonqualified pension plans, qualified and non-qualified defined contribution retirement plans, and postretirement health and life plans that cover eligible employees. The Bank of America Corporation Corporate Benefits Committee has overall responsibility for the administration of these benefit plans. Required disclosures are included in the December 31, 2022 Form 10-K of Bank of America.

**Defined Contribution Pension Plans**
The defined contribution plan sponsored by the Parent is the Bank of America 401(k) Plan.

**Defined Benefit Pension Plans**
Certain of the Company's employees are covered by Bank of America's Qualified Pension Plan. Benefits earned under the Qualified Pension Plan have been frozen.

Bank of America has an annuity contract that guarantees the payment of benefits vested under a terminated U.S. pension plan (Other Pension Plan). Bank of America, under a supplemental agreement, may be responsible for, or

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2022**

benefit from, actual experience and investment performance of the annuity assets. Bank of America made no contribution under this agreement in 2022. Contributions may be required in the future under this agreement.

Bank of America's noncontributory, nonqualified pension plans are unfunded and provide supplemental defined pension benefits to certain eligible employees.

**12. Employee Incentive Plans**

The Company participates in a number of equity compensation plans sponsored by Bank of America, with awards being granted predominantly from the Bank of America Corporation Equity Plan (BACEP). Refer to the December 31, 2022 Form 10-K of Bank of America. Under this plan, Bank of America grants stock-based awards, including restricted stock units (RSUs), to eligible employees. Grants in 2022 from the BACEP include RSUs that were authorized to settle predominantly in shares of common stock of Bank of America. Certain RSUs will be settled in cash or contain settlement provisions that subject these awards to variable accounting.

The RSUs will generally vest over four years and three years. The four year awards vest primarily in one-fourth increments on each of the first four anniversaries of the grant date while the three year awards vest primarily in one-third increments on each of the first three anniversaries of the grant date, provided that the employee remains continuously employed with the Company during that time. Certain of the awards granted in 2022 do not include retirement eligibility. For all other RSUs granted to employees who are retirement eligible, they are deemed authorized as of the beginning of the year preceding the grant date when the incentive award plans are generally approved.

**Other Compensation Arrangements**

The Company participates in Bank of America-sponsored deferred compensation plans in which employees who meet certain minimum compensation thresholds may participate on either a voluntary or mandatory basis. Contributions to the plans are made on a tax-deferred basis by participants. Participants' returns on these contributions may be indexed to various mutual funds and other funds. The Company also participates in several Bank of America sponsored, cash-based employee award programs, under which certain employees are eligible to receive future cash compensation, generally upon fulfillment of the service and vesting criteria for the particular program.

When appropriate, Bank of America maintains various investments as an economic hedge of its liabilities to participants under these deferred compensation plans and award programs, including derivative transactions.

**13. Income Taxes**

The reconciliation of the beginning UTB balance to the ending balance is presented in the table below:

| (dollars in millions) | | |
|---|---|---:|
| **Balance at December 31, 2021** | $ | 46 |
| Increases related to positions taken during current year | | — |
| Increases related to positions taken during prior years | | — |
| Decreases in positions taken during prior years [1] | | (2) |
| Settlements | | (1) |
| Expiration of statute | | (18) |
| **Balance at December 31, 2022** | $ | 25 |

As of December 31, 2022, the balance of the Company's UTBs which would, if recognized, affect the Company's effective tax rate, was $20.6 million. Included in the UTB balance are some items, the recognition of which would not affect the effective tax rate, such as the portion of gross state UTBs that would be offset by the tax benefit of the associated federal deduction, and the portion of gross non-U.S. UTBs that would be offset by tax reductions in other jurisdictions.

It is reasonably possible that the UTB balance may decrease by as much as $1.8 million during the next 12 months, since resolved items will be removed from the balance whether their resolution results in payment or recognition.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
December 31, 2022

The Company files income tax returns in numerous state, local and non-U.S. jurisdictions each year. The Internal Revenue Service (IRS) and other tax authorities in states, cities, and countries in which the Company has significant business operations, examine tax returns periodically (continuously in some jurisdictions). The table below summarizes the status of examinations, by major jurisdiction, for the Company at December 31, 2022.

| Jurisdiction | Years under Examination [1] | Status at December 31, 2022 |
|---|---|---|
| U.S. federal | 2017-2021 | Field examination |
| California | 2012-2014 | Appeals |
| California | 2015-2017 | Field examination |
| California | 2018-2020 | To begin in 2023 |
| New York | 2019-2021 | To begin in 2023 |

[1] All tax years subsequent to the above years remain open to examination.

Current income taxes are recorded as income tax payable due to affiliate, which are included on the Consolidated Balance Sheet within Interest and other payables. Significant components of the Company's deferred tax assets and liabilities as of December 31, 2022 are presented below.

| (dollars in millions) | | |
|---|---|---|
| **Deferred tax assets** | | |
| Lease liability | $ | 279 |
| Loss carryforward | | 83 |
| Accrued expenses | | 101 |
| Other | | 29 |
| Gross deferred tax assets | | 492 |
| Less: valuation allowance | | (58) |
| Total deferred tax assets, net of valuation allowance | $ | 434 |
| | | |
| **Deferred tax liabilities** | | |
| Right-to-use asset | | 264 |
| Goodwill and intangibles | | 237 |
| Gross deferred tax liabilities | $ | 501 |
| | | |
| **Net deferred tax liability** | $ | 67 |

The table below summarizes the deferred tax assets and the related valuation allowance recognized for the net operating loss and tax credit carryforwards at December 31, 2022.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2022**

| (dollars in millions) | Deferred Tax Asset | | Valuation Allowance | | Net Deferred Tax Asset | | First Year Expiring |
|---|---|---|---|---|---|---|---|
| Net operating losses - U.S. states [1] | $ | 83 | $ | (35) | $ | 48 | Various |
| **Total loss carryforwards** | **$** | **83** | **$** | **(35)** | **$** | **48** | |
| | | | | | | | |
| State tax credits | $ | 4 | $ | — | $ | 4 | After 2033 |
| Foreign tax credits | | 23 | | (23) | | — | |
| **Total tax credit carryforwards** | **$** | **27** | **$** | **(23)** | **$** | **4** | |

[1] Amounts above include capital losses. The losses and related valuation allowances for U.S. states before considering the benefit of federal deductions were $105 million and $(44) million, respectively.

Realization of the deferred tax assets above is dependent on the Company's, or Bank of America's ability to generate sufficient taxable income prior to their expiration. Management concluded that no valuation allowance was necessary to reduce the U.S. federal NOL and state tax credit carryforwards since estimated future taxable income will more-likely-than-not be sufficient to utilize these assets prior to expiration.

At December 31, 2022, the Company had a current income tax payable due to its affiliates of approximately $511.9 million as a result of its inclusion in consolidated, combined, and unitary tax return filings with Bank of America under the intercompany tax allocation agreements with Bank of America.

**14. Subsequent Events**

The Company evaluates whether events, occurring after the balance sheet date but before the date the Consolidated Balance Sheet is available to be issued, require accounting as of the balance sheet date, or disclosure in the Consolidated Balance Sheet. The Company has evaluated such subsequent events through February 24, 2023, which is the issuance date of the Consolidated Balance Sheet.

In February 2023, the maturities of the Company's existing revolving senior unsecured lines of credit with NB Holdings, Bank of America, and MLBTC were extended to February 1, 2024.

There have been no other material subsequent events that occurred during such period that would require disclosure or recognition in the Consolidated Balance Sheet as of December 31, 2022.

**15. Regulatory Requirements**

**SEC Uniform Net Capital Rule**
As an SEC registered broker-dealer and CFTC registered introducing broker, the Company is subject to the net capital requirements of the Securities Exchange Act of 1934 Rule 15c3-1 ("SEA Rule 15c3-1") and CFTC Regulation 1.17. The Company has elected to compute the minimum capital requirement in accordance with the "Alternative Standard" as permitted by SEA Rule 15c3-1.

In accordance with the Alternative Standard, the Company is required to maintain net capital in excess of $250 thousand or two percent of aggregate debit items, computed in accordance with the Formula for Determination of Customer Account Reserve Requirements of Brokers and Dealers, which was $137.2 million.

At December 31, 2022, MLPF&S' regulatory net capital as defined by SEA Rule 15c3-1 was $6.0 billion and exceeded the minimum requirement of $137.2 million by $5.9 billion.

MERRILL_WDNC_003011

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
**December 31, 2022**

**SEC Customer Protection Rule**

The Company is also subject to SEA Rule 15c3-3, which requires, under certain circumstances, that cash or securities be deposited into a special reserve bank account for the exclusive benefit of customers. As of December 31, 2022, the Company had $11.2 billion of U.S. Government securities segregated in the special reserve bank account.

As a clearing broker and in accordance with SEA Rule 15c3-3, the Company computed a reserve requirement for the proprietary accounts of broker dealers (PAB). As of December 31, 2022, the Company had $5.0 million of cash segregated in a special reserve bank account for such requirement.

The company prepares SEC Form X-17A-5, FOCUS Report, Part II, on an unconsolidated basis. The following is a summary of certain consolidating financial information of the Company:

| (dollars in millions) | Standalone (FOCUS Report) | Subsidiaries | Eliminations | Consolidated |
|---|---|---|---|---|
| Total Assets | $ 33,841 | $ 422 | $ (349) | $ 33,914 |
| Total Liabilities | $ 24,241 | $ 211 | $ (138) | $ 24,314 |
| Total Stockholder's Equity | 9,600 | 211 | (211) | 9,600 |
| Total Liabilities and Stockholder's Equity | $ 33,841 | $ 422 | $ (349) | $ 33,914 |

Exhibit E

# Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries

(SEC ID No. 8-07221)

**Consolidated Balance Sheet**

**December 31, 2023**

Filed pursuant to Rule 17a-5(e)(3) under the Securities Exchange Act of 1934 as a Public Document

MERRILL_WDNC_003013

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
Table of Contents
December 31, 2023

|  | Page(s) |
|---|---|
| **Report of Independent Registered Public Accounting Firm** | |
| **Consolidated Balance Sheet** | 1 |
| **Notes to Consolidated Balance Sheet** | 2 - 13 |

MERRILL_WDNC_003014



**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholder of Merrill Lynch, Pierce, Fenner & Smith Incorporated:

***Opinion on the Financial Statement – Balance Sheet***

We have audited the accompanying consolidated balance sheet of Merrill Lynch, Pierce, Fenner & Smith Incorporated and its subsidiaries (the "Company") as of December 31, 2023, including the related notes (collectively referred to as the "consolidated financial statement"). In our opinion, the consolidated financial statement presents fairly, in all material respects, the financial position of the Company as of December 31, 2023 in conformity with accounting principles generally accepted in the United States of America.

***Basis for Opinion***

The consolidated financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statement based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of this consolidated financial statement in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statement is free of material misstatement, whether due to error or fraud.

Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statement, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statement. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statement. We believe that our audit provides a reasonable basis for our opinion.

*PricewaterhouseCoopers LLP*

Charlotte, NC
February 23, 2024

We have served as the Company's auditor since 2009.

*PricewaterhouseCoopers LLP, 214 N. Tryon Street, Suite 4200, Charlotte, NC 28202*
*T: (704) 344 7500, F: (704) 344 4100, www.pwc.com/us*

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Consolidated Balance Sheet**
**December 31, 2023**

(Dollars in millions, except share and per share amounts)

### ASSETS

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 2,876 |
| Cash segregated for regulatory purposes or deposited with clearing organizations | | 1,015 |
| | | |
| Securities financing transactions | | |
| Receivables under resale agreements | | 15,754 |
| Receivables under securities borrowed transactions | | 403 |
| Total securities financing transactions | | 16,157 |
| | | |
| Trading assets, at fair value | | |
| Equities | | 239 |
| Other | | 4 |
| Total trading assets, at fair value | | 243 |
| | | |
| Other receivables | | |
| Customers | | 6,029 |
| Brokers and dealers | | 254 |
| Interest and other, including loans due from affiliates | | 2,082 |
| Total other receivables | | 8,365 |
| | | |
| Right-of-use lease assets | | 961 |
| Goodwill and intangible assets | | 1,813 |
| Other assets | | 339 |
| **Total assets** | **$** | **31,769** |

### LIABILITIES

| | | |
|---|---|---:|
| Securities financing transactions | | |
| Payables under securities loaned transactions | | 2,091 |
| | | |
| Trading liabilities, at fair value (includes $237 measured at fair value in accordance with the fair value option election) | | |
| Equities | | 236 |
| Other | | 1 |
| Total trading liabilities, at fair value | | 237 |
| | | |
| Other payables | | |
| Customers | | 14,287 |
| Brokers and dealers | | 194 |
| Compensation and benefits | | 789 |
| Interest and other | | 2,464 |
| Loans due to affiliates | | 958 |
| Lease liabilities | | 1,017 |
| Total other payables | | 19,709 |
| | | |
| Contingencies and guarantees (See *Note 10*) | | |
| **Total liabilities** | **$** | **22,037** |

### STOCKHOLDER'S EQUITY

| | | |
|---|---|---:|
| Common stock, par value $1 per share; 1,200 shares authorized; 1,000 shares issued and outstanding | | — |
| Paid-in capital | | 6,764 |
| Retained earnings | | 2,968 |
| **Total stockholder's equity** | **$** | **9,732** |
| **Total liabilities and stockholder's equity** | **$** | **31,769** |

The accompanying notes are an integral part of the Consolidated Balance Sheet.    Page 5 of 17

Case 3:24-cv-00440-KDB-DCK    Document 53-6    Filed 12/06/24    Page 5 of 17

JA462

MERRILL_WDNC_003016

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
Notes to the Consolidated Balance Sheet
December 31, 2023

## 1.   Organization

**Description of Business**

Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S), together with its subsidiaries (the "Company"), is registered as a broker-dealer and investment adviser with the U.S. Securities and Exchange Commission (SEC), and is a member firm of the Financial Industry Regulatory Authority (FINRA), the New York Stock Exchange (NYSE), and other securities exchanges. MLPF&S is also registered as an introducing broker with the U.S. Commodity Futures Trading Commission (CFTC) and is a member of the National Futures Association (NFA) and the Securities Investor Protection Corporation (SIPC). Additionally, it is registered as a swap firm with the NFA.

The Company provides its clients with investment-related products and services, including brokerage services and discretionary and non-discretionary investment advisory services through its investment advisory programs. Through its retirement group, the Company provides a wide variety of investment and custodial services to Individual Retirement Accounts (IRAs) and other retirement plans for small businesses. The Company also provides investment, administration, communications, and consulting services to corporations and their employees for their retirement programs, including 401(k), pension, profit-sharing, and nonqualified deferred compensation plans. In addition, the Company provides financing to clients through margin lending and other extensions of credit. Certain products and services may be provided through affiliates.

The Company is a wholly-owned indirect subsidiary of Bank of America Corporation ("Bank of America" or the "Parent"). The Company's direct parent is BAC North America Holding Company (BACNA), which is a wholly-owned subsidiary of NB Holdings Corporation ("NB Holdings"). NB Holdings is a wholly-owned subsidiary of Bank of America.

## 2.   Summary of Significant Accounting Policies

**Principles of Consolidation and Basis of Presentation**

The Consolidated Balance Sheet is presented in conformity with accounting principles generally accepted in the United States of America. The Consolidated Balance Sheet is presented in U.S. dollars.

The Consolidated Balance Sheet includes the accounts of the Company and its majority-owned subsidiaries. Intercompany accounts and transactions have been eliminated. Assets held in an agency or fiduciary capacity are not included in the Consolidated Balance Sheet.

The Company generally consolidates those variable interest entities (VIEs) where the Company is the primary beneficiary. At December 31, 2023, there were no interests in consolidated nor unconsolidated VIEs.

The preparation of the Consolidated Balance Sheet in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect reported amounts and disclosures. Actual results could materially differ from those estimates and assumptions.

**Cash and Cash Equivalents**

The Company defines cash equivalents as short-term, highly liquid securities, and interest-earning deposits with maturities, when purchased, of 90 days or less, that are not used for trading purposes.

**Cash Segregated for Regulatory Purposes or Deposited with Clearing Organizations**

The Company maintains relationships with clients and is therefore obligated by rules mandated by its primary regulator, the SEC, to segregate or set aside cash and/or qualified securities to satisfy these regulations in order to protect customer assets. In addition, the Company is a member of various clearing organizations and exchanges at which it maintains cash and/or securities required for the conduct of its day-to-day clearance activities. At December 31, 2023, the Company had $994.7 million of cash deposited with clearing organizations.

Included in Cash segregated for regulatory purposes or deposited with clearing organizations at December 31, 2023 was $5.0 million of cash that had been segregated in a special reserve account as required by Rule 15c3-3 under the Securities Exchange Act of 1934 ("SEA Rule 15c3-3") and considered restricted cash by the Company. Included in cash segregated for regulatory purposes or deposited with clearing organizations was an additional $15.4 million of cash that is considered restricted cash by the Company at December 31, 2023.

**Securities Financing Transactions**

Securities borrowed or purchased under agreements to resell and securities loaned or sold under agreements to repurchase ("securities financing transactions") are treated as collateralized financing transactions. Generally, these agreements are recorded at acquisition or sale price plus accrued interest.

The Company's policy is to monitor the market value of the principal amount loaned and obtain collateral from or return collateral pledged to counterparties when appropriate. Securities financing transactions do not create material credit risk due to these collateral provisions; therefore, an allowance for loan losses is not necessary.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
December 31, 2023

The Company may use securities received as collateral for resale agreements to satisfy regulatory requirements such as SEA Rule 15c3-3. At December 31, 2023, approximately $11.1 billion of such securities had been segregated in special reserve accounts as required by SEA Rule 15c3-3. Refer to *Note 15 - Regulatory Requirements* for further information.

Securities borrowed transactions require the Company to provide the counterparty with collateral in the form of cash, letters of credit, or other securities. The Company receives collateral in the form of cash or other securities for securities loaned transactions.

The carrying values of securities financing transactions approximate fair value as these items are not materially sensitive to shifts in market interest rates because of their short-term nature and/or variable interest rates or to credit risk because securities financing transactions are substantially collateralized.

Refer to *Note 6 – Securities Financing Transactions* for further information.

### Trading Assets and Liabilities
Trading assets and liabilities primarily consist of equity securities held by the Company in connection with dividend reinvestment plans (DRIP) participated in by the Company's customers.

Financial instruments utilized in trading activities are carried at fair value. Fair value is generally based on quoted market prices for the same or similar assets and liabilities. If these market prices are not available, fair values are estimated based on dealer quotes, pricing models, discounted cash flow methodologies, or similar techniques where the determination of fair value may require significant management judgment or estimation.

### Other Receivables and Payables

*Customers*
Customer securities transactions are recorded on a settlement date basis. Receivables from and payables to customers include amounts due on cash and margin transactions. Securities owned by customers, including those that collateralize margin or other similar transactions, are not reflected on the Consolidated Balance Sheet.

Margin loans represent credit extended to customers to finance their purchases of securities by borrowing against securities they own and are fully collateralized by these securities in customer accounts. Collateral is maintained at required levels at all times. The borrowers of a margin loan are contractually required to continually adjust the amount of the collateral as its fair value changes. The Company applies the practical expedient based on collateral maintenance provisions in estimating an allowance for credit losses for margin loans. Expected losses are assumed not to have a material impact to the Consolidated Balance Sheet.

*Brokers and Dealers*
Receivables from brokers and dealers primarily include amounts receivable for securities not delivered by the Company to a purchaser by the settlement date ("fails to deliver"), margin deposits, and commissions. Payables to brokers and dealers primarily include amounts payable for securities not received by the Company from a seller by the settlement date ("fails to receive"). These accounts generally settle daily and due to the short-term nature of brokers and dealers receivable, the credit exposure is limited. Expected credit losses are assumed not to have a material impact to the Consolidated Balance Sheet.

*Interest and Other*
Interest and other receivables include interest on customer receivables and securities financing transactions, receivables from affiliates, dividends receivable, income taxes, commissions and fees, and other receivables. The Company performs qualitative analyses, including consideration of historical losses and current economic conditions, to estimate any expected credit losses which are recorded as a contra-asset against the amortized cost basis of the financial asset.

Interest and other payables include interest payable for securities financing transactions, income taxes, payables to affiliates, and other payables.

*Compensation and Benefits*
Compensation and benefits payables consist of salaries payable, financial advisor compensation, incentive and deferred compensation, payroll taxes, pension, and other employee benefits.

*Loans Due to Affiliates*
Loans due to affiliates consist of unsecured borrowings with Bank of America, NB Holdings, Merrill Lynch Bank and Trust Company (Cayman) Ltd. (MLBTC), and Bank of America National Association (BANA). Refer to *Note 3 - Related Party Transactions* for further information.

### Leases
The Company's lessee arrangements are comprised of operating leases. Under these arrangements, the Company records right-of-use assets and lease liabilities at lease commencement. All leases are recorded on the Consolidated Balance Sheet, except for leases with an initial term of less than 12 months for which the Company made the short-term lease election.

The Company made an accounting policy election not to separate lease and non-lease components of a contract that is or contains a lease for its real estate and equipment leases. As such, lease payments represent payments on both lease and non-lease components. At lease commencement, lease liabilities are recognized based on the present value of the remaining lease payments

## Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries
**Notes to the Consolidated Balance Sheet**
December 31, 2023

and discounted using the Company's incremental borrowing rate. Right-of-use assets initially equal the lease liability, adjusted for any lease payments made prior to lease commencement and for any lease incentives. Refer to *Note 9 - Leases* for further information.

### Goodwill and Intangible Assets
Goodwill is the purchase premium after adjusting for the fair value of net assets acquired. Goodwill is not amortized but is reviewed for potential impairment on an annual basis, or when events or circumstances indicate a potential impairment.

The Company assesses its fair value against its carrying value, including goodwill, as measured by Stockholder's Equity. In performing its goodwill impairment testing, the Company first assesses qualitative factors to determine whether it is more likely than not that the Company's fair value is less than its carrying value. Qualitative factors include, among other things, macroeconomic conditions, industry and market considerations, financial performance, and other relevant Company-specific considerations. If the Company concludes it is more likely than not that its fair value is less than its carrying value, a quantitative assessment is performed. The Company has an unconditional option to bypass the qualitative assessment in any period and proceed directly to performing the quantitative goodwill impairment test. The Company may resume performing the qualitative assessment in any subsequent period.

