## No. 25-1385

# In the United States Court of Appeals
### FOR THE FOURTH CIRCUIT

KELLY MILLIGAN, on behalf of himself and all others similarly situated

*Plaintiff - Appellant*

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.;
BANK OF AMERICA CORPORATION

*Defendants - Appellees*

and

JOHN/JANE DOE 1, the Senior Vice President-Human Resources Global Banking
and Global Wealth and Investment Management Administration
at Bank of America Corp.

*Defendant*

On Appeal from the U.S. District Court for the Western District of North Carolina
No. 24-cv-440, Honorable Kenneth D. Bell

## BRIEF OF APPELLEES (REDACTED)

SAMUEL S. SHAULSON
MORGAN, LEWIS & BOCKIUS LLP
600 Brickell Avenue, Suite 1600
Miami, FL 33131
(305) 415-3412

MATTHEW A. RUSSELL
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
(312) 324-1771

MICHAEL E. KENNEALLY
ANDREW R. HELLMAN
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

*Counsel for Defendants-Appellees*

## MERRILL LYNCH, PIERCE, FENNER & SMITH INC.'S DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Defendant-Appellee Merrill Lynch, Pierce, Fenner & Smith Inc. makes the following disclosure:

1.     Is party/amicus a publicly held corporation or other publicly held entity?

No.

2.     Does party/amicus have any parent corporations?

Yes.

Merrill Lynch, Pierce, Fenner & Smith Inc. (the "Company") is a wholly-owned indirect subsidiary of Bank of America Corporation. The Company's direct parent is BAC North America Holding Company (BACNA), which is a wholly-owned subsidiary of NB Holdings Corporation ("NB Holdings"). NB Holdings is a wholly-owned subsidiary of Bank of America, a publicly held corporation.

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

As noted above, the Company is a wholly-owned indirect subsidiary of Bank of America, a publicly held corporation. Other than that, no.

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

No.

5.     Is party a trade association?

No.

6.     Does this case arise out of a bankruptcy proceeding?

No.

i

7.    Is this a criminal case in which there was an organizational victim?

No.

Dated:  July 28, 2025                    s/ Michael E. Kenneally
                                                          MICHAEL E. KENNEALLY

                                                          *Counsel for Defendants-Appellees*

## BANK OF AMERICA CORP.'S DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule

26.1, Defendant-Appellee Bank of America Corp. makes the following disclosure:

1.    Is party/amicus a publicly held corporation or other publicly held entity?

      Yes.

2.    Does party/amicus have any parent corporations?

      No.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held cor-
      poration or other publicly held entity?

      No.

4.    Is there any other publicly held corporation or other publicly held entity that
      has a direct financial interest in the outcome of the litigation?

      No.

5.    Is party a trade association?

      No.

6.    Does this case arise out of a bankruptcy proceeding?

      No.

7.    Is this a criminal case in which there was an organizational victim?

      No.

Dated:  July 28, 2025                   s/ Michael E. Kenneally
                                        MICHAEL E. KENNEALLY

                                        *Counsel for Defendants-Appellees*

iii

# TABLE OF CONTENTS

**Page**

MERRILL LYNCH, PIERCE, FENNER & SMITH INC.'S DISCLOSURE
STATEMENT..........................................................................................................i

BANK OF AMERICA CORP.'S DISCLOSURE STATEMENT.......................... iii

TABLE OF AUTHORITIES .....................................................................................vi

INTRODUCTION ...................................................................................................1

STATEMENT OF ISSUES ....................................................................................4

STATEMENT OF THE CASE................................................................................5

I.      Statutory and Regulatory Background .............................................................5

II.     Factual Background........................................................................................8

     A.     Merrill's Wealth Management and Financial Advisor Business ..........8

     B.     The Merrill Lynch FA Incentive Compensation Plans and Other
         Programs...............................................................................................8

     C.     The WealthChoice Long-Term Contingent Award Plan ....................11

     D.     Plaintiff Kelly Milligan .....................................................................16

III.    Procedural History .......................................................................................17

SUMMARY OF ARGUMENT .............................................................................19

ARGUMENT.........................................................................................................22

I.      The district court correctly concluded that Merrill's contingent
     incentive awards are not a "pension plan" within the meaning of
     ERISA.........................................................................................................22

     A.     Courts widely reject Plaintiff's theory that the possibility of
         post-employment payment triggers the statutory definition. ..............23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

B.    The awards do not "result[] in a deferral of income by employees." ..........................................................................................33

C.    The awards do not defer income "to the termination of covered employment or beyond." ....................................................................37

II.    The district court also correctly concluded that DOL's regulatory exemption for bonus plans independently precludes ERISA coverage. .......38

A.    Award payments qualify as "bonuses for work performed." ..............39

B.    Plaintiff's efforts to avoid the regulation fail. .....................................42

C.    Plaintiff's last-ditch attempt to invalidate the regulation is baseless. ...............................................................................................46

CONCLUSION ....................................................................................................51

CERTIFICATE OF COMPLIANCE ......................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aetna Health Inc. v. Davila*,
  542 U.S. 200 (2004).............................................................................................6

*Alessi v. Raybestos-Manhattan, Inc.*,
  451 U.S. 504 (1981).............................................................................................6

*Aliff v. BP Am., Inc.*,
  26 F.3d 486 (4th Cir. 1994) ...............................................................................33

*Black & Decker Disability Plan v. Nord*,
  538 U.S. 822 (2003).............................................................................................7

*Boos v. AT&T, Inc.*,
  643 F.3d 127 (5th Cir. 2011) .......................................................................34, 35

*Callan v. Merrill Lynch & Co.*,
  2010 WL 3452371 (S.D. Cal. Aug. 30, 2010)............................................45, 46

*Cashman v. GreyOrange, Inc.*,
  2023 WL 2652789 (N.D. Ga. Mar. 27, 2023) ...................................................41

*CFTC v. Schor*,
  478 U.S. 833 (1986)...........................................................................................49

*Conkright v. Frommert*,
  559 U.S. 506 (2010).............................................................................................6

*Depew v. MNC Fin., Inc.*,
  819 F. Supp. 492 (D. Md. 1993)........................................................................26

*Emmenegger v. Bull Moose Tube Co.*,
  197 F.3d 929 (8th Cir. 1999) .................................................................25, 30, 41

*Faris v. S. Ute Indian Tribe*,
  2023 WL 7386870 (D. Colo. Nov. 8, 2023).......................................................41

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Fraver v. N.C. Farm Bureau Mut. Ins. Co.*,
  801 F.2d 675 (4th Cir. 1986) .........................................................................36, 37

*Gobeille v. Liberty Mut. Ins. Co.*,
  577 U.S. 312 (2016)..............................................................................................47

*Hagel v. United Land Co.*,
  759 F. Supp. 1199 (E.D. Va. 1991) ....................................................................26

*Inman v. Klockner-Pentaplast of Am., Inc.*,
  467 F. Supp. 2d 642 (W.D. Va. 2006)................................................................26

*Juric v. USALCO, LLC*,
  659 F. Supp. 3d 619 (D. Md. 2023)..............................................................26, 30

*Kennedy v. Braidwood Mgmt., Inc.*,
  145 S. Ct. 2427 (2025)..........................................................................................48

*Keszenheimer v. Reliance Standard Life Ins. Co.*,
  402 F.3d 504 (5th Cir. 2005) ...............................................................................42

*Killian v. McCulloch*,
  850 F. Supp. 1239 (E.D. Pa. 1994).....................................................................41

*Lockheed Corp. v. Spink*,
  517 U.S. 882 (1996)...........................................................................................1, 7

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..................................................................................46, 47, 48

*Lord & Taylor, LLC v. White Flint, L.P.*,
  849 F.3d 567 (4th Cir. 2017) ...............................................................................33

*Lorenzo v. Prime Commc'ns, L.P.*,
  2018 WL 2296341 (E.D.N.C. Mar. 29, 2018).....................................................43

*Macsherry v. Sparrows Point, LLC*,
  2017 WL 3315262 (D. Md. Aug. 3, 2017)...........................................................43

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985)............................................................................6, 7

*McKinsey v. Sentry Ins.*,
  986 F.2d 401 (10th Cir. 1993) .............................................................41

*Muldrow v. City of St. Louis*,
  601 U.S. 346 (2024)..............................................................................24

*Murphy v. Inexco Oil Co.*,
  611 F.2d 570 (5th Cir. 1980) .........................................................*passim*

*Nachman Corp. v. PBGC*,
  446 U.S. 359 (1980)......................................................................5, 6, 7

*Oatway v. Am. Int'l Grp.*,
  325 F.3d 184 (3d Cir. 2003) ..........................................................*passim*

*Pasternack v. Shrader*,
  863 F.3d 162 (2d Cir. 2017) .................................................................25

*Rathbun v. Qwest Commc'ns Int'l, Inc.*,
  458 F. Supp. 2d 1238 (D. Colo. 2006)..................................................35

*Rich v. Shrader*,
  823 F.3d 1205 (9th Cir. 2016) .......................................25, 30, 31, 38

*Scanlan v. Am. Airlines Grp.*,
  384 F. Supp. 3d 520 (E.D. Pa. 2019)....................................................31

*Shafer v. Morgan Stanley*,
  2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023).......................31, 32, 43

*Teague v. S. Elevator Grp.*,
  2003 WL 21418100 (M.D.N.C. Mar. 27, 2003)..............................29, 37

*Tolbert v. RBC Cap. Mkts. Corp.*,
  758 F.3d 619 (5th Cir. 2014) .......................................................*passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Wilson v. Safelite Grp.*,
930 F.3d 429 (6th Cir. 2019) ........................................................................39, 41

