No. 25-1385

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

KELLY MILLIGAN, on behalf of himself and all others similarly situated

*Plaintiff-Appellant*

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; BANK OF AMERICA CORPORATION

*Defendants-Appellees*,

and

JOHN/JANE DOE 1**,** the Senior Vice President-Human Resources Global Banking and Global Wealth and Investment Management Administration at Bank of America Corp

*Defendant*

On Appeal From The United States District Court for the Western District of North Carolina, No. 1:24-cv-00440, the Hon. Kenneth D. Bell

**BRIEF OF *AMICUS CURIAE***
**Society for Human Resource Management**
***In support of* Defendants-Appellees & Affirmance**

Ian H. Morrison
Sam Schwartz-Fenwick
Jules A. Levenson
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606
Telephone: (312) 460-5000

imorrison@seyfarth.com
sschwartz-fenwick@seyfarth.com
jlevenson@seyfarth.com
*Attorneys for Amicus Curae*
SOCIETY FOR HUMAN RESOURCE
MANAGEMENT
August 4, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 29(a)(4) and 29(b)(4), and L.R. 26.1(b)(1), the undersigned counsel state that the *amicus curiae* is not a corporation, and thus no disclosure statement is required by Fed. R. App. P. 26.1 or L.R. 26.1(b).

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...........................................ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ............................1

INTRODUCTION.................................................................................3

ARGUMENT ........................................................................................6

    I.    The Court should reject Appellant's efforts to vastly expand the scope of ERISA coverage in the absence of statutory authority and despite contrary regulatory guidance...................................................................................6

        A.    The District Court correctly determined that the Plan is not subject to ERISA.........................................6

        B.    Adopting Appellant's statutory interpretation would greatly and erroneously expand ERISA coverage. ..................................................................15

    II.    Expanding the scope of ERISA coverage would have deleterious effects on SHRM members and other employers nationwide. .........................................................19

        A.    ERISA imposes extensive obligations on retirement plan sponsors. ...........................................19

        B.    Employers could be subject to significant costs and penalties under the Appellant's interpretation. ............................................................22

CONCLUSION .......................................................................................25

# TABLE OF AUTHORITIES

Page(s)

Cases

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010).....................................................16

*Cunningham v. Cornell Univ.*,
  86 F.4th 961 (2d Cir. 2023)................................................................21

*Halo v. Yale Health Plan*,
  819 F.3d 42 (2d Cir. 2016) ................................................................19

*McKinsey v. Sentry Ins.*,
  986 F.2d 401 (10th Cir. 1993)............................................................15

*O'Grady v. BlueCrest Cap. Mgmt. LLP*,
  111 F. Supp. 3d 494 (S.D.N.Y. 2015).................................................17

*Oatway v. Am. Int'l Grp., Inc.*,
  325 F.3d 184 (3d Cir. 2003) ..............................................................13

*Osberg v. Rajaratnam*,
  95 A.D.3d 649, 946 N.Y.S.2d 21 (1st Dept. 2012) .............................18

*Pasternack v. Shrader*,
  863 F.3d 162 (2d Cir. 2017) ................................................................7

*Paul v. RBC Cap. Mkts. LLC*,
  No. C16-5616 RBL, 2018 WL 784577 (W.D. Wash. Feb. 8,
  2018)..................................................................................................12

*Ret. Sys. v. Horizon Lines, Inc.*,
  713 F. Supp. 2d 378 (D. Del. 2010).....................................................16

*Tolbert v. RBC Cap. Mkts. Corp.*,
  758 F.3d 619 (5th Cir. 2014).....................................................9, 12, 13

*Wilson v. Safelite Group, Inc.*,
  930 F.3d 429 (6th Cir. 2019).......................................................12, 13

iv

**Statutes**

29 U.S.C. § 1001 ................................................................................ 8

29 U.S.C. § 1002 .............................................................. 8, 7, 9, 11

29 U.S.C. § 1021 .............................................................................. 20

29 U.S.C. § 1024 .............................................................................. 20

29 U.S.C. § 1030 ................................................................................ 8

29 U.S.C. § 1052 .............................................................................. 20

29 U.S.C. § 1053 ...................................................................... 20, 23

29 U.S.C. § 1055 .............................................................................. 20

29 U.S.C. § 1081 .............................................................................. 21

29 U.S.C. § 1083 .............................................................................. 21

29 U.S.C. § 1103 .............................................................................. 21

29 U.S.C. § 1104 .............................................................................. 21

29 U.S.C. § 1106 .............................................................................. 21

29 U.S.C. § 1132 .............................................................................. 24

29 U.S.C. § 1135 ................................................................................ 8

29 U.S.C. § 1306 .............................................................................. 22

29 U.S.C. § 1321 .............................................................................. 22

**Regulations**

29 C.F.R. § 2510.3–2(c) .............................................................. 9, 15

29 C.F.R. § 2575.2(b) ...................................................................... 24

29 C.F.R. § 2575.502c–1 ................................................................ 24

29 CFR § 2560.503–1(b) ............................................................ 21

40 FR 34526, 34532 (Aug. 15, 1975) ........................................ 9

**Other Authorities**

27 Am. Jur. 2d *Employment Relationship* § 66 ....................................... 18

DOL Op. No. 98-02A, 1998 WL 103654 (Mar. 6, 1998) .......... 9, 14, 15, 16

DOL Op. No. 2002-13A, 2002 WL 31846478 (Dec. 6, 2002) ............... 9, 16

*ERISA Practice and Procedure*
(2024) ........................................................................ 6, 20, 22

Jeffrey D. Mamorsky, 1 *Employee Benefits Handbook* § 24:2
(2024) ........................................................................ 22

Jeffrey D. Mamorsky, 1 *Employee Benefits Handbook* § 24:4
(2024) ........................................................................ 22

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Society for Human Resource Management ("SHRM") is a
member-driven catalyst for creating better workplaces where people
and businesses thrive together. As the trusted authority on all things
work, SHRM is the foremost expert, researcher, advocate, and thought
leader on issues and innovations impacting today's evolving workplaces.
With nearly 340,000 members in 180 countries, SHRM touches the lives
of more than 362 million workers and their families globally. In states
encompassed by the Fourth Circuit alone, SHRM has nearly 32,000
members who represent a diverse cross-section of employers across
industries.

SHRM's membership of HR professionals and business executives
sits at the intersection of work, workers, and the workplace, fostering
positive collaboration and workplace cultures where all thrive. With
hands-on experience in talent management, benefits design, and

---

[1] This brief was principally authored by *Amicus* along with Seyfarth
Shaw LLP, counsel for *Amicus*. No party's counsel authored this brief in
whole or in part. Neither any party nor any party's counsel contributed
money related to the preparation or submission of this brief. No person
other than *Amicus*, its members, and their counsel contributed money
related to the preparation or submission of this brief.

compliance, SHRM members are uniquely positioned to offer practical, informed perspectives on this issue. Additionally, as reported within SHRM's 2025 Employee Benefits Survey, over half of respondents reported offering an incentive bonus plan. Given the prevalence of bonus and incentive plans, SHRM anticipates that expanded ERISA coverage under the novel theory urged by Appellants will have a significant impact on SHRM members and employers throughout the country. The impacts include restricting or eliminating usage of incentive compensation plans to motivate retention, placing potentially onerous administrative burdens on programs funded from general assets, and raising the specter of penalties and legal exposure for past noncompliance. SHRM offers this *amicus* brief because the issues raised in this matter are of immense importance to both SHRM's members and the business community at large. SHRM submits this brief in support of Defendants-Appellees and affirmance. All parties have consented to the filing of this brief, so no further leave to file is required. Fed. R. App. P. 29(a)(2).

## INTRODUCTION

For decades, employers nationwide have utilized incentive programs to reward employees for productivity and motivate them to remain employed by providing additional compensation beyond the employees' base pay. These programs, even when they include receipt of incentive payments that do not immediately vest, are not designed to offer retirement income, but to provide additional compensation to current employees. Accordingly, these programs have long been understood to be outside the scope of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, which governs retirement plans and imposes extensive regulatory requirements and potential liability for failure to comply.

The incentive plan at issue here—the WealthChoice Contingent Award Plan ("Plan")—fits comfortably into the non-ERISA category. The Plan provides incentive income to financial advisors to support its goal of enhancing retention by providing extra compensation to employees who generated more business. (*See* JA67). Indeed, the Plan expressly states that it seeks to encourage continued employment and align advisor interests and business objectives. (*See* JA67). And one

3

method of doing so is that subject to limited exceptions, unvested Plan awards are cancelled upon an advisor's termination of employment. Accordingly, the District Court correctly recognized that the Plan is not governed by ERISA because (1) most Plan awards are promptly paid out to active employees and (2) the Plan meets the Department of Labor ("DOL") exemption for bonus plans. (JA545-547).

Appellant's arguments threaten to upend this status quo. Appellant argues that the Plan is subject to ERISA because it pays incentive awards based on the revenue generated by the employees receiving the awards (thus making the payments "commissions" that are not subject to regulations limiting ERISA coverage of bonus plans) and because the Plan allows certain employees to be paid their awards after separating employment. These assertions contradict significant contrary case law and regulatory guidance and, if adopted by this Court, would upend employers' longstanding understanding of the rules applicable to incentive plans.

Appellant's legal interpretation, if adopted by this Court or other courts, would have significant deleterious effects on employer incentive plans. With regard to pension plans, ERISA imposes extensive plan

4

design, funding, administrative, and fiduciary duty requirements that in turn lead to significant costs for employers that sponsor them. ERISA also has mandatory vesting provisions that would prevent employers from even offering many of the incentive plans that are currently available. Moreover, ERISA imposes significant potential liability for failure to comply with its reticulated regulations. Thus, if incentive plans are suddenly covered—simply because of certain scenarios allowing payment after separation—every employer offering a newly covered plan might be exposed to hundreds of thousands—or potentially even millions—of dollars in liability. This is incompatible with the governing statutes and regulations. Moreover, these extreme burdens might lead employers to simply eliminate such programs altogether to avoid the significant attendant costs.

Accordingly, the Court should affirm the judgment of the District Court.

## ARGUMENT

**I.    The Court should reject Appellant's efforts to vastly expand the scope of ERISA coverage in the absence of statutory authority and despite contrary regulatory guidance.**

### A.    The District Court correctly determined that the Plan is not subject to ERISA.

The Court should affirm because the District Court correctly concluded that ERISA does not govern the Plan. Congress adopted ERISA (the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.) to secure employees' entitlement to receive promised benefits in the wake of catastrophic failures of private employer pension plans. *See* Ronald J. Cooke, "Congressional policy, basic concepts, and coverage," 2 *ERISA Practice and Procedure* § 4:1 (2024) (noting Congress enacted ERISA seeking "to remedy the predicament of thousands of employees whose expectations of adequate retirement income were destroyed by stingy pension plan provisions, bad management, or inadequate funding"). ERISA imposes a wide range of reporting, disclosure, administrative, funding, and fiduciary obligations on the employers that sponsor covered plans. These range from annual government filings (with severe penalties for noncompliance), detailed disclosure duties requiring periodic

6

publication of plan summaries, and the obligation to maintain assets to secure pension obligations in separately custodied trust. If this Court were to adopt Appellant's assertions that the Plan was really an ERISA-governed pension plan (based solely on allowing exceptional post-termination payments), it would retroactively subject Appellees (and many other sponsors of similar incentive programs) to myriad statutory requirements and obligations beyond the scope of Congress's carefully crafted statute. It would also raise significant issues regarding the viability of such plans going forward (and might lead to employers eliminating such plans altogether).

As relevant here, ERISA governs an employer sponsored benefit plan, fund, or program that "to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program ... results in a deferral of *income* by employees for periods extending to the termination of covered employment or beyond[.]" 29 U.S.C. § 1002(2)(A)(ii) (emphasis added). Though this is a broad definition, courts throughout the country have held that not every plan that can be squeezed into the literal language of § 1002(2)(A)(ii) is an ERISA plan. *E.g.*, *Pasternack v. Shrader*, 863 F.3d 162, 168 (2d Cir. 2017) (quoting

*Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980), for the proposition that "this statutory provision is 'not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within its reach'").[2]

Additionally, Congress authorized the Department of Labor to issue regulations refining the extent of ERISA coverage. 29 U.S.C. § 1135 ("Subject to subchapter II and section 1029 of this title, the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter [29 U.S.C. §§ 1001-1003, 1021-1193c]," including "defin[ing] accounting, technical and trade terms"); *see also, e.g.*, 29 U.S.C. § 1002 (authorizing certain specific regulations); 29 U.S.C. § 1030 (authorizing alternate methods of compliance with reporting and disclosure requirements). In August 1975, less than one year after ERISA came into force, the Department promulgated regulations excluding from ERISA coverage "payments made by an employer ... as bonuses for work performed, unless such

---

[2] Indeed, the District Court expressly recognized this line of authority in citing *Murphy* and explaining that "Plaintiff's expansive interpretation reaches far beyond Congress' intent and ignores ERISA's fundamental premise, both of which are rooted in protecting the *retirement assets* of workers. (JA544-545) (emphasis in original).

payments are systematically deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3-2(c); 40 FR 34526, 34532 (Aug. 15, 1975).[3]

This longstanding view has been supplemented with Department guidance explaining the mere fact certain employees receive payments after separation from employment is insufficient to bring payments into the category of deferral covered by § 1002(2)(A)(ii). *E.g.*, DOL Op. No. 2002-13A, 2002 WL 31846478, at *3 (Dec. 6, 2002) ("the mere fact that many of the Plans' participants may have separated from the Company ... prior to the time they will be eligible to convert SAFE Units to cash, does not, in the Department's view, implicate a deferral of income of the kind contemplated by section 3(2)(A) of ERISA"); DOL Op. No. 98-02A, 1998 WL 103654, at *2 (Mar. 6, 1998) ("Because the Plan [did] not expressly condition distribution of the bonus payments upon termination of employment or retirement, the Plan [wa]s not by its express terms a pension plan within the meaning of section 3(2)(A) of ERISA," even though certain employees were entitled to receive payments following separation of employment.); *accord Tolbert v. RBC*

---

[3] This portion of the regulation has remained unchanged for 50 years.

9

*Cap. Mkts. Corp.*, 758 F.3d 619, 625 (5th Cir. 2014) ("[T]he mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage.") (quoting *Murphy*, 611 F.2d at 575). Further, as noted *supra*, the District Court properly recognized that because (1) most Plan awards are promptly paid to active employees once earned and (2) the Plan meets the Department of Labor exemption for bonus plans, the Plan is not covered by ERISA. (JA545-547).

Despite this authority, Appellant argues that the Plan here is governed by ERISA. (*See* App. Br. (ECF No. 15) at 18-55). In particular, Appellant argues (App. Br. at 30-32) that ERISA covers any plan where the plan language results in even incidental post-termination payments.[4] Additionally, Appellant argues (App. Br. at 38-49) that Plan awards are commissions (rather than bonuses) because (1) they are based on revenue generated by advisors, rather than being calculated

---

[4] Appellant (App. Br. at 31) protests that he does not seek to extend ERISA coverage to incidental payments, yet a handful of lines later in the same paragraph he argues (App. Br. at 32) that the statutory test can be satisfied "even if the payments were incidental."

as a percentage of the company's profits, and (2) they are similar to other commission portions of advisor compensation.

Appellant is incorrect for the reasons Appellees explain at length in their principal brief. (*See* Appellee Brief (ECF No. 25, "Resp. Br.") at 22-51). However, two points that would result in significant expansion of ERISA coverage are particularly salient here.

*First*, despite protestations that he is not seeking ERISA coverage for plans that make incidental post-termination payments, Appellant takes the position that any plan whose terms permit payments to be made after an employee's separation falls within 29 U.S.C. § 1002(2)(A)(ii) regardless of the plan's purpose and regardless of the frequency or systematic nature of such payments. (App. Br. at 23-34 (arguing that § 1002(2)(A)(ii) "covers plans based on their outcome of deferring employee compensation until the end of employment or later, regardless of the plan's purpose); *id.* at 31-32 (arguing that that § 1002(2)(A)(ii) creates a binary test: "either a plan results in [a covered] deferral or it does not")). In other words, Appellant's reading of ERISA covers any non-bonus incentive program if the program terms permit post-termination payment in any circumstance.

However, Appellant's argument relies on inapposite authority. For example, in *Tolbert* (and *Paul v. RBC Cap. Mkts. LLC*, No. C16-5616 RBL, 2018 WL 784577, at *5 (W.D. Wash. Feb. 8, 2018), which concerned the same plan as *Tolbert*), not only did the plan in question permit employees to elect post-termination payment distribution of already-vested benefits, it also expressly authorized immediate vesting of certain benefits even for voluntary separation. 758 F.3d at 622 (noting that under the plan "Mandatory Deferred Compensation and Company Contributions vest immediately upon either the death of the employee or the separation of the employee" provided requisite conditions were met). Moreover, that plan *expressly* defined itself as a deferred compensation plan. *Paul*, 2018 WL 784577, at *5 (noting that plan terms expressly referred to plan as being a "deferred compensation plan ... designed to provide an opportunity for such employees to invest a portion of their compensation in tax-deferred savings and investment options in an effort to support long-term savings").

Similarly, in *Wilson v. Safelite Group, Inc.*, 930 F.3d 429, 437 (6th Cir. 2019), the plan "expressly provide[d] for employees to defer income from several sources to the future[,] authorize[d] options for payment of

12

deferred income both before and after termination[,] ... [and its] default provision provide[d] for distributions to occur after termination of employment." Thus, the plans at issue in both *Tolbert* and *Wilson* made offering a choice to participants as to the timing of the deferred income (pre or post separation) a key feature.

Conversely, the Plan here provides incentive income on a defined schedule to support its goal of enhancing retention by providing extra compensation to employees who generated more business. (*See* Resp. Br. at 11-12; JA67). Indeed, the Plan is designed to pay employees while they remained employed, with limited exceptions, and is not comparable to the plans at issue in the Appellant's authority. Instead, it is analogous to the plans at issue in cases holding that incidental post-termination payments do not transform a plan into one covered by ERISA. *E.g.*, *Tolbert*, 758 F.3d at 625 ("[T]he mere fact that some payments under a plan may be made after an employee has retired or left the company does not result in ERISA coverage.") (quoting *Murphy*, 611 F.2d at 575); *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 189 (3d Cir. 2003) ("post-retirement payments [that] were only incidental to the goal of providing current compensation" did not trigger ERISA

coverage); DOL Op. No. 98-02A, 1998 WL 103654, at *2 (Mar. 6, 1998)
("Because the Plan [did] not expressly condition distribution of the
bonus payments upon termination of employment or retirement, the
Plan [wa]s not by its express terms a pension plan within the meaning
of section 3(2)(A) of ERISA," even though certain employees were
entitled to receive payments following separation of employment.); *see
also* Resp. Br. at 11-12, 33-38.

      *Second*, the Court should reject Appellant's proposed rule that any
payment to an employee based on a percentage of revenue generated is
a commission, not a bonus. (App. Br. at 41 (arguing Plan awards are
commissions, not bonuses because they are calculated based on an
advisor's transactions, rather than being based on company profits and
being provided over and above an advisor's usual compensation)).
Although Appellant cites case authority regarding the nature of
bonuses and commissions, including cases explaining that commissions
are a *type* of payment based on revenue generated (App. Br. at 39-40),
none of Appellant's authority holds that any payment based on revenue
generated is *perforce* a commission and thus beyond the scope of the
Department of Labor's bonus regulation. Moreover, such a proposition

14

is contrary to both case law and Department guidance. *McKinsey v. Sentry Ins.*, 986 F.2d 401, 405-06 (10th Cir. 1993) (applying DOL bonus regulation, 29 C.F.R. § 2510.3–2(c), to plan where payments were "based upon the amount of Sales Credits [sales representatives] produce[d]"); DOL Op. No. 98-02A, 1998 WL 103654, at *1 (Mar. 6, 1998) (noting plan potentially qualified for treatment as a bonus plan where it provided for physicians to receive "individual bonus award amount[s] equal to the percentage of revenue that his or her efforts have gained during a fiscal year in excess of ... individual [g]oals"). Accordingly, the Court should reject Appellant's erroneous statutory and regulatory interpretation.

### B. Adopting Appellant's statutory interpretation would greatly and erroneously expand ERISA coverage.

Given the extensive ERISA obligations that fall on an employer sponsoring a pension plan, it is essential that employers know at the outset whether they are setting up a bonus plan or a pension plan. Appellant's efforts at a sweeping re-write of the statute and regulations is not only legally erroneous as noted above, but could potentially trigger vast ramifications for employers by dramatically expanding ERISA coverage to numerous types of incentive plans that have never

15

heretofore been thought of as pension plans. If this Court (or other courts) were to adopt Appellant's statutory interpretation, any employer incentive plan tied to revenue generated by an employee (and in fact *any* non-bonus deferred payment structure) would be governed by ERISA so long as the plan allows any payments following the separation of employment, regardless of the plan's goals and even if the vast majority of participants are paid while still employed.

Not only is this contrary to statute, governing regulations, and case authority, it would greatly expand ERISA coverage to incentive programs administered by SHRM members throughout the country. "[A]ccess to stock options and [compensation] according to [company] performance ... are ubiquitous in corporate America," *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 396 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011), a fact further underscored by the opinion letters issued by the Department of Labor concerning a variety of incentive plans. *E.g.*, DOL Op. No. 2002-13A, 2002 WL 31846478, at *3 (Dec. 6, 2002); DOL Op. No. 98-02A, 1998 WL 103654, at *2 (Mar. 6, 1998). In fact, over 50% of respondents in SHRM's 2025

employee benefit survey reported offering an incentive bonus plan.[5]

In light of the broad prevalence of incentive programs, Appellant's position (if adopted) would represent a sea change in ERISA coverage requirements for such programs. Under the Appellant's logic, any entity that provides incentives to employees based on the revenue generated by the employees would be forced to comply with ERISA if any portion of the incentive could be paid to a separated employee. For example, under this erroneous approach, a law firm bonus plan based on billable hours or value of time (both close proxies for revenue generation) would be required to comply with ERISA so long as bonuses were not paid *immediately* when earned and any set of individuals might be paid the bonus after termination.

This is problematic because most employers condition incentive bonus payments on being actively employed on the bonus payment date to get their bonus, as shown by many cases across the country about who is entitled to bonuses. *E.g.*, *O'Grady v. BlueCrest Cap. Mgmt. LLP*, 111 F. Supp. 3d 494, 501 (S.D.N.Y. 2015) (bonus plan provided that

---

[5] The SHRM 2025 Employee Benefits Survey is available at https://www.shrm.org/topics-tools/research/employee-benefits-survey/other.

employee "will not be eligible to be paid any bonus if at any time prior to the date of any payment ... [his] employment has been terminated"), *aff'd*, 646 F. App'x 2 (2d Cir. 2016); *Osberg v. Rajaratnam*, 95 A.D.3d 649, 946 N.Y.S.2d 21, 22 (1st Dept. 2012) (holding that plaintiff was not entitled to bonus where his "employment was terminated prior to the end of the year" and "bonus ... was expressly and unambiguously conditioned upon his working through the end of the relevant calendar year"); 27 Am. Jur. 2d *Employment Relationship* § 66 (surveying case law since 1980 on effect of termination on bonus payment and noting that certain "courts find that if an employee is terminated prior to the date when he or she was to become eligible for a bonus payment, then the employer is not obligated to pay his or her bonus").

Under Appellant's view of ERISA, however, if these employers so much as allow humanitarian exemptions to the rule requiring incentives be paid to only current employees, they would subject themselves to ERISA. The only alternative to complying with ERISA's vast and complex regulatory scheme (discussed *infra*) would be to terminate the incentive plans entirely or prohibit *any* post-termination

payments, even when the termination was for disability or death.[6] (*See also* Resp. Br. at 27-28). Either of these outcomes would be deleterious to both employees and employers.

## II. Expanding the scope of ERISA coverage would have deleterious effects on SHRM members and other employers nationwide.

### A. ERISA imposes extensive obligations on retirement plan sponsors.

The stakes of the Appellant's misguided efforts to expand ERISA coverage can be seen by a brief overview of the extensive regulatory burdens placed on pension plans. "Employee benefit plans governed by ERISA are highly regulated by the federal government." Lee T. Polk, 1 *ERISA Practice and Litigation* § 1:7 (2023). Indeed, "ERISA is a comprehensive reticulated statute, and is enormously complex and detailed[.]" *Halo v. Yale Health Plan*, 819 F.3d 42, 59 (2d Cir. 2016) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 477 (1999)).

This complexity and high level of regulation are evident from even a brief perusal of ERISA's statutory structure. For example,

---

[6] And certain incentive structures might not be permissible *at all* within the ERISA framework.

19

ERISA contains extensive disclosure and reporting requirements. 29

U.S.C. §§ 1021-32. Some of these obligations include:

- Publishing and furnishing participants with summary plan descriptions, 29 U.S.C. § 1021(a)(1);

- Filing annual reports with the DOL, 29 U.S.C. §§ 1021(b), 1024(a);

- Furnishing participants with summary annual reports, 29 U.S.C. §§ 1021(a)(2),1024(b)(3);

- Providing governing plan documents to participants upon written request, 29 U.S.C. § 1024(b)(4); and

- Providing plan funding notices to the Pension Benefit Guaranty Corporation (for defined benefit plans[7] subject to ERISA's funding requirements), 29 U.S.C. § 1021(f).[8]

ERISA also imposes vesting and participation standards, which

limits the extent to which employers can restrict participation and

require that covered plan benefits be nonforfeitable within a specified

range of years of service. 29 U.S.C. §§ 1052-53. And defined benefit

plans must offer survivorship annuities. 29 U.S.C. § 1055. Furthermore,

many defined benefit plans are subject to comprehensive minimum

---

[7] The Plan and similar incentive programs would likely be classified as defined benefit plans because they pay a specific benefit as outlined by the incentive program.

[8] *See also* Ronald J. Cooke, 1 *ERISA Practice and Procedure* § 3:2 (2024) (surveying the vast requirements, penalties for failure to comply, and "substantial record keeping requirements").

20

funding requirements. 29 U.S.C. §§ 1081, 1083 (funding standards for single-employer defined benefit plans).

Additionally, except for certain exempt plans, ERISA governed benefit plans must be run by fiduciaries adhering to standards of prudence and loyalty, 29 U.S.C. § 1104, and subject to extensive regulations as to permissible transactions, 29 U.S.C. § 1106. *See also Cunningham v. Cornell Univ.*, 86 F.4th 961, 973, 981 (2d Cir. 2023) (analyzing claims asserting prohibited transactions and breaches of fiduciary duty), *rev'd on other grounds*, 145 S. Ct. 1020 (2025). ERISA plans must also establish formal claims procedures to resolve benefit claims submitted by participants. 29 CFR § 2560.503-1(b) ("Every employee benefit plan shall establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations[.]").

Beyond this, ERISA plans (unless exempt) must hold all assets in a trust, 29 U.S.C. § 1103 (subject to exceptions, "assets of an employee benefit plan shall be held in trust by one or more trustees") and plans that are insured by the Pension Benefit Guarantee Corporation must pay per-participant premium rates of up to $717 annually for variable

rate premiums and $106 annually for flat-rate premiums.[9] *Premium Rates*, PBGC (Oct. 11, 2024), *available at*, https://www.pbgc.gov/prac/prem/premium-rates (last accessed Aug. 1, 2025); *see also* 29 U.S.C. § 1306; Jeffrey D. Mamorsky, 1 *Employee Benefits Handbook* § 24:4 (2024) (explaining forms of PBGC premiums).

In short, treating an incentive program as an ERISA governed pension plan subjects it to compliance with myriad rules, regulations, and restrictions, and has significantly broader consequences than simply fixing obligations of benefit payments between employees and employers. *See Preliminary Materials*, Ronald J. Cooke, *ERISA Practice and Procedure* (2024) ("[I]t cannot be disputed that [ERISA] is massive in its complexity, detail and scope.").

### B. Employers could be subject to significant costs and penalties under the Appellant's interpretation.

ERISA's extensive regulatory requirements also impose

---

[9] "The Pension Benefit Guarantee Corporation (PBGC) insurance provisions of the Employee Retirement Income Security Act of 1974 (ERISA) apply to most defined benefit pension plans established or maintained by an employer engaged in commerce or in any industry or activity affecting commerce. The PBGC insures qualified or nonqualified plans that have met the qualifications requirement in practice for the preceding five years." Jeffrey D. Mamorsky, 1 *Employee Benefits Handbook* § 24:2 (2024); 29 U.S.C. § 1321.

significant costs on employers—both in the form of *complying* with

applicable regulations and penalties for failure to do so. For example,

the Plan is operated to provide incentive compensation beyond

employees' base compensation, and the applicable rules are defined in

the plan document and the award agreements. (*See, e.g.*, JA67-68). But

if the Plan were to be governed by ERISA, a single document laying out

the incentive plans would be insufficient. Appellees would have been

obligated to create a summary plan document; submit annual reports;

respond to document requests; comply with participation, vesting, and

funding requirements; comply with fiduciary duties; and avoid

prohibited transactions. *Supra* § II.A. Not only would this add

significant compliance costs, but it would also frustrate the stated goal

of the Plan—motivating employee retention—and undermine its

rationale, because ERISA restricts Appellees' ability to limit payments

to current employees. *See* 29 U.S.C. § 1053 (vesting requirements).

   In addition to the prospective compliance costs, expanding ERISA

coverage could expose employers that offer incentive plans to

retrospective liability (and the attendant litigation costs). For example,

an ERISA-covered plan administrator who fails to file an annual report

with the Secretary of Labor is subject to fines of over $2,000 per day. 29

U.S.C. § 1132(c)(2); 29 C.F.R. § 2575.2(b). Similarly, plan

administrators can be fined up to $110 per day for failing to furnish

ERISA plan participants with certain disclosures and requested

documents. 29 U.S.C. § 1132(c)(1); 29 C.F.R. § 2575.502c-1. Under the

Appellant's erroneous reading of ERISA, an incentive program that has

been operating as a non-ERISA plan could be subject to hundreds of

thousands of dollars in penalty liability. And this is even before

considering claims by participants claiming that the employer was not

appropriately complying with its fiduciary duties as required under

ERISA. *See* 29 U.S.C. § 1132(a)(2) (allowing a "a participant, beneficiary

or fiduciary" to assert a claim "for appropriate relief" for alleged

fiduciary breaches or otherwise not administering plan in accordance

with ERISA's strictures).

Moreover, these costs would not be borne by a single employer in a

single case. Rather, every single employer with an incentive plan based

on revenue generated by employees would be faced with these costs

unless *no* payments were made after separation. Given the ubiquity of

these incentive plans, SHRM anticipates that its members could be

24

facing significant costs in further liability associated with transforming how they run incentive programs and in potential exposure for past plan administration outside the scope of ERISA. This Court should not countenance such a massive expansion of liability.

*    *    *

The District Court correctly rejected Appellant's efforts to expand ERISA coverage in a way that would greatly expand the number of regulated plans beyond what the statute and the DOL regulations provide, while imposing vast costs that are not permitted or required by governing law. Accordingly, the decision should be affirmed.

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's judgment.

Respectfully submitted,

DATED: August 4, 2025

SOCIETY FOR HUMAN RESOURCE MANAGEMENT

*/s/ Ian H. Morrison*
Ian H. Morrison
Samuel Schwartz-Fenwick
Jules A. Levenson
SEYFARTH SHAW LLP
233 S. Wacker Dr., Suite 8000
Chicago, Illinois 60606

Telephone: (312) 460-5000
imorrison@seyfarth.com
sschwartz-fenwick@seyfarth.com
jlevenson@seyfarth.com

*Attorneys for Amicus Curiae*

Society for Human Resource
Management

26

**CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION, TYPEFACE
REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.     This brief complies with the type-volume limitation of FED. R. APP. P. 29(a)(4), 29(a)(5), and 32(a)(7)(B) and Local Rule 32(b) because the brief contains 4,683 words (according to the word-processing software, Microsoft Word, which was used to prepare the brief), excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

2.     This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5), as well as the type style requirements of FED. R. APP. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in plain, 14-point Century Schoolbook typeface; footnotes appear in plain, 14-point Century Schoolbook typeface.

s/ Ian H. Morrison
Ian H. Morrison

Dated: August 4, 2025

27

**CERTIFICATE OF SERVICE**

I, certify that on August 4, 2025, I electronically filed the foregoing

Brief with the Clerk of Courts using the CM/ECF  filing system, which

will send notification of such filing to all counsel of record.


 s/ Ian H. Morrison