No. 25-1385

# In the United States Court of Appeals for the Fourth Circuit

—— ◆▮◆ ——

KELLY MILLIGAN, on behalf of himself and all others similarly situated,

*Plaintiff-Appellant,*

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; BANK OF AMERICA CORPORATION; and JOHN/JANE DOE 1, the Senior Vice President-Human Resources Global Banking and Global Wealth and Investment Management Administration at Bank of America Corp.,

*Defendants-Appellees,*

On Appeal from the United States District Court for the Western District of North Carolina
Case No. 3:24-cv-00440 (Hon. Kenneth D. Bell)

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, THE CENTER ON EXECUTIVE COMPENSATION, THE AMERICAN BENEFITS COUNCIL, AND THE ERISA INDUSTRY COMMITTEE AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES**

ANDREW J. PINCUS
ARCHIS A. PARASHARAMI
CHARLES A. ROTHFELD
DANIEL E. JONES
*Mayer Brown LLP*
*1999 K Street NW*
*Washington, DC 20006*
*(202) 263-3000*

*Counsel for* Amici Curiae

[additional counsel on signature page]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1385</u>      Caption: <u>Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>The Chamber of Commerce of the United States of America</u>
(name of party/amicus)

_____

 who is _____<u>Amicus Curiae</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Andrew J. Pincus                    Date: _____ 8/4/2025 _____

Counsel for: Amicus Curiae

- 2 -

[Print to PDF for Filing]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1385__        Caption: __Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The Center on Executive Compensation__
(name of party/amicus)

_____

 who is _____Amicus Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Andrew J. Pincus                     Date:        8/4/2025

Counsel for: Amicus Curiae

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>25-1385</u>        Caption: <u>Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>The American Benefits Council</u>
(name of party/amicus)


who is <u>Amicus Curiae</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Andrew J. Pincus

Date: 8/4/2025

Counsel for: Amicus Curiae

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1385__      Caption: __Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__The ERISA Industry Committee__
(name of party/amicus)

_____

 who is _____Amicus Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.     Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO

2.     Does party/amicus have any parent corporations?     ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
       If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct
        financial interest in the outcome of the litigation?                    ☐YES ☑NO
        If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☐NO
        If yes, identify any publicly held member whose stock or equity value could be affected
        substantially by the outcome of the proceeding or whose claims the trade association is
        pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
        If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
        party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
        caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
        corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?          ☐YES ☑NO
        If yes, the United States, absent good cause shown, must list (1) each organizational
        victim of the criminal activity and (2) if an organizational victim is a corporation, the
        parent corporation and any publicly held corporation that owns 10% or more of the stock
        of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Andrew J. Pincus                          Date:        8/4/2025

Counsel for: Amicus Curiae

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................ii

INTEREST OF AMICI CURIAE........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................ 4

ARGUMENT ............................................................................ 6

The District Court Properly Held That Incentive Programs Like
Merrill Lynch's Are Not ERISA Pension Plans...................................... 6

    A.    Under ERISA's Plain Terms, The Incentive
        Arrangements In This Case Are Not Pension Plans............ 6

    B.    Merrill Lynch's Incentive Program Is A Bonus Plan
        That Is Exempt From ERISA ............................................. 10

    C.    Employers Routinely Use Incentive Arrangements Like
        Those In This Case To Encourage Employee Retention
        And Reward Loyalty, Not To Provide Retirement
        Benefits................................................................ 12

    D.    Adopting Plaintiff's Overbroad Reading Of ERISA
        Would Harm Employers And Employees Alike................... 17

CONCLUSION ...................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Emmenegger v. Bull Moose Tube Co.*,
  197 F.3d 929 (8th Cir. 1999) ............................................................... 11

*McKinsey v. Sentry Ins.*,
  986 F.2d 401 (10th Cir. 1993) ............................................................ 11

*Merrill Lynch, Pierce, Fermer & Smith, Inc. v. Brennan*,
  2007 WL 632904 (N.D. Ohio Feb. 23, 2007) ...................................... 13

*Murphy v. Inexco Oil Co.*,
  611 F.2d 570 (5th Cir. 1980) ................................................................ 9

*Oatway v. Am. Int'l Grp., Inc.*,
  325 F.3d 184 (3d Cir. 2003) ........................................................... 9, 11

*Pasternack v. Shrader*,
  863 F.3d 162 (2d Cir. 2017) ............................................................... 10

*Shafer v. Morgan Stanley*,
  No. 24-3141(L) (2d Cir. July 9, 2025) ................................................ 18

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983) ................................................................................ 6

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.
  Morgan Stanley Inv. Mgmt., Inc.*,
  712 F.3d 705 (2d Cir. 2013) ............................................................... 19

**Statutes and Regulations**

12 U.S.C. § 5641 ...................................................................................... 16

29 C.F.R. § 2510.3-2(c) ..................................................................... 10, 11

29 C.F.R. § 2530 ....................................................................................... 5

29 C.F.R. § 2530.203.............................................................................. 18

ii

29 C.F.R. § 2530.204 ................................................................ 18

29 U.S.C. § 1002(2)(A) ............................................................. 7

29 U.S.C. § 1053 ................................................................ 5, 18

29 U.S.C. § 1101(a)(1) .............................................................. 16

29 U.S.C. § 1132(a) ................................................................. 18

29 U.S.C. § 1132(g) ................................................................. 18

## Other Authorities

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE
   (3d ed. 1992) ..................................................................... 7

Andreas Stuermann, *Employers, Are You Ready For The
   Great Resignation? Actionable Ideas To Recruit, Retain,
   And Reward Key Talent*, Stuermann Consulting (Feb.
   2022) ............................................................................. 14

Bartek Podolski, *Ask an Advisor: What is a long-term
   incentive plan and how can it help us?*, EBN (July 15,
   2022) ............................................................................. 15

Deborah S. Davidson et al., *A Chubb Special Report: A
   Primer on 401(k) Forfeiture Litigation*, Chubb (Oct. 2024) ......... 17, 18

DOL Advisory Op. 98-02A, 1998 WL 103654 ................................ 9, 11

DOL Advisory Op. 2002-13A, 2002 WL 31846478 ............................. 12

Eduardo Rivera Greenwood, *Workers are leaving. What can
   you do about it?*, Deloitte (Oct. 5, 2022) ............................... 12

J.P. Morgan, *A Quick Guide to Long Term Incentive Plans
   (LTIPs)* (Mar. 13, 2024) ..................................................... 15

*Long-term incentive plans: A comprehensive guide for HR*,
   Rippling (Dec. 12, 2024) ..................................................... 15

Mason Braswell, *Recruiting Bonuses for Top Producers Flirt with 400%, Hitting Fresh Highs*, AdvisorHub (Sept. 21, 2022) ................................................................................ 14

Sam Cook, *The Professional Services Industry Is Leading The Office Worker Revolt*, MentorcliQ (Dec. 1, 2021) ......................... 13

Shane McFeely & Ben Wigert, *This Fixable Problem Costs U.S. Businesses $1 Trillion*, Gallup (Mar. 13, 2019) ......................... 13

Vincent Amanor-Boadu, *Empirical evidence for the "Great Resignation"*, Monthly Labor Review, U.S. Bureau of Labor Statistics (Nov. 2022) ............................................................ 12

## INTEREST OF *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Center on Executive Compensation (Center) is dedicated to developing and promoting principled pay, human capital management, and governance practices while advocating for compensation policies that serve the best interests of shareholders, employees, and other corporate

---

[1] No counsel for a party authored this brief in whole or in part, and no person or entity, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this brief.

stakeholders. The Center currently represents more than 160 companies across multiple industries.

The American Benefits Council (Council) is a national non-profit organization dedicated to protecting and fostering privately sponsored employee benefit plans. The Council's more than 430 members are primarily large, multi-state employers that provide employee benefits to active and retired workers and their families.

The ERISA Industry Committee (ERIC) is a national non-profit business trade association representing approximately 100 of the nation's largest employers in their capacity as sponsors of employee benefit plans for their workers, retirees, and families. ERIC routinely participates as *amicus curiae* in cases implicating the scope and content of the regulation of employee benefits.

*Amici*'s members include many employers that, in addition to maintaining retirement plans, offer a variety of long-term incentive or deferred incentive compensation arrangements to their employees. These arrangements play a vital role—both in the financial services industry and beyond—in efforts to retain valuable employees, reward their loyalty, and discourage misconduct. Consequently, *amici* have a strong

interest in this Court affirming the district court's well-reasoned holding that compensation arrangements like the ones in this case are *not* pension plans subject to the requirements of the Employee Retirement Income Security Act of 1974 (ERISA). A contrary conclusion would harm employers and employees alike by inducing employers to eliminate or curtail these beneficial compensation arrangements.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case presents the question whether compensation award programs offered by Defendants (collectively referred to here as Merrill Lynch) are "employee benefit pension plans" (pension plans) under ERISA. They are not. *Amici* fully endorse Merrill Lynch's arguments and write separately to emphasize and elaborate on the key reasons why the district court's analysis both is correct as a matter of law and advances the real-world interests of both employers and employees.

Both the express terms and the central features of Merrill Lynch's compensation arrangements (which are similar to incentive award programs used by numerous employers across the country) demonstrate that they are not pension plans; instead, they are elements of *current* compensation that reward employees for their continued service and effective performance. The text of the statute, the Department of Labor's regulatory exemption for "bonus" incentive programs, and the overwhelming consensus among judicial and Department of Labor decisions all point to the same result: the arrangements are not ERISA pension plans.

Broader workplace dynamics—both in and beyond the securities and financial services industries—confirm that arrangements like Merrill Lynch's are not ERISA pension plans. Long-term incentive and deferred incentive compensation programs are in widespread use, and employers offer them for a variety of reasons that have nothing to do with providing income after retirement or following departure from current employment. Those programs play a critical role in promoting retention of productive employees, encouraging workplace success, and deterring or penalizing misconduct.

Distorting ERISA so that it reaches those programs would have destructive effects. Making those programs subject to ERISA's strict vesting and anti-forfeiture rules would expose employers to potentially astronomical liability for unexceptional cancellations of incentive awards that have not vested under those programs' terms. *See* 29 U.S.C. § 1053; 29 C.F.R. § 2530. That result would undermine employers' justifiable reliance on nearly fifty years of case law and regulatory guidance concluding that such programs fall outside ERISA's scope, making it more difficult for businesses to offer their employees attractive and flexible compensation programs. Indeed, it would induce some employers

to eliminate their long-term incentive or deferred incentive compensation programs altogether, stripping them of a valuable tool with which to retain talented employees and denying employees access to a widely desired compensation arrangement. Nothing in ERISA requires such an unfortunate outcome.

## ARGUMENT

**The District Court Properly Held That Incentive Programs Like Merrill Lynch's Are Not ERISA Pension Plans.**

### A. Under ERISA's Plain Terms, The Incentive Arrangements In This Case Are Not Pension Plans.

Congress enacted ERISA in 1974 to "promote the interest of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). These protections are important, but—precisely because they are very powerful medicine—Congress gave ERISA's requirements a focused and closely circumscribed scope. In particular, ERISA defines the term "employee benefit plan" to include "*pension* plans and welfare plans." *Id.* at 90-91 (emphasis added). Welfare plans (such as plans providing health or disability benefits) are not at issue here. A pension plan, as the term suggests, refers to a program that provides for retirement or other *post*-employment income, not a program designed to compensate current employees.

6

That is clear from the statutory text. The usual meaning of the word "pension"—the term Congress selected to describe the compensation schemes reached by ERISA—is "[a] sum of money paid regularly as a retirement benefit or by way of patronage." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1340 (3d ed. 1992). And Congress expressly confirmed its embrace of that common understanding, providing that, to qualify as an "employee benefit pension plan" under ERISA, a program must, "by its express terms or as a result of surrounding circumstances," either "(i) provide[] retirement income to employees" or "(ii) result[] in a deferral of income by employees for periods extending to the *termination* of covered employment *or beyond*." 29 U.S.C. § 1002(2)(A) (emphasis added). Although this definition is not strictly limited to payments made after retirement, it plainly is, at a minimum, directed at benefits *designed to be paid after departure from current employment*.

Given the statute's focus on post-employment compensation, numerous characteristics of Merrill Lynch's compensation arrangements establish that they fall outside ERISA's scope. Among other things, as the district court explained:

7

- Merrill Lynch's cash or stock awards are unvested—i.e., unearned—unless an advisor "remain[s] employed with the company until the vesting date," and only at that time does "the award . . . become 'earned and payable.'" JA542.

- Nothing in the incentive plan "'would allow a reasonable person to calculate or determine the benefits of the plan or the procedure for receiving [them], as those matters are left to the sole discretion' of Defendants." *Id*. (alterations in original).

- The incentive payments are automatically distributed directly to the advisor once vested. "After vesting, the [advisor] is paid 'as soon a[s] practicable . . . but in no event no later than 2½ months following such vesting date' and there is no option to defer it." JA543 (alterations in original).

- As a result, the payments are distributed to *current* employees except when one of the very narrow enumerated exceptions to the vesting rules applies, which may result in payment being made to a former employee. *Id*. (noting that these "uncommon situations" are "largely out of a[n advisor's] control").

- Accordingly, the incentive payments overwhelmingly are distributed to current employees (in fact, 92.6% of Merrill Lynch advisors who received payments between 2018 and 2024 "were active employees"). JA543 n.2.

- The incentive program is expressly described as "'maintained primarily for the purpose of providing long-term contingent incentive compensation'" that was "'intend[ed] to encourage the Financial Advisor to *remain employed by the Company* . . . and to further align the interests of the Financial Advisor with the Company's business objectives.'" JA542 (emphasis added).

*See also* Merrill Lynch Br. 8-16.

As the district court properly found, awards with these characteristics do not provide retirement income, or "pension" benefits in

8

any sense. Yet under Plaintiff's contrary view, "virtually *any* plan that allows for income to be paid after employment ends, even incidentally, could fall under ERISA's purview." JA544. That "expansive interpretation reaches far beyond Congress's intent and ignores ERISA's fundamental premise, both of which are rooted in protecting *retirement assets* of workers." *Id.* at 8-9. The district court's rejection of that result follows the uniform consensus among courts and the Department of Labor that "incidental" payments to former employees under plans generally designed to compensate current employees are insufficient to trigger ERISA's coverage. *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 189 (3d Cir. 2003) (following *Murphy v. Inexco Oil Co.*, 611 F.2d 570 (5th Cir. 1980) and "the unbroken line of cases that have followed *Murphy*'s reasoning"); *Murphy*, 611 F.2d at 574-75; DOL Advisory Op. 98-02A, 1998 WL 103654, at *1-2; *see also* Merrill Lynch Br. 24-26 (collecting additional cases).

That consensus has been reached for good reason: as the district court noted below (JA544), courts generally have admonished that ERISA's definition of "pension plan" is "not to be read as an elastic girdle that can be stretched to cover any content that can conceivably fit within

9

its reach." *Pasternack v. Shrader*, 863 F.3d 162, 168 (2d Cir. 2017) (quoting *Murphy*, 611 F.2d at 574-75). Like many forms of long-term incentive or deferred incentive compensation programs, the awards here are designed to, and do, provide additional compensation to current employees to reward them for continued service and good conduct. That is a far cry from a program *aimed at* providing retirement or post-termination income.

### B. Merrill Lynch's Incentive Program Is A Bonus Plan That Is Exempt From ERISA.

In addition, and separately, Merrill Lynch's incentive program is independently exempt from ERISA's coverage under the Department of Labor's "bonus" plan regulation. *See* Merrill Lynch Br. 38-51. That rule exempts from ERISA's coverage a program providing "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are *systematically* deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3-2(c) (emphasis added). On the face of it, the Merrill Lynch plan—which systematically pays *current* employees—falls squarely within the terms of this exemption.

Unsurprisingly, the district court's holding to that effect is consistent with the overwhelming weight of case law and DOL guidance, which have found that an "incentive plan designed to provide a financial incentive for employees to remain" with their employer "and improve their performance there"—as does Merrill Lynch's—falls within ERISA's exemption for bonus plans. *Oatway*, 325 F.3d at 186-89; *see also*, *e.g.*, *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 931-34 (8th Cir. 1999); *McKinsey v. Sentry Ins.*, 986 F.2d 401, 406 (10th Cir. 1993); Merrill Lynch Br. 41-42 (collecting additional cases and DOL opinions). That is exactly the purpose of the awards here, both under the express terms of Merrill Lynch's program and in practice—as the district court properly found. JA546-548.

That should end the inquiry, because there is no reasonable dispute that the payments are not "systematically deferred to the termination of covered employment or beyond." 29 C.F.R. § 2510.3-2(c). The DOL has made clear that the "systematically deferred" standard is a high one, under which an "inordinate percentage" of payments under the program must be made after employment and the economic benefits of the program allocated "disproportionately to retirees." DOL Advisory Op. 98-

11

02A, 1998 WL 103654, at *2; *accord* DOL Advisory Op. 2002-13A, 2002 WL 31846478, at *3 n.3. Incidental payments to a small number of former advisors come nowhere close to meeting that stringent regulatory standard.

### C. Employers Routinely Use Incentive Arrangements Like Those In This Case To Encourage Employee Retention And Reward Loyalty, Not To Provide Retirement Benefits.

In addition, the practical reality, in the securities and financial services industries and beyond, is that employers offer arrangements like Merrill Lynch's to retain and reward current employees, not to provide retirement or post-termination income. This background confirms that such incentive programs are *not* pension plans (and *are* bonus plans)— and therefore fall outside ERISA's scope.

Employers face significant challenges in retaining productive employees. Those challenges have been particularly acute during the past few years, with workers voluntarily leaving their jobs at historically high rates—a phenomenon known as the "Great Resignation." *See*, *e.g.*, Vincent Amanor-Boadu, *Empirical evidence for the "Great Resignation"*, Monthly Labor Review, U.S. Bureau of Labor Statistics (Nov. 2022), https://bit.ly/3H7fKju; Eduardo Rivera Greenwood, *Workers are leaving.*

*What can you do about it?*, Deloitte (Oct. 5, 2022), https://bit.ly/3UKP1MC.

Professional and business services firm resignations spiked during the Great Resignation. Bureau of Labor Statistics data show that approximately 3.4 million workers in that industry quit their jobs in just the five months between May and September of 2021—representing 17% of the 20 million Americans who resigned during that time period. *See* Sam Cook, *The Professional Services Industry Is Leading The Office Worker Revolt*, MentorcliQ (Dec. 1, 2021), https://bit.ly/46ynxRC.

This turnover is tremendously costly to businesses. Generally, a "conservative estimate" of the cost to replace a departing worker is "one-half to two times the employee's annual salary." Shane McFeely & Ben Wigert, *This Fixable Problem Costs U.S. Businesses $1 Trillion*, Gallup (Mar. 13, 2019), https://bit.ly/4lQB0cc. These costs can be even greater for client-focused professional services firms, where financial advisors and similar workers maintain and cultivate client relationships, and those clients may follow their advisors to a new firm. *See, e.g., Merrill Lynch, Pierce, Fermer &. Smith, Inc. v. Brennan*, 2007 WL 632904, at *2 (N.D. Ohio Feb. 23, 2007) (noting the "fluid nature" of the financial

13

services industry, where "brokers routinely switch firms and take their client lists with them").

Indeed, the employees who are most successful at developing extensive client networks are often the target of competition among firms, with businesses offering "eye-popping bonuses to woo talent." Mason Braswell, *Recruiting Bonuses for Top Producers Flirt with 400%, Hitting Fresh Highs*, AdvisorHub (Sept. 21, 2022), https://bit.ly/4ldIULN (reporting that signing bonuses for brokers can reach up to four times the broker's prior 12-month revenue).

To address this problem, employers have adopted a variety of incentive compensation arrangements—like the one at issue here—designed to promote employee loyalty and longevity. *See, e.g.*, Andreas Stuermann, *Employers, Are You Ready For The Great Resignation? Actionable Ideas To Recruit, Retain, And Reward Key Talent*, Stuermann Consulting (Feb. 2022), https://bit.ly/3HaZ3Ue. Among the most common and effective features of such arrangements is the use of mandatory vesting periods—like those in Merrill Lynch's programs—requiring employees to remain at the firm for a certain period of time in good standing prior to receiving an award of additional cash or equity. *See*

*generally* J.P. Morgan, *A Quick Guide to Long Term Incentive Plans (LTIPs)* (Mar. 13, 2024), https://bit.ly/4ooIrcv; *Long-term incentive plans: A comprehensive guide for HR*, Rippling (Dec. 12, 2024), https://bit.ly/4mra1E8.

Employers across a variety of industries use these arrangements "to further enhance retention." Pearl Meyer, *Looking Ahead to Executive Pay Practices in 2024*, at 7, https://bit.ly/46DPQOz (reporting that nearly 20% of responding employers that offer long-term incentive arrangements increased participation levels in those arrangements in 2023). And employers are increasingly starting to offer long-term incentive awards to employees below the executive level. *See, e.g.*, J.P. Morgan, *supra* (53% of publicly traded companies reported granting long-term incentive awards to employees below the vice president level) (citing Pearl Meyer, *supra*); *see also* Bartek Podolski, *Ask an Advisor: What is a long-term incentive plan and how can it help us?*, EBN (July 15, 2022), https://bit.ly/4m04qVx (similarly noting that "[m]any companies are starting to offer [LTIPs] to employees below the executive level").[2]

---

[2] Because employers are increasingly offering deferred compensation arrangements to employees other than executives and senior management, ERISA's separate exclusion of "top hat" plans from the

Finally, long-term incentive and deferred incentive compensation arrangements not only reward loyalty and good conduct, but also discourage misconduct by imposing real consequences in the form of cancelled incentive awards. Indeed, financial regulators have exercised their statutory mandate under Section 956 of the Dodd-Frank Act to direct regulated firms to use multi-year vesting periods and subject incentive awards to cancellation to deter and penalize excessive risk-taking and other harmful behaviors. *See* 12 U.S.C. § 5641 (requiring federal regulators to "prescribe regulations or guidelines" prohibiting incentive-based payment arrangements "that the regulators determine encourage[] inappropriate risks by covered financial institutions").

As all of this background shows, incentive programs like the one at issue here manifestly are not established to provide post-employment income of any sort. Far from it; their goal is to shape behavior and provide rewards for current employees. Such payments cannot reasonably be

---

vesting requirements imposed by ERISA, 29 U.S.C. § 1101(a)(1), is no solution to Plaintiff's overbroad reading of the statute. Top hat plans must be maintained "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" (*id.*), rather than a broader set of the employer's workforce.

characterized as pension benefits, even if made, in rare cases, after employment terminates.

### D.    Adopting Plaintiff's Overbroad Reading Of ERISA Would Harm Employers And Employees Alike.

Plaintiff's theory is worse than legally wrong: if adopted, it would have enormously destructive practical consequences, harming both employers and employees.

To begin, that approach, if valid, certainly would encourage a wave of litigation against employers in all sectors of the economy that use long-term incentive or deferred incentive compensation arrangements.[3] ERISA establishes strict vesting and anti-forfeiture rules for pension plans covered by the statute that may impose enormous liability on

---

[3] This is a familiar game of whack-a-mole, as specialized ERISA plaintiffs' firms invoke theories of liability that challenge well-established legal understandings and seek to push the boundaries of employer liability under the statute. For example, since the fall of 2023 the ERISA plaintiffs' bar has filed a wave of lawsuits asserting the "novel theory" that employers are violating ERISA when they use 401(k) plan forfeitures—employer contributions that participants forfeit when they leave the plan before those contributions vest—to offset future employer contributions. Deborah S. Davidson et al., *A Chubb Special Report: A Primer on 401(k) Forfeiture Litigation*, Chubb (Oct. 2024), https://bit.ly/3Hf0fpx. The reason these lawsuits are "novel" is because the Internal Revenue Service has allowed such practices for years, and employers have incorporated that guidance into their plan documents, which they must follow. *See id.* at 1-2.

17

employers for nonpayment of benefits. *See*, *e.g.*, 29 U.S.C. §§ 1132(a) (ERISA rights of action), 1132(g) (availability of attorneys' fees), 1053 (pension plan vesting requirements); 29 C.F.R. §§ 2530.203, 2530.204 (pension vesting and accrual requirements). Plaintiff here invokes just these provisions. The prospect of substantial liability for claims based on alleged violations of these provisions means that, if this case succeeds, many others will follow with copycat claims. It requires no wild speculation to anticipate this outcome; indeed, the plaintiffs' firm leading this case also advanced a virtually identical suit against Morgan Stanley, which is now in arbitration. *See Shafer v. Morgan Stanley*, No. 24-3141(L) (2d Cir. July 9, 2025) (dismissing appeal from decision compelling arbitration for lack of jurisdiction).

And if their theory succeeds, these plaintiffs' firms will have no reason to stop with the financial services industry. It is not difficult for a single firm or set of firms to bring dozens of cookie-cutter lawsuits—that is already par for the course in ERISA litigation. An attorney need only identify a theory that applies to a large number of employers before blanketing the country with a series of similar complaints to see which ones gain traction. *See* note 3, *supra*.

Defending against such lawsuits challenging commonplace and useful compensation arrangements would impose substantial costs on employers in virtually all cases and sometimes would extract strike-suit settlements, as the prospect of "asymmetric" discovery for defendants in ERISA actions comes at an "ominous" price, entailing "probing and costly inquiries." *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 719 (2d Cir. 2013). But the harmful consequences of this increase in costs would not be limited to employers. Businesses would pass these costs on to customers in the form of higher prices or less attractive service offerings, and to employees in the form of reduced compensation.

Relatedly, if this Court were to embrace Plaintiff's proposed departure from nearly fifty years of case law and regulatory guidance on the meaning of an ERISA pension plan, that change in the law would undermine employers' settled expectations and introduce substantial uncertainty. Consistent application of the statutory text and regulatory exemptions is critical to give employers clear guidance about what legal regimes apply to their compensation arrangements and to allow them to structure their arrangements accordingly.

That uncertainty, and the prospect of burdensome and costly ERISA litigation, might cause many employers to stop offering long-term incentive or deferred incentive compensation arrangements altogether. That would injure employers because they would lose a valuable tool with which to retain employees and discourage misconduct. And it would harm employees who would be denied the opportunity to reap rewards for their long-term contributions to their employer.

This prospect would be especially problematic in the securities and financial services context, where regulators expect that firms will use cancellable incentive compensation subject to multi-year vesting periods as a tool for discouraging employee misconduct. *See* pages 15-16, *supra*. In these circumstances, Plaintiff's theory might impose ERISA liability on businesses that adopt and implement incentive compensation arrangements favored by regulators, subjecting employers to intolerably conflicting incentives.

And at minimum, employers in all industries would be forced to offer deferred incentive compensation on much less attractive and flexible terms. For example, to avoid making even very occasional payments to former employees (and thus having their incentive program

treated as an ERISA pension plan), employers would be forced to jettison common-sense exceptions that allow for limited post-employment payments, instead imposing a strict rule cancelling *all* deferred incentive compensation awards the moment an employee no longer works for the employer—even when termination is due to death, disability, or layoff. That harsh and inequitable result would turn ERISA's employee-protection policy on its head. Congress could not have intended that incongruous result.

## CONCLUSION

The Court should affirm the judgment below.

Dated:  August 4, 2025

JANET GALERIA
MARIEL A. BROOKINS
   *U.S Chamber Litigation*
   *Center*
   *1615 H Street NW*
   *Washington, DC 20062*

*Counsel for* Amicus Curiae
*The Chamber of Commerce of*
*the United States of America*

ANI HUANG
   *Center on Executive*
   *Compensation*
   *4075 Wilson Blvd*
   *Arlington, VA 22023*

*Counsel for* Amicus Curiae
*The Center on Executive*
*Compensation*

Respectfully submitted,

/s/ Andrew J. Pincus
ANDREW J. PINCUS
ARCHIS A. PARASHARAMI
CHARLES A. ROTHFELD
DANIEL E. JONES
   *Mayer Brown LLP*
   *1999 K Street NW*
   *Washington, DC 20006*
   *(202) 263-3000*

*Counsel for* Amici Curiae

22

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Cir. R. 29.1(c) because it contains 3,792 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Century Schoolbook 14-point type for text and footnotes.

Dated:      August 4, 2025

/s/ Andrew J. Pincus
Andrew J. Pincus