No. 25-1385

IN THE

# United States Court of Appeals for the Fourth Circuit

KELLY MILLIGAN, on behalf of himself and all others similarly situated,

*Plaintiff-Appellant*,

*v.*

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.; BANK OF AMERICA CORPORATION,

*Defendants-Appellees,*

JOHN/JANE DOE 1, the Senior Vice President-Human Resources Global Banking and Global Wealth and Investment Management Administration at Bank of America Corp.

*Defendant.*

On Appeal from the United States District Court for the Western District of North Carolina, No. 3:24-cv-00440, Hon. Kenneth D. Bell

**BRIEF OF THE SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

Michael Delikat
Alyssa Barnard-Yanni
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019
(212) 506-5000

Robert M. Loeb
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 339-8400

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1385__          Caption: __Milligan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Securities Industry and Financial Markets Association (SIFMA)__
(name of party/amicus)

_____

 who is _____Amicus_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?  ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
   If yes, identify all such owners:

i

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?     ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)     ☐YES ☐NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?     ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Robert M. Loeb                          Date:  August 4, 2025

Counsel for: Amicus SIFMA

Print to PDF for Filing

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF AUTHORITIES ...................................................................iv

INTEREST OF *AMICUS CURIAE* ......................................................... 1

INTRODUCTION ................................................................................... 2

ARGUMENT ......................................................................................... 3

    I.    Contingent Deferred Incentive-Based Compensation Programs Encourage Finance Executives And Employees To Prioritize Long-Term Performance Over Short-Term Gains. ............................................................... 3

    II.    Reversing The District Court Threatens Contingent Deferred Incentive-Based Compensation Programs Throughout The Financial Sector. ...................................... 10

CONCLUSION ..................................................................................... 15

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Statutes, Regulations and Rules**

15 U.S.C. § 7243(a) ..................................................................... 8

29 U.S.C. § 1002(2)(A)(ii) ..................................................... 11, 15

29 U.S.C. § 1053(a) .................................................................. 13

29 C.F.R. § 2510.3-2(c) ............................................................ 12

Fed. R. App. P. 29(a)(4)(E) ........................................................ 1

**Other Authorities**

Emilios Avgouleas & Jay Cullen, *Excessive Leverage and
     Bankers' Pay: Governance and Financial Stability Costs of
     a Symbiotic Relationship*, 21 Colum. J. Eur. L. 1 (2014)................6, 8

Bd. of Governors of the Fed. Reserve Sys., *Incentive
     Compensation Practices: A Report on the Horizontal
     Review of Practices at Large Banking Organizations*
     (2011), https://tinyurl.com/2p9vbdsk.................................7, 9

William C. Dudley, President, Fed. Rsrv. Bank of New York,
     Remarks at the Workshop on Reforming Culture and
     Behavior in the Financial Services Industry: Enhancing
     Financial Stability by Improving Culture in the Financial
     Services Industry (Oct. 20, 2014),
     https://tinyurl.com/2y3ybtce ..............................................8

Financial Stability Board, FSB Principles for Sound
     Compensation Practices: Implementation Standards
     (Sept. 25, 2009), https://tinyurl.com/yevxrymy ...................6

Guidance on Sound Incentive Compensation Policies, 75 Fed.
     Reg. 36,395 (June 25, 2010)...........................................4, 6

Hamid Mehran & Joseph Tracy, *Deferred Cash Compensation: Enhancing Stability in the Financial Services Industry*, 22 Econ. Pol'y Rev. 61 (Aug. 2016), https://tinyurl.com/3j2rzrha ........................................................ 9, 13

Incentive-Based Compensation Arrangements, 81 Fed. Reg. 37,670 (June 10, 2016) .................................................................. 7, 8

The Leaders' Statement: The Pittsburgh Summit September 24-25, 2009, https://tinyurl.com/4ae673j8 (last visited Jan. 27, 2025) ............................................................................... 5, 6

Lisa H. Nicholson, *Corporate Governance in the Financial Services Industry: Dodd-Frank Reforms to Banker Compensation Arrangements*, 47 Ind. L. Rev. 201 (2014) ............... 4, 5

Notice of Proposed Rulemaking, "Incentive-Based Compensation Arrangements," Office of the Comptroller of the Currency (May 6, 2024), https://bit.ly/40CKEqA ................. 7, 14

Senior Supervisors Grp., Risk Management Lessons from the Global Banking Crisis of 2008 (2009), https://tinyurl.com/mcmjdxdd .................................................. 5

## INTEREST OF *AMICUS CURIAE*[1]

The Securities Industry and Financial Markets Association (SIFMA) is the leading trade association for broker-dealers, investment banks, and asset managers operating in the United States and global capital markets. On behalf of industry members and their one million employees, SIFMA advocates on legislation, regulation, and business policy affecting retail and institutional investors, equity and fixed income markets, and related products and services. As relevant here, SIFMA and its members have a strong interest in ensuring that the regulatory structure of equity markets serves the interests of investors and that regulations affecting SIFMA's members are sound, fair, and administrable. SIFMA regularly files amicus briefs in important cases arising under and relating to the federal securities laws.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus* certifies that no counsel for a party authored the brief in whole or in part, and no person or entity other than *amicus* and its counsel made a monetary contribution intended to fund the preparation or submission of the brief. All parties have consented to the filing of this brief.

## INTRODUCTION

Employers often structure their compensation programs to vest incentive-based compensation at some later point, contingent on the employee meeting specified criteria in the interim. This form of compensation program, frequently called a deferred incentive-based compensation program, is common in many industries and has become ubiquitous in the financial sector because it incentivizes long-term performance over short-term gains.  U.S. financial regulators have long encouraged such incentive-based compensation programs for this very purpose.

The reason such programs are effective at aligning risk in the financial sector is that they allow institutions to make their employees' variable incentive-based compensation contingent on performance over a longer time horizon—and do not require payment of incentive-based compensation when the conditions of vesting are not met.  That very feature, however, is what would make this valuable tool incompatible with the anti-forfeiture provision applicable to ERISA employee pension benefit plans—if contingent deferred incentive-based compensation programs were ERISA employee pension benefit plans.  Fortunately,

this compensation structure, as exemplified Merrill Lynch's long-term contingent award plan, is plainly *not* an ERISA employee pension benefit plan—as the court below agreed and the vast majority of courts to consider the question have found.  This Court should affirm.  A contrary decision would have an outsized and destabilizing effect on the entire financial sector, creating a cloud of uncertainty over the status of deferred compensation programs for structuring contingent incentive-based compensation.  If the Court holds that ERISA applies to contingent variable incentive-based compensation programs, financial institutions will find themselves in an impossible position—forced to choose between financial regulators' crystal-clear guidance to maintain such programs on the one hand, and this Court's interpretation of their obligations under ERISA on the other.

## ARGUMENT

I. **Contingent Deferred Incentive-Based Compensation Programs Encourage Finance Executives And Employees To Prioritize Long-Term Performance Over Short-Term Gains.**

After the 2008 global financial crisis, "[d]isgruntled shareholders and the general public began to express concern that executive pay and corporate performance [were] misaligned," citing the fact that "the top

executives at many of the [affected] financial institutions made money despite the fact that their companies suffered huge losses." Lisa H. Nicholson, *Corporate Governance in the Financial Services Industry: Dodd-Frank Reforms to Banker Compensation Arrangements*, 47 Ind. L. Rev. 201, 204 (2014). One particular concern was that "compensation policies at many of the large financial institutions often rewarded short-term gains in an environment of intense competition for talented professionals and eager investors instead of consideration of the long-term consequences of the entities['] trading activities." *Id*. at 201. Studying this problem in the immediate aftermath of the financial crisis, federal regulators likewise concluded that "[f]lawed incentive compensation practices in the financial industry were one of many factors contributing to the financial crisis that began in 2007." Guidance on Sound Incentive Compensation Policies, 75 Fed. Reg. 36,395, 36,396 (June 25, 2010).

This observation was not limited to the United States. The question of how to optimize incentive-based compensation policies at financial institutions to align employee incentives with long-term financial health received significant attention at the 2009 G20 summit,

with world leaders agreeing "to implement strong international compensation standards aimed at ending practices that lead to excessive risk-taking." The Leaders' Statement: The Pittsburgh Summit September 24-25, 2009, https://tinyurl.com/4ae673j8 (last visited Jul. 29, 2025). "The G-20 proposals were supported," among other things, "by a 2009 study of 20 global financial institutions by a group of senior financial supervisors from seven countries including the United States … which found that 'historical compensation arrangements evidenced both an insensitivity to risk and the skewed incentives to maximize revenues.'" Nicholson, *supra*, 47 Ind. L. Rev. at 228 (quoting Senior Supervisors Grp., Risk Management Lessons from the Global Banking Crisis of 2008 at 4 (2009), https://tinyurl.com/mcmjdxdd).

When identifying *solutions* to the widely recognized misaligned-incentives problem, one near-universal proposal came up repeatedly: contingent deferred incentive-based compensation.[2]   The U.S.

---

[2] The term "deferred" is used in a colloquial sense to describe these programs. Under the compensation programs, there is no right to the potential unvested future payments unless the specific contingencies are satisfied.

Department of the Treasury issued non-binding compensation guidelines advising that "incentive compensation arrangements for senior executives at [large banking organizations] are likely to be better balanced if they involve deferral of a substantial portion of the executives' incentive compensation over a multi-year period."  75 Fed. Reg. at 36,410.  The G20 similarly endorsed "requiring a significant portion of variable compensation to be deferred."  The Leaders' Statement at 9, *supra*; *see also* Financial Stability Board, FSB Principles for Sound Compensation Practices: Implementation Standards ¶ 6 (Sept. 25, 2009), https://tinyurl.com/yevxrymy (body created by the 2009 G20 summit recommending that "a substantial portion of variable compensation" be deferred "[f]or senior executives" and "other employees whose actions have a material impact on the risk exposure of the firm").  Indeed, the European Union "*mandates* the deferral of variable remuneration."  Emilios Avgouleas & Jay Cullen, *Excessive Leverage and Bankers' Pay: Governance and Financial*

*Stability Costs of a Symbiotic Relationship*, 21 Colum. J. Eur. L. 1, 11 n.62 (2014) (emphasis added).[3]

The contingent deferral of variable incentive-based compensation has proven such an attractive tool for aligning risk incentives precisely because such compensation can be reduced or rescinded over time.  As the Federal Reserve has explained, "[i]f payout of a portion of incentive compensation awards is deferred for a period of time … late-arriving information about risk taking and outcomes of such risk taking can be used to alter the payouts in ways that will improve the balance of risk-taking incentives."  Bd. of Governors of the Fed. Reserve Sys., *Incentive Compensation Practices: A Report on the Horizontal Review of Practices at Large Banking Organizations* 6 (2011), https://tinyurl.com/2p9vbdsk; *see also id*. at 15 (such a compensation structure allows "adjusting the payout for actual losses or other aspects of the employee's performance

---

[3] U.S. regulators have several times proposed rules like those in the European Union that would require contingent deferral of incentive-based compensation for certain large financial institutions.  *See, e.g.*, Incentive-Based Compensation Arrangements, 81 Fed. Reg. 37,670 (June 10, 2016); Notice of Proposed Rulemaking, "Incentive-Based Compensation Arrangements," Office of the Comptroller of the Currency (May 6, 2024), https://bit.ly/40CKEqA.  So far, no such final rule has been promulgated.

that are realized or become better known only during the deferral period"); Incentive-Based Compensation Arrangements, 81 Fed. Reg. 37,670, 37,681 (June 10, 2016) (proposed rule on contingent deferred incentive-based compensation explaining it works by "reduc[ing] … the amount of deferred incentive-based compensation … that has not vested" based on certain "adverse outcomes," like "[i]nappropriate risk-taking").[4]  In short, an employer's ability to adjust the amount of variable incentive-based compensation over a longer time horizon by making payment contingent on performance in the interim is what "provides long-term incentives" in the financial sector to prioritize long-term performance over short-term gains.  Avgouleas & Cullen, *supra*, 21 Colum. J. Eur. L. at 11; *see also* William C. Dudley, President, Fed.

---

[4] Note that contingent deferred incentive-based compensation is distinct from a clawback.  Contingent deferred compensation programs place conditions on an incentive-based compensation award that prevent it from vesting at all unless the specified contingencies are satisfied.  In contrast, "the term 'clawback' refers to a mechanism by which [an] institution can recover *vested* incentive-based compensation … if certain events occur."  81 Fed. Reg. at 37,681 (emphasis added). For example, the Sarbanes-Oxley Act of 2002 created a clawback system requiring certain executives to reimburse their employers for "any bonus or other incentive-based or equity-based compensation *received* … during [a] 12-month period" following certain "misconduct" in connection "with any financial reporting requirement under the securities laws." 15 U.S.C. § 7243(a) (emphasis added).

Reserve Bank of New York, Remarks at the Workshop on Reforming Culture and Behavior in the Financial Services Industry: Enhancing Financial Stability by Improving Culture in the Financial Services Industry (Oct. 20, 2014), https://tinyurl.com/2y3ybtce (contingent deferred incentive-based compensation requires employees "to more fully internalize the consequences of their actions"). And indeed, extensive academic "research suggests that deferred debt-like compensation reduces incentives for risk taking and risk shifting." Hamid Mehran & Joseph Tracy, *Deferred Cash Compensation: Enhancing Stability in the Financial Services Industry*, 22 Econ. Policy Rev. 61, 67 (Aug. 2016), https://tinyurl.com/3j2rzrha (collecting studies).

For all of these reasons, contingent deferred incentive-based compensation programs are ubiquitous in the finance sector. Even before the 2008 global financial crisis, contingent deferred compensation was "fairly common", both in the financial sector and in other industries too. Fed. Reserve, *Incentive Compensation Practices, supra*, at 2. Now, however, "[a]lmost all" large financial institutions use some form of contingent deferred compensation allowing them to "adjust downward the amount of deferred incentive compensation" in

certain circumstances. *See id*.; *see also id*. at 1 n.1 (listing large financial institutions evaluated). Such compensation may include cash, stock, or both. *E.g.*, *id*. at 15. Because such contingent awards do not vest until after passage of a set period of time (often a number of years), *see id*.; RB12-15, employees who leave their employment *before* the award vests are generally not entitled to payment of the award upon their departure. That core feature of contingent deferred incentive-based compensation is at the heart of the present dispute: Appellant sued because he was not paid his unvested compensation when he left Merrill Lynch. OB11.

## II.  Reversing The District Court Threatens Contingent Deferred Incentive-Based Compensation Programs Throughout The Financial Sector.

As Appellees Merrill Lynch and Bank of America have explained in detail in their response brief, the district court was correct to conclude that their long-term contingent award plan was not an "employee pension benefit plan" subject to ERISA's anti-forfeiture rule. RB22-51. In short, the statute is clear that an employee pension benefit plan is established, as relevant here, where a "plan, fund, or program ... by its express terms or as a result of surrounding circumstances ...

results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(ii). That is to say, the hallmark of an employee pension benefit plan is providing benefits for the end of employment. RB23-33. Given their risk-aligning purpose, *supra* at 3-10, what contingent deferred incentive-based compensation programs defer is the *vesting* of the right to variable incentive-based compensation; they do not defer payment of income to which an employee is presently entitled. RB34-37. Moreover, such programs do not involve any deferral of income "*by employees*." 29 U.S.C. § 1002(2)(A)(ii) (emphasis added). That is because employers set the vesting conditions, including the applicable time period before an employer earns contingent deferred incentive-based compensation. RB12-15.

The validly promulgated regulations expounding the undefined terms "retirement income" and "deferral of income" reaffirm that contingent deferred incentive-based compensation programs are not ERISA pension benefit plans. RB46-51, "[T]he term[] … 'pension plan' shall not include payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are

systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c). As courts and regulators have consistently concluded, contingent deferred incentive-based compensation in the financial industry constitutes a "bonus" within the meaning of this regulation. RB39-43. And the foregoing discussion makes clear that such programs, although their contingent vesting is deferred by some period of years to allow for a longer time horizon to assess performance, are not *systematically* deferred to termination; to the contrary, if employees leave employment before the contingent deferred award has vested, they are generally *not* entitled to payment, subject to limited exceptions. *Supra* § I.

Reversing the district court and holding that contingent deferred incentive-based compensation programs *are* employee pension benefit plans subject to ERISA's anti-forfeiture rule would threaten more than a decade of progress in better aligning financial-sector compensation with the long-term health of financial institutions—and indeed the long-term health of the economy writ large. As discussed above, the reason contingent deferred incentive-based compensation "reduces

incentives for risk taking and risk shifting," Mehran & Tracy, *supra*, 22 Econ. Policy Rev. at 67, is that such compensation, because its vesting is contingent, can be adjusted downward if a longer time horizon yields a different assessment of an employee's performance. *Supra* at 7-10. That kind of adjustment, however, is not permitted in the context of an ERISA employee pension benefit plan. *See* 29 U.S.C. § 1053(a) (requiring that "pension plan" benefits be "nonforfeitable"). Thus, reversal would place in jeopardy the purpose and very essence of contingent deferred incentive-based compensation programs throughout the financial sector.

The threat is particularly acute here because, while extensive district court precedent holds that contingent deferred incentive-based compensation programs are *not* employee pension benefit plans under ERISA, *see* OB4, few federal courts of appeals have squarely addressed the question presented here. As a result, this Court's decision will reverberate well beyond the Fourth Circuit; as this case itself illustrates, employees seeking to challenge reductions or forfeitures of deferred compensation would undoubtedly present this Court's decision in district courts (and arbitration proceedings) throughout the country

in support of their challenges. OB33-37 (citing out-of-circuit decisions, including dicta from the Southern District of New York, in support of their challenge below). For that reason, an adverse decision will likely force financial institutions to change or even eliminate their contingent deferred compensation programs throughout the country.

Such changes will harm not just the systemic health of the financial sector, *supra* at 12-13, but executives and employees themselves. For example, an issue of particular focus here is Merrill Lynch's exceptions to cancellation of its long-term contingent award plan: If an employee leaves employment due to death, disability, or retirement, their contingent compensation award may vest notwithstanding their departure in certain circumstances. OB8 & n.4; RB14-16. These exceptions account for only between 6% and 9% of financial advisors receiving payments through Merrill Lynch's deferred incentive-based compensation plan in a given year. RB16. Not only are such exceptions commonplace, but they have even been endorsed by regulators—particularly the humanitarian exceptions for death and disability. *See, e.g.*, Notice of Proposed Rulemaking, "Incentive-Based Compensation Arrangements," *supra* (permitting the acceleration of

14

vesting to pay deferred incentive-based compensation "in the case of death or disability").  But these types of exceptions are what is alleged to bring Merrill Lynch's long-term contingent award plan within the scope of ERISA. OB8-19 & n.4, 14-15.  If this Court reverses, financial institutions may face pressure to eliminate *all* exceptions to contingent deferred compensation cancellation, including humanitarian exceptions, to ensure that payments are *never* deferred to "periods extending to the termination of covered employment or beyond."  29 U.S.C. § 1002(2)(A)(ii).  Such changes would deprive employees of substantial benefits without advancing the purposes of ERISA or protecting retirement income one iota.

## CONCLUSION

The Court should affirm the judgment of the district court. A contrary decision would create destabilizing effects threatening contingent deferred compensation programs throughout the financial

sector, depriving the investing public of the significant systemic benefits such programs provide.

Respectfully submitted,

/s/ Robert M. Loeb

| | |
|---|---|
| Michael Delikat | Robert M. Loeb |
| Alyssa Barnard-Yanni | ORRICK, HERRINGTON & |
| ORRICK, HERRINGTON & | SUTCLIFFE LLP |
| SUTCLIFFE LLP | 2100 Pennsylvania Ave., NW |
| 51 West 52nd Street | Washington, DC 20037 |
| New York, NY  10019 | (202) 339-8400 |
| (212) 506-5000 | |

*Counsel for Amicus Curiae*

August 4, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 2,655 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robert M. Loeb*
Robert M. Loeb
*Counsel for Amicus Curiae*