When performing the quantitative assessment, if the Company's fair value exceeds its carrying value, goodwill would not be considered impaired. If the carrying value of the Company exceeds its fair value, goodwill would be considered impaired for the amount by which equity exceeds its fair value. The amount of impairment recognized cannot exceed the amount of the Company's goodwill. Impairment establishes a new basis in the goodwill, and subsequent reversals of impairment are not permitted under applicable accounting guidance.

The Company had no unamortized intangible assets with finite lives as of December 31, 2023.

Intangible assets deemed to have indefinite useful lives are not subject to amortization. This consists of the Company's proportion of the value assigned to the Merrill Lynch brand name. Impairment is recognized if the carrying value of the intangible asset with an indefinite life exceeds its fair value.

Refer to *Note 7 - Goodwill and Intangible Assets* for further information.

### Other Assets
Other assets consist primarily of equipment and facilities, prepaid expenses and deferred charges. Premises and equipment are carried at cost less accumulated depreciation and amortization. Depreciation and amortization are recognized using the straight-line method over the estimated useful lives of the assets. The cost of certain facilities shared with affiliates is allocated to the Company by Bank of America based on the relative amount of space occupied.

### Fair Value
The Company measures the fair values of its assets and liabilities, where applicable, in accordance with accounting guidance that requires an entity to base fair value on exit price. Under this guidance, an entity is required to maximize the use of observable inputs and minimize the use of unobservable inputs in measuring fair value. Under applicable accounting standards, fair value measurements are categorized into one of three levels based on the inputs to the valuation technique with the highest priority given to unadjusted quoted prices in active markets and the lowest priority given to unobservable inputs. The Company categorizes its fair value measurements of financial instruments based on this three-level hierarchy.

**Level 1** Unadjusted quoted prices in active markets for identical assets or liabilities. Level 1 assets and liabilities include equity securities that are traded in an active exchange market.

**Level 2** Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities. Level 2 assets and liabilities include equity securities with quoted prices that are traded less frequently than exchange-traded instruments.

**Level 3** Unobservable inputs that are supported by little or no market activity and that are significant to the overall fair value of the assets or liabilities. Level 3 assets and liabilities include financial instruments for which the determination of fair value requires significant management judgment or estimation. The fair value for such assets and liabilities is generally determined using pricing models, discounted cash flow methodologies or similar techniques that incorporate the assumptions a market participant would use in pricing the asset or liability.

See *Note 5 – Fair Value Measurements* for further information.

### Income Taxes
Gross deferred tax assets and liabilities represent decreases or increases in taxes expected to be paid in the future because of future reversals of temporary differences in the bases of assets and liabilities as measured by tax laws and their bases as reported in the balance sheet. Deferred tax assets are also recognized for tax attributes such as net operating loss carryforwards and tax credit carryforwards. Valuation allowances are recorded to reduce deferred tax assets to the amounts management concludes are more likely than not to be realized.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
**Notes to the Consolidated Balance Sheet**
December 31, 2023

Income tax benefits are recognized and measured based upon a two-step model: first, a tax position must be more likely than not to be sustained based solely on its technical merits in order to be recognized, and second, the benefit is measured as the largest dollar amount of that position that is more likely than not to be sustained upon settlement. The difference between the benefit recognized and the tax benefit claimed on a tax return is referred to as an unrecognized tax benefit.

Under the intercompany tax allocation agreements, tax benefits associated with net operating losses (NOLs) (or other tax attributes) of the Company are payable to the Company generally upon utilization in Bank of America's tax returns.

In addition, under these agreements, substantially all current income taxes (federal, combined, and unitary state) are recorded as income tax receivable and payable due to affiliate, which are included on the Consolidated Balance Sheet within Interest and other receivables, including loans due from affiliates, Interest and other payables, and Loans due to affiliates, and is settled on at least an annual basis.

In accordance with Bank of America's intercompany tax allocation agreements, any new or subsequent change in an unrecognized tax benefit related to Bank of America's state consolidated, combined, or unitary return in which the Company is a member will generally not be reflected in the Company's Consolidated Balance Sheet. However, upon resolution of the item, any significant impact determined to be attributable to the Company will be reflected on the Company's Consolidated Balance Sheet.

See *Note 13 - Income Taxes* for further discussion of income taxes.

**Foreign Currency Translation**
Assets and liabilities denominated in foreign currencies are remeasured at period-end rates of exchange.

3. **Related Party Transactions**

The Company enters into securities financing transactions with affiliates. The Company also provides certain investment management, brokerage, trust, and other securities services to affiliated companies, and contracts a variety of services from Bank of America and certain affiliated companies, including accounting, legal, regulatory compliance, transaction processing, purchasing, building management, and other services.

The following table summarizes related party assets and liabilities as of December 31, 2023.

| (Dollars in millions) | | |
|---|---|---:|
| **Assets** | | |
| Cash and cash equivalents | $ | 2,465 |
| Receivables under resale agreements | | 15,754 |
| Receivables under securities borrowed transactions | | 403 |
| Brokers and dealers receivables | | 5 |
| Interest and other, including loans due from affiliates | | 654 |
| **Total assets** | $ | **19,281** |
| | | |
| **Liabilities** | | |
| Payables under securities loaned transactions | $ | 2,091 |
| Customers payables | | 55 |
| Brokers and dealers payables | | 4 |
| Interest and other payables | | 785 |
| Loans due to affiliates | | 958 |
| **Total** | $ | **3,893** |

The Company has established unsecured borrowing agreements with Bank of America, NB Holdings, and MLBTC in the normal course of business. Amounts outstanding under these arrangements are included within Loans due to affiliates on the Consolidated Balance Sheet.

Certain of these agreements are revolving senior lines of credit, which have a term of six months. Interest is based on prevailing short-term market rates. The credit lines will be automatically extended for another six-month term unless specific actions are taken

MERRILL_WDNC_003020

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
Notes to the Consolidated Balance Sheet
December 31, 2023

180 days prior to the maturity date. These arrangements are summarized below:

### *Revolving Lines of Credit*

(Dollars in millions)

| Borrower | Lender | Committed/ Uncommitted | Limit | Maturity | Outstanding Balance |
|---|---|---|---|---|---|
| MLPF&S | NB Holdings | Uncommitted | $ 9,000 | 8/1/2024 | $ 956 |
| MLPF&S | Bank of America | Uncommitted | 2,500 | 8/1/2024 | 2 |
| MLPF&S | MLBTC | Uncommitted | 5,000 | 8/1/2024 | — |
| MLPF&S | NB Holdings | Committed | 1,000 | 8/1/2024 | — |
| Managed Account Advisors LLC [1] | NB Holdings | Uncommitted | 100 | 8/1/2024 | — |
| | | | | | $ 958 |

[1] Managed Account Advisors LLC is a wholly-owned, consolidated subsidiary of MLPF&S

The Company also has an intraday line of credit, in which intraday liquidity is provided through daylight overdraft of the demand deposit accounts held by the Company at BANA. This arrangement is summarized below:

### *Intraday Lines of Credit*

(Dollars in millions)

| Borrower | Lender | Committed/ Uncommitted | Limit | Outstanding Balance |
|---|---|---|---|---|
| MLPF&S | BANA | Committed | $ 3,500 | $ — |
| | | | $ | — |

Other subsidiaries of MLPF&S engage in lending transactions with NB Holdings in the normal course of business. At December 31, 2023, the subsidiaries of MLPF&S had $52.4 million due from NB Holdings included in Interest and other, including loans due from affiliates on the Consolidated Balance Sheet.

Refer to *Note 8 - Subordinated Borrowing and Other Financing* for information on the subordinated borrowing between the Company and NB Holdings.

4. **Risks and Uncertainties**

**Market Risk**
Market risk is the risk that changes in market conditions may adversely impact the value of assets, liabilities, and assets under management. In the event of market stress, these risks could have a material impact on our results.

**Market Liquidity Risk**
Market liquidity risk represents the risk that the level of expected market activity changes dramatically and, in certain cases, may even cease. This exposes the Company to the risk that the Company will not be able to transact business and execute trades in an orderly manner, which may impact results. The impact could be further exacerbated if expected hedging or pricing correlations are compromised by disproportionate demand or lack of demand for certain instruments.

**Liquidity Risk**
The Company's primary liquidity risk management objective is to meet expected and unexpected cash flow and collateral requirements while continuing to support the Company's business and customers under a range of economic conditions. To achieve that objective, the Company analyzes and monitors its liquidity risk under expected and stressed conditions, maintains liquidity and access to diverse funding sources and seeks to align liquidity-related incentives and risks. The Company defines liquidity as readily available assets, limited to cash and high-quality, liquid, unencumbered securities that the Company can use to meet contractual and contingent financial obligations as those obligations arise. In addition, the Company is supported through committed and uncommitted borrowing arrangements with Bank of America, NB Holdings, and other affiliates. See *Note 3 - Related Party Transactions*.

**Counterparty Credit Risk**
The Company is exposed to risk of loss if an individual, counterparty, or issuer fails to perform its obligations under contractual terms ("default risk"). Cash instruments expose the Company to default risk.

Financial services institutions and other counterparties are interrelated because of trading, funding, clearing, or other relationships. Defaults by one or more counterparties, or market uncertainty about the financial stability of one or more financial services

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
Notes to the Consolidated Balance Sheet
December 31, 2023

institutions, or the financial services industry generally, could lead to market-wide liquidity disruptions, losses, defaults and related disputes and litigation.

The Company has established policies and procedures for mitigating counterparty credit risk, including reviewing and establishing limits for credit exposure, maintaining qualifying collateral, and continually assessing the creditworthiness of counterparties.

In the normal course of business, the Company executes, settles, and finances various customer securities transactions. Execution of these transactions includes the purchase and sale of securities by the Company. These activities may expose the Company to default risk arising from the potential that customers or counterparties may fail to satisfy their obligations. In these situations, the Company may be required to purchase or sell financial instruments at unfavorable market prices to satisfy obligations to other customers or counterparties. In addition, the Company seeks to control the risks associated with its customer margin activities by requiring customers to maintain collateral in compliance with regulatory and internal guidelines.

Liabilities to other brokers and dealers related to unsettled transactions (i.e., fails to receive) are recorded at the amount for which the securities were purchased, and are paid upon receipt of the securities from other brokers or dealers. In the case of aged fails to receive, the Company may purchase the underlying security in the market and seek reimbursement for losses from the counterparty.

### Concentrations of Credit Risk
The Company's exposure to credit risk associated with its activities is measured on an individual counterparty basis, as well as by groups of counterparties that share similar attributes. Concentrations of credit risk can be affected by changes in political, industry, or economic factors. To reduce the potential for risk concentration, credit limits are established and monitored in light of changing counterparty and market conditions. The Company's concentrations of credit risk could adversely affect financial condition.

### Concentration of Risk to the U.S. Government and its Agencies
At December 31, 2023, the Company had indirect exposure to the U.S. Government and its agencies resulting from maintaining U.S. Government and agencies securities as collateral for resale agreements. The Company's direct credit exposure on these transactions is with the counterparty; thus the Company has credit exposure to the U.S. Government and its agencies only in the event of the counterparty's default. Securities issued by the U.S. Government or its agencies held as collateral for resale agreements at December 31, 2023 totaled $15.8 billion, which was all from affiliated companies.

## 5.  Fair Value Measurements

Under applicable accounting standards, fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. The Company determines the fair values of its financial instruments under applicable accounting standards and conducts a review of fair value hierarchy classifications on a quarterly basis. Transfers into or out of fair value hierarchy classifications are made if the significant inputs used in the financial models measuring the fair values of the assets and liabilities become unobservable or observable in the current marketplace. For more information regarding the fair value hierarchy and how the Company measures fair value, see *Note 2 – Summary of Significant Accounting Policies.*

### Valuation Techniques
The following section outlines the valuation methodologies for the Company's assets and liabilities. While the Company believes its valuation methods are appropriate and consistent with other market participants, the use of different methodologies or assumptions to determine the fair value of certain financial instruments could result in a different estimate of fair value at the reporting date.

During 2023, there were no significant changes to valuation approaches or techniques that had, or are expected to have, a material impact on the Company's Consolidated Balance Sheet.

#### *Trading Assets and Liabilities*
The fair values of trading assets and liabilities are primarily based on actively traded markets where prices are based on either direct market quotes or observed transactions. Liquidity is a significant factor in the determination of the fair values of trading assets and liabilities. Market price quotes may not be readily available for some positions such as positions within a market sector where trading activity has slowed significantly or ceased.

### Recurring Fair Value
Assets and liabilities carried at fair value on a recurring basis at December 31, 2023, including financial instruments that the

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
Notes to the Consolidated Balance Sheet
December 31, 2023

Company accounts for under the fair value option, are summarized in the following table.

| (Dollars in millions) | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Assets** | | | | |
| Trading assets | | | | |
| Equities | $    230 | $    9 | $    — | $    239 |
| Other | — | 4 | — | 4 |
| **Total assets** | $    230 | $    13 | $    — | $    243 |
| | | | | |
| **Liabilities** | | | | |
| Trading liabilities | | | | |
| Equities | $    227 | $    9 | $    — | $    236 |
| Other | — | 1 | — | 1 |
| **Total liabilities** | $    227 | $    10 | $    — | $    237 |

**Short-Term Financial Instruments**
Certain financial instruments are not carried at fair value or only a portion of the ending balance is carried at fair value on the Consolidated Balance Sheet.

The carrying value of short-term financial instruments, including cash and cash equivalents, cash segregated for regulatory purposes or deposited with clearing organizations, other receivables and payables from and to customers and brokers and dealers, loans due to affiliates, interest and other receivables and payables, and securities financing transactions approximates the fair value of these instruments. These financial instruments generally expose the Company to limited credit risk and have no stated maturities or have short-term maturities and carry interest rates that approximate market.

Under the fair value hierarchy, cash and cash equivalents and cash segregated for regulatory purposes or deposited with clearing organizations are classified as Level 1. Other receivables and payables from and to customers and brokers and dealers, loans due to affiliates, interest and other receivables and payables are classified as Level 2. Securities financing transactions are classified as Level 2 because they are generally short-dated and/or variable-rate instruments collateralized by U.S. Government or agency securities.

**Fair Value Option Election**
The Company elects to account for trading liabilities related to the Company's DRIP program under the fair value option. This represents the Company's obligation to settle the fractional shares in cash equal to the fair value at the date of settlement. The fair value option has been elected for the Company's DRIP program obligations to offset the changes in the corresponding trading assets, which are recognized at fair value.

6.  **Securities Financing Transactions**

The Company enters into securities financing transactions with affiliates which include securities borrowed or purchased under agreements to resell and securities loaned or sold under agreements to repurchase. These securities financing transactions are to obtain securities for settlement, meet its regulatory reserve requirements under SEA Rule 15c3-3, and maintain liquidity.

**Offsetting of Securities Financing Transactions**
Substantially all of the Company's securities financing activities are transacted under legally enforceable master agreements that give the Company, in the event of default by the counterparty, the right to liquidate securities held and to offset receivables and payables with the same counterparty. The Company may offset repurchase and resale transactions with the same counterparty on the Consolidated Balance Sheet where it has such a legally enforceable master netting agreement and the transactions have the same maturity date.

The table below presents securities financing transactions included on the Company's Consolidated Balance Sheet at December 31, 2023. Balances are presented on a gross basis. Gross assets and liabilities may be adjusted on an aggregate basis to take into consideration the effects of legally enforceable master netting agreements, where applicable. At December 31, 2023,

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
Notes to the Consolidated Balance Sheet
December 31, 2023

the Company did not offset any of its financing transactions.

*Securities Financing Transactions*

| (Dollars in millions) | Gross Assets[1] | Amounts Offset | Net Balance Sheet Amount | Financial Instruments[2] | Net Assets |
|---|---|---|---|---|---|
| Receivables under resale agreements | $ 15,754 | $ — | $ 15,754 | $ (15,754) | $ — |
| Receivables under securities borrowed transactions | 403 | — | 403 | (389) | 14 |
| **Total** | **$ 16,157** | **$ —** | **$ 16,157** | **$ (16,143)** | **$ 14** |

| | Gross Liabilities[1] | Amounts Offset | Net Balance Sheet Amount | Financial Instruments[2] | Net Liabilities |
|---|---|---|---|---|---|
| Payables under securities loaned transactions | $ 2,091 | $ — | $ 2,091 | $ (2,010) | $ 81 |
| **Total** | **$ 2,091** | **$ —** | **$ 2,091** | **$ (2,010)** | **$ 81** |

[1] Includes activity where uncertainty exists as to the enforceability of certain master netting agreements under bankruptcy laws in some countries or industries.
[2] Includes securities collateral received or pledged under repurchase or securities lending agreements where there is a legally enforceable master netting agreement. These amounts are not offset on the Consolidated Balance Sheet, but are shown as a reduction to derive a net asset or liability. Securities collateral received or pledged where the legal enforceability of the master netting agreements is uncertain is excluded from the table.

**Payables under Securities Loaned Transactions Accounted for as Secured Borrowings**
For securities loaned transactions, the Company receives collateral in the form of cash or other securities. To determine whether the market value of the underlying collateral remains sufficient, collateral is generally valued daily, and the Company may receive or return collateral pledged, when appropriate. At December 31, 2023, the maturity of all of the Company's securities loaned transactions were either overnight or continuous (i.e., no stated term), or short-term.

## 7. Goodwill and Intangible Assets

### Goodwill
The Company completed its annual goodwill impairment test as of June 30, 2023 using a quantitative assessment. Based on the results of the annual goodwill impairment test, the Company determined there was no impairment. For more information regarding the nature of and accounting for the Company's annual goodwill impairment testing, see *Note 2 – Summary of Significant Accounting Policies*.

The carrying amount of goodwill was $878.0 million at December 31, 2023.

### Intangible Asset
At December 31, 2023, the carrying amount of the Company's indefinite-lived intangible asset representing the Merrill Lynch brand name was $935.0 million. The intangible has an indefinite life and, accordingly, is not being amortized.

The Company determined that there was no impairment of the intangible asset as of the June 30, 2023 test date.

## 8. Subordinated Borrowing and Other Financing

The Company has a $3.0 billion revolving subordinated line of credit agreement with NB Holdings which has been approved for regulatory capital purposes. The credit line will mature on December 21, 2025 and may be automatically extended by 390 days unless specific actions are taken 390 days prior to the maturity date. At December 31, 2023, there was no outstanding balance on the line of credit. The borrowing has a variable interest rate based on the Secured Overnight Financing Rate (SOFR) plus a market-based spread.

The Company may obtain letters of credit from issuing banks to satisfy various counterparty collateral requirements in lieu of depositing cash or securities collateral. There were no letters of credit outstanding at December 31, 2023.

## 9. Leases

The Company enters into lessee arrangements, which predominantly consist of operating leases for premises and equipment; the Company's financing leases are not significant. For more information on lease accounting, see *Note 2 – Summary of Significant Accounting Policies*. Lease terms may contain renewal and extension options and early termination features. Generally, these options do not impact the lease term because the Company is not reasonably certain that it will exercise the options.

The following table provides information on the right-of-use asset, lease liability and weighted-average discount rate and lease terms

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
Notes to the Consolidated Balance Sheet
December 31, 2023

at December 31, 2023.

*Supplemental Information for Lessee Arrangements*

(Dollars in millions)

| | | |
|---|---|---:|
| Right-of-use asset | $ | 961 |
| Lease liabilities | $ | 1,017 |
| Weighted-average discount rate used to calculate present value of future minimum lease payments | | 3.2 % |
| Weighted-average lease term (in years) | | 7.0 |

**Maturity Analysis**

The maturities of lessee arrangements outstanding at December 31, 2023 are presented in the table below based on undiscounted cash flows.

*Maturities of Lessee Arrangements*

| (Dollars in millions) | | Operating Leases |
|---|---|---:|
| 2024 | $ | 225 |
| 2025 | | 176 |
| 2026 | | 172 |
| 2027 | | 137 |
| 2028 | | 101 |
| Thereafter | | 325 |
| Total undiscounted cash flows | | 1,136 |
| Less: Net present value adjustment | | (119) |
| **Total lease liabilities** | $ | **1,017** |

## 10. Contingencies and Guarantees

### Guarantees

*Exchange and Clearing House Member Guarantees*

The Company is a member of various securities and derivative exchanges and clearinghouses, both in the U.S. and in other countries. As a member, the Company may be required to pay a pro-rata share of the losses incurred by some of these organizations as a result of another member's default and under other loss scenarios. The Company's potential obligations may be limited to its membership interests in such exchanges and clearinghouses, to the amount (or multiple) of the Company's contribution to the guarantee fund or, in limited instances, to the full pro-rata share of the residual losses after applying the guarantee fund. The Company's maximum potential exposure under these membership agreements is difficult to estimate; however, the Company has assessed the probability of making any such payments as remote.

*Clearing Services*

The Company performs securities clearance and settlement services with other brokerage firms and clearinghouses on behalf of its clients. Under these arrangements, the Company stands ready to meet the obligations of its clients with respect to securities transactions. The Company's obligations in this respect are secured by the assets in the clients' accounts and the accounts of their customers as well as by any proceeds received from the transactions cleared and settled by the Company on behalf of clients or their customers. The Company's maximum potential exposure under these arrangements is difficult to estimate; however, the potential for the Company to incur material losses pursuant to these arrangements is remote.

### Litigation and Regulatory Matters

In the ordinary course of business, the Company is routinely a defendant in or a party to pending and threatened legal, regulatory, or governmental actions and proceedings. In view of the inherent difficulty of predicting the outcome of such matters, particularly where the claimants seek very large or indeterminate damages or where the matters present novel legal theories or involve a large number of parties, the Company generally cannot predict the eventual outcome of the pending matters, timing of the ultimate resolution of these matters, or eventual loss, fines or penalties related to each pending matter.

As a matter develops, the Company, in conjunction with any outside counsel handling the matter, evaluates whether such matter presents a loss contingency that is probable and estimable and whether a loss in excess of any accrued liability is reasonably possible in future periods. Once the loss contingency is deemed to be both probable and estimable, the Company will establish an accrued liability. The Company continues to monitor any matters for further developments that could affect the amount of the accrued liability that has been previously established.

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
Notes to the Consolidated Balance Sheet
December 31, 2023

## 11. Employee Benefit Plans

Bank of America sponsors a qualified noncontributory trusteed pension plan (Qualified Pension Plan), a number of noncontributory nonqualified pension plans, qualified and non-qualified defined contribution retirement plans, and postretirement health and life plans that cover eligible employees. The Bank of America Corporation Corporate Benefits Committee has overall responsibility for the administration of these benefit plans. Required disclosures are included in the December 31, 2023 Form 10-K of Bank of America.

### Defined Benefit Pension Plans
Certain of the Company's employees are covered by Bank of America's Qualified Pension Plan. Benefits earned under the Qualified Pension Plan have been frozen.

Bank of America has an annuity contract that guarantees the payment of benefits vested under a terminated U.S. pension plan (Other Pension Plan). Bank of America, under a supplemental agreement, may be responsible for, or benefit from, actual experience and investment performance of the annuity assets.

Bank of America's noncontributory, nonqualified pension plans are unfunded and provide supplemental defined pension benefits to certain eligible employees.

## 12. Employee Incentive Plans

Incentive plans are sponsored by Bank of America. Refer to the December 31, 2023 Form 10-K of Bank of America. The Company participates in a number of equity compensation plans sponsored by Bank of America, with awards being granted predominantly from the Bank of America Corporation Equity Plan (BACEP). Under this plan, Bank of America grants stock-based awards, including restricted stock units (RSUs), to eligible employees.

Grants in 2023 from the BACEP include RSUs that were authorized to settle predominantly in shares of common stock of Bank of America. Certain RSUs will be settled in cash or contain settlement provisions that subject these awards to variable accounting.

### Other Compensation Arrangements
The Company participates in Bank of America-sponsored deferred compensation plans in which employees who meet certain minimum compensation thresholds may participate on either a voluntary or mandatory basis. Contributions to the plans are made on a tax-deferred basis by participants. Participants' returns on these contributions may be indexed to various mutual funds and other funds. The Company also participates in several Bank of America sponsored, cash-based employee award programs, under which certain employees are eligible to receive future cash compensation, generally upon fulfillment of the service and vesting criteria for the particular program.

When appropriate, Bank of America maintains various investments as an economic hedge of its liabilities to participants under these deferred compensation plans and award programs, including derivative transactions.

## 13. Income Taxes

The reconciliation of the beginning unrecognized income tax benefits balance to the ending balance is presented in the table below:

| (Dollars in millions) | | |
|---|---|---|
| Balance at January 1, 2023 | $ | 25 |
| Increases related to positions taken during current year | | — |
| Increases related to positions taken during prior years | | — |
| Decreases in positions taken during prior years[1] | | — |
| Settlements | | — |
| Expiration of statute | | (3) |
| Balance at December 31, 2023 | $ | 22 |

At December 31, 2023, the balance of the Company's unrecognized income tax benefits which would, if recognized, affect the Company's effective tax rate, was $18.0 million. Included in the unrecognized income tax benefits balance are some items, the recognition of which would not affect the effective tax rate, such as the tax effect of certain temporary differences, the portion of gross state unrecognized income tax benefits that would be offset by the tax benefit of the associated federal deduction, and the portion of gross non-U.S. unrecognized income tax benefits that would be offset by tax reductions in other jurisdictions.

It is reasonably possible that the unrecognized income tax benefits balance may decrease by as much as $2.0 million during the next 12 months, since resolved items will be removed from the balance whether their resolution results in payment or recognition.

The Company files income tax returns in numerous state, local and non-U.S. jurisdictions each year. The Internal Revenue Service (IRS) and other tax authorities in countries and states in which the Company has significant business operations, examine tax

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
Notes to the Consolidated Balance Sheet
December 31, 2023

returns periodically (continuously in some jurisdictions). The table below summarizes the status of examinations, by major jurisdiction, for the Company at December 31, 2023.

*Tax Examination Status*

| Jurisdiction | Years under Examination [1] | Status |
|---|---|---|
| U.S. Federal | 2017-2021 | Field examination |
| California | 2015-2017 | Field examination |
| California | 2018-2021 | To begin in 2024 |
| New York | 2019-2021 | Field examination |

[1] All tax years subsequent to the above years remain open to examination.

Significant components of the Company's deferred tax assets and liabilities as of December 31, 2023 are presented in the following table.

*Deferred Tax Assets and Liabilities*

(Dollars in millions)

| | | |
|---|---|---|
| **Deferred tax assets** | | |
| Lease liabilities | $ | 249 |
| Loss carryforward | | 54 |
| Accrued expenses | | 119 |
| Other | | 34 |
| Gross deferred tax assets | | 456 |
| Valuation allowance | | (43) |
| **Total deferred tax assets, net of valuation allowance** | $ | 413 |
| | | |
| **Deferred tax liabilities** | | |
| Right-of-use lease assets | | 235 |
| Goodwill and intangible assets | | 236 |
| Other | | 14 |
| Gross deferred tax liabilities | $ | 485 |
| **Net deferred tax liability** | $ | 72 |

The table below summarizes the deferred tax assets and the related valuation allowance recognized for the net operating loss and tax credit carryforwards at December 31, 2023.

*Net Operating Loss and Tax Credit Carryforward Deferred Tax Assets*

| (Dollars in millions) | Deferred Tax Asset | | Valuation Allowance | | Net Deferred Tax Asset | | First Year Expiring |
|---|---|---|---|---|---|---|---|
| Net operating losses - U.S. states[1] | $ | 54 | $ | (19) | $ | 35 | Various |
| **Total loss carryforwards** | $ | 54 | $ | (19) | $ | 35 | |
| | | | | | | | |
| State tax credits | $ | 4 | $ | — | $ | 4 | After 2033 |
| Foreign tax credits | | 24 | | (24) | | — | |
| **Total tax credit carryforwards** | $ | 28 | $ | (24) | $ | 4 | |

[1] Amounts above include capital losses. The losses and related valuation allowances for U.S. states before considering the benefit of federal deductions were $68 million and $(24) million, respectively.

Management concluded that no valuation allowance was necessary to reduce the state tax credit carryforwards since estimated future taxable income will be sufficient to utilize these assets prior to expiration. Management's conclusion is supported by financial results and profit forecasts for the Company and Bank of America. However, a material change in those estimates could lead management to reassess such valuation allowance conclusions.

At December 31, 2023, the Company had a current income tax payable due to its affiliates of $660.0 million as a result of its inclusion in consolidated, combined, and unitary tax return filings with Bank of America under the intercompany tax allocation agreements with Bank of America.

MERRILL_WDNC_003027

**Merrill Lynch, Pierce, Fenner & Smith Incorporated and Subsidiaries**
Notes to the Consolidated Balance Sheet
December 31, 2023

## 14. Subsequent Events

The Company evaluates whether events, occurring after the balance sheet date but before the date the Consolidated Balance Sheet is available to be issued, require accounting as of the balance sheet date, or disclosure in the Consolidated Balance Sheet. The Company has evaluated such subsequent events through February 23, 2024, which is the issuance date of the Consolidated Balance Sheet.

In February 2024, the maturities of the Company's existing revolving senior unsecured lines of credit with NB Holdings, Bank of America, and MLBTC were extended to February 1, 2025.

There have been no other material subsequent events that occurred during such period that would require disclosure or recognition in the Consolidated Balance Sheet as of December 31, 2023.

## 15. Regulatory Requirements

### SEC Uniform Net Capital Rule

As an SEC registered broker-dealer and CFTC registered introducing broker, the Company is subject to the net capital requirements of the Securities Exchange Act of 1934 Rule 15c3-1 ("SEA Rule 15c3-1") and CFTC Regulation 1.17. The Company has elected to compute the minimum capital requirement in accordance with the "Alternative Standard" as permitted by SEA Rule 15c3-1.

In accordance with the Alternative Standard, the Company is required to maintain net capital in excess of $250 thousand or two percent of aggregate debit items, computed in accordance with the Formula for Determination of Customer Account Reserve Requirements of Brokers and Dealers, which was $134.3 million.

At December 31, 2023, the Company's regulatory net capital as defined by SEA Rule 15c3-1 was $5.8 billion and exceeded the minimum requirement of $134.3 million by $5.7 billion.

### SEC Customer Protection Rule

The Company is also subject to the customer protection requirements of SEA Rule 15c3-3, which requires, under certain circumstances, that cash or securities be deposited into a special reserve bank account for the exclusive benefit of customers. As of December 31, 2023, the Company had $11.1 billion of U.S. Government securities segregated in the special reserve bank account.

As a clearing broker and in accordance with SEA Rule 15c3-3, the Company computed a reserve requirement for the proprietary accounts of broker dealers (PAB). As of December 31, 2023, the Company had $5.0 million of cash segregated in the special reserve bank account.

The Company prepares SEC Form X-17A-5, FOCUS Report, Part II, on an unconsolidated basis. The following is a summary of certain consolidating financial information of the Company:

| (Dollars in millions) | Standalone (FOCUS Report)[1] | | Subsidiaries | | Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|
| **Total assets** | $ | **31,700** | $ | **371** | $ | **(302)** | $ | **31,769** |
| | | | | | | | | |
| Total liabilities | $ | 21,968 | $ | 218 | $ | (149) | $ | 22,037 |
| Total stockholder's equity | | 9,732 | | 153 | | (153) | | 9,732 |
| **Total liabilities and stockholder's equity** | $ | **31,700** | $ | **371** | $ | **(302)** | $ | **31,769** |

[1] There are no material differences between the FOCUS Report and the above schedule.

# EXHIBIT F
# FILED UNDER SEAL

# Exhibit A

**MERRILL LYNCH FINANCIAL ADVISOR
CAPITAL ACCUMULATION AWARD PLAN**

**As amended through January 1, 2002**

e:\plans\plandocs\fccaap.doc

ML 002369

## MERRILL LYNCH FINANCIAL ADVISOR
## CAPITAL ACCUMULATION AWARD PLAN

| | | | |
|---|---|---|---|
| I. | DEFINITION................................................................................................ | 1 |
| | 1. | Definitions ........................................................................................ | 1 |
| | | | |
| II. | ELIGIBILITY ............................................................................................... | 4 |
| | 2. | Eligible Employees........................................................................... | 4 |
| | | | |
| III. | THE AWARDS; APPRECIATION ............................................................... | 4 |
| | 3. | The Awards....................................................................................... | 4 |
| | | (a) | Criteria for Awards ................................................................ | 4 |
| | | (b) | Calculation of Amounts Payable for Awards Made Prior to January 2003 ............................................................................................ | 4 |
| | | (c) | Calculation of Amounts Payable for Awards Made in January 2003 and Thereafter ...................................................................... | 5 |
| | 4. | Shares Available Under the Plan ...................................................... | 5 |
| | | | |
| IV. | STATUS OF THE AWARD .......................................................................... | 5 |
| | 5. | No Trust or Fund Created ................................................................. | 5 |
| | 6. | Non-transferability ............................................................................ | 5 |
| | 7. | Relationship to Other Benefits ......................................................... | 5 |
| | | | |
| V. | PAYMENT OF THE AWARD ....................................................................... | 6 |
| | 8. | In General ......................................................................................... | 6 |
| | 9. | Termination of Employment .............................................................. | 6 |
| | | (a) | Death .................................................................................... | 6 |
| | | (b) | Retirement; Employment by Competitor ............................... | 6 |
| | | (i) | Awards for Performance Periods Prior to 1995..................... | 6 |
| | | (ii) | Awards for Performance Periods After 1994.......................... | 6 |
| | | (iii) | Employment by Competitor.................................................... | 7 |
| | | (iv) | Rule of 65.............................................................................. | 8 |
| | | (c) | Other Termination of Your Employment................................. | 7 |
| | | (i) | Awards for Performance Periods Prior to 1995..................... | 7 |
| | | (ii) | Awards for Performance Periods After 1994.......................... | 8 |
| | | (iii) | Disability, Leave of Absence of Transfer............................... | 8 |
| | | (d) | Alternative Payments of Termination .................................... | 8 |
| | | (e) | Termination of Employment After a Change in Control........... | 8 |
| | | (i) | Payment Upon Change in Control ......................................... | 8 |
| | | (ii) | Definition of "Change in Control" .......................................... | 9 |
| | | (iii) | Agreement Concerning a Change in Control ......................... | 9 |
| | | (iv) | Amendments Subsequent to Change in Control..................... | 10 |
| | | (v) | Cause.................................................................................... | 10 |
| | | (vi) | "Good Reason"....................................................................... | 11 |
| | 10. | Payment of Forfeited Amounts.......................................................... | 12 |
| | | (a) | Calculation of Payment ......................................................... | 12 |

i

ML 002370

JA478

|  |  |  |  |
|---|---|---|---|
| | (b) | Limitations on Payment of Forfeited Amounts | 12 |
| 11. | Withholding | | 14 |
| 12. | Designation of Beneficiary | | 14 |
| | (a) | Designation of Beneficiary and Alternate Beneficiary | 14 |
| | (b) | Change in Beneficiary | 14 |
| | (c) | In the Event of Death of the Beneficiary During Payment | 14 |
| VI. | ADMINISTRATIONOF THE PLAN | | 14 |
| | 13. Powers of the Committee | | 14 |
| VII. | MISCELLANEOUS PROVISIONS | | 15 |
| | 14. Changes in Capitalization | | 15 |
| | 15. Tax Litigation | | 15 |
| | 16. Employment Rights | | 16 |
| | 17. Amendment of the Plan | | 16 |
| | 18. Governing Law | | 16 |

ii

e:\plans\plandocs\fccaap.doc

## MERRILL LYNCH FINANCIAL ADVISOR
## CAPITAL ACCUMULATION AWARD PLAN

The Merrill Lynch Financial Advisor Capital Accumulation Award Plan reflects MLPF&S's commitment to reward top producing Private Client Employees. The purpose of the Award is to establish and retain a strong sales force and professional managers by recognizing the benefits of their contributions to MLPF&S.

The terms and conditions of the Merrill Lynch Financial Advisor Capital Accumulation Award Plan are as follows:

## I. DEFINITIONS

### 1.    Definitions.

*"Account"* means a book reserve established in the name of an eligible employee by MLPF&S, to which the Award or Awards granted to such eligible employee will be credited.

*"Account Balance"* as of a particular date means the vested portion of the Awards, plus any accrued Appreciation, in the Account as of that date.

*"Affiliate"* means any corporation, partnership, or other organization of which ML & Co. owns or controls, directly or indirectly, not less than 50 percent of the total combined voting power of all classes of stock or other equity interest.

*"Appreciation"* means the amounts accrued on the Awards under Section 3.

*"Awards"* means the amounts awarded pursuant to Section 3 of the Plan.

*"Award Date"* means a date, established by the Committee with respect to each Award, as of which such Award will be credited to the Account.

*"Award Year"* means the calendar year in which an Award Date falls.

"*Committee*" means the Management Development and Compensation Committee of the Board of Directors of ML & Co.

*"Common Stock"* means Merrill Lynch & Co., Inc. Common Stock, par value $1.33 1/3 per share.

1

e:\plans\plandocs\fccaap.doc

ML 002372

**JA480**

"*Common Stock Amount*" means the number derived by dividing the amount of an Award by the Fair Market Value of Common Stock as of the last day of the Performance Period, or such other date or period as may be established by the Committee, rounded to the nearest whole number. Such number represents the total number of shares of Common Stock you may receive on the Payment Date.

"*Company*" means ML & Co. and all of its Affiliates.

"*Disability*". You will be deemed to have incurred a "<u>Disability</u>" if you are entitled to receive benefits under the Merrill Lynch & Co., Inc. Long-Term Disability Plan.

"*Fair Market Value*" of Common Stock on any given date(s) shall be: (a) the mean of the high and low sales prices on the New York Stock Exchange Composite Tape on the date(s) in question, or, if the Common Stock shall not have been traded on any such date(s), the mean of the high and low sales prices on the New York Stock Exchange Composite Tape on the first day prior thereto on which the Common Stock was traded; provided, however, if the Distribution Date (as defined in the Rights Agreement) shall have occurred and the Rights shall then be represented by separate certificates rather than by certificates representing the Common Stock, there shall be added to such value calculated in accordance with (a) above, the mean of the high and low sales prices of the Rights on the New York Stock Exchange Composite Tape on the date(s) in question, or if the Rights shall not have been traded on any such date(s), the mean of the high and low sales prices on the New York Stock Exchange Composite Tape on the first day prior thereto on which the Rights were so traded; or (b) such other amount as may be determined by the Committee by any fair and reasonable means.

"*Fiscal Year*" means the annual period used by ML & Co. for financial accounting purposes.

"*Forfeited Amount*" means, with respect to an Award Date, the amount of Awards credited to Accounts as of such Award Date that have been forfeited by participants pursuant to Section 9.

"*Junior Preferred Stock*" means ML & Co.'s Series A Junior Preferred Stock, par value $1.00 per share.

"*Minimum Value*" means the dollar amount obtained by applying a per annum rate of 1%, compounded annually, to the amount of an Award, from and including the last day of the Performance Period, or such other date as may be established by the Committee, to and including the Payment Date.

"*ML & Co.*" means Merrill Lynch & Co., Inc.

2

e:\plans\plandocs\fccaap.doc

ML 002373

**JA481**

*"MLPF&S"* means Merrill Lynch, Pierce, Fenner & Smith Incorporated, a subsidiary of ML & Co.

*"Payment Calculation Date"* means, with respect to an Award, the first day of the month in which an Award first becomes payable under Section 8 or 9.

*"Payment Date"* means, with respect to any amount payable under the Plan, the date on which such amount first becomes payable.

*"Plan"* means this Merrill Lynch Financial Advisor Capital Accumulation Award Plan.

*"Performance Period"* means the period, generally a fiscal year of ML & Co., during which you generate the production/revenue or achieve the goals that are the basis of an Award.

"*Private Client Employee*" means a Financial Advisor (including a resident manager or producing manager), life market estate planning and business insurance specialist (EPBIS), broad market EPBIS, insurance planning specialist or mortgage and credit specialist, or any other employee group that the Committee, in its sole discretion, determines are private client employees for purposes of eligibility for awards under the Plan, as evidenced in the applicable Committee resolutions or instrument of grant.

*"Proportional Amount"* means the proportion that the amount of an Award credited to an Account with respect to an Award Date bears to the total amount of Awards credited to all Accounts with respect to such Award Date that have not been forfeited or paid pursuant to Section 9.

*"Retirement."* You will be deemed to have reached "Retirement" if your employment with the Company terminates (i) on or after you have attained your 65th birthday, (ii) when you cease employment on or after your 55th birthday and you have completed at least 10 years of service, including approved leaves of absence of one year or less, or (iii) at any age with the express approval of the Committee, in its sole discretion, upon a recommendation by the management of MLPF&S, in its sole discretion. (Participants should be aware that such recommendations will be considered only in exceptional cases.)

*"Rights"* means the Rights to Purchase Units of Series A Junior Preferred Stock issued pursuant to the Rights Agreement.

*"Rights Agreement"* means the Rights Agreement dated as of December 16, 1987 between ML & Co. and Manufacturers Hanover Trust Company, Rights Agent.

3

ML 002374

"*Rule of 65*" You will be deemed to be eligible for the Rule of 65 contained in Section 9(c)(iv) of FACAAP if, after December 31, 2001, your employment with the Company terminates other than for Cause (as defined herein) (i) on or after you have completed at least 20 years of service with the Company, including approved leaves of absence of one year or less, and (ii) your combined length of service with the Company and your age equals at least 65, and (iii) you are not eligible for "Retirement" under the Plan.

*"You"* means the individual participant in this Plan.

## II. ELIGIBILITY

### 2. Eligible Employees.

You are eligible for an Award if (i) you were, during the Performance Period, a Private Client Employee (regardless of whether you continue to be a Private Client Employee at the time of grant), (ii) you meet the applicable Award criteria determined pursuant to Section 3 (a) and (iii) as of the date of grant, your employment with the Company has not terminated for any reason other than death or Retirement.

## III. THE AWARDS; APPRECIATION

### 3. The Awards.

**(a)  Criteria for Awards.**  The criteria for Awards will be established periodically by the Committee, upon the recommendation of the management of the Company.  The criteria for Awards may vary from Performance Period to Performance Period and according to type of performance, and may be announced prior to, during, or following the applicable Performance Period. An Award will generally be stated as an amount equal to a percentage of achievement against established goals during a Performance Period. An Award may, however, be a fixed dollar amount and the amount of Awards may vary according to such factors as are established periodically by the Committee. Awards granted will be credited to the Account as of the Award Date.

**(b)  Calculation of Amounts Payable for Awards Made Prior to January 2003.**  There shall be computed, with respect to each Award, both the cash amount and the Common Stock Amount of such Award.  If, as of the Payment Calculation Date, the then Fair Market Value of the Common Stock Amount is equal to or greater than the Minimum Value of the Common Stock Amount, you will receive the Common Stock Amount in shares of Common Stock; however, if such Fair Market Value of the Common Stock Amount as of such date is less than such Minimum Value, you will receive such Minimum Value in cash.  If shares of Common Stock are unavailable for payment under the Plan or if the Committee shall otherwise, in its sole discretion, so direct, the

4

e:\plans\plandocs\fccaap.doc

ML 002375

**JA483**

Fair Market Value of such shares as of the Payment Calculation Date will instead be paid in cash.  Fractional shares shall be paid in cash.  Until receipt by you of any share of Common Stock hereunder, you will have no right, title, or interest in such share, including, without limitation, the right to receive dividends and to vote any shares.

       **(b)**    **Calculation of Amounts Payable for Awards Made in January 2003 and Thereafter.**  Each award shall be converted into a Common Stock Amount of such Award.  When the award is payable under the terms of the Plan, you will receive the Common Stock Amount in shares of Common Stock.  Fractional shares shall be paid in cash.  Until receipt by you of any share of Common Stock hereunder, you will have no right, title, or interest in such share, including, without limitation, the right to receive dividends and to vote any shares.

### 4. Shares Available Under the Plan.

       The total number of shares of Common Stock that may be issued under the Plan shall be 104,000,000 subject to adjustment as provided in Section 14. Shares of Common Stock issued under the Plan shall be treasury shares.

## IV.  STATUS OF THE AWARD

### 5. No Trust or Fund Created.

       Neither the Plan nor any grant made hereunder shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company and you or any other person.  To the extent that any person acquires a right to receive payments from the Company pursuant to a grant under the Plan, such right shall be no greater than the right of any unsecured general creditor of the Company.

### 6. Non-transferability.

       Your rights under the Plan, including the right to any amounts or shares payable, may not be assigned, pledged, or otherwise transferred except, in the event of your death, to your designated beneficiary or, in the absence of such a designation, by will or the laws of descent and distribution.

### 7. Relationship to Other Benefits.

       No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement, group insurance, or other employee benefit plan of the Company.  The Plan shall not preclude the stockholders of ML & Co., the Board of Directors or any committee thereof, or the Company from authorizing or approving other employee benefit plans or forms of incentive compensation, nor shall it limit or prevent the continued operation of other

5

ML 002376

**JA484**

incentive compensation plans or other employee benefit plans of the Company or the participation in any such plans by participants in the Plan.

## V. PAYMENT OF THE AWARD

### 8.  In General.

(a)  Subject to the provisions of Section 9, the Common Stock Amount or Minimum Value (other than for awards granted in or after January 2003) with respect to an Award as appropriate, will be paid to you in a lump sum (in shares of Common Stock or in cash, as determined under Section 3, in the case of the Common Stock Amount; or in cash, in the case of the Minimum Value) as soon as practicable following January 1 of the tenth year following the Award Year, provided that, for Awards made in and after January 2003 for Performance Years 2002 and thereafter, you will receive only the Common Stock Amount and such Common Stock Amount will be paid to you as soon as practicable following January 1 of the eighth year following the Award Year; and provided further that for Awards made in January 2001 and January 2002 to Financial Advisors employed by International Private Client, such awards will be paid to you, in the case of Awards for the 2000 Performance Period, as soon as practicable following January 1 of the fifth year following the Award Year, and, in the case of Awards made for the 2001 Performance Period, as soon as practicable following January 1 of the seventh year following the Award Year.

(b) If you (i) (A) are 65 years of age or older and (B) have completed 10 years or more of service; (ii) (A) are 60 years of age or older and (B) have completed 15 years or more of service, or (iii) (A) are 55 years of age or older and (B) have completed 20 years or more of service, you will be given a one-time option to cause the acceleration of the vesting of 50% of the total number of shares represented by the Common Stock Amount of all Awards granted to you under the Plan (in the order and in accordance with procedures determined by the Administrator) provided that you (1) sign a contract with the Corporation agreeing not to compete in any way with the business of the Corporation following your termination of employment and (2) agree to a formal account transition plan with Advisory Division, and provided further that in the event your employment terminates as a result of Retirement all non-accelerated Awards granted to you under the Plan that have not been paid and become payable as a result of such Retirement, shall (notwithstanding the Performance Period to which they relate) be payable in two equal installments the first of which shall be in January after the date of your  Retirement and the second of which shall be one year after the first payment. In the event that you satisfy the requirements of the preceding sentence the "Payment Calculation Date" for such vested awards shall be the first day of the month following the date that such conditions were met and the payment shall be made as soon as practicable following the Payment Calculation Date This provision shall not apply to awards made to Financial Advisors employed by International Private Client in January 2001 and January 2002.

6

e:\plans\plandocs\fccaap.doc

(c). Notwithstanding the foregoing or any other provision of this Plan (except Section 9(e), which shall control in the event of a conflict), the Committee directs that in the event of any allegation of any misconduct on your part, including any violation of any law, regulation, or Company policy, that payment of the Account Balance will be delayed until the Committee or the management of the Company, upon consultation with the General Counsel, either (i) has determined that payment is appropriate under the circumstances, or (ii) has made a determination that the Account Balance shall be forfeited by you.

## 9. Termination of Employment.

**(a)    Death.** If you die prior to payment pursuant to Section 8, then your Award(s) will be deemed to be 100% vested and the Account Balance will be paid to your beneficiary as soon as practicable.  In such event, the "Payment Calculation Date" will be deemed to be the first day of the month in which the death occurred.

**(b)    Retirement; Employment by Competitor.**  Termination of your employment as a result of Retirement or a change in your status in anticipation of Retirement shall have the following effect:

**(i)    Awards for Performance Periods Prior to 1995.**  With respect to Awards granted prior to and for the 1994 Performance Period (i.e., the Performance Period ended December 30, 1994), your Award(s) will vest and be paid to you as soon as practicable after your Retirement, in which case the "Payment Calculation Date" will be deemed to be the first day of the month in which the Retirement occurred. In addition, if you have entered into a formal account transition plan with Advisory Division that does not exceed one year and transferred to an IA code for not more than one year from Retirement, your Awards will be vested and paid to you as soon as practicable after such transfer, in which case the "Payment Calculation Date will be deemed to be the first day of the month in which such transfer occurred.

**(ii)    Awards for Performance Periods After 1994.**  With respect to Awards granted for Performance Periods after the 1994 Performance Period, your Account Balance will vest and become payable in two installments, the first payable as of the end of the year in which Retirement occurs (or, in the case of any Award granted after Retirement, as of the Award Date) and the second vested and payable as of the end of the year following the year in which Retirement occurs (subject to paragraph 9(b)(iii) below). Each such installment payment will be calculated based on 50% of the Award.   The Payment Calculation Date for each installment will be deemed to be the first business day of January of the year following the year in which the installment becomes payable (except that the Payment Calculation Date for the first installment in

7

e:\plans\plandocs\fccaap.doc

ML 002378

**JA486**

respect of any Award granted after Retirement shall be deemed to be the Award Date), and the payment shall be made as soon thereafter as practicable. Notwithstanding the foregoing, if the value of any Award as of the first day of the month in which the Retirement occurs is less than $500, such Award will be paid in a lump sum as soon as practicable after Retirement and the Payment Calculation Date will be deemed to be the first day of the month in which the Retirement occurs.

          **(iii)**    **Employment by Competitor.**    Notwithstanding the foregoing, if, within two years of the date of your Retirement, or at any time after such two-year period if amounts are still payable to you as provided in subsection (ii) above, you commence employment or become affiliated in any way with a company determined by the Committee (or its designee) to be a retail brokerage competitor of the Company or an Affiliate, any amount paid to you under this section shall be forfeited by you and returned to the Company and all amounts that have not yet vested under this section shall cease to vest and no longer be payable.

          **(iv)**    **Rule of 65.** If your employment terminates after December 31, 2001, and you qualify for the Rule of 65, your awards will continue to be outstanding and to vest in accordance with their original terms, provided that your awards will cease to be eligible for continued vesting and you will lose your award if you commence employment or become affiliated in any way with a company determined by the Committee (or its designee) to be a retail brokerage competitor of the Company or an Affiliate.

       **(c)**    **Other Termination of Your Employment.**    Termination of your employment for any reason other than death or Retirement shall have the following effect:

          **(i)**    **Awards for Performance Periods Prior to 1995.**    With respect to Awards granted prior to and for the 1994 Performance Period (i.e., the Performance Period ended December 30, 1994), you will receive only partial payment of an Award based upon the percentage of such Award that has vested as of December 31st of the year prior to the year in which the termination occurs and the remainder of the Award shall be deemed forfeited. Vesting of your Award(s) shall occur as of the end of the day on December 31st of each year in accordance with the following schedule:

| Year | Percentage of Total Award Vested at Year-End |
|------|------|
| Award Year | 0% |
| Second Year | 0% |
| Third Year | 0% |
| Fourth Year | 0% |

8

|              |      |
|--------------|------|
| Fifth Year   | 50%  |
| Sixth Year   | 60%  |
| Seventh Year | 70%  |
| Eighth Year  | 80%  |
| Ninth Year   | 90%  |
| Tenth Year   | 100% |

The vested amount will be paid to you in a lump sum as soon as practicable following such termination. In addition, (A) the "Payment Calculation Date" will be deemed to be the first day of the month in which such termination occurred and (B) anything else in this Plan to the contrary notwithstanding, you will receive no more than the Minimum Value with respect to an Award.

**(ii)** **Awards for Performance Periods After 1994** With respect to Awards granted for Performance Periods after the 1994 Performance Period excluding Awards made to Financial Advisors employed by International Private Client with respect to Performance Periods in 2000 and 2001 (which shall become vested in accordance with the terms of such Awards), your Award will become 100% vested at the end of the day on December 31st of the tenth  year following the Award Year, and the vested amount will be payable in accordance with Section 8 hereof. If your employment terminates for any reason other than death or Retirement on or prior to such date, you shall immediately forfeit your entire Award, unless the Committee, in its sole discretion, finds that the circumstances in the particular case so warrant and allows you to retain any portion or all of your Award, in which case it may, in its sole discretion, specify that you shall receive payment of no more than the Minimum Value with respect to the portion of the Award it allows you to retain.

**(iii)** **Disability, Leave of Absence or Transfer.** Your employment will not be considered as terminated if you are on an approved leave of absence, have incurred a Disability, or if you transfer or are transferred but remain in the employ of the Company.

**(d)** **Alternative Payments on Termination.** If your employment terminates and amounts become payable pursuant to Sections 9(a), 9(b), or 9(c), the Committee may, in its sole discretion, direct that the Account Balance be paid at some other time or that it be paid in installments (on which delayed payment(s) the Committee may determine that Appreciation will not accrue and/or that some other appreciation rate will be applied), which determination (including the manner of payment and application of an appreciation rate) may be changed by the Committee at any time.

**(e)** **Termination of Employment After a Change in Control.**

**(i)** **Payment Upon Change in Control.** Any other provision of this Plan to the contrary notwithstanding, in the event that a Change in Control of

9

e:\plans\plandocs\fccaap.doc

ML & Co. occurs and thereafter your employment is terminated by the Company without cause or by you for Good Reason, your Award(s) will be deemed to be 100% vested and your entire Account Balance will be paid to you (or to your beneficiary in the event of death) in cash in a lump sum, as promptly as possible after such termination of employment.  Your Common Stock Amount shall have a cash value equal to the highest of such Common Stock Amount's (A) Minimum Value on the date of your termination, (B) Fair Market Value on the date of your termination, or (C) highest Fair Market Value for any day during the 90-day period ending on the date of the Change in Control, and, if such termination occurs before the Payment Date, the "Payment Calculation Date" shall be deemed to be the date on which such termination occurs.  Payment shall be calculated according to Section 3 (as modified by this subsection (e)), regardless of whether a termination under this subsection (e) occurs on or before December 31 of the ninth year following an Award Year.

**(ii)    Definition of "Change in Control".**  A "Change in Control" means a change in control of ML & Co. of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), whether or not ML & Co. is then subject to such reporting requirement; provided, however, that, without limitation, a Change in Control shall be deemed to have occurred if:

(A)    any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, or any syndicate or group deemed to be a person under Section 14(d)(2) of the Exchange Act, is or becomes the "beneficial owner" (as defined in Rule 13d-3 of the General Rules and Regulations under the Exchange Act), directly or indirectly, of securities of ML & Co. representing 30% or more of the combined voting power of ML & Co.'s then outstanding securities entitled to vote in the election of directors of ML & Co.; or

(B)    during any period of two consecutive years individuals who at the beginning of such period constituted the Board of Directors of ML & Co. and any new directors, whose election by the Board of Directors or nomination for election by the stockholders of ML & Co. was approved by a vote of at least 3/4 of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof; or

(C)    all or substantially all of the assets of ML & Co. are liquidated or distributed.

**(iii)    Agreement Concerning a Change in Control.**  If ML & Co. executes an agreement, the consummation of which would result in the occurrence of the Change in Control as described in subparagraph (ii), then, with respect to a termination of employment, unless such termination is by the

10

Company for Cause, or by you other than for Good Reason, occurring after the execution of such agreement (and, if such agreement expires or is terminated prior to consummation, prior to such expiration or termination of such agreement), a Change in Control shall be deemed to have occurred as of the date of the execution of such agreement.

        **(iv)  Amendments Subsequent to Change in Control.** In the event of a Change in Control, no changes in the Plan and no adjustments, determinations or other exercises of discretion by the Committee or the Board of Directors, that were made subsequent to the Change in Control and that would have the effect of diminishing your rights or payments under the Plan or this Section 9(e), or of causing you to recognize income (for federal income tax purposes) with respect to your Account Balance prior to the actual distribution in cash to you of such Account Balance, shall be effective.

        **(v)  Cause.** Termination of your employment by the Company for "Cause" shall mean termination upon:

        (A)  your willful and continued failure substantially to perform your duties with the Company (other than any such failure resulting from your incapacity due to physical or mental illness or any such actual or anticipated failure resulting from termination by you for Good Reason) after a written demand for substantial performance is delivered to you by the Board of Directors, which demand specifically identifies the manner in which the Board of Directors believes that you have not substantially performed your duties; or

        (B)  the willful engaging by you in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise.

No act or failure to act by you shall be deemed "willful" unless done, or omitted to be done, by you not in good faith and without reasonable belief that this action or omission was in the best interest of the Company.

Notwithstanding the foregoing, you shall not be deemed to have been terminated for Cause unless and until there shall have been delivered to you a copy of a resolution duly adopted by the affirmative vote of not less than three quarters of the entire membership of the Board of Directors at a meeting of the Board called and held for such purpose (after reasonable notice to you and an opportunity for you, together with counsel, to be heard before the Board of Directors), finding that, in the good faith opinion of the Board of Directors, you were guilty of conduct set forth above in clause (A) or (B) of the first sentence of this Subsection and specifying the particulars thereof in detail.

        **(vi)  "Good Reason"** shall mean your termination of your employment with the Company if, without your written consent, any of the following circumstances shall occur:

11

e:\plans\plandocs\fccaap.doc

ML 002382

      (A)   a meaningful and detrimental alteration in your position or in the nature or status of your responsibilities from those in effect immediately prior to the Change in Control;

      (B)   a reduction by the Company of your base salary as in effect just prior to the Change in Control;

      (C)   the relocation of the office of the Company where you were employed at the time of the Change in Control (the "CIC Location") to a location more than fifty miles away from the CIC Location, or the Company's requiring you to be based more than fifty miles away from the CIC Location (except for required travel on the Company's business to an extent substantially consistent with your business travel obligations just prior to the Change in Control);

      (D)   the failure of the Company to continue in effect any benefit or compensation plan, including, but not limited to, this Plan, the Company's retirement program, or the Company's Long-Term Incentive Compensation Plan, Employee Stock Purchase Plan, 1978 Incentive Equity Purchase Plan, cash incentive compensation or other plans adopted prior to the Change in Control, in which you are participating at the time of the Change in Control, unless an equitable arrangement (embodied in an ongoing substitute or alternative plan) has been made with respect to such plan in connection with the Change in Control, or the failure by the Company to continue your participation therein on at least as favorable a basis, in terms of both the amount of benefits provided and the level of your participation relative to other participants, as existed at the time of the Change in Control; or

      (E)   the failure of the Company to continue to provide you with benefits at least as favorable as those enjoyed by you under any of the Company's pension, life insurance, medical, health and accident, disability, deferred compensation or savings plans in which you were participating at the time of the Change in Control, the taking of any action by the Company which would directly or indirectly materially reduce any of such benefits or deprive you of any material fringe benefit enjoyed by you at the time of the Change in Control, or the failure by the Company to provide you with the number of paid vacation days to which you are entitled on the basis of years of service with the Company in accordance with the Company's normal vacation policy in effect at the time of the Change in Control.

## 10. Payment of Forfeited Amounts.

      **(a)**   **Calculation of Payment.** With respect to any Award Date prior to December 27, 1991, a Proportional Amount of the Forfeited Amount with respect to such Award Date, plus Appreciation on such Proportional Amount, will be distributed to each participant (or, in the event of death, to his or her beneficiary)

12

e:\plans\plandocs\fccaap.doc

ML 002383

who has become 100% vested, at the same time that the Award credited to an Account as of such Award Date is paid to such participant (or beneficiary). For purposes of calculating the Proportional Amounts and Appreciation thereon (i) the Payment Calculation Date for a Proportional Amount will be deemed to be the Payment Calculation Date with respect to the Award to which the Proportional Amount relates, and (ii) the Proportional Amount payable to a participant will be determined as of the date such participant becomes 100% vested, without adjustment for amounts of Awards forfeited after such date.

**(b)    Limitations on Payment of Forfeited Amounts.** With respect to Award Dates after December 27, 1991, you shall no longer become entitled to receive a Proportional Amount of any Forfeited Amounts forfeited on or after such date, and no adjustments shall be made to your Account for any Forfeited Amounts.

## 11. Withholding.

The Company shall have the right, before any payment is made or a certificate for any shares is delivered or any shares are credited to any brokerage account, to deduct or withhold from any payment under the Plan any Federal, state, or local taxes, including transfer taxes, required by law to be withheld or to require you or your beneficiary or estate, as the case may be, to pay any amount, or the balance of any amount, required to be withheld.

## 12. Arbitration.

Any claim or dispute concerning your individual rights or entitlements under or otherwise relating to this Plan shall be settled by arbitration before either the American Arbitration Association ("AAA" or JAMS (formerly the "Judicial Arbitration and Mediation Services") depending upon which of these forums you choose, in accordance with the Commercial Dispute Resolutions Procedures of the AAA or the Comprehensive Arbitration Rules and Procedures of JAMS, provided however, that: (1) the arbitrator shall be required to adhere to established principles of substantive law and the governing burdens of proof; (2) the arbitrator shall be prohibited for disregarding, adding to or modifying the terms of the Plan; (3) the arbitrator shall be an attorney licensed to practice law who is experienced in similar matters; and (4) more than one employee or former employee may consolidate their claims and join in the same arbitration proceeding only with the consent of all the parties to the proceeding. No claim or dispute concerning rights or entitlements under or otherwise relating to the Plan may be brought or litigated in a class action. The award rendered in this arbitration shall be final and binding, and judgment upon the award may be entered in any court of competent jurisdiction.

13

e:\plans\plandocs\fccaap.doc

ML 002384

**JA492**

## 13. Designation of Beneficiary.

**(a)     Designation of Beneficiary and Alternate Beneficiary.**  You may designate, in a writing delivered to ML & Co. before your death, a beneficiary to receive payments in the event of your death.  You may also designate an alternate beneficiary to receive payments if the primary beneficiary does not survive you.  You may designate more than one person as your beneficiary or alternate beneficiary, in which case such persons would receive payments as joint tenants with a right of survivorship as to the amounts not yet paid from your Account.  If you die without a surviving beneficiary, then your estate will be considered your beneficiary.

**(b)     Change in Beneficiary.**  You may change your beneficiary or alternate beneficiary (without the consent of any prior beneficiary) in a writing delivered to ML & Co. before your death.  Unless you state otherwise in writing, any change in beneficiary or alternate beneficiary will automatically revoke prior designations only of your beneficiary or only of your alternate beneficiary, as the case may be, under this Plan only; designations under other Plans will remain unaffected.

**(c)     In the Event of Death of the Beneficiary During Payment.**  If a beneficiary who is receiving payments hereunder dies before all of the payments have been made and if there is no surviving joint tenant, the Account Balance will be paid as soon as practicable in one lump sum to such beneficiary's estate and not to any alternate beneficiary you may have designated.

## VI. ADMINISTRATION OF THE PLAN

## 14.     Powers of the Committee.

The Committee has full power and authority to interpret, construe, and administer the Plan and to adopt, amend, and rescind such rules and regulations as, in its opinion, may be advisable for the administration of the Plan.  The Committee's interpretations and construction hereof, and actions hereunder, including any determinations regarding the amount or recipient of any payments and whether any amount of Common Stock payable hereunder will instead be paid in the equivalent amount of cash, will be binding and conclusive on all persons for all purposes. The Committee will not be liable to any person for any action taken or omitted in connection with the interpretation and administration of this Plan unless attributable to its willful misconduct or lack of good faith.

## VII. MISCELLANEOUS PROVISIONS

## 15.     Changes in Capitalization.

14

e:\plans\plandocs\fccaap.doc

ML 002385

**JA493**

Any other provision of the Plan to the contrary notwithstanding (except for Section 9(e), which shall control in the event of a conflict), if any change shall occur in or affect Common Stock on account of a merger, consolidation, reorganization, stock dividend, stock split or combination, reclassification, recapitalization, or distribution to holders of Common Stock (other than cash dividends) or, if in the opinion of the Board of Directors of ML & Co. (the "Board of Directors"), after consultation with ML & Co.'s independent public accountants, changes in ML & Co.'s accounting policies, acquisitions, divestitures, distributions, or other unusual or extraordinary items have disproportionately and materially affected the value of Common Stock, the Board of Directors may make such adjustments, if any, that it may deem necessary or equitable, in its sole discretion, in order to preserve the benefit of this Plan for ML & Co. and its employees and stockholders, in the number of shares subject to or reserved for issuance under this Plan and in the method of calculating Appreciation. In the event of a change in the presently authorized Common Stock that is limited to a change in the designation thereof or a change of authorized shares with par value into the same number of shares with a different par value or into the same number of shares without par value, the shares resulting from any such change shall be deemed to be Common Stock within the meaning of this Plan and in the method of calculating Appreciation. In the event of any other change affecting the Common Stock, such adjustment may be made as may be deemed equitable by the Board of Directors to give proper effect to such event, in its sole discretion, in order to preserve the benefit of this Plan for ML & Co. and its employees and stockholders.

## 16.    Tax Litigation.

The Company shall have the right to contest, at its expense, any tax ruling or decision, administrative or judicial, on any issue that is related to the Plan and that the Company believes to be important to participants in the Plan and to conduct any such contest or any litigation arising therefrom to a final decision.

## 17.    Employment Rights.

Neither the Plan nor any action taken hereunder shall be construed as giving any employee of the Company the right to become a participant, and a grant under the Plan shall not be construed as giving any participant any right to be retained in the employ of the Company.

## 18.    Amendment of the Plan.

The Board of Directors or the Committee (but no other committee of the Board of Directors) may modify, amend or terminate the Plan at any time. No such modification, amendment or termination will, without your consent, adversely affect your rights in relation to an Award after it has been granted to you.

15

e:\plans\plandocs\fccaap.doc

ML 002386

**JA494**

**19.    Governing Law.**

This Plan will be construed in accordance with and governed by the laws of the State of New York as to all matters, including, but not limited to, matters of validity, construction, and performance.

16

e:\plans\plandocs\fccaap.doc

ML 002387

# Exhibit B

**MERRILL LYNCH GROWTH AWARD PLAN
FOR FINANCIAL ADVISORS**

**ML000314**

### MERRILL LYNCH GROWTH AWARD PLAN
### FOR FINANCIAL ADVISORS

#### Table of Contents

ARTICLE I  NAME, PURPOSE, AND EFFECTIVE DATE ............................................................ 1

ARTICLE II DEFINITIONS.................................................................................................................. 1

ARTICLE III  ELIGIBILITY................................................................................................................ 3
   3.1 Eligible Employees................................................................................................................ 3

ARTICLE IV GROWTH AWARDSANNUAL AWARDS ............................................................. 4
   4.1 Amount of Growth Awards ................................................................................................. 4
   4.2 Crediting of Accounts......................................................................................................... 4

ARTICLE V ADJUSTMENT OF ACCOUNTS .............................................................................. 4
   5.1 Annual Adjustment of Accounts ....................................................................................... 4
   5.2 Statement of Account.......................................................................................................... 4

ARTICLE VI PAYMENT OF GROWTH AWARD BALANCES................................................... 4
   6.1 General Rule......................................................................................................................... 4
   6.2 Withholding of Taxes ......................................................................................................... 5
   6.3 Domestic Relations Orders ................................................................................................ 5

ARTICLE VII THE EFFECT OF TERMINATION OF EMPLOYMENTS ..................................... 5
   7.1 Death .................................................................................................................................... 5
   7.2 Termination Prior To Vesting Date..................................................................................... 5
   7.3 Retirement Prior to Vesting Date ....................................................................................... 6
   7.4 Competition.......................................................................................................................... 6
   7.5 Termination for Cause or Misconduct................................................................................ 7
   7.6 Termination of Employment After a Change in Control .................................................... 7

ARTICLE VIII STATUS OF AWARDS AND ACCOUNTS ........................................................ 10
   8. 1 NO TRUST OF FUND CREATED; GENERAL CREDITOR STATUS.............................. 10
   8.2 NON-ASSIGNABILITY ...................................................................................................... 10
   8.3 Relationship To Other Benefits ........................................................................................ 10

ARTICLE IX BENEFICIARY........................................................................................................... 10
   9.1 Designation of Beneficiary ............................................................................................... 10
   9.2 Change of Beneficiary....................................................................................................... 10
   9.3 Beneficiary Death After Commencement of Payments
   9.4 Payment On Behalf Of Incompetents ............................................................................. 10

ARTICLE X  AMENDMENT AND TERMINATION ........................................................ 11
    10.1 Reservation of Rights.................................................................................. 11

ARTICLE XI  ADMINISTRATION OF THE PLAN ..................................................... 11
    11.1 Powers Of The Administrator ..................................................................... 11
    ..................................................................................................................................

ARTICLE XII  MISCELLANEOUS PROVISIONS....................................................... 11
    12.1 Books and Records Controlling ................................................................. 11
    12.2 Successors and Assigns ............................................................................. 11
    12.3 Severability ................................................................................................ 11
    12.4 Litigation.................................................................................................... 12
    12.5 Headings Are Not Controlling ................................................................... 12
    12.6 Governing Law............................................................................................ 12

ii

ML000316

JA499

## MERRILL LYNCH GROWTH AWARD PLAN
## FOR FINANCIAL ADVISORS

### ARTICLE I

### Name, Purpose, and Effective Date

The name of the Plan is the Merrill Lynch Growth Award Plan.

The Plan, established under the Financial Advisor Compensation Program as in effect from time to time, is intended to be unfunded and maintained primarily for the purpose of providing long-term incentive compensation, subject to certain conditions, to a select group of financial advisors, who remain in the employ of the Company until completion of the period of service specified in this Plan. All decisions concerning who is to be considered eligible to participate in the Plan and who is to receive awards under this Plan are to be made by the Company.

The Plan is effective for the Plan Year commencing January 1, 2002, and each Plan Year thereafter.

### ARTICLE II

### Definitions

Unless otherwise required by the context, each of the following terms shall have the meaning indicated for that term:

*"Account"* means a book reserve established in the name of an eligible employee by MLPF&S, to which the Award or Awards granted to such eligible employee will be credited.

*"Account Balance"* means, as of any date, vested portion of all Growth Award credited to a Participant's Account adjusted in accordance with Section 5.1 to reflect the Growth Rate and any payments made from the Account prior to that date.

*Administrator"* means the Head of Human Resources of ML & Co., or his or her functional successor.

*"Advisory Division Administration"* means the appropriate members of management of the domestic Advisory Division of MLPF&S or its functional successor.

*"Affiliate"* means any corporation partnership, or other organization of which ML & Co. owns or controls, directly or indirectly, not less than 50% of the total combined voting power of all classes of stock or other equity interest.

*"Award Date"* means a date, established by Advisory Division Administration with respect to each Award, as of which such Award will be credited to the Account.

*"Award Year"* means the calendar year in which an Award Date falls.

*"Beneficiary"* means any person(s) or entity(ies) designated as such in accordance with Article IX.

*"Code"* means the Internal Revenue Code of 1986, as amended from time to time.

*"Company"* means ML & Co. and all of its Affiliates.

*"Disability"* means a physical or mental impairment of a Participant which counts towards the individual's satisfaction of the waiting period under the ML & Co. Basic Long Term Disability Plan, as amended from time to time, and which thereafter entitles the individual to receive benefits under that plan.

*"Eligible Employee"* means, for a given Plan Year, an Employee who (a) at the end of the performance period is a Global Private Client Employee (regardless of whether you continue to be a Global Private Client Employee at the time of grant), (b) you meet the eligibility criteria determined pursuant to Section 3(b), (c) with respect to such Production Credits, is paid from the Company's domestic based payroll (but is not a U.S. citizen or "green card" holder who is employed outside the United States); and (d) as of the date of grant, your employment with the Company has not terminated for any reason other than, death, Retirement or Rule 65

*"Employee"* means a financial advisor or any other employee group that the Administrator, in his or her sole discretion, determines are employees for purposes of eligibility for Annual Awards under the Plan. An individual who held such position during a Plan Year but who transfers to another position within the Company shall continue to be an Employee with respect to such Plan Year as long as his or her employment with the Company continues. No individual who would otherwise be eligible for an Annual Award but who is not an employee of the Company at the date of grant shall be entitled to an Annual Award under the Plan unless such individual's employment was terminated as a result of death, Retirement or Rule 65.

*"Financial Advisor"* means a domestic financial advisor employee of MLPF&S

*"Fiscal Year"* for a given Plan Year means the annual period used by ML & Co. for financial accounting purposes that ends with or prior to December 31 of that Plan Year.

*"Growth Award"* means an award determined by the Advisory Division Administration for credit to a Participant's Account under the plan.

*"Growth Rate"* means with respect to an individual Financial Advisor, for each Growth Award shall mean the higher of (A) the percentage (which shall not exceed 20%) represented by the increase in such individual Financial Advisor's production credits over the prior Fiscal Year' production credits, as determined by Advisory Division Administration or (B) 2%.

*"ML & Co."* means Merrill Lynch & Co., Inc.

*"MLPF&S"* means Merrill Lynch, Pierce, Fenner & Smith Incorporated.

*"Participant"* for a given Plan Year means an Eligible Employee who has satisfied the criteria set forth in Article III for receiving a Growth Award.

2

ML000318

JA501

"*Plan*" means this Merrill Lynch Growth Plan for Selected Financial Advisors.

"*Plan Year*" means a calendar year commencing on January 1, 2002, or on any January 1 thereafter.

"*Retirement.*" You will be deemed to have reached "<u>Retirement</u>" if your employment with the Company terminates other than for cause (i) on or after you have attained your 65th birthday, (ii) when you cease employment on or after your 55th birthday and you have completed at least 10 years of service, including approved leaves of absence of one year or less, or (iii) at any age with the express approval of the Advisory Division Administration, in its sole discretion, upon a recommendation by the management of MLPF&S, in its sole discretion. (Participants should be aware that such recommendations will be considered only in exceptional cases.)

"*Rule of 65*" You will be deemed to be eligible for the Rule of 65 contained in Section if your employment with the Company terminates other than for cause (i) on or after you have completed at least 20 years of service with the Company, including approved leaves of absence of one year or less, and (ii) your combined length of service with the Company and your age equals at least 65, and (iii) you are not eligible for "Retirement" under the Plan.

"*Production Credits*" of an Employee for a given Plan Year means the production credits of such Employee for the applicable Fiscal Year as determined under the Financial Advisor compensation plan applicable to such Employee as in effect from time to time.

"*Vesting Date*" means for any individual Award means a date that is four full years after the Award has been granted.

"*Years of Service*" means the number of "years of service" reflected on the records of the Company for purposes of determining the Participant's rights under the Merrill Lynch & Co., Inc. Retirement Accumulation Plan.

ARTICLE III

<u>ELIGIBILITY</u>

**3.1. Eligible Employees.**

(a) **General Rule.** An employee will be eligible to receive award if he or she (i) was employed during the Performance Period, a Financial Advisor  (regardless of whether he or she continues to be a Financial Advisor at the time of grant), (ii) he or she met the applicable Growth Award criteria determined by Advisory Division Administration, using the criteria described below, as of the date of grant, his or her employment with the Company has not terminated for any reason other than death, Rule 65 or Retirement.

(b)    **Criteria for Awards.**   The criteria for Growth Awards will be established periodically by the Advisory Division.   The criteria for Awards may vary from Performance Period to Performance Period and according to type of performance, and may be announced prior to, during, or following the applicable Performance Period.  An Award will generally be stated as an amount equal to a percentage of achievement against established goals during a Performance Period.  A Growth Award may, however, be a fixed dollar amount and the amount

3

ML000319

**JA502**

of Growth Awards may vary according to such factors as are established periodically by the Advisory Division.

## ARTICLE IV

### Growth Awards

**4.1    Amount of Growth Awards**

Growth Awards under this Plan shall be made for a Plan Year only to Eligible Employees who are Participants for the Plan Year. The amount of each Participant's Growth Award shall be determined in accordance with the criteria in effect for the Performance Period to which the Award relates.

**4.2    Crediting of Accounts**

A Participant's Annual Award for a Plan Year shall be credited to the Participant's Account as soon as practicable (but in no event later than 120 days) after the last day of the applicable Fiscal Year.

## ARTICLE V

### Adjustment of Accounts

**5.1    Adjustment of Annual Awards**

Each Annual Award shall be increased annually to by the higher of the Participant's Growth Rate (not to exceed 20%) or 2%. The adjustment shall be made as soon as practicable (but in no event later than 120 days) after the last day of the applicable Fiscal Year.

**5.2    Statement of Account**

Each Participant for whom an Account is maintained under the Plan will be able to access account balance information via the Merrill Lynch website.

## ARTICLE VI

### Payment of Growth Award Balances

**6. 1    General Rule**

Subject to Article VII below, a Participant's individual Growth Awards shall be paid on the Vesting Date for the particular Growth Awards. Payment of unvested Growth Awards shall be made only upon a Participant's death. In the case of Termination due to Retirement, where the Participant is not deemed to be in Competition under Section 7.4: (a) the payments shall vest in two annual installments, the first of which shall be paid after the end of the calendar year in which the Retirement occurs (or if Retirement occurs prior to the grant of an Annual Award, as

4

soon as practicable after such grant) and the remainder of which shall be paid after the end of the subsequent calendar year(s) (each such installment payment will be calculated based on 50% of the Award) and (b) in case of death, a then the unpaid balance of the Account will be paid to the Beneficiary in a single sum as soon as practicable following the Participant's death. Notwithstanding the foregoing, if the value of any Award as of the first day of the month in which the Retirement occurs is less than $500, such Award will be paid in a lump sum as soon as practicable after Retirement.

A Participant's Account Balance may be further deferred if the Participant meets **all of** the eligibility requirements for any other deferred compensation plan that, in the discretion of the Administrator, may be offered by the Company. In such event a Participant may elect to defer amounts otherwise payable under this Plan under such other plan filling out such forms as the Administrator may determine in the calendar year prior to the calendar year immediately preceding the date on which such amounts would otherwise be payable.

### 6.2 Withholding of Taxes

The Company will deduct or withhold from any amounts to be credited to an Account, or from any payments to be made hereunder, any federal, state, local income or employment taxes as required under applicable laws to be withheld, or require the Participant or the Beneficiary to pay any such amount, or the balance of any such amount.

### 6.3    Domestic Relations Orders.

ML & Co. will pay to, or to the Participant for the benefit of, the Participant's spouse or former spouse, the portion of the Participant's <u>Vested</u> Growth Awards specified in a valid court order entered in a domestic relations proceeding involving the Participant's divorce or legal separation.  Such payment will be made net of any amounts the Company may be required to withhold under applicable federal, state or local law.  Growth Awards that have not vested are not the property of the Participant and are NOT permitted to be paid. The Company shall be entitled to withhold from the remaining <u>Vested</u> Growth Awards payable to the Participant amounts required under applicable federal, state or local law to be withheld from the Participant in connection with a payment to the Participant's spouse.

## <u>ARTICLE VII</u>

## <u>The Effect of Termination of Employment</u>

### 7.1 Death

Upon the death of a Participant prior to the Vesting Date, then his or her Growth Awards will be deemed to be 100% vested and the Account Balance will be paid to his or her designated beneficiary or estate as soon as practicable.

### 7.2    Termination Prior to the Vesting Date

A Participant's Growth Awards shall cease to vest and shall not be payable to the Participant in the event of the Participant's Termination of employment with the Company for any reason other than his or her death, Rule 65 or Retirement prior to the Vesting Date for the relevant Growth Awards

5

**(a)    Rule of 65.** If a Participant's employment terminates and he or she qualifies for the Rule of 65, the Growth Awards granted to the Participant will continue to be outstanding and to vest in accordance with their original terms (except that a 2% floor will only be applied for one full year following the date of termination) and provided that the Growth Awards will cease to be eligible for continued vesting and will be eliminated if the Participant you commences employment or become affiliated in any way with a company (including self-employment) determined by the Advisory Division (or its designee) to be a retail brokerage competitor of the Company or an Affiliate.

**(b)    Disability.** If a Participant qualifies for Disability, the Growth Awards granted to the Participant will continue to be outstanding and to vest in accordance with their original terms (except that a 2% floor will only be applied for one full year following the date of termination) and provided that the Growth Awards will cease to be eligible for continued vesting and will be eliminated if the Participant commences employment or become affiliated in any way with a company (including self-employment) determined by the Advisory Division (or its designee) to be a retail brokerage competitor of the Company or an Affiliate.

### 7.3  Retirement Prior to the Vesting Date

If a Participant terminates his or her employment as a result of Retirement, unvested Growth Award(s) will vest and become the Account Balance will become payable in two installments as specified in Section 6.1.

### 7.4    Competition

**Employment by Competitor.** Notwithstanding the foregoing, if, within two years of the date of a Participant's Retirement, or at any time after such two-year period if amounts are still payable as provided in Section 6.1 above, the Participant commences employment or become affiliated in any way with a company determined by the Advisory Division (or its designee) to be a retail brokerage competitor of the Company or an Affiliate, any amount paid under Section 6.1 shall be forfeited by you and returned to the Company and all amounts that have not yet vested under Section 6.1 shall cease to vest and no longer be payable.

**(a)    Procedure.** A Participant's Account Balance will cease to vest and be payable in the event the Advisory Division in its sole discretion, determines that the Participant has been in Competition with the Company at any time during the period ending four years after the Participant's termination as a result of Retirement, Disability or the Rule of 65. The Participant shall have no further interest in his or her Account Balance from the date the Administrator makes such a determination and notifies the Participant at his or her last known address on the books and record of the Company, and no further payments of any award amounts  under the Plan will be made to the Participant and his or her Beneficiary.

**(b)    Competition Defined.** For purposes of Section 7.4, "Competition" means the Participant's application for or acceptance of Employment with, or direct or indirect inducement or recruitment of any other employee of the Company to apply for or accept Employment with, any other person or entity determined by the Advisory Division (or its designee) to be a retail brokerage competitor of the Company or an Affiliate. For purposes of this Section 7.4(b), the term "Employment" shall include the performance of services as an employee and as an independent contractor (self-employed or otherwise) or consultant.

6

ML000322

### 7.5 Termination for Cause or Misconduct

A Participant's Account is subject to forfeiture in the event the Administrator, in his or her sole discretion, determines that the Participant has engaged in any misconduct relating to his or her employment with the Company, including any violation of any law, regulation or Company policy. In the event of any allegation of any such misconduct, any scheduled payment of the Account Balance will not be made unless and until the Administrator, upon consultation with the Director of Compliance of MLPF&S or his or her designee or functional successor, has determined that payment is appropriate under the circumstances.

### 7.6 Termination of Employment After a Change In Control

(a)    **Payment Upon Change in Control.**  Any other provision of this Plan to the contrary notwithstanding, in the event that a Change in Control of ML & Co. occurs and thereafter a Participant's employment is terminated by the Company without Cause or by the Participant for Good Reason, the Participant's entire Account Balance will be paid to the Participant (or to the Participant's Beneficiary in the event of death) in cash in a single sum, as promptly as possible after such termination of employment.

(b)    **Definition of "Change in Control".**  A "Change in Control" means a change in control of ML & Co. of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), whether or not ML & Co. is then subject to such reporting requirement; provided, however, that, without limitation, a Change in Control shall be deemed to have occurred if:

(i)    any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, or any syndicate or group deemed to be a person under Section 14(d)(2) of the Exchange Act, other than ML & Co.'s Employee Stock Ownership Plan, is or becomes the "beneficial owner" (as defined in Rule 13d-3 of the General Rules and Regulations under the Exchange Act), directly or indirectly, of securities of ML & Co. representing 30% or more of the combined voting power of ML & Co.'s then outstanding securities entitled to vote in the election of directors of ML & Co.; or

(ii)    during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of ML & Co. and any new directors, whose election by the Board of Directors or nomination for election by the stockholders of ML & Co. was approved by a vote of at least 3/4 of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof; or

(iii)    all or substantially all of the assets of ML & Co. are liquidated or distributed.

(c)    **Agreement Concerning a Change in Control.**  If ML & Co. executes an agreement, the consummation of which would result in the occurrence of the Change in Control as described in Section 8.4(b), then, with respect to a termination of employment, unless such termination is by the Company for Cause, or by the Participant other than for Good Reason, occurring after the execution of such agreement (and, if such agreement expires or is terminated prior to consummation, prior to such expiration or termination of such agreement), a

ML000323

Change in Control shall be deemed to have occurred as of the date of the execution of such agreement.

(d)    **Amendments Subsequent to Change in Control.**  In the event of a Change in Control, no changes in the Plan and no adjustments, determinations or other exercises or discretion by the Administrator or ML & Co., that were made subsequent to the Change in Control and that would have the effect of diminishing a Participant's rights or payments under the Plan, or of causing the Participant to recognize income (for federal income tax purposes) with respect to the Participant's Account Balance prior to the actual distribution in cash to a Participant of such Account Balance, shall be effective.

(e)    **Cause.**  Termination of a Participant's employment by the Company for "Cause" shall mean termination upon:

(i)    the Participant's willful and continued failure substantially to perform the Participant's duties with the Company (other than any such failure resulting from the Participant's incapacity due to physical or mental illness or any such actual or anticipated failure resulting from termination by the Participant for Good Reason) after a written demand for substantial performance is delivered to the Participant by National Sales Management, which demand specifically identifies the manner in which National Sales Management believes that the Participant has not substantially performed his or her duties; or

(ii)    the willful engaging by the Participant in conduct, which is demonstrably and materially injurious to the Company, monetarily or otherwise.

No act or failure to act by the Participant shall be deemed "willful" unless done, or omitted to be done, by the Participant not in good faith and without reasonable belief that this action or omission was in the best interest of the Company.

Notwithstanding the foregoing, a Participant shall not be deemed to have been terminated for Cause unless and until there shall have been delivered to the Participant a copy of a written finding by National Sales Management (issued after reasonable notice to the Participant and an opportunity for the Participant, together with counsel, to be heard), that, in the good faith opinion of National Sales Management, the Participant was guilty of conduct set forth above in clause (i) or (ii) of the first sentence of this Section 8.4(e) and specifying the particulars thereof in detail.

(f)    "Good Reason" shall mean a Participant's termination of his or her employment with the Company if, without the Participant's written consent, any of the following circumstances shall occur:

(i)    a meaningful and detrimental alteration in the Participant's position or in the nature or status of the Participant's responsibilities from those in effect immediately prior to the Change in Control;

(ii)    a reduction by the Company of the Participant's base salary as in effect just prior to the Change in Control;

(iii)    the relocation of the office of the Company where the Participant was employed at the time of the Change in Control (the "CIC Location") to a location more than fifty miles away from the CIC Location (except for required travel on the

8

Company's business to an extent substantially consistent with the Participant's business travel obligations just prior to the Change in Control); or

(iv)    the failure of the Company to continue to provide the Participant with benefits at least as favorable as those enjoyed by the Participant under any of the Company's pension, life insurance, medical, health and accident disability, deferred compensation or savings plans in which the Participant was participating at the time of the Change in Control, the taking of any action by the Company which would directly or indirectly materially reduce any of such benefits or deprive the Participant of any material fringe benefit enjoyed by the Participant at the time of the Change in Control, or  the failure by the Company to provide accordance with the Company's normal vacation policy in effect at the time of the Change in Control.

## ARTICLE VIII

### Status of Awards and Accounts

8.1    No Trust or Fund Created; General Creditor Status

Nothing contained herein and no action taken pursuant hereto will be construed to obligate the Administrator to invest any assets of ML & Co. in any Selected Benchmark Return Option, nor to establish a trust or separate fund of any kind or a fiduciary relationship between ML & Co. and a Participant, Participant's Beneficiary or estate, or any other person or entity.  The Administrator may, if it so chooses, earmark any assets of ML & Co. to meet its obligations hereunder.  Title to and beneficial ownership of any funds represented by the Account will at all times remain in ML & Co.; such funds will continue for all purposes to be a part of the general funds of ML & Co. and may be used for any corporate purpose.  No person will, by virtue of the provisions of this Plan, have any interest whatsoever in any specific assets of the Company, including any such funds.  TO THE EXTENT THAT ANY PERSON ACQUIRES A RIGHT TO RECEIVE PAYMENTS FROM ML & CO. UNDER THIS PLAN, SUCH RIGHT WILL BE NO GREATER THAN THE RIGHT OF ANY UNSECURED GENERAL CREDITOR OF ML & CO.

### 8.2    Non-Assignability

The right of a Participant, or of any other person with reference to the Participant, to the Account Balance, or any other benefits hereunder, shall be: (a) subject to forfeiture as explained above, and (b) cannot be assigned, alienated, sold, garnished, transferred, pledged, or encumbered except by a written designation of Beneficiary under this Plan, by written will, or by the laws of descent and distribution.

### 8. 3    Relationship to Other Benefits

9

ML000325

**JA508**

No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement, group insurance, or other employee benefit plan of the Company. The Plan shall not preclude the stockholders of ML & Co., the Board of Directors or any committee thereof, or the Company from authorizing or approving other employee benefit plans or forms of incentive compensation, nor shall it limit or prevent the continued operation of other incentive compensation plans or other employee benefit plans of the Company or the participation in any such plans by participants in the Plan.

## ARTICLE IX

### Beneficiary

#### 9.1     Designation of Beneficiary

A Participant may designate, in a writing delivered to the Administrator or his or her designee before the Participant's death, a Beneficiary to receive payments in the event of the Participant's death. The Participant may also designate a contingent Beneficiary to receive payments in accordance with this Plan if the primary Beneficiary does not survive the Participant. The Participant may designate more than one person as the Beneficiary or contingent Beneficiary, in which case (i) no contingent Beneficiary would receive any payment unless all of the primary beneficiaries predeceased the Participant, and (ii) the surviving beneficiaries in any class shall share in any payments in proportion to the percentages of interest assigned to them by the Participant. If the Participant dies without a surviving Beneficiary, the Participant's estate will be considered the Beneficiary.

#### 9.2     Change of Beneficiary

A Participant may change the Beneficiary or contingent Beneficiary (without the consent of any prior Beneficiary) in a writing delivered to the Administrator or his or her designee before the Participant's death. Unless otherwise stated in writing, any change in Beneficiary or contingent Beneficiary designation will automatically revoke prior such designations, as applicable, under this Plan.

#### 9.3     Beneficiary Death After Commencement of Payments

If, after a Participant's death, a Beneficiary entitled to receive, or actually receiving, payments hereunder dies before receiving full payment, the Account Balance to which the Beneficiary was entitled will be paid as soon as practicable in one lump sum to such primary Beneficiary's estate.

#### 9.4     Payment on Behalf of Incompetents

If, in his or her sole discretion, the Administrator finds that any person who is entitled to receive any payment hereunder is a minor or is unable to care for his or her affairs because of disability or incompetence, payment of the Account Balance may be made to anyone found by the Administrator to be the committee or other authorized representative of such person, or to be otherwise entitled to such payment, in the manner and under the conditions that the Administrator determines. Such payment will be a complete discharge of the liabilities of the Company hereunder with respect to the amount so paid.

10

ML000326

## ARTICLE X

### Amendment and Termination

#### 10.1    Reservation of Rights

ML & Co., through the Administrator, reserves the right to amend or terminate this Plan in whole or in part, at any time for any reason; provided, however, that no such action shall reduce a Participant's Account Balance as of the effective date of that action, or otherwise deprive the Participant or a Beneficiary of any entitlement thereto.

## ARTICLE XI

### Administration of the Plan

#### 11.1    Powers Of The Administrator

The Administrator has full power, discretion and authority to interpret, construe, and administer this Plan so as to ensure that it provides deferred compensation to Participants who are members of a select group of management or highly compensated employees within the meaning of Title I of ERISA. The Administrator's interpretations and construction hereof, and actions hereunder, including any determinations regarding the amount or recipient of any payments, will be binding and conclusive on all persons for all purposes. The Administrator will not be liable to any person for any action taken or omitted in connection with the interpretation and administration of this Plan unless attributable to willful misconduct or lack of good faith. The Administrator may designate persons to carry out the specified responsibilities of the Administrator and shall not be liable for any act or omission of a person as designated.

## ARTICLE XII

### Miscellaneous Provisions

#### 12.1    Books and Records Controlling

The books and records of the Company will be controlling in the event a question arises hereunder concerning the amount of Production Credits, Eligible Compensation, Annual Awards, Accounts, designations of Beneficiary(ies), or any similar matters.

#### 12.2    Successors and Assigns

The provisions of this Plan will be binding upon and inure to the benefit of the Company and its successors and assigns, the Participants and their designated Beneficiary(ies), and their respective heirs, executors, administrators, and legal representatives.

#### 12.3    Severability

If any provision of this Plan, or the application thereof, shall for any reason be invalid or unenforceable, such provision shall be limited only to the extent necessary in the circumstances

11

ML000327

JA510

to make it valid and enforceable.  In any event, the remaining provisions of this Plan will continue in full force and effect.

### 12.4    Litigation

The Company shall have the right to contest, at its expense, any ruling or decision, administrative or judicial, on an issue that is related to the Plan and that the Administrator believes to be important to the Participants, and to conduct any such contest or any litigation arising therefrom to a final decision.

### 12.5    Headings Are Not Controlling

The headings contained in this Plan are for convenience only and will not control or affect the meaning or construction of any of the terms or provisions of this Plan.

### 12.8    Governing Law

THE PLAN SHALL BE CONSTRUED AND ITS PROVISIONS ENFORCED AND ADMINISTERED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND PERFORMED ENTIRELY IN SUCH STATE, AS TO ALL MATTERS, INCLUDING, BUT NOT LIMITED TO, MATTERS OF VALIDITY, CONSTRUCTION, AND PERFORMANCE.

12

ML000328

JA511

# Exhibit C



Merrill Lynch

WEALTHBUILDER
Account Plan

WEALTHBUILDER ACCOUNT PLAN

Revised April 2, 2001

FOR INTERNAL USE ONLY

ML000329

## Answers to Commonly Asked Questions About the WealthBuilder Account

**1.** **Q.** **What are the eligibility requirements for having a WealthBuilder Account?**

**A.** You must have eligible compensation of $250,000 or more; attained the title of Vice President or above; and be in the Chairman's Club or above. Other criteria may apply; please see the Plan Document for details.

**2.** **Q.** **How does my WealthBuilder Account work?**

**A.** If you are eligible to have a WealthBuilder Account, all supplemental Awards that you have earned in the WealthBuilder Program have been credited to this account. Awards are credited in a dollar-denominated value. You may select from the available benchmark funds and cash equivalent funds to earn returns (which may be positive or negative) as if your Awards had been invested, at net asset value (NAV), in Class A shares of the benchmark funds. **All Awards are initially benchmarked against Ready Assets Trust, but you may immediately allocate your account to one or more of the other available indexes.**

**3.** **Q.** **Does this change how the Financial Consultant Capital Accumulation Award Plan (FCCAAP) Account works?**

**A.** No. The operation of the FCCAAP Account is unaffected by the creation of the WealthBuilder Account.

**4.** **Q.** **Will I own shares of the mutual funds I select?**

**A.** No. For tax reasons, you do not own the selected benchmark funds. As long as you have an Account Balance in this plan, you will be an unsecured general creditor of Merrill Lynch (same status as FCCAAP).

**5.** **Q.** **How often can I change my Merrill Lynch fund allocations?**

**A.** You may change your selections as many as 12 times per calendar year, among any of the available benchmark funds, and may reallocate in any whole percentage increments. You may change your selections by calling (800) MER-401k.

**6.** **Q.** **Who administers the WealthBuilder Account?**

**A.** Benefits & Investment Solutions (BIS) will administer your WealthBuilder Account. You will receive a letter from them assigning you a "PIN" number that enables you to access your account. If you already have a "PIN" assigned by BIS, that "PIN" will also allow you to access your WealthBuilder Account. You can call BIS at (800) MER-401k.

FOR INTERNAL USE ONLY

ML000330

**7.** **Q.** **What happens to my Awards if I do not select benchmark funds?**

**A.** Your Awards will remain benchmarked against ML Ready Assets Trust.

**8.** **Q.** **How often will I receive WealthBuilder statements?**

**A.** You will receive statements quarterly from BIS in addition to confirmations of any reallocations you choose to make.

**9.** **Q.** **When does the WealthBuilder Account become vested?**

**A.** Vesting generally occurs when you become eligible for retirement. A Financial Advisor (FA) is eligible to retire at age 55, as long as he or she also has at least 10 years of service with Merrill Lynch, or at age 65 with no length of service requirement. However, if you terminate prior to age 55 and have 20 years of service, you will be treated as having retired and become vested. Your balance, however, will be reduced by 1% for each year, or part thereof, prior to your 55th birthday, and payment will begin after your 55th birthday. If you terminate prior to vesting, your entire Account Balance is forfeited.

**10.** **Q.** **When do I receive the monies in the Account?**

**A.** Under current procedures you will receive 50% of your Account Balance the January following retirement, with the remaining 50% to be paid the following January. If you have earned an award after your retirement, 50% of the award will be paid when awards are credited, with the remaining balance to be paid the following January.

**11.** **Q.** **Are taxes withheld when the award is paid?**

**A.** Yes. Federal, state and local taxes are withheld upon payment of the Award, based on the valuation of the Account Balance on the payment date. Medicare and, where applicable, OASDI are withheld from each Award upon vesting.

**12.** **Q.** **What happens if I transfer out of production or if I am no longer eligible for WealthBuilder?**

**A.** Your Account Balance will continue to earn returns based upon your selected benchmark funds and be paid to you in two annual installments at retirement. You will not receive any additional Awards unless you transfer to another eligible population.

FOR INTERNAL USE ONLY

ML000331

**13. Q. If I were "vested" in my Account Balance but leave Merrill Lynch for the competition, do I take a portion of my WealthBuilder Account Balance with me?**

    **A.** No. Under the WealthBuilder Account Plan, participants who compete with ML & Co. within two years after termination **forfeit** any remaining balance in their WealthBuilder Account. This noncompete provision is fully described in the WealthBuilder Account Plan document.

**14. Q. Can I assign the right to receive the WealthBuilder Award?**

    **A.** No. You are not entitled to the Award until it is vested, and even then it is subject to forfeiture if you go to work for the competition. Under the terms of the Plan, rights under WealthBuilder cannot be assigned and cannot become subject to qualified Domestic Relations Orders or other such arrangements.

**15. Q. What happens to my Account Balance in the event of my death?**

    **A.** The Account Balance will be paid to your Beneficiary. If no Beneficiary has been named, the Account Balance will be paid to your estate.

**16. Q. Is my Designation of Beneficiary the same as my Beneficiary for my life insurance?**

    **A.** No. You must complete the WealthBuilder section of Designation of Beneficiary, available on the Advisory Division Web site. If you do not have access to the Advisory Division Web site, please call (609) 282-1759 and request a hard copy of the Designation of Beneficiary.

**17. Q. What should I do if I want to change my Beneficiary?**

    **A.** You must complete the Designation of Beneficiary, available on the Advisory Division Web Site. If you do not have access to the Advisory Division Web site, please call (609) 282-1759 and request a hard copy. You may also change prior designations by completing this form.

**18. Q. How do I find out more information about this program?**

    **A.** Talk with your Resident Vice President (RVP) or call Private Client Compensation at (609) 282-5654.

> Note: All terms and conditions of WealthBuilder are governed by the Plan document. However, these questions simply attempt to explain certain features of WealthBuilder.

FOR INTERNAL USE ONLY

## WEALTHBUILDER BENCHMARK FUNDS WORKSHEET

*Initially your award will be benchmarked against ML Ready Assets Trust. You may subsequently allocate your WealthBuilder Award against the available benchmark funds. You may make your allocations in 10% increments and change those allocations up to 12 times per year. It should be noted that these benchmark funds are subject to change over time.*

**To make your allocation and obtain a current listing of available benchmark funds, please call BIS at (800) MER-401k.**

Before deciding which benchmark funds to select, you should read the prospectuses for the funds. To obtain prospectuses, please call Business Financial Services at (800) MER-401k or, for international employees, (732) 563-7301.

FOR INTERNAL USE ONLY

ML000333



Notes

FOR INTERNAL USE ONLY



Merrill Lynch

# WEALTHBUILDER
## Account Plan

WEALTHBUILDER ACCOUNT PLAN
FOR A SELECT GROUP OF ELIGIBLE EMPLOYEES

FOR INTERNAL USE ONLY

## WEALTHBUILDER ACCOUNT PLAN
## FOR A SELECT GROUP OF ELIGIBLE EMPLOYEES

### Table of Contents

**ARTICLE I  Name, Purpose, and Effective Date** .................................. 1
**ARTICLE II  Definitions** .................................................... 1
**ARTICLE III  Participation** ................................................. 4
  3.1 Participation .......................................................... 4
**ARTICLE IV  Annual Awards** ............................................... 5
  4.1 Amount of Awards ..................................................... 5
  4.2 Crediting of Accounts ................................................. 5
**ARTICLE V  Benchmark Return Options; Adjustment of Accounts** ............. 5
  5.1 Election Limitations ................................................... 5
  5.2 Adjustment of Accounts ............................................... 5
  5.3 Statement of Account .................................................. 7
**ARTICLE VI  Forfeiture of Accounts** ........................................ 7
  6.1 Forfeiture for Early Separation ......................................... 7
  6.2 Forfeiture for Competition ............................................. 7
  6.3 Forfeiture for Misconduct .............................................. 8
**ARTICLE VII  Status of Awards and Accounts** ................................ 8
  7.1 No Trust or Fund Created; General Creditor Status ...................... 8
  7.2 Non-Assignability ..................................................... 8
**ARTICLE VIII  Payment of Account Balances** ................................ 8
  8.1 General Rule .......................................................... 8
  8.2 Early Qualifying Termination ........................................... 9
  8.3 Withholding of Taxes .................................................. 9
  8.4 Termination of Employment After a Change In Control ................... 9
  8.5 Payment on Behalf of Incompetents .................................... 11
**ARTICLE IX  Beneficiary** ................................................... 11
  9.1 Designation of Beneficiary ............................................. 11
  9.2 Change of Beneficiary ................................................. 11
  9.3 Beneficiary Death After Commencement of Payments .................... 12
**ARTICLE X  Amendment and Termination** .................................... 12
  10.1 Reservation of Rights ................................................ 12
**ARTICLE XI  Administration of the Plan** .................................... 12
  11.1 Powers Of The Administrator ......................................... 12
  11.2 Claims Procedure .................................................... 12
**ARTICLE XII  Miscellaneous Provisions** ..................................... 13
  12.1 Books and Records Controlling ........................................ 13
  12.2 Successors and Assigns ............................................... 13
  12.3 Severability .......................................................... 13
  12.4 Litigation ............................................................ 13
  12.5 Headings Are Not Controlling ......................................... 13
  12.8 Governing Law ...................................................... 13

FOR INTERNAL USE ONLY

ML000336

## WEALTHBUILDER ACCOUNT PLAN
## FOR A SELECT GROUP OF ELIGIBLE EMPLOYEES

### ARTICLE I

### Name, Purpose, and Effective Date

The name of the Plan is the WealthBuilder Account Plan for a Select Group of Eligible Employees.

The Plan, established under the WealthBuilder Program as in effect from time to time, is intended to be unfunded and maintained primarily for the purpose of providing deferred compensation for the members of a select group of management or highly compensated employees, within the meaning of Title 1 of ERISA, who remain in the employ of the Company until retirement or completion of a substantial period of service as specified in this Plan. All decisions concerning who is to be considered a member of that select group and how the Plan is to be administered and interpreted shall be consistent with this intention.

The Plan is effective commencing January 1, 1994, and each year thereafter, unless terminated in accordance with Section 10.1 hereof.

### ARTICLE II

### Definitions

Unless otherwise required by the context, each of the following terms shall have the meaning indicated for that term:

*"Account"* means a Participant's account established under Article IV to which all credits and debits are made with respect to the individual's Annual Awards credited hereunder.

*"Account Balance"* means, as of any date, the Annual Awards credited to a Participant's Account adjusted in accordance with Section 5.2 to reflect the performance of the Participant's Selected Benchmark Return Options, adjustments made as a result of any Capital Call Default and the Debit Balance and any payments made from the Account prior to that date.

*"Administrator"* means the Head of Human Resources of ML & Co., or his or her functional successor.

*"Affiliate"* means any corporation partnership, or other organization of which ML & Co. owns or controls, directly or indirectly, not less than 50% of the total combined voting power of all classes of stock or other equity interest.

*"Annual Award"* means an annual award determined under the Program for credit to a Participant's Account.

*"Applicable Federal Rate"* means the applicable federal rate for short-term (0-3 years) obligations of the United States Treasury established in January of each year.

*"Available Balance"* means amounts in a Participant's Account that are indexed to Benchmark Return Options with daily liquidity after all Capital Calls with respect to ML Ventures have been completed and an Account's Debit Balance, if any, has been reduced to zero.

*"Average Leveraged Principal Amount"* means, for each Participant, for any period, the sum of the Leveraged Principal Amounts outstanding at the end of each day in the period divided by the number of days in such period.

FOR INTERNAL USE ONLY

PAGE ONE

*"Benchmark Return Options"* means such investment vehicles as the Administrator may from time to time designate for the purpose of indexing Accounts hereunder. In the event a Benchmark Return Option ceases to exist or is no longer to be a Benchmark Return Option, the Administrator may designate a substitute Benchmark Return Option for such discontinued option.

*"Beneficiary"* means any person(s) or entity(ies) designated as such in accordance with Article IX.

*"Board of Directors"* means the Board of Directors of ML & Co.

*"Capital Call"* means the periodic demands for funds from a Participant's Account that will be equal to and occur simultaneously with capital calls made by [private equity funds (including ML Ventures) chosen by the Participant].

*"Capital Call Default"* means the result of there being an insufficient Liquid Balance in the Participant's Account to fund a Capital Call.

*"Capital Demand Default Adjustment"* means the negative adjustment described in Section 5.4 in the number of "units" (including units acquired by "Leverage") attributed to a private equity Benchmark Return Option that will be the consequence under the Plan of a Capital Call Default.

*"Cash Compensation"* means base salary plus Adjusted Compensation paid in a particular year, plus any cash bonus paid in the particular year for the immediately prior year's performance, such as a Household Incentive Program awards, but does not include payments made under the Investment Certificate Program.

*"Code"* means the Internal Revenue Code of 1986, as amended from time to time.

*"Company"* means ML & Co. and all of its Affiliates.

*"Debit Balance"* means, as of any date, the dollar amount, if any, representing any Leveraged Principal Amount (together with any pro rata Interest Amounts determined in accordance with Section 5.4(e), if applicable), as reduced by any distributions recorded from ML Ventures Units recorded in a Participant's Account.

*"Disability"* means a physical or mental impairment of a Participant which, during the first six months thereof, counts towards the individual's satisfaction of the waiting period under the ML & Co. Basic Long Term Disability Plan, as amended from time to time, and which thereafter entitles the individual to receive benefits under that plan.

*"Eligible Compensation"* for a given year means base earning for the performance year to which an award relates, Adjusted Compensation earned in the performance year and cash incentive compensation paid in the award year, including OMICP, household incentive bonus and premier incentive compensation and/or managers money fund.

*"Eligible Employee"* means, for a given year an Employee who (a) meets the criteria outlined in Section 3.1(a) and is paid from the Company's domestic based payroll (but is not a U.S. citizen or "green card" holder who is employed outside the United States).

*"Employee"* means a Financial Advisor (including a resident manager or producing manager), or any other employee group that the Administrator, in his or her sole discretion, determines are employees for purposes of eligibility for Annual Awards under the Plan. An individual who held such position during a Plan Year but who transfers to another position within the Company shall continue to be an Employee with respect to such Plan Year as long as his or her employment with the Company continues. No individual who would otherwise be eligible for an Annual Award but who is not an employee of the Company at the date of grant shall be entitled to an Annual Award under the Plan unless such individual's employment was terminated as a result of death, Disability or Qualifying Termination.

PAGE TWO

FOR INTERNAL USE ONLY

ML000338

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended from time to time.

*"Fiscal Quarter"* means the quarterly period used by ML & Co. for financial accounting purposes.

*"Fiscal Year"* for a given Plan Year means the annual period used by ML & Co. for financial accounting purposes that ends with or prior to December 31 of that Plan Year.

*"Initial Leveraged Amount"* means the initial dollar amount by which a Participant's deferral into ML Ventures Units is leveraged as determined in accordance with Section 5.4(c).

*"Interest"* means the hypothetical interest accruing on a Participant's Average Leveraged Principal Amount at the Applicable Federal Rate.

*"Interest Amounts"* means, for any Participant, as of any date, the amount of Interest that has accrued to such date on such Participant's Average Leveraged Principal Amount, from the date on which a Participant's Leveraged Principal Amount is established, or from the most recent date that Interest Amounts were added to the Leveraged Principal Amount.

*"ML Ventures Return Option"* means, for eligible Participants, the option of indexing returns hereunder to the performance of a ML Ventures limited partnership, on a leveraged or unleveraged basis. Participants will be eligible to choose the ML Ventures Return Option only if, they received Cash Compensation of at least $200,000 in each of 1999 and 1998.

*"ML Ventures Units"* means the record-keeping units credited to the Accounts of Participants who have chosen the ML Ventures Return Option.

*"Leveraged or Unleveraged Distributions"* means the distributions to a Participant's Account attributable to the leveraged or unleveraged portion (as the case may be) of a Participant's ML Ventures Units.

*"Leverage-Eligible Participants"* means persons who (1) are accredited investors within the meaning of the Securities Act of 1933, and (2) received Cash Compensation of at least $250,000 in 1999, and (3) received Cash Compensation of at least $200,000 in 1998 and otherwise qualify, in accordance with standards determined by the Administrator, to select a ML Ventures Return Option on a leverage basis.

*"Leveraged Principal Amount"* means a Participant's Initial Leveraged Amount, if any, as adjusted to reflect the addition of Interest Amounts (or any pro rata Interest Amounts).

*"Liquid Balance"* means, as of any date, the Deferred Amounts credited to a Participant's Account, adjusted (either up or down) to reflect: (1) the performance of the Participant's Mutual Fund Return Balances as provided in Section 5.4(f); (2) distributions with respect to ML Ventures Units made in accordance with Section 5.4(d); (3) reduction of any Debit Balance as provided in Section 5.4(e) to zero; and (4) any payments to the Participant under Article VIII hereof.

*"ML & Co."* means Merrill Lynch & Co., Inc.

*"MLPF&S"* means Merrill Lynch, Pierce, Fenner & Smith Incorporated.

*"Mutual Fund Return Options"* means the mutual funds chosen as Benchmark Return Options by the Administrator.

*"Advisory Division Management"* means the appropriate members of management of the domestic Advisory Division of MLPF&S or its functional successor.

*"Net Asset Value"* means, with respect to each Benchmark Return Option that is a mutual fund or other commingled investment vehicle for which such values are determined in the normal course of business, the net asset value, on the date in question, of the Selected Benchmark Return Option for which the value is to be determined.



PAGE THREE

FOR INTERNAL USE ONLY

*"Participant"* for a given Plan Year means an Eligible Employee who has satisfied the criteria set forth in Article III for receiving an allocation to his or her Account.

*"Plan"* means this WealthBuilder Account Plan for a Select Group of Eligible Employees.

*"Private Fund Return Option(s)"* means one or more private funds that are chosen by the Administrator to be offered—with such limitations as may be required—to eligible Participants as Benchmark Return Options.

*"Private Fund Unit(s)"* means the record-keeping units credited to the Accounts of Participants who have chosen one or more Private Fund Return Options.

*"Program"* means the WealthBuilder Program of which this Plan is a part.

*"Qualification Year"* means the calendar year immediately preceding the year for which the eligibility determination is being made.

*"Qualifying Termination"* means termination of employment with the Company for reasons other than for cause:

    (i) on or after an individual's 65th birthday; or

    (ii) on or after an individual's 55th birthday with at least 10 Years of Service; or

    (iii) at any age, but only after at least 20 Years of Service; or

    (iv) at any age regardless of the number of Years of Service, but only with the express approval of the Administrator, which may be granted subject to whatever conditions (including reductions in the Participant's Account Balance) and restrictions the Administrator may impose and only if the termination is found by the Administrator to be in, or not contrary to, the best interests of the Company.

*"Selected Benchmark Return Option"* means a Benchmark Return Option selected by the Participant in accordance with Section 5.1.

*"Years of Service"* means the number of "years of service" reflected on the records of the Company for purposes of determining the Participant's rights under the Merrill Lynch & Co., Inc. Retirement Accumulation Plan.

### ARTICLE III

### Participation

#### 3.1 Participation

(a) **General Rule.** An eligible employee will be a Participant in any year only if he or she (i) has more than $250,000 of Eligible Compensation in both the Qualification Year and the year in which the award is made, (ii) has attained at least the title of Vice President or holds a Advisory Division Management position with the Company (a "Advisory Manager"),

(b) **Newly Employed Individuals.** Subject to the approval of the Administrator in his or her sole discretion, an Eligible Employee who is newly employed by the Company can be a Participant if his or her Eligible Compensation is greater than $250,000 [and he or she is either employed as a Advisory Division Manager or is to be nominated for at least the title of Vice President at the first opportunity following the individual's commencement of employment with the Company.]

PAGE FOUR

FOR INTERNAL USE ONLY

## ARTICLE IV

### Awards

#### 4.1 Amount of Awards

Annual Awards under this Plan shall be made only to Eligible Employees who are employed by the Corporation on the date that Awards are to be credited to the Participant's Account. The amount of each Participant's Award in any given year shall be determined in accordance with the Program.

#### 4.2 Crediting of Accounts

A Participant's Award shall be credited to the Participant's Account as soon as practicable after the last day of the prior Fiscal Year.

## ARTICLE V

### Benchmark Return Options; Adjustment of Accounts

#### 5.1 Election Limitations

A Participant must choose one or more Benchmark Return Options and the percentage of the Participant's Account to be adjusted to reflect the performance of each Selected Benchmark Return Option; *provided,* that if for any reason the Participant does not effectively designate Benchmark Return Options with respect to his or her entire Account, until such time as an effective description is provided, the Participant's Selected Benchmark Return Option shall be the default Benchmark Return Option specified by the Administrator. All elections of Selected Benchmark Return Options shall be in multiples of 1%. A Participant may, by complying with such procedure as the Administrator may prescribe on a uniform and nondiscriminatory basis, including procedures specifying the frequency with respect to which such changes may be effected (but not more than twelve times in any calendar year), change the Selected Benchmark Return Options to be applicable with respect to his or her Account.

#### 5.2 Return Option; Adjustment of Accounts

(a) **Selection of ML Ventures Return Option or Private Fund Return Options.** In any year that a ML Ventures partnership [or other Private Fund partnership is offered,] eligible Participants may select the ML Ventures Return Option (and designate any Leverage Percentage) or select a Private Fund Return Option. **Participants should be aware that (1) once the closing of the relevant fund has occurred, Participants will not be able to alter their elections; and (2) that Payments of a Participant's Account Balance on Retirement may be delayed by the selection of ML Ventures. Participants should also be aware that in the event of a Capital Call Default, for certain private equity funds, Including ML Ventures, they may be penalized by having their Accounts adjusted downward in accordance with Section 5.4(d).**

(b) **Selection of Mutual Fund Return Options.** Coincident with the Participant's election to defer Compensation, the Participant must select the percentage of the Participant's Account to be adjusted to reflect the performance of Mutual Fund Return Options, for use when a Participant's Account has a Liquid Balance. All elections shall be in multiples of 1%. A Participant may, by complying with such procedures as the Administrator may prescribe on a uniform and nondiscriminatory basis, including procedures specifying the frequency with respect to which such changes may be effected (but not more than 12 times in any calendar year), change the Selected Benchmark Return Options to be applicable with respect to his or her Account.

FOR INTERNAL USE ONLY

PAGE FIVE

ML000341

**(c) Selection of the ML Ventures Leverage Percentage by Eligible Participants.**
Prior to the closing of the offering of a ML Ventures partnership, Leverage-Eligible
Participants who select the ML Ventures Return Option on a leveraged basis must choose
their Leverage Percentage, in accordance with standards determined by the Administrator,
by submitting such forms as the Administrator shall prescribe. Prior to the closing of a ML
Ventures partnership, the Administrator will determine each Leverage-Eligible Participant's
Initial Leveraged Amount by applying such Participant's Leverage Percentage to the dollar
value of the portion of the Participant's Account Balance allocated to the ML Ventures
Return Option. The Initial Leveraged Amount will be recorded as the Leveraged Principal
Amount, to which amount Interest Amounts will be added annually in accordance with
Section 5.4(e).

**(d) Adjustments of ML Ventures and other Private Fund Return Options.**

(i)    Whenever a distribution is paid on an actual unit of a ML Ventures partnership
or other similar private fund return option, an amount equal to such per unit
distribution times the number of units in the Participant's Account will first be
applied against any Debit Balance, as provided in Section 5.4(e), and then, if
any portion of such distribution remains after the Debit Balance is reduced to
zero, be credited to the Participant's Account to be indexed to the Mutual Fund
Return Option(s) chosen by the Participant.

(ii)   In the event of a Capital Call Default, a Participant's investment in the relevant
fund will be capped. If this occurs, the number of units represented by the
return option (including, in the case of ML Ventures, any leveraged units) will
be adjusted downward to reflect a smaller investment and resulting lower
leverage.

**(e) Adjustment of Debit Balance.** Any Debit Balance shall be reduced as soon as
possible any distributions relating to ML Ventures Units. Reductions of the Debit Balance,
as provided in the foregoing sentence, shall be applied first to reduce the Debit Balance
attributable to accrued Annual Charges and then, after all such accrued Annual Charges
have been satisfied, to reduce any Leveraged Principal Amount. As of the last day of each
Fiscal Year, Interest Amounts computed by the Administrator shall be added to the
Leveraged Principal Amount. If on any date the Leveraged Principal Amount would be
discharged completely as a result of distributions or chargeoffs, Interest Amounts will be
computed though such date and added to the Leveraged Principal Amount as of such date.

**(f) Adjustment of Mutual Fund Return Balances.** While each Participant's Account
does not represent the Participant's ownership of, or any ownership interest in, any
particular assets, the Account shall be adjusted to reflect the investment experience of the
Participant's Selected Benchmark Return Options in the same manner as if investments in
accordance with the Participant's elections had actually been made through the ML Benefit
Services Platform and ML II Core Recordkeeping System, or any successor system used for
keeping records of Participants' Accounts (the "ML II System"). In adjusting Accounts, the
timing of receipt of Participant instructions by the ML II System shall control the timing
and pricing of the notional investments in the Participant's Selected Benchmark Return
Options in accordance with the rules of operation of the ML II System and its requirements
for placing corresponding investment orders, as if orders to make corresponding invest-
ments were actually to be made, except that in connection with the crediting of Annual
Awards to the Participant's Account and distributions from the Account, appropriate alloca-
tion instructions shall be treated as received from the Participant prior to the close of trans-
actions through the ML II System on the relevant day. Each Selected Benchmark Return
Option shall be valued using the Net Asset Value of the Selected Benchmark Return Option
as of the relevant day; *provided,* that, in valuing a Selected Benchmark Return Option for
which a Net Asset Value is not computed, the value of the security involved for determining
Participants' rights under the Plan shall be the price reported for actual transactions in that
security through the ML II System on the relevant day, without giving effect to any transac-
tion charges or costs associated with such transactions; *provided further,* that, if there are

PAGE SIX

FOR INTERNAL USE ONLY

no such transactions effected through the ML II System on the relevant day, the value of the security shall be:

    **(A)** if the security is listed for trading on one or more national securities exchanges, the average of the high and low sale prices for that day on the principal exchange for such security or if such security is not traded on such principal exchange on that day, the average of the high and low sales prices on such exchange on the first day prior thereto on which such security was so traded;

    **(B)** if the security is not listed for trading on a national securities exchange but is traded in the over-the-counter market, the average of the highest and lowest bid prices for such security on the relevant day; or

    **(C)** if neither clause (a) nor (b) applies, the value determined by the Administrator by whatever means he considers appropriate in his sole discretion.

**5.3 Statement of Account**

For each Fiscal Quarter, each Participant for whom an Account is maintained under the Plan will receive a statement that reports the value of the Account as of the end of the Fiscal Quarter.

**ARTICLE VI**

**Forfeiture of Accounts**

**6.1 Forfeiture for Early Separation**

A Participant's entire Account (including any Leverage associated with a ML Ventures Return Option) shall be forfeited in the event of the Participant's termination of employment with the Company for any reason prior to his or her death, Disability or Qualifying Termination.

**6.2 Forfeiture for Competition**

**(a) Forfeiture Procedure.** A Participant's Account (including any Leverage associated with a ML Ventures Return Option) is subject to forfeiture in the event the Administrator, in his or her sole discretion, determines that the Participant has been in Competition with the Company at any time during the period ending two years after the Participant's Qualifying Termination.

**(b) Competition Defined.** For purposes of Section 6.1(a), *"Competition"* means the Participant's application for or acceptance of Employment with, or direct or indirect inducement or recruitment of any other employee of the Company to apply for or accept Employment with, any other person or entity for the purpose of providing or offering to provide any Related Product or Service to any Client that has a Known Relationship. For purposes of this Section 6.1(b),

    (i) the term *"Employment"* shall include the performance of services as an employee and as an independent contractor or consultant;

    (ii) the term *"Client"* means any person or entity to whom the Company provides or has provided, within the two-year period ending on the date of the Participant's Qualifying Termination, any Related Product or Service;

    (iii) The term *"Related Product or Service"* means (A) with respect to an individual Client, any financial product or service; or (B) with respect to any institutional client, any financial product or service provided by the Company to the Client in the course of the Known Relationship or any financial product or service related thereto; and

FOR INTERNAL USE ONLY

PAGE SEVEN

ML000343

**JA527**

(iv) the term *"Known Relationship"* means a relationship between the Client and the Company of which the Participant has or had actual knowledge that was acquired prior to Qualifying Termination, which acquisition occurred (A) as consequence of the performance by the Participant of responsibilities as an employee of the Company acting within the scope of his or her employment; or (B) under circumstances indicating that the information acquired was non-public.

### 6.3 Forfeiture for Misconduct

A Participant's entire Account (including any Leverage associated with a ML Ventures Return Option) is subject to forfeiture in the event the Administrator, in his or her sole discretion, determines that the Participant has engaged in any misconduct relating to his or her employment with the Company, including any violation of any law, regulation or Company policy. In the event of any allegation of any such misconduct, any scheduled payment of the Account Balance will not be made unless and until the Administrator, upon consultation with the Director of Compliance of MLPF&S or his or her designee or functional successor, has determined that payment is appropriate under the circumstances.

### ARTICLE VII

### Status of Awards and Accounts

### 7.1 No Trust or Fund Created; General Creditor Status

Nothing contained herein and no action taken pursuant hereto will be construed to obligate the Administrator to invest any assets of ML & Co. in any Selected Benchmark Return Option, nor to establish a trust or separate fund of any kind or a fiduciary relationship between ML & Co. and a Participant, Participant's Beneficiary or estate, or any other person or entity. The Administrator may, if it so chooses, earmark any assets of ML & Co. to meet its obligations hereunder. Title to and beneficial ownership of any funds represented by the Account will at all times remain in ML & Co.; such funds will continue for all purposes to be a part of the general funds of ML & Co. and may be used for any corporate purpose. No person will, by virtue of the provisions of this Plan, have any interest whatsoever in any specific assets of the Company, including any such funds. TO THE EXTENT THAT ANY PERSON ACQUIRES A RIGHT TO RECEIVE PAYMENTS FROM ML & CO. UNDER THIS PLAN, SUCH RIGHT WILL BE NO GREATER THAN THE RIGHT OF ANY UNSECURED GENERAL CREDITOR OF ML & CO.

### 7.2 Non-Assignability

The right of a Participant, or of any other person with reference to the Participant, to the Account Balance, or any other benefits hereunder, shall be: (a) subject to forfeiture as explained above; and (b) cannot be assigned, alienated, sold, garnished, transferred, pledged, or encumbered except by a written designation of Beneficiary under this Plan, by written will, or by the laws of descent and distribution.

### ARTICLE VIII

### Payment of Account Balances

### 8. 1 General Rule

Subject to Article VI above and Section 8.2 below, the payment of a Participant's Account hereunder shall be made only upon a Participant's Qualifying Termination, death or, Disability: (a) in case of Qualifying Termination, in two annual installments (or such higher number of installments, not in excess of nine, as established on a uniform and nondiscriminatory basis by the Administrator in his or her sole discretion), the first of which shall be paid at the end of the calendar year in which the Qualifying Termination occurs (or if Qualifying Termination occurs prior to the grant of an Annual Award, as soon as practicable after such grant) and the remainder of which shall be paid at the end of the subsequent

PAGE EIGHT

FOR INTERNAL USE ONLY

ML000344

calendar year(s); and (b) in case of Disability or death, a single sum. In the event a Participant dies prior to the payment of the entire Account, then the unpaid balance of the Account will be paid to the Beneficiary in a single sum as soon as practicable following the Participant's death. **In the event that immediately prior to the payment, all or any portion of a Participant's Account Balance remains indexed to ML Ventures, such payments will only be made from the Available Account Balance (after the Debit Balance has been reduced to zero) and further payments shall be made only as distributions are made from ML Ventures.**

**8.2 Early Qualifying Termination**

In the event of a Participant's Qualifying Termination before the Participant's 55th birthday, then:

(a) the Participant's Available Balance as of the date of such Qualifying Termination shall be first reduced by 1 per cent for each year, or part thereof, that the Qualifying Termination occurs before such 55th birthday; and

(b) payment of the Participant's Account shall begin only after the Participant's 55th birthday.

**8.3 Withholding of Taxes**

The Company will deduct or withhold from any amounts to be credited to an Account, or from any payments to be made hereunder, any federal, state, local income or employment taxes as required under applicable laws to be withheld, or require the Participant or the Beneficiary to pay any such amount, or the balance of any such amount.

**8.4 Termination of Employment After a Change In Control**

**(a) Payment Upon Change in Control.** Any other provision of this Plan to the contrary notwithstanding, in the event that a Change in Control of ML & Co. occurs and thereafter a Participant's employment is terminated by the Company without Cause or by the Participant for Good Reason, the Participant's Available Account Balance will be paid to the Participant (or to the Participant's Beneficiary in the event of death) in cash in a single sum, as promptly as possible after such termination of employment.

**(b) Definition of "Change in Control."** A *"Change in Control"* means a change in control of ML & Co. of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), whether or not ML & Co. is then subject to such reporting requirement; *provided, however,* that, without limitation, a Change in Control shall be deemed to have occurred if:

(i) any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, or any syndicate or group deemed to be a person under Section 14(d)(2) of the Exchange Act, other than ML & Co.'s Employee Stock Ownership Plan, is or becomes the "beneficial owner" (as defined in Rule 13d-3 of the General Rules and Regulations under the Exchange Act), directly or indirectly, of securities of ML & Co. representing 30% or more of the combined voting power of ML & Co.'s then outstanding securities entitled to vote in the election of directors of ML & Co.; or

(ii) during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of ML & Co. and any new directors, whose election by the Board of Directors or nomination for election by the stockholders of ML & Co. was approved by a vote of at least 3/4 of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof; or

(iii) all or substantially all of the assets of ML & Co. are liquidated or distributed.

FOR INTERNAL USE ONLY



PAGE NINE

**(c) Agreement Concerning a Change in Control.** If ML & Co. executes an agreement, the consummation of which would result in the occurrence of the Change in Control as described in Section 8.4(b), then, with respect to a termination of employment, unless such termination is by the Company for Cause, or by the Participant other than for Good Reason, occurring after the execution of such agreement (and, if such agreement expires or is terminated prior to consummation, prior to such expiration or termination of such agreement), a Change in Control shall be deemed to have occurred as of the date of the execution of such agreement.

**(d) Amendments Subsequent to Change in Control.** In the event of a Change in Control, no changes in the Plan and no adjustments, determinations or other exercises or discretion by the Administrator or ML & Co., that were made subsequent to the Change in Control and that would have the effect of diminishing a Participant's rights or payments under the Plan, or of causing the Participant to recognize income (for federal income tax purposes) with respect to the Participant's Account Balance prior to the actual distribution in cash to a Participant of such Account Balance, shall be effective.

**(e) Cause.** Termination of a Participant's employment by the Company for "Cause" shall mean termination upon:

    (i) the Participant's willful and continued failure substantially to perform the Participant's duties with the Company (other than any such failure resulting from the Participant's incapacity due to physical or mental illness or any such actual or anticipated failure resulting from termination by the Participant for Good Reason) after a written demand for substantial performance is delivered to the Participant by Advisory Division Management, which demand specifically identifies the manner in which Advisory Division Management believes that the Participant has not substantially performed his or her duties; or

    (ii) the willful engaging by the Participant in conduct which is demonstrably and materially injurious to the Company, monetarily or otherwise.

No act or failure to act by the Participant shall be deemed "willful" unless done, or omitted to be done, by the Participant not in good faith and without reasonable belief that this action or omission was in the best interest of the Company.

Notwithstanding the foregoing, a Participant shall not be deemed to have been terminated for Cause unless and until there shall have been delivered to the Participant a copy of a written finding by Advisory Division Management (issued after reasonable notice to the Participant and an opportunity for the Participant, together with counsel, to be heard) that, in the good faith opinion of Advisory Division Management, the Participant was guilty of conduct set forth above in clause (i) or (ii) of the first sentence of this Section 8.4(e) and specifying the particulars thereof in detail.

**(f) "Good Reason"** shall mean a Participant's termination of his or her employment with the Company if, without the Participant's written consent, any of the following circumstances shall occur:

    (i) a meaningful and detrimental alteration in the Participant's position or in the nature or status of the Participant's responsibilities from those in effect immediately prior to the Change in Control;

    (ii) a reduction by the Company of the Participant's base salary as in effect just prior to the Change in Control;

    (iii) the relocation of the office of the Company where the Participant was employed at the time of the Change in Control (the "CIC Location") to a location more than fifty miles away from the CIC Location (except for required travel on the Company's business to an extent substantially consistent with the Participant's business travel obligations just prior to the Change in Control);

PAGE TEN

FOR INTERNAL USE ONLY

(iv) the failure of the Company to continue in effect any benefit or compensation plan, including, but not limited to, this Plan, the Company's retirement program, or the Company's Long-Term Incentive Compensation Plan, Employee Stock Purchase Plan, 1978 Incentive Equity Purchase Plan, cash incentive compensation or other plans adopted prior to the Change in Control, in which the Participant is participating at the time of the Change in Control, unless an equitable arrangement (embodied in an ongoing substitute or alternative plan) has been made with respect to such plan in connection with the Change in Control, or the failure by the Company to continue the Participant's participation therein on at least as favorable a basis, in terms of both the amount of benefits provided and the level of the Participant's participation relative to other participants, as existed at the time of the Change in Control; or

(v) the failure of the Company to continue to provide the Participant with benefits at least as favorable as those enjoyed by the Participant under any of the Company's pension, life insurance, medical, health and accident disability, deferred compensation or savings plans in which the Participant was participating at the time of the Change in Control, the taking of any action by the Company which would directly or indirectly materially reduce any of such benefits or deprive the Participant of any material fringe benefit enjoyed by the Participant at the time of the Change in Control, or the failure by the Company to provide in accordance with the Company's normal vacation policy in effect at the time of the Change in Control.

### 8.5 Payment on Behalf of Incompetents

If, in his or her sole discretion, the Administrator finds that any person who is entitled to receive any payment hereunder is a minor or is unable to care for his or her affairs because of disability or incompetence, payment of the Available Balance may be made to anyone found by the Administrator to be the committee or other authorized representative of such person, or to be otherwise entitled to such payment, in the manner and under the conditions that the Administrator determines. Such payment will be a complete discharge of the liabilities of the Company hereunder with respect to the amount so paid.

### ARTICLE IX

#### Beneficiary

#### 9.1 Designation of Beneficiary

A Participant may designate, in a writing delivered to the Administrator or his or her designee before the Participant's death, a Beneficiary to receive payments in the event of the Participant's death. The Participant may also designate a contingent Beneficiary to receive payments in accordance with this Plan if the primary Beneficiary does not survive the Participant. The Participant may designate more than one person as the Beneficiary or contingent Beneficiary, in which case (i) no contingent Beneficiary would receive any payment unless all of the primary beneficiaries predeceased the Participant; and (ii) the surviving beneficiaries in any class shall share in any payments in proportion to the percentages of interest assigned to them by the Participant. If the Participant dies without a surviving Beneficiary, the Participant's estate will be considered the Beneficiary.

#### 9.2 Change of Beneficiary

A Participant may change the Beneficiary or contingent Beneficiary (without the consent of any prior Beneficiary) in a writing delivered to the Administrator or his or her designee before the Participant's death. Unless otherwise stated in writing, any change in Beneficiary or contingent Beneficiary designation will automatically revoke prior such designations, as applicable, under this Plan.

PAGE ELEVEN

FOR INTERNAL USE ONLY

### 9.3 Beneficiary Death After Commencement of Payments

If, after a Participant's death, a Beneficiary entitled to receive, or actually receiving, payments hereunder dies before receiving full payment, the Account Balance to which the Beneficiary was entitled will be paid as soon as practicable in one lump sum to such primary Beneficiary's estate.

## ARTICLE X

### Amendment and Termination

### 10.1 Reservation of Rights

ML & Co., through the Administrator, reserves the right to amend or terminate this Plan in whole or in part, at any time for any reason; *provided, however,* that no such action shall reduce a Participant's Account Balance as of the effective date of that action, or otherwise deprive the Participant or a Beneficiary of any entitlement thereto.

## ARTICLE XI

### Administration of the Plan

### 11.1 Powers Of The Administrator

The Administrator has full power, discretion and authority to interpret, construe, and administer this Plan so as to ensure that it provides deferred compensation to Participants who are members of a select group of management or highly compensated employees within the meaning of Title I of ERISA. The Administrator's interpretations and construction hereof, and actions hereunder, including any determinations regarding the amount or recipient of any payments, will be binding and conclusive on all persons for all purposes. The Administrator will not be liable to any person for any action taken or omitted in connection with the interpretation and administration of this Plan unless attributable to willful misconduct or lack of good faith. The Administrator may designate persons to carry out the specified responsibilities of the Administrator and shall not be liable for any act or omission of a person as designated.

### 11.2 Claims Procedure

**(a) Initial Claim.** An application for payments under this Plan shall be in a form acceptable to, and in compliance with all required information as deemed necessary by, the Administrator. If an application for payments is denied, in whole or in part, the Administrator shall promptly give the applicant written notice of the denial, setting forth the specific reasons therefor. The notice shall include the following:

    (i)  The basis for the denial;

    (ii)  A reference to the appropriate provisions of the Plan on which the denial is based;

    (iii) A description of any additional information required of the applicant; and

    (iv) An explanation of the procedure for having a denied application reviewed under this Plan.

**(b) Appeal Procedure.** The applicant may, upon receipt of a notice of denial, request a review of the application by the Administrator. Such request shall be delivered in writing to the Administrator. After the Administrator has reviewed the application, the final decision shall be communicated in writing to the applicant. Such communication shall set forth the specific reasons for the decision with reference to the appropriate provisions of the Plan.

PAGE TWELVE

FOR INTERNAL USE ONLY

## ARTICLE XII

### Miscellaneous Provisions

#### 12.1 Books and Records Controlling

The books and records of the Company will be controlling in the event a question arises hereunder concerning the amount of Production Credits, Eligible Compensation, Annual Awards, Accounts, designations of Beneficiary(ies), or any similar matters.

#### 12.2 Successors and Assigns

The provisions of this Plan will be binding upon and inure to the benefit of the Company and its successors and assigns, the Participants and their designated Beneficiary(ies), and their respective heirs, executors, administrators, and legal representatives.

#### 12.3 Severability

If any provision of this Plan, or the application thereof, shall for any reason be invalid or unenforceable, such provision shall be limited only to the extent necessary in the circumstances to make it valid and enforceable. In any event, the remaining provisions of this Plan will continue in full force and effect.

#### 12.4 Litigation

The Company shall have the right to contest, at its expense, any ruling or decision, administrative or judicial, on an issue that is related to the Plan and that the Administrator believes to be important to the Participants, and to conduct any such contest or any litigation arising therefrom to a final decision.

#### 12.5 Headings Are Not Controlling

The headings contained in this Plan are for convenience only and will not control or affect the meaning or construction of any of the terms or provisions of this Plan.

#### 12.8 Governing Law

This Plan will be construed in accordance with and governed by the laws of the State of New York, to the extent not preempted by ERISA or any other federal law, as to all matters, including, but not limited to, matters of validity, construction, and performance.

PAGE THIRTEEN

FOR INTERNAL USE ONLY

ML000349

Notes



PAGE FOURTEEN

FOR INTERNAL USE ONLY

## Notes

FOR INTERNAL USE ONLY

PAGE FIFTEEN

ML000351



**Merrill Lynch**

FOR INTERNAL USE ONLY

ML000352

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-CV-00440-KDB-DCK**

**KELLY MILLIGAN,**

     **Plaintiff,**

     **v.**                                   **ORDER**

**BANK OF AMERICA
CORPORATION,
MERRILL LYNCH, PIERCE,
FENNER & SMITH, INC., AND
JOHN/JANE DOE 1,**

     **Defendants.**

---

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Doc. No. 41). The Court has carefully considered this motion, the parties' briefs and exhibits and oral argument on the motion from the parties' counsel on March 4, 2025. For the reasons discussed below, the Court will **GRANT** the motion.

## I.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Modern Mosaic, LTD v. Turner Construction Co.*, *et al.*, 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id*. (quoting *Libertarian Party of Va. v.*

1

*Judd*, 718 F.3d 308, 313 (4th Cir. 2013)). In determining if summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017)).

      The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252 (quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land,* 36 F.4th at 252 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II.    FACTS AND PROCEDURAL HISTORY

Plaintiff Kelly Milligan worked as a financial advisor ("FA") for Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill"), a wholly owned subsidiary of Bank of America (collectively, "Defendants") from 2000-2021, at which point he voluntarily departed to start his own company and compete with Merrill. Doc. No. 1 at ¶¶ 1, 11. During his tenure, Plaintiff participated in the "Financial Advisor Incentive Compensation Plan" ("FAICP").[1] Doc. No. 42-10 at 2. As outlined in the FAICP, FAs are paid a guaranteed monthly salary and are eligible to earn monthly incentive compensation. *Id.* In addition, Defendants offer "Long-Term Contingent Awards" which include restricted stock units (RSUs) and the WealthChoice Award ("WCA"). *Id.* at 10. FAs receive RSUs under this award scheme unless they elect to allocate a portion of their long-term contingent award in the form of a WCA. *Id.*

Over his tenure, Plaintiff elected and earned several WCAs. Plaintiff alleges that by departing, he forfeited over $500,000 in "deferred compensation" because he and others similarly situated were forced to forfeit the value of their WCAs when they voluntarily left Merrill before their plans vested. Doc. No. 1 at ¶¶ 1, 11. Plaintiff further asserts that the WCA program is subject to the Employee Retirement Income Security Act of 1974 ("ERISA") because it "provides for deferred commissions." Doc. No. 54-2 at 5. More specifically, Plaintiff argues that each WCA is subject to ERISA because it is an "employee pension benefit plan" that "results in a deferral of income." Doc. No. 1 at ¶ 3. The deferral of income allegedly results when FAs are "paid for the

---

[1] Plaintiff states that the FAICPs issued each year were substantively identical (Doc. No. 54-2 at 5), so the Court will primarily reference the 2020 guide (Doc. No. 42-10).

3

work years after they perform it." *Id.* at ¶ 4. These payments occur for "periods extending to the termination of covered employment or beyond," because in certain circumstance—such as death or retirement—participants receive the value of their plan after their employment ends. *Id.*

In Plaintiff's view, this means that the plan violates ERISA's vesting schedule, and he has filed a proposed class action suit against Defendants seeking declaratory and equitable relief, along with reformation of the compensation plan. In response, Defendants filed the pending motion for summary judgment, asserting that the WCA is not an employee pension benefit plan because it does not, by design, defer compensation to the end of covered employment or beyond, and because it is a bonus plan that is exempt from ERISA. Doc. No. 42-2 at 5. The motion has been fully briefed and argued and is now ripe for the Court's ruling.

## III.    DISCUSSION

Congress passed ERISA in 1974, in an era when many long-term employees were not getting the pension benefits their employers promised would be there when they retired. *See Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996) (ERISA "seek[s] to ensure that employees will not be left empty-handed once employers have guaranteed them certain benefits."); *see also Murphy v. Inexco Oil Co.*, 611 F.2d 570, 574 (1980) (noting that ERISA was enacted to protect the retirement assets of workers). Congress sought to ensure that if employees were promised a benefit at retirement—and "fulfilled whatever conditions are required to obtain a vested benefit"— they "actually will receive it." *Nachman Corp. v. PBGC*, 446 U.S. 359, 375 (1980). The Supreme Court and others have cautioned, however, that ERISA does not dictate what benefits employers must offer, *Spink*, 517 U.S. at 887, nor is it intended to hamstring or dissuade an employer in designing other compensation programs, such as retention or other bonus programs, tailored to their particular workforce or industry. *See, e.g., Conkright v. Frommert*, 559 U.S. 506, 517 (2010).

4

"To state a claim under ERISA, a plaintiff must allege and establish the existence of an 'employee [pension] benefit plan' that is governed by ERISA." *Albers v. Guardian Life Ins. Co.*, No. 98 Civ. 6244, 1999 WL 228367, at *2 (S.D.N.Y. Apr. 19, 1999). An employee pension benefit plan is defined under ERISA as:

> any plan, fund, or program . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--
>
> > (i) provides retirement income to employees, or
> >
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A). However, even if an employee pension benefit plan can be established, the Department of Labor ("DOL") carves out an exception excluding bonus payments from ERISA's definition of an employee pension benefit plan unless the payments are "systematically deferred to the termination of covered employments or beyond" or are designed for the purpose of providing retirement income. 29 C.F.R. § 2510.3–2(c). It is within this framework that the Court must consider the compensation structure at Merrill.

As previously noted, a FA's income is comprised of a guaranteed monthly salary, monthly cash compensation, and long-term contingent incentive awards such as a WCA. Doc. Nos. 54-2 at 5; 42-2 at 8. The monthly cash compensation, which is akin to a commission, is calculated and paid monthly, using a "cash" grid that represents a percentage of "production credits" or revenue generated. Doc. No. 42-2 at 9. These percentages substantially increase as "production" or revenue generated increases. In contrast, the WCA program utilizes a separate "long-term" grid that reflects a much smaller percentage of production credits (starting at less than 10% of the "cash" grid

5

percentage) and is calculated only after a full performance year. *Id.* Also, unlike the cash compensation that begins with the first dollar of revenue generated, WCA eligibility does not begin until after a threshold amount of revenue is generated. Doc. No. 42-10 at 2. Significantly, FAs must also remain employed with the company until the vesting date for the award to become "earned and payable." Doc. No. 42-2 at 19.

During oral argument, Defendants noted that, like *Callan v. Merrill Lynch & Co., Inc.,* No. 09 CV 0566 BEN (BGS), 2010 WL 3452371, at *8 (S.D. Cal. Aug. 30, 2010), which addressed Merrill's predecessor plan to the WCA, there is nothing in the WCA that "would allow a reasonable person to calculate or determine the benefits of the plan or the procedure for receiving [them], as those matters are left to the sole discretion" of Defendants. In its FAICP, the WCA is described as:

> The [WCA], as in effect from time to time, is intended to be **unfunded and maintained primarily for the purpose of providing long-term contingent incentive compensation**, subject to certain conditions, to a select group of Financial Advisors. By awarding a portion of a Financial Advisor's incentive compensation in the form of a cash award which becomes earned and payable over time, **the Company intends to encourage the Financial Advisor to remain employed by the Company** and its Subsidiaries and to further align the interests of the Financial Advisor with the Company's business objectives.

Doc. No. 41-3 at 3 (emphasis added). The final amount of each WCA award is further determined by "the Administrator" and "subject to the review and approval by the Company." *Id.* at 6. Also, the company retains the right to adjust the amount of any award to align with the performance of both the company and individual lines or sub-lines of business. Doc. No. 41-10 at 39.

When a WCA is calculated, a notional account is created and the FA can select mutual funds or other investments to benchmark against. Doc. No. 41-1 at 11. The value of the account is indexed to the performance of the chosen fund or benchmark investment. *Id.* at 12. Both the FAICP and the Award Agreement state that the "Account Balance represents an unsecured, unfunded,

6

contingent promise . . . to pay the value of the account [] after the Vesting date." *Id.* Again, the FAICP makes clear that the WCA becomes earned and payable only after an eight-year vesting period, and where the FA remains employed through the payment date. *Id.* at 11. After vesting, the FA is paid "as soon a[s] practicable . . . but in no event later than 2½ months following such vesting date" and there is no option to defer it. Doc. No. 41-3 at 8.

In most cases, when employment ends, the balance of any unvested accounts is cancelled, unless the employee dies, retires, or is involuntarily terminated. Doc. Nos. 41-7 at 7, 42-2 at 12-13. During oral argument, Defendant asserted that *not* cancelling WCAs in those relatively uncommon situations[2] upholds the purpose of the plan, which is, in large part, to reward company loyalty and longevity. FAs who depart under one of these circumstances (which are largely out of a FA's control) must generally covenant to not compete in order to attain their WCA. Doc. No. 41-1 at 13. Involuntary terminations (with a non-competition agreement), death, and retirement do not render an employee adverse to the company the way a FA leaving to work for a competitor might.

The specific circumstances of the departure determine how and when a WCA vests. In the event of death, the FA's estate is paid promptly. Doc. No. 41-1 at 12. If the termination is related to a workforce reduction, divestiture or disability, the award will "continue to become earned and payable on the stated vesting schedule," so long as the FA agrees to certain covenants, including to not solicit clients and employees. *Id.* at 13. For changes in control, awards become immediately earned as of the termination date. *Id.* Finally, for retirement, WCAs become earned and payable in

---

[2] According to the parties, 18% of WCA recipients received some payment after their employment ended and 92.6% of the FAs who received WCAs between 2018 and 2024 were active employees, both of which demonstrate that receiving a WCA payment post-employment is uncommon. Doc. Nos. 42-2 at 13, 54-2 at 8.

two installments: first, after the end of the year the FA retires, and second, after the end of the next year. As a condition of payment, retiring FAs must also covenant to not solicit employees or clients and must not engage in competition. *Id.* According to Defendants, spacing retirement payments out this way gives the company some recourse in the event that the FA resumes working and engages in competition. Somewhat paradoxically, it is these unique circumstances that, in Plaintiff's view, bring WCAs under ERISA's narrow ambit.

### A.  *Employee Pension Benefit Plan*

Because it is possible for a WCA to be paid out, in certain limited circumstances, after the end of covered employment, the central dispute requires interpretation of subsection (ii) of the ERISA statute. Subsection (ii) addresses whether a plan's express terms or circumstances result in deferrals of income to or beyond the termination of employment. *See* 29 U.S.C. § 1002(2)(A)(ii). Plaintiff urges the Court to use a "results-based" test when considering whether the plan defers income to the end of employment or beyond, which at least one other court has considered. *See Pasternack v. Shrader,* 863 F.3d 162, 171 n.5 (2d Cir. 2017) (noting that the "word 'results' calls for an effects-based inquiry rather than one based on purpose"). However, adopting Plaintiff's view would mean that virtually *any* plan that allows for income to be paid after employment ends, even incidentally, could fall under ERISA's purview.

The Court disagrees with Plaintiff's interpretation. ERISA's "definition is not algorithmic" and its words should not be "read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach." *Murphy,* 611 F.2d at 575. Plaintiff's expansive interpretation reaches far beyond Congress' intent and ignores ERISA's fundamental premise,

both of which are rooted in protecting the *retirement assets* of workers.[3] *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51 (1987) ("i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy") (quotations and citations omitted).

Indeed, courts routinely find, as the Court does here, that "the purpose of the plan must be to provide retirement income or to defer income until termination or beyond." *Juric v. USALCO, LLC*, 659 F. Supp. 3d 619, 633 (D. Md. 2023). *See also Depew v. MNC Fin., Inc.*, 819 F. Supp. 492, 495 (D. Md. 1993) (finding no employee pension benefit plan under ERISA when the plans did not "require[ ] deferral of income until the termination of employment or thereafter"); *Rich v. Shrader*, 823 F.3d 1205, 1210 (9th Cir. 2016) ("[W]e agree with our sister circuits that have determined that the paramount consideration is whether the primary purpose of the plan is to provide deferred compensation or other retirement benefits."). And the "mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage." *Murphy*, 611 F.2d at 575. *See also Juric,* 659 F. Supp. 3d at 633 (finding the fact that some income "can or may be deferred" insufficient to sustain an ERISA claim); *Rich,* 823 F.3d at 1211 (finding the same).

The express purpose of the WCA program is to reward employees for performance and tenure, and both the plan structure and administration are tailored to achieve those ends. While the WCA contemplates rare situations under which an award might be paid after the end of employment, as is the case with retirement, in most circumstances, once the award is earned, it is

---

[3] *See* U.S. Department of Labor, *ERISA*, https://www.dol.gov/general/topic/health-plans/erisa (last accessed January 30, 2025).

9

promptly paid out. In sum, this is the type of scenario around which the Court will decline to stretch the "elastic girdle." *Murphy*, 611 F.2d at 575.

**B.  Department of Labor Bonus Plan Exemption**

Even if the Court were to adopt Plaintiff's results-based test and find that the WCA could be an employee pension benefit plan under ERISA, it is still subject to the Department of Labor's ("DOL") exemption for bonus plans, unless payments under the plan are "systematically deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3–2(c). By definition, "[a] bonus is '[a] premium paid in addition to what is due or expected[,] [especially] a payment by way of division of a business's profits, given over and above normal compensation.'" *Shafer v. Stanley*, No. 20 CIV. 11047 (PGG), 2024 WL 4697235, at *7 (S.D.N.Y. Nov. 5, 2024) (quoting *Bonus*, Black's Law Dictionary (11th ed. 2019)).

According to the DOL, a bonus plan "in operation," must not be "a vehicle for the provision of retirement income," DOL Advisory Op. 89-07A at 2, and a "significant operative factor" when considering whether a plan is a bonus plan under the regulation, is whether an "inordinate percentage of the bonus recipients were at . . . retirement age." *Id. See also Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 188–89 (3d Cir. 2003) (holding a plan was not subject to ERISA "because its purpose was to operate as an incentive and bonus program, and not as a means to defer compensation or provide retirement benefits"); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 931–34 (8th Cir. 1999) ("Though the [plan's] vesting requirement could result in the deferral of a portion of any earned incentive until a participant's termination or retirement, ... such a deferral would only occur by happenstance. In fact, the stated purpose of the vesting requirement reinforces our conclusion that the [plan] is a non-ERISA bonus plan.").

10

Here, the WCA is an unfunded, discretionary plan, devised for the express purpose of rewarding long-term FAs who also help the company meet financial goals. Awards are not guaranteed (the way salary and commission are); the employee must meet a minimum production threshold and stay at the company until the award vests, eight years later. Also, the award, while based on a small percentage of the FA's revenue generated over a performance year, is subject to adjustments by the company based on company and business line performance. Thus, the WCA is clearly a bonus plan, paid over and above normal compensation, and its intent and operation are not designed to provide retirement income.

Finally the plan does not "systematically defer income to the termination of covered employment or beyond." 29 C.F.R. § 2510.3–2(c). Generally, neither the company nor the FA may defer award payouts, and the few exceptions are intended to deter workforce reentry (in the case of retirement) and competition. Again, the vast majority of award payouts are to actively employed FAs. Thus, while it is possible in certain circumstances to receive a WCA payout after the end of employment, it is both limited in scope and uncommon in occurrence. It is, as the *Emmenegger* Court stated, "happenstance," 197 F.3d at 933, and plainly not systematic.

Consistent with the two courts that have found Defendants' functionally identical predecessor plans to be bonus plans exempt from ERISA,[4] the Court finds that the WCA is not an

---

[4] *See Mullett v. Merrill, Lynch, Pierce, Fenner & Smith*, No. CIV.A. 01-CV-2118, 2002 WL 32298599, at *2 (E.D. Pa. Feb. 26, 2002) (finding a bonus program exempt from ERISA where the plan was implemented to "establish and retain a strong salesforce," subject to a ten-year vesting period and paid promptly once vested; also concluding that the plan "provides neither 'retirement income' nor 'systematically deferred compensation until the termination of employment' merely because an employee might receive the benefits after he or she has retired or terminated employment"); *Callan,* WL 3452371, at *7-8 (finding a similar plan with similar criteria, vesting periods, and payment practices to be a bonus plan exempt from ERISA).

employee pension benefit plan; it is a bonus plan exempt from ERISA, and the Court will grant Defendants' Motion for Summary Judgment.

## IV.   ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1.  Defendants' Motion for Summary Judgment (Doc. No. 41) is **GRANTED;** and

2.  The Clerk is directed to close this matter in accordance with this Order.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: March 10, 2025

Kenneth D. Bell
United States District Judge

12

# United States District Court
## Western District of North Carolina
### Charlotte Division

| | | |
|---|---|---|
| Kelly Milligan**,** | ) | JUDGMENT IN CASE |
| | ) | |
| Plaintiff(s), | ) | 3:24-cv-00440-KDB-DCK |
| | ) | |
| vs. | ) | |
| | ) | |
| Merrill Lynch, Pierce, Fenner & | ) | |
| Smith, Inc. et al**,** | | |
| Defendant(s). | ) | |

 DECISION BY COURT. This action having come before the Court and a decision having been rendered;

IT IS ORDERED AND ADJUDGED that Judgment is hereby entered in accordance with the Court's March 11, 2025 Order.

March 11, 2025

Katherine Hord Simon, Clerk
United States District Court

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| KELLY MILLIGAN,<br>ON BEHALF OF HIMSELF AND<br>ALL OTHERS SIMILARLY SITUATED,<br><br>      Plaintiff,<br><br>   vs.<br><br>MERRILL LYNCH, PIERCE, FENNER &<br>SMITH INC., BANK OF AMERICA CORP.,<br>and JOHN/JANE DOE 1, THE SENIOR VICE<br>PRESIDENT–HUMAN RESOURCES<br>GLOBAL BANKING AND GLOBAL<br>WEALTH AND INVESTMENT<br>MANAGEMENT ADMINISTRATION AT<br>BANK OF AMERICA CORP.,<br><br>      Defendants. | Civil Action No. 3:24-cv-00440<br><br><br><br><br><br>CLASS ACTION |

### PLAINTIFF'S NOTICE OF APPEAL

Notice is hereby given that Plaintiff Kelly Milligan, on behalf of himself and all others similarly situated, appeals to the United States Court of Appeals for the Fourth Circuit from the Judgment entered by the District Court on March 11, 2025 (Civil Action No. 3:24-cv-00440-KDB-DCK, ECF 83) in the above-captioned action.

Dated:  April 9, 2025

Respectfully submitted,

*/s/ John D. Hurst*
John D. Hurst
N.C. Bar No. 37680
MOTLEY RICE LLC
50 Clay Street, Suite 1
Morgantown, WV  26501
Telephone: (304) 413-0456
Facsimile: (304) 413-0458
jhurst@motleyrice.com

Thomas R. Ajamie*
John S. "Jack" Edwards, Jr.*
Courtney D. Scobie*
AJAMIE LLP
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, TX  77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com
cscobie@ajamie.com

Mathew P. Jasinski*
Douglas P. Needham*
M. Zane Johnson*
MOTLEY RICE LLC
27 Church Street, 17th Floor
Hartford, CT  06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
mjasinski@motleyrice.com
dneedham@motleyrice.com
zjohnson@motleyrice.com

Robert A. Izard*
Craig A. Raabe*
Seth R. Klein*
Christopher M. Barrett*
IZARD, KINDALL & RAABE LLP
29 South Main Street, Suite 305
West Hartford, CT  06107
Tel: (860) 493-6292
Fax: (860) 493-6290
rizard@ikrlaw.com
craabe@ikrlaw.com
sklein@ikrlaw.com
cbarrett@ikrlaw.com

*Admitted *pro hac vice.*

## CERTIFICATE OF SERVICE

I, John D. Hurst, an attorney, certify that on April 9, 2025, I caused a copy of the foregoing document to be filed through the Court's CM/ECF Electronic Filing System, which will transmit notice of such filing to all counsel of record.

/s/ John D. Hurst
John D. Hurst