**STATUTES**

Employee Retirement Income Security Act of 1974
29 U.S.C. § 1001....................................................................................................5
29 U.S.C. § 1002............................................................................................*passim*
29 U.S.C. § 1053..................................................................................................22
29 U.S.C. § 1135............................................................................................*passim*

Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364,
94 Stat. 1208 ......................................................................................................49

**REGULATIONS**

29 C.F.R. § 2510.3-2.......................................................................................*passim*

Coverage; Reporting and Disclosure Requirements, 40 Fed. Reg. 34,526 (Aug.
15, 1975) ...............................................................................................................7

Notice of Proposed Rulemaking, 40 Fed. Reg. 24,642 (June 9, 1975) ....................7

**OTHER AUTHORITIES**

*Defer*, *Black's Law Dictionary* (12th ed. 2024)........................................................33

DOL Advisory Op. 89-07A,
1989 WL 206413 (Apr. 27, 1989) ......................................................................45

DOL Advisory Op. 98-02A,
1998 WL 103654 (Mar. 6, 1998).........................................................................41

DOL Advisory Op. 2023-13A,
2002 WL 31846478 (Dec. 6, 2002)....................................................................42

John H. Langbein, *What ERISA Means by "Equitable,"* 103 Colum. L. Rev.
1317 (2003).............................................................................................................5

ix

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Kelly Milligan*, QUORUM PRIVATE WEALTH,
https://quorumpw.com/team/kelly-milligan/ (last visited July 25, 2025) ..........16

## INTRODUCTION

This case asks whether incentive compensation awards for high-performing employees who remain with their financial services firm for eight years are a "pension plan" under the Employee Retirement Income Security Act of 1974 ("ERISA"). They are not. Countless employers have long paid similar bonuses, which help retain and reward talented employees. They do not provide retirement benefits and do not function like pension plans. Courts therefore widely hold, like the district court below, that such bonuses are not subject to ERISA's requirements for pension plans. This Court should affirm.

Regulating retention bonuses as retirement plans would be baffling to the Congress that enacted ERISA. ERISA was written to address a serious problem: pension-plan failures that left workers without payments promised to fund their retirements. The statute therefore aims to ensure that when employers make such promises, employers keep them. Yet Congress decided *not* to "mandate what kind of benefits employers must provide." *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Instead, ERISA allows employers to choose what benefits, if any, to offer employees. Plaintiff misuses ERISA in the exact way Congress rejected: to extract payments on terms on which his employer admittedly did not promise them.

Plaintiff worked for Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill") as a financial advisor. Merrill offers financial advisors a compensation package that

1

includes a guaranteed monthly salary, cash incentive compensation paid monthly, and additional long-term contingent incentive awards that high-performing financial advisors can earn through the Bank of America WealthChoice Contingent Award Plan ("WealthChoice"). The long-term awards promote retention in an industry where turnover is common and costly, and have conditions that a financial advisor must satisfy to earn the payment. One such condition is remaining continuously employed with Merrill through a specified date eight years after the award issues. If the financial advisor voluntarily leaves Merrill before then—as Plaintiff did here, to start his own competing firm—he does not earn the award.

Plaintiff does not dispute that Merrill can lawfully condition its long-term contingent incentive awards in this way. But he claims that the awards amount to a pension plan under ERISA—and trigger all of ERISA's pension-plan regulations— because WealthChoice allows payments to *other* financial advisors who leave Merrill before the end of the eight-year vesting period for *other* reasons, like death, disability, or retirement. In these limited and carefully defined scenarios, payments can benefit loyal financial advisors and their families without frustrating the goal of promoting retention. Yet according to Plaintiff, Merrill's desire to be generous to *those* financial advisors transforms all WealthChoice awards into an ERISA-governed retirement plan. In other words, he thinks the *Employee Retirement Income Security Act* bars Merrill from making awards to dying, disabled, or retiring financial advisors

2

unless Merrill also makes payments to those who, like Plaintiff, voluntarily leave Merrill to work for its competitors.

Fortunately, ERISA does not support that absurd result. Indeed, Plaintiff's theory faces two independent problems.

Start with the statutory text. Plaintiff invokes a provision that defines a plan as a pension plan to the extent that it "(i) provides retirement income to employees" or "(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A). Plaintiff rests his case on clause (ii). In his view, even though financial advisors normally cannot claim unvested awards after their employment ends—that, after all, is the point of retention-promoting compensation—the receipt of post-employment awards by a small subset of financial advisors (under 9% each year) shows that WealthChoice results in a deferral of income past the termination of employment. As the district court recognized, courts across the country have rejected this misinterpretation of the statutory language. ERISA does not treat every post-employment payment as a retirement plan. If it did, mailing a final paycheck a week after the employee's last day on the job would be administering an ERISA-governed retirement plan. So too would paying end-of-year bonuses to employees who died or became disabled after year end. That is what Plaintiff's view entails. Unsurprisingly, Plaintiff fails to account for numerous aspects of the statutory language, all of

3

which confirm that Plaintiff has no right to demand that Merrill operate its retention-focused bonus program as a retirement plan.

Plaintiff's second problem is that his theory contradicts a longstanding Department of Labor ("DOL") regulation that has been in force for about as long as ERISA itself. The statute authorizes DOL to promulgate regulations defining technical terms. 29 U.S.C. § 1135. Fifty years ago, DOL exercised this delegated authority to clarify that ERISA's definition of a "pension plan" does not reach "payments made by an employer to some or all of its employees as bonuses for work performed" (with specified exceptions that Plaintiff admits do not apply here). 29 C.F.R. § 2510.3-2(c). The district court concluded that even if ERISA's statutory definition, standing alone, could conceivably apply to the awards, DOL's bonus regulation confirms that the definition does not stretch so far. Courts widely agree that incentive compensation payments earned over time to promote retention are "bonuses" within the meaning of the regulation. Under both ERISA's statutory definition and DOL's bonus regulation, this Court should affirm.

## STATEMENT OF ISSUES

I.      Whether the district court was correct to conclude that the narrow exceptions to the rule that WealthChoice awards are earned only after eight years of continued employment do not make the entire WealthChoice program an "employee pension benefit plan" subject to ERISA's pension-plan requirements.

4

II.     Whether the district court was correct to conclude in the alternative that the awards are exempt from ERISA's pension-plan requirements under a DOL regulation for "bonus" plans, given the awards' purpose and effect of rewarding longevity with Merrill.

## STATEMENT OF THE CASE

### I.     Statutory and Regulatory Background

Congress enacted ERISA in 1974, "following almost a decade of studying the Nation's private pension plans." *Nachman Corp. v. PBGC*, 446 U.S. 359, 361 (1980).  Congress sought "to protect pension plan participants and beneficiaries against two hazards … that had revealed themselves in pre-ERISA practice": employers' defaulting on their pension plans and administrators' mismanaging of plan assets, both of which jeopardized retirement benefits that workers had been promised.  John H. Langbein, *What ERISA Means by "Equitable*,*"* 103 Colum. L. Rev. 1317, 1322-24 (2003); *see* 29 U.S.C. § 1001(a) (stating animating congressional purposes, including "the inadequacy of current minimum standards" for "the soundness and stability of plans with respect to adequate funds to pay promised benefits," which resulted in workers and their families "be[ing] deprived of anticipated benefits" for retirement).

"Congress wanted to correct this condition by making sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled

5

whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman Corp.*, 446 U.S. at 375.  Congress thus codified in ERISA a set of regulations—"minimum rules for employee participation," "funding standards to increase solvency of pension plans," "fiduciary standards for plan managers," "and an insurance program in case of plan termination"—that together "ensure that employee pension expectations are not defeated." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 510 n.5 (1981).

Significantly, however, Congress let employers continue to decide what benefits, if any, to offer their employees. *See, e.g.*, *Conkright v. Frommert*, 559 U.S. 506, 516 (2010) ("Congress did not require employers to establish benefit plans in the first place").  Congress also took care to ensure that "the cost of federal standards" would not "discourage the growth of private pension plans," which would have left workers worse off overall. *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148 n.17 (1985).  The Supreme Court has "therefore recognized that ERISA represents a 'careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans,'" so that the statute benefits employers and employees alike. *Conkright*, 559 U.S. at 517 (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215 (2004)).  ERISA's focus, then, is "to ensure that employees will not be left empty-handed once employers have guaranteed them

6

certain benefits." *Lockheed*, 517 U.S. at 887; *see Nachman Corp.*, 446 U.S. at 374; *Mass. Mut.*, 473 U.S. at 148 n.17.

Recognizing the complexity of employee benefit regulation, Congress "empower[ed] the Secretary of Labor to 'prescribe such regulations as he finds necessary or appropriate to carry out' the statutory provisions securing employee benefit rights." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) (quoting 29 U.S.C. § 1135). That delegation of authority includes express authority to "define accounting, technical and trade terms used in [the statute]." 29 U.S.C. § 1135. Within a year of ERISA's enactment, DOL exercised this authority to "clarif[y] the limits of the defined terms 'employee pension benefit plan' and 'pension plan' for purposes of" ERISA. 29 C.F.R. § 2510.3-2(a); Coverage; Reporting and Disclosure Requirements, 40 Fed. Reg. 34,526, 34,526 (Aug. 15, 1975) (final rule); *see also* Notice of Proposed Rulemaking, 40 Fed. Reg. 24,642 (June 9, 1975).

Relevant here, and consistent with ERISA's purpose of fostering predictable liabilities, DOL instructed that the pension-plan requirements generally do not apply to employee bonus programs. 29 C.F.R. § 2510.3-2(c); 40 Fed. Reg. at 24,642. The statute and regulation at the center of this case have thus been in effect, and have been relied on by employers and employees alike, for half a century.

7

## II.     Factual Background

### A.     Merrill's Wealth Management and Financial Advisor Business

Merrill is a registered broker-dealer and investment advisor that offers invest-ment and wealth management services.  JA38 ¶ 13.  It is a wholly owned subsidiary of Bank of America, which established WealthChoice.  *Id.*; JA41 ¶ 19.

Merrill operates in a competitive market for talented financial advisors, who are essential to its success.  JA350 ¶¶ 3-4.  Many financial advisors change employ-ers over their careers—often taking clients with them.  *Id.* ¶ 4.  Merrill and its com-petitors therefore recruit financial advisors with incentives like sign-on bonuses and other payments.  *Id.*  These recruitment incentives are often designed to compensate financial advisors for incentive compensation they did not earn because they left another firm.  *Id.* ¶ 5.

### B.     The Merrill Lynch FA Incentive Compensation Plans and Other Programs

Merrill offers a competitive compensation package.  JA350 ¶ 3.  The Merrill Lynch Financial Advisor Incentive Compensation Plan ("FA Comp Plan"), pub-lished annually, summarizes the central features of this compensation program.  *E.g.*, JA587 ¶ 8; JA777-809.[1]  During the relevant period, the FA Comp Plans outlined

---

[1] While this brief cites examples, all FA Comp Plans from 2015-2020 are reproduced at JA588-888.  Plaintiff's Award Agreements (2010-2019) are reproduced at JA77-288, JA558-84, and the WealthChoice Fact Sheets (2015-2020) are reproduced at JA315-48.

8

various ways a financial advisor can earn compensation and incentive awards, but the categories most relevant here are: (1) a guaranteed base salary; (2) monthly cash incentive compensation; and (3) the opportunity to earn long-term contingent incentive awards. *See* JA779.

First, financial advisors received a guaranteed monthly salary set before the start of each calendar year. *See, e.g.*, JA803.

Second, financial advisors are eligible to receive monthly cash compensation on top of their monthly salary. JA14-15 ¶ 2; JA802 ¶ 1. This monthly cash compensation was calculated as a percentage of the financial advisor's "production credits"—which generally represent revenue from the advisor's clients—using "cash grid rates" stated in each annual FA Comp Plan. JA779-780. For example, a financial advisor with less than ██████ in production in 2018 could earn ███ of that amount as ongoing compensation. *Id.* But a financial advisor could earn as much as ███ in monthly cash compensation by attaining ██████ or more in production. *Id.* ████████████████████████████████████████

████████████████████████████████████████

████████████████████████ JA780, JA802.

Third, financial advisors could be granted additional long-term contingent incentive awards. JA779-780. These awards were granted only *after* the prior year, in amounts "based on [production credit] levels for the full performance year."

9

JA780. Financial advisors could be granted two types of contingent incentive awards: a Long-Term Productivity award and a Service award. JA779, JA784. The amount of a Long-Term Productivity award was based on a distinct "long term productivity grid," separate from the "cash grid" above. *Id.* Unlike the cash grid, moreover, a financial advisor had to satisfy a minimum production threshold to qualify for a Long-Term Productivity award. JA779.[2] Financial advisors also could be granted a separate Service award, based on a combination of their length of service and full-year production, in an amount based on another distinct rate. JA784. For most of the relevant period, the contingent awards (both Long-Term Productivity and Service awards) were issued through two vehicles: (1) WealthChoice awards and (2) restricted stock units ("RSUs") under the applicable Bank of America stock plan. *Id.*

Separate from the FA Comp Plan, Bank of America sponsored several actual retirement plans over the relevant period—including the Bank of America 401(k) Plan—as well as a voluntary deferred-compensation plan for eligible employees. JA350 ¶ 6. These plans, which are governed by ERISA, were differentiated from the long-term incentive award plans, including WealthChoice. *See, e.g.*, JA361 ¶ 9,

---

[2] For example, in 2018, a financial advisor had to have at least     in production to be eligible. JA779-780. If an advisor met this threshold, the award was    . JA779. The long-term grid rate grew as advisors achieved higher production, thus incentivizing performance. *See, e.g., id.* (         production may be eligible for a contingent award of    ).

10

JA371 (explaining why certain changes for "our long-term incentive award plans" did not "also apply to my company retirement plans" or "voluntary deferred compensation plans").

## C. The WealthChoice Long-Term Contingent Award Plan

As explained, Bank of America established WealthChoice to serve as one vehicle for "providing long-term contingent incentive compensation, subject to certain conditions, to a select group of Financial Advisors." JA67 (Art. I). Its stated purpose was to "encourage the Financial Advisor to remain employed by the Company and its Subsidiaries and to further align the interests of the Financial Advisor with the Company's business objectives." *Id.* WealthChoice advances these goals "[b]y awarding … incentive compensation in the form of a cash award which becomes earned and payable over time." *Id.*

WealthChoice awards were issued annually. *See, e.g.*, JA558-684 (2019 Award Agmt., granted on Feb. 15, 2019); JA339 (2019 Fact Sheet, stating grant date will be Feb. 15, 2019). To be eligible for a WealthChoice award, a financial advisor generally must be employed on the grant date and satisfy all "performance criteria" as "established periodically by the Administrator and [which] may vary from Performance Period to Performance Period and according to the type of performance." JA68. The administrator has "sole and exclusive discretion" to determine whether someone is eligible. *Id.* (defining "Covered Associate"); JA70 ("The amount of each

11

Covered Associate's Award in any given year shall be determined by the Administrator and be subject to the review and approval of the Company."); *see also, e.g.*, JA780, JA785.

Each award was "evidenced by an Award Agreement" between the financial advisor and Bank of America, which "specif[ies] the terms and provisions applicable to such Award as determined by the Administrator." JA70, JA560. The Award Agreements made clear that the advisors do not earn the contingent award unless and until they satisfy all the contractual conditions for doing so. *See, e.g.*, JA560, JA565. Most notably, advisors must "remain employed with Bank of America and its Subsidiaries through" the date that the award "will become earned and payable." JA565 ¶ (a); JA560 ¶ 4 (the award "shall become earned by, and payable to, you in the amounts and on the dates shown"); JA561 ¶ 8 (the award "represents an unsecured, unfunded, contingent promise" to pay its value "after the Vesting Date"). The annual FA Comp Plan similarly informed that "Long Term Contingent awards are subject to the terms and conditions of the applicable plans, programs and award agreements, including but not limited to their vesting requirements." JA785 (emphasis omitted).

A WealthChoice award generally does not become "earned and payable" unless the financial advisor remains employed eight years after the award was granted.

12

For example, the Award granted to Plaintiff on February 15, 2019, stated that, subject to other terms in the Award Agreement, his "Award will become *earned and payable* on February 15, 2027 *if you remain employed* with Bank of America and its Subsidiaries through that date." JA565 ¶ (a) (emphasis added). The FA Comp Plans similarly made clear that "*no awards are earned or paid until fully vested* in accordance with the terms and conditions of each award." JA785 (emphasis omitted in part); *see also* JA340 (2019 Fact Sheet).

The Award Agreements also provided that a notional account will be established with the stated value of each WealthChoice award. JA560 ¶ 1. This notional account "represents [the financial advisor's] contingent right to receive the value of the Account Balance on the Vesting Date for [his or her] Award." *Id.* The "value" of the account is indexed to the performance of "mutual funds or other benchmark investments [the financial advisor] select[s] from choices established by the Administrator." *Id.* The Award Agreements are clear, however, that an "Account Balance represents an unsecured, unfunded, contingent promise by your employer to pay the value of the Account Balance to you after the Vesting Date," and the financial advisor "will not own the mutual funds or other options chosen as benchmarks." JA561 ¶ 8; *see also* JA71 § 6.1.

13

If an advisor satisfies the conditions for earning a WealthChoice award, payment occurs promptly thereafter. JA19 ¶ 23; JA565 ¶ (a) ("Once the Account Balance representing your Award becomes earned and payable, payment of your Account Balance will be made as soon as administratively practicable[.]"); *see also* JA72 § 7.1. Therefore, once an award is earned, a financial advisor cannot "defer" payment for such award to a later date.

The Award Agreements govern the effect of termination of employment. *See* JA73 (Art. VIII). They state that "[i]n the case of your Termination of Employment prior to the [stated] payment date, then the Account Balance representing your Award shall become earned and payable or be canceled depending on the reason for your Termination of Employment as follows." JA565 ¶ (b).

As a general rule, if employment ends before the award's stated payment date for any reason other than limited circumstances specified in the Award Agreement, "the Account Balance shall be canceled as of your Termination of Employment." *Id.* ¶ (b)(iii), JA566 ¶ (b)(v). This includes financial advisors who depart voluntarily, like Plaintiff. *Id.*; *see* JA341 (2019 Fact Sheet).

The Award Agreements also address certain involuntary terminations due to circumstances largely beyond financial advisors' control. If they die, the "Account Balance shall become immediately earned and payable," with payment "made as soon as administratively practicable." JA565 ¶ (b)(i). If a termination is due to a

14

"Workforce Reduction, Divestiture or Disability" (as defined in the Agreement), the awards "shall continue to become earned and payable" on the stated vesting schedule—but only if the financial advisors comply with additional covenants, including not to solicit employees and clients, and not to engage in "Detrimental Conduct" before the awards are earned. *Id.* ¶ (b)(ii); JA568 ¶ (d)(ii). If the employment terminates within two years of a "Change in Control"—either without "Cause," or "for Good Reason"—the awards "shall become immediately earned as of the date of such" termination. JA566 ¶ (b)(iv).

WealthChoice anticipates that individuals may retire from the industry in the ordinary course before an eight-year vesting period would end. If a financial advisor is eligible for "Retirement" at termination (other than terminations due to death or for Cause), awards "will become earned and payable in two installments." *Id.* ¶ (c). The first half becomes "earned and payable" shortly after the end of the year the financial advisor terminates or retires. *Id.* To earn such awards, however, a financial advisor also must comply with additional terms—including an agreement (i) not to engage in "Competition"; (ii) not to solicit employees and clients; (iii) not to engage in Detrimental Conduct; and (iv) to submit an annual certification that he has not engaged in Competition. JA566-67 ¶ (c). If the advisor does not satisfy these added conditions, any unearned awards "shall be immediately canceled as of the date of such determination." JA567 ¶ (c).

15

Data reflecting the distribution of WealthChoice awards confirms that, as de-signed, nearly all payments were made to *actively* employed financial advisors. Spe-cifically, from 2018 through June 30, 2024, between 91.3% and 94.2% of all finan-cial advisors who received payment for earned WealthChoice awards in each year were paid while employed, under the normal eight-year period. JA556 ¶ 3.

### D.    Plaintiff Kelly Milligan

Plaintiff is a former financial advisor who started working at Merrill in 2000. JA16-17 ¶ 11; JA350-51 ¶ 7; JA353. He voluntarily resigned from Merrill on April 30, 2021, to cofound a competitor financial and wealth advisory firm, Quorum Pri-vate Wealth. *Id.*; *see also* JA383; *Kelly Milligan*, QUORUM PRIVATE WEALTH, https://quorumpw.com/team/kelly-milligan/ (last visited July 25, 2025).

From 2015 through 2020, Plaintiff's annual compensation based on the "cash grid" (*i.e.*, not including his distinct WealthChoice and RSU awards) ranged from around $                                        per year. JA586 ¶ 3. From 2015 until April 2021, Plaintiff earned—and Merrill therefore paid him—roughly                  in monthly compensation based on the cash grid. *Id.* ¶ 4.

Separately, Plaintiff was issued long-term contingent awards (including both Long-Term Productivity and Service awards) that together ranged from around                            annually, or              on average. *Id.* ¶ 5. But not all of Plaintiff's contingent awards were WealthChoice awards. From 2015 through 2018,

16

he was granted 50% of his awards in WealthChoice, with the other 50% as RSUs. *Id.* ¶ 6. For 2019 and 2020, however, Plaintiff chose 100% RSUs. *Id.* ¶ 7.

While at Merrill, Plaintiff also earned (and was therefore paid) several WealthChoice awards as they vested. JA556 ¶ 4. For example, in February 2021— just two months before he left—Plaintiff received a cash payment of ▮▮▮ (before taxes), for a WealthChoice award granted on February 15, 2013. *Id.* ¶ 5. The previous year, in February 2020, he was paid ▮▮▮ (before taxes), the value of the award he was granted on February 15, 2012. *Id.* ¶ 6.

## III. Procedural History

Plaintiff filed a putative class action complaint asserting that WealthChoice qualifies as an "employee pension benefit plan" under ERISA and violates requirements for such plans. JA14-34. The district court disagreed and granted summary judgment to Merrill. JA537-49.

The court began with the statutory definition of "pension plan," noting that Plaintiff's argument "requires interpretation of subsection (ii)," which "addresses whether a plan's express terms or circumstances result in deferrals of income to or beyond the termination of employment." JA544. The court acknowledged that "it is possible for a[n award] to be paid out, in certain limited circumstances, after the end of covered employment," but recognized that basing ERISA coverage on that mere possibility "would mean that virtually *any* plan that allows for income to be

17

paid after employment ends, even incidentally, could fall under ERISA's purview."
*Id.* Reasoning that such an "expansive interpretation reaches far beyond Congress'
intent and ignores ERISA's fundamental premise, both of which are rooted in pro-
tecting the *retirement assets* of workers," the court surveyed cases holding that for
ERISA to apply, "the purpose of the plan must be to provide retirement income or
to defer income until termination or beyond." JA544-45 (citation omitted).

Applying these principles, the district court observed that WealthChoice's
"express purpose … is to reward employees for performance and tenure, and both
the plan structure and administration are tailored to achieve those ends." JA545.
The court ultimately concluded that based on how WealthChoice generally func-
tions, ERISA does not apply: while it "contemplates rare situations under which an
award might be paid out after the end of employment, as is the case with retirement,
in most circumstances, once the award is earned, it is promptly paid out." JA545-
46. The district court "decline[d] to stretch the 'elastic girdle'" of the "pension plan"
definition around these facts, where doing so would veer so far from ERISA's basic
premise.

The district court then turned to DOL's bonus regulation, concluding that the
regulation independently precluded ERISA coverage and thus defeated Plaintiff's
claims in its own right. The court considered the dictionary definition of a "bonus"
as a "premium paid in addition to what is due or expected" and, surveying case law

18

and DOL advisory opinions, added that "a significant operative factor when considering whether a plan is a bonus plan under the regulation" "is whether an inordinate percentage of the bonus recipients were at retirement age." JA546 (quotations, ellipsis, and citation omitted).

The court concluded that, under this framework, WealthChoice is an exempt bonus plan. It is "devised for the express purpose of rewarding long-term FAs who also help the company meet financial goals," and award payments "are not guaranteed (the way salary and commission are)" but rather require recipients to "stay at the company until the award vests," among other things. JA547. These features showed what "is clearly a bonus plan," with awards "paid over and above normal compensation," and the "intent and operation are not designed to provide retirement income." *Id.* Because "the vast majority of award payments are to actively employed FAs," the "few exceptions" to the default vesting rule are "plainly not systematic." *Id.*

## SUMMARY OF ARGUMENT

I. The district court soundly applied ERISA's statutory language to conclude that ERISA's pension-plan requirements do not apply. The undisputed facts show that the awards are overwhelmingly paid to *current* employees. Plaintiff highlights that employees who die, become disabled, or retire may receive payments in specified circumstances. But such merely incidental post-employment payments do not

19

trigger ERISA's pension-plan definition, as appellate courts and courts in this Circuit have widely concluded.

That makes sense, because Congress enacted ERISA to protect the assets that workers reasonably expect to rely on when they retire. It would defy that goal to treat payments that employers and employees (financial advisors, no less) alike understand as incentive compensation for *current* employees as though they were retirement savings—particularly when Plaintiff's theory would punish an employer for voluntarily choosing to make payments to certain deceased, disabled, or retiring employees. After all, if Merrill made no such exception to its eight-year vesting requirement, Plaintiff would have no argument. Giving Plaintiff a windfall that would encourage, if not all but guarantee, less generosity to retiring employees would turn ERISA on its head.

Beyond contravening a long line of authority and ERISA's basic purpose, Plaintiff's claim also fails to account for multiple other features of the statutory text. For instance, he fails to explain how the awards here "result[] in a deferral of income by employees," 29 U.S.C. § 1002(2)(A)(ii), when the employees have no right to the money in the first place—no income to defer—until they satisfy the vesting requirements. Nor does he explain how any deferral of income by employees (assuming there were one) is "for periods extending to the termination of covered employment

or beyond." *Id.* Unlike an actual retirement plan, the predetermined eight-year vesting schedule here bears no particular relationship to anyone's retirement. Merrill does allow former employees to receive payment in the specified circumstances that do not frustrate its purpose of promoting retention. But in structure and practice, those payments are incidental to paying *current* employees.

II. The district court was also correct to conclude that apart from ERISA's definition of "pension plan," DOL's "bonus plan" regulation defeats ERISA coverage. The plain meaning of "bonus" reaches a premium paid on consideration in addition to the compensation that is ordinarily expected. Court after court has held that the regulation reaches plans that promote superior performance and retention, as WealthChoice does. Plaintiff has no real response. He argues at length that award payments are "commissions" rather than "bonuses"; but they are not, and in any event he never explains why those terms would be mutually exclusive for the bonus regulation, which does not refer to "commissions" at all. As a last gasp, then, Plaintiff seeks to invalidate the regulation entirely. This effort fails. In ERISA, Congress explicitly delegated to the Secretary of Labor the authority to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter," including by defining technical or trade terms. 29 U.S.C. § 1135. DOL lawfully exercised that authority in promulgating the bonus regulation in 1975, one year after ERISA's enactment, and that regulation has not materially changed since.

21

Congress has made various changes to ERISA, including DOL's authority to issue regulations classifying certain plans, but has never expressed the slightest disapproval of the bonus regulation. Plaintiff's effort to erase this long-settled regulation, on which stakeholders have long relied, is radical and deeply misguided.

## ARGUMENT

Plaintiff asserts that Merrill's contingent incentive award program "violates ERISA's vesting and anti-forfeiture requirements." JA15 ¶ 6; *accord* JA14 ¶ 1 (alleging a "violation of ERISA § 203(a), 29 U.S.C. § 1053(a)"); JA28-32 ¶¶ 64, 67-68, 80 (similar). For those requirements to apply, however, the program must be a "pension plan" under the statute. 29 U.S.C. § 1053(a). The district court correctly concluded that it is not.

## I.  The district court correctly concluded that Merrill's contingent incentive awards are not a "pension plan" within the meaning of ERISA.

Under ERISA's definitions:

[T]he terms "employee pension benefit plan" and "pension plan" mean any plan, fund, or program … established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A).

Plaintiff concedes that WealthChoice awards do not provide retirement income under clause (i) and instead focuses exclusively on clause (ii). Br. 46-47. So, as the district court recognized, "the central dispute" is whether WealthChoice's express terms or surrounding circumstances result in a deferral of income by employees until the termination of employment or beyond. JA544 (citing 29 U.S.C. § 1002(2)(A)(ii)). As the district court determined, the answer to that question is no.

### A. Courts widely reject Plaintiff's theory that the possibility of post-employment payment triggers the statutory definition.

The district court recognized that Plaintiff's argument starts from a factually accurate premise—that "it is possible for a[n award] to be paid out, in certain limited circumstances, after the end of covered employment"—but then wrongly expands the statutory language so that " virtually *any* plan that allows for income to be paid after employment ends, even incidentally, could fall under ERISA's purview." JA544. Plaintiff does not shy away from this characterization of his position. He argues that Section 1002(2)(A)(ii) "creates a straightforward 'results in' test: either a plan results in such a deferral or it does not." Br. 32. In his view, "if one of its outcomes" is a deferral of income to retirement, the "plan is covered under [clause] (ii)." Br. 20 (emphasis omitted). Plaintiff thus rewrites ERISA to cover any plan,

fund, or program to the extent that it "(ii) [*ever*] results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A). But ERISA does not say that it applies if a plan "ever" results in a deferral of income to the termination of covered employment; only Plaintiff does. Courts should not "add words … to the statute Congress enacted." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024).

Rather than expand the statute as Plaintiff proposes, the district court followed an unbroken line of cases, dating back almost to ERISA's enactment, that recognize that ERISA's definition of "pension plan" "'is not algorithmic,' and its words should not be 'read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach.'" JA544 (quoting *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980)). The company in *Murphy*, for example, awarded "participation units" (royalty interests in a drilling prospect) to certain employees as a bonus. 611 F.2d at 572. If the employees left the company "for reasons other than death, disability, or company-authorized retirement," their participation units were forfeited. *Id.* at 573 n.3. But those who retired with the company's authorization continued to own and receive payments from the participation units they were previously assigned. *Id.* at 573. The company's former president filed suit arguing, much like Plaintiff here, that this program constituted an ERISA pension plan. *Id.* at 575. But the Fifth Circuit easily rejected his position that the awards triggered the

24

statute's definition just because former employees could sometimes receive payments: "Under the statutory definition, … the mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage." *Id.* at 575.

Other circuits agree: Section 1002(2)(A)(ii) is not triggered merely because some individuals receive payments after their employment ends. *See, e.g.*, *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 933 (8th Cir. 1999) ("Though the PSP's vesting requirement could result in the deferral of a portion of any earned incentive until a participant's termination or retirement … , such a deferral would only occur by happenstance."); *Oatway v. Am. Int'l Grp.*, 325 F.3d 184, 189 (3d Cir. 2003) (statutory definition not satisfied where "post-retirement payments were only incidental to the goal of providing current compensation"); *Rich v. Shrader*, 823 F.3d 1205, 1211 (9th Cir. 2016) ("[T]he mere possibility that income *can* be deferred does not mandate ERISA coverage."); *Pasternack v. Shrader*, 863 F.3d 162, 169 (2d Cir. 2017) (holding that stock ownership plan was not a pension plan even though the "ownership stake [could] be liquidated into cash only after retirement").

For decades, district courts in this Circuit have likewise declined to apply clause (ii) every time an employer pays a former employee. As Judge Ellis reasoned:

> Plaintiff … interprets § 1002(2)(A)(ii) as requiring only that *some portion* of deferred income become due, under the particular facts of a case, after termination of employment. This argument is ultimately unpersuasive. A more

25

> natural reading of § 1002(2)(A)(ii)'s requirement that
> there be a "deferral of income … to the termination of cov-
> ered employment or beyond" is that the statute requires
> that a plan *generally* defer the receipt of income to the ter-
> mination of employment. … This reading comports not
> only with the language, but with the general purpose of
> ERISA to protect employees' expectations concerning the
> receipt of retirement income.

*Hagel v. United Land Co.*, 759 F. Supp. 1199, 1202 (E.D. Va. 1991) (second em-

phasis added).  ERISA covers a plan under clause (ii) if it generally functions like a

retirement plan.  *See, e.g.*, *Juric v. USALCO, LLC*, 659 F. Supp. 3d 619, 633 (D. Md.

2023) ("[W]hile the documents reflect that the Equity Incentive Plan could poten-

tially result in post-termination income, this is not sufficient to bring the plan within

ERISA's regulatory scheme."); *Inman v. Klockner-Pentaplast of Am., Inc.*, 467 F.

Supp. 2d 642, 651 (W.D. Va. 2006) ("[A]lthough it is possible that Plaintiff could

see income from his stock investment after the time he retired, that fact alone does

not render the KPP stock purchase an ERISA plan."); *Depew v. MNC Fin., Inc.*, 819

F. Supp. 492, 496 (D. Md. 1993) (following *Hagel*, 759 F. Supp. at 1202, and col-

lecting other cases).

The district court correctly held that this well-settled principle forecloses

Plaintiff's theory: WealthChoice awards reward *current* financial advisors for their

longevity with Merrill.  Paying those who retire, die, become disabled, or otherwise

stop working for Merrill in the specified circumstances WealthChoice allows does

not detract from its promotion of retention or transform a bonus program for *current*

employees into an ERISA-governed pension plan.  WealthChoice overwhelmingly makes payments to current employees.  Plaintiff does not challenge the district court's finding that "92.6% of the FAs who received [award payments] between 2018 and 2024 were active employees."  JA543 n.2.  Structurally and statistically, "post-retirement payments [are] only incidental to the goal of providing current compensation," so the awards are "not an employee pension benefit plan under ERISA." *Oatway*, 325 F.3d at 189.

Plaintiff's contrary theory violates Congress's purpose in enacting ERISA as well as common sense.  His theory is categorical and absolute: "Subsection (ii) does not qualify coverage based on the frequency, amount, or systematic nature of post-termination payments."  Br. 32.  That approach would produce ERISA plans where no one ever imagined or intended—least of all Congress when it sought to address the problem of (actual) pension plan failures.  Employees might receive payment upon or after the termination of employment in a wide range of situations.  Applying ERISA's pension plan regime whenever that happens, however incidentally, would not help protect anyone's retirement assets.

Consider a few examples.  A company pays out year-end bonuses in February to everyone employed at the end of the prior calendar year, including those who retired or died in January.  Plaintiff finds an ERISA-governed pension plan.  An employee issues paychecks every two weeks on Thursday covering the two full prior

27

weeks, including to employees who ended employment on Monday, Tuesday, or Wednesday. That, to Plaintiff, "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond" and means another ERISA-governed pension plan. An employee dies in an accident shortly before his biweekly paycheck hits his account. ERISA-governed pension plan number three. What conceivable congressional purpose would such an extreme approach further? Congress enacted ERISA to protect workers' retirement assets, not to give Plaintiff, a highly compensated financial advisor who left Merrill long before retirement age to start a competitive business, a windfall through a plan designed to promote retention. Still less did Congress set up an Easter egg hunt for class-action lawyers to search for hidden pension plans.

Indeed, Plaintiff's argument conflicts with ERISA's core purpose: "protecting the *retirement assets* of workers." JA545. Accepting Plaintiff's position would turn that purpose on its head, as a district court in this Circuit explained in rejecting a similar position:

> [Defendant] set up its plan to award incentive bonuses based on stock performance over a five-year period. Generously, it allowed an exception for earlier payments if an employee died or retired. If including these exceptions placed the plan under ERISA so that it was subject to vesting requirements, employers in the future would not include such provisions and employees who died or retired prior to the payment date would be financially harmed.

*Teague v. S. Elevator Grp.*, 2003 WL 21418100, at \*4 (M.D.N.C. Mar. 27, 2003). The availability of awards for those whose employment ends through death, disability, or retirement helps those individuals and their families, but it does not show that WealthChoice is a pension plan.

On appeal, Plaintiff objects at length that the district court purportedly failed to "apply the statute's 'results in' test" and "improperly grafted a purpose requirement onto the text." Br. 2. Not so. Consistent with the many authorities just discussed, the court rested its conclusion on WealthChoice's results given its terms and surrounding circumstances: the "rare situations under which an award might be paid after the end of employment" did not create an ERISA plan because "in most circumstances, once the award is earned, it is promptly paid out." JA545-46.

Plaintiff's real objection is that the district court considered the awards' purpose *at all*. He continually criticizes the district court for weighing the undisputed fact that WealthChoice is not intended to fund anyone's retirement, but rather to promote retention. *See, e.g.*, Br. 2-3, 13, 15, 20, 23-25, 27, 29. Plaintiff would prefer to avoid discussion of WealthChoice's purpose because it rebuts his outlandish claims. But the court did not consider the awards' purpose *to the exclusion* of results, as Plaintiff suggests. *See* JA545 (noting that the Plan's "express purpose … is to reward employees for performance and tenure" en route to observing that "the plan

29

structure and administration are tailored to achieve those ends"). The court's approach was logical and lawful and consistent with a wealth of authority. Nothing in ERISA or any other law required the district court to disregard the awards' purpose or any other relevant context. In fact, as the district court noted, *id.*, many courts "have determined that the paramount consideration" when deciding "what qualifies under § 1002(2)(A)"—that is, under clauses (i) *and* (ii)—"is whether the primary purpose of the plan is to provide deferred compensation or other retirement benefits." *Rich*, 823 F.3d at 1210.[3]

Plaintiff places great weight on one appellate decision, *Tolbert v. RBC Capital Markets Corp.*, 758 F.3d 619 (5th Cir. 2014). But far from helping Plaintiff, it reaffirms *Murphy*'s rejection of Plaintiff's view: "the mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage." 758 F.3d at 625 (quoting *Murphy*, 611 F.2d at 575). In *Tolbert*, however, the "express terms" of the plan's statement of purpose revealed that the plan was designed to enable employees "to defer receipt of a portion of their

---

[3] *Accord, e.g.*, *Oatway*, 325 F.3d at 189 (agreeing that a plan was "not an employee pension benefit plan under ERISA because it was not created for the purpose of providing retirement income"); *Emmenegger*, 197 F.3d at 933 (emphasizing lack of evidence that a "program's purpose was to provide retirement income" in holding that it did not constitute an ERISA-governed pension plan); *Juric*, 659 F. Supp. 3d at 633 ("To qualify as an 'employee pension benefit plan' under 29 U.S.C. § 1002(2)(A), courts routinely find that the purpose of the plan must be to provide retirement income or to defer income until termination or beyond[.]").

compensation," and "[t]he vesting sections explain[ed] that, *upon separation*, unvested amounts vest[ed] immediately." *Id.* at 625-26. The express terms of the plan thus placed it squarely within clause (ii) of ERISA's "pension plan" definition because it was designed to defer compensation for periods including up to termination of employment, including by participants' election. Such facts bear no similarity to the facts here. *See, e.g.*, *Rich*, 823 F.3d at 1211 (finding *Tolbert* off point because "[t]he plan in that case was referred to by the defendant company as a 'deferred compensation plan' and its main purpose was to allow for the deferral of compensation"); *Scanlan v. Am. Airlines Grp.*, 384 F. Supp. 3d 520, 530 (E.D. Pa. 2019) (distinguishing *Tolbert* on similar grounds). Plaintiff does not and could not argue that WealthChoice shares either aspect of the plan in *Tolbert*.

Plaintiff also heavily emphasizes a district court decision to even less persuasive effect. *See Shafer v. Morgan Stanley*, 2023 WL 8100717 (S.D.N.Y. Nov. 21, 2023), *reconsideration denied*, 2024 WL 4697235 (S.D.N.Y. Nov. 5, 2024), *and appeal dismissed*, 2025 WL 1890535 (2d Cir. July 9, 2025). Plaintiff, whose counsel filed the *Shafer* complaint, cites the decision dozens of times but omits that it *granted a motion to compel arbitration* of claims that ERISA covered a different plan. In light of that arbitration ruling, the district court's commentary on the merits was ill-considered dictum, as the Second Circuit recently remarked. *See Shafer*, 2025 WL 1890535, at *2 ("It may well be that the better course would have been for the district

31

court to *assume* that the plans were governed by ERISA and hold that, regardless," the plaintiffs were required to arbitrate.); *see also id.* at \*3 (Second Circuit emphasizing that it was "not inclined to further entangle the courts in the merits of this arbitrable dispute" (quotation marks and brackets omitted)).  The court of appeals stressed that the defendant was "free to argue to … arbitrators that the district court's conclusion that the plans were governed by ERISA was dictum and was legally incorrect," and further observed that the defendant "ha[d] already done so—successfully—in some of the intervening arbitrations."  *Id.* at \*2.  Neither the Second Circuit nor, apparently, multiple arbitrators considering *the same facts as the district court* found its advisory opinion on ERISA coverage persuasive, and this Court should give that advisory opinion no weight here.[4]

The district court correctly applied the text and purpose of Section 1002(2)(A) to the facts to conclude that WealthChoice is not an ERISA-governed pension plan. This Court could easily "affirm for the reasons given by the district court" and look

---

[4] The district court decision in *Shafer* is unpersuasive for many reasons.  For example, it conflated the statutory definition in Section 1002(2)(A)(ii) with the bonus regulation rather than treating the regulation as a separate exception.  *Shafer*, 2023 WL 8100717, at \*18.  It failed to grapple with cases like *Murphy*, which declined to apply the statutory definition just because some deceased, disabled, or retired employees could receive payments.  *Id.* at \*19-20.  In any event, the summary-judgment record here differs materially from *Shafer*'s motion-to-compel-arbitration record which contained no facts to "suggest[] that post-employment deferred compensation payments are rare."  *Id.*  Here, post-employment payments account for under 9% of annual payments, JA556 ¶ 3; JA543 n.2.

no further.  *E.g.*, *Lord & Taylor, LLC v. White Flint, L.P.*, 849 F.3d 567, 577 n.5 (4th Cir. 2017); *Aliff v. BP Am., Inc.*, 26 F.3d 486, 490 (4th Cir. 1994) (per curiam).  But if the Court does proceed further, it will find that Plaintiff's reading of the statute has three additional problems that independently defeat his claim.

### B.    The awards do not "result[] in a deferral of income by employees."

To start, WealthChoice is not a pension plan under clause (ii) because it does not result in a "deferral of income" at all.  29 U.S.C. § 1002(2)(A)(ii).  ERISA does not define "deferral of income," so the words' plain meaning controls.  To "defer" is "[t]o postpone; to delay until a later date."  *Defer*, *Black's Law Dictionary* (12th ed. 2024).  "Income" means "[t]he money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts, and the like."  *Income*, *Black's*, *supra*.  A deferral of income thus results when an employee is entitled to payment now for work already performed but does not receive that payment until later.  The awards here, however, expressly state that financial advisors do not earn and have no entitlement to them unless and until they remain continuously employed with Merrill through the vesting date.  *See supra* at 11-16.  At that point, the awards are promptly paid out.  Such awards do not result in a "deferral of income" because employees have no right to payment unless and until they fulfill the conditions to earn payment, including remaining continuously employed through the vesting date.  The awards do not withdraw money originally

33

slated to go out in a financial advisor's next paycheck and deposit it into an account to be received later; the awards provide additional compensation that otherwise would not have been earned or received *at all*, as a reward to those who choose to continue to work for Merrill through the eight-year vesting period.

Case law confirms that a "deferral of income" means a postponement of payments to which employees have a *present* right. *Tolbert*, the appellate case Plaintiff cites most often, is instructive on this point. There, the Fifth Circuit contrasted the facts of an earlier case to explain "that, to establish coverage via subsection (ii), employees 'must show that they forewent income at some point in exchange for receiving income from the plan at a later date.'" *Tolbert*, 758 F.3d at 625 (brackets omitted) (quoting *Boos v. AT&T, Inc.*, 643 F.3d 127, 134 (5th Cir. 2011)). "The plaintiffs in *Boos*," "retirees who received reimbursements for their telephone expenses from their former telephone-company employer" had not made that showing: those "plaintiffs had no right to income until they purchased telephone services," and because they received reimbursements after purchasing the services, they had not forgone "any income in exchange for receiving income at a later date." *Id.* The plaintiffs in *Tolbert*, by contrast, showed a "deferral of income" because their plan gave them "the option 'to defer receipt of a portion of their compensation to be earned with respect to the upcoming Plan Year.'" *Id.* Because the plan allowed

34

them to postpone the receipt of money to which they were already entitled, the plaintiffs had forgone income "in exchange for receiving income at a later date." *Id.*

WealthChoice, like the plan in *Boos*, does not result in "deferral of income." Just as the plaintiffs in *Boos* had no right to reimbursement payments until they purchased telephone services, financial advisors have no right to incentive compensation awards until they remain employed through the vesting date. *See also Rathbun v. Qwest Commc'ns Int'l, Inc.*, 458 F. Supp. 2d 1238, 1248 (D. Colo. 2006) (payments "cannot be characterized as deferred income" where, as here, plan participants "have no entitlement to any funds until they" take specified action—here, remaining continuously employed).

Plaintiff does not argue that he had any present right to payment on the awards before the vesting date. Nor could he. The contingent incentive awards clearly state the conditions to earn the awards, and Plaintiff chose to work for Merrill on those terms. Indeed, Plaintiff develops no meaningful argument at all for why the plan here "results in a deferral of income"; he addresses the issue in just two brief paragraphs. Br. 28-29. First, he contends that the term "deferred compensation" has a specific "meaning" that "predates ERISA." Br. 28. But ERISA uses a different phrase, "deferral of income," so Plaintiff's focus on the meaning of "deferred compensation" is beside the point. Second, Plaintiff notes that financial advisors "perform the work associated with an award of deferred compensation by generating

35

revenue in one year but must wait eight years to get paid." Br. 28-29. That is his only real argument for why a "deferral of income" results here—but this Court's precedent forecloses it.

Plaintiff's argument overlooks that while the work that a financial advisor performs in one year influences the calculation of the *amount* of the award the advisor might receive in a future year, that work in year one does not determine the advisor's *entitlement* to the award. Just the opposite, the advisor needs to continue working *past* the one year and through the vesting date to earn the award and become entitled to payment on it. This Court has already held that a "deferral of income" does not result merely because the revenue that an employee generates in the present determines an amount of incentive compensation he may receive in the future, *if* he satisfies additional conditions. *See Fraver v. N.C. Farm Bureau Mut. Ins. Co.*, 801 F.2d 675 (4th Cir. 1986). In *Fraver*, an insurance company's contracts with its agents provided that, "[u]pon termination of th[e] contract, Company shall pay to agent … an amount equal to the agent's renewal commission for the last 12 months prior to termination." *Id.* at 676. This Court held that these provisions did "not establish any deferral of the agent's and agency manager's income." *Id.* at 677.[5]

---

[5] The bulk of *Fraver*'s reasoning concerns clause (i), which Plaintiff here has disclaimed. The opinion's focus on clause (i), however, suggests that the Court found it obvious that clause (ii) did not apply.

The insurance agents in *Fraver* "perform[ed] the work associated with" their payments "in one year but [had to] wait" until after termination of their contracts "to get paid." Br. 28-29; *cf. Fraver*, 801 F.2d at 678 (noting that "post-termination benefits are calculated on the basis of the agent's commissions for the prior year"). That type of waiting period did not "establish any deferral of … income" in *Fraver*, 801 F.2d at 677, nor does it here.

### C.     The awards do not defer income "to the termination of covered employment or beyond."

Next, even if the awards resulted in deferral of income, that deferral would not be "for periods extending to the termination of covered employment or beyond," 29 U.S.C. § 1002(2)(A)(ii). Unlike a pension plan in which payments are scheduled around a participant's retirement date, the awards' eight-year vesting schedule has no necessary relationship to the termination of employment; the schedule applies equally to all award recipients across all ages and levels of seniority. Any deferrals thus are not until retirement or the termination of employment more generally. They are for eight-year periods. *See Teague*, 2003 WL 21418100, at \*4 ("[T]he Plan defers payments for five years, not beyond the termination of employment. It merely allows earlier payments when retirement or death frustrates the intent of the Plan.").

Plaintiff argues that WealthChoice results in qualifying deferrals because it "creates the possibility of post-employment payments" for "advisors who end their employment with Merrill in several situations, including retirement." Br. 30. Once

37

again, then, Plaintiff relies on the exceptions rather than the general design and pur-

pose, contrary to the overwhelming precedent discussed above. *See, e.g.*, *Rich*, 823

F.3d at 1211; *Oatway*, 325 F.3d at 189; *Murphy*, 611 F.2d at 575. As discussed, that

approach comports with Congress's purpose in enacting ERISA, and with common

sense.

## II.    The district court also correctly concluded that DOL's regulatory exemption for bonus plans independently precludes ERISA coverage.

A DOL regulation "clarifies the limits of the defined terms 'employee pension

benefit plan' and 'pension plan' for purposes of [ERISA] by identifying certain spe-

cific plans, funds and programs which do not constitute employee pension benefit

plans for those purposes." 29 C.F.R. § 2510.3-2(a). As relevant here:

> [T]he terms "employee pension benefit plan" and "pension plan" shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees.

*Id.* § 2510.3-2(c). The district court concluded that the awards here are "clearly a

bonus plan" that does not "provide retirement income" or "systematically defer in-

come to the termination of covered employment or beyond." JA547 (citation omit-

ted). So even if ERISA's statutory definition standing alone could conceivably ap-

ply, WealthChoice is still "a bonus plan exempt from ERISA" under the regulation.

JA548.

38

The regulation provides an independent basis for this Court to affirm the district court's judgment. For ERISA's pension-plan requirements to apply, Plaintiff must show that the regulation's "bonus program" exemption does not. *See, e.g.*, *Tolbert*, 758 F.3d at 626 (ERISA applies where a plan "fits comfortably within the meaning of [29 U.S.C.] § 1002(2)(A)(ii), and nothing in [29 C.F.R.] § 2510.3-2(c) takes it out"); *Wilson v. Safelite Grp.*, 930 F.3d 429, 438 (6th Cir. 2019) (ERISA applies where plan is an "employee pension benefit plan pursuant to § 1002(2)(A)(ii)," and is not an exempt "plan providing for payments made 'as bonuses for work performed'" (quoting 29 C.F.R. § 2510.3-2(c))). The district court ruled that Defendants were entitled to summary judgment under both the statutory definition and regulatory exemption. JA544-48. The court was correct to conclude that award payments are "bonuses" within the meaning of the regulation, and Plaintiff's objections on appeal are not persuasive. Br. 38-49. Neither is Plaintiff's last-gasp attack on the validity of the regulation itself. Br. 49-55.

### A.    Award payments qualify as "bonuses for work performed."

Plaintiff's brief does not dispute the district court's conclusion that award payments are not "systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c). So the dispositive question before the Court is whether the awards constitute

39

"bonuses for work performed." *Id.* Because the regulation does not define "bonuses," the term's ordinary meaning controls, as the district court reasoned, JA546, and as Plaintiff agrees on appeal, Br. 38-39. A "bonus," as relevant here, means a "premium paid in addition to what is due or expected; esp., a payment by way of division of a business's profits, given over and above normal compensation <year-end bonus>." *Bonus*, *Black's*, *supra*. "In the employment context, workers' bonuses are not a gift or gratuity; they are paid for services or on consideration in addition to or in excess of the compensation that would ordinarily be given." *Id.*

The awards here fit this definition, as the district court recognized. JA547 ("Awards are not guaranteed (the way salary and commission are); the employee must meet a minimum production threshold and stay at the company until the award vests, eight years later."). Unlike financial advisors' base salary, which is "due or expected" and "the compensation that would ordinarily be given" to advisors who satisfy the minimal requirements of the job, these contingent incentive compensation awards are a "premium paid in addition to" the base salaries, "over and above" that "normal compensation." And the awards "are paid … on consideration": financial advisors earn and receive payment on the awards in exchange for voluntarily choosing to remain continuously employed by Merrill through the vesting date and meeting the minimum production threshold, JA779, which they need not do to earn their base salaries.

40

Courts have consistently agreed that the bonus regulation applies to incentive compensation programs that state a purpose of promoting superior performance and retention and that are structured to further those purposes. *See, e.g.*, *Wilson*, 930 F.3d at 435-36 ("Generally, a bonus plan's terms state that the plan's express purpose is to pay a financial 'bonus' or 'additional incentive' to employees to encourage performance or retention." (citation omitted)); *Oatway*, 325 F.3d at 189 (affirming district court's conclusion that bonus regulation applied to "an incentive plan designed to provide a financial incentive for employees to remain with AIG and improve their performance there"); *Emmenegger*, 197 F.3d at 932 (applying bonus regulation to plan with stated "objectives of … encouraging selected managers to stay with BMT"); *McKinsey v. Sentry Ins.*, 986 F.2d 401, 406 (10th Cir. 1993) (applying bonus regulation to plan with seven-year vesting schedule and "express terms" stating "purpose of promoting in career sales representatives the strongest interest in the successful operation of the Company, loyalty to the organization and increased effectiveness of their work" (citation omitted)).[6]  The DOL has similarly long advised inquiring employers that the bonus regulation covers plans that pay employees to reward longevity. *See, e.g.*, DOL Advisory Op. 98-02A, 1998 WL 103654, at *2

---

[6] *See also, e.g.*, *Faris v. S. Ute Indian Tribe*, 2023 WL 7386870, at *5 (D. Colo. Nov. 8, 2023); *Cashman v. GreyOrange, Inc.*, 2023 WL 2652789, at *5 (N.D. Ga. Mar. 27, 2023); *Killian v. McCulloch*, 850 F. Supp. 1239, 1246 (E.D. Pa. 1994).

(Mar. 6, 1998) (applying bonus regulation to program that paid awards only to employees who "remain[ed] employed continuously during [a] five-year period," a "delay … designed to motivate [them] to continue in employment"); DOL Advisory Op. 2023-13A, 2002 WL 31846478, at *1-3 (Dec. 6, 2002) (applying bonus regulation to incentive payments for "motivating and retaining skilled employees"). WealthChoice states such a purpose, and its vesting schedule is structured to further that purpose. JA67 (stating purpose "to encourage the Financial Advisor to remain employed by the Company and its Subsidiaries"). The awards thus fit comfortably within the bonus regulation.

### B. Plaintiff's efforts to avoid the regulation fail.

Plaintiff primarily argues that "the awards are commissions, not bonuses." Br. 38. This objection lacks merit on multiple levels. Plaintiff baldly asserts that "commissions are distinct from bonuses," Br. 39, without developing any argument as to why *the bonus regulation* would treat the two as distinct and mutually exclusive. The regulation does not even refer to "commissions," much less categorically exclude commissions from its scope. Plaintiff thus veers far off course in his detour through cases that distinguish "commissions" from "bonuses" in irrelevant contexts. Br. 39-40. Not one of those cases even mentions the bonus regulation; most do not even involve ERISA. *See Keszenheimer v. Reliance Standard Life Ins. Co.*, 402 F.3d

504, 509 (5th Cir. 2005) (per curiam) (distinguishing "bonuses" from "commissions" within the meaning of an insurance policy that used both terms); *Macsherry v. Sparrows Point, LLC*, 2017 WL 3315262, at \*23 (D. Md. Aug. 3, 2017) (discussing a commercial property transaction); *Lorenzo v. Prime Commc'ns, L.P.*, 2018 WL 2296341, at \*2 (E.D.N.C. Mar. 29, 2018) (describing facts underlying statutory wage-and-hour claims). The only case that Plaintiff cites to support his atextual carveout for "commissions"—without explaining why the Court should follow it— is *Shafer*, the unpublished, out-of-circuit district court order granting a motion to compel arbitration that could not resolve the merits of the ERISA claim and addressed the issue only in dicta. *See Shafer*, 2023 WL 8100717; *see also supra* at 31-32 & n.4. The *Shafer* court deemed bonuses and commissions "distinct" within the meaning of the bonus regulation by applying cases that *do not even mention the regulation*. *See Shafer*, 2023 WL 8100717, at \*19 (citing one case involving ERISA, but not the regulation, and two cases not involving ERISA at all). And here too, *Shafer* is distinguishable. The deferred credits in *Shafer* were earned on the "first dollar of revenue" the employees generated, *id.* at \*18, but the WealthChoice awards here are restricted to those who clear a production threshold—a classic bonus for outstanding performance.

Plaintiff also objects to the district court's "reli[ance] on three facts in [concluding] that awards are not commissions." Br. 41; *see* Br. 41-45. Because the

43

regulation does not draw the bonus-vs.-commission distinction that Plaintiff imagines, the Court can ignore this discussion entirely. Plaintiff's digressions in any event fail even on their own terms. First, Plaintiff asserts that the district court erred in finding "that the annual '[a]wards are not guaranteed (the way salary and commission are)'" because, according to Plaintiff, "annual awards" and "monthly commissions … are treated in precisely the same way." Br. 41 (quoting JA547). Plaintiff selectively omits the legally relevant portion of the district court's reasoning: annual awards are unlike monthly commissions because to earn the award, an advisor "must meet a minimum production threshold and stay at the company until the award vests, eight years later." JA547. That distinction—rewarding longevity and standout performance, above and beyond generating day-to-day revenue—is what makes the awards a bonus. Second, Plaintiff emphasizes that "the production requirement … applies to monthly commissions" as well as "annual awards," although he concedes that the threshold for the annual awards was higher. Br. 43. And again, Plaintiff ignores the continuous-employment requirement, which is unique to the annual awards. Third, Plaintiff insists that the awards are not "discretionary," *id.*, but that objection fails twice over. The awards *are* discretionary; the plan documents and award agreements reserve exactly the discretion Plaintiff denies. *See, e.g.*, JA68, JA73, JA573-74. More fundamentally, though, payments need not be discretionary in order to be bonuses: a companywide holiday bonus is still a bonus even if all

44

employees receive the same amount, and a law firm's annual bonus is still a bonus even if every associate who bills a defined number of hours (or meets other objective criteria) receives payment.

Plaintiff's scattered objections to the district court's citations to legal authorities, Br. 45-49, are ill founded. His argument about the "district court's reliance on DOL Advisory Op. 89-07A," 1989 WL 206413 (Apr. 27, 1989), rests on nothing more than misleading selective quotations.[7] Plaintiff's complaints about the district court's reliance on case law fare even worse. Plaintiff claims that cases from the Third and Eighth Circuits "held that the relevant plans were bonus plans under Subsection (i)." Br. 46. That makes no sense: while the *statute* has subsections, the bonus *regulation* does not. Finally, Plaintiff objects to the district court's reference to *Callan v. Merrill Lynch & Co.*, 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010), but once again cannot rebut the court's actual reasoning and instead stoops to misleading excerpts. Br. 48-49. In the decision below, the district court briefly noted that the *Callan* decision found "a similar plan with similar criteria, vesting periods, and payment practices to be a bonus plan exempt from ERISA." JA547 n.4 (citing *Callan*,

---

[7] *Compare* JA546 ("According to the DOL, a bonus plan 'in operation,' must not be 'a vehicle for the provision of retirement income,' DOL Advisory Op. 89-07A at 2, and a 'significant operative factor' when considering whether a plan is a bonus plan under the regulation, is whether an 'inordinate percentage of the bonus recipients were at … retirement age.'"), *with* Br. 45 (omitting everything after the citation). The undisputed evidence shows that an inordinate percentage of award recipients were not at retirement age here.

2010 WL 3452371, at *7-8). Indeed, the *Callan* court found that predecessor plan to be an exempt bonus program for reasons that apply equally here: the plan did "not have a retirement purpose or provide a systematic deferral of compensation," but rather was "intended merely as a bonus program to award top performing employees and provide financial incentive for employees to remain with Merrill Lynch and improve their performance there." *Callan*, 2010 WL 3452371, at *8. The district court *then* went on to describe how award amounts were determined under the plan there, which worked differently from the Plan here, but the court primarily rested its decision on the plan's purpose of promoting retention.

Plaintiff's objections to the district court's application of the bonus regulation miss the forest for the trees. Br. 38-49. Even if Plaintiff's complaints about the district court's assessment of the facts and analysis of persuasive authorities had some merit, they still would not affect the key question, whether award payments constitute "bonuses for work performed." 29 C.F.R. § 2510.3-2(c). They do: courts have consistently held that programs that make payments on vesting schedules to encourage retention are exempt bonus programs, and regulation squarely applies here for that reason. *See supra* at 39-42.

### C.    Plaintiff's last-ditch attempt to invalidate the regulation is baseless.

Finally, Plaintiff attacks the regulation itself. Br. 49-55. He couches this argument in terms of the Supreme Court's decision in *Loper Bright Enterprises v.*

*Raimondo*, 603 U.S. 369 (2024), but he expounds irrelevant aspects of that case and neglects the applicable parts.

In *Loper Bright*, the Supreme Court reaffirmed the longstanding rule that "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation." *Id.* at 413. ERISA includes such a delegation of authority to the Secretary of Labor: ERISA empowers the Secretary to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter." 29 U.S.C. § 1135; *see Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 322 (2016) (noting that ERISA vests the Secretary with this "general power"). That broad delegation goes on to list illustrative (but not exhaustive) examples of proper exercises of rulemaking power, including that "such regulations may define accounting, technical and trade terms used in such provisions," "[a]mong other things." 29 U.S.C. § 1135. This delegation of authority easily fits within Congress's constitutional prerogative to empower agencies "to exercise a degree of discretion" under a statute, "to give meaning to a particular statutory term," or "to prescribe rules to fill up the details of a statutory scheme." *Loper Bright*, 603 U.S. at 394-95 (quotations omitted).

The DOL lawfully exercised this delegated authority in promulgating the bonus regulation to define the statute's terms. Congress used the phrases "provides

47

retirement income" and "results in a deferral of income" in ERISA without elabora-

tion, 29 U.S.C. § 1002(2)(A), and thus left those "technical and trade terms" open

for the Secretary of Labor to "define," *id.* § 1135. Within a year of ERISA's enact-

ment, in 1975, DOL did so in the bonus regulation. It clarified that "payments

made … as bonuses for work performed" do not "result[] in a deferral of income"

within the meaning of the statute "unless such payments are systematically deferred

to the termination of covered employment or beyond." 29 C.F.R. § 2510.3-2(c).

That definition comports with the statutory purpose of protecting employees' retire-

ment income and its textual focus on "employees" as a group rather than individual

workers who might receive payments at or after the end of their employment under

idiosyncratic circumstances. And DOL's regulation is entitled to particularly great

weight because it was "issued contemporaneously with the enactment of the statute"

and has been DOL's consistent position ever since. *Loper Bright*, 603 U.S. at 388.

"That considered and consistent Executive Branch practice," "without any apparent

objection from Congress," "buttresses the ordinary meaning and natural interpreta-

tion of the statute." *Kennedy v. Braidwood Mgmt., Inc.*, 145 S. Ct. 2427, 2455 (2025)

(considering agency interpretation in effect for "26 years").

Plaintiff contends that a "narrow[er] grant of exemption authority" in Sec-

tion 1002(2) implies that DOL exceeded its congressionally delegated authority in

48

promulgating the bonus regulation under Section 1135, Br. 52, but the statute's history proves the exact opposite. Congress amended Section 1002(2) to add Plaintiff's cited provision, which gives DOL additional authority to regulate certain severance and supplemental retirement income payments as welfare plans rather than pension plans, five years *after* DOL promulgated the bonus regulation. Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364, § 409, 94 Stat. 1208, 1307 (codified as amended at 29 U.S.C. § 1002(2)(B)). If DOL's bonus regulation exceeded its Section 1135 authority or misinterpreted Section 1002(2), Congress would not have granted this additional regulatory authority while leaving the bonus regulation in full force. *See, e.g.*, *CFTC v. Schor*, 478 U.S. 833, 846 (1986) ("Where, as here, 'Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation,' [courts] cannot but deem that construction virtually conclusive.").

At bottom, Plaintiff's argument that the regulation conflicts with the statute assumes its own conclusion. According to Plaintiff, the regulation conflicts with the statute because clause (ii) requires only that "post-employment compensation deferrals arise from the plan—not that they be 'systematic.'" Br. 53. But that argument rests on Plaintiff's assumption that the phrase "results in a deferral of income by employees" reaches any plan that defers even *one* payment to or beyond *one* employee's last day of work. Plaintiff reads clause (ii) to apply if a plan *ever* "results

49

in a deferral of income," but for the reasons already addressed, the statutory text is better read to apply only if a plan *generally* "results in a deferral of income" given its terms and surrounding circumstances. *See supra* at 37-38. Plaintiff does not cite any authority holding that the statutory text requires his extreme reading; he just insists that it does. Because the Secretary reads the statute backed by the weight of Congress's delegation of authority and Plaintiff reads it with only his own say-so, the Secretary's reading prevails.

And rightly so. The bonus regulation serves ERISA's purposes by clarifying that incentive payments that function like retirement plans are governed as retirement plans, while incentive payments that do not, are not. Applying ERISA's pension-plan regime to bonus payments would not do anything to protect anyone's retirement savings. But it would burden employers who seek to use financial incentives to encourage superior performance and loyalty, and that, in turn, would impede workers' ability to earn such rewards. If Plaintiff—an affluent professional whom Merrill paid handsomely until he left to become its competitor—prevailed on his extreme theory, his windfall would come at others' expense. The inevitable consequence would be for firms across the industry to eliminate the exceptions on which Plaintiff's theory hangs—to eliminate payments to dying, disabled, and retiring financial advisors. The Congress that enacted ERISA would find that outcome appalling. ERISA does not permit, much less require, that intolerable result, and the bonus

50

regulation provides an additional guardrail against the absurd consequences of Plaintiff's extreme and opportunistic theory.

## CONCLUSION

The Court should affirm the judgment of the district court.

Dated: July 28, 2025                  Respectfully submitted,

                                     s/ Michael E. Kenneally
                                     MICHAEL E. KENNEALLY
ANDREW R. HELLMAN
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-3000

SAMUEL S. SHAULSON
MORGAN, LEWIS & BOCKIUS LLP
600 Brickell Avenue, Suite 1600
Miami, FL 33131
(305) 415-3412

MATTHEW A. RUSSELL
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
(312) 324-1771

*Counsel for Defendants-Appellees*

51

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because, excluding the portions of the document exempted by Rule 32(f), it contains 12,017 words.

This brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface, Times New Roman 14-point font.

Dated:  July 28, 2025            s/ Michael E. Kenneally
                                 MICHAEL E. KENNEALLY

                                 *Counsel for Defendants-Appellees*